No: 25-1392 and 25-5468

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KYLE JOHNSON,

      Plaintiff-Appellee

      v.

JAMES ADGAR,

      Defendant-Appellant

NO.  25-1392 and 25-5468
Consolidated

D.C. No: 5:21-cv-01849-BLF
Northern District of California,
San Jose Division

**Appellant's Excerpts of Record**

**Volume 1 of 3**

On Appeal from the United States District Court
for the Northern District of California (San Jose)
No. 5:21-cv-01849-BLF
Hon. Beth Labson Freeman

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
MALGORZATA LASKOWSKA, Senior Deputy City Attorney (187252)
BRIAN P. EGGLESTON, Senior Deputy City Attorney (289309)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Margo.Laskowska@sanjoseca.gov;
Brian.Eggleston@sanjoseca.gov

Attorneys for James Adgar

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants. | Case No.  5:21-cv-01849-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW; AND GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>[Re:  Dkt. Nos. 263, 267] |

Following the murder of George Floyd by former Minneapolis police officer Derek Chauvin, Plaintiff Kyle Johnson took part in a protest in the City of San Jose on May 30, 2020.  At that protest, Mr. Johnson was struck in the back of the leg by a police projectile, causing trauma to his leg and ultimately leading to a pulmonary embolism.  Mr. Johnson brought this suit to recover for his injuries, alleging that his constitutional, statutory, and common law rights were violated by Defendants City of San Jose and San Jose Police Officer James Adgar.  The suit went to trial in January 2025.  Following deliberations, the jury returned a verdict for Mr. Johnson and against Officer Adgar, awarding Mr. Johnson damages in the amount of approximately $1.4 million.  The jury found no liability against the City of San Jose.

Now before the Court are the Parties' post-trial motions.  Plaintiff filed a Motion for Attorneys' Fees and Costs, Dkt. No. 263 ("Fee Mot."), and Defendants filed a Motion for Judgment as a Matter of Law, Dkt. No. 267 ("JMOL Mot.").  Each motion was opposed, Dkt. Nos.

United States District Court<br>Northern District of California

273 ("Fee Opp."), 275 ("JMOL Opp."), and reply briefs were filed, Dkt. Nos. 280 ("Fee Reply"), 281 ("JMOL Reply").  The Court held a hearing on May 15, 2025, Dkt. No. 286, and requested supplemental materials related to the motion for attorneys' fees, Dkt. Nos. 287, 298.

For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Judgment as a Matter of Law and GRANTS IN PART Plaintiff's Motion for Attorneys' Fees and Costs.

## I.     BACKGROUND

As the facts in this case are well known to the Parties, the Court provides only an abbreviated recitation here.

Following widespread news coverage of the death of George Floyd in Minneapolis, San Jose saw multiple days of large protests.  The San Jose Police Department ("SJPD") responded to the protests, and SJPD officers used several types of weapons as part of that response, including 40mm and 37mm projectile impact weapons ("PIWs").  The 40mm PIW fires a foam baton with a 40-millimeter diameter and can be used to directly target individuals.

After hearing about the protests that occurred on May 29, 2020, Plaintiff Kyle Johnson decided to attend a protest at San Jose City Hall on the evening of May 30, 2020.  Defendant Officer James Adgar was working on a "skirmish line" at that protest.  Officer Adgar had been issued a 40mm PIW for use as needed while working the protests.  Mr. Johnson arrived at the City Hall protest by around 10:00 p.m. and stood with a crowd of demonstrators in front of City Hall, across from the SJPD skirmish line.  At around 10:24 p.m. and 10:33 p.m. on May 30, protestors threw volleys of water bottles and other objects at the police skirmish line, and the stationed police officers responded by firing PIWs.  Mr. Johnson was struck in the back of the leg by a 40mm PIW projectile following the 10:33 p.m. volley.  He was walking away from the police skirmish line at the time and had not thrown any objects toward the police skirmish line.  The projectile caused Mr. Johnson to limp and sit down on the ground.  He later developed significant bruising, which caused a blood clot that led to at least one pulmonary embolism.

Mr. Johnson filed this lawsuit in March 2021, initially asserting claims against the City of San Jose and Doe defendants.  Dkt. No. 1.  Six months later, he filed a First Amended Complaint

United States District Court
Northern District of California

2

against the City, Officer Adgar, and Doe defendants.  Dkt. No. 47.  Following motion to dismiss proceedings, Mr. Johnson filed a Second Amended Complaint, Dkt. No. 73 ("SAC"), asserting claims under 42 U.S.C. § 1983 against Officer Adgar and the City for violation of the Fourth Amendment for a seizure accomplished through excessive force and for violation of the First Amendment for retaliatory use of force.  *See id.* ¶¶ 68–82.  Mr. Johnson also asserted claims against Officer Adgar and the City for violation of the Bane Act, Cal. Civ. Code §§ 52.1, 52; battery; and negligence.  *Id.* ¶¶ 83–98.

After jury selection proceedings on January 3, 2025, trial commenced in this matter on January 6, 2025.  Dkt. Nos. 224, 232.  Presentation of evidence and closing arguments concluded on January 16, 2025, *see* Dkt. No. 241, and the jury returned its verdict on January 22, 2025, Dkt. Nos. 245, 246 (verdict form).  The jury found in favor of Kyle Johnson and against James Adgar on Mr. Johnson's Fourth Amendment claim, First Amendment claim, Bane Act claim, battery claim, and negligence claim.  Dkt. No. 246.  The jury found no liability against Defendant City of San Jose.  *See id.*  The Court entered Judgment on January 31, 2025.  Dkt. No. 260.  Plaintiff and Defendants then filed the present motions.

## II.    DISCUSSION

### A.  Motion for Judgment as a Matter of Law

#### 1.  Legal Standard

A district court may grant a motion for judgment as a matter of law pursuant to Rule 50(a) or (b) "when the evidence presented at trial permits only one reasonable conclusion," *i.e.*, "if no reasonable juror could find in the non-moving party's favor."  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (quoting *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002), and *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005)); *see also* Fed. R. Civ. P. 50(a)–(b).  "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party."  *Torres*, 548 F.3d at 1205–06 (quoting *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)).  "A jury's verdict must be upheld if it is supported by substantial evidence," meaning "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same

United States District Court
Northern District of California

3

evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

### 2.   Analysis

Defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on four claims—Plaintiff's Fourth Amendment claims for unlawful seizure and excessive force, his First Amendment claim, and his Bane Act claim—and for qualified immunity as to the three federal law claims as asserted against Officer Adgar.  JMOL Mot. at 1.  Having considered the Parties' arguments and the evidence at trial, the Court concludes that Defendants' request must be denied as to the Fourth Amendment claims, granted as to the First Amendment claim, and granted in part and denied in part as to the Bane Act claim.

### a.   Defendants' Preliminary Argument

Defendants first make an overarching argument that "this case was tried on the theory that Officer Adgar fired 'indiscriminately' into the crowd," JMOL Mot. at 3, yet Plaintiff's only evidence of this threshold issue was circumstantial and "completely consistent with Officer Adgar's attempting to hit a moving suspect and hitting Plaintiff by mistake," *id.* at 4.  In opposition, Plaintiff states that this argument "requires the Court to apply an incorrect legal standard and ignores other evidence presented at trial."  JMOL Opp. at 11.

It is true enough that Plaintiff relies on circumstantial evidence of his theory that Officer Adgar shot indiscriminately, but, as the jury was instructed at trial, "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence," so "[i]t is for [the jury] to decide how much weight to give" to either form of evidence.  Dkt. No. 242 at 25 (Jury Instruction No. 9).  More importantly, Plaintiff rightly points out that the question is not whether that evidence is *also* "consistent" with the defense theory.  The Court "may not make credibility determinations or weigh the evidence."  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citation omitted).  Instead, it "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor."  *Id.*

In this case, although Officer Adgar testified that he "saw someone throw something or in the process of throwing it" and targeted that person with his 40mm PIW, Trial Tr. Vol. 7 at 1323:6–11, the jury apparently did not find this statement credible.  The jurors spent a significant

4

ER0005

amount of time at trial viewing bodycam footage of the moments leading up to the shot that struck Mr. Johnson, *e.g.*, Trial Exs. 100A, 106A, 108A, 527, and they also viewed photo captures from the footage depicting where Mr. Johnson and the alleged suspect were standing in the moments leading up to Mr. Johnson's injury, Trial Exs. 440, 552A.  The jury was entitled to decide that Officer Adgar's testimony was not believable in light of all of the evidence at trial—including Mr. Johnson's competing testimony that there was no one in his vicinity throwing items toward the skirmish line, Trial Tr. Vol. 2 at 196:11–197:2.  Therefore, the Court concludes that substantial evidence supports the jury's conclusion that Office Adgar fired indiscriminately into the crowd of protestors.

### b.  Fourth Amendment Claims

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied."  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991), and *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)).  "[A]n unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act."  *Id.* (internal alterations and citations omitted).

The Supreme Court has also interpreted the Fourth Amendment to prevent the use of excessive force when the government conducts a seizure.  *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  A Fourth Amendment excessive force claim requires a showing of (1) a seizure, and (2) excessive force.  *Id.*  "[W]hether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted).

ER0006

A Fourth Amendment seizure claim—and thus also a Fourth Amendment excessive force claim—requires a showing that "the challenged conduct objectively manifests an intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). Defendants' arguments related to Plaintiff's Fourth Amendment claims boil down to this single key issue: whether there is a factual basis to support a finding that Officer Adgar had an intent to restrain. Defendants argue that "[t]he indiscriminate use of projectiles is irreconcilable with an intent to restrain an identifiable person," JMOL Mot. at 5–6, and, moreover, that "all SJPD officers responding to the protests were constrained by necessity from making arrests on . . . May 30" and therefore Officer Adgar could not have intended to restrain anyone when discharging his 40mm PIW, *id.* at 7. In response, Plaintiff argues that "the evidence presented at trial more than sufficiently shows that Adgar intended to fire his PIW" and that Mr. Johnson was "the undifferentiated object of the shot intentionally and indiscriminately fired." JMOL Opp. at 15. Plaintiff also argues that "[n]one of the cases on which Defendants rely hold that the intent to seize must be directed at a specific identified individual." *Id.* at 16.

The Court concludes that substantial evidence supports the jury's finding that Mr. Johnson was seized within the meaning of the Fourth Amendment. It is true, as Defendants state, that neither "[a]ccidental force" nor "force intentionally applied for some other purpose" will amount to a Fourth Amendment seizure. *Torres*, 592 U.S. at 317. But the Supreme Court in *Torres* specifically declined to "opine on matters not presented" such as the use of "pepper spray, flash-bang grenades, lasers, and more." *Id.* Instead, it simply emphasized that "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for [courts] rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* (emphasis in original). The Ninth Circuit has subsequently applied *Torres* in another case arising out of the San Jose George Floyd protests to conclude that, viewing the facts in the light most favorable to the plaintiff, "a reasonable factfinder could find that [an officer] objectively manifested an intent to restrain" when he used a 40mm PIW on the plaintiff, because that PIW "is chiefly designed, intended, and used for the purpose of incapacitating its target." *Sanderlin v. Dwyer*, 116 F.4th 905, 913 (9th Cir. 2024).

ER0007

United States District Court
Northern District of California

Contrary to Defendants' attempts to distinguish *Sanderlin*, the Court concludes that the same logic applies to Mr. Johnson's case despite his theory of indiscriminate shooting. In fact, the Ninth Circuit has already expressly explained that, first, "[f]or an act to be unintentional, the governmental conduct must lack the element of volition," and second, "an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012). The latter statement demonstrates why an "indiscriminate shooting" scenario is different from an "innocent bystander" scenario. *Cf. United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) ("[A]n innocent bystander struck by a stray bullet from the officer's weapon would not have [a Fourth Amendment] claim." (citing *Brower*, 489 U.S. at 596–97)). Whereas an innocent bystander is struck by accident when an officer intentionally targets a different person or persons, a theory of indiscriminate shooting is one in which the plaintiff asserts that an officer shot intentionally in a particular direction with "an absence of concern" about who might be hit.

Here, there is plenty of evidence that Officer Adgar's deployment of the 40mm PIW was intentional, *see, e.g.,* Trial Tr. Vol. 7 at 1317:18–1319:11—indeed, Defendants do not dispute that fact. And, as noted previously, *Nelson* demonstrates that a theory of "indiscriminate shooting" is *not* "irreconcilable" with the requirements for establishing a Fourth Amendment seizure. Quite the contrary, *Nelson* involved its own theory of indiscriminate shooting: there, officers fired pepperballs toward a group of partygoers congregated in a breezeway, and at least one officer provided testimony that they had been "instructed . . . to 'shoot at the crowd.'" *Nelson*, 685 F.3d at 872–877. On those facts, the Ninth Circuit concluded that the plaintiff was an "undifferentiated object[] of shots intentionally fired by the officers in that direction" and that he had been "intentionally seized under the Fourth Amendment." *Id.* at 877. Given that clear authority, Mr. Johnson's theory that Officer Adgar shot indiscriminately into the crowd of protestors does not undermine the jury's finding that he was seized.

Defendants also try to argue that the officers working the protests did not have the ability to arrest anyone and that the dispersal orders they issued are objective evidence that the projectiles were used only "defensively" and to encourage people to disperse. JMOL Mot. at 7–8. This

ER0008

argument also fails.  First, whether Officer Adgar *subjectively* intended to encourage the protesters to disperse because it was not practical for him to actually arrest anyone "is of no importance." *See Nelson*, 685 F.3d at 877.   And second, "[i]f conflicting inferences may be drawn from the facts, the case must go to the jury."  *Torres*, 548 F.3d at 1206.  Certainly, a jury could have considered the dispersal orders or the officers' inability to actually pursue any arrests as objective evidence going to the intent to restrain.  However, the Parties also presented a large volume of evidence pertaining to the 40mm PIW specifically, including, for example, a Duty Manual Revision dated May 22, 2020 regarding the use of Projectile Impact Weapons that clearly stated: "40mm Projectile Impact Weapons that do not contain chemical agents *may not be used for crowd control purposes*," Trial Ex. 155 at SJ404741 (emphasis added), and PIW training presentations stating that PIWs were "[t]o be used when objectively reasonable to incapacitate a suspect" or to "prevent any person from being seriously injured," Trial Ex. 211 at SJ411194.  Plaintiff's police practices expert and Lieutenant Lee Tassio also both offered testimony that the appropriate use of force as a police officer, including in the form of deploying a 40mm PIW, involves consideration of whether there is a crowd or individuals in the vicinity who might be at risk.  Trial Tr. Vol. 5 at 821:6–822:5, 942:21–948:8.

In short, it is far from true that "the evidence presented at trial permits only one reasonable conclusion," *i.e.*, that there was no objective intent to restrain.  Given that conflicting inferences could be drawn, the Court defers to the jury's conclusion that, by firing a PIW primarily intended for use to incapacitate a suspect at a distance, Officer Adgar objectively intended to restrain an undifferentiated member of the protest crowd.

Because the Court concludes that substantial evidence supported the jury's conclusion that Mr. Johnson was seized within the meaning of the Fourth Amendment, and because Defendants' only challenge to the findings on the excessive force claim is as to the seizure element, the Court concludes that Defendants' motion for judgment as a matter of law on Plaintiff's Fourth Amendment claims must be DENIED.

### c.   Qualified Immunity on the Fourth Amendment Claims

The next question is whether Officer Adgar is entitled to qualified immunity on Plaintiff's

United States District Court
Northern District of California

8

Fourth Amendment claims. "[G]overnment officials are entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Puente v. City of Phoenix*, 123 F.4th 1035, 1057 (9th Cir. 2024) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)) (internal quotations omitted). The second prong of the inquiry is met "when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)) (internal quotations omitted); *Wesby*, 583 U.S. at 63 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," such that it is "settled law."). The two prongs of the qualified immunity analysis may be addressed in either order. *Puente*, 123 F.4th at 1057.

### i.  Whether Mr. Johnson's Rights Were Violated

Defendants first argue that Officer Adgar did not violate Mr. Johnson's Fourth Amendment rights because his "use of force was objectively reasonable as a matter of law." JMOL Mot. at 11. Citing the recent Ninth Circuit case *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), Defendants say that "Officer Adgar's use of intermediate force was an objectively reasonable response to the public safety concern posed by the violent and unruly crowd" that Mr. Johnson was a part of, JMOL Mot. at 13, and thus that Mr. Johnson's constitutional rights were not violated by Officer Adgar's actions. Plaintiff responds that Defendants' argument improperly focuses on the evidence most favorable to Defendants' position, rather than applying the relevant standard on a motion for judgment as a matter of law. JMOL Opp. at 17–18. In addition, Plaintiff points out, *id.* at 19, that when "a jury has found (with reasonable support in the evidence) a constitutional violation by a police officer, [courts] view the jury's verdict as sufficient to deny him qualified immunity on the first prong of the analysis." *Est. of Aguirre v. Cnty. of Riverside*, 131 F.4th 702, 707 (9th Cir. 2025) (internal quotations omitted).

Defendants' argument on the first prong of the qualified immunity analysis fails. The most closely analogous portion of *Puente*, which is Defendants' primary authority, indicates that the force used on Mr. Johnson was *not* objectively reasonable as a matter of law. In *Puente*, the Ninth Circuit evaluated the excessive-force claims of three plaintiffs who had taken part in a protest at a

United States District Court
Northern District of California

9

presidential rally: Yedlin, Travis, and Guillen. 123 F.4th at 1056–62. For two of the three plaintiffs—Yedlin and Travis—the Ninth Circuit determined that the use of force against them was reasonable as a matter of law and that therefore neither of those plaintiffs' Fourth Amendment rights were violated. *Id.* at 1057–60.

Regarding Yedlin, the Ninth Circuit noted that the officers "had a very significant interest in avoiding any breach of the security fence separating the Free Speech Zone from the Public Safety Zone, because that would present an immediate and substantial threat to the safety of the officers, nearby members of the public, and potentially even the President's motorcade." *Id.* at 1058. Yedlin "posed an immediate threat to the [officers'] ability to maintain this boundary," because he had "return[ed] and vigorously [shaken] the fence just seconds after the [officers] had repelled an apparent attempt to breach it." *Id.* He was also "actually on notice of such a potential use of force." *Id.* Under those circumstances, the use of pepperballs fired in his direction was reasonable as a matter of law. *Id.* at 1058–59.

Regarding Travis, the Ninth Circuit observed that "Travis intentionally approached the moving skirmish line" in order to take pictures or video of the skirmish line. *Id.* at 1059. She "remained in the area in clear disregard of the repeated announcement that an unlawful assembly had been declared and after multiple orders to disperse had been issued" and "she placed herself between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers." *Id.* On those facts, the Ninth Circuit concluded that the use of an irritating chemical powder, pepper spray, and a police projectile on her was objectively reasonable, noting also that she was not seriously injured by any of those police tools. *Id.*

However, the Ninth Circuit concluded that there was a triable issue of fact regarding the reasonableness of the use of force against the third plaintiff, Guillen. *Id.* at 1061. The panel emphasized that, "in contrast to Travis's situation, the video evidence does not show any obviously unlawful or threatening conduct occurring in Guillen's immediate vicinity" prior to the use of force, "[n]or did Guillen engage in any personal conduct, as Yedlin had done, that itself presented a risk to public safety." *Id.* Guillen was also not disobeying orders. *Id.* Despite the fact that Guillen apparently did not pose any threat to public or officer safety, she was struck in the

10

"stomach and upper hip" with some kind of projectile, which caused her to bleed and rendered her unable to walk without assistance from a friend. *Id.* at 1060. Moreover, Guillen alleged that, as of the time of filing the lawsuit, "the range of movement in her leg ha[d] not fully returned, and that she now requires the use of an inhaler" due to the injuries sustained at the protest. *Id.* at 1061. The Ninth Circuit thus declined to find the officers' conduct as to Guillen objectively reasonable. *Id.*

The evidence presented regarding Mr. Johnson's conduct at the May 30 protest is most closely analogous to the evidence of Guillen's conduct. No evidence was presented suggesting that Mr. Johnson engaged in personal conduct that presented a risk to public safety. And while Defendants tried to establish that objects were thrown from the crowd in Mr. Johnson's vicinity, there was no evidence indicating that Mr. Johnson intentionally approached the officers in clear disregard of dispersal orders and placed himself between the skirmish line and any protestors throwing objects. Moreover, the evidence of objects being thrown from the area in which Mr. Johnson was standing is, at best, mixed. Defendants cite video footage showing that protestors were throwing water bottles and other objects as well as testimony from various witnesses that some protestors were engaging in such conduct. JMOL Mot. at 10 (citing, *e.g.*, Trial Exs. 527, 107). But the jury also heard testimony from Plaintiff's video forensic expert indicating that the location from which bottles were thrown was relatively far from Mr. Johnson's location at City Hall Plaza, Trial Tr. Vol. 3 at 413:14–416:1, 422:20–24, and they heard testimony from Mr. Johnson himself that he did not see anyone in his immediate vicinity throwing anything, *id.* at 335:19–336:16, Trial Tr. Vol. 2 at 196:14–197:2. The jury was entitled to credit this testimony and conclude that Mr. Johnson was not located near any other protestors who were behaving in an unruly or dangerous manner.

On a motion for judgment as a matter of law, the Court views the evidence "in the light most favorable to the nonmoving party," *Go Daddy Software*, 581 F.3d at 961, and may not substitute its own judgment for that of the jury where the jury's verdict is supported by substantial evidence. "[T]he jury's view of the facts," if supported, "must govern [the Court's] analysis once litigation has ended with a jury's verdict," *A.D. v. California Highway Patrol*, 712 F.3d 446, 457

ER0012

(9th Cir. 2013), and the Court concludes that substantial evidence supports the jury's verdict that Officer Adgar violated Mr. Johnson's federal constitutional rights under the Fourth Amendment.

### ii.   "Clearly Established" Law

The Court next considers the second prong of the qualified immunity analysis: whether the rights at issue, and the unlawfulness of Officer Adgar's conduct, were "clearly established" as of May 30, 2020.  Defendants argue—again relying on *Puente*—that they were not.  According to Defendants, the analysis in *Puente* suggests that the factual circumstances underlying Mr. Johnson's claims make his case "materially distinguishable" from the authority that Mr. Johnson relies upon to say that the unlawfulness of Officer Adgar's conduct was clearly established as of May 2020, which is *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  JMOL Mot. at 15. Specifically, Defendants argue that the Ninth Circuit's opinion in *Nelson* is only applicable to situations in which there is an "absence of exigency" involving public safety concerns, where the plaintiff was confined to a narrow and/or enclosed space, and where no verbal order to disperse had been given, and that those three circumstances are inapplicable to the protest at which Mr. Johnson was injured.  *Id.* at 16–17.

Plaintiff responds that Defendants' reliance on *Puente* to distinguish *Nelson* is misplaced, because *Puente* is a subsequent legal development that should not be considered for purposes of the qualified immunity analysis.  JMOL Opp. at 21–22 (citing *Sanderlin*, 116 F.4th at 916).  In any event, Plaintiff argues that *Puente* is distinguishable from this case "both procedurally and factually," because *Puente* was decided at the summary judgment stage and involved a protest crowd of thousands of people, some of whom were using "unidentified gas and pyrotechnic devices" causing "exigent" concerns to the public as well as the security of a President of the United States.  *Id.* at 23 (citing *Puente*, 123 F.4th at 1063).

The Court agrees with Plaintiff.  Neither Plaintiff nor Defendants may have the benefit of subsequent legal developments in determining whether the law was "clearly established" at the time of the conduct in question.  As the Ninth Circuit recently explained, "[a] subsequent legal development could narrow the scope of a once broader constitutional right or otherwise work a change into the legal framework," and "just as [courts] cannot reasonably expect an officer to

12

anticipate subsequent legal developments to render his actions unlawful . . . [courts] cannot presume that an officer acts with clairvoyance that precedent clearly defining a constitutional right may later be disturbed." *Sanderlin*, 116 F.4th at 916–17. Thus, while subsequent authority *may* be considered to discern whether the officer committed a constitutional violation, it *may not* be used "to argue that the right was not clearly established at the time he committed the violation." *Id.* at 917.

But even if Defendants could properly rely on *Puente*, their invocation of that case in favor of granting qualified immunity to Officer Adgar would fall flat. The Court again emphasizes that "[i]n evaluating a renewed qualified immunity motion under Rule 50(b) after a jury trial, [the Court] analyze[s] the motion based on the facts established at trial, viewing the evidence in the light most favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020) (citation omitted). Thus, as previously discussed, the evidence at trial indicates that Officer Adgar shot his 40mm PIW indiscriminately into a crowd of protestors who were not close in proximity to any individual throwing objects at the police skirmish line or otherwise engaging in unruly conduct. In other words, drawing all reasonable inferences in favor of Plaintiff, the facts underlying his case are closely analogous to those in *Nelson*: Mr. Johnson and those in proximity to him did not pose any safety risk, so there was no government interest in stopping disorderly behavior, and the general interest in dispersal is not sufficient to justify a use of force that could cause "serious and permanent injury to one or more individuals," 685 F.3d at 883—especially with the use of a 40mm projectile that officers are expressly prohibited from using for "crowd control." Defendants' characterization of the facts as involving "behavior that raised public safety concerns" in an area that "was not . . . a discretely separate zone" from where Plaintiff was standing, JMOL Mot. at 17, departs from the relevant standard of review on a motion for judgment as a matter of law by viewing the facts in the light most favorable to the movant—Defendants—and by declining to give appropriate deference to the jury's findings.

Because *Nelson* clearly established the unlawfulness of shooting a projectile weapon capable of causing serious and permanent injury indiscriminately into a group of protestors who

13

United States District Court
Northern District of California

did not pose an imminent risk to public safety, Officer Adgar is not entitled to qualified immunity from Mr. Johnson's Fourth Amendment claims.

### d. First Amendment Claim

Defendants next seek judgment as a matter of law on Plaintiff's First Amendment claim, which requires a showing "(1) that [Plaintiff] was engaged in a constitutionally protected activity; (2) that [the officer's] actions would 'chill a person of ordinary firmness from continuing to engage in the protected activity;' and (3) that 'the protected activity was a substantial or motivating factor in [the officer's] conduct.'" *Sanderlin*, 116 F.4th at 910–11 (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)).  Defendants argue that the evidence at trial was insufficient to support a finding that Mr. Johnson was engaged in constitutionally protected activity at the time he was struck by the police projectile and that the evidence at trial was insufficient to support a finding of a retaliatory motive that was a "but-for" cause of Plaintiff's injury.  JMOL Mot. at 18–23.  Plaintiff first responds that Defendants did not adequately preserve these arguments regarding the First Amendment claim when they made their Rule 50 motion at trial.  JMOL Opp. at 24.

This first argument in opposition to the motion is rejected.  Rule 50 is subject to a "liberal interpretation," such that "Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a)." *Go Daddy Software*, 581 F.3d at 961 (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)).  In making their Rule 50 motion at trial, Defendants did raise their argument that Plaintiff's evidence was insufficient to show a First Amendment violation, and a challenge to each of Plaintiff's constitutional claims was implicit in Defendants' *Monell* arguments, since the *Monell* claims were necessarily predicated on the underlying constitutional violations.  Accordingly, the Court concludes that Defendants sufficiently preserved their First Amendment arguments for purposes of the present motion.

Plaintiff goes on to argue that Defendants failed to present evidence at trial "that a dispersal order was given while Plaintiff was present at City Hall plaza on May 30, 2020," so Plaintiff's protest activity was constitutionally protected.  JMOL Opp. at 26.  The Court agrees with Plaintiff that substantial evidence supports the jury's finding that his conduct was

14

constitutionally protected.  It is true that protests that "are violent or pose a clear and present danger of imminent violence" may be lawfully dispersed.  *See Puente*, 123 F.4th at 1062 (quoting *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996)).  But consideration of "[w]hether a particular situation presents a clear and present danger of imminent lawlessness must be evaluated under an objective standard, rather than based on the subjective apprehensions of the officers," *id.* (citing *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017)), and the analysis is fact-specific, requiring assessment of "the tenor of the demonstration as a whole," *id.* (quoting *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)).

Defendants briefly and confidently assert that "the protest did indeed turn violent" to an extent that would support dispersal, JMOL Mot. at 19, pointing again to *Puente*.  But in *Puente*, where the Ninth Circuit concluded that "there were sufficient objectively reasonable grounds to establish the requisite 'clear and present danger' of an 'immediate threat to public safety, peace, or order,'" the panel expressly stated: "Whatever the outer boundaries of the 'clear and present danger' test may be, we think that circumstances involving the use of unidentified gas and pyrotechnic devices by agitators dispersed throughout a crowd, escalating violence toward the officers, an organized attempt to breach a police line, and the exigent concern of presidential security, falls within it." *Puente*, 123 F.4th at 1063.  The evidence before the jury in this case was very different.  Here, there was no evidence that a dispersal order was given while Plaintiff was present—or within a short time prior to his arrival—and the protest was generally peaceful, with most participants standing quietly or holding signs.  As Plaintiff points out, the San Jose City Hall protest on May 30, 2020 involved *thousands* fewer protestors than the protest at issue in *Puente*, and there was no evidence presented of "gas or pyrotechnic devices" or "an organized attempt to breach a police line."  A couple of volleys of thrown water bottles from a much smaller, much less unruly crowd paints a picture different enough that the question of whether the protest was constitutionally protected could properly go to the jury in this case, and the Court cannot overturn a jury determination that is supported by substantial evidence.  *See Torres*, 548 F.3d at 1205–06.  Here, the jury apparently disagreed that the protest turned violent to such an extent as would justify dispersal, and that conclusion is supported by substantial evidence.

United States District Court
Northern District of California

15

Finally, Plaintiff addresses Defendants' arguments about retaliatory motive by arguing that such animus "can be shown by direct or circumstantial evidence" and that, here, there are various pieces of circumstantial evidence indicating retaliatory motive. JMOL Opp. at 26–27. Specifically, the George Floyd protests involved "anti-police sentiment," Officer Adgar's use of the 40mm PIW was improper and not in compliance with the relevant standards, and Sergeant Jonathan Byers, who was the Sergeant to whom Officer Adgar reported on the evening of May 30, 2020, *see* Trial Tr. Vol. 7 at 1287:11–24, told officers to "let them have it" moments before Officer Adgar fired the projectile that struck Mr. Johnson, Trial Tr. Vol. 5 at 838:5–16; Trial Ex. 118c. Later in the evening, Sergeant Byers also asked officers on duty that night if "everyone [got] some love with the stun bag." Trial Tr. Vol. 5 at 839:10–16; Trial Ex. 118d.

Sergeant Byers's comment at the end of the night on May 30, 2020 is, to say the very least, extremely distasteful. However, "later-occurring conduct by individual officers, even if distasteful or immature, does not provide a sufficient basis for reasonably inferring" retaliatory intent at the time of the conduct in question. *See Puente*, 123 F.4th at 1063. And no evidence was presented to establish that Officer Adgar heard Sergeant Byers's order to "let them have it," so—to the extent that statement might be taken as an indication of retaliatory animus—there is not a sufficient basis to believe that Officer Adgar's conduct was motivated by or responsive to it.

Setting aside those two pieces of evidence, Plaintiff is relying on the facts that (1) there was "anti-police sentiment" at the protests, and (2) Officer Adgar shot his 40mm PIW indiscriminately into the crowd of protestors. The Court concludes that this circumstantial evidence is not enough to support the jury's finding that retaliatory animus was a "but-for cause" of Mr. Johnson's injury. As discussed in the preceding sections of this order, Officer Adgar's conduct was an excessive use of force. But, though unjustified, it was not random or utterly inexplicable—it closely followed the 10:33 p.m. volley of objects thrown at the line of officers. Plaintiff presented *no* other evidence of retaliatory animus on Officer Adgar's part. On these facts—and lack thereof—no reasonable jury could conclude that Officer Adgar's deployment of his 40mm PIW "was in fact subjectively motivated by antipathy to Plaintiff['s] political speech." *See Puente*, 123 F.4th at 1063. To find otherwise would mean that any time a police officer uses

United States District Court
Northern District of California

16

excessive force in a context where there is some anti-police sentiment, a presumption of retaliatory intent arises.  Imposing such a presumption goes too far, so the Court determines that the jury's finding of retaliatory animus by Officer Adgar is not supported by substantial evidence.  Defendants are entitled to judgment as a matter of law on the First Amendment retaliation claim.

Because the Court concludes that the evidence at trial was insufficient to support the jury's conclusion that Mr. Johnson's First Amendment rights were violated, the Court GRANTS Defendants' motion for judgment as a matter of law as to Plaintiff's First Amendment claim.

### e.   Bane Act Claim

Finally, Defendants move for judgment as a matter of law on Mr. Johnson's Bane Act claim.  The Bane Act bars interference "by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States."  Cal. Civ. Code § 52.1(b).  The claim requires a showing of "specific intent" to interfere with the right in question, which involves a two-part analysis: first, a purely legal determination of whether the "right at issue [is] clearly delineated and plainly applicable under the circumstances of the case," and second, a factual determination of whether "the defendant commit[ted] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by" the right.  *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 803 (2017), *as modified* (Nov. 17, 2017).  "Reckless disregard of the 'right at issue'" is sufficient to show specific intent under the Bane Act.  *Id.* at 804.

Defendants argue that Plaintiff's First and Fourth Amendment rights were not "clearly delineated" and that the evidence at trial "was insufficient as a matter of law to establish [that] [Officer] Adgar had a specific intent to interfere" with Plaintiff's rights.  JMOL Mot. at 23–24.  In response, Plaintiff argues that "the clearly delineated and plainly applicable standard is nowhere near as exacting as the clearly established law requirement" and that the jury's conclusion that Officer Adgar fired indiscriminately into a crowd of protestors supports a finding of "reckless disregard" for Plaintiff's rights.  JMOL Opp. at 30–31.

*Nelson* demonstrates that Plaintiff's Fourth Amendment rights were clearly delineated and plainly applicable on the facts of this case.  Particularly considering the closely analogous factual

United States District Court
Northern District of California

17

underpinnings of *Nelson* and this suit, the Court determines that there is not anything "vague or novel" about the application of Plaintiff's Fourth Amendment rights here. *Cf. Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 803). Moreover, the Court agrees with Plaintiff that the jury's conclusion that Officer Adgar fired indiscriminately at protestors who did not pose a safety risk also supports a finding of "reckless disregard" for the protesters' constitutional rights. Therefore, Defendants' motion for judgment as a matter of law on Plaintiff's Bane Act claim is DENIED insofar as it is based on the Fourth Amendment violations. However, because the Court concludes that the evidence was insufficient to support the jury's verdict on Plaintiff's First Amendment claim, Defendants' motion for judgment as a matter of law on Plaintiff's Bane Act claim is GRANTED insofar as it is based on the alleged First Amendment violation.

### B. Motion for Attorneys' Fees and Costs

#### 1. Legal Standard

Pursuant to 42 U.S.C. § 1988, "in federal civil rights actions the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." *Barnard v. Theobald*, 721 F.3d 1069, 1076–77 (9th Cir. 2013) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 426 (1983)). "Congress passed § 1988 'to attract competent counsel to prosecute civil rights cases.'" *Id.* (quoting *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008)). "Consequently, 'a court's discretion to deny fees under § 1988 is very narrow and . . . fee awards should be the rule rather than the exception.'" *Id.* (quoting *Mendez*, 540 F.3d at 1126). At the same time, "the district court must strike a balance between granting sufficient fees to attract qualified counsel to civil rights cases and avoiding a windfall to counsel." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (internal citations omitted).

"District courts must calculate awards for attorneys' fees using the 'lodestar' method, and the amount of that fee must be determined on the facts of each case." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)); *see also Hensley*, 461 U.S. at 429. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the

United States District Court
Northern District of California

18

litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016) (citation omitted). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. Once calculated, the lodestar amount, which is presumptively reasonable, may be further adjusted based on other factors not already subsumed in the initial lodestar calculation. *Morales v. City of San Rafael*, 96 F.3d 359, 363–64 & nn.8–9 (9th Cir. 1996) (identifying factors) (citing *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

### 2. Analysis

The Court will proceed as follows: First, the Court will determine the number of compensable hours requested by Plaintiff's counsel. Second, the Court will evaluate whether those hours are reasonable. Third, the Court will consider whether the hourly rates requested by Plaintiff's counsel are reasonable. Once the reasonable hours and reasonable rates are ascertained, the Court will use those values to arrive at the lodestar. Finally, the Court will consider whether any adjustment should be made to the lodestar for factors not considered in calculating the lodestar value.

### a. Prevailing Party and Compensated Claims

Under 42 U.S.C. § 1988, a "prevailing party" in a suit under 42 U.S.C. § 1983 may recover "a reasonable attorney's fee." 42 U.S.C. § 1988(b). "A plaintiff is considered a 'prevailing party' for purposes of § 1988 if the plaintiff 'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Herrington v. Cnty. of Sonoma*, 883 F.2d 739, 744 (9th Cir. 1989) (quoting *Hensley*, 461 U.S. at 433)). Counsel for Plaintiff argues that Plaintiff is the "prevailing party" under Section 1983 and the Bane Act. Fee Mot. at 8. Defendants do not dispute that Plaintiff is the prevailing party for purposes of Section 1988, but they argue that Plaintiff's requested fees are unreasonable for various reasons, including that Plaintiff did not prevail on all theories and claims at trial. Fee Opp. at 3–8.

When counsel seeks fees for both successful and unsuccessful claims, the Ninth Circuit instructs district courts to follow a two-part analysis. First, the court asks, "did the plaintiff fail to

United States District Court
Northern District of California

19

prevail on claims that were unrelated to the claims on which he succeeded?" *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1172 (9th Cir. 2019) (citing *Hensley*, 461 U.S. at 434). "[T]here is no certain method of determining when claims are 'related' or 'unrelated,'" *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 902–03 (9th Cir. 1995) (quoting *Hensley*, 461 U.S. at 437 n.12), but "[the] inquiry rests on whether the 'related claims involve a common core of facts *or* are based on related legal theories,'" with "the focus . . . on whether the claims arose out of a common course of conduct." *Ibrahim*, 912 F.3d at 1172 (emphasis in original) (citing *Webb v. Sloan*, 330 F.3d 1158, 1168–69 (9th Cir. 2003)). Where the Court finds that the claims are unrelated, "the final fee award may not include time expended on the unsuccessful claims." *Schwarz*, 73 F.3d at 901 (quoting *Thorne v. City of El Segundo,* 802 F.2d 1131, 1141 (9th Cir. 1986)).

"If it is impossible to isolate the truly unrelated claims from those related claims, the district court should instead reflect that limited success in *Hensley*'s second step: the significance of the overall relief in relation to the hours reasonably expended on the litigation." *Webb*, 330 F.3d at 1169 (citing *Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001)). "The second step of the *Hensley* analysis is to consider whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* at 1168 (quoting *Sorenson*, 239 F.3d at 1147). Fees must be reduced if "the plaintiff has obtained limited success on his pleaded claims, and the result does not confer a meaningful public benefit." *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009). To evaluate the "public benefit," courts should consider "whether the plaintiff has affected a change in policy or a deterrent to widespread civil rights violations" and may also consider "the public benefit of deterring unconstitutional conduct by law enforcement officials in determining the appropriate fee." *Id.* (internal citations omitted).

In this case, Plaintiff did not prevail on his *Monell* claims or on the California Public Records Act ("CPRA") claim asserted in his initial Complaint. In addition, as discussed above in the Court's Order on Defendants' Motion for Judgment as a Matter of Law, Plaintiff failed to produce sufficient evidence at trial to support a jury verdict in his favor on his First Amendment

ER0021

claim and the portion of the accompanying Bane Act claim predicated on an alleged First Amendment violation.  The question, therefore, is whether the Fourth Amendment claims on which he prevailed are "related" to the various claims on which he did not.

The Court finds that Plaintiff's unsuccessful *Monell* claims, First Amendment claim, and CPRA claim are not related to Plaintiff's successful Fourth Amendment claims.  While the Fourth Amendment violations sustained by Plaintiff form a predicate to the *Monell* claims and all reasonable hours devoted to proof of the predicate acts will be compensated, proof of the *Monell* claims separately required proof that the City had a "widespread or longstanding practice" of improperly using PIWs for crowd control.  These failed claims were therefore based on an entirely distinct legal theory and required Plaintiff to produce significant evidence of distinct facts, such as police conduct at other protests or at other times during the San Jose George Floyd protests when Plaintiff himself was not present.  Indeed, as defense counsel argues, Plaintiff's attorneys engaged in "extensive discovery" and presented testimony from a number of witnesses that "only related to the *Monell* issues" and did not bear at all upon the individual Fourth Amendment violations by Officer Adgar that harmed Plaintiff.  *See* Fee Opp. at 4–5.  Thus, the *Monell* claims did not arise out of a "common course of conduct" to the Fourth Amendment claims.  Likewise, the key facts and legal theories underlying Plaintiff's First Amendment claim required evidence of whether Officer Adgar had retaliatory intent—which was not an element of the Fourth Amendment claims. Plaintiff's First Amendment claim was "intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised,'" *Schwarz*, 73 F.3d at 903 (quoting *Thorne*, 802 F.2d at 1141), since the First Amendment claim aimed at remedying alleged retaliation for speech, while the Fourth Amendment claims aimed at remedying unjustified and unlawful uses of force.  Finally, Plaintiff's CPRA claim was based on an entirely separate set of facts and legal arguments; specifically, that Defendants wrongly failed to produce public records requested by Plaintiff.

Because these claims are unrelated to the claims on which Plaintiff prevailed, the final fee award will not include time expended purely on the *Monell*, First Amendment, or CPRA claims. The Court will award reasonable fees for the time spent on the successful, compensable Fourth

21

Amendment claims.  As such, the Court's next step must be to adjust Plaintiff's counsel's requested fee award hours to exclude those hours spent on the non-compensable claims.

### b.  Compensable Hours by Task Category

Plaintiff's attorneys seek fees for their time as follows:

| Attorney/Staff Member | Requested Billing Rate | Hours Billed | Total Fee |
|---|---|---|---|
| James McManis | $2000/hour | 84.8 | $169,600 |
| Abimael Bastida | $800/hour | 1090.3 | $872,240 |
| Matthew Schechter | $850/hour | 278 | $236,300 |
| Christine Peek | $850/hour | 579.2 | $492,320 |
| Priya Swaminathan | $800/hour | 338.5 | $270,800 |
| Tianqi Michael Sun | $550/hour | 885.3 | $486,915 |
| Galenstein Dang | $475/hour | 1079.7 | $512,857.50 |
| **TOTAL** | | 4335.8 | $3,041,032.50 |

*See* Dkt. No. 263-1 at 287.  The Court will first consider reductions for time spent on unrelated, unsuccessful claims and non-compensable state-law claims.  *See Schwarz*, 73 F.3d at 901.  The Court has used as its guide the chart submitted by Plaintiffs at Dkt. No. 263-1 at page 287.

### i.  Client Communication

The Court will not reduce any time spent on client communication.

### ii.  Complaint and Pre-Complaint Investigation

This category will be lightly reduced based on review of time records covering the period from July 16, 2020 to March 16, 2021, the date the initial Complaint was filed.  Entries showing work on the California Public Records Act claim will be eliminated.  Those reductions are described in regard to compensation for attorney Christine Peek's work.  No other reductions are necessary due to the reasonableness of the hours claimed for preparation of the Complaint.

### iii.  Motions

First, the Court notes that three motions to dismiss were briefed in this case, although one of those motions was terminated prior to argument.  Dkt. Nos. 27, 53, 74.  Plaintiff's briefing on the first motion to dismiss spent 13.5 of twenty-five pages, or 54 percent, on argument related to

United States District Court
Northern District of California

non-compensable claims (i.e., Plaintiff's unsuccessful and unrelated CPRA, First Amendment, and *Monell* claims, and Plaintiff's tort claims, for which attorneys' fees are not awarded).  *See* Dkt. No. 31 at 17–23, 26–33.  On the second motion to dismiss, Plaintiff spent fifteen of twenty-five pages, or 60 percent, on argument related to non-compensable claims.  *See* Dkt. No. 58 at 21–26, 28–36.  The third motion to dismiss more narrowly targeted Plaintiff's First Amendment retaliation claim and Plaintiff's *Monell* theories, so the entire brief was related to non-compensable claims.  *See* Dkt. No. 79.  Taking the average of the three motions to dismiss, then, 71 percent of the time was spent on non-compensable claims.

Next, the Court notes that there was one motion for summary judgment in this case, which was filed by Defendants.  Of twenty-five pages of briefing, Plaintiff spent a little over eleven—or 45 percent—on the *Monell* and First Amendment claims.  *See* Dkt. No. 128 at 20–32.  Therefore, the Court will reduce time spent on the motion for summary judgment by 45 percent.

Finally, the Parties briefed *Daubert* motions related to the testimony of Dr. Harlan Watkins and Roger Clark.  Dkt. Nos. 110, 112.  The Court will not reduce time spent on the *Daubert* motion related to Dr. Harlan Watkins, since the doctor's testimony pertained to Plaintiff's medical damages evidence.  However, Plaintiff's opposition to the *Daubert* motion related to the testimony of Roger Clark spent four of eight pages of argument, or 50 percent, on the *Monell* claims, so time spent on that motion will be reduced accordingly.  *See* Dkt. No. 130 at 5–9.

#### iv.  Case Management

The Court will not reduce any time spent on case management.

#### v.  Discovery

Plaintiff's counsel seeks compensation for 1,132.1 hours devoted to discovery.  Time spent in discovery on the First Amendment and *Monell* theories and other non-compensable claims is challenging to parse, as many of the billing entries are somewhat vague—for example, stating only that the biller reviewed documents produced in discovery.  Accordingly, the Court requested that the Parties provide various supplemental materials to guide the Court's assessment of how much of the time spent on discovery was compensable.  On July 2, 2025, the Parties submitted a Joint Discovery Chart that, among other things, identified the depositions taken in this matter and what

United States District Court
Northern District of California

ER0024

percentage of each deposition the respective sides asserted was related to the *Monell* claims only. Dkt. No. 296 ("Joint Discovery Chart"), Ex. A. at 1.  The Court informed the Parties that it would audit the deposition transcript for which the Parties' respective assessments of the proportion of time spent on the *Monell* issues was furthest apart, and would then credit all assessments made by whichever side (if either) was most accurate in its evaluation.  *See* Dkt. No. 289 at 79:23–80:5.

After receiving and reviewing the Parties' Joint Discovery Chart, the Court requested the Parties' further submission of the transcript from the deposition of Lee Tassio.  *See* Dkt. Nos. 298, 299, 300.  The Court reviewed the transcript and determined that Defendants were accurate in characterizing the deposition as 100 percent related to Plaintiff's *Monell* claims, as there was no specific questioning or discussion of Plaintiff Johnson, his injury, Officer Adgar's conduct, or specific events/incidents at the protest outside of San Jose City Hall on the night of May 30, 2020 in particular.  The Court therefore has accepted all of Defendants' assessments of non-compensable time and determines that no fees will be awarded for time spent on the depositions of the following individuals: Jason Dwyer, Chris Sciba, Lee Tassio, David Tindall, and Macedonio Zuniga.  Fees for time spent on the depositions of James Adgar and Roger Clark will be reduced by 10 percent, fees for time spent on the deposition of Jonathan Byers will be reduced by 65 percent, and fees for time spent on the deposition of Justin Palmer will be reduced by 30 percent. *See* Joint Discovery Chart, Ex. A at 1.

Finally, the Court notes that the billing entries related to discovery requests, discovery responses, and document review are largely impenetrable insofar as distinguishing the subject matter and/or claims involved, since most of those entries state descriptions along the lines of: "Review documents (document production)" or "Prepare document (written discovery requests)." In the Joint Discovery Chart, Defendants assert that 60.09 percent of the discovery requests sent by Plaintiff pertained to non-compensable claims.  Joint Discovery Chart at 7.  Meanwhile, Plaintiff asserts that only 27.9 percent of the discovery requests he sent pertain to non-compensable claims.  *Id.*  In other words, Plaintiff concedes that approximately 28 percent of discovery requests related only to the *Monell* theories.

Were it possible to review, line-by-line, the time that Plaintiff's attorneys spent on

United States District Court
Northern District of California

24

document discovery specifically geared toward the non-compensable claims, the Court would do so. However, as noted by Defendants' attorney fee auditor James P. Schratz, many of Plaintiff's counsels' document discovery entries are too vague to ascertain whether the time was spent on, for example, *Monell*-related documents or Fourth Amendment–related documents. *See* Dkt. No. 274, Declaration of James P. Schratz in Support of Defendant City of San Jose's Opposition to Plaintiff's Motion for Attorneys' Fees ("Schratz Decl.") ¶ 143 (listing numerous billing entries with descriptions like "Prepare documents (document production)" and "Review documents (document production)"). The Court is not inclined to reduce compensable time based upon the vagueness of the billing entries alone. But because it is impossible to separate out the discovery entries related to non-compensable claims, and recognizing some overlap in conducting discovery with regard to compensable claims, the Court will proportionally reduce time spent on document discovery based on an estimate of the fraction of time dedicated to the substance of those claims.

Having credited Defendants' assessment of the portion of non-compensable time spent on the deposition of Lee Tassio, the Court finds it likely that Defendants are also more accurate in their assessment that more than 60 percent of the time spent on document discovery was related to non-compensable claims. However, the Court recognizes the Parties' countervailing incentives in estimating the proportion of discovery time spent on unsuccessful claims and theories, and also understands that, at times, Defendants resisted discovery in ways that increased the number of hours reasonably necessary to litigate the case. *See* Dkt. No. 263-1, Declaration of Abimael Bastida in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Bastida Decl.") ¶¶ 11–12. In addition, the Court also credits Plaintiff's counsel's declaration that it took significant time to review the massive amount of bodycam footage produced in order to ascertain which officer's projectile struck Plaintiff, *id.* ¶ 6, as well as his declaration that counsel has already written off the hours billed by various timekeepers who left the firm or conducted only a small amount of work on the case, *id.* ¶ 29. Therefore, the Court concludes that the reasonable document discovery time spent on non-compensable claims is 45 percent. The Court believes that attributing 55 percent of discovery hours to compensable work will fairly compensate Plaintiff's counsel.

In response to a further request of the Court, Plaintiff has represented that the number of

United States District Court
Northern District of California

25

hours spent drafting and reviewing responses to the discovery requests listed in the Joint Discovery Chart for which fees are sought is 366.4, Dkt. No. 299, Ex. B, so that is the value that the Court will use to reduce time spent on document discovery.  Because the Court does not have a breakdown of precisely how much time was spent on document requests and document discovery by each member of the litigation team, the Court will use a blended billing rate, determined in the ensuing section related to reasonable hourly rates, to make this 164.9 hour reduction.

### vi.   Trial and Trial Preparation

Plaintiff's counsel requests compensation for 1,984.9 hours devoted to trial preparation. The Court will also reduce the time spent at trial and on trial preparation by a reasonable amount based on the preparation time dedicated to non-compensable claims.

*Motions* in Limine --- Two of Defendants' Motions *in Limine*—Motion *in Limine* No. 1 and Motion *in Limine* No. 3—were related only to non-compensable claims.  Dkt. Nos. 160, 162. Plaintiff submitted opposition briefs to each of these motions, which were four and five pages long respectively.  Dkt. Nos. 171, 173.  The Court will conservatively assume that each opposition took Plaintiff's counsel two hours to write and will therefore reduce trial preparation time by four hours for time spent on these two motions *in limine*.  Since it is unclear which timekeeper(s) prepared these two opposition briefs, the Court will make this reduction using a blended billing rate as determined in the ensuing section regarding reasonable hourly rates.

*Jury Instructions and Verdict Forms* --- The verdict form in this case include 33 questions, 20 of which went to non-compensable claims.  The jury instructions included 43 instructions, 4 of which instructed exclusively on non-compensable claims.  Although few in number, the Parties met with the undersigned for many hours in chambers hashing out the *Monell* jury instructions and related verdict questions.  The Court will reduce time spent on preparing the verdict forms and jury instructions by 40 percent.  The submitted time records show at least 78 hours spent by Plaintiff's counsel on preparing the jury instructions and verdict forms, as follows:

| Date | Hours Billed |
|------|------|
| October 10, 2024 | 1.4 |
| October 13, 2024 | 1.6 |

26

United States District Court
Northern District of California

| | |
|---|---|
| October 23, 2024 | 3.2 |
| October 24, 2024 | 8.5 |
| November 4, 2024 | 3.1 |
| November 5, 2024 | 2.2 |
| November 7, 2024 | 0.8 |
| November 12, 2024 | 0.7 |
| November 22, 2024 | 0.7 |
| November 26, 2024 | 2.6 |
| December 9, 2024 | 2.3 |
| December 10, 2024 | 0.8 |
| December 11, 2024 | 3.2 |
| December 12, 2024 | 1.2 |
| December 13, 2024 | 0.6 |
| December 15, 2024 | 3.3 |
| December 16, 2024 | 27.5 |
| December 17, 2024 | 2.3 |
| December 19, 2024 | 1.2 |
| December 22, 2024 | 1.2 |
| December 23, 2024 | 5.5 |
| December 24, 2024 | 0.4 |
| December 26, 2024 | 2.7 |
| December 27, 2024 | 1.2 |
| **Total** | 78.2 |

Because the Court can identify the specific timekeeper who billed each of these 78.2 hours, the Court will reduce each relevant timekeeper's hours accordingly in the ensuing section of this order, which addresses timekeeper-specific reductions.

*Trial Brief* --- Plaintiff submitted a trial brief that dedicated five of eleven pages, or 45

27

ER0028

United States District Court
Northern District of California

percent, to argument on non-compensable claims. Dkt. No. 218; *see* Schratz Decl. ¶ 160. The following time spent on the trial brief will therefore be reduced by 45 percent:

| Date | Hours Billed |
|---|---|
| December 24, 2024 | 11.1 |
| December 26, 2024 | 3.2 |
| December 27, 2024 | 13 |
| **Total** | 27.3 |

Again, the Court will reduce each relevant timekeeper's hours accordingly in the ensuing section of this order.

*Witness List* --- Between the initial witness list submitted prior to the Final Pretrial Conference, Dkt. No. 166, and the additional witnesses sought to be added through Plaintiff's motion to amend the witness list, Dkt. No. 221, Plaintiff provided a list of at least eighty potential witnesses whose testimony would go only to the unsuccessful *Monell* claims and who did not ultimately testify at trial. The Court conservatively assumes that at least one hour of trial preparation time was dedicated to each of these potential witnesses, between time spent (1) reviewing related discovery, (2) contacting and discussing potential testimony with the witness, (3) setting trial strategy, and (4) adding the witness to the draft witness list. It is unclear which timekeeper(s) carried out this witness list preparation, so the Court will reduce overall trial preparation time—and the accompanying attorneys' fees—by 80 hours using a blended rate.

*Exhibit List* --- Plaintiff's exhibit list similarly discloses a large number of exhibits prepared specifically for Plaintiff's presentation on non-compensable claims. Looking at exhibits described by Plaintiff as going to the "facts and circumstances surrounding SJPD's tactical response and policies during and after George Floyd protests" or similar, *see* Dkt. No. 166 (exhibit list)—a description indicating Plaintiff's *Monell* theories—Plaintiff included 341 possible documents (out of 434 documents total) that were intended to go to non-compensable claims. The Court will conservatively assume that Plaintiff's attorneys spent 15 minutes per document to review it and add it to the exhibit list, amounting to 85 hours of trial preparation time. Again, it is unclear which timekeeper(s) carried out this exhibit list preparation, so the Court will reduce

28

overall trial preparation time—and the accompanying attorneys' fees—by 85 hours using a blended rate.

*Witnesses Called at Trial* --- Plaintiff presented several witnesses whose testimony went partially or entirely to the *Monell* theories.  The Court will conservatively reduce trial time spent on the *Monell* theories by the amount of time spent on direct and redirect examinations of *Monell*-only witnesses, namely: Breanna Contreras (24 minutes of direct and redirect examination), Pietro di Donato (18 minutes of direct and redirect examination), Derrick Sanderlin (18 minutes of direct and redirect examination), Jason Dwyer (17 minutes of direct and redirect examination), Chris Sciba (5 minutes of direct examination), and Lee Tassio (1 hour, 9 minutes of direct and redirect examination).  The Court will also reduce the time spent on direct and redirect examination of Jonathan Byers (42 minutes of direct, redirect, and further redirect examination) by 65 percent, the time spent on direct examination of Jason Palmer (7 minutes of direct examination) by 30 percent, the time spent on direct and redirect examination of Roger Clark (1 hour, 10 minutes of direct and redirect examination) by 10 percent, and the time spent on cross and recross examination of James Adgar (44 minutes of cross and recross examination) by 10 percent.  Altogether, these reductions add up to 3 hours and 11 minutes of trial time.

Time spent preparing to present these witnesses at trial should be reduced for the same reason.  In this case, Plaintiff's counsel has requested fees for 1,984.9 hours of trial preparation time, while the allotted trial presentation time was fifteen hours.  *See* Bastida Decl., Ex. L; Dkt. No. 186.  That equates to over 132 hours of preparation time per hour of trial presentation time.  Granted, the Court recognizes that some amount of trial preparation time goes toward tasks other than presentation of witnesses and evidence—for example, preparing the jury instructions or preparing for opening statements and closing arguments.  But because the bulk of trial preparation time is as to the witnesses and evidence, the Court will conservatively assume that counsel billed approximately 75 hours of preparation time per hour of trial presentation time.  Thus, trial preparation time for the above testimony will be reduced by 238.5 hours, for an overall reduction of 241.7 hours related to non-compensable time spent on preparation and presentation of witnesses.  The Court will again use a blended rate to make this reduction.

United States District Court
Northern District of California

29

#### vii.    Settlement

The Court will not reduce any time spent on settlement discussions.

#### viii.    Fee Motion and Bill of Costs

The Court will not reduce any time spent on preparing the fee motion and the bill of costs.

### c.    Timekeeper-Specific Adjustments for Compensable Hours

Taking into account the foregoing preliminary observations, the Court now turns to the lodestar hours billed by each timekeeper included in the Motion for Attorneys' Fees and Costs. Where possible—and as specified below—the Court has endeavored to reduce the hours specifically billed by each timekeeper that are not compensable. As discussed above, however, this kind of surgical reduction was not possible for hours billed conducting certain discovery and trial preparation tasks, as many of those hours were logged with vague or general descriptions. Accordingly, select categories of discovery and trial preparation hours were reduced, as described above, using a blended rate. Where blended rate reductions were made, no further reductions on those tasks will be applied to individual timekeepers.

#### i.    Partner James McManis

Attorney McManis spent a modest number of hours working on this case relative to the other counsel and paralegals staffed on it. Still, the Court determines that a modest reduction to his billed hours is also warranted, for the reasons discussed above. The Court will subtract the 1.5 hours of time that Mr. McManis billed on April 13, 2023 to review files and deposition materials related to the separate *Sanderlin* case, because that time was spent exclusively in pursuit of the failed *Monell* claims. For the same reason, the Court will reduce Mr. McManis's time spent on motions to dismiss (4.1 hours) by 71 percent, his time spent on the motion for summary judgment (6.5 hours) by 45 percent, *see* Bastida Decl., Ex. L, and his time spent on the Clark *Daubert* motion (1.2 hours) by 50 percent, in accordance with the Court's earlier comments about the amount of time related to each of these tasks spent only on the unsuccessful claims. Accordingly, the Court will adjust Mr. McManis's lodestar hours downward to 76.9 hours.

#### ii.    Partner Abimael Bastida

As lead trial counsel, Attorney Bastida spent the greatest number of hours on this case of

United States District Court
Northern District of California

the various billers. The Court finds much of Attorney Bastida's billing to be appropriate, but, as previously discussed, the Court will not award fees for time spent exclusively on the unsuccessful *Monell* claims and First Amendment claim and thus reduces Mr. Bastida's lodestar hours accordingly.

Mr. Bastida spent 25.5 hours on the motions to dismiss and 103.8 hours on the motion for summary judgment. The Court will apply the proportional reductions discussed above to those lodestar hours. In addition, the Court will not award fees for Mr. Bastida's time spent on the Dwyer deposition (9.2 hours spent preparing for and attending), the Sciba deposition (7.1 hours spent preparing for and attending), the Zuniga deposition (2.1 hours spent preparing for and attending), the Tassio deposition (4.5 hours spent preparing for and attending), or the Tindall deposition (9.9 hours spent preparing for and attending). The Court will reduce Mr. Bastida's time spent on the Byers deposition (8.2 hours spent preparing for and attending) by 65 percent and will reduce his time spent on the Palmer deposition (4.5 hours spent attending) by 30 percent. (The Court notes that the time spent preparing for and attending these depositions appears low. However, Plaintiff's counsel has represented that a number of depositions were taken by attorneys whose time was not submitted with the Motion for Attorneys' Fees and costs, *see* Joint Discovery Chart at 1, so the Court understands that deposition-related time in this action has already been significantly written down.) The Court will also reduce the time spent by Mr. Bastida on preparing the jury instructions and verdict form (32.9 hours) by 40 percent, and the time that he spent on preparing the trial brief (10.7 hours) by 45 percent.

Accordingly, the Court will adjust Mr. Bastida's lodestar hours downward to 967.9 hours.

### iii.   Partner Matthew Schechter

Attorney Schechter did not participate in discovery or pretrial motion practice in this case, *see* Bastida Decl., Ex. L, so there is no need for the Court to reduce time spent on those tasks by Attorney Schechter. However, the Court will reduce the time spent by Mr. Schechter on preparing the jury instructions and verdict form (32.9 hours) by 40 percent. Thus, the Court will adjust Mr. Schechter's lodestar hours downward to 264.8 hours.

United States District Court
Northern District of California

31

#### iv.  Independent Contractor Christine Peek

Former partner and current independent contractor Christine Peek spent a significant amount of time developing this case in its earlier stages.  As with Attorney Bastida, the Court will not award fees for the time that Attorney Peek spent on the unsuccessful *Monell* and First Amendment claims.  Specifically, Ms. Peek billed 130.2 hours of time on the motions to dismiss that will be reduced by 71 percent.  In addition, Attorney Peek spent 50 hours of time on the unsuccessful CPRA claim that will not be compensated.  *See* Schratz Decl. ¶ 162.  Accordingly, the Court will adjust Ms. Peek's lodestar hours downward to 436.8 hours.

#### v.  Senior Counsel Priya Swaminathan

Attorney Swaminathan assisted primarily with preparing this case for trial.  *See* Bastida Decl., Ex. L.  However, the Court will not award fees for Attorney Swaminathan's time spent preparing for Lieutenant Tassio's trial testimony (18.4 hours) or Chief Tindall's testimony (6.3 hours).  The Court will reduce Ms. Swaminathan's time spent preparing for Mr. Clark's trial testimony (16.8 hours) by 10 percent, her time spent preparing for Sergeant Byers's trial testimony (1.2 hours) by 65 percent, and her time spent preparing for Sergeant Palmer's trial testimony (7.6 hours) by 30 percent.  In addition, the Court will reduce Ms. Swaminathan's time spent on the Clark *Daubert* motion (1.7 hours) by 50 percent, and will reduce time recorded as spent on *Daubert* motions without identifying which of the two *Daubert* motions was being worked on (8.3 hours) by 25 percent.  Finally, the Court will reduce Ms. Swaminathan's time spent on preparing the jury instructions and verdict form (6.1 hours) by 40 percent, and the time that she spent on preparing the trial brief (19.9 hours) by 45 percent.  Thus, Ms. Swaminathan's lodestar hours will be 294.6.

#### vi.  Associate Tianqi Michael Sun

Like Attorney Swaminathan, Attorney Sun assisted primarily with preparing this case for trial.  *See* Bastida Decl., Ex. L.  However, Mr. Sun did bill 147.2 hours of time spent on the motion for summary judgment, which will be reduced by 45 percent so as not to award fees for time spent exclusively on the unsuccessful claims.  Mr. Sun also recorded 44.7 hours of time spent on *Daubert* motions without identifying which of the two *Daubert* motions was being worked on.

ER0033

The Court will reduce that time by 25 percent, based on the assumption that half of that preparation time was spent on the *Daubert* motion related to Roger Clark. (The 44.7 hours does not include time clearly recorded as being spent on the *Daubert* motion related to Dr. Watkins.) Also, for the same reasons as discussed previously, the Court will reduce Mr. Sun's time spent preparing for the trial testimony of Officer Adgar (10.1 hours) by 10 percent. Accordingly, the Court will adjust Mr. Sun's lodestar hours downward to 806.9 hours.

### vii.   Paralegal Galenstein Dang

In line with the above analysis, the Court will not award fees for Paralegal Dang's time spent on unsuccessful claims, so the 89.9 hours he billed for time spent on the motion for summary judgment will be reduced by 45 percent. The 8.5 hours that he billed for time spent on the jury instructions and verdict form will also be reduced by 40 percent. Accordingly, the Court will adjust Mr. Dang's lodestar hours downward to 1035.8.

### d.   Reasonable Hourly Rates

Under § 1988, fees "'are to be calculated according to the prevailing market rates in the relevant community,' taking into consideration 'the experience, skill, and reputation of the attorney.'" *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005) (first quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984); then quoting *Schwarz*, 73 F.3d at 906). The fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Id.* at 814. "[T]he relevant community is the forum in which the district court sits," here the Northern District of California. *Camacho*, 523 F.3d at 979 (citation omitted).

Plaintiff's counsel requests the following rates: $2000/hour for Founding Partner James McManis, who has over fifty years of experience, Dkt. No. 263-2, Declaration of James McManis in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("McManis Decl.") ¶¶ 3–4; $850/hour for Partner Matthew Schechter, who has over 25 years of experience, McManis Decl. ¶ 10; $850/hour for former Partner and current Independent Contractor Christine Peek, who has over 20 years of experience, McManis Decl. ¶ 17; $800/hour for Partner Abimael Bastida, who has over eight years of experience, McManis Decl. ¶ 8; $800/hour for Senior Counsel Priya

33

Swaminathan, who has approximately 18 years of experience, McManis Decl. ¶ 13; $550/hour for Associate Tianqi Michael Sun, who has approximately four years of experience, McManis Decl. ¶ 21; and $475/hour for Senior Paralegal Galenstein Dang, who has held various roles in the legal industry for over a decade and has been with the McManis firm for approximately four years, McManis Decl. ¶ 22.

Defendants dispute the reasonableness of Plaintiff's attorneys' requested hourly rates, stating that the McManis firm is basing its fee request on its asserted customary hourly rates for *paying* clients and that the fee requested in this litigation is "unconscionable." Fee Opp. at 10. In addition, Defendants' auditor Mr. Schratz opined that Plaintiff's attorneys' requested billing rates were not supported. Schratz Decl. ¶¶ 54–109. Mr. Schratz relies on actual fee awards in cases litigated in this District. *Id.* ¶¶ 101–02. The awarded rates in those cases were roughly half of what Plaintiff's attorneys request for attorneys of similar skill and experience. Mr. Schratz proposed that the following hourly rates would be more in line with the rates awarded in civil rights cases in the Northern District of California:

> For Partner James McManis: $650-750/hour
>
> For Partner Matthew Schechter: $575-600/hour
>
> For Partner Abimael Bastida: $450/hour
>
> For Independent Contractor Christine Peek: $500-550/hour
>
> For Senior Counsel Priya Swaminathan: $500-550/hour
>
> For Associate Tianqi Michael Sun: $300/hour
>
> For Senior Paralegal Galenstein Dang: $205/hour

Schratz Decl. ¶ 108.

In support of their requested rates, Plaintiff's attorneys submitted declarations from attorneys Allen Ruby and James Wagstaffe. Dkt. No. 263-3, Declaration of Allen Ruby in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Ruby Decl."); Dkt. No. 263-4, Declaration of James Wagstaffe in Support of Plaintiff's Motion for Attorneys' Fees and Costs ("Wagstaffe Decl."). Both attorneys attest that they have over forty years of legal practice experience, Ruby Decl. ¶ 3; Wagstaffe Decl. ¶ 3, and that they are "familiar with the hourly rates

34

charged by Bay Area lawyers and law firms," Ruby Decl. ¶ 7; Wagstaffe Decl. ¶ 8. They also both attest that "[t]he requested billing rates for the McManis Faulkner attorneys . . . are within the range of the Bay Area market rates for lawyers of their respective backgrounds, skill, and experience." Ruby Decl. ¶ 7; Wagstaffe Decl. ¶ 8. However, it is unclear whether either Mr. Ruby or Mr. Wagstaffe is opining on reasonable rates for civil rights cases litigated in this District. Accordingly, the Court considers the declarations of Mr. Ruby and Mr. Wagstaffe but is unable to give those declarations significant weight in determining prevailing market rates for civil rights attorneys in the Northern District of California.

For that reason, the Court requested a supplemental declaration from Plaintiff's counsel in support of the fee motion, providing a list of cases where Plaintiff's attorneys were awarded attorneys' fees in civil rights cases in the Northern District of California over the past five years, including a notation of the hourly rate awarded to each attorney requesting fees in this case. Dkt. No. 283. Plaintiff's counsel's Supplemental Declaration of Abimael Bastida in Support of Plaintiff's Motion for Attorneys' Fees [and] Costs," Dkt. No. 285 ("Suppl. Fee Decl."), stated that although McManis Faulkner's attorneys had been awarded attorneys' fees for litigated civil rights cases in the Northern District in the past, none of those fee awards occurred within the last five years. *Id.* ¶ 3. Plaintiff's counsel then provided four exemplar cases in which attorneys' fees were awarded in civil rights cases litigated by other law firms within the last five years. *Id.* ¶ 4.

In those cases, attorneys with over fifty years of experience were awarded attorneys' fees at an hourly rate of between $919 and $1250 per hour. *Id.*; *see, e.g.*, *Human Rights Def. Ctr. v. Cnty. of Napa*, No. 20-cv-01296, 2021 WL 1176640, at *11 (N.D. Cal. Mar. 28, 2021) (approving hourly rates of $1100 for a founding partner with over forty years of experience; $950 for an attorney with about 40 years of experience; $625 for an attorney with about 10 years of experience; $650 for an attorney with about 20 years of experience; and $260 and $350 for paralegals with 10 and 30 years of experience, respectively). An attorney with twenty-four years of experience was awarded $875/hour. Suppl. Fee Decl. ¶ 4(a) (citing *Andrews v. Equinox Holdings, Inc.*, 570 F. Supp. 3d 803, 807–08 (N.D. Cal. 2021)). Attorneys with between ten and fifteen years of experience were awarded fees at an hourly rate of between $600 and $750. *Id.*

United States District Court
Northern District of California

35

(citing *Lashbrook v. City of San Jose*, No. 20-cv-01236 (N.D. Cal. filed Sept. 2, 2020), *Hum. Rts. Def. Ctr.*, 2021 WL 1176640, at *11–12, and *Andrews*, 570 F. Supp. 3d at 807–08). Attorneys with significantly under ten years of experience were awarded $350/hour and $415/hour. *Id.* (citing *Andrews*, 570 F. Supp. 3d at 807, and *Lashbrook*, No. 20-cv-01236).

Considering this comparative information, the Court concludes that certain of the rates requested by Plaintiff's attorneys are justified, while others must be reduced. As a preliminary matter, the Court is not persuaded by Defendants' position that lower rates should be awarded to smaller law firms. True, some courts in this district have taken firm size into account when awarding attorneys' fees. *See, e.g.*, *Int'l Petroleum Prods. & Additives Co., Inc. v. Black Gold S.A.R.L.*, No. 19-cv-03004, 2020 WL 789567, at *4 (N.D. Cal. Feb. 18, 2020); *GemCap Lending I, LLC v. Unity Bank Minnesota*, No. 18-cv-05979, 2019 WL 3842010, at *5 (N.D. Cal. Aug. 15, 2019). But that approach is not uniform, and many cases that consider firm size review it as a "proxy" for billing practices and/or quality of representation. *See, e.g.*, *Cuellar v. First Transit Inc.*, No. 20-cv-01075, 2024 WL 83231, at *12 n.64 (C.D. Cal. Jan. 8, 2024) ("Thus, the Court would expect Class Counsel's rates to be even lower than the median rates listed in the Real Rate Report, as rates tend to increase with firm size."); *L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.*, No. 18-cv-6809, 2024 WL 3839401, at *4 (C.D. Cal. Aug. 2, 2024) ("[I]t is not simply the size of Plaintiffs' counsel's firm that is at issue here. It is also its reputation and its actual billing practices, for which firm size serves as a proxy."). This issue is presently pending before the Ninth Circuit, so the Court's approach in the future may be different. For now, though, the Court is convinced that the more important considerations in establishing a reasonable billing rate are the attorney's years of experience and field of practice, so the Court will not reduce the requested rates based simply on the small size of Plaintiff's attorneys' firm.

Here, the Court finds that the rates requested for Plaintiff's attorneys Mr. Schechter, Ms. Peek, and Ms. Swaminathan are consistent with the prevailing market rates for civil rights attorneys of their background and experience. In addition, although Mr. Bastida's requested rate appears to be slightly higher than the rate typically awarded to an attorney with the number of years of experience that he has, the Court concludes that the rate is reasonable in light of the lead

United States District Court
Northern District of California

role that Counsel Bastida took throughout the summary judgment and trial phases of this litigation.

The Court has considered all of the competing evidence on reasonable rates and tempered the Parties' more extreme positions using the Court's own multi-decade experience in awarding reasonable fees in civil rights cases. On that basis, the Court determines that a slight reduction in hourly rate is appropriate with regard to the work conducted by Mr. Sun, as $550/hour appears to be out of line with the typical rate awarded to a civil rights attorney with only three or four years of experience. Accordingly, the Court will award fees for Mr. Sun's work at a rate of $500/hour. Likewise, the Court finds that the requested rate for the work conducted by Mr. Dang was also higher than the typical rate awarded to a civil rights paralegal with approximately ten years of experience, so the Court will award fees for Mr. Dang's work at a rate of $400/hour. Finally, the Court determines that a significant reduction is required to the hourly rate requested by Mr. McManis, as that rate requested appears to be nearly twice the hourly rate typically awarded to a civil rights attorney of his background and experience. The Court will award Mr. McManis attorneys' fees at a rate of $1200/hour.

Having arrived at the reasonable billing rates for Plaintiff's attorneys, the Court determines the blended billing rates that will be used for the blended-rate discovery and trial/trial preparation reductions discussed previously, *supra* sections II.B.2.b.v & II.B.2.b.vi, as follows. The discovery-related blended-rate reduction will use a rate of $637.50/hour—which excludes Mr. McManis's, Mr. Schechter's, and Ms. Swaminathan's billing rates, as none of these attorneys was substantially involved in discovery. *See* Bastida Decl., Ex. L. Therefore, applying a 45 percent reduction, the Court will reduce the ultimate lodestar calculation by $105,123.75 ($637.50 x 164.9) to account for time spent exclusively on *Monell* and First Amendment document discovery.

The trial and trial-preparation blended-rate reductions will be based on the five timekeepers who billed significant trial and/or trial preparation time: Attorney Bastida, Attorney Schechter, Attorney Swaminathan, Attorney Sun, and Paralegal Dang. The blended rate for these five timekeepers is $670/hour. Therefore, the reduction for time spent preparing oppositions to the two relevant motions *in limine* (4 hours) amounts to $2,680; the reduction for time spent on potential witness preparation related to non-compensable claims (80 hours) amounts to $53,600;

United States District Court
Northern District of California

37

the reduction for time spent on trial exhibit preparation related to non-compensable claims (85 hours) amounts to $56,950; and the reduction for time spent on non-compensable preparation and presentation of trial witnesses (241.7 hours) amounts to $161,939.

### e. Lodestar Calculation Adjusted for Non-Compensable Time

Based on the foregoing analysis, the adjusted lodestar hours for compensable work are summarized in the following table:

| | Hourly Rate | Hours Requested | Hours Excluded | Compensable Hours | Total Tentatively Awarded |
|---|---|---|---|---|---|
| **James McManis** | $1200 | 84.8 | 7.9 | 76.9 | $92,280 |
| **Abimael Bastida** | $800 | 1090.3 | 122.4 | 967.9 | $774,320 |
| **Matthew Schechter** | $850 | 278 | 13.2 | 264.8 | $225,080 |
| **Christine Peek** | $850 | 579.2 | 142.4 | 436.8 | $371,280 |
| **Priya Swaminathan** | $800 | 338.5 | 43.9 | 294.6 | $235,680 |
| **Tianqi Michael Sun** | $500 | 885.3 | 78.4 | 806.9 | $403,450 |
| **Galenstein Dang** | $400 | 1079.7 | 43.9 | 1035.8 | $414,320 |
| **SUBTOTAL Compensable Time** | | | | 3,883.7 | $2,516,410 |
| **Blended Rate Value of Non-Compensable Discovery/Trial/Trial Preparation Time** | | | | 575.6 | ($380,292.75) |
| **TOTAL Adjusted Lodestar** | | | | | $2,136,117.25 |

### f. Reasonableness of Compensable Hours

The Court will next consider whether these hours expended for compensable work are reasonable. *Hensley* instructs that "[t]he district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.'" 461 U.S. at 434 (citing S. Rep. No. 94-1011, p. 6 (1976)). Thus, the Court cannot "uncritically" accept Plaintiff's counsel's representations of hours expended; rather, the Court must assess their reasonableness. *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984). In making this determination, the Court can reduce hours when documentation is inadequate, or when the requested hours are redundant, excessive, or unnecessary. *Hensley*, 461 U.S. at 433–34.

In general, the Court finds that Plaintiff's counsel's lodestar hours, as adjusted to exclude

38

ER0039

non-compensable time, are reasonable.[1] There is one glaring exception: the number of hours spent on preparing for trial.[2] Even under the adjusted lodestar, Plaintiff's attorneys are requesting fees for approximately 1500 hours spent on trial preparation. Actual trial presentation time was only fifteen hours for each side. In other words, even after the above adjustments to the lodestar, Plaintiff's counsel seeks fees for *100 hours* of trial preparation time *per hour* of trial presentation time.

The Court concludes based on its decades of experience related to fee awards in civil rights cases that such a proportion of preparation time to trial time is excessive and unreasonable, particularly in light of the fact that 984.5 out of 1,984.9—a full 50 percent—of requested trial preparation hours were billed at partner rates of $800/hour or greater. As Defendants' independent auditor points out, the billing records submitted in this case reflect a request for fees that is astonishingly partner heavy. Over half of the attorney hours were billed by partners, and those attorney hours account for over two-thirds of the total fees requested. Schratz Decl. ¶ 111. The Court understands that Plaintiff's counsel did write off some associate time due to turnover of associates at the firm. However, the Court would expect a very partner-heavy trial team to proceed efficiently in preparing for trial, so the Court reduces trial preparation hours to reflect the expectation of efficiency that accompanies seniority—and, in turn, the timekeeper's heightened billing rates.

Again, the Court is limited in its ability to revise the lodestar with surgical precision, because many of Plaintiff's attorneys' time entries are too vague and nonspecific to identify where or why the overbilling in trial preparation occurred. *See* Schratz Decl. ¶ 133. Accordingly, the Court further reduces the compensated trial preparation time by 375 hours based on its expectation that partner-level attorneys would spend closer to 75 hours of trial preparation time per hour of

---

[1] The Court does not agree with Defendants' billing auditor that "intra-office conferencing hours that are greater than 4.0 percent of the total hours for each biller are excessive," Schratz Decl. ¶ 128, and so will not reduce time spent on intra-office conferencing.
[2] Counsel's time billed for discovery and fact investigation in this case is also high. However, the Court recognizes that the discovery was difficult and time-consuming, involving review of countless hours of police bodycam footage and, at times, vigorous resistance from the defense. Having already reduced discovery hours spent exclusively on the non-compensable claims, the Court concludes that the remaining hours are reasonable under the circumstances of this case.

39

trial presentation time.  This reduction is applied at the same blended rate used previously to reduce trial preparation time, $670/hour, amounting to a further reduction in fees of $251,250.  The Court notes that this further reduction is only slightly greater than the 10 percent "haircut" that courts may discretionarily apply "without a more specific explanation."  *Moreno*, 534 F.3d at 1112.  However, the Court does not make this reduction as a discretionary "haircut;" instead, it is based on the Court's experience and expectation based on similar cases of the number of hours reasonably expended in preparing for a civil rights trial like this one.  *See, e.g.*, *id.* (discussing a civil rights case in which the attorney requested fees for time spent preparing for a jury trial three times, with each trial date preceded by under 400 hours of preparation time).

After applying this further reduction to compensate for the unreasonable number of hours that Plaintiff's counsel has billed for time spent on trial preparation, the total lodestar value is $1,884,867.25.

### g.   Multiplier

The final step in the Court's analysis is consideration of whether the lodestar should be adjusted based on other factors not already subsumed in the initial lodestar calculation.  *See Morales*, 96 F.3d at 363–64 & nn.8–9 ("After making th[e] [lodestar] computation, the district court then assesses whether it is necessary to adjust the presumptively reasonable lodestar figure on the basis of the *Kerr* factors that are not already subsumed in the initial lodestar calculation." (citing *Kerr*, 526 F.2d at 70)).  Plaintiff's attorneys seek a 1.5 multiplier of the lodestar calculation, arguing that it is "appropriate here to account for the risk and the difficulty of the questions involved, and the skill required to avoid dismissal and bring this case to a successful conclusion at trial."  Fee Mot. at 13.  Defendants contest the request for a multiplier through the declaration of their independent fee auditor, James Schratz.  *See* Schratz Decl. ¶¶ 169–187.

There is a "strong" presumption that the fee arrived at under the lodestar method is reasonable, so "a multiplier is warranted only in 'rare and exceptional circumstances.'"  *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 665 (9th Cir. 2020) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546–52 (2010)).  In general, "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and "an enhancement may *not* be

ER0041

awarded based on a factor that is subsumed in the lodestar calculation." *Perdue*, 559 U.S. at 553 (citation omitted) (emphasis added); *accord Parsons v. Ryan*, 949 F.3d 443, 467 (9th Cir. 2020) ("Any reliance on factors that have been held to be subsumed in the lodestar determination will be considered an abuse of the trial court's discretion." (quoting *Cunningham v. Cnty. of Los Angeles*, 879 F.2d 481, 487 (9th Cir. 1988))).

The twelve factors laid out in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975), for consideration in arriving at a reasonable attorneys' fee include: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Morales*, 96 F.3d at 363 n.8 (quoting *Kerr*, 526 F.2d at 70). "Under the lodestar approach, many of the *Kerr* factors have been subsumed as a matter of law." *See id.* (citing *Cunningham*, 879 F.2d at 487).

Here, as expected, most of the *Kerr* factors have already been subsumed into the Court's adjusted lodestar calculation. The first factor—time and labor required—is subsumed into the calculation of compensable hours and the Court's reduction for the unreasonably excessive number of hours spent on trial preparation. Likewise, the preceding calculations of the reasonable number of compensable hours expended incorporate the second factor—the "novelty and difficulty of the questions involved." Moreover, Plaintiff's individual Fourth Amendment claims and Bane Act claim were fairly routine; the novel or difficult components of this case were the *Monell* and First Amendment claims that ultimately failed. As Defendants argue, pursuit of those *Monell* theories significantly increased the time and labor required in this case, but that time is not included in the lodestar calculation. Otherwise, this was a fairly standard civil rights lawsuit. The Court does recognize the complexity of the damages portion of the case considering the aggravation of a serious preexisting condition, but concludes that ultimately the evidence

41

ER0042

presented at trial was relatively straightforward.

The hourly rates awarded—which are already on the high end for the Northern District of California—also subsume various of the *Kerr* factors, including factor three (the skill required to litigate the case), factor five (the customary fee charged), factor six (whether that fee is fixed or contingent), and factor nine (the experience, reputation, and ability of the attorneys). Indeed, contrary to Plaintiff's counsel's arguments in favor of a multiplier, the Supreme Court has indicated that "the quality of an attorney's performance" should generally not be used as a basis for a multiplier, because such skill-related factors are presumably reflected in the billing rate. *Perdue*, 559 U.S. at 553. Likewise, the Supreme Court has noted that "when an attorney agrees to represent a civil rights plaintiff who cannot afford to pay the attorney, the attorney presumably understands that no reimbursement is likely to be received until the successful resolution of the case and therefore enhancements to compensate for delay in reimbursement for expenses must be reserved for unusual cases." *Id.* at 555 (citation omitted); *accord Morales*, 96 F.3d at 364 n.9 ("Among the subsumed factors presumably taken into account in either the reasonable hours component or the reasonable rate component of the lodestar calculation are: '(1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, (4) the results obtained, and (5) the contingent nature of the fee agreement.'" (cleaned up)). Besides, the delay in receiving fees is addressed "by basing the award on current rates" even though many of the billed hours reflected in a fee motion are from years past. *Perdue*, 559 U.S. at 556.

Plaintiff's counsel provided no argument indicating that counsel's acceptance of this case precluded other employment (factor four) or that the client or circumstances posed unique time limitations (factor seven). Regarding factors eight and eleven—the amount involved and results obtained, and the nature and length of the client relationship—the Court certainly commends counsel for an excellent result in this case. The $1.3 million secured for Mr. Johnson is significant and is commensurate to counsel's dedicated relationship with their client. Of course, as Defendants point out, that was a small fraction of the $5.6 million Plaintiff sought, but counsel's substantial success reflects their persistence through years of difficult discovery and opposing

United States District Court
Northern District of California

42

ER0043

counsel's vigorous defense.  Still, as previously discussed, the Court has determined that rates on the high end of those generally awarded in the Northern District of California are reasonable to recognize these attorneys for their skilled and dedicated advocacy and to compensate for the delay in receiving fees.  Indeed, the presumptively reasonable lodestar calculation *exceeds* the amount the jury awarded to Plaintiff himself by hundreds of thousands of dollars.  Finally, while many civil rights cases against police departments and other government entities come with a degree of "undesirability" given the financial risk of proceeding on contingency that usually accompanies these lawsuits, the Court does not see exceptional undesirability here and concludes that the award secured is generally in line with that in other similar civil rights cases.

In sum, the Court concludes that Plaintiff's counsel in this case will be adequately compensated for their efforts based on the adjusted lodestar.  A further multiplier would amount to a windfall and is not appropriate.

### h.  Costs

Section 1988 allows counsel to "recover . . . those out-of-pocket expenses that 'would normally be charged to a fee[-]paying client.'"  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1216 n.7 (9th Cir. 1986), *reh'g denied and opinion amended*, 808 F.2d 1373 (9th Cir. 1987)).

In addition to the attorneys' fees discussed above, Plaintiff's attorneys seek payment of the costs claimed in Plaintiff's concurrently filed Bill of Costs, Dkt. No. 264 ("BOC"), as well as various out-of-pocket litigation expenses incurred over the course of the lawsuit that would normally be charged to McManis Faulkner's clients, *see* Bastida Decl. ¶ 30 & Exs. M–R.  In the Motion for Attorneys' Fees and Costs, Plaintiff's counsel requests $30,918.36 in litigation expenses plus all costs in the accompanying Bill of Costs.  Fee Mot. at 14 (citing Bastida Decl. ¶ 30 & Exs. M–R).  In the Bill of Costs, Plaintiff's counsel requests $33,299.89 in costs and $2,310.95 in witness fees.  BOC at 2.  Defendants do not object to Plaintiff's request for litigation costs and expenses.  The Court finds Plaintiff's request for litigation expenses and costs to be reasonable and appropriate and will award the amounts requested.

ER0044

### 3. Conclusion

The Court awards a total of $1,884,867.25 in attorneys' fees and $66,529.20 in costs to Plaintiff.

## III. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Judgment as a Matter of Law (Dkt. No. 267) is GRANTED IN PART AND DENIED IN PART; and

2. Plaintiff's Motion for Attorneys' Fees and Costs (Dkt. No. 263) is GRANTED IN PART.

**IT IS SO ORDERED.**

Dated:  August 15, 2025

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

44

ER0045

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

KYLE JOHNSON,

           Plaintiff,

    v.

CITY OF SAN JOSE, et al.,

           Defendants.

Case No.  5:21-cv-01849-BLF

**JUDGMENT**

In accordance with the jury's verdict, attached hereto,

It is hereby ordered and adjudged that Judgment in the amount of $1,353,313 is entered for Plaintiff Kyle Johnson and against Defendant James Adgar, and that

Judgment is entered for Defendant City of San Jose and against Plaintiff Kyle Johnson on all claims alleged against Defendant City of San Jose.

**IT IS SO ADJUDGED AND ORDERED.**

Dated:  January 31, 2025

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

**ER0046**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON

               Plaintiff,

     v.

CITY OF SAN JOSE, et al.

              Defendants.

Case Number:  5:21-cv-01849-BLF

**JURY VERDICT**

*VERDICT FORM INSTRUCTIONS*

*Please answer the numbered questions. At the end of each question place an "X" in the space to the left of "Yes" or "No" to indicate your unanimous finding as to that question. Instructions are provided after each question in italicized font to direct you to the next question you are required to answer. Do not answer any question unless you are instructed to do so. Please begin by answering Question 1.*

1

ER0047

### SECTION I: *Fourth Amendment Violation*

**On Plaintiff Kyle Johnson's** *Claims against Defendant James Adgar* **alleging that James Adgar violated Kyle Johnson's Fourth Amendment rights, we the Jury, unanimously find as follows:**

**Question 1:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar acted under color of law?

    __X__ YES         _____ NO

*If the answer to Question 1 is yes, go to Question 2.  If the answer to Question 1 is no, go to Question 9.*

**Question 2:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar used excessive force against Kyle Johnson?

    __X__ YES         _____ NO

*Go to Question 3.*

**Question 3:** Did Kyle Johnson prove by a preponderance of evidence that James Adgar seized Kyle Johnson?

    __X__ YES         _____ NO

*If your answer to Question 2 or Question 3 is yes, answer Question 4.  If your answers to Question 2 and Question 3 are no, stop here and go to Question 9.*

**Question 4:** Did Kyle Johnson prove by a preponderance of evidence that James Adgar's use of excessive force on Kyle Johnson, or seizure of Kyle Johnson, was a substantial factor in causing harm to Kyle Johnson?

    __X__ YES         _____ NO

*If your answer to Question 4 is yes, go to Question 5. If your answer to Question 4 is no, go to Question 9.*

2

ER0048

**On Plaintiff Kyle Johnson's *Claim against Defendant City of San Jose* alleging a violation of Plaintiff's Fourth Amendment rights, we the Jury, unanimously find as follows:**

**Question 5:** Did Kyle Johnson prove by a preponderance of the evidence that the City of San Jose had a widespread or longstanding custom or practice of allowing police officers to use less lethal weapons, including 40mm projectiles, indiscriminately or in disregard of the City's written policies or standards?

_____ YES        _X_ NO

*If the answer to Question 5 is yes, answer Question 6. If the answer to Question 5 is no, stop here and go to Question 9.*

**Question 6:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar acted pursuant to the custom or practice described in Question 5 in shooting a 40mm projectile that struck Kyle Johnson?

N/A

_____ YES        _____ NO

*If the answer to Question 6 is yes, answer Question 7. If the answer to Question 6 is no, stop here and go to Question 9.*

**Question 7:** Did Kyle Johnson prove by a preponderance of the evidence that the custom or practice described in Question 5 was the moving force that caused James Adgar to shoot a 40mm projectile that struck Kyle Johnson on May 30, 2020?

N/A

_____ YES        _____ NO

*If the answer to Question 7 is yes, then answer Question 8. If the answer to Question 7 is no, go to Question 9.*

**Question 8:** Did Kyle Johnson prove by a preponderance of evidence that the City of San Jose's custom or practice described in Question 5 was a substantial factor in causing harm to Kyle Johnson?

N/A

_____ YES        _____ NO

*Go to Question 9.*

3

ER0049

## SECTION II: *First Amendment Violation*

**On Plaintiff Kyle Johnson's *Claim against Defendant James Adgar* alleging James Adgar violated Kyle Johnson's First Amendment rights, we the Jury, unanimously find as follows:**

**Question 9:**   Did Kyle Johnson prove by a preponderance of the evidence that he was participating in constitutionally protected activity when he was struck in the back of the leg with a 40mm projectile?

_X_ YES          ____ NO

*If the answer to Question 9 is yes, answer Question 10. If the answer to Question 9 is no, stop here and go to Question 17.*

**Question 10:**  Did Kyle Johnson prove by a preponderance of the evidence that James Adgar acted under color of law?

_X_ YES          ____ NO

*If the answer to Question 10 is yes, answer Question 11. If the answer to Question 10 is no, stop here and go to Question 17.*

**Question 11:**  Did Kyle Johnson prove by a preponderance of the evidence that retaliation for his exercise of his First Amendment rights of free speech or assembly was a substantial or motivating factor that caused James Adgar to indiscriminately shoot the 40mm projectile that struck Kyle Johnson on May 30, 2020?

_X_ YES                    ____ NO

*If the answer to Question 11 is yes, answer Question 12. If the answer to Question 11 is no, stop here and go to Question 17.*

4

ER0050

**Question 12:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar's indiscriminate use of 40mm projectiles would chill a person of ordinary firmness from continuing to engage in the protest?

_____X___ YES          _____ NO

*If the answer to Question 12 is yes, answer Question 13. If the answer to Question 12 is no, stop here and go to Question 17.*

**Question 13:** Did Kyle Johnson prove by a preponderance of evidence that James Adgar's retaliation for Kyle Johnson exercising his First Amendment rights of free speech or assembly was a substantial factor in causing harm to Kyle Johnson?

___X___ YES          _____ NO

*If the answer to Question 13 is yes, answer Question 14. If the answer to Question 13 is no, stop here and go to Question 17.*

Case No. 5:21-cv-01849-BLF

ER0051

**On Plaintiff Kyle Johnson's *Claim against Defendant City of San Jose* alleging violation of Plaintiff's First Amendment rights, we the Jury, unanimously find as follows:**

**Question 14:** Did Kyle Johnson prove by a preponderance of the evidence that the City of San Jose had a widespread or longstanding custom or practice of allowing police officers to use less lethal weapons, including 40mm projectiles, indiscriminately or in disregard of the City's written policies or standards, in retaliation against persons exercising free speech and assembly rights?

_____ YES          _X_ NO

*If the answer to Question 14 is yes, answer Question 15. If the answer to Question 14 is no, stop here and go to Question 17.*

**Question 15:** Did Kyle Johnson prove by a preponderance of the evidence that the custom or practice described in Question 14 was the moving force that caused Defendant Adgar to shoot a 40mm projectile May 30, 2020 into the crowd of protestors that included Kyle Johnson?

N/A

_____ YES          _____ NO

*If the answer to Question 15 is yes, answer Question 16. If the answer to Question 15 is no, go to Question 17.*

**Question 16:** Did Kyle Johnson prove by a preponderance of evidence that the City of San Jose's custom or practice described in Question 14 was a substantial factor in causing harm to Kyle Johnson?

N/A

_____ YES          _____ NO

*Go to Question 17.*

6

ER0052

## SECTION III: *Bane Act*

**On Plaintiff Kyle Johnson's *Claim against Defendant James Adgar* alleging James Adgar violated the California Bane Act, we the Jury, unanimously find as follows:**

**Question 17:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar acted violently against Kyle Johnson?

___X___ YES          _____ NO

*If the answer to Question 17 is yes, answer Question 18. If the answer to Question 17 is no, stop here and go to Question 21.*

**Question 18:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar committed acts of violence to prevent Kyle Johnson from exercising his right to be free from unreasonable seizure?

___X___ YES          _____ NO

*Answer Question 19.*

**Question 19:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar committed acts of violence to prevent plaintiff from exercising his right to free speech and assembly or to retaliate against plaintiff for having exercised his right to free speech and assembly?

___X___ YES          _____ NO

*If the answer to Question 18 <u>or</u> 19 is yes, answer Question 20. If the answer to Question 18 <u>and</u> 19 is no, stop here and go to Question 21.*

**Question 20:** Did plaintiff prove by a preponderance of the evidence that James Adgar's conduct was a substantial factor in causing harm to plaintiff?

___X___ YES          _____ NO

*Go to Question 21.*

7

ER0053

## SECTION IV: *Battery*

**On Plaintiff Kyle Johnson's** *Claim against Defendant James Adgar* **alleging battery, we the Jury, unanimously find as follows:**

**Question 21:** Did Kyle Johnson prove by a preponderance of evidence that James Adgar caused Kyle Johnson to be touched with the intent to harm or offend Kyle Johnson?

_X_ YES        _____ NO

*If the answer to Question 21 is yes, answer Question 22. If the answer to Question 21 is no, stop here and go to Question 25.*

**Question 22:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar used unreasonable force on Kyle Johnson?

_X_ YES        _____ NO

*If the answer to Question 22 is yes, answer Question 23. If the answer to Question 22 is no, stop here and go to Question 25.*

**Question 23:** Did Kyle Johnson consent to James Adgar's use of force?

_____ YES        _X_ NO

*If the answer to Question 23 is no, go to Question 24. If the answer to Question 23 is yes, stop here and go answer Question 25.*

**Question 24:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar's use of unreasonable force was a substantial factor in causing harm to Kyle Johnson?

_X_ YES        _____ NO

*Go to Question 25.*

8

ER0054

## SECTION V: *Negligence*

**On Plaintiff Kyle Johnson's *Claim against James Adgar* alleging negligence, we the Jury, unanimously find as follows:**

**Question 25:** Did Plaintiff prove by a preponderance of the evidence that on May 30, 2020 James Adgar negligently shot a 40mm projectile that struck Plaintiff?

    ✗ YES          _____ NO

*If the answer to Question 25 is yes, answer Question 26. If the answer to Question 25 is no, stop here and go to Question 32.*

**Question 26:** Did Kyle Johnson prove by a preponderance of the evidence that he was harmed?

    ✗ YES          _____ NO

*If the answer to Question 26 is yes, answer Question 27. If the answer to Question 26 is no, stop here and go to Question 32.*

**Question 27:** Did Kyle Johnson prove by a preponderance of the evidence that James Adgar's negligence was a substantial factor in causing Kyle Johnson's harm?

    ✗ YES          _____ NO

*If the Answer to Question 27 is yes, answer Question 28. If the answer to Question 27 is no, stop here and go to answer Question 32.*

9

ER0055

## SECTION VI: *Contributory Negligence*

*The following questions only apply to Plaintiff Kyle Johnson's Fifth Claim for Negligence. Answer Question 28 and follow the instructions only if your answers to Questions 25, 26, and 27 are yes. If you answered no to Question 25, 26, or 27, stop here and go to Question 32.*

**On James Adgar's defense alleging that Plaintiff's harm was caused or contributed to by Plaintiff's actions, or the actions of others, we the Jury, unanimously find as follows:**

**Question 28:** Did James Adgar prove by a preponderance of the evidence that Kyle Johnson's conduct on May 30, 2020 was negligent?

_____ YES        ✗ NO

*If the answer to Question 28 is yes, answer Question 29. If the answer to Question 28 is no, skip Question 29 and answer Question 30.*

N/A

**Question 29:** Did James Adgar prove by a preponderance of the evidence that Kyle Johnson's negligence was a substantial factor in causing Kyle Johnson's harm?

_____ YES        _____ NO

*Answer Question 30.*

**Question 30:** Did Defendant Adgar prove by a preponderance of the evidence that any of the following other persons were negligent:

a.  The person identified in Exhibit 552a that corresponds to video Exhibit 527 at 22:33:13-15?

✗ YES        _____ NO

b.  The person identified in Exhibit 553 that corresponds to video exhibit 107 at 22:33:25-27?

✗ YES        _____ NO

*If the answer to Question 30a or 30b is yes, answer Question 31. If the answer to Question 30a and 30b is no, go to Question 32.*

10

ER0056

**Question 31:** Did Defendant Adgar prove by a preponderance of the evidence that the conduct of others was a substantial factor in causing or contributing to Plaintiff's harm?

___X___ YES          _____ NO

*Go to Question 32.*

11

Case No. 5:21-cv-01849-BLF

ER0057

**SECTION VII: *Damages***

*Answer Question 32 only if the answer to Questions 4, 8, 13, 16, 20, 24, or 27 is yes. If the answer to all of these questions is no, date and sign this verdict form, and return it to the Court.*

**On Plaintiff Kyle Johnson's claim for damages, we the Jury, unanimously find as follows:**

**Question 32:** What amount has Plaintiff proved by a preponderance of the evidence will fairly compensate Plaintiff for any harm to him?

$ 1,353,313

*Answer Question 33 only if you answered yes to Question 29, Question 31, or both.*

**Question 33:** On Plaintiff's Fifth Claim for Negligence only, what percentage of responsibility for Plaintiff's harm do you assign to the following?

| | |
|---|---|
| Defendant James Adgar | 78 % |
| Plaintiff Kyle Johnson | 0 % |

The person identified in Exhibit 552a that corresponds to video Exhibit 527 at 22:33:13-15.    17 %

The person identified in Exhibit 553 that corresponds to video exhibit 107 at 22:33:25-27.    5 %

**TOTAL**                    **100%**

*Please have the Presiding Juror sign and date the verdict form and return it to the Court.*

Dated: January 22, 2025        Presiding Juror: _Mary Grace Perry_

12

Case No. 5:21-cv-01849-BLF

**ER0058**