No: 25-1392 and 25-5468

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KYLE JOHNSON,

        Plaintiff-Appellee

v.

JAMES ADGAR,

        Defendant-Appellant

NO.  25-1392 and 25-5468
Consolidated

D.C. No: 5:21-cv-01849-BLF
Northern District of California,
San Jose Division

**Appellant's Excerpts of Record**

**Volume 2 of 3**

On Appeal from the United States District Court
for the Northern District of California (San Jose)
No. 5:21-cv-01849-BLF
Hon. Beth Labson Freeman

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
MALGORZATA LASKOWSKA, Senior Deputy City Attorney (187252)
BRIAN P. EGGLESTON, Senior Deputy City Attorney (289309)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Margo.Laskowska@sanjoseca.gov;
Brian.Eggleston@sanjoseca.gov

Attorneys for James Adgar

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor,
San José, California 95113-1905
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email: cao.main@sanjoseca.gov

Attorneys for Defendants, CITY OF SAN JOSE and JAMES ADGAR

JAMES McMANIS (40958)
MATTHEW SCHECHTER (212003)
ABIMAEL BASTIDA (303355)
PRIYA SWAMINATHAN (349074)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244
Email: abastida@mcmanislaw.com

Attorneys for Plaintiff, KYLE JOHNSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>            Plaintiff,<br><br>        v.<br><br>CITY OF SAN JOSE and JAMES ADGAR,<br><br>          Defendants. | Case Number:  5:21-cv-01849-BLF<br><br>**JOINT CERTIFICATION OF COUNSEL REGARDING ADMITTED EXHIBITS**<br><br>Trial Date:  January 3, 2025<br>Courtroom: 5th Floor, Courtroom 1<br>Judge:      Honorable Beth L. Freeman |

///

///

1

Pursuant to Civil Local Rule 5-1(g)(1)(A), all parties hereby certify that the exhibits attached hereto and lodged on flash drive with the court, are true and correct copies of the exhibits admitted by the Court and submitted to the jury in the above-entitled matter. The complete list of admitted exhibits and corresponding filing methods are as follows:

| Exhibit No. | Description | Party | Location |
|---|---|---|---|
| 1a | Kyle Johnson Photo-2018-01-27 IMG_8365 | P | Attached |
| 1b | Kyle Johnson Photo-2019-07-12 IMG_2995 | P | Attached |
| 1e | Kyle Johnson Photo-2024-01-25 IMG_3543 | P | Attached |
| 1i | Kyle Johnson Video-2020-05-15 IMG_3645 | P | Flash Drive |
| 2 | Kyle Johnson Injury Photos-Johnson_001636-001637 | P | Attached |
| 15 | Kyle Johnson Kaiser Medical Records-JOHNSON_000001-002280 | P | Flash Drive |
| 16 | Kyle Johnson Kaiser Billing Records-JOHNSON_200001-200142 | P | Attached |
| 17 | Kyle Johnson Kaiser Pharmacy Receipts-JOHNSON_200126-200145 | P | Attached |
| 18 | Dr. Harlan Watkins CV | P | Attached |
| 35 | Holly Allman CV | P | Attached |
| 40 | Pat Mason CV | P | Attached |
| 44 | Roger Clark CV | P | Attached |
| 49 | Jason Fries CV | P | Attached |
| 65 | Less Lethal 40m Launcher & Stunbag Projectile Impact Weapons Safety Update Training | P | Attached |
| 88 | Officer James Adgar Photo | P | Attached |
| 98 | L. Tassio 5/29 BWC | D | Flash Drive |
| 98a | L. Tassio 5/29 BWC [17.14.28-17.14.48] | P | Flash Drive |
| 100a | City Hall West Plaza Video | P | Flash Drive |
| 102 | K. Babineau 5/30 BWC | D | Flash Drive |
| 102a | K. Babineau 5/30 BWC [21.53.17-21.53.46] | P | Flash Drive |
| 104a | J. Chavez 5/30 BWC Screenshot [22.01.53] | P | Attached |
| 106a | T. Takash 5/30 BWC [22.33.03-22.33.40] | P | Flash Drive |
| 107 | J. Palmer 5/30 BWC | D | Flash Drive |
| 107a | J. Palmer 5/30 BWC [22.50.30-22.50.48] | P | Flash Drive |
| 108a | A. Brown 5/30 BWC [22.32.54-22.33.52] | P | Flash Drive |
| 111a | J. Villaruz 5/30 BWC [22.32.54-22.34.06] | P | Flash Drive |
| 112 | J. Adgar 5/30 BWC | D | Flash Drive |
| 112a | J. Adgar 5/30 BWC [22.17.38-22.18.00] | P | Flash Drive |
| 112c | J. Adgar 5/30 BWC [22.32.59-22.33.38] | P | Flash Drive |
| 113 | H. Santana 5/30 BWC | D | Flash Drive |
| 114 | J. Nicholas 5/30 BWC | D | Flash Drive |
| 116a | E. Morales 5/30 BWC [22.32.54-22.33.47] | P | Flash Drive |

2

| Exhibit No. | Description | Party | Location |
|---|---|---|---|
| 117a | E. Thompson 5/30 BWC [22.32.54-22.33.42] | P | Flash Drive |
| 118 | J. Byers 5/30 BWC | D | Flash Drive |
| 118a | J. Byers 5/30 BWC [22.29.48-22.30.11] | P | Flash Drive |
| 118b | J. Byers 5/30 BWC [22.30.48-22.31.01] | P | Flash Drive |
| 118c | J. Byers 5/30 BWC [22.33.09-22.34.18] | P | Flash Drive |
| 118d | J. Byers 5/30 BWC [22.54.35-22.55.05] | P | Flash Drive |
| 118e | J. Byers 5/30 BWC [22.29.21-22.29.33] | P | Flash Drive |
| 119a | M. Koska 5/30 BWC [22.32.54-22.33.40] | P | Flash Drive |
| 120a | City Hall Rotunda Pantry Exit Video Excerpt | P | Flash Drive |
| 125a | KPIX CBS SF Bay Area News Report Video | P | Flash Drive |
| 149 | Cameraman hit video | P | Flash Drive |
| 150 | Derrick Sanderlin Benny Blanco YouTube May 30, 2020 | P | Flash Drive |
| 151a | SJPD 2020 Duty Manual-(SJ278383, SJ278677-78, SJ278690, SJ278694-5) | P | Attached |
| 151b | SJPD 2020 Duty Manual-(SJ278383, SJ278669) | P | Attached |
| 155 | SJPD Duty Manual Revisions re Projectile Impact Weapons | P | Attached |
| 181 | Sciba Less Lethal Devices Training | P | Attached |
| 196 | Tassio MFF Training | P | Attached |
| 198 | Post Guidelines re Crowd Management | P | Attached |
| 210 | Less Lethal Training | P | Attached |
| 211 | MFF Metro Academy Training | P | Attached |
| 236a | Byers 5/30 Report-SJ025126-7 | P | Attached |
| 257 | Tassio Email re 40mm OC Rounds | P | Attached |
| 436 | Peter Di Donato Injury Photo | P | Attached |
| 439 | Breanna Contreras Injury Photo | P | Attached |
| 440 | 527 Moraga BWC Screenshot [22.33.14] Marked by Johnson on 1/14/25 | P | Attached |
| 503.2 | 5/29 Drone Footage [Patrol Car] | D | Flash Drive |
| 503.3 | 5/29 Drone Footage [Construction Zone] | D | Flash Drive |
| 503.4 | 5/29 Drone Footage [Skirmish Line] | D | Flash Drive |
| 505.2a | Arson Video [00.17-00.33-no sound] | D | Flash Drive |
| 515 | City Hall West Plaza Video 25% speed | D | Flash Drive |
| 517 | F. Orabuena 5/30 BWC [19.17.36-51] | D | Flash Drive |
| 518 | R. Vasquez 5/30 BWC [21.18.40-21.19.45] | D | Flash Drive |
| 519 | J. Adgar 5/30 BWC [22.23.00-22.35.00] | D | Flash Drive |
| 523 | J. Palmer 5/30 BWC [22.24.17-22.24.41] | D | Flash Drive |
| 526 | M. Moraga 5/30 BWC [22.24.17-22.24.30] | D | Flash Drive |
| 527 | M. Moraga 5/30 BWC [22.33.08-22.33.21] | P | Flash Drive |
| 528 | J. Ikeuchi 5/30 BWC [22.24.17-22.24.30] | D | Flash Drive |
| 529 | J. Ikeuchi 5/30 BWC [22.33.08-22.33.19] | D | Flash Drive |
| 530 | R. Joseph 5/30 BWC [22.24.17-22.24.30] | D | Flash Drive |
| 531 | R. Joseph 5/30 BWC [22.33.08-22.33.17] | D | Flash Drive |
| 533 | C. Randolph 5/30 BWC [22.24.17-22.24.30] | D | Flash Drive |
| 534 | S. Cespedes 5/30 BWC [22.33.08-22.33.19] | D | Flash Drive |
| 536 | T. Rodgers 5/30 BWC [22.33.08-22.33.18] | D | Flash Drive |

3

| Exhibit No. | Description | Party | Location |
|---|---|---|---|
| 552a | 527 Moraga BWC Screenshot [22.33.14] Marked by Adgar on 1/14/25 | D | Attached |
| 553 | 107 Palmer BWC Screenshot [22.33.26] Marked by Adgar on 1/14/25 | D | Attached |

Dated: March 25, 2025                    McMANIS FAULKNER

                                         /s/ Abimael Bastida
                                         ABIMAEL BASTIDA
                                         Attorneys for Plaintiff


Dated: March 11, 2025                    NORA FRIMANN, City Attorney

                                         /s/ Nicholas Sympson
                                         NICHOLAS SYMPSON
                                         Senior Deputy City Attorney
                                         Attorneys for Defendants


## ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all counsel represented by conformed signatures above have concurred in the filing of this document.


Dated: March 25, 2025                    /s/ Nicholas Sympson
                                         NICHOLAS SYMPSON
                                         Senior Deputy City Attorney
                                         Attorneys for Defendants

4

# TRIAL EXHIBIT 2

Kyle Johnson Injury Photos-Johnson_001636-001637



**CONFIDENTIAL**

**JOHNSON_001636**

**ER0065**



**CONFIDENTIAL**

**JOHNSON_001637**

**ER0066**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA

Case No:  5:21-cv-01849-BLF

Joint / Plaintiff / Defendant Exh. No.: 002

Date Admitted:

By: Tiffany Salinas-Harwell, Deputy Clerk

# TRIAL EXHIBIT 107

# J. Palmer 5/30 BWC (.mp4)

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>      Plaintiff(s),<br><br>    v.<br><br>CITY OF SAN JOSE, et al.<br><br>      Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 107: J. Palmer 5/30 BWC** |

### <u>MANUAL FILING NOTIFICATION</u>

Regarding: **TRIAL EXHIBIT 107: J. Palmer 5/30 BWC.**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 107     Case Number: 5:21-cv-01849-BLF

2194182

**ER0069**

Case 5:21-cv-01849-BLF     Document 277     Filed 03/28/25     Page 244 of 601

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025

NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
     NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 107          Case Number: 5:21-cv-01849-BLF
                                                                        2194182

**ER0070**

# CERTIFICATE OF SERVICE

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**      5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 107: J. Palmer 5/30 BWC**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/ Brian Ward*
Brian Ward

CERTIFICATE OF SERVICE                                          Case Number: 5:21-cv-01849-BLF

2194182
**ER0071**

# TRIAL EXHIBIT 112

# J. Adgar 5/30 BWC (.mp4)

ER0072

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>                    Plaintiff(s),<br><br>          v.<br><br>CITY OF SAN JOSE, et al.<br><br>                    Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 112: J. Adgar 5/30 BWC** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 112: J. Adgar 5/30 BWC.**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 112          Case Number: 5:21-cv-01849-BLF
2194186
**ER0073**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):


                                        Respectfully submitted,

Dated:  March 28, 2025                  NORA FRIMANN, City Attorney


                                        By:  /s/ Nicholas Sympson
                                             NICHOLAS SYMPSON

                                        Attorneys for Defendants CITY OF SAN JOSE
                                        and JAMES ADGAR

# CERTIFICATE OF SERVICE

**CASE NAME:**   *Johnson v. City of San Jose, et al.*
**CASE NO.:**       5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 112: J. Adgar 5/30 BWC**

☒   by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/ Brian Ward*
Brian Ward

CERTIFICATE OF SERVICE                                     Case Number: 5:21-cv-01849-BLF

2194186
**ER0075**

# TRIAL EXHIBIT 155

# SJPD Duty Manual Revisions re Projectile Impact Weapons

ER0076



CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:**  ALL DEPARTMENT PERSONNEL    **FROM:**  Edgardo Garcia
Chief of Police

**SUBJECT:**  PROJECTILE IMPACT WEAPONS    **DATE:**  May 22, 2020
SEE BELOW

Memo# 2020-019

## SUBJECT

**DUTY MANUAL REVISION – L 2629 USE OF PROJECTILE IMPACT WEAPONS**
**DUTY MANUAL REVISION – L 2629.5 LIMITED USE OF 37 MM PROJECTILE**
**IMPACT WEAPON FOR CROWD CONTROL**

## BACKGROUND

In the interest of providing officers with additional less-than-lethal force options, the Department is revising the following Duty manual sections related to the use of Projectile Impact Weapons (PIW) to include the authorized use of the 40mm OC less-than-lethal munitions.  Field situations often arise where a normal 40mm foam baton round is ineffective on a dangerous suspect.  These circumstances include but are not limited to incidents where the suspect is barricaded and/or behind cover.  The 40mm OC round, which is similar to the foam baton round but carries a payload of OC powder,  has the capability to be deployed at or in the general area of a suspect in order to gain compliance through blunt force and/or through the OC irritant exposure. Several Duty Manual sections are being revised to ensure that the use of the 40mm OC round complies with the PIW sections as well as with the Chemical Agent sections of the Duty Manual.

The availability of a 40mm PIW containing Chemical Agents requires revision of section L 2629.5 which previously prohibited the use of 40mm PIWs in crowd control situations.

## ANALYSIS

The Duty Manual has been revised to reflect changes to the below listed sections.  Additions are shown in *italics and underlined*. Deletions are shown in "strike through" form.

**SJ404740**

**ER0077**

ALL DEPARTMENT PERSONNEL
SUBJECT: DUTY MANUAL REVISIONS – PROJECTILE IMPACT WEAPONS
May 22, 2020
Page 2 of 3

**L   2629**     **USE OF PROJECTILE IMPACT WEAPONS:**
*Revised 05-22-20*

Only officers who have completed an approved training course taught by a qualified Department member or a representative of the manufacturer supplying the ammunition are authorized to use this type of equipment. Because projectile impact weapons have the potential to cause serious injury or death, this type of weapon will only be used in the following circumstances:

• To be used when objectively reasonable to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody.

• To be used when objectively reasonable in situations where its use is likely to prevent any person from being seriously injured.

***NOTE:*** *Less lethal projectiles containing chemical agents are available for use by authorized personnel.  The use of less lethal chemical agent projectiles shall comply with this Duty Manual section and with sections DM L 2609 – USE OF CHEMICAL AGENTS and DM L 2610 – PROVIDING FIRST AID.*

All patrol officers, who have completed an approved training course, shall be required to carry a projectile impact weapon (either a stun-bag shotgun or a 40mm Projectile Impact Weapon) while on-duty; officers not permanently assigned a 40mm Projectile Impact Weapon shall check out a projectile impact weapon (stun-bag shotgun or 40mm Projectile Impact Weapon) from Central Supply at the beginning of each assigned shift.

The intentional discharge of a Projectile Impact Weapon at a suspect shall be documented as a use of force. When an intentional discharge of a Projectile Impact Weapon is used for the purpose of breaking glass, and the discharge does not result in any person being struck by a projectile, the discharge shall be documented in a General Offense report.

**L 2629.5**     **LIMITED USE OF 37 MM PROJECTILE IMPACT WEAPON FOR CROWD CONTROL:**
*Revised 05-22-20*

Only the 37mm Projectile Impact Weapon *(i.e. SAGE Gun)* may be used for crowd control purposes ~~as~~ *in the method* prescribed in this section. Stun-bag shotguns ~~and 40mm Projectile Impact Weapons may only be used in accordance with Section L 2629 and~~ may not be used for crowd control purposes ~~as a method for crowd dispersal as described in this section~~. *40mm Projectile Impact Weapons that do not contain chemical agents may not be used for crowd control purposes.  40mm Projectile Impact Weapons that do contain chemical agents may be used for crowd control purposes as described in section L 2609*.

**SJ404741**

**ER0078**

**ALL DEPARTMENT PERSONNEL**
**SUBJECT: DUTY MANUAL REVISIONS – PROJECTILE IMPACT WEAPONS**
May 22, 2020
Page 3 of 3

The 37mm utilizes a single black powder round that deploys five foam baton projectiles. For the purposes of this policy, this Projectile Impact Weapon is not intended to target individual suspects, but to provide a visual and auditory deterrent (loud report and bright muzzle flash). The primary objective when deploying a 37mm Projectile Impact Weapon in this manner is to compel persons engaged in assaultive resistance to disperse peacefully, so that the use of physical force intentionally directed at persons can be avoided. For the purposes of this policy, assaultive resistance is defined as acts of violence against persons, or intentional destruction of property resulting in major property damage. An example of this type of conduct would include suspects throwing objects capable of causing bodily injury from within the crowd at officers or other persons.

The 37mm Projectile Impact Weapon shall be utilized in accordance with the following procedures:

1. A lawful dispersal order shall have been given and the crowd has been given a reasonable amount of time to disperse and has failed to do so in violation of Penal Code Section 409 – Failure to Disperse.
2. Only personnel assigned to the Special Operations Division shall utilize the 37mm Projectile Impact Weapon during crowd control situations.
3. A Command Officer must authorize both the carrying and discharging of the 37mm Projectile Impact Weapon for crowd control purposes.
4. When authorized, the 37mm round shall be fired into the ground in front of the crowd. The 37mm round should only be expelled when there is sufficient distance between the officer and the crowd to allow the energy of the round, once it strikes the ground, to sufficiently dissipate in order to prevent any substantial risk of injury to any person.

When an intentional discharge of a 37mm Projectile Impact Weapon is used for the purpose of dispersing a crowd engaged in assaultive resistance, the discharge shall be documented as a use of force in accordance with Duty Manual Sections L 2643 – L 2645 regardless of whether or not a person is struck by a 37mm round. Nothing in these guidelines is meant to restrict or prevent an officer from deploying a Projectile Impact Weapon in accordance with the Duty Manual Sections L 2629 – L 2631.

**ORDER**

Effective immediately, all sworn personnel will adhere to the above listed Duty Manual changes.

Edgardo Garcia
Chief of Police

EG:PC

**SJ404742**

**ER0079**

# TRIAL EXHIBIT 257

# Tassio Email re 40mm OC Rounds

ER0080

**From:** Tassio, Lee on behalf of Tassio, Lee <lee.tassio@sanjoseca.gov>
**Sent:** Friday, May 29, 2020 4:42 PM EDT
**To:** Moran, Tyler <Tyler.Moran@sanjoseca.gov>
**Subject:** FW: 40mm OC Rounds
**Attachment(s):** "2020-019 DM Revisions - Projectile Impact Weapons.pdf","2020-020 DM Revisions - Chemical Agents[3].pdf"

**Sergeant Lee Tassio #3872**
**San Jose Police Department**
**Special Operations - METRO Unit**
201 W. Mission St.
San Jose, CA 95110
Office: 408-277-4044
Work Cell: 408-839-4251

---

**From:** Tassio, Lee <lee.tassio@sanjoseca.gov>
**Sent:** Wednesday, May 27, 2020 9:08:45 AM
**To:** Minten, Mark <Mark.Minten@sanjoseca.gov>; Weidner, Brett <Brett.Weidner@sanjoseca.gov>; Jize, Christina <Christina.Jize@sanjoseca.gov>; Simonini, Mike <Mike.Simonini@sanjoseca.gov>; Avila, Juan <JuanD.Avila@sanjoseca.gov>; Marshall, Jonathan <Jonathan.Marshall@sanjoseca.gov>
**Subject:** FW: 40mm OC Rounds

All,

Please familiarize yourselves with the new 40mm OC round policies. Even if you don't have a 40mm launcher you should know and understand the policy. I will provide 40mm OC rounds to those of you who have 40mm launchers this week.

Lee

Sergeant Lee Tassio #3872
San Jose Police Department
Special Operations – METRO
Work Cell: (408) 839-4251
Office: (408) 277-4631
3872@sanjoseca.gov



**From:** "Tassio, Lee" <lee.tassio@sanjoseca.gov>
**Date:** Saturday, May 23, 2020 at 2:34 PM
**To:** "Prim, John" <john.prim@sanjoseca.gov>, "Vizzusi, Anthony" <Anthonyj.Vizzusi@sanjoseca.gov>, "Lopez, Ronnie" <RONNIE.LOPEZ@sanjoseca.gov>, "Matchett, Brian" <BRIAN.MATCHETT@sanjoseca.gov>
**Subject:** 40mm OC Rounds

All,

As you may have seen, the new policies regarding the 40mm OC rounds have come out.

LT, with your approval I would like to start distributing these rounds to Metro / VCET officers for use in the field.

All of the Metro / VCET officers received the required training for the 40mm OC rounds during the crowd control / less lethal training on 4/29.
I recommend all of the officers read and understand the new polices before deploying these rounds.

Some of my observations on the new polices:

- 40mm OC rounds require supervisor or Incident Commander approval BEFORE deployment.
- The use of the 40mm OC round must meet the requirements outlined in both L2609 (Use of Chemical Agents) AND L2629 (Use of Projectile Impact Weapons)
- The 40mm OC round is intended to be used to '*to prevent individuals from gathering in a specific area during an unlawful assembly, directly on violent crowds, or to encourage a suspect to exit an enclosed structure, vehicle, or open space.* " (It should not be used as an alternative to 40mm Foam Baton Rounds for things such as direct impact strikes where there is no justification for chemical agents use, to breach windows or similar situations)

ER008514

- L2629.5 (Limited Use of 37MM…) has been modified as follows:
  - *"40mm Projectile Impact Weapons that do not contain chemical agents may not be used for crowd control purposes. 40mm Projectile Impact Weapons that do contain chemical agents may be used for crowd control purposes as described in section L 2609."*

As I understand this policy modification, we may no longer deploy 40mm foam baton rounds during crowd control incidents. We may only deploy 37mm SAGE rounds for crowd dispersal and 40mm OC rounds for direct targeting of violent suspects or for indirect targeting for crowd dispersal.

We currently have a stock of 200 rounds of 40mm OC rounds for Metro and VCET (Canines also has 100 rounds). The rounds are stored in the Metro Bike Shed Ammo locker (Orange round marked CTS 4556)

Please sign out what you take. I recommend 2 rounds per 40mm officer and 10 rounds to the SGT.

**Please take extra care in storing these rounds. They are frangible and if the tip of the round breaks the OC powder will leak out!**
(I purchased a 40mm bandolier to T&E when I ordered the rounds and so far it has worked very well. Here is the link if you would like to purchase one for your team: https://www.tacticaltailor.com/40mmbelt12rd.aspx

Let me know if you have any questions and please let me know if you have a deployment so we can assess effectiveness.

Thanks,
Lee


Sergeant Lee Tassio #3872
San Jose Police Department
Special Operations – METRO
Work Cell: (408) 839-4251
Office: (408) 277-4631
3872@sanjoseca.gov



**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA**

Case No:  5:21-cv-01849-BLF

Joint / Plaintiff / Defendant Exh. No.: 257

Date Admitted:

By: Tiffany Salinas-Harwell, Deputy Clerk

ER0083

# TRIAL EXHIBIT 526

# M. Moraga 5/30 BWC [22.24.17-22.24.30] (.mp4)

ER0084

**CERTIFICATE OF SERVICE**

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**        5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 526: M. Moraga 5/30 BWC [22.24.17-22.24.30]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/  Brian Ward*
BRIAN WARD

1

CERTIFICATE OF SERVICE                    Case Number: 5:21-cv-01849-BLF

2194369
**ER0085**

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>                    Plaintiff(s),<br><br>          v.<br><br>CITY OF SAN JOSE, et al.<br><br>                    Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 526: M. Moraga 5/30 BWC [22.24.17-22.24.30]** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 526: M. Moraga 5/30 BWC [22.24.17-22.24.30].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 526          Case Number: 5:21-cv-01849-BLF

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025

NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>              Plaintiff(s),<br><br>        v.<br><br>CITY OF SAN JOSE, et al.<br><br>              Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 527: M. Moraga 5/30 BWC [22.33.08-22.33.21]** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 527: M. Moraga 5/30 BWC [22.33.08-22.33.21].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 527                Case Number: 5:21-cv-01849-BLF

2194370
**ER0088**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025

NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
        NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

2194370

**ER0089**

**CERTIFICATE OF SERVICE**

**CASE NAME:**   *Johnson v. City of San Jose, et al.*
**CASE NO.:**     5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 527: M. Moraga 5/30 BWC [22.33.08-22.33.21]**

☒   by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March __, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

/s/_____
BRIAN WARD

1

CERTIFICATE OF SERVICE                                   Case Number: 5:21-cv-01849-BLF

2194370

**ER0090**

# TRIAL EXHIBIT 528

# J. Ikeuchi 5/30 BWC [22.24.17-22.24.30] (.mp4)

ER0091

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| KYLE JOHNSON, | Case Number:  5:21-cv-01849-BLF |
|---|---|
| Plaintiff(s), | **TRIAL EXHIBIT 528: J. Ikeuchi 5/30 BWC [22.24.17-22.24.30]** |
| v. | |
| CITY OF SAN JOSE, et al. | |
| Defendant(s). | |

## MANUAL FILING NOTIFICATION

Regarding: **TRIAL EXHIBIT 528: J. Ikeuchi 5/30 BWC [22.24.17-22.24.30].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 528               Case Number: 5:21-cv-01849-BLF

2194371

**ER0092**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025

NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

## CERTIFICATE OF SERVICE

**CASE NAME:**   *Johnson v. City of San Jose, et al.*
**CASE NO.:**   5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 528: J. Ikeuchi 5/30 BWC [22.24.17-22.24.30]**

☒   by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

/s/   *Brian Ward*
BRIAN WARD

1

CERTIFICATE OF SERVICE

Case Number: 5:21-cv-01849-BLF

2194371
**ER0094**

# TRIAL EXHIBIT 530

# R. Joseph 5/30 BWC [22.24.17-22.24.30] (.mp4)

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>                    Plaintiff(s),<br><br>          v.<br><br>CITY OF SAN JOSE, et al.<br><br>                    Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 530: R. Joseph 5/30 BWC [22.24.17-22.24.30]** |

## MANUAL FILING NOTIFICATION

Regarding: **TRIAL EXHIBIT 530: R. Joseph 5/30 BWC [22.24.17-22.24.30].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 530                Case Number: 5:21-cv-01849-BLF

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

                                    Respectfully submitted,

Dated:  March 28, 2025                  NORA FRIMANN, City Attorney


By:  */s/ Nicholas Sympson*
      NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE and JAMES ADGAR

2

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 530        Case Number: 5:21-cv-01849-BLF

2194373

**ER0097**

**CERTIFICATE OF SERVICE**

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**        5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 530: R. Joseph 5/30 BWC [22.24.17-22.24.30]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

/s/    Brian Ward
BRIAN WARD

CERTIFICATE OF SERVICE

Case Number: 5:21-cv-01849-BLF
2194373
**ER0098**

# TRIAL EXHIBIT 531

# R. Joseph 5/30 BWC [22.33.08-22.33.17] (.mp4)

ER0099

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| KYLE JOHNSON,<br><br>　　　　　Plaintiff(s),<br><br>　　v.<br><br>CITY OF SAN JOSE, et al.<br><br>　　　　　Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 531: R. Joseph 5/30 BWC [22.33.08-22.33.17]** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 531: R. Joseph 5/30 BWC [22.33.08-22.33.17].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 531　　　　　　Case Number: 5:21-cv-01849-BLF

2194374

**ER0100**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025                    NORA FRIMANN, City Attorney


By:  /s/ Nicholas Sympson
     NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

## CERTIFICATE OF SERVICE

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**       5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 531: R. Joseph 5/30 BWC [22.33.08-22.33.17]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

/s/    *Brian Ward*
BRIAN WARD

1

# TRIAL EXHIBIT 534

# S. Cespedes 5/30 BWC [22.33.08-22.33.19] (.mp4)

ER0103

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>             Plaintiff(s),<br><br>     v.<br><br>CITY OF SAN JOSE, et al.<br><br>             Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 534: S. Cespedes 5/30 BWC [22.33.08-22.33.19]** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 534: S. Cespedes 5/30 BWC [22.33.08-22.33.19].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 534          Case Number: 5:21-cv-01849-BLF

2194376

**ER0104**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025

NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
      NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

**CERTIFICATE OF SERVICE**

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**       5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 534: S. Cespedes 5/30 BWC [22.33.08-22.33.19]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

/s/   Brian Ward
BRIAN WARD

1

# TRIAL EXHIBIT 536

ER0107

T. Rodgers 5/30 BWC [22.33.08-22.33.18] (.mp4)

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>                    Plaintiff(s),<br><br>          v.<br><br>CITY OF SAN JOSE, et al.<br><br>                    Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 536: T. Rodgers 5/30 BWC [22.33.08-22.33.18]** |

**<u>MANUAL FILING NOTIFICATION</u>**

Regarding: **TRIAL EXHIBIT 536: T. Rodgers 5/30 BWC [22.33.08-22.33.18].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 536          Case Number: 5:21-cv-01849-BLF

2194380

**ER0108**

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025                    NORA FRIMANN, City Attorney

By:  /s/ Nicholas Sympson
     NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

2

## CERTIFICATE OF SERVICE

**CASE NAME:**   *Johnson v. City of San Jose, et al.*
**CASE NO.:**      5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 536: T. Rodgers 5/30 BWC [22.33.08-22.33.18]**

☒   by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/   Brian Ward*
BRIAN WARD

1

CERTIFICATE OF SERVICE

Case Number: 5:21-cv-01849-BLF

2194380
**ER0110**

# TRIAL EXHIBIT 552a

527 Moraga BWC Screenshot [22.33.14] Marked by Adgar on 1/14/25

2020-05-30 22:33:14
AXON BODY 3 X6039A3

**Trial Exhibit 552a-1**

527 Moraga

0

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No.: 5:21-cv-01849-BLF
DEFENDANTS' EXHIBIT NO. 552 A
Date Admitted:_____
By: Tiffany Salinas-Harwell, Deputy Clerk

**Trial Exhibit 552a-2**

ER0113

# TRIAL EXHIBIT 553

107 Palmer BWC Screenshot [22.33.26] Marked by Adgar on 1/14/25

ER0114



2020-05-30 22:33:26
AXON BODY 3 X6039940

**Trial Exhibit 553-1**

ER0115

107 Palmer

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No.: 5:21-cv-01849-BLF
DEFENDANTS' EXHIBIT NO. 553
Date Admitted:_____
By: Tiffany Salinas-Harwell, Deputy Clerk

**Trial Exhibit 553-2**

ER0116

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

PLAINTIFF,                    CASE NO.  CV-21-01849 BLF

VS.                           SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA    JANUARY 3, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 1
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,                PAGES 1 - 24

DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:    MCMANIS FAULKNER
                      BY:  ABIMAEL BASTIDA
                           MATTHEW SCHECHTER
                      10TH FLOOR
                      50 WEST SAN FERNANDO STREET
                      SAN JOSE, CALIFORNIA 95113

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0117

ALL GOOD, UPSTANDING PEOPLE.  SO EVEN THOUGH I MIGHT LIKE THEM, I COULDN'T WITH ONE BROAD BRUSH SAY ALL CAL BEARS ARE GREAT.

WELL, THAT'S THE WAY IT IS IN ANY GROUP, WHETHER IT'S BIG OR A SMALL GROUP.  WE HAVE TO JUDGE PEOPLE BASED ON WHAT WE KNOW WITH THEM.

AND AS JURORS, YOU WILL BE JUDGING CREDIBILITY.  YOU'RE NOT JUDGING THE INHERENT WORTH OF ANYONE.  THAT'S NOT WHAT WE DO HERE.

YOU'RE JUDGING THEIR CREDIBILITY, YOU'RE JUDGING WHAT HAPPENED, AND I'LL HAVE JURY INSTRUCTIONS FOR YOU THAT TELL YOU ABOUT IT.

BUT I WANT YOU TO UNDERSTAND THAT IT'S REALLY IMPORTANT FOR YOU TO THINK ABOUT WHERE YOU MIGHT HAVE BIASES THAT COULD BE HARMFUL TO THE JOB THAT YOU HAVE AS JURORS IN THE CASE.

AND WE'RE GOING TO BE ASKING YOU QUESTIONS AND ASKING YOU TO VOLUNTEER INFORMATION.

NOW, IT'S NOT ALWAYS COMFORTABLE TO ADMIT THAT WE MIGHT BE CLOSE MINDED, BUT -- AND THUS NOT ABLE TO BE FAIR.  BUT I NEED YOU TO HELP ON THAT.  I NEED YOU TO BE HONEST.

NOW, SOME PEOPLE CAN SAY I'VE HAD A LIFE EXPERIENCE AND I HAVE A VERY STRONG FEELING ABOUT IT, BUT I KNOW THAT WAS ABOUT ME AND NOT ABOUT THIS CASE AND I CAN SET IT ASIDE.  AND THAT IS WHAT I AM LOOKING FOR.

BUT IF YOU SAY I HAVE A LIFE EXPERIENCE THAT I THINK IS GOING TO AFFECT THIS CASE AND I CAN'T SET IT ASIDE, AND I'VE

ER0118

ALREADY MADE A DECISION BEFORE I'VE HEARD ANYTHING, THAT'S WHAT I'M LOOKING FOR.

IF YOU THINK THAT MAY CREEP IN AND AFFECT YOUR JUDGMENT, THAT'S THE KIND OF THING THAT WE'RE LOOKING FOR.

SO IT'S NOT -- I'M NOT LOOKING FOR SOUL SEARCHING, I'M JUST LOOKING FOR YOUR CANDID ANSWERS.

I'M ALSO NOT LOOKING FOR PEOPLE TO MAKE UP THINGS TO GET OFF OF JURY DUTY.  SO I, TOO, JUDGE CREDIBILITY AND I'VE SEEN A LOT OF JURORS.  SO I'M NOT GOING TO PUT UP WITH ANYONE THAT I THINK IS FAKING IT JUST TO GET OUT OF HERE.  BUT I KNOW YOU'VE TAKEN YOUR OATH SERIOUSLY, AND YOU WILL BE HONEST WITH ME.

SO THAT IS GENERALLY THE ROLE OF JURORS.

NOW, IN THIS CASE WE'RE GOING TO GET DOWN TO PICKING JURORS FOR THIS PARTICULAR CASE.  I'M NOT INTERESTED IN SOMEONE WHO WANTS TO SERVE ON THIS TRIAL.  I'M NOT LOOKING FOR SOMEONE WHO THINKS, WOW, THAT'S INTERESTING, YEAH, PICK ME FOR THIS ONE.

SO YOU DON'T GET TO PICK.  AND IT'S NOT LIKE YOU THINK SOME OTHER CASE WOULD BE BETTER FOR YOU.  IF YOU CAME IN HERE WANTING A VERY JUICY CASE THAT YOU COULD SEE LIKE THE ONES YOU'VE SEEN ON T.V., WELL, THAT'S NOT WHAT THIS IS.  BUT THIS IS -- THIS CASE IS IMPORTANT, IT IS OF VITAL IMPORTANCE TO THE PARTIES WHO ARE HERE AND WE'RE LOOKING TO SEE WHETHER YOU CAN BE FAIR AND OPEN MINDED AND RENDER A JUST VERDICT IN THIS CASE.

SO WHAT I'M GOING TO DO NOW IS I'M GOING TO TURN TO SOME

ER0119

INFORMATION ABOUT THIS CASE.  ULTIMATELY TODAY YOUR JOB WILL BE TO FILL OUT A WRITTEN QUESTIONNAIRE, AND THEN YOU GET TO GO HOME AND COME BACK ON MONDAY.

SO I WANT TO EXPLAIN A NUMBER OF THINGS TO YOU SO THAT WHEN YOU FILL OUT THE QUESTIONNAIRE, YOU WON'T JUST BE IN THE DARK ABOUT WHY I'M ASKING YOU THESE QUESTIONS.

SO I SAID TO YOU BEFORE THE NAME OF THE CASE IS JOHNSON VERSUS CITY OF SAN JOSE AND JAMES ADGAR.

I'M GOING TO READ TO YOU WHAT WE CALL A NEUTRAL STATEMENT OF THE CASE.  WHAT THAT MEANS IS THAT I WANT YOU TO KNOW THE SUBJECT MATTER OF THE CASE.  THIS IS NOT EVIDENCE.  AND IF ANY OF YOU DRAW A CONCLUSION AS TO WHAT YOUR VERDICT WOULD BE FROM WHAT I'VE READ TO YOU, THAT WOULD BE A GOOD DEFINITION OF NOT BEING FAIR AND OPEN MINDED BECAUSE EVIDENCE COMES IN BY SWORN WITNESSES WHO SIT ON THIS WITNESS STAND OR DOCUMENTS OR VIDEOS OR OTHER THINGS I ADMIT INTO EVIDENCE.  NOTHING I SAY IS EVIDENCE.  NOTHING THE ATTORNEYS SAY IS EVIDENCE.  AND NOTHING I'M READING YOU HERE IS EVIDENCE.

BUT IT IS THE SUBJECT MATTER OF THE CASE, AND THAT'S WHAT I WANT YOU TO UNDERSTAND, AND THEN I'LL INTRODUCE YOU TO THE ATTORNEYS WHO ARE TRYING THE CASE.

IN THIS CASE THE PLAINTIFF, KYLE JOHNSON, ALLEGES THAT THE DEFENDANT, SAN JOSE POLICE OFFICER JAMES ADGAR, VIOLATED MR. JOHNSON'S CIVIL RIGHTS UNDER THE UNITED STATES CONSTITUTION AND VIOLATED CALIFORNIA LAW CAUSING PERSONAL AND EMOTIONAL

ER0120

INJURIES TO MR. JOHNSON.

MR. JOHNSON ALLEGES HE WAS STRUCK IN THE BACK OF THE LEG WITH A 40 MILLIMETER PROJECTILE WHILE PEACEFULLY PROTESTING IN THE CITY OF SAN JOSE ON MAY 30, 2020, AFTER THE KILLING OF GEORGE FLOYD IN MINNEAPOLIS, MINNESOTA.

MR. JOHNSON ALLEGES THAT HIS PROTESTING OF BOTH POLICE BRUTALITY AND THE KILLING OF GEORGE FLOYD WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN OFFICER ADGAR'S CONDUCT.

MR. JOHNSON ALSO ALLEGES OFFICER ADGAR INDISCRIMINATELY FIRED THE PROJECTILE INTO THE CROWD OF PROTESTORS AND THIS WAS AN EXCESSIVE USE OF FORCE UNDER THE FOURTH AMENDMENT TO THE CONSTITUTION.

AND FURTHER, THAT OFFICER ADGAR SHOULD BE HELD LIABLE UNDER CALIFORNIA BANE'S ACT AND FOR BATTERY AND FOR NEGLIGENCE.

ADDITIONALLY MR. JOHNSON ALLEGES THAT THE CITY OF SAN JOSE IS LIABLE FOR UNCONSTITUTIONAL PRACTICES RELATING TO OFFICER'S USE OF FORCE DURING THE PROTEST.

DEFENDANTS DENY MR. JOHNSON'S ALLEGATIONS.

DEFENDANTS ALLEGE THE CITY'S POLICIES AND PRACTICES CONFORMED TO THE CONSTITUTIONAL REQUIREMENTS THAT OFFICER ADGAR'S ACTIONS ON MAY 30, 2020 COMPLIED WITH CONSTITUTIONAL REQUIREMENTS THAT OFFICER ADGAR USED 40 MILLIMETER PROJECTILES ONLY AS NECESSARY FOR SAFETY AND THAT NEITHER OFFICER ADGAR NOR THE CITY ARE LIABLE FOR MR. JOHNSON'S ALLEGED INJURIES.

ALL RIGHT.  SO THAT IS THE NEUTRAL STATEMENT OF THE

ER0121

POSITIONS OF EACH OF THE PARTIES IN THE CASE. AND THROUGHOUT THE TRIAL, FOR THOSE OF YOU WHO ARE SEATED AS JURORS, YOU WILL HEAR EVIDENCE ON THOSE TOPICS.

NOW, I'D LIKE TO INTRODUCE YOU TO THE ATTORNEYS. I'M GOING TO DO A QUICK INTRODUCTION TODAY AND ON MONDAY WE'LL DO IT FURTHER.

THE PLAINTIFF, MR. JOHNSON IN THIS CASE, IS REPRESENTED BY HIS LEAD COUNSEL, MR. BASTIDA.

INTRODUCE YOURSELF.

MR. BASTIDA: GOOD MORNING. THANK YOU FOR BEING HERE. MY NAME IS ABIMAEL BASTIDA, AND THIS IS THE PLAINTIFF MR. KYLE JOHNSON. WE THANK YOU FOR BEING HERE TODAY.

THE COURT: THANK YOU.

AND THE CITY AND OFFICER ADGAR REPRESENTED BY THEIR LEAD COUNSEL, MR. SYMPSON, INTRODUCE YOURSELF.

MR. SYMPSON: GOOD MORNING, LADIES AND GENTLEMEN. I'M NICHOLAS SYMPSON, AND I'LL BE REPRESENTING THE CITY OF SAN JOSE AND OFFICER JAMES ADGAR. I APPRECIATE YOUR TIME COMING IN HERE, AND I LOOK FORWARD TO SEEING YOU NEXT WEEK.

THE COURT: THANK YOU.

ALL RIGHT. SO LET ME TELL YOU SORT OF THE NUTS AND BOLTS OF SELECTION. I MENTIONED TO YOU I'M GOING TO SELECT NINE PEOPLE TO SERVE ON A JURY. SO YOU CAN LOOK AROUND THE ROOM AND QUICKLY FIGURE OUT THAT YOUR ODDS ARE PRETTY GOOD OF NOT BEING

ER0122

ON THIS JURY.  BUT I DON'T WANT YOU TO THINK OF IT THAT WAY.

PEOPLE WHO THINK OF IT THAT WAY KIND OF USUALLY GO TO SLEEP, AND THEY'RE THE ONES WHO GET PICKED BECAUSE YOU DIDN'T TELL US ABOUT YOURSELVES.  SO I NEED ALL OF YOU TO KEEP YOUR HEAD IN THE JURY SELECTION.

THE LAW REQUIRES THAT YOU ALL BE PRESENT DURING THE QUESTIONING OF ALL OF THE OTHER JURORS, SO I CAN'T JUST SCHEDULE APPOINTMENTS WITH YOU AND DO IT ONE AT A TIME.

BUT I CAN DO CERTAIN THINGS THAT MOVE IT ALONG EFFICIENTLY.  AND MY GOAL HERE IS TO RESPECT YOUR TIME THROUGHOUT THE TRIAL AND TO MOVE THE CASE ALONG EFFICIENTLY, BUT I'M NOT GOING TO HURRY BECAUSE THE ATTORNEYS AND THE PARTIES HAVE THE RIGHT TO PRESENT THEIR CASE.

BUT MY JOB IS A LITTLE BIT OF HERDING CATS AND A LITTLE BIT OF CARRYING THE CATTLE PROD TO KEEP THINGS MOVING, AND THAT IS MY PROMISE.  BUT I DO THAT FOR YOU AS WELL AS JURORS TO MAKE SURE THAT WE'RE ALL HERE.

SO THE FIRST THING THAT I'M GOING TO DO FOR JURY SELECTION, AND THIS IS A -- THIS IS ACTUALLY A BIG SAVINGS OF YOUR TIME, I'M GOING TO HAVE EACH OF YOU FILL OUT A QUESTIONNAIRE.  THERE ARE A LOT OF QUESTIONS ON THIS DOCUMENT.

IF I HAD EACH ONE OF YOU ANSWER IT ORALLY IN THE COURTROOM, WE WOULD BE HERE FOR A COUPLE OF DAYS.

I THINK MOST OF YOU WILL FILL THIS OUT IN AN HOUR AS OPPOSED TO A COUPLE OF DAYS OF LISTENING TO EVERYONE, AND THAT

ER0123

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 3, 2025

ER0124

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

   PLAINTIFF,    CASE NO.  CV-21-01849 BLF

 VS.      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA JANUARY 6, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR, VOLUME 2
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,   PAGES 25 - 220

   DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF: MCMANIS FAULKNER
     BY:  ABIMAEL BASTIDA
      MATTHEW SCHECHTER
     10TH FLOOR
     50 WEST SAN FERNANDO STREET
     SAN JOSE, CALIFORNIA 95113


   (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTER: IRENE L. RODRIGUEZ, CSR, RMR, CRR
      CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0125

A.   YES, I DO.

Q.   OKAY.  DO YOU SEE THE TIME STAMP IN THE UPPER RIGHT HAND CORNER?

A.   YES, I DO.

Q.   AND WHAT IS THAT DATE?

A.   THE DATE SAYS 2020-5-30, WHICH TO ME INDICATES MAY 30TH.

Q.   CORRECT.  AND DOES IT ALSO HAVE A TIME STAMP?

A.   YES, IT DOES.

Q.   AND WHAT IS THE TIME STAMP?

A.   IT SAYS 21:53:23.

Q.   DO YOU UNDERSTAND THAT TO BE MILITARY TIME AS SOME PEOPLE CALL IT?  AND WOULD IT BE FAIR TO SAY BASED ON COMMON KNOWLEDGE THAT IT'S 9:53 P.M.?

A.   YES.

         MR. BASTIDA:  YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED.

         THE COURT:  ANY OBJECTION?

         MR. SYMPSON:  NO, YOUR HONOR.  THANK YOU.

         THE COURT:  IT WILL BE ADMITTED.

         MR. BASTIDA:  AND THAT IT BE PUBLISHED TO THE JURY, PLEASE?

         THE COURT:  YES.

     (PLAINTIFF'S EXHIBIT 102 WAS RECEIVED IN EVIDENCE.)

         MR. BASTIDA:  CAN WE PLAY THE CLIP AGAIN FOR THE JURY.

ER0126

(VIDEO PLAYING OFF THE RECORD.)

MR. BASTIDA:  PAUSE IT.

Q.   OKAY.  MR. JOHNSON, ARE YOU ABLE TO SEE YOURSELF ON THE SCREEN AT THIS MOMENT?

A.   YES, SIR.

Q.   AND FOR THE RECORD IT'S MAY 30TH, 2020, TIME STAMP 21:53, UPPER RIGHT HAND CORNER.

DO YOU SEE THAT?

A.   YES, I DO.

Q.   OKAY.  THE STREET BEHIND YOU, DO YOU SEE THAT STREET BEHIND YOU?

A.   YES, I DO.

Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT STREET IS?

A.   MY UNDERSTANDING IS THAT IT IS 4TH STREET.

Q.   OKAY.  THIS IS THE CITY HALL PLAZA AS YOU'VE STATED BEFORE?

A.   YES.

Q.   DO YOU SEE ON THE SCREEN YOUR FRIEND MR. SIMON AND THE OTHER INDIVIDUAL THAT YOU TESTIFIED YOU WERE WITH?

A.   YES, I DO.

Q.   OKAY.  AND WHERE ARE THEY, IF YOU CAN DESCRIBE THAT TO THE JURY?

A.   I'M IN THE LOWER RIGHT-HAND CORNER.  I CAN SEE MY DARK BLUE TOP AND MY DARK BLUE JEANS AND MY TAN COLORED SHOES.

THERE'S AN INDIVIDUAL THAT IS BEING BLOCKED BY ME, WHICH

ER0127

JOHNSON DIRECT BY MR. BASTIDA

IS BRANDON, AND THEN THE FRIEND OF BRANDON'S BEHIND US IS DANNY.

Q.   OKAY.  MR. DANG HAS ZOOMED INTO THE SCREEN HERE.

IS THAT YOU AND MR. SIMON AND DANNY?

A.   YES, THAT IS CORRECT.

Q.   OKAY.  SO FROM THE MOMENT THAT YOU ARRIVED AT ST. JAMES MARK AND MET UP WITH MR. SIMON AND DANNY AND WALKED UP 3RD STREET AND MADE A LEFT ON SANTA CLARA, TO THE MOMENT THAT WE'RE SEEING HERE ON THE SCREEN OF THE CORNER OF SANTA CLARA AND 4TH STREET, DID YOU GO ANYWHERE ELSE?

A.   NO, I DID NOT.

Q.   IS THIS THE FIRST TIME THAT YOU STEPPED FOOT AT CITY HALL ON MAY 30TH?

A.   YES, THAT IS CORRECT.

Q.   ONCE YOU ARRIVED AT CITY HALL AT THIS MOMENT FOR THE FIRST TIME AT 9:53 P.M., WHAT DID YOU DO AT THAT TIME?

A.   WE JUST KIND OF WALKED AROUND INSIDE OF THE PLAZA AND I BELIEVE WE WENT TOWARDS LIKE THE FLAG POLLS AND EVENTUALLY ENDED UP AT THE PLANTERS.

Q.   OKAY.  WHAT DO YOU MEAN BY PLANTERS?  CAN YOU EXPLAIN THAT?

A.   I BELIEVE THE PLANTERS WERE THESE BIG SQUARE BLOCKED I GUESS THINGS THAT WERE IN THE SIDEWALK THAT HAD EITHER LIKE A BUSH OR A TREE INSIDE OF THEM.

Q.   BUT ON CITY HALL PLAZA?

ER0128

A.   YES, THAT IS CORRECT.

Q.   OKAY.  CAN WE PULL UP EXHIBIT 104A.

DO YOU SEE THAT IN FRONT OF YOU, MR. JOHNSON?

A.   YES, I DO.

Q.   CAN YOU DESCRIBE WHAT IT IS?

A.   IT IS A PICTURE OF ME, MY FRIEND BRANDON, AND THE OTHER FRIEND, DANNY.

Q.   AND AGAIN THE TIME STAMP NOW SAYS 22:01, SO APPROXIMATELY 10:01 AT NIGHT, MAY 30TH.

ANY REASON TO BELIEVE THAT'S INACCURATE?

A.   NO, SIR.

Q.   OKAY.

MR. BASTIDA:  YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED.

THE COURT:  ANY OBJECTION?

MR. SYMPSON:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

MR. BASTIDA:  I ASK THAT IT BE PUBLISHED TO THE JURY, PLEASE?

THE COURT:  YES.

(PLAINTIFF'S EXHIBIT 104A WAS RECEIVED IN EVIDENCE.)

BY MR. BASTIDA:

Q.   SO, MR. JOHNSON, AS YOU'RE LOOKING AT THE SCREEN, YOU ARE THE ONE FURTHEST TO THE RIGHT; CORRECT?

A.   THAT IS CORRECT.

ER0129

Q.    I NOTICE THAT YOU'RE NOT HOLDING UP A SIGN AS PROTESTORS TYPICALLY DO.

HOW IS IT THAT YOU WERE PROTESTING THAT DAY?

A.    I BELIEVE MY PRESENCE ALONE WAS ENOUGH TO STAND IN PROTEST.  I BELIEVE I WAS STANDING THERE IN SOLIDARITY WITH THE BLACK AND BROWN COMMUNITY.

Q.    AND TO BE CLEAR, YOU WERE NOT THERE FOR ANY OTHER REASON OTHER THAN TO PROTEST?

A.    YES, THAT'S CORRECT.

Q.    AND WOULD THAT BE PEACEFUL PROTESTING OR DID YOU HAVE ANY INTENTION OF DOING ANYTHING ELSE OTHER THAN PEACEFUL PROTESTING THAT NIGHT?

A.    NO.

MR. SYMPSON:  OBJECTION.  COMPOUND.  LEADING.

THE COURT:  SUSTAINED AS TO BOTH.

MR. BASTIDA:  OKAY.

Q.    JUST TO BE CLEAR, THAT WAS MY FAULT FOR WORDING THAT QUESTION.  BUT JUST TO BE CLEAR, WHAT WAS YOUR INTENTION, EVEN THOUGH YOU DID NOT HAVE A SIGN, WHAT WAS YOUR INTENTION OF BEING THERE AT CITY HALL ON THAT DAY?

A.    TO STAND UP AGAINST POLICE BRUTALITY AGAINST THE BLACK AND BROWN COMMUNITY.

Q.    WHEN YOU ARRIVED AND YOU TESTIFIED THROUGH VIDEO AND HAVE INDICATED THAT YOU ARRIVED FOR THE FIRST TIME AT CITY HALL AT AROUND 9:53 P.M.

ER0130

DO YOU RECALL HOW BIG OF A CROWD THERE WAS, IF ANY?

A.   IT WASN'T A HUGE CROWD.  IT HAD TO BE LESS THAN 200 PEOPLE, GIVE OR TAKE.

Q.   OKAY.  AND AT THIS TIME ON THE SCREEN, OTHER THAN THE FEW INDIVIDUALS THAT WE SEE ON THE SCREEN, DO YOU REMEMBER THERE BEING A LOT OF OTHER PEOPLE AT CITY HALL AT THAT TIME?

A.   NOT IN FRONT OF CITY HALL BUT THERE WAS A LITTLE BIT OF A CROWD ACTUALLY ON THE STREET ON 4TH STREET.

Q.   OKAY.  AND AS THE MINUTES PROGRESSED, DO YOU RECALL IF THE CROWD GREW IN SIZE?

A.   I CAN'T RECALL.

Q.   OKAY.  DO YOU RECALL WHATEVER THE SIZE WAS, DO YOU RECALL WHAT THE CROWD WAS GENERALLY DOING?

A.   MOSTLY JUST EITHER CHANTING OR STANDING AROUND.  THERE WAS SOME PEOPLE CURSING, BUT THAT WAS ABOUT THE MOST OF IT.

Q.   OKAY.  DID YOU HAPPEN TO HEAR WHO PEOPLE WERE CURSING AT?

A.   SOME OF THE INDIVIDUALS WERE CURSING AT THE LINE OF POLICE OFFICERS.

Q.   OKAY.  DID YOU SEE -- DID YOU OBSERVE THEM DOING ANYTHING ELSE OTHER THAN CURSING AT THE POLICE OFFICERS?

A.   NO, I DID NOT.

Q.   AND ABOUT HOW MANY POLICE OFFICERS WERE THERE WHEN YOU ARRIVED?

A.   I DON'T HAVE THE EXACT NUMBER.  I JUST REMEMBER THAT THERE WAS A LINE OF POLICE OFFICERS AN SANTA CLARA STREET JUST OFF

ER0131

THE CURB, AND THEN THERE WAS MORE BEHIND THEM, AND MORE SO IN THE MIDDLE OF THE INTERSECTION OF 4TH STREET AND SANTA CLARA STREET.

Q.   OKAY.  AND GENERALLY DO YOU RECALL WHETHER THE OFFICERS WERE IN ANY TYPE OF FORMATION?  DID IT APPEAR THAT THEY WERE JUST STANDING AROUND?

A.   THERE WAS A LINE OF POLICE OFFICERS IN THE STREET OF SANTA CLARA STREET.  IT SEEMED LIKE THEY WERE PROTECTING THAT CONSTRUCTION SITE.

AND THEN THERE WERE OTHER OFFICERS THAT WERE WALKING JUST BEHIND THEM IN THE STREET.

Q.   SO WE'VE ESTABLISHED NOW THAT YOU ARRIVED AT CITY HALL, AND YOU'RE STANDING HERE WITH YOUR FRIENDS AT APPROXIMATELY 10:00 O'CLOCK, 10:01.

AT SOME POINT IN THE NIGHT WERE YOU INJURED THAT NIGHT?

A.   YES, I WAS.

Q.   AND DID IT OCCUR AT CITY HALL?

A.   YES, IT DID.

Q.   FROM THIS MOMENT -- I'M GOING TO USE THIS AS A MARKER, WHAT WE'RE SEEING IN FRONT OF US, TIME STAMPED 10:01, UNTIL THE MOMENT THAT YOU WERE INJURED, DID YOU DO ANYTHING THAT YOU BELIEVED COULD BE PERCEIVED AS THROWING AN OBJECT AT ANYONE?

A.   NO, I DID NOT.

Q.   DID YOU COMMIT ANY CRIMES TO YOUR KNOWLEDGE?

A.   NO, I DID NOT.

ER0132

Q.   DID YOU THREATEN ANYONE?

A.   NO, I DID NOT.

Q.   DID YOU OBSERVE OTHER PEOPLE THROWING OBJECTS?

A.   NOT BEFORE THIS TIME.

Q.   OKAY.  WHAT ABOUT AT THE TIME THAT YOU WERE INJURED -- CLOSER TO THE TIME THAT YOU WERE INJURED, DID YOU OBSERVE OBJECTS BEING THROWN AT THAT TIME?

A.   AT THE TIME, YES, I DID SEE ONE BOTTLE BEING THROWN.

Q.   OKAY.  AND DID YOU SEE IN WHAT DIRECTION THAT WAS THROWN?

A.   IT WAS CLOSER TOWARDS THE INTERSECTION OF 4TH STREET AND SANTA CLARA STREET.

Q.   OKAY.  SO APPROXIMATELY -- TO THE BEST OF YOUR RECOLLECTION, HOW FAR AWAY WAS THAT FROM YOU?

A.   ABOUT 50, MAYBE 70 YARDS AWAY.

Q.   OKAY.  NOW I'M CONFUSED MYSELF.  DID IT LAND 50 TO 70 YARDS AWAY FROM YOU OR WAS IT THROWN FROM 50 TO 70 YARDS AWAY FROM YOU?

A.   IT LANDED ABOUT 50 TO 75 YARDS AWAY FROM ME.

Q.   OKAY.  DID YOU SEE IT ACTUALLY LAND?

A.   I DID SEE IT LAND, YES.

Q.   AND WHERE DID IT LAND?

A.   IT LANDED BEHIND THE POLICE LINE AND I SAW IT BOUNCE, WHICH MAKES ME THINK IT WAS A WATER BOTTLE.

Q.   OKAY.  DID IT STRIKE ANYONE?

A.   NO, I DID NOT SEE IT STRIKE ANYONE.

ER0133

Q.   AND DID YOU SEE WHERE, APPROXIMATELY WHERE THIS WATER BOTTLE ORIGINATED FROM WHEN IT WAS LAUNCHED?

A.   IT LOOKED LIKE IT CAME FROM PEOPLE IN THE CROWD ON 4TH STREET.

Q.   AND APPROXIMATELY HOW FAR AWAY WAS IT FROM YOU?

A.   ABOUT 70 YARDS AWAY, GIVE OR TAKE.

Q.   OKAY.  AT THIS POINT ARE YOU STILL STANDING BY THE PLANTERS?

A.   YES.

Q.   I WANT TO PULL EXHIBIT 108A, PLEASE, AT TIME STAMP 22:32.

     MR. DANG:  THIS WILL BE EXHIBIT 108A AT 22:32:54 TO 22:33:52.

BY MR. BASTIDA:

Q.   CAN YOU SEE THE VIDEO, MR. JOHNSON?

A.   YES, I CAN.

Q.   AND LET ME KNOW WHEN YOU'RE DONE REVIEWING THIS CLIP.

     (VIDEO PLAYING OFF THE RECORD.)

     THE WITNESS:  YES, IT'S DONE.

BY MR. BASTIDA:

Q.   OKAY.  WERE YOU ABLE TO SEE YOURSELF ON THE SCREEN?

A.   YES, I WAS.

Q.   AND THE TIME STAMP IS NOW ABOUT A MINUTE LATER, 22:33.  DO YOU SEE THAT?

A.   YES, I DO.

Q.   AND STILL ON THE SAME DAY.  ANY REASON TO BELIEVE THAT

ER0134

BY MR. BASTIDA:

Q.   SO, MR. JOHNSON, I'M JUST GOING TO HAVE YOU CONFIRM THAT WE ARE WATCHING THE SAME SCENE, THE SAME MOMENT, AND A COUPLE OF OTHER DIFFERENT VIDEOS.

A.   OKAY.

MR. DANG:  112C WILL BE BODY WORN CAMERA, TIME STAMP 22:32:59 TO 22:33:38.

THE COURT:  IS THERE ANY OBJECTION TO THESE EXHIBITS?  WE CAN MOVE IT ALONG IF THERE'S NOT AN OBJECTION.

MR. SYMPSON:  I WILL -- DO NOT ANTICIPATE AN OBJECTION.

THE COURT:  ALL RIGHT.  SO I'LL ADMIT THESE EXHIBITS SUBJECT TO THEM ACTUALLY BEING SHOWN TO THE JURY.  IF YOU DON'T SHOW ONE OF THESE, THEN IT WILL NOT BE ADMITTED.  OKAY?  SO THAT WILL SPEED IT ALONG.  YOU CAN PUBLISH IT RIGHT AWAY.

MR. BASTIDA: OKAY.  GREAT.

(PLAINTIFF'S EXHIBIT 112C, 111A, 116A, 119A, AND 117A WERE RECEIVED IN EVIDENCE.)

MR. BASTIDA:  THEN I WOULD ASK THAT 112C BE PUBLISHED AND SHOWN TO THE JURY?

THE COURT:  YES.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   MR. JOHNSON, BASED ON YOUR RECOLLECTION AS YOU'RE WATCHING THIS VIDEO, IS THAT THE SAME SEGMENT THAT WE HAVE BEEN WATCHING

ER0135

WITH THE PREVIOUS OTHER EXHIBITS THAT WE'VE BEEN DISCUSSING?

A.    YES, THAT'S CORRECT.

Q.    COULD WE DO 111A, PLEASE.

MR. DANG:  111A WILL BE VILLARUZ BODY WORN CAMERA, TIME STAMP 22:32:54 TO 22:34:06.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.    MR. JOHNSON, WAS THAT THE SAME SEGMENT AT THE TIME THAT YOU WERE SHOT?

A.    YES, THAT'S CORRECT.

MR. BASTIDA:  CAN WE DO 116A, PLEASE.

MR. DANG:  116A WILL BE MORALES BODY WORN CAMERA 22:32:54 TO 22:33:47.

(VIDEO PLAYING OFF THE RECORD.)

MR. BASTIDA:  WE ONLY HAVE TWO MORE, YOUR HONOR. 119A.

Q.    OH, BEFORE I MOVE ON, MR. JOHNSON, THE SEGMENT WE JUST WATCHED, WAS THAT THE SAME SEGMENT OF THE MOMENT THAT YOU WERE SHOT?

A.    YES.

Q.    OKAY.

MR. DANG:  119A WILL BE KOSKA BODY WORN CAMERA 22:32:54 TO 22:33:40.  HERE WE GO.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

ER0136

Q.   MR. JOHNSON, ONCE AGAIN, WAS THIS THE SAME SEGMENT AT THE TIME THAT YOU WERE SHOT?

A.   YES, IT WAS.

         MR. BASTIDA:  117A, PLEASE.

         MR. DANG:  117A WILL BE THOMPSON BODY WORN CAMERA TIME STAMP 22:32:54 TO 22:33:42.

         (VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   MR. JOHNSON, SAME SEGMENT OF YOUR INJURY?

A.   YES, THAT'S CORRECT.

Q.   YOU WITNESSED A WATER BOTTLE THROWN AT THE DIRECTION OF THE POLICE OFFICER.  YOU SAID THAT EARLIER; CORRECT?

A.   YES.

Q.   DID YOU SEE ANY OTHER OBJECTS THROWN AT THE POLICE OFFICERS DURING THE TIMEFRAME THAT YOU WERE INJURED?

A.   NO, I DID NOT.

Q.   DID YOU SEE ANYONE THROWING ANYTHING OTHER THAN WATER BOTTLES AT POLICE OFFICERS DURING THAT SAME TIMEFRAME?

A.   NO, I DID NOT.

Q.   BASED ON WHAT YOU OBSERVED AT THAT TIME, WHAT WAS THE MAJORITY OF THE CROWD DOING JUST MOMENTS BEFORE YOU WERE SHOT?

A.   THE MAJORITY OF US WERE JUST STANDING AROUND TALKING TO EACH OTHER.

Q.   DURING THE SEGMENT, THE TIME STAMP THAT WE OBSERVED THROUGH VARIOUS ANGLES, DID YOU OBSERVE, WHILE YOU WERE AT THE

ER0137

PROTEST, DID YOU OBSERVE ANY OFFICER GET INJURED?

A.   NO, I DID NOT.

Q.   DO YOU RECALL WHETHER THERE COULD HAVE BEEN, BASED ON YOUR RECOLLECTION, WHETHER THERE COULD HAVE BEEN ANY OTHER -- OTHER THAN THE WATER BOTTLE THAT YOU OBSERVED, DO YOU RECALL WHETHER THERE COULD HAVE BEEN ANY OTHER REASON THAT THE OFFICER FIRED OPEN INTO THE CROWD?

            MR. SYMPSON:  OBJECTION.  CALLS FOR SPECULATION.

            THE COURT:  SUSTAINED.

BY MR. BASTIDA:

Q.   AFTER YOU WERE STRUCK ON YOUR LEG, DID ANYONE OFFER YOU ANY MEDICAL AID?

A.   HUH, NO.

Q.   DID ANY OFFICER TRY TO ARREST YOU IN ANY WAY?

A.   NO.

Q.   BEFORE THE MOMENT THAT YOU WERE STRUCK, DID YOU HEAR ANY WARNING THAT FORCE COULD BE USED AGAINST YOU OR THE CROWD?

A.   NO.

Q.   AND FROM THE MOMENT THAT YOU ARRIVED AT CITY HALL PLAZA AT 9:53 TO THE MOMENT THAT WE'VE BEEN WATCHING, DID YOU HEAR ANY ORDERS INSTRUCTING YOU TO LEAVE THE AREA?

A.   NO, I DID NOT.

Q.   ANY DISPERSAL ORDERS?

A.   NO, I DID NOT.

Q.   ANY UNLAWFUL ASSEMBLY ORDERS?

ER0138

A.   NO.

Q.   DID ANY OFFICER COMMUNICATE, EITHER VERBALLY OR NON-VERBALLY, TO YOU THAT YOU WERE NOT ALLOWED TO BE THERE?

A.   NO, NOT AT ALL.

Q.   DID YOU OBSERVE ANY OFFICER COMMUNICATE TO THE CROWD AS A WHOLE, IN ANY WAY VERBALLY OR NON-VERBALLY, THAT THEY HAD TO LEAVE THE AREA?

A.   NO.

CAN WE SHOW EXHIBIT 120, PLEASE.

MR. DANG:  THIS WILL BE EXHIBIT 120A EXCERPTED AT VIDEO TIME STAMP 9:36:13 TO 9:38:40.

BY MR. BASTIDA:

Q.   MR. JOHNSON, PLEASE TAKE A LOOK AT THIS CLIP, AND LET ME KNOW WHEN YOU'RE DONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. BASTIDA:  GO AHEAD AND PAUSE IT, PLEASE.

Q.   IN THAT SEGMENT THAT WE'VE SEEN, DID YOU SEE YOURSELF ON THE SCREEN?

A.   YES, I DID.

Q.   AND CAN YOU DESCRIBE WHAT YOU SAW?

A.   I SAW MYSELF RUNNING WITH A NOTICEABLE LIMP, AND I WAS HEADING BACK TOWARDS THE BUILDING OF CITY HALL.

Q.   AND IS THIS BEFORE OR AFTER YOU WERE SHOT?

A.   THIS WAS AFTER I WAS HIT.

Q.   OKAY.  ANY REASON TO BELIEVE THAT WHAT IS SHOWN ON THE

ER0139

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 7, 2025

ER0140

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

        PLAINTIFF,             CASE NO.  CV-21-01849 BLF

  VS.                   SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 7, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,  VOLUME 3
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 221 - 467

      DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                   BY:  ABIMAEL BASTIDA
                      MATTHEW SCHECHTER
                   10TH FLOOR
                   50 WEST SAN FERNANDO STREET
                   SAN JOSE, CALIFORNIA 95113


      (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0141

YESTERDAY YOU IDENTIFIED YOURSELF IN THAT PHOTOGRAPH WITH I THINK IT WAS YOU AND YOUR FRIEND BRANDON?

A.   YES.

Q.   AND THEN DANNY; RIGHT?

A.   YES.

Q.   AND YOU WERE SPECIFICALLY ASKED ABOUT THE FACE MASK THAT YOU WERE WEARING THERE?

A.   YES, THAT'S CORRECT.

Q.   EXCUSE ME.   YOU MENTIONED THAT YOU HAD NOT BROUGHT THAT FACE MASK THERE YOURSELF; RIGHT?

A.   THAT'S CORRECT.

Q.   BUT THAT YOUR BUDDY, BRANDON, GAVE IT TO YOU; RIGHT?

A.   YES.

Q.   AND YOUR TESTIMONY WAS THAT YOU PUT THAT ON BECAUSE OF COVID?

A.   YES.

Q.   AND EVEN THOUGH YOU HAD JUST BEEN AT THE PARTY WITH 15-SUM PEOPLE AND -- I GUESS I DIDN'T ASK YOU THIS, WERE YOU WEARING A MASK WHEN YOU WERE AT THE PARTY?

A.   NO, I WAS NOT.   NO, I WAS NOT.   I WAS RELATIVELY FAMILIAR WITH THE PEOPLE THAT WERE THERE AND I TRUSTED THEIR JUDGMENT OF TRYING TO STAY SAFE AND DISTANCE AT THAT TIME.

Q.   THAT MAKES SENSE TO ME.   BUT THEN WHEN YOU GO TO THE PROTESTS THERE ARE TONS OF PEOPLE THERE, YOU DON'T KNOW THEM, YOU DON'T KNOW WHAT THEY'VE BEEN DOING, SO IS THAT WHY YOU

ER0142

DECIDED IT WAS PROBABLY A GOOD IDEA TO WEAR A MASK NOW?

A.   YES.

Q.   IT HAD NOTHING TO DO WITH TRYING TO KEEP YOUR FACE HIDDEN OR ANYTHING?

A.   NO, NOT AT ALL.

Q.   THANK YOU.  I APPRECIATE THAT.  THAT CLARIFIES THINGS FOR ME.

ACTUALLY, AT THIS POINT, IF WE COULD PUT UP PLAINTIFF'S EXHIBIT 104A.

AND DO YOU SEE THAT ON YOUR SCREEN?

A.   YES, I DO.

Q.   AND THAT'S THAT SAME PHOTO THAT WE SAW YESTERDAY WHERE YOU IDENTIFIED YOURSELF?

A.   YES.

Q.   AND YOU SAID THAT WAS DANNY AND -- ACTUALLY, I DON'T KNOW IF YOU SAID THIS.  IS THAT DANNY AND BRANDON NEXT TO YOU?

A.   YES, THEY ARE.

Q.   AND IS THAT BRANDON THEN ON THE LEFT?

A.   YES.

Q.   AND HE'S WEARING IT LOOKS LIKE DARK JEANS, JEANS AND A BLACK HOODIE WITH THE HOODIE UP?

A.   YES.

Q.   AND IT LOOKS LIKE HE HAS A DARK FACE MASK ON AS WELL, TOO?

A.   YES.

Q.   AND THEN DANNY ALSO SEEMS TO BE IN DARK PANTS AND A DARK

ER0143

HOODIE WITH THE HOOD UP?

A.   YES.

Q.   AND A FACE MASK AS WELL?

A.   YES.

Q.   NOW, I KNOW, IF I RECALL YESTERDAY -- LET ME SEE.  BASED UPON WHAT WE SAW, YOU ARRIVED SOMEWHERE AROUND 9:53 P.M., OR SOMETHING LIKE THAT?

A.   YES.  APPROXIMATELY, YEAH.

Q.   OKAY.  AND YOU ARRIVED -- HAD YOU ALREADY MET UP WITH BOTH BRANDON AND DANNY AT THAT POINT?

A.   YES, I DID.

Q.   OKAY.  SO YOU MET THEM AROUND ST. JAMES PARK AND THE THREE OF YOU WALKED OVER TO THE PLAZA?

A.   THAT'S CORRECT.

Q.   ONCE YOU GOT THERE, DID YOU STAY WITH THEM UNTIL THE TIME UP UNTIL YOU WERE HIT BY THE PROJECTILE?

A.   YES.

Q.   SO DURING THAT PERIOD FROM 9:53 TO I THINK WE IDENTIFIED 10:33 WE BELIEVE YOU WERE HIT, AT THAT TIME YOU WERE HANGING OUT WITH BRANDON AND DANNY?

A.   YES.  WE MIGHT HAVE BEEN A FEW FEET APART FROM EACH OTHER, BUT, YES, FOR THE MOST PART WE WERE HANGING OUT TOGETHER.

Q.   AND YOU WERE HANGING OUT AND TALKING TO EACH OTHER?

A.   YES.

Q.   AND AMONGST ALL OF THE OTHER PEOPLE WHO WERE THERE, TOO?

ER0144

A.    YES.

Q.    DO YOU RECALL IF YOU WERE TALKING AND HAVING CONVERSATIONS WITH OTHER PEOPLE THAT WERE THERE?

A.    I BELIEVE SOME PEOPLE WALKED UP TO US AND WE MAY HAVE HAD A FEW CONVERSATIONS WITH THEM, YES.

Q.    DO YOU HAPPEN TO REMEMBER, AND AGAIN, I WON'T BLAME YOU IF YOU DON'T, BUT DESCRIPTIONS PARTICULARLY OF THE CLOTHING OF ANY NEW PEOPLE THAT YOU MET THAT WALKED UP AND HAD CONVERSATIONS WITH YOU?

A.    NOT NECESSARILY THEIR CLOTHING.  I DO REMEMBER SOME PEOPLE HAVING LIKE SKATEBOARDS AND BIKES AND STUFF, BUT THE MOST I REMEMBER IS A PERSON WALKED UP TO US THAT HAD A SKATEBOARD.

Q.    OKAY.  OKAY.

WERE THESE PEOPLE THAT YOU HAD MET BEFORE THAT NIGHT?

A.    NO.

Q.    SO YOU DON'T NECESSARILY KNOW WHAT THOSE PEOPLE WERE DOING BEFORE THEY CAME OVER AND TALKED TO YOU; RIGHT?

A.    NO.

Q.    OR AFTER THEY LEFT AND FINISHED TALKING TO YOU?

A.    NO.  I HAVE NO IDEA WHAT THEY WERE DOING BEFORE OR AFTER THEY WERE TALKING TO ME.

Q.    SO IF SOME OF THOSE PEOPLE THAT YOU WERE TALKING WITH BEFORE HAD, YOU KNOW, PRIOR TO TALKING WITH YOU, BEEN ENGAGING IN SOME SORT OF ACTS OF VIOLENCE LIKE THROWING ITEMS AT POLICE OFFICERS OR, YOU KNOW, DAMAGING SOME PROPERTY OR SOMETHING LIKE

ER0145

THAT, YOU'D HAVE NO WAY OF KNOWING?

A.   NO, I WOULD NOT.

Q.   AND THEN THE SAME QUESTION WHEN THEY LEFT, WHEN YOU'RE FINISHED TALKING AND THESE PEOPLE ARE GOING TO GO ON AND DO WHAT THEY'RE GOING TO DO, IF THEY, AFTER TALKING TO YOU, SAME THING, WERE THROWING ITEMS OR DOING ANYTHING LIKE THAT, YOU'D HAVE NO WAY OF KNOWING FOR CERTAIN?

A.   NO, I WOULD NOT.

Q.   AND SO YOU DESCRIBED THE SCENE, IF I RECALL CORRECTLY, WHEN YOU FIRST ARRIVED AT CITY HALL PLAZA ON THE 30TH AT AROUND 9:53 P.M., AND RATHER THAN TRY TO SUMMARIZE WHAT YOU SAID, WHY DON'T YOU JUST TELL ME WHAT IT WAS LIKE WHEN YOU FIRST ARRIVED AGAIN?

A.   WHEN I FIRST ARRIVED AT THE CITY HALL PLAZA, I DID NOTICE A LARGE GROUP INSIDE OF 4TH STREET, AT THE CORNER OF 4TH STREET AND SANTA CLARA.  THEY WERE ACTUALLY IN THE STREET.  WE MIGHT HAVE STAYED AROUND THERE FOR PROBABLY ABOUT A MINUTE OR TWO, AND THAT'S WHEN WE DECIDED TO WALK ACROSS TO THE CITY HALL PLAZA.

Q.   OKAY.  WHEN YOU GOT THERE AND THERE WAS THAT CROWD IN 4TH STREET OR LIKE ON THE STREET ITSELF, DID YOU NOTICE WHAT THE SIZE OF THE CROWD WAS LIKE IN THE ACTUAL PLAZA AT THAT POINT?

A.   IT SEEMED SMALLER THAN -- AT LEAST FOR ME, THE REASON I DECIDED TO WALK OVER THERE, I DIDN'T KNOW WHAT WAS GOING ON BEFORE THEN, BUT I ALSO WANTED IT TO BE AN AREA THAT WASN'T AS

ER0146

THE COURT:  ANY OBJECTION?

MR. BASTIDA:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(DEFENDANTS' EXHIBIT 533 WAS RECEIVED IN EVIDENCE.)

MR. SYMPSON:  AND MAY I PUBLISH?

THE COURT:  YES.

BY MR. SYMPSON:

Q.   NOTICE THE TIME STAMP.  THIS IS AGAIN THAT SAME TIME STAMP THAT WE'VE BEEN TALKING ABOUT IN THE LAST THREE CLIPS AT 10:24?

A.   YES.

Q.   ANY CHANCE YOU SEE YOURSELF IN THIS ONE?

A.   I SEE AN INDIVIDUAL THAT LOOKS LIKE ME.  RIGHT WHERE YOUR CURSOR IS THERE'S AN INDIVIDUAL HOLDING EITHER A BAG OR A SIGN OR SOMETHING, THAT'S A TAN COLOR, AND I BELIEVE I SEE MYSELF WITH THE ZEBRA PRINT MASK ON.

Q.   SO RIGHT WHERE THAT CURSOR IS CIRCLING?

A.   YES.

Q.   THANK YOU.

CAN WE GO AHEAD AND PLAY 533.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   DID YOU HAPPEN TO SEE A PERSON BASICALLY CENTER OF THE CAMERA JUST ABOUT 2 SECONDS BEFORE THE END THAT APPEARED TO BE THROWING SOMETHING?

A.   UNFORTUNATELY, NOT.  I FOCUSSED ON MYSELF.  CAN I SEE THE

ER0147

VIDEO AGAIN?

Q.   YES.   THANK YOU VERY MUCH.

SO BEFORE WE PLAY AGAIN, YOU IDENTIFIED YOURSELF AS BEING KIND OF IN THE CENTER OF THE SCREEN BEHIND THE GUY WITH THE SIGN; RIGHT?

A.   YES.

Q.   OKAY.   AND I'LL ASK YOU NOW TO JUST KEEP YOUR FOCUS ON THAT LOCATION AND DON'T TRACK YOURSELF, BUT I UNDERSTAND WHY YOU WOULD BE TEMPTED TO DO SO.   AND CAN YOU GO AHEAD AND PLAY THROUGH.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:   PAUSE RIGHT HERE.

Q.   NOW, LOOKING IN THAT SAME AREA THAT YOU IDENTIFIED YOURSELF FROM, YOU NO LONGER SEE YOURSELF THERE; RIGHT?

A.   THAT'S CORRECT.

Q.   DOES THAT HELP REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT ONCE A VOLLEY STARTED, WHETHER OR NOT YOU TEMPORARILY LEFT THAT AREA?

A.   SEEING THE VIDEO, I DID NOTICE MYSELF WALKING BACK TOWARDS THAT SILVER, I GUESS, BEAM TO THE FAR LEFT.

Q.   I'VE HAD A TERRIBLE TIME TRYING TO DESCRIBE THESE THINGS, TOO, THE WALL, THE BEAM.

SO, YES, THANK YOU.   I APPRECIATE THAT.

AND THEN IF WE CAN GO BACK JUST A FEW FRAMES HERE.

OKAY.   DO YOU SEE THAT PERSON THAT IS PICTURED RIGHT IN

ER0148

THE MIDDLE.  IT LOOKS LIKE THEIR LEGS ARE IN A SPREAD STANCE.

DO YOU SEE THAT PERSON?

A.   YES, I DO.

Q.   OKAY.  IF WE CAN JUST GO FRAME BY FRAME FOR A LITTLE BIT THERE.

DO YOU SEE HIS BODY MOVEMENTS?

A.   YES, I DO.

Q.   AND THAT APPEARS TO BE HIM THROWING SOME SORT OF ITEM; RIGHT?

A.   YES.

Q.   AND THAT'S BEING THROWN IN THE DIRECTION OF WHERE THE SKIRMISH LINE OF POLICE OFFICERS IS ALONG SANTA CLARA STREET?

A.   THAT IS CORRECT.

Q.   AND, FRANKLY, FROM WHERE YOU IDENTIFIED YOURSELF AT THE BEGINNING OF THIS VIDEO, PRETTY CLOSE TO WHERE YOU WERE STANDING AT THE BEGINNING OF THIS VIDEO; RIGHT?

A.   AT THE BEGINNING, BUT NOT AT THE END.

WHERE HE'S THROWING, I'M NOT NEAR HIM.

Q.   RIGHT.  BECAUSE AT THAT POINT THE VOLLEY STARTED AND I THINK THERE'S SOME SORT OF POLICE RESPONSE, AND YOU GOT OUT OF THERE?

A.   YES, THAT'S CORRECT.

Q.   OKAY.  THANK YOU.

BASED UPON THE PERSPECTIVE THAT WE'RE SEEING RIGHT NOW, CAN YOU TELL WHAT THAT PERSON IS WEARING AT ALL?

ER0149

A.   THE INDIVIDUAL THAT IS THROWING THE BOTTLE?

Q.   YES, I'M SORRY.  THANK YOU?

A.   IT LOOKS LIKE HE'S WEARING ALL BLACK.

Q.   DARK PANTS, DARK LONG SLEEVE TYPE OF SHIRT?

A.   YES.

Q.   YOU WOULD AGREE THAT THAT'S SIMILAR TO HOW YOUR BUDDY, BRANDON, WAS DRESSED; RIGHT?

MR. BASTIDA:  OBJECTION.  RELEVANCE.

THE COURT:  OVERRULED.

THE WITNESS:  IT COULD BE SIMILAR, YES.

BY MR. SYMPSON:

Q.   AND TO YOUR RECOLLECTION, THERE WAS PROBABLY A LOT OF PEOPLE WEARING DARK PANTS AND DARK LONG SLEEVE SHIRTS AND THAT TYPE OF THING?

A.   YES.

Q.   OKAY.  THANK YOU.

SO YOU HAD SAID YESTERDAY THAT FROM THE TIME THAT YOU ARRIVED AT 9:53, THAT YOU, AGAIN, YOU ONLY SAW THAT ONE BOTTLE CLOSE TO THE TIME WHEN YOU WERE STRUCK, BUT THAT NOTHING WAS HAPPENING TO THE OFFICERS BEFORE THAT ONE BOTTLE WENT IN THE AIR RIGHT BEFORE YOU WERE STRUCK; CORRECT?

A.   YES.

Q.   BUT YOU DID SAY THAT YOU IDENTIFIED THE LINE OF POLICE OFFICERS ON SANTA CLARA; RIGHT?

A.   YES, I DID.

ER0150

Q.   AND YOU SAID IT LOOKED TO YOU LIKE THEY WERE PROTECTING THE CONSTRUCTION ZONE AREA?

A.   IT LOOKED LIKE THEY WERE STANDING IN THE STREET AND THAT'S WHEN I REALIZED THE CONSTRUCTION SITE AREA, SO IT LOOKED LIKE THEY WERE PROTECTING IT.

Q.   OKAY.  AT THAT POINT, YOU HAD SAID YOU HAD HEARD ABOUT THE LOOTING AT THE CONSTRUCTION SITE THE DAY BEFORE.  DID YOU EVER PUT IT TOGETHER IN YOUR MIND, EXCUSE ME, THAT THAT WAS THE CONSTRUCTION SITE THAT THEY WERE TALKING ABOUT?

A.   MAYBE AT ONE POINT.  I JUST DON'T REMEMBER EXACTLY.

Q.   OKAY.  THANK YOU.  IS THERE ANY -- WELL, LET ME ASK YOU THIS, IS THERE ANY SPECIFIC REASON THAT YOU INTERPRETED THEM, AS A PART OF THEIR JOB AT LEAST, PROTECTING THE CONSTRUCTION ZONE BECAUSE THEY WERE STANDING THERE?

A.   I'M SORRY, CAN YOU REPHRASE THE QUESTION?

Q.   YES, I CAN.  I'M SORRY.

DID YOU THINK THAT THERE WAS SOME SORT OF REASONABLE CONCERN THAT MEMBERS OF THE DEMONSTRATION MIGHT GO INTO THAT CONSTRUCTION ZONE AND DO WHAT YOU HEARD ABOUT YESTERDAY WITH POSSIBLY LOOTING THE CONSTRUCTION ZONE?

A.   I HEARD ABOUT IT THE FOLLOWING DAY, SO IT COULD HAVE BEEN, IT COULD HAVE BEEN THAT CONSTRUCTION ZONE, THAT'S PROBABLY WHY THEY WERE THERE.

Q.   YEAH.  OKAY.  OKAY.

BECAUSE YOU AGREE, YOU DON'T LIKE LARGE CROWDS IN ANY

ER0151

EVENT AND SO IF THINGS DO GO BAD, THAT COULD BE A POTENTIAL TARGET FOR PEOPLE WHO WANT TO DO STUFF THAT YOU WOULDN'T DO YOURSELF?

A.   YEAH.   I'M NOT IN ANYONE ELSE'S HEAD, BUT IT COULD BE A POSSIBILITY, YES.

Q.   AND I KNOW THAT AND THAT'S WHY I'M THINKING ABOUT YOUR THOUGHT PROCESS, IF OTHER PEOPLE ARE GOING TO DO THINGS THAT YOU YOURSELF WOULDN'T DO, THAT WOULD BE LIKE, OH, THAT MIGHT BE ONE OF THE PLACES THAT OTHER PEOPLE WOULD DO, BUT I WOULDN'T DO; RIGHT?

A.   YES.

Q.   AND THEN I WANT TO MOVE AHEAD TO RIGHT ABOUT THE TIME YOU WERE STRUCK WITH THE PROJECTILE, AROUND 10:33.

     CAN WE PUT UP 529.   MAY I SHOW THAT TO MR. JOHNSON.

     YOU'VE GOT THAT ON YOUR SCREEN?

A.   YES, I DO.

Q.   AND ONCE AGAIN, THIS APPEARS TO BE CITY HALL PLAZA ON MAY 30TH, 2020, NOW AT APPROXIMATELY 10:33 P.M.?

A.   YES.

Q.   AND DOES THAT FAIRLY AND ACCURATELY DEPICT THE LOCATION WHERE YOU WERE AT AT THAT TIME?

A.   CLOSER TOWARDS THE PLANTERS OF THAT SILVER BEAM, YES.

Q.   LET ME ASK, DOES THAT APPEAR TO BE A FAIR AND ACCURATE REPRESENTATION OF THE SCENE OF CITY HALL PLAZA WHILE YOU WERE THERE?

ER0152

A.   YES.

Q.   THANK YOU.

YOUR HONOR, I WOULD ASK TO MOVE DEFENSE 529 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. BASTIDA:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(DEFENDANTS' EXHIBIT 529 WAS RECEIVED IN EVIDENCE.)

MR. SYMPSON:  AND MAY I PUBLISH?

THE COURT:  YES.

MR. SYMPSON:  THANK YOU.

Q.   SO NOW WE'RE AT 10:33.  SO THIS IS 9 MINUTES AFTER THOSE LAST VIDEOS THAT WE JUST WENT THROUGH; RIGHT?

A.   YES.

Q.   AND ANY CHANCE YOU SEE YOURSELF AT THE BEGINNING OF THIS SCREEN?

A.   NO, I DO NOT.

Q.   AND FROM YOUR RECOLLECTION, BECAUSE YOU RECALL SEEING ONE BOTTLE THROWN ABOUT THIS TIME OVER FROM 4TH STREET, WHERE WERE YOU -- WHERE DO YOU RECALL BEING WHEN YOU SAW THAT BOTTLE BEING THROWN THAT CAME FROM 4TH STREET?

A.   I WAS IN THE AREA OF WHERE THE PLANTERS WERE TO THAT SILVER BEAM IN THAT GENERAL AREA.

Q.   WOULD YOU SAY MORE OR LESS THE SAME AREA THAT YOU IDENTIFIED YOURSELF IN FROM THAT LAST CLIP, I WANT TO SAY IT WAS 533, WHERE YOU COULD SEE YOURSELF BEHIND THE GUY WITH THE

ER0153

SIGN?

A.   I WOULD SAY I WAS IN THE PLANTER AREA, YES.

Q.   OKAY.  YOU DON'T HAVE TO AGREE WITH ME.  IF YOU WANT TO SAY SOMETHING DIFFERENT, PLEASE DO.  I'M JUST TRYING TO UNDERSTAND AS BEST I CAN.

OKAY.  CAN WE PLAY THROUGH THIS ONE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   OKAY.  AND YOU SAW MULTIPLE ITEMS BEING THROWN AT THAT POINT; RIGHT?

A.   YES, FROM THE VIDEO.

Q.   AND DID YOU HEAR THE SOUND OF GLASS BREAKING IN THAT VIDEO AS WELL, TOO?

A.   YES, I DID.

Q.   AND YOU WOULD AGREE THAT AT LEAST SOME -- SO YOU ONLY SAW ONE BOTTLE THE ENTIRE TIME YOU WERE THERE BEING THROWN ABOUT THAT TIME COMING FROM 4TH STREET; RIGHT?

A.   YES, BECAUSE WHEN I SAW THAT BOTTLE, MY INITIAL REACTION WAS TO TURN AROUND.

Q.   RIGHT, RIGHT.  IT MAKES SENSE.

AND LIKE YOU SAID BEFORE, YOU'RE NOT NECESSARILY LOOKING OUT FOR THE BOTTLES THAT ARE COMING OR ITEMS BEING THROWN, YOU'RE HANGING OUT WITH YOUR FRIENDS AND THERE TO PEACEFULLY PROTEST; RIGHT?

A.   EXACTLY.

ER0154

Q.   OKAY.  BUT NOW AFTER SEEING THIS, CLEARLY THERE WERE MUCH MORE THAN JUST ONE BOTTLE THAT WAS THROWN APPROXIMATELY THIS TIME OVER FROM 4TH STREET; RIGHT?

A.   YES, AFTER WATCHING THE VIDEO I CAN SEE THAT.

Q.   SO NOW AFTER WATCHING THIS VIDEO, YOU WOULD AGREE THAT THERE WAS AT LEAST SOME SORT OF WAVE OR VOLLEY OF ITEMS BEING THROWN AROUND 10:24 AS WELL; RIGHT?

A.   I'M SORRY, ASK THE QUESTION AGAIN.

Q.   I'M SORRY, I'M GETTING TO THAT POINT IN THE DAY.

YOU WOULD AGREE NOW AFTER WATCHING THE LAST SET OF CLIPS, THERE WAS A VOLLEY OF ITEMS THROWN THAT OCCURRED SOME TIME AROUND 10:24 AS WELL; CORRECT?

A.   YES, FROM THE VIDEO EVIDENCE, YES.

Q.   RIGHT.  IN ADDITION TO THIS ONE SINGLE BOTTLE YOU REMEMBER FROM THAT DAY?

A.   YES.

Q.   AND AT 10:24, SOME OF THOSE BOTTLES CAME FROM MUCH CLOSER TO YOU THAN 4TH STREET AND THAT SAME, AGAIN, GENERAL AREA I WOULD SAY?

A.   YES, I WOULDN'T SAY NECESSARILY IN MY GENERAL AREA, BUT, YES, CLOSER TOWARDS THE BUILDING.

Q.   THANK YOU FOR CORRECTING THAT.

NOW WE'VE JUST SEEN THIS ONE CLIP AT 10:33 P.M.  YOU WOULD AGREE CLEARLY MORE THAN JUST ONE BOTTLE WAS THROWN FROM THE 4TH STREET AREA; CORRECT?

ER0155

A.   FROM THE VIDEO EVIDENCE, YES.

Q.   OKAY.  AND EVEN AT THIS POINT FROM THIS VIDEO, YOU WOULD AGREE THAT THERE WAS SOME OF THE ITEMS WERE THROWN AGAIN FROM THE LEFT OF THAT WALL CLOSER TO YOUR, I DON'T WANT TO SAY GENERAL ANY MORE, CLOSER TO THE DIRECTION WHERE YOU WERE?

A.   I DIDN'T SEE A BOTTLE COMING FROM THAT WALL AREA, BUT, I MEAN, IT WAS PROBABLY MORE TOWARDS THE FRONT OF THAT WHITE BUILDING.

Q.   OKAY.  AND CAN WE PLAY THAT THROUGH ONE MORE TIME.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  CAN YOU PAUSE AND THEN GO BACK A COUPLE OF FRAMES.

Q.   YOU SAW AT LEAST THREE THAT LOOKED LIKE THEY WERE COMING FROM THE RIGHT OF THAT WALL; RIGHT?

A.   YES.

Q.   AND THEN DO YOU SEE THE ITEM ON THIS SCREEN HERE THAT LOOKS LIKE IT APPEARS TO BE COMING FROM THE LEFT SIDE OF THE WALL?

A.   YES, I DO SEE THAT NOW.

Q.   OKAY.  I'D LIKE TO MOVE ON NOW.

CAN YOU PLEASE PUT UP DEFENSE 531, PLEASE.

I'LL ASK YOU THE SAME ROUND OF QUESTIONS.  DOES THIS APPEAR TO BE A FAIR AND ACCURATE REPRESENTATION OF CITY HALL PLAZA ON MAY 30TH, 2020, AT 10:33 P.M. WHILE YOU WERE THERE?

A.   YES.

ER0156

MR. SYMPSON:  YOUR HONOR, I WOULD ASK TO MOVE DEFENSE 531 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. BASTIDA:  NO.

THE COURT:  IT WILL BE ADMITTED.

(DEFENDANTS' EXHIBIT 531 WAS RECEIVED IN EVIDENCE.)

MR. SYMPSON:  AND MAY I PUBLISH?

THE COURT:  YES.

BY MR. SYMPSON:

Q.   THANK YOU.  ANY CHANCE YOU SEE YOURSELF FROM THE BEGINNING OF THIS ONE?

A.   NO, SIR, I DO NOT SEE MYSELF.

Q.   OKAY.  CAN WE GO AHEAD AND PLAY IT THROUGH.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   YOU'VE PREVIOUSLY SEEN BOTTLES OR ITEMS BEING THROWN IN THAT LAST CLIP, BUT FROM THIS PERSPECTIVE, YOU WOULD AGREE IT LOOKS LIKE IT'S COMING PRETTY CLOSE TO HITTING SOMEBODY WHO APPEARS TO PEACEFULLY PROTESTING?

A.   YES, I SEE THAT.

Q.   AND IT LOOKS LIKE IT'S COMING DIRECTLY ON FROM THE OFFICER WHOSE BODY CAM THAT WE'RE WATCHING AT THIS POINT?

A.   YES, IT LOOKED LIKE IT CAME FROM THAT WHITE BUILDING AREA AND LANDED CLOSE, YES.

Q.   SO AT THAT POINT, THE PEOPLE WHO ARE -- THE GENTLEMAN IN

ER0157

ALL TRYING TO FIGURE OUT WHAT TO CALL THIS OBJECT HERE. RIGHT HERE THIS INDIVIDUAL WITH THE HANDS UP -- IT'S NOT A BUILDING, IT'S LIKE A MONUMENT ON THE RIGHT-HAND SIDE?

A. OH, OKAY.

Q. DO YOU SEE THAT?

A. YES.

Q. IT'S SLANTED?

A. YES.

Q. OKAY. IN THE VIDEO THAT WE JUST WATCHED, DID YOU SEE ANY OBJECT BEING THROWN TO THE RIGHT OF THAT MONUMENT LET'S CALL IT?

A. SO IF I'M LOOKING AT IT TO THE RIGHT?

Q. YES.

A. YES, I DID SEE OBJECTS IN THAT GENERAL AREA.

Q. AND IF YOU'RE LOOKING AT IT, DID YOU SEE ANY OBJECTS BEING THROWN FROM THE LEFT OF IT?

A. NO, I DID NOT.

Q. OKAY. I'M GOING TO CHECK WITH COCOUNSEL, BUT I BELIEVE I'M DONE. IT WILL JUST TAKE 30 SECONDS.

(DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

MR. BASTIDA: NO FURTHER QUESTIONS, YOUR HONOR, SUBJECT TO RECALL.

THE COURT: THANK YOU.

MR. SYMPSON, ANY RECROSS FOR THIS WITNESS?

MR. SYMPSON: YES. IT SHOULD BE VERY BRIEF,

ER0158

YOUR HONOR.  THANK YOU.

**RECROSS-EXAMINATION**

BY MR. SYMPSON:

Q.   I PROMISE YOU I'M ALMOST DONE, MR. JOHNSON.

ON REDIRECT, MR. BASTIDA WAS ASKING YOU ABOUT YOUR MEDICAL TREATMENT FOR CARDIOMYOPATHY SINCE 2009 AND YOU AGAIN SAID NO TREATMENT SINCE 2009.

AND I UNDERSTAND THAT TO MEAN YOU WEREN'T GIVEN ANY MEDICATIONS; RIGHT?

A.   THAT'S CORRECT.

Q.   BUT AGAIN, IT DOESN'T MEAN THAT YOU WEREN'T HAVING -- YOU WEREN'T SEEN BY DOCTORS DURING THAT PERIOD; RIGHT?

A.   ARE YOU ASKING ME IF I WAS SEEN BY DOCTORS DURING THAT PERIOD?

Q.   RIGHT.

A.   THEN YES, I WAS SEEN.

Q.   BECAUSE THERE WAS THAT TWO YEAR PERIOD THAT YOU HAD TO HAVE THAT MONITOR, I FORGET THE NAME OF IT NOW, THE LOOP RECORDER I THINK IMPLANTED?

A.   YES, THAT'S CORRECT.

Q.   SO WHILE YOU WEREN'T ON MEDICATION, YOU WERE MONITORED 24 HOURS A DAY AT LEAST DURING THAT PERIOD WITH THE LOOP MONITOR; RIGHT?

A.   THAT IS CORRECT.

Q.   AND IT IS TRUE THAT WHEN YOU WERE FIRST DIAGNOSED WITH THE

**ER0159**

CARDIOMYOPATHY, YOU WANTED TO BE SURE THAT DIAGNOSIS WAS CORRECT SO YOU GOT THAT SECOND OPINION FROM STANFORD; RIGHT?

A.   YES, WE DID GET A SECOND OPINION.

Q.   AND THEY AGREED THAT YOU IN FACT -- THEY AGREED WITH THE DIAGNOSIS; RIGHT?

A.   I BELIEVE THAT'S TRUE, YES.

Q.   AND MR. BASTIDA ASKED YOU A LITTLE BIT ABOUT THE TIME PERIOD AT 10:24 AND THEN AGAIN AT 10:33 P.M. ON MAY 30TH.

DO YOU RECALL THAT?

A.   YES.

Q.   AND DO YOU RECALL THAT ULTIMATELY WHEN YOU AND I WERE WATCHING THE VIDEOS OF THE 10:24 YOU COULD IDENTIFY YOURSELF AT ONE POINT AT THE BEGINNING OF THE VIDEO, AND THEN YOU DISAPPEARED AFTER THE VOLLEY BECAUSE YOU SOUGHT REFUGE SOMEWHERE?

A.   IN ONE OF THE VIDEOS, YES, I SAW MYSELF.

Q.   BUT JUST TO BE CLEAR, BY THE TIME 10:33 ROLLED AROUND, YOU HAD COME UP TO ROUGHLY THE SAME POSITION THAT YOU WERE IN PRIOR TO THE VOLLEY AT 10:24?

A.   SO ARE YOU ASKING FROM THE FIRST VOLLEY AT 10:24, DID I RETURN BACK TO THAT GENERAL AREA?

Q.   YES, LET ME ASK IT MORE CLEARLY.  AT 10:24 YOU LEFT THAT AREA WHEN THE LESS-LETHAL WEAPONS WERE FIRED, BUT THEN YOU CAME BACK TO THAT AREA BEFORE 10:33?

A.   WHEN THE FIRST VOLLEY HAPPENED, I RETREATED TOWARDS THAT

ER0160

CENTER AREA OF THE PLAZA, AND THEN AROUND 10:33 OR JUST BEFORE

THAT I WAS EVENTUALLY BACK WHERE THE PLANTERS WERE.

Q.   OKAY.  SO EVEN THOUGH -- I MEAN, I UNDERSTAND YOU TOLD ME

THAT EARLIER.  YOU DON'T REMEMBER THE IMPACT AS BEING THE MOST

IMPORTANT PART OF THE NIGHT, UNDERSTANDABLY, BUT NOW WATCHING

THE VIDEO, EVEN THOUGH YOU HAD SEEN THE LESS-LETHALS FIRED IN

YOUR DIRECTION AND YOU WANT AND SOUGHT REFUGE, YOU STILL CAME

BACK; RIGHT?

A.   YES, I WAS STANDING IN THE PLANTER AREA.

Q.   OKAY.  AND YOU HAD SAID YESTERDAY, I BELIEVE, THAT YOU HAD

NEVER HEARD ANY SORT OF DISPERSAL ORDERS OR ANYTHING LIKE THAT;

CORRECT?

A.   YES, I DIDN'T HEAR ANY DISPERSAL ORDERS.

Q.   OKAY.  BUT ISN'T IT SAFE TO SAY THAT YOU WERE ON NOTICE,

AFTER HAVING WATCHED THESE VIDEOS NOW AT 10:24, THAT THE CITY

HALL PLAZA WAS A LITTLE OUT OF HAND IF FOR NO OTHER REASON THAT

THERE WERE OFFICERS FIRING LESS-LETHAL WEAPONS?

A.   I WASN'T GIVEN ANY DISPERSAL ORDERS AND I DIDN'T

NECESSARILY BELIEVE THAT IT WOULD HAPPEN AGAIN, SO I DID NOT

DISPERSE.

Q.   BUT AT THE SAME TIME, YOU SAID YOU'RE UNCOMFORTABLE IN

CROWDS, AND YOU DON'T LIKE TO BE IN BIG CROWDS, AND YOU'RE

CONCERNED ABOUT THINGS THAT COULD HAPPEN.

     SO YOU'RE TELLING ME THAT AFTER THAT VOLLEY AT 10:24, THE

LESS-LETHAL WEAPONS IS FIRED, SCARY ENOUGH FOR YOU TO GO SEEK

ER0161

REFUGE, BUT STILL EVEN THOUGH YOU'RE TYPICALLY AFRAID OF CROWDS AND AFRAID WHAT THEY MIGHT DO, YOU STILL CAME BACK TO THAT SAME AREA BEFORE 10:33?

A.   YES, I WAS STILL IN THE GENERAL AREA.

Q.   CAN WE BRING UP PLAINTIFF'S 108A, PLEASE.

CAN WE FAST FORWARD THAT TO ABOUT THE TIMESTAMP AT THE TOP TO 22:33 ABOUT 22:33:32.

OKAY.  WE CAN PAUSE HERE.

I WANT TO DIRECT YOUR ATTENTION, MR. JOHNSON, AGAIN, TO WHAT I'M DESCRIBING AS THE PILLAR, THE OBJECT TO KIND OF IN FRONT AND TO THE LEFT OF THE PERSON IN THE RED SWEAT SHIRT.

DO YOU SEE THAT?  WHAT I'M TALKING ABOUT?

A.   YES, I DO.

Q.   OKAY.  AND CAN YOU PLAY THROUGH FROM THIS POINT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  OKAY.  I THINK I MAY HAVE THE WRONG VIDEO.

NOTHING FURTHER FOR YOU AT THIS POINT.  THANK YOU.

THE COURT:  MR. BASTIDA.

MR. SYMPSON:  I'M SORRY, MAY I TAKE THAT BACK?

WAS THAT 104 I ASKED FOR YOU TO PUT UP?

THE COURT:  YOU ASKED FOR 108.

MR. SYMPSON:  THEN I AM DONE.  THANK YOU.

THE COURT:  ALL RIGHT.  MR. BASTIDA, ANYTHING FURTHER?

ER0162

MR. BASTIDA: NO. THANK YOU, YOUR HONOR.

THE COURT: MR. JOHNSON, YOU MAY STEP DOWN.

THE WITNESS: THANK YOU, YOUR HONOR.

THE COURT: I THINK THIS WOULD BE A GOOD TIME FOR A BREAK. LET'S COME BACK AT 2:45.

THE CLERK: COURT IS IN RECESS.

(RECESS FROM 2:33 P.M. UNTIL 2:46 P.M.)

THE COURT: PLEASE BE SEATED EVERYONE. WE'RE BACK ON THE RECORD.

DO WE HAVE EVERYONE?

WE'RE MISSING ONE JUROR. ALWAYS GOOD TO COUNT TO NINE.

(PAUSE IN PROCEEDINGS.)

THE COURT: ALL RIGHT. NOW WE HAVE ALL JURORS.

ALL COUNSEL AND THE PARTIES ARE PRESENT.

MR. BASTIDA, YOUR NEXT WITNESS.

MR. BASTIDA: YES, YOUR HONOR. JASON FRIES.

THE COURT: ALL RIGHT. MR. FRIES, COME UP TO THE WITNESS STAND, PLEASE, AND STAND TO BE SWORN.

THE WITNESS: SURE.

THE CLERK: PLEASE RAISE YOUR RIGHT HAND.

**(PLAINTIFF'S WITNESS, JASON FRIES, WAS SWORN.)**

THE WITNESS: YES.

THE CLERK: THANK YOU, SIR. PLEASE BE SEATED.

IF YOU WOULD PLEASE PULL THAT MICROPHONE A LITTLE CLOSE TO YOU AND STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

ER0163

CERTIFICATE OF REPORTER


        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
        IRENE RODRIGUEZ, CSR, RMR, CRR
        CERTIFICATE NUMBER 8074


                DATED:  JANUARY 8, 2025

ER0164

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

      PLAINTIFF,            CASE NO.  CV-21-01849 BLF

   VS.                      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 8, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 4
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 468 - 709

     DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                  BY:  ABIMAEL BASTIDA
                     MATTHEW SCHECHTER
                  10TH FLOOR
                  50 WEST SAN FERNANDO STREET
                  SAN JOSE, CALIFORNIA 95113

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

UNITED STATES COURT REPORTERS

ER0165

THERE ANY PATTERNS OR TRENDS THAT YOU SEE IN THE MEDICAL RECORDS THAT SHAPED YOUR OPINIONS?

A.   ANY TRENDS?  WELL, HE WAS ON ANTICOAGULANTS, AND THAT WAS SOMETHING I COULDN'T SEE.  AND HE TOLD ME HE WAS HAVING SPECIFICALLY MORE BLEEDING AS ANYONE WOULD WHEN YOU HAVE AN OPEN WOUND AND YOU'RE TAKING ANTICOAGULANTS.

SO ANTICOAGULANTS WITH A WOUND HEALING WOULD HAVE MADE HIS ULCERATIVE COLITIS WORSE.

HE TOLD ME BEFORE ANTICOAGULANTS HE WAS ABLE TO GET AS LONG AS MAYBE TWO-WEEK REMISSIONS WHERE HE HAD NO BLEEDING AT ALL, AND NOW HE'S DOWN TO TWO-DAY REMISSIONS WHERE HE'S GOT BLEEDING FOUR OR FIVE TIMES A WEEK AND MAYBE TWO DAYS NOT.

AND THIS IS KNOWN.  THIS IS REPORTED IN THE LITERATURE. WHY DO WE NEED THE LITERATURE?  IT'S OBVIOUS.  IT'S PROVEN IN THE LITERATURE THAT ANTICOAGULANTS WORSEN WITH GI BLEEDING AND PEOPLE WITH ULCERATIVE COLITIS.  THEY BLEED MORE.

Q.   AND WHEN YOU WERE TAKING MR. JOHNSON'S HISTORY DURING THE COURSE OF THE IME, WHAT SYMPTOMS DID HE INDICATE HE SUFFERED FROM IMMEDIATELY AFTER THE INCIDENT THAT OCCURRED ON MAY 30TH, 2020?

A.   WELL, THAT WAS A STRIKING INJURY WHICH TURNED OUT TO BE CATASTROPHIC FOR HIM.  HE HAD EXTREME PAIN WHEN INJURED AND THE BLOW KNOCKED HIM OFF HIS FEET.  HE'S A BIG 6 FEET, 200 POUND GUY.  I MEAN, HE'S ATHLETIC.  AND IT KNOCKED HIM RIGHT OFF OF HIS FEET TO HIS LEFT SIDE, I THINK HE TOLD ME, AND HE COULDN'T

ER0166

GET UP.  BYSTANDERS HAD TO HELP HIM UP AND GET HIM BEHIND SOME SORT OF BARRIER.

THEN HE TRIED TO WALK AND COULDN'T.  HE HAD TO CALL HIS GIRLFRIEND TO COME AND PICK HIM UP.

SO HE HAD EXTREME PAIN IN THAT AREA, AND BY THE NEXT DAY THERE WAS BRUISING, LIKE 6 TO 8 INCHES ABOVE THAT POPLITEAL SPACE, WHICH IS THAT SPACE BEHIND YOUR KNEE, 6 TO 8 INCHES ABOVE AND BELOW, AND IT WAS ALL SWOLLEN.  I'VE SEEN THE PHOTOGRAPHS.

AND IT'S REALLY BLACK AND BLUE AS YOU WOULD EXPECT ANY BRUISING.  SO HE HAD A SEVERE CONTUSION IS THE MEDICAL TERM FOR THAT.

EXTREME PAIN.  HE SAID HE COULDN'T EVEN BEND HIS KNEE THE NEXT DAY.  AND HIS GIRLFRIEND HAD CRUTCHES, WHICH SHE LOANED HIM.  AND HE SAID HE HAD TO USE THOSE CRUTCHES TO REALLY -- BEFORE HE COULD WALK WITHOUT PAIN, HE HAD TO USE CRUTCHES FOR THREE MONTHS.

SO THIS IS A DEVASTATING INJURY TO A YOUNG MAN.

Q.   DR. WATKINS, YOU DID MENTION SOME PHOTOGRAPHS.

IF WE CAN PLEASE SHARE A SCREEN TO WHAT HAS ALREADY BEEN ADMITTED INTO EVIDENCE AS EXHIBIT 2?

MR. DANG:  EXHIBIT 2.

THE WITNESS:  YEAH.

BY MR. SCHECHTER:

Q.   DR. WATKINS, AS YOU'RE TAKING A LOOK AT THOSE PHOTOGRAPHS,

ER0167

WHICH ARE ALSO ON THE SCREEN HERE IN THIS COURTROOM, ARE THOSE CONSISTENT WITH THE TYPES OF INJURIES AND WHAT YOU WERE DESCRIBING YOU OBSERVED WHEN YOU CONDUCTED THE IME?

A.    YES, SIR.

Q.    OKAY.  YOU CAN TAKE THOSE DOWN.  THANK YOU.

DR. WATKINS, HOW DID THESE INJURIES THAT MR. JOHNSON SUFFERED PROGRESS OVER TIME?

A.    WELL, I COULD SEE THOSE BRUISES HAD GONE AWAY BY THE TIME I EXAMINED HIM, WHICH WAS SIGNIFICANTLY AFTER THE INJURY.

BUT WHAT HAPPENED WAS ON THE 28TH HE HAD SOME BACK AND FORTH CALLS WITH THE NURSE ON CALL AT KAISER AND WHO TELLS HIM TO COME IN.  SO HE DOES COME IN ON THE 28TH OF JUNE, WHICH IS ALMOST A MONTH AFTER THE INJURY.

HE'S GOT COMPLAINTS OF SHORTNESS OF BREATH AND CHEST PAIN, AND THEN THEY DO A SERIES OF STUDIES WHICH DOCUMENT THAT HE HAD DEVELOPED CLOTS IN THE VEINS OF HIS LEFT -- BEHIND THE LEFT KNEE AREA, THAT'S CALLED THE POPLITEAL SPACE.  SO GUESS WHAT? THEY CALL THOSE THE POPLITEAL VEINS.

AND THE ULTRASOUND THEY DID SHOWED THAT THERE WERE CLOTS UP INTO THE VEINS ABOVE AND BELOW THE KNEE.  ABOVE THE KNEE, THAT'S THE FEMORAL VEINS.  BELOW THE KNEE, THAT IS CALF VEINS.

SO HE'S GOT FEWEST BLOCKS, COMPLETE BLOCKAGES OF THESE VEINS FROM CLOT, BLOOD CLOT, WHICH IS COMPLETELY OBSTRUCTING THESE VEINS.  SO THAT'S OFTEN ASSOCIATED WITH PULMONARY EMBOLISM.

ER0168

OH.  AND THEY DID A VENOGRAM TO RULE OUT MAY-THURNER SYMPTOM, WHICH IS A RIGHT ILIAC VEIN.  THAT'S THE PELVIC VEIN CROSSING THE LEFT ILIAC VEIN, AND ALL OF THIS IS IN YOUR PELVIS BELOW YOUR BELT, AND TO SEE IF THAT WAS COMPRESSING IT.  NO, HE DIDN'T HAVE THAT.  THEY DID A VENOGRAM TO RULE THAT OUT.

AND THEY THEN -- BUT THEY NOTICED ON THE VENOGRAM, THEY SAW THERE WERE SOME CLOTS AT THE BASIS OF THE LUNGS, SO THEY DID -- ON THE 30TH THEY DID --

Q.  BEFORE YOU GET AHEAD THERE, I'M GOING TO PAUSE YOU THERE. I'M GOING TO STICK -- BEFORE WE GET TO THE 30TH.

SO PRIOR TO THE 30TH OF JUNE, WAS THERE ANY DIAGNOSIS AT ANY POINT OF DEEP VEIN THROMBOSIS FOR MR. JOHNSON?

A.  NO, THAT WAS MADE, I THINK, FROM THE -- THEY SAW THE RESULTS OF THE VENOGRAM ON 6-28.

Q.  OKAY.  LET ME FIRST -- SINCE I RAISED DEEP VEIN THROMBOSIS, COULD YOU JUST EXPLAIN WHAT THAT IS?

A.  YEAH.  DEEP VEIN THROMBOSIS, WHICH WE ALWAYS JUST CALL DVT, IS WHEN CLOTS APPEAR IN THE VEINY -- MANY VEINS IN THE BODY.

CLOTS THAT ARE GOING TO GO TO THE LUNGS USUALLY ARE REFERRED TO AS PROXIMAL DVT.  PROXIMAL MEANING CLOSER TO THE HEART.  AND THAT STARTS ACTUALLY BELOW THE KNEE.  SO THAT INCLUDES THE POPLITEAL VEINS, AND BEHIND THE KNEE; THE FEMORAL VEINS IN THE THIGH; THE ILIAC VEINS IN THE PELVIS.  AND ACTUALLY YOU CAN GET CLOTS IN THE INFERIOR VENA CAVA, WHICH

ER0169

BOTH ILIAC VEINS FORM AS THEY COME OUT OF THE PELVIS, AND THAT'S ONE BIG VEIN THAT RUNS RIGHT UP TO YOUR BODY TO THE HEART.

SO ANYTHING IN THOSE AREAS IS CONSIDERED PROXIMAL DVT, WHICH IS HIGHLY PRONE TO EMBOLIZE TO THE LUNGS.  EMBOLIZE MEANS CLOTS BREAK OFF AND TRAVEL IN A CIRCULATION.

REMEMBER, ALL OF THIS BLOOD IS COMING UP AGAINST THE FLOW OF GRAVITY ALL OF THE WAY UP INTO THE INFERIOR VENA CAVA AND THROUGH THAT INTO THE RIGHT HEART AND INTO THE LUNGS, WHICH IS A GIANT FILTER BECAUSE THAT'S WHERE YOU EXCHANGE AIR AND CARBON DIOXIDE.

AND THEN IT GETS PLUGGED UP INTO THE ARTERIES OF THE LUNGS, WHICH CAN CAUSE DEATH.

SO THIS IS A POTENTIALLY FATAL DISEASE.  NOT A GOOD DISEASE TO HAVE.

Q.   I THINK WHEN I PAUSED YOU THERE EARLIER YOU WERE ABOUT TO DISCUSS I THINK A PULMONARY EMBOLISM.

SO LET ME ASK YOU, BASED ON YOUR UNDERSTANDING, WAS MR. JOHNSON EVER DIAGNOSED WITH A PULMONARY EMBOLISM?

A.   YES, HE WAS DIAGNOSED WITH THAT, WORKING DIAGNOSIS ON 6-28.

AND ON 6-30 I THINK THEY STARTED HIM BECAUSE OF THE DVT. THEY KNEW ABOUT -- HE WAS ALREADY STARTED ON ANTICOAGULANTS WHEN HE CAME BACK ON 6 -30 WITH CHEST PAIN, AND THEY DID A FORMAL CT PULMONARY ANGIOGRAM, THAT IS COMPUTERIZED TOMOGRAPHIC

ER0170

PULMONARY --

Q.   DR. WATKINS.   DR. WATKINS, AGAIN, CAN YOU REPEAT WHAT YOU JUST SAID THERE.   YOU WERE A LITTLE SOFT.   THE COURT REPORTER COULDN'T HEAR YOU.

IN TERMS OF WHAT THE DIAGNOSIS AND THE TESTS THEY WERE RUNNING THERE?

A.   YEAH.   SO ON 6-30 THEY DID A FORMAL CTPA TO FIND OUT, BECAUSE THIS IS A DIE THAT YOU CAN SEE AND YOU JUST INJECT IT THROUGH A VEIN AND YOU CAN SEE THE DIE FLOWING THROUGH THE PULMONARY ARTERIES, AND YOU CAN SEE WHERE THE CLOTS ARE.

AND HE HAD CLOT ON THE BASIS OF BOTH LUNGS, THE ARTERIES, NOT THE CENTRAL PULMONARY ARTERIES BUT THE PERIPHERAL PULMONARY ARTERIES.   AND IT WAS ON BOTH SIDES, BILATERAL LOWER LOBE PULMONARY EMBOLISM IS HOW THEY WROTE THAT OUT.

Q.   AND JUST SO WE'RE ALL ON THE SAME PAGE, AND WE'RE ALL CLEAR.   AGAIN, CAN YOU JUST KIND OF BRIEFLY EXPLAIN WHAT A PULMONARY EMBOLISM IS?

A.   YEAH.   A PULMONARY EMBOLISM IS CLOTS, CLOTS IN THE PULMONARY ARTERIES.

THE ARTERIES ARE THE BLOOD COMING FROM THE RIGHT SIDE OF THE HEART, THAT'S OXYGEN IN BLOOD, BRINGING IT TO THE LUNGS WHERE IT GOES INTO SMALLER PULMONARY ARTERIES OUT INTO CAPILLARIES WHERE THE GASES ARE ACTUALLY EXCHANGED IN THESE TINY LITTLE AIR SACS THAT ARE CALLED ALVEOLI.

AND CARBON DIOXIDE GOES IN, OXYGEN COMES OUT TO THESE

ER0171

LITTLE ARTERIES. THEY CARRY THAT OUT TO THE PULMONARY VEINS, WHICH TAKE IT OVER TO THE LEFT SIDE OF THE HEART WHICH PUMPS THE BLOOD AROUND THE BODY.

SO CLOTS CAN'T GET THROUGH THIS GIANT FIGHTER OF VESSELS WHICH GET PROGRESSIVELY SMALLER IN THE LUNGS FROM THE MAIN PULMONARY ARTERIES, TO THE LOBAR ARTERIES, TO THE SEGMENTAL, TO THE SUBSEGMENTAL. SO YOU ARE GETTING THIS ONE.

AND THE SUBSEGMENTAL ARTERIES GO OUT INTO ALL OF THESE LITTLE VAST SPIDER WEB OF CAPILLARIES WHICH ARE INVISIBLE TO THE NAKED EYE WHERE THE GAS EXCHANGE TAKES PLACE.

SO YOU GET GIANT BELLOWS FULL OF LITTLE -- MILLIONS OF LITTLE AIR SACS WHERE THE OXYGEN COMES IN AND THE CARBON DIOXIDE GOES OUT.

SO THIS IS BAD NEWS HERE. IF YOU CAN'T EXCHANGE AIR, YOU KNOW, IF YOUR LIFE BLOOD LITERALLY IS BLOCKED FROM CIRCULATING, YOU'RE IN BAD, BAD TROUBLE.

Q. DR. JOHNSON -- DR. WATKINS. I'M SORRY.

DR. WATKINS, FROM YOUR REVIEW OF THE MEDICAL RECORDS, WAS THERE AN INDICATION AS TO WHAT THE CAUSE, WHAT THE CAUSE OF THE PULMONARY EMBOLISM WAS? SO JUST BASED ON YOUR REVIEW OF THE MEDICAL RECORDS.

A. RIGHT. YEAH, THE CAUSE IS OBVIOUS. HE GOT A TERRIBLE INJURY TO HIS LEG, AND YOU SAW THE EXTERNAL EFFECTS OF THAT, AND THE INTERNAL EFFECTS ARE JUST AS NASTY.

HE HAD TERRIBLE DAMAGE TO THE VEINS IN HIS LEFT POSTERIOR

ER0172

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 9, 2025

ER0173

710

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

        PLAINTIFF,          CASE NO.  CV-21-01849 BLF

   VS.                SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 10, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 5
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,         PAGES 710 - 965

      DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

  FOR THE PLAINTIFF:   MCMANIS FAULKNER
                   BY:  ABIMAEL BASTIDA
                      MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

  OFFICIAL COURT REPORTER:  IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

UNITED STATES COURT REPORTERS

ER0174

TASSIO AS-ON DIRECT BY MR. SYMPSON

CONTROL THAT WITH SPECIFICALLY SCENARIO NUMBER 2 WHERE INSIDERS -- THIS IS MY SUMMARY, BUT INSIDERS USING PEACEFUL PROTESTORS AS A SHIELD; IS THAT CORRECT?  IT'S THAT SCENARIO?

A.   YES.

Q.   AND HAVE YOU ENCOUNTERED SUCH -- OR EXCUSE ME, STRIKE THAT.

HAVE YOU ENCOUNTERED SIMILAR SCENARIOS IN REAL LIFE WHILE OUT ON DUTY?

A.   YES.

Q.   DID YOU EXPERIENCE SUCH THINGS ON MAY 29TH, 2020?

A.   YES.

Q.   AND HOW ABOUT ON MAY 30TH, 2020?

A.   YES.

Q.   THEY ALSO TALKED ABOUT -- I'M GOING TO FORGET THE ACRONYM -- MOBILE FORCE -- ANOTHER F?

A.   MOBILE FIELD FORCE.

Q.   MOBILE FIELD FORCE.  THERE WE GO.

PART OF DOING THE CROWD CONTROL IS ARRANGING FOR MOBILE FIELD FORCE TO MAKE PLANS FOR ARREST OF MEMBERS OF THE CROWD IF NECESSARY?

A.   CORRECT.

Q.   NOW, IS THERE ALWAYS, IN YOUR EXPERIENCE, AN OPPORTUNITY TO GO INTO A CROWD AND DETAIN AND ARREST SOMEBODY WHO MAY HAVE ENGAGED IN SOME SORT OF PROHIBITED ACT WHILE WITHIN THE CROWD?

A.   NO, IT'S ACTUALLY VERY DIFFICULT TO MAKE AN ARREST DURING

ER0175

A CROWD CONTROL EVENT.

Q.    WHY IS THAT?

A.    TYPICALLY IT'S RESOURCE INTENSIVE, AND THE CROWD IS TYPICALLY VERY HOSTILE TO BEGIN WITH, WHICH IS WHY WE ARE THERE AND DOING WHAT WE'RE DOING.

SO TO TRY AND GO OUT INTO THE CROWD AND SINGLE SOMEBODY OUT AND THEN CIRCLE THEN AND ARREST THEM IS COMPLICATED AND DANGEROUS.

Q.    SIMILARLY, WHAT ABOUT THE DUTY TO PROVIDE MEDICAL AID TO SOMEBODY WHO MIGHT HAVE BEEN STRUCK BY A PROJECTILE IMPACT WEAPON WHILE IN THE CONTEXT OF A CROWD OR LARGE DEMONSTRATION?

A.    YES.  WE PROVIDED OR WE DO PROVIDE MEDICAL CARE TO ANYBODY WHO IS STRUCK WITH AN IMPACT -- PROJECTILE IMPACT WEAPON THAT WE HAVE IN OUR CARE AND CUSTODY.

Q.    AND WHAT IF THEY'RE LIKE YOU DESCRIBED BEFORE, THEY'RE NOT IN YOUR CARE AND CUSTODY BECAUSE YOU CAN'T GO INTO THE CROWD TO SAFELY MAKE AN ARREST OF THAT PERSON?

A.    WE CAN'T PROVIDE CARE TO PEOPLE WE DON'T HAVE CUSTODY OF. WE WOULD LOVE TO TAKE EVERYBODY INTO CUSTODY THAT WE STRIKE WITH A PROJECTILE IMPACT WEAPON, BUT WE SIMPLY CAN'T PROVIDE CARE TO SOMEBODY WHO IS NOT IN OUR CUSTODY.

Q.    IS THERE THAT SAME CONCERN AS THERE IS FOR PROVIDING OR MAKING ARRESTS AS THERE IS FOR ATTEMPTING TO PROVIDE AID TO PEOPLE IN THESE TYPES OF CROWD CONTROL SITUATIONS?

A.    YEAH, THE SAME THEORY APPLIES.  IF WE HAVE TO GO OUT INTO

ER0176

THE CROWD TO PROVIDE AID, WE WOULD DO THE SAME TACTIC, WE WOULD ENCIRCLE THAT PERSON AND THEN TAKE THAT PERSON INTO CUSTODY AND THEN MOVE THEM BACK TO A SAFE LOCATION WHERE MEDICS COULD GET TO THEM.  BUT THE TACTIC IS THE SAME AS THOUGH WE WERE ARRESTING THEM, SO THE SAME THREATS APPLY.

Q.   I'M SORRY.  AS I WORK DOWN MY NOTES HERE.  THIS MIGHT BE A SILLY QUESTION --

THE COURT:  I THINK WE'RE GOING TO HAVE TO STOP FOR A BREAK THOUGH.  I THOUGHT MAYBE WE COULD FINISH, BUT I'M NOT RUSHING YOU AT ALL.

ALL RIGHT.  LET'S TAKE A 10 MINUTE BREAK, LADIES AND GENTLEMEN.  WE'LL COME BACK AT 10 PAST.

THE CLERK:  COURT IS IN RECESS.

(RECESS FROM 10:59 A.M. UNTIL 11:11 A.M.)

THE COURT:  PLEASE BE SEATED EVERYONE.  WE'RE BACK ON THE RECORD.

ALL COUNSEL AND THE PARTIES ARE ALL HERE, ALL OF OUR JURORS.

MR. SYMPSON, WOULD YOU LIKE TO CONTINUE?

MR. SYMPSON:  PLEASE, YOUR HONOR.

THE COURT:  GO AHEAD.

BY MR. SYMPSON:

Q.   WELCOME BACK, LIEUTENANT TASSIO.

LIEUTENANT TASSIO, WHEN IT CAME TO THE CROWD CONTROL TACTICS TRAINING YOU DISCUSSED ON YOUR EXAMINATION, THERE WAS A

ER0177

Q.   TERM CALLED INTERMEDIATE FORCE OPTIONS.

DO YOU RECALL THAT?

A.   YES.

Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT INTERMEDIATE FORCE OPTIONS MEANS?

A.   YES.

Q.   AND WHAT ARE INTERMEDIATE FORCE OPTIONS?

A.   MEANING FORCE THAT IS LIKELY TO PRODUCE PAIN OR INJURY.

Q.   AND WOULD THAT INCLUDE 40 MILLIMETER PROJECTILE IMPACT WEAPONS?

A.   YES.

Q.   AS WELL AS A 37 MILLIMETER PROJECTILE IMPACT WEAPONS?

A.   YES.

Q.   NOW, YOU ALSO MENTIONED SOME -- THE TERM PREASSAULTIVE INDICATORS.

DO YOU RECALL THAT?

A.   YES.

Q.   SPECIFICALLY YOU MENTIONED IN TERMS OF CROWD CONTROL SOMEBODY WITH A BELATED STANCE WITH THEIR ARM BEHIND THEM AS IF THEY WERE PREPARING TO THROW SOMETHING; IS THAT RIGHT?

A.   YES.

Q.   AND CAN YOU EXPLAIN WHAT YOU MEANT BY A BELATED STANCE IN THAT CONTEXT?

A.   A TYPICAL WAY SOMEONE WOULD THROW A BASEBALL OR SOMETHING IS THEY WOULD PUT ONE FOOT SLIGHTLY IN FRONT OF THE ORDER WITH

ER0178

THEIR FEET APPROXIMATELY SHORTER WIDTH APART, AND THEY WOULD KIND OF WIND UP BY PULLING WHATEVER THEIR DOMINANT ARM IS BEHIND THEIR BODY AND MAYBE EVEN POINT THEIR NON-DOMINANT HAND OUT THERE FOR BALANCE, AND KIND OF WIND UP AND THROW SOMETHING, LIKE YOU WOULD SEE A PITCHER FOR BASEBALL DO OR SOMETHING LIKE THAT.

Q.   YOU MENTIONED ANOTHER TERM, AND CORRECT ME IF I GET THIS WRONG, SOMETHING THAT OFFICERS SHOULD CONSIDER -- WELL, LET ME PUT IT THIS WAY, BASICALLY IN ANY USE OF FORCE WAS A TERM CALLED THE TOTALITY OF THE CIRCUMSTANCES.

DO YOU RECALL THAT?

A.   YES.

Q.   CAN YOU EXPLAIN TO ME WHAT YOU MEANT IN THAT CONTEXT, THE TOTALITY OF THE CIRCUMSTANCES?

A.   IT MEANS THAT YOU NEED TO TAKE INTO ACCOUNT ALL OF THE THINGS THAT ARE OCCURRING, THAT ARE KNOWN TO THE OFFICER AT THE TIME THE FORCE IS APPLIED.  SO WHAT IS THE CONDUCT OF THE SUSPECT WHO THE FORCE IS BEING APPLIED TO?  WHAT ARE THE CIRCUMSTANCES FOR WHICH BOTH THE OFFICER AND THE SUSPECT ARE THERE?  IF THE SUSPECT IS WANTED FOR A CRIME?  AND IF SO, WHAT IS THE SEVERITY OF THE CRIME?  IS THE SUSPECT TRYING TO FLEE FROM THE OFFICER?

YOU TAKE ALL OF THOSE THINGS INTO CONSIDERATION TO DETERMINE WHETHER THAT FORCE IS REASONABLE AT THE TIME IT'S APPLIED, AND IT HAS TO BE INFORMATION THAT IS AVAILABLE TO THE

ER0179

OFFICER AT THAT TIME.  YOU CAN'T USE HINDSIGHT TO LOOK BACK AND SAY, WELL, THEY SHOULD HAVE KNOWN THIS.  IT'S WHAT DID THAT OFFICER REASONABLY KNOW AT THAT TIME WHEN THEY APPLIED THAT FORCE.

Q.   WOULD THE LEVEL OF HOSTILITY OF A CROWD OR A LARGE DEMONSTRATION BE A FAIR CIRCUMSTANCE TO CONSIDER?

          MR. BASTIDA:  OBJECTION.  LEADING.

          THE COURT:  OVERRULED.

          THE WITNESS:  YES, ABSOLUTELY.

BY MR. SYMPSON:

Q.   NOW, YOU MENTIONED CIRCUMSTANCES AS KNOWN TO THE OFFICER.

     IS THAT THE APPROPRIATE PERSPECTIVE WHEN EVALUATING A USE OF FORCE?

A.   YES.  YOU NEED TO LOOK AT THE APPLICATION OF FORCE THROUGH THE EYES OF THE OFFICER WHO IS APPLYING THE FORCE.

     YOU DON'T USE, LIKE I SAID, HINDSIGHT OR AN EXPERT OPINION.  IT'S SOMEBODY WHO'S THERE AT THE TIME THE FORCE IS BEING APPLIED.

Q.   WHAT ABOUT THE PERSPECTIVE OF SOMEBODY WHO MAY BE A TARGET AS OPPOSED TO THE OFFICER?  IS IT FAIR TO TAKE THE OFFICER'S PERSPECTIVE AND NOT CONSIDER THEIRS WHEN EVALUATING WHETHER THE OFFICER'S USE OF FORCE WAS REASONABLE?

A.   I THINK THAT PLAYS INTO THE TOTALITY OF THE FORCE, BUT ULTIMATELY IT'S THE FACTS AND THE PERCEPTION OF THE OFFICER AT THE TIME THE FORCE WAS APPLIED AND THE THINGS THAT THE OFFICER

ER0180

TASSIO AS-ON RECROSS BY MR. BASTIDA

Q.   AND DID YOU HEAR OF ANY OFFICER GETTING INTO HAND-TO-HAND PHYSICAL CONTACT WITH AN OFFICER -- WITH A PROTESTOR?  I'M SORRY.

A.   NO, I DON'T REMEMBER.

THE COURT:  WE'VE SWITCHED TO 5-29 NOW?

MR. BASTIDA:  NO, 5-30.  THIS IS 5-30.

THE COURT:  I DON'T THINK THE QUESTION ABOUT 10:15 IN THE EVENING RELATED TO MAY 30TH, THAT'S WHY -- THAT'S WHY I GOT CONFUSED.

MR. SYMPSON:  I DID INTEND TO RELATE IT TO 5-30.

THE COURT:  YOU DID?

MR. SYMPSON:  YES, I DID.

THE COURT:  OKAY.  THEN MY MISTAKE.  I APOLOGIZE.

BY MR. BASTIDA:

Q.   OKAY.  SO JUST TO CLARIFY, WHAT WE DISCUSSED RIGHT NOW ABOUT YOU NOT BEING AWARE OF ANY OFFICERS EXPERIENCING ANY HAND-TO-HAND PHYSICAL COMBAT WITH A PROTESTOR, THAT WAS ON MAY 30TH, THAT LINE OF QUESTIONING?

A.   CORRECT.

Q.   OKAY.  MY FINAL QUESTION IS, YOU POINTED OUT THAT OFFICER ADGAR WAS NOT IN THAT EMAIL THAT YOU SENT TO YOUR TEAM INSTRUCTING THEM TO FAMILIARIZE THEMSELVES WITH THE 40 MILLIMETER USE OF FORCE POLICY; CORRECT?

A.   CORRECT.

Q.   BUT OFFICER ADGAR WAS AN OFFICER ON DUTY ON MAY 29TH AND

MAY 30TH; CORRECT?

A.   I DON'T KNOW.

Q.   ASSUMING HE WAS, HE WOULD HAVE BEEN EXPECTED TO BE FAMILIARIZED WITH THE USE OF FORCE POLICY REGARDING PROJECTILE IMPACT WEAPONS; CORRECT?

A.   YES.

Q.   AND I'M SORRY.  FINAL, FINAL QUESTION.

WOULD IT BE WITHIN USE OF FORCE POLICY TO SHOOT AN INDIVIDUAL WITH A 40 MILLIMETER FOAM BATON ROUND WHEN THAT INDIVIDUAL HAS THEIR HANDS UP AND IS NOT RUNNING AWAY?

A.   IT KIND OF DEPENDS ON THE TOTALITY OF THE CIRCUMSTANCES.

Q.   ALL OF THE ONES THAT WE'VE DISCUSSED SO FAR?

A.   YEAH.  I MEAN, IT'S HARD TO ANSWER A USE OF FORCE HYPOTHETICAL BASED ON SUCH A NARROW OR VAGUE SCENARIO.  DOES THAT MAKE SENSE?

Q.   OKAY.  BUT THE KEY -- WHAT YOU'RE SAYING IS THAT THE OFFICER SHOULD CONSIDER THE CIRCUMSTANCES AT THAT MOMENT?

A.   YES, THEY SHOULD TAKE THAT INTO CONSIDERATION ALONG WITH EVERYTHING ELSE.

Q.   OKAY.  ONE SECOND, YOUR HONOR.

(DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

MR. BASTIDA:  NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  THANK YOU.  ANY RECROSS FOR THIS WITNESS, MR. SYMPSON?

MR. SYMPSON:  YES, VERY BRIEFLY.  AND I SHOULD BE

ER0182

ABLE TO GET DONE WITHIN THE NEXT 5 MINUTES.

THE COURT:  OKAY.

**AS-ON REDIRECT EXAMINATION**

BY MR. SYMPSON:

Q.   LIEUTENANT TASSIO, MR. BASTIDA JUST ASKED YOU SOME QUESTIONS ABOUT THE DISPERSAL ORDERS.

DO YOU RECALL THAT?

A.   YES.

Q.   BASED UPON YOUR RECOLLECTION AND SEEING YOUR BODY WORN CAMERA VIDEO FROM MAY 29TH AT THAT TIME, DO YOU RECALL IF THERE HAD BEEN ANY DISPERSAL ORDERS ISSUED AT THAT POINT?

A.   YES, THERE HAD BEEN.

Q.   DO YOU RECALL HEARING ANY DISPERSAL ORDERS ACTIVELY OCCURRING WHILE THAT VIDEO WAS PLAYED?

A.   I THINK ONE BEGAN, BUT I STOPPED IT TO TELL HIM TO SEND HIM OFF FOR MEDICAL AID.

Q.   OKAY.  BASED UPON YOUR EXPERIENCE ON MAY THE 29TH -- MAY 29 FIRST, WERE THOSE ORDERS, DISPERSAL ORDERS, WERE THOSE FOLLOWED FOR THE MOST PART OR WHAT WAS THE, I DON'T KNOW, I'LL SAY ACCEPTANCE RATES?

A.   THEY DID NOT APPEAR TO BE FOLLOWED.

Q.   SIMILARLY, ON MAY 30TH, DO YOU KNOW WHETHER OR NOT THOSE -- THERE WERE DISPERSAL ORDERS ISSUED THROUGHOUT MAY 30TH?

A.   THERE WERE.

ER0183

TASSIO AS-ON REDIRECT BY MR. SYMPSON

Q.   AND BASED UPON WHAT YOU OBSERVED AND EXPERIENCED ON MAY 30TH, WAS THERE MUCH COMPLIANCE WITH THOSE DISPERSAL ORDERS?

A.   NO.

Q.   IN TERMS OF THE LEARNING DOMAINS YOU DISCUSSED IN TERMS OF POST TRAINING AND CERTIFICATION, THOSE ARE CONSISTENT WITH EACH OTHER; RIGHT?  THE LEARNING DOMAINS AND POST?

A.   YES.

Q.   OKAY.  DOES THE LEARNING DOMAIN SAY ANYTHING ABOUT THE FREQUENCY OF DISPERSAL ORDERS OR HOW FREQUENTLY DISPERSAL ORDERS SHOULD BE GENERATED OR GIVEN?

A.   FREQUENT ENOUGH THAT A REASONABLE PERSON IN THE AREA THAT YOU'RE ATTEMPTING TO DISPERSE WOULD KNOW AND UNDERSTAND THAT THEY NEED TO LEAVE THE AREA.  IT DOESN'T GIVE A SPECIFICITY TO TIME OR NUMBER OF DISPERSAL ORDERS IN A GIVEN TIMEFRAME.

Q.   THANK YOU.

NOTHING FURTHER.

THE COURT:  ALL RIGHT.  MR. BASTIDA?

MR. BASTIDA:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  ALL RIGHT.  AND MAY LIEUTENANT TASSIO BE EXCUSED?

(DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

MR. BASTIDA:  YES, YOUR HONOR.

THE COURT:  LIEUTENANT TASSIO, THANK YOU FOR YOUR TESTIMONY.  YOU'RE FREE TO GO.

ER0184

Q.   AND SOME OF THOSE FACTORS, ARE THOSE SOME OF THE SUBJECTS THAT COME UP IN THE INFORMAL TRAINING DISCUSSIONS YOU'VE DESCRIBED FOR US?

A.   YES.

Q.   BEFORE I ASK YOU MORE SPECIFICALLY ABOUT THE PROTESTS ON MAY 29TH, I WANT TO ASK YOU ABOUT WHETHER YOU'VE EVER BEEN IN SORT OF LARGE-SCALE CROWD CONTROL SCENARIOS PRIOR TO MAY 29TH AND MAY 30TH?

A.   YES, I HAVE.

Q.   ABOUT HOW MANY TIMES?

A.   AN ESTIMATE WOULD BE FIVE TO TEN.

Q.   AND WHAT ARE SOME OF THE CIRCUMSTANCES WHERE THERE'S BEEN A LARGE CROWD OR GATHERING AND YOU'VE HAD TO RESPOND IN YOUR CAPACITY AS A POLICE OFFICER?

A.   SO ONE OF THE THINGS THAT WILL HAPPEN YEARLY IS CINCO DE MAYO CELEBRATIONS IN SAN JOSE.  HISTORICALLY, THOSE CAN BE VERY RELATIVELY BENIGN UP TO WE'VE HAD A PATROL CAR FLIPPED OVER AND SET ON FIRE.

     IT CAN DEVOLVE INTO AN UNLAWFUL ASSEMBLY RATHER QUICKLY. IT GENERALLY INVOLVES LOTS OF PEOPLE ON THE STREETS CONSUMING ALCOHOL, CELEBRATION.  THERE'S CRUISING WITH CARS THAT OFTENTIMES WILL BACK UP TRAFFIC SIGNIFICANTLY, KIND OF LIKE A ROLLING CAR SHOW.  SOMETIMES THAT WILL DEVOLVE INTO A SIDE SHOW WITH PEOPLE DOING BURNOUTS AND SPINNING THEIR TIRES DOING DOUGHNUTS IN THE INTERSECTION WHICH CAN OFTENTIMES GET THE

ER0185

BYERS AS-ON DIRECT BY MR. SYMPSON

CROWD RILED UP AND AGITATED.

THAT OFTENTIMES LEADS TO PEOPLE STARTING TO VANDALIZE PROPERTIES, IT'S LED TO LOOTING IN THE PAST, THERE HAVE BEEN VTA BUSES THAT HAVE BEEN VANDALIZED, PEOPLE TAKING SKATEBOARDS AND OTHER OBJECTS AND SMASHING ALL OF THE WINDOWS TO THE BUSSES, SPRAY PAINTING THEM, WHICH AT THAT POINT IT'S JUST A LARGE GATHERING OF PEOPLE, NOT ALL OF WHOM BUT MANY OF WHOM ARE INVOLVED IN CRIMINAL ACTIVITY THAT IS STARTING TO CAUSE LARGE-SCALE DESTRUCTION.

WE HAVE BEEN DEPLOYED IN MOBILE FIELD FORCE TIMES, OR TO USE THE COLLOQUIAL TERM RIOT TEAMS, WHERE WE HAD TO GO OUT AND PUT OUR RIOT GEAR ON AND GET ON LINE.

THERE ARE A LARGE CROWD OF PEOPLE, AND THEY THROW BOTTLES AND BRICKS AND OTHER THINGS AT US.  AND AS WE START -- IN MY EXPERIENCE WITH CINCO DE MAY CROWDS, AS WE START WALKING TOWARDS THEM TO BEGIN TO CONFRONT THEM TO TAKE ENFORCEMENT ACTION, THEY WILL TURN AND GO THE OTHER WAY AND START DISPERSING ON THEIR OWN.

I'VE BEEN INVOLVED IN IT WITH DEMONSTRATIONS IN FRONT OF THE MAYOR'S HOUSE.

I WOULD CONSIDER SIDE SHOWS PART OF THAT AS WELL WHERE WE'VE GONE TO THE 400 PEOPLE AND MAYBE 150 CARS AT AN INTERSECTION, AND I'VE HAD TO GET OFFICERS ORGANIZED AND ON LINE TO START MOVING THROUGH THESE LARGE CROWDS TO STOP PEOPLE FROM GENERAL LAWLESS ACTIVITY INVOLVING SIDE SHOWS.

ER0186

Q.   SO SOME OF YOUR PRIOR EXPERIENCE IT SOUNDS LIKE THEY'VE GOTTEN INTO SOME PRETTY CHAOTIC SITUATIONS?

A.   YES.

Q.   HOW, IF AT ALL, DOES YOUR PRIOR CROWD EVENTS COMPARE TO THE EVENTS ON MAY 29TH AND MAY 30TH?

            MR. BASTIDA:  OBJECTION, RELEVANCE.

            THE COURT:  OVERRULED.

            THE WITNESS:  THERE'S NO COMPARISON TO WHAT WE EXPERIENCED ON MAY 29TH AND 30TH.

     I'VE NEVER SEEN ANYTHING LIKE THAT IN MY LIFE.  IT WAS SIGNIFICANTLY MORE VIOLENT AND DESTRUCTIVE THAN ANYTHING I'VE EXPERIENCED IN MY 15 YEARS AS A POLICE OFFICER.

BY MR. SYMPSON:

Q.   IS THAT -- LET ME ASK YOU THIS IN TWO PARTS, AND YOU MIGHT HAVE KIND OF ALREADY ANSWERED IT.

     HOW DID YOUR PAST EXPERIENCE COMPARE NOW SPECIFICALLY JUST TO MAY 30TH AS OPPOSED TO MAY 29TH?

A.   I'M SORRY, COULD YOU SAY THAT ONE MORE TIME.

Q.   SURE.  LET ME START OVER.

     YOU WERE THERE BOTH ON THE 29TH AND THE 30TH?

A.   THAT'S CORRECT.

Q.   WAS THERE A DIFFERENCE IN SCALE OR ANYTHING BETWEEN THE DEMONSTRATORS AND DEMONSTRATIONS ON THE 29TH AND 30TH?

A.   YES.

Q.   CAN YOU EXPLAIN.

ER0187

A.   ON THE 29TH WE WENT OUT THINKING THAT IT WAS GOING TO BE A REGULAR DAY OF PATROL, WHICH YOU KNOW, THOSE DAYS ARE ALWAYS UNIQUE.  NO TWO DAYS ARE THE SAME.  BUT WE DIDN'T KNOW THAT THERE WAS GOING TO BE THOUSANDS OF PEOPLE IN DOWNTOWN SAN JOSE IN A LARGE-SCALE RIOT.

IT WAS OVERWHELMING.  IT WAS -- WE WERE EXHAUSTED.  IT WAS TIRING.  WE DIDN'T EAT ALL DAY.  WE DIDN'T HAVE WATER.  WE DIDN'T HAVE PLACES TO USE THE BATHROOM.  THERE WERE NO BREAKS. THERE WAS NO STEPPING OFF THE LINE AND TAKING A COUPLE OF MOMENTS TO COMPOSE YOURSELF.  NO ONE WAS LOOKING AT THEIR PHONES.

IT WAS WILD, PANDEMONIUM, OUT OF CONTROL.

THE 30TH WAS SIGNIFICANTLY MORE STATIC IN THAT THE CROWDS WERE GENERALLY AT CITY HALL.  AS I PREVIOUSLY STATED, DURING THE DAYLIGHT HOURS IT WAS GENERALLY BENIGN.  IT WAS CHANTING. THERE WERE SOME ARRESTS THAT WERE MADE, BUT MOSTLY IT WAS OFFICERS STANDING BY A SKIRMISH LINE, PEOPLE OUT THERE PROTESTING, CHANTING, SINGING.

SO THE TWO DAYS WERE SIGNIFICANTLY DIFFERENT.  HOWEVER, ON THE 30TH, WE HAD A PLAN.  WE HAD DIRECTION.  WE HAD ORGANIZATION.  WE HAD MORE OF A -- IF IT DOES WHAT -- IF THE EVENTS OF THE 29TH HAPPENED ON THE 30TH, WE WERE SIGNIFICANTLY MORE PREPARED TO DEAL WITH IT BOTH IN TERMS OF RESOURCES AND MENTALLY.

Q.   WAS THAT BECAUSE OF SOME OF THE LESSONS YOU LEARNED ON THE

ER0188

29TH?

A.   ABSOLUTELY.

Q.   NOW, ON THE 30TH YOU MENTIONED AT LEAST DURING THE DAY IT WAS MORE BENIGN THAN THE DAY BEFORE.

DID THAT CHANGE AT ALL AS THE DAY TURNED INTO NIGHT?

A.   YES.

Q.   AND CAN YOU DESCRIBE THAT KIND OF TRANSITION?

A.   SO, I MEAN, DURING THE DAY YOU WOULD SEE CHILDREN IN THE CROWD.  THERE WERE, YOU KNOW, REGULAR FOLKS THAT WERE OUT THERE, AGAIN, MAKING THEIR VOICES HEARD, CHANTING.  A LOT OF IT WAS ANTI-POLICE SENTIMENT, BUT I UNDERSTOOD GIVEN THE CIRCUMSTANCES THAT WE WERE GOING TO BE THE RECIPIENT OF THAT.

AS IT TURNED MORE TOWARDS DUSK AND NIGHT, VEHICLES WOULD DRIVE BY AND, YOU KNOW, REV THEIR ENGINES UP, HONK THEIR HORNS, HONK REPEATEDLY.  A CROWD WOULD GET VERY AGITATED AND RILED UP.  THAT'S WHEN THEY GENERALLY WOULD START THROWING THINGS AT US.

YOU COULD JUST SEE AS IT TURNED INTO NIGHT, THE COVER OF DARKNESS GAVE THE CROWD A MORE EMBOLDENED FEEL TO BE ABLE TO ENGAGE IN SOME OF THE ACTIVITIES THAT THEY HAD THE DAY BEFORE.

YOU ALSO SAW SOME OF THE PEOPLE THAT WERE JUST OUT THERE PEACEFULLY LETTING THEIR VOICES BE HEARD, THEY HAD LEFT.  THEY HAD GONE HOME, AND NOW WE SAW A LOT OF PEOPLE THAT WERE MASKED UP COVERING THEIR FACES.  THAT TYPE OF STUFF.

Q.   WAS THE NIGHT IN THAT SENSE, THE EVENING AND NIGHT OF MAY 30TH, CLOSER TO WHAT YOU EXPERIENCED ON THE 29TH THAN THE

ER0189

DAYTIME OF THE 30TH?

A.   YES.

Q.   A LITTLE BIT MORE ON THE 29TH.  YOU MENTIONED THAT YOU DIDN'T NECESSARILY KNOW THERE WAS A PLANNED PROTEST WHEN YOU SHOWED UP FOR WORK THAT DAY?

A.   CORRECT.

Q.   AND WHEN YOU ENCOUNTERED THE PROTEST, HOW, IF AT ALL, DID THAT IMPACT OTHER POTENTIAL EMERGENCY CALLS FOR SERVICE, IF AT ALL, WITHIN YOUR DISTRICT?

A.   SIGNIFICANTLY.

Q.   IN WHAT SENSE?

A.   SO AS I DROVE OUT TO THE DISTRICT ON THE 29TH AROUND 3:45, 4:00 O'CLOCK I NOTICED THERE WERE A LOT MORE PEOPLE IN DOWNTOWN SAN JOSE, SIGNIFICANTLY MORE THAN ARE USUALLY THERE.  PEOPLE HAD SIGNS AND PEOPLE WERE UPSET.

IF I DRIVE IN DOWNTOWN SAN JOSE IN A PATROL CAR, NOT EVERYBODY IS A FAN OF THE POLICE NORMALLY.  SOME ARE AND SOME AREN'T.

THIS DAY IT SEEMED LIKE EVERYBODY WAS VERY UPSET WITH THE POLICE.  I COULD SEE PEOPLE START TO GATHER IN THE ROADWAYS, CITY HALL, NOT STAYING ON THE SIDEWALKS AS PEOPLE NORMALLY DO.

AS I DROVE ON SANTA CLARA STREET, WE SAW PEOPLE TARGETING POLICE CARS AND STARTING TO POINT AND YELL AND THROW THINGS.

I DROVE SOUTH ON MARKET STREET DOWN BY REED STREET AND SAW THERE WAS ANOTHER LARGE GROUP OF PEOPLE DOWN THERE.  THE PEOPLE

ER0190

STARTED YELLING AT ME.  I HAD SOME CONVERSATIONS WITH SOME PEOPLE.  IT WAS VERY HOSTILE.

SO I STARTED DIRECTING OFFICERS TO STAY OFF OF SANTA CLARA STREET BECAUSE I FELT LIKE INDIVIDUAL OFFICERS DRIVING UP AND DOWN SANTA CLARA STREET WERE GOING TO BE TARGETED.

THERE WERE A FEW TIMES THAT I HAD TO TAKE SOME EVASIVE MANEUVERS NOT TO GET BLOCKED IN BY A CROWD FOR FEAR THAT THEY WERE GOING TO ATTACK MY PATROL CAR, ATTACK ME, LIGHT MY CAR ON FIRE.

SO I STARTED DIRECTING PEOPLE AWAY FROM SANTA CLARA STREET, AND I ALSO HAD TO STOP OFFICERS FROM RESPONDING TO CALLS FOR SERVICE.

SO AN EXAMPLE IS THERE WAS SOMEONE WHO CALLED FOR A WELFARE CHECK OF HER BOYFRIEND AND HAD NOT HEARD FROM HIM.  HE SUFFERED FROM DEPRESSION.

SHE WANTED US TO GO TO THE AREA OF 3RD AND SAN FERNANDO STREET, AND I SAID, NO, THAT'S WHERE A LARGE CROWD IS.  IF THE OFFICERS GO THERE AND IF THEY PARK THEIR CARS AND IF THEY TRY TO GO UP TO HIS RESIDENCE, THE CARS ARE GOING TO GET LIT ON FIRE.

I LATER GOT UPDATED THAT SHE HAD CONVINCED THE BUILDING MANAGER TO OPEN THE APARTMENT DOOR WHERE SHE FOUND HER BOYFRIEND HANGING.  HE HAD COMMITTED SUICIDE.  HE WAS COLD TO THE TOUCH, WHICH IS AN INDICATOR OF IRREVERSIBLE DEATH.

AND MY THOUGHT PROCESS WAS, WELL, HE'S NOT GOING TO GET

ER0191

BYERS AS-ON DIRECT BY MR. SYMPSON

ANY MORE DEAD, WE ARE NOT GOING TO THAT BECAUSE OF THE SAFETY CONCERNS OF THE CROWD AND HOW HOSTILE AND AGITATED THEY WERE AGAINST THE POLICE.

THIS IS NOT SOMETHING THAT I HAVE EVER EVEN HEARD OF IN POLICE WORK, THAT WE SIMPLY IGNORE A SUICIDE.  WE NEED TO MAKE SURE THAT THIS IS NOT A SUSPICIOUS DEATH, THAT SHE DIDN'T HAVE SOMETHING TO DO WITH IT, WE NEED TO CONDUCT AN INVESTIGATION.

IT WAS NOT SAFE FOR US TO COMPLETE OUR BASIC POLICE SERVICE IN DOWNTOWN AT THAT TIME.

Q.   WHAT WERE YOU DOING INSTEAD OF ATTENDING TO THAT CALL?

A.   I STARTED TRYING TO HELP GET SOME ORGANIZATION FOR WHAT CROWDS WERE THERE.  WHERE WERE THEY?  WHAT WERE THEY DOING? WHAT WAS OUR POLICE RESPONSE GOING TO BE?

TYPICALLY IF SOMEBODY IS ASSIGNED TO MOBILE FIELD FORCE, THEY'RE THE ONES THAT ARE GOING TO GO DEAL WITH THE CROWDS. THAT'S GOING TO BE LIKE AN OFFICER OR TWO PULLED FROM EACH TEAM.  THERE ARE 16 TEAMS ACROSS THE CITY, SO YOU'LL GET 2 TEAMS OF 8 OR 10 THAT WILL GO DEAL WITH THAT, AND THEY HAD ALREADY BEEN DEPLOYED, BUT THAT WAS NOT ENOUGH.

I SAW WHERE THEY HAD LEFT THE MAJORITY OF THEIR PATROL CARS PARKED ON SANTA CLARA STREET AROUND 7TH STREET, 8TH STREET, THEY WERE JUST LEFT IN THE MIDDLE OF THE STREET AND THEY WERE STARTING TO GET VANDALIZED.

PEOPLE WOULD, AS I'M STANDING RIGHT THERE, RUN UP WITH A BRICK AND SMASH THE WINDSHIELD OF A PATROL CAR AND SAY "F YOU

ER0192

BYERS AS-ON DIRECT BY MR. SYMPSON

NAZI KKK," AND TURN AND RUN AWAY.  AND WE COULDN'T DO ANYTHING ABOUT IT BECAUSE OF THE NUMBERS OF PEOPLE.  AND WE DIDN'T WANT TO GET DRAWN INTO CHASING A PERSON, AND THEN YOU'RE GOING TO BE ISOLATED AND AWAY FROM OTHER OFFICERS AND POTENTIALLY BEING DRAWN INTO A CROWD SOMEWHERE.

SO INITIALLY I ASSIGNED OFFICERS TO HOLD SECURITY ON THE PATROL CARS.

I THEN STARTED COLLECTING SOME OF THE ROCKS, BRICKS, BOTTLES ON THE STREET AND TRIED TO HIDE THEM IN TRASH CANS BECAUSE THEY COULD HAVE BEEN USED AGAINST US AGAIN.

AND THEN I DECIDED TO GO JOIN THE MOBILE FORCE TEAMS AND START DIRECTING SOME OF THE RESOURCES.

Q.  YOU MENTIONED NOW A COUPLE OF TIMES SOME PRETTY INFLAMMATORY OR VOLATILE LANGUAGE THAT WAS BEING, I DON'T KNOW, DIRECTED TO YOU AND OTHER OFFICERS.

DO YOU FEEL THAT WAS DISRESPECTFUL GIVEN THE CIRCUMSTANCES?

A.  IT WASN'T RESPECTFUL.

YES, IT WAS DISRESPECTFUL, BUT THIS IS PART OF BEING A POLICE OFFICER AT A LARGE-SCALE DEMONSTRATION THAT ULTIMATELY TURNED INTO A RIOT IS THIS IS FREEDOM OF SPEECH.  THEY HAVE THE RIGHT TO SAY THESE THINGS, WHETHER I AGREE WITH THEM OR NOT, WHETHER IT PERSONALLY OFFENDS ME OR NOT.

I AM A REPRESENTATIVE OF THE LOCAL GOVERNMENT AND PART OF MY JOB OF BEING A POLICE OFFICER IS TO HEAR INSULTS AND NOT

ER0193

BYERS AS-ON DIRECT BY MR. SYMPSON

REACT EMOTIONALLY.

WE DO OUR BEST, BUT WE'RE NOT PERFECT.

Q. IS THAT KIND -- WHAT YOU DESCRIBED, IS THAT ANY SORT OF COMPONENT OF THE BRIEFING THAT YOU HAD RECEIVED BEFORE YOU STARTED ON MAY 30TH?

A. YES.

Q. DID YOU EVER FEEL LIKE THOSE PEOPLE THAT WERE SAYING THINGS TO YOU, THE VOLATILE COMMENTS OR THE INFLAMMATORY COMMENTS, THAT THEY WERE PROTESTING AGAINST YOU PERSONALLY?

A. YES. AS A SUPERVISOR OF DOWNTOWN SAN JOSE, I HAD DIRECTED MY TEAMS IN SOME PROJECTS SPECIFICALLY TARGETING GANG MEMBERS WHO HAD BEEN SELLING DRUGS, THEY HAD BEEN ATTACKING PEOPLE, THEY HAD BEEN INCREDIBLY VIOLENT, THEY HAD TAKEN OVER AN APARTMENT IN DOWNTOWN SAN JOSE. IT WAS KIND OF THEIR BASE OF OPERATIONS.

WE HAD SERVED A SEARCH WARRANT A FEW DAYS BEFORE. I GOT THEM OUT OF THE APARTMENT AND MADE NUMEROUS ARRESTS.

THAT WAS A WIN FOR THAT PART OF SAN JOSE BECAUSE THEY HAD JUST BEEN CAUSING CHAOS. AND I HAD SPENT NUMEROUS HOURS WITH GANG MEMBERS PRIOR TO THE NIGHT OF THE 29TH OR THE DAY OF THE 29TH, SO THEN NUMEROUS HAD BEEN LET OUT OF JAIL AND WERE ONLY ISSUED CRIMINAL CITATIONS AS A RESULT OF THE SEARCH WARRANT.

SO AS I WAS STANDING ON LINE AT 3RD AND SAN FERNANDO STREET, 5 FEET AWAY FROM ME ARE SOME OF THESE GANG MEMBERS THAT I HAD ARRESTED THAT WERE BASICALLY TALKING SMACK TO ME

ER0194

BYERS AS-ON DIRECT BY MR. SYMPSON

SPECIFICALLY SAYING HEY, BYERS, I SEE YOU, YOU'RE GOING TO GET YOURS, DON'T WORRY, WE'RE COMING FROM YOU, WE'RE GOING TO SHOW YOU WHAT'S UP, CURSING AT ME, THAT TYPE OF STUFF.

SO THERE WERE SOME PEOPLE WHO HAD BEEN INVOLVED IN PREVIOUS CRIMINAL ACTIVITY THAT RECOGNIZED ME AS THE PERSON WHO HAD BEEN HOLDING THEM ACCOUNTABLE FOR THAT.

Q.   SO THAT WAS PERSONAL TO YOU?

A.   IT'S HARD NOT TO TAKE IT PERSONAL WHEN THERE'S GANG MEMBERS BASICALLY THREATENING YOU TO YOUR FACE, YET I'M NOT IN A POSITION TO ARREST THEM.  I BASICALLY HAVE TO SIT THERE AND TAKE IT.

Q.   WHAT ABOUT THE REST OF THE CROWD, YOU KNOW, THE ONES THAT YOU DIDN'T HAVE ANY PERSONAL HISTORY OR INTERACTIONS WITH, PEOPLE THAT ARE JUST SHOWING UP TO VOICE THEIR OPINION AND EXPRESS THEMSELVES BUT AS YOU MENTIONED THEY HAD TO SOME EXTENT AN ANTI-POLICE ATTITUDE TOWARD IT, DO YOU FEEL LIKE YOU WERE BEING PERSONALLY PROTESTED BY THOSE FOLKS?

A.   NO.  I UNDERSTAND THAT THEY SEE THE UNIFORM AND THEY SEE THE BADGE.  AND THEY'RE UPSET WITH THE CURRENT STATE OF POLICING IN THE UNITED STATES, AND THEY'RE NOT SPECIFICALLY MAD AT ME, BUT IT'S DIRECTED TOWARDS ME, AND I UNDERSTOOD IT.

YOU DO YOUR BEST NOT TO TAKE IT PERSONALLY, BUT YOU CAN ONLY HEAR A FEW NAZI -- YOU KNOW, SO MANY TIMES WHERE YOU SAY THAT'S NOT ME.  BUT YOU DON'T REACT EMOTIONALLY TO THAT AND LASH OUT.  YOU JUST HAVE TO MAINTAIN COMPOSURE, TRY TO STAY

ER0195

BYERS AS-ON DIRECT BY MR. SYMPSON

THE RADIO TRAFFIC WAS REALLY LIMITED TO CRUCIAL INFORMATION.

A LOT OF INFORMATION WAS COMING FROM AIR 3, OUR HELICOPTER UNIT, THAT WAS UP IN THE AIR AND WAS BROADCASTING WHAT WAS HAPPENING; OTHER SERGEANTS ASKING FOR HELP, ASKING FOR ADDITIONAL RESOURCES AND KIND OF GIVING UPDATES ON WHERE THE CROWD IS.

SO I GOT SOME INFORMATION FROM THE RADIO.

Q.   LET ME ASK YOU THIS, WAS THE -- YOU MENTIONED A CROWD MOVING FROM CITY HALL AND TO HIGHWAY 101 AND BACK IN THE AREA. ARE THOSE THE ONLY LOCATIONS ON MAY 29TH WHERE THERE WERE LARGE GROUPS OR DEMONSTRATIONS WITHIN DOWNTOWN?

A.   NO.

Q.   AND WHAT WAS IT LIKE IN TERMS OF THE DIFFERENT LOCATIONS WHERE CROWDS GATHERED AND DEMONSTRATIONS WERE OCCURRING?

A.   SO THE CROWD ON THE 29TH WAS JUST MASSIVE, AND IT SEEMED LIKE IT WAS KIND OF ENDLESS.

AS WE WOULD GET TO A CERTAIN STREET, FOR EXAMPLE, 3RD STREET AND YOU LOOK DOWN AND SEE FOUR OR FIVE DIFFERENT PEOPLE IN THE STREET, YOU WOULD FORM A SKIRMISH LINE, A LINE WITH ALL OF THE OFFICERS WITH THEIR RIOT HELMETS AND 42 INCH BATONS AND DIRECT PEOPLE DOWN THE STREET.

ON 3RD STREET FROM SANTA CLARA DOWN TO SAN FERNANDO, THEY WERE MOSTLY COOPERATIVE.  THEY WOULD BACK UP.  THEY WOULD CHANT.

THEY WEREN'T HAPPY WITH US, BUT THEY WEREN'T THROWING

ER0196

ROCKS AND BOTTLES AT US.

AND THEN WE GOT TO 3RD STREET, THE INTERSECTION OF 3RD AND SAN FERNANDO AND JUST STAYED THERE FOR A WHILE, AND THAT'S WHERE THE GANG MEMBERS WERE THREATENING ME.

BUT NOBODY WAS THROWING ROCKS OR BOTTLES.  AND IT WAS A VERY UPSET AND AGITATED CROWD, BUT THERE WAS NO CRIMINAL ACTIVITY HAPPENING.

SO I DON'T BELIEVE THAT ANY ARRESTS WERE MADE, NONE TO MY RECOLLECTION.  MAYBE SOMEBODY THAT REFUSED TO MOVE TOOK A KNEE, RAISED A FIST AND THEN YOU'VE GOT TO GO, YOU'VE GOT TO GO, OKAY, NOW WE'RE GOING TO ARREST YOU.  BUT THAT WAS RELATIVELY PEACEFUL OTHER THAN THE VERBIAGE THAT THEY WERE USING.

BUT THEN LATER WE MOVED TO SANTA CLARA AND MARKET AND HAD TO GO SOUTH ON MARKET TO CESAR CHAVEZ PARK, AND THAT CROWD WAS INCREDIBLY AGITATED, THROWING BRICKS AND CARS WERE DOING DONUTS AND BURN OUT AND GETTING THE CROWD AMPED UP.  THEY WERE DEPLOYING TEAR GAS.  SO THAT WAS MORE OF THE VIOLENT RIOT CROWD.

Q.   TO WHAT EXTENT, IF AT ALL, DID YOU SEE ARSON OCCURRING OR FIRES BEING STARTED THROUGHOUT DOWNTOWN?

A.   I NEVER HAVE SEEN SO MANY FIRES BEING STARTED ANYWHERE.

Q.   WHAT TYPES OF OBJECTS WERE BEING LIT ON FIRE?

A.   ANYTHING THAT WAS FLAMMABLE.  THERE WERE CARS THAT WERE LIT ON FIRE.  THEY WOULD LIGHT CITY OWNED GARBAGE CANS ON FIRE, WHICH IS BASICALLY JUST GOING TO BURN OUT IN THAT LITTLE

ER0197

BYERS AS-ON DIRECT BY MR. SYMPSON

SELF-CONTAINER AND NOT SPREAD TO ANYTHING ELSE.

THERE WERE DUMPSTERS THAT WERE SET ON FIRE, AND THEN THEY WOULD PUSH THOSE DUMPSTERS UP AGAINST BUILDINGS.  THOSE BUILDINGS HAD PEOPLE INSIDE OF THEM.

THE FIRE DEPARTMENT WAS NOT ABLE TO RESPOND TO A LOT OF STUFF ON THE 29TH BECAUSE THEN PEOPLE WOULD START VERBALLY THREATENING THE FIREFIGHTERS, AND THE FIREFIGHTERS ARE NOT EQUIPPED TO DEAL WITH HOSTILE CROWDS.  THAT WAS ANOTHER PROBLEM THAT WE HAD TO SOLVE FOR FIRE.

ANYTHING THAT THEY COULD BURN.  LIKE SOME OF THE NEWSPAPER STANDS LIKE THE METRO NEWSPAPER STANDS, THEY WOULD THROW THOSE DOWN AND TRY TO SET THEM ON FIRE.

ABANDONED VEHICLES IN THE STREET, THOSE WOULD GET LIT ON FIRE.  ANYTHING THAT THEY COULD LIGHT ON FIRE, THEY WOULD LIGHT ON FIRE.

Q.   I WANT TO SHIFT GEARS A LITTLE BIT NOW.  MR. BASTIDA HAD ASKED YOU ABOUT SOME PRIOR TESTIMONY THAT YOU HAD GIVEN THAT INCLUDED TRYING -- CORRECT ME IF I'M MISTAKEN ABOUT THIS, BUT TRYING TO MOVE CROWDS ON THE SIDE STREETS AND GET THEM TO AVOID SPECIFIC AREAS.

IS THAT A DECENT CHARACTERIZATION?

A.   HAVING THE OFFICERS MOVE ON THE SIDE STREETS TO AVOID THE MAIN CROWDS ON THE MAIN STREETS.

Q.   SO IT WAS OFFICERS WHO WERE MOVING ON SIDE STREETS TO AVOID CROWDS ON THE MAIN STREETS?

ER0198

BYERS AS-ON DIRECT BY MR. SYMPSON

A.   INITIALLY, YES.  BECAUSE IT WAS STILL HARD TO COMPREHEND THE SCALE AND THE TIME THAT THIS RIOT WAS GOING TO HAVE.  I WAS STILL THINKING THAT WE COULD STILL PROVIDE SOME OF OUR BASIC POLICE FUNCTION.

AGAIN, WE HAD ALL OF THE WAY TO HIGHWAY 101,  SO 28TH STREET AND WILLIAMS AND THE HANCHETT NEIGHBORHOOD, H-A-N-C-H-E-T-T, AND STILL TRIED TO RESPOND TO SOME OF THE 911 CALLS WE GET EVERY DAY, BUT WE WERE UNABLE TO.

Q.   DID THAT TACTIC OF USING THE SIDE STREETS -- LET ME PUT IT THIS WAY, WHEN YOU WERE ASKED ABOUT THAT BY MR. BASTIDA, IT WAS IN THE CONTEXT OF THE PROTEST BEING ABOUT BLACK LIVES MATTER AND GEORGE FLOYD.

AND HOW, IF AT ALL, DID THE CONTENTS OR THE SUBJECT MATTER OF THE DEMONSTRATIONS PLAY INTO YOUR TACTICAL DECISIONS ON THAT DAY?

A.   I MEAN, IT'S VERY SPECIFICALLY FOCUSSED ON THE ACTS OF POLICE OFFICERS THAT OCCURRED WITH THE DEATH OF GEORGE FLOYD, SO THE ENTIRE RIOT WAS ANTI-POLICE:  THAT POLICING IN AMERICA HAD GOTTEN OUT OF CONTROL, THAT IT WAS ANTI -- POLICE HAVING BIAS OF PEOPLE OF COLOR, THE APPLICATION OF FORCE, OF NOT APPLYING MEDICAL TO A PERSON WHO IS IN DISTRESS.

SO THE SENTIMENT WAS ANTI-POLICE.

YOU KNOW, IF THERE'S ONE OR TWO PEOPLE THAT DON'T LIKE THE COPS AND THERE'S A COP CAR THERE, THAT'S FINE, WE CAN DEAL WITH THAT.

ER0199

YOU HAVE GOT 50 PEOPLE THAT DON'T LIKE COPS AND YOU HAVE 1 COP CAR THERE, YOU MIGHT HAVE A PROBLEM.

NOW 400 PEOPLE THAT HATE THE COPS AND THERE IS A COP CAR THERE, AND YOU DEFINITELY HAVE A PROBLEM.  THAT COP CAR IS GETTING LIT ON FIRE.

Q.   DID YOU USE THE SAME TYPES OF TACTICS IN TERMS OF DISPERSING CROWDS OR MOVING CROWDS OR TRYING TO GET CROWDS TO SPREAD APART THAN YOU WOULD IF THE SUBJECT MATTER HAD BEEN DIFFERENT?

A.   YES.  SO WHEN WE'RE DEALING WITH A CROWD AND IT'S -- AND I'M TALKING SPECIFICALLY ABOUT A RIOT, AN UNLAWFUL ASSEMBLY, AND WE'RE NOW GOING TO EMPLOY TACTICS THAT ARE GOING TO ATTEMPT TO MAKE THIS CROWD STOP THE UNLAWFUL DANGEROUS ACTIVITY THAT THEY'RE DOING, THE POINT IS TO DIVIDE THEM.

A CROWD OF A THOUSAND PEOPLE IS INCREDIBLY HARD TO DEAL WITH.  TWO CROWDS OF 500 ARE GOING TO BE A LITTLE MORE MANAGEABLE BUT CAN STILL BE VERY OUT OF CONTROL.

BUT NOW IF YOU SPLIT THOSE INTO FOUR CROWDS AND SPLIT THOSE FOUR CROWDS INTO EIGHT CROWDS, THAT NOW TAKES THE ANONYMITY OUT OF BEING IN THE CROWD.

WHERE IF YOU HAVE A CROWD OF 40 PEOPLE AND SOMEONE IS THROWING A BOTTLE OR BRICK AT YOU, IT'S SIGNIFICANTLY EASIER TO IDENTIFY THAT SINGLE PERSON WHO IS DOING THAT AS OPPOSED TO I DON'T KNOW, THERE'S A THOUSAND PEOPLE, IT CAME HERE SOMEWHERE IN THE BACK, I DON'T KNOW WHO THREW IT.

ER0200

Q.   ARE THERE TACTICAL REASONS THEN FOR MOVING PEOPLE AROUND?

A.   YES.

Q.   I WANT TO JUMP INTO YOUR EXPERIENCE ON THE 30TH.

SPECIFICALLY, WERE YOU AROUND -- BETWEEN THE CONSTRUCTION SITE ACROSS FROM CITY HALL PLAZA AND CITY HALL PLAZA ITSELF ON THE EVENING OF MAY 30TH?

A.   YES.

Q.   AND WERE YOU THERE AROUND ROUGHLY 10:20 P.M.?

A.   I WAS OUT THERE FOR ABOUT TEN HOURS, YES, BUT DURING THAT TIME YES, I WAS.

Q.   DO YOU HAVE A RECOLLECTION OF WHAT WAS KIND OF GOING ON AT THAT TIME?

A.   YES.

Q.   AND WHAT IS THAT?

A.   A LARGE CROWD OF PEOPLE THAT WAS IN THE OPEN CITY HALL PLAZA AREA, SO ON SANTA CLARA STREET FROM 4TH STREET TO 6TH STREET, BUT MORE REALLY 4TH TO 5TH STREET.  ON THE SOUTH SIDE IS SAN JOSE CITY HALL.  IT'S A LARGE OPEN PLAZA.  WE'VE HAD NUMEROUS DEMONSTRATIONS THERE BEFORE.  IT SEEMS TO BE KIND OF A PLACE OF CHOICE FOR PEOPLE TO GO AND LET THEIR VOICES BE HEARD.

THAT'S WHERE A LOT OF PEOPLE WERE CONGREGATING ON THE 30TH PRIOR TO ME EVEN STARTING MY SHIFT.

AS I PREVIOUSLY TESTIFIED, DURING THE DAY IT WAS A LOT OF PEOPLE CHANTING RELATIVELY PEACEFUL.  A COUPLE OF ARRESTS HAPPENED, BUT NOTHING MAJOR.

ER0201

THEN AS IT TURNED INTO NIGHTTIME, THE CROWD CHANGED. IT WAS THE FAMILIES AND THE KIDS LEFT. IT WAS NOW PEOPLE WHO WERE WEARING, YOU KNOW, FACE MASKS, AND THE GROUP WAS AGITATED, STARTING TO GET MORE TOWARDS ACTS THAT WERE GOING TO BE VIOLENT.

HOWEVER, SOMETIMES THEY WERE OKAY AND JUST STANDING THERE AND SOMETIMES THEY WOULD GET RILED UP OFTENTIMES BY THE PASSING VEHICLES, REVVING ENGINES, HONKING THEIR HORNS, GETTING THE PEOPLE TO START CHEERING, AND THAT IS WHEN THEY STARTED THROWING STUFF AT US.

Q. WHAT KIND OF THINGS WERE THROWN AT YOU THAT EVENING AT THAT LOCATION?

A. ROCKS, BRICKS, CENTER BLOCKS BROKEN INTO CHUNKS, GLASS BOTTLES, PLASTIC BOTTLES, BOTTLES WITH WATER IN THEM. SOME WATER BOTTLES WERE FROZEN. HARD OBJECTS, STUFF THAT COULD BE THROWN BY HAND, STUFF THAT IF IT HIT YOU, IT WAS GOING TO HURT AND CAUSE GREAT BODILY INJURY. AND IF IT GOT YOU IN THE RIGHT SPOT, IT COULD POTENTIALLY KILL YOU.

Q. HOW CLOSE WERE THESE PROJECTILES THAT WERE THROWN IN YOUR DIRECTION? HOW CLOSE DID THEY GET TO HITTING OFFICERS?

A. THEY HIT SOME OFFICERS. THERE WERE OFFICERS THAT WERE HIT BY THESE THINGS ON BOTH DAYS, ON THE 29TH AND 30TH.

SPECIFICALLY ON THE 30TH THERE WERE OFFICERS THAT WERE INSTRUCT. IT WAS REALLY -- THE RANGE WAS INCREDIBLY ACCURATE. THERE WERE BOTTLES THAT WERE THROWN PAST ME, AND THERE WERE

ER0202

ONES THAT BROKE IN FRONT OF ME, BRICKS, ROCKS, ALL OF THAT STUFF WAS IMPACTING ALL AROUND US.

Q.   WHAT ABOUT SOME OF THE OTHER PROTESTORS OR THE PEACEFUL PROTESTORS THAT WERE THERE, HOW CLOSE DID THOSE PROJECTILES GET TO STRIKING SOME OF THE PEACEFUL PROTESTORS?

MR. BASTIDA:  LACKS FOUNDATION.

THE COURT:  WHY DON'T YOU ASK IF HE'S AWARE?

BY MR. SYMPSON:

Q.   WHILE YOU WERE ON THE SCENE, DID YOU SEE PROJECTILES GETTING CLOSE TO MEMBERS OF THE CROWD WHO WERE NOT ENGAGED IN ANY SORT OF ACTS OF VIOLENCE?

A.   YES.

Q.   AND HOW CLOSE DID THESE ITEMS COME TO STRIKING THOSE PEACEFUL PROTESTORS?

A.   FEET.  I MEAN, THEY'RE COMING RIGHT OVER THE TOPS OF THEIR HEADS.

Q.   TO WHAT EXTENT AT ALL -- LET ME ASK YOU THIS WAY.  WHEN YOU'RE TALKING ABOUT THESE BOTTLES BEING THROWN AT YOU SPECIFICALLY OF THE TIME PERIOD FROM ABOUT 10:00 P.M. TO I'LL SAY 10:40, WAS IT A TOTAL CONSISTENT CONSTANT BARRAGE OF BOTTLES OR WAS IT SOMETHING ELSE?

A.   NO.  IT WAS -- YOU KNOW, SOMETIMES WE GET ONE OR TWO, AND THAT WASN'T ANYTHING INCREDIBLY SIGNIFICANT UNLESS YOU WERE HIT BY THAT OBJECT.

NO.  THIS WAS MORE OF A COORDINATED ATTACK AGAINST THE

ER0203

POLICE.

SO WE WOULD SEE PEOPLE IN THE CROWD WITH BACKPACKS, WE WOULD SEE PEOPLE WITH THESE VERY LARGE BACKPACKS WITH A RED WITH A WHITE CROSS ON THEM.  THEY WOULD GO BACK FARTHER AWAY IN THE CROWD.

SO ABOUT THE FIRST FOUR OR FIVE ROWS OF PEOPLE WERE GENERALLY INVOLVED IN CHANTING.  THEY WERE KIND OF THE PEOPLE WHO WANTED TO BE OUT FRONT WITH THE COPS, YELL AT THE COPS, TAKE A KNEE AND ENGAGE IN VERBAL DISCOURSE.

THE PEOPLE WHO WERE THROWING THE STUFF AT US THAT WERE ALWAYS AT LEAST 5 OR 6 ROWS BACK, MAYBE 15, 20 FEET BEHIND THE ROWS OF OTHER PROTESTORS, AND WE WOULD SEE PEOPLE WITH THESE BACKPACKS WALKING THROUGHOUT THE CROWD.

OFTENTIMES THEY WOULD COME OUT TO THE FRONT AND HAND SOMEBODY A BOTTLE OF WATER TO MAKE IT APPEAR AS IF, OH, WE JUST HAVE WATER, BUT WE WERE NOT INSPECTING WHAT WAS IN THESE BACKPACKS.  BUT THEN THEY WOULD GO BACK INTO THE CROWD, FURTHER BACK, AND WE WOULD SEE PEOPLE REACH INTO THE BACKPACKS AND KIND OF HANDING THINGS OUT TO NUMEROUS PEOPLE.

AND IT WAS SHORTLY AFTER THAT THAT -- WHEN WE HAD GOTTEN AND WHEN THE COPS WERE IN A CLUSTER OF, YOU KNOW, FIVE, TEN OFFICERS ALL STANDING TOGETHER, WE FINALLY GOT SOME FOOD DELIVERED TO US, AND THAT'S WHEN A BIG VOLLEY OF ROCKS AND BOTTLES CAME, AND IT JUST IMPACTED ALL AROUND US, AND IT WAS AT THAT POINT THAT I CALLED FOR ADDITIONAL HELP.

ER0204

Q.   WHY DID YOU CALL FOR ADDITIONAL HELP AT THAT POINT?

A.   IT WAS MORE THAN WE COULD HANDLE.  WE HAD THREE DIFFERENT TEAMS OUT THERE.  I WAS ONE OF THREE SERGEANTS.  WE WERE SPREAD PRETTY THIN FROM 4TH STREET TO 6TH STREET TRYING TO HOLD CITY HALL.

THAT I MEAN, WE WERE OUTNUMBERED, YOU KNOW, 10, 20 TO 1.  I DON'T KNOW.  THERE WAS A LOT OF PEOPLE THERE.

AND THEN THE VOLUME THAT THEY WERE ABLE TO THROW AT US WAS SIGNIFICANT THAT IT WAS ONLY GOING TO BE A MATTER OF TIME UNTIL BEFORE OFFICERS WERE GOING TO START GETTING MAJORLY INJURED AND GOING DOWN, AND THOSE OFFICERS WERE GOING TO NEED TO BE PULLED OFF THE LINE, RESCUED, THEY WERE GOING TO NEED EMERGENCY MEDICAL HELP.

THERE WERE GOING TO BE PROTESTORS THAT WERE GOING TO GET INJURED EVENTUALLY WITH HOW CLOSE THESE ROCKS AND BOTTLES WERE COMING TO THEM.

SO IT WAS GOING TO CAUSE A MAJOR OFFICER SAFETY AND PUBLIC SAFETY ISSUE.

AND UP UNTIL THAT POINT THINGS HAD BEEN RELATIVELY OKAY. SO THAT WAS WHY I CALLED FOR ADDITIONAL RESOURCES.

Q.   WHEN YOU DESCRIBED EARLIER IN THE DAY ON THE 30TH THAT THE CROWDS WERE MORE CALM AND BENIGN AND TO WHAT EXTENT, IF AT ALL, DID YOU SEE ANY USE OF FORCE AGAINST THOSE CROWDS BY POLICE OFFICERS?

A.   IT WAS VERY SPECIFIC AND INDIVIDUAL.  SOMEBODY IN THE

ER0205

BARREL, USE SOME TYPE OF ACCELERANT LIKE HAIR SPRAY OR SOMETHING VERY -- AN AEROSOL THAT IS VERY FLAMMABLE, AND REMOVE THE CAP FROM THE COMBUSTION CHAMBER, AND SPRAY THE AEROSOL IN THERE, AND PUT THE CAP BACK ON.

SO NOW YOU HAVE A CLOSED COMBUSTION CHAMBER AND THROUGH THAT IGNITOR THEY WILL USE THAT SPARK TO IGNITE THE EXPLOSION, WHICH CAUSES THE POTATO, OR WHATEVER PROJECTILE THEY'RE USING, TO FLY OUT THE END AT SIGNIFICANT SPEED.

Q.   TO YOUR KNOWLEDGE WOULD THAT BE SOMETHING THAT HAS THE POTENTIAL TO CAUSE SERIOUS BODILY INJURY?

A.   YES.

Q.   I'D LIKE TO THEN ADVANCE TO 20:50:55 -- YES, 22.  MY NOTES ARE JUST OFF.  THANK YOU.  AND IF YOU COULD PLAY THAT PORTION.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   DID YOU HEAR MORE DISCUSSION ABOUT POTATO GUNS IN THAT CLIP?

A.   YES.

Q.   BASED UPON YOUR EXPERIENCE ON SCENE, WERE POTATO GUNS A CAUSE FOR CONCERN WHILE YOU WERE THERE?

A.   YES.

Q.   I ALSO WANT TO ASK YOU BRIEFLY AT THE VERY END OF THIS CLIP, IT LOOKS LIKE THE CROWD HAS DISPERSED TO SOME EXTENT THROUGH CITY HALL PLAZA AND NOW YOU GUYS ARE ACTUALLY WALKING THROUGH THE AREA?

ER0206

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  SUSTAINED.

BY MR. SYMPSON:

Q.   CAN YOU EXPLAIN WHAT, IF ANYTHING, THE GROUP OF OFFICERS IS DOING HERE AS THEY WALK THROUGH CITY HALL PLAZA?

A.   SO THE WHITE SMOKE THAT YOU SEE IS TEAR GAS, AND THE CROWD HAS BEEN DISPERSED THROUGH THE USE OF FLASH BANG, NOISE FLASH DEVICES, FLASH BANG GRENADES AND TEAR GAS, AND NOW OFFICERS ARE PUSHING SOUTHBOUND FROM SANTA CLARA STREET TO THE CITY HALL PLAZA TO ENSURE THAT NOBODY ELSE REMAINS ON CITY HALL PLAZA.

Q.   ARE YOU FAMILIAR WITH THE TERM KETTLING?

A.   YES.

Q.   AND WHAT DOES THAT MEAN TO YOU?

A.   KETTLING IS A TERM THAT WAS -- THE WAY THAT I KNOW IT WAS WORLD WAR I THE GERMAN ARMY WOULD ESSENTIALLY USE SUPERIOR NUMBERS, AND THEY WOULD SURROUND AN OPPOSING FORCE MAKING IT TO WHERE THEY HAD NO ESCAPE, AND INSTEAD OF TAKING PRISONERS, THEY WERE BASICALLY EXECUTING PEOPLE IN MASS.

THE TERM "KETTLING" AS I UNDERSTAND IT IN LAY TERMS IS TWO OPPOSING FORCES, AND ONE OF THOSE FORCES THROUGH NUMBERS, STRENGTHS OR TACTICS CAN FORCE THE OPPOSING FORCE INTO AN AREA WHERE THEY HAVE NO ESCAPE, SO LIKE PUSHING THEM DOWN INTO AN ALCOVE OR AN ALLEY CUTTING OFF THE AVENUE OF ESCAPE TO WHERE THEY THEN ARE CONFINED AND THE SUPERIOR FORCE CAN ESSENTIALLY DO WHATEVER THEY WANT TO DO.

ER0207

Q.   SO ESSENTIALLY NO EGRESS FOR THEM IF THEY'RE PINNED IN SOMEWHERE?

A.   THAT IS CORRECT.

Q.   AND TO WHAT EXTENT IS THAT WHAT WE'RE SEEING DEMONSTRATED HERE AS YOU AND THE REST OF OTHER OFFICERS WALK THROUGH CITY HALL PLAZA?

A.   NO.

Q.   CAN YOU EXPLAIN THE DIFFERENCE?

A.   SO AT CITY HALL PLAZA ON THE OTHER SIDE FROM -- EVERYBODY CAN SEE THIS RIGHT NOW, YES? -- ON THE SIDE WE CAN SEE THE BLUE DOME AND THE BUILDING DIRECTLY IN FRONT OF US THERE'S A WALKWAY THAT GOES THROUGH THERE THAT IS RATHER LARGE THAT GOES DOWN TO SAN FERNANDO STREET SOUTH OF CITY HALL PLAZA.

     AND SO THEY HAVE AVENUES -- I'M SORRY, THE PEOPLE ENGAGED IN THE DEMONSTRATION AND THE RIOT HAVE AVENUES OF ESCAPE.  THEY WERE NOT SURROUNDED, THEY WERE NOT FORCED INTO A CONFINED AREA. THAT'S PART OF OUR DISPERSAL ORDER IS TELL THEM WHERE WE WANT THEM TO GO.

     SO PREVIOUS IN THIS VIDEO YOU CAN SEE A LINE OF OFFICERS ON 4TH STREET STARTING TO MOVE SOUTH.  WE'RE TRYING TO PUSH THAT CROWD SOUTH AND GET IT OUT OF THE AREA, BUT THEY WERE NOT KETTLED IN ANY WAY.  THERE WAS ALWAYS NUMEROUS DIRECTIONS THAT THEY COULD GO, JUST NOT AT THE COPS.

Q.   AND IS THAT A STRATEGIC WAY TO DISPERSE THE CROWD SO THAT THEY DON'T --

ER0208

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  SUSTAINED.

BY MR. SYMPSON:

Q.   TO WHAT EXTENT IS THAT A SPECIFIC STRATEGY FOR YOU IN THOSE SPECIFIC TYPES OF SITUATIONS?

A.   SO I'VE NEVER EXPERIENCED ANY TYPE OF TRAINING OR ANYTHING HAVING TO DO WITH RIOTS OR CROWD CONTROL THAT HAD ANYTHING TO DO WITH KETTLING SUCH AS -- THEY DON'T TELL YOU THAT YOU SHOULD DO IT.  THEY TELL YOU THE OPPOSITE, THAT WHEN WE'RE GOING TO DECLARE SOMETHING AN UNLAWFUL ASSEMBLY, AND WE'RE GOING TO START TELLING PEOPLE WHERE TO GO, THAT THEY NEED A PLACE TO GO. THERE NEEDS TO BE A PLACE TO RELIEVE THE PRESSURE.

SO MY EXPERIENCE WITH IT IS WE DON'T KETTLE PEOPLE. THERE'S NO GAIN TO THAT.

IT DID OCCUR IN OTHER CITIES THAT I'M AWARE OF, BUT WE DID NOT DO THAT IN SAN JOSE.  THERE'S -- ALL OF THE STREETS CONTINUE ON, AND THAT'S WHERE WE WERE DIRECTING THEM TO GO.

Q.   FAIR TO SAY THEN, SPECIFICALLY AT THIS LOCATION AT APPROXIMATELY 10:33 P.M., WERE THERE OPEN AVENUES AVAILABLE FOR DEMONSTRATORS TO LEAVE SHOULD THEY CHOOSE TO DO SO?

A.   MULTIPLE.

THE COURT:  WOULD THIS BE A GOOD TIME TO TAKE OUR BREAK?

MR. SYMPSON:  THAT WOULD BE PERFECT.  THANK YOU, YOUR HONOR.

ER0209

THE COURT:  LADIES AND GENTLEMEN, WE'RE GOING TO TAKE OUR AFTERNOON BREAK.  LET'S MAKE IT 15 MINUTES.  WE'LL COME BACK AT 10 MINUTES TO 3:00.

THE CLERK:  COURT IS IN RECESS.

(RECESS FROM 2:34 P.M. UNTIL 2:53 P.M.)

THE COURT:  PLEASE BE SEATED EVERYONE.  WE'RE BACK ON THE RECORD.  ALL COUNSEL AND THE PARTIES ARE HERE.  ALL OF OUR JURORS.

THANK YOU, SERGEANT.  LET'S PICK UP WHERE WE LEFT OFF.

MR. SYMPSON, WOULD YOU LIKE TO CONTINUE?

MR. SYMPSON:  YES, YOUR HONOR.  JUST A SMALL LAST PORTION.

YOUR HONOR, MR. BASTIDA READ PART OF PRIOR TESTIMONY FROM SERGEANT BYERS FROM A DEPOSITION FROM PAGE 27, LINE 20 THROUGH 28, LINE 1.

I'D LIKE TO READ THE REST OF THAT ANSWER FOR COMPLETENESS.

THE COURT:  OKAY.  TELL ME WHAT PART YOU'RE READING.

MR. SYMPSON:  I WOULD LIKE TO READ NOW FROM WHERE MR. BASTIDA BEGAN, PAGE 27, LINE 20, AND I'D LIKE TO READ THROUGH LINE 28, LINE 8.

THE COURT:  GO AHEAD.

MR. SYMPSON:  "QUESTION:  OKAY.  AND ARE YOU SAYING THAT -- WELL, WHY DID YOU WANT THEM TO USE SIDE STREETS AND AVOID THAT AREA?

"ANSWER:  BECAUSE OF THE LARGE GROUP OF PEOPLE.  THE CROWD

ER0210

WAS -- IT WAS MOSTLY ANTI-POLICE SENTIMENT.  THERE WERE CHANTS OF BLACK LIVES MATTER, CHANTS OF CALLING POLICE TO BE HELD ACCOUNTABLE FOR THE DEATH OF GEORGE FLOYD, BUT IT WAS MOSTLY DIRECTED TO POLICE OFFICERS.

I STOPPED MY OFFICERS FROM GOING INTO CERTAIN AREAS BECAUSE THEY WERE GOING TO BE FACED WITH LARGE CROWDS THAT WOULD BE OVERWHELMING THAT WOULD OVERTAKE THESE POLICE OFFICERS, AND MY FEAR FOR THE OFFICERS WAS THAT THEY WERE GOING TO GET INJURED, SUFFER GREAT BODILY INJURY OR DEATH BY A CROWD THAT AT THAT POINT WAS BEING VIOLENT, THROWING THINGS, ATTACKING POLICE OFFICERS."

AND THAT'S ALL.

AND WITH THAT, I HAVE NOTHING FURTHER.

THE COURT:  REDIRECT FOR THIS WITNESS, MR. BASTIDA?

MR. BASTIDA:  YES, BRIEFLY.  AND THIS IS STILL UNDER F.R.E. 611 IS MY UNDERSTANDING?

THE COURT:  YES.

**AS-ON RECROSS-EXAMINATION**

BY MR. BASTIDA:

Q.  SERGEANT BYERS, YOU TESTIFIED DURING YOUR EXAMINATION, DURING MR. SYMPSON'S EXAMINATION THAT YOU HAD A CAUSE FOR CONCERN REGARDING POTATO GUNS.

DO YOU RECALL THAT?

A.  YES.

Q.  OKAY.  ISN'T IT TRUE THAT THE RADIO THAT MR. SYMPSON

POLICE.  SO WE CAN DO NOTHING AND ALLOW THEM TO DEFACE CITY HALL.

WHEN THAT HAPPENS, THEY BECOME EMBOLDENED AND THEN THEY START LIGHTING THINGS ON FIRE, AND THEN MORE PEOPLE COME, AND THEN THEY DETERMINE THAT THE COPS ARE NOT GOING TO DO ANYTHING.

ONE OF THE OTHER OPTIONS I HAD WAS TO SEND OFFICERS OVER THERE.  SIMILAR TO THE NIGHT BEFORE, IF I START GETTING TWO OR THREE OFFICERS THAT ARE ASSUMINGLY GOING TO GET INTO A FOOT PURSUIT WITH PEOPLE WHO HAVE JUST BEEN DEFACING CITY HALL, THEN THOSE OFFICERS ARE GOING TO BE SEPARATED FROM THE REST OF THE OFFICERS POTENTIALLY BAITED INTO AN AREA WHERE THERE ARE NUMEROUS OTHER PEOPLE AROUND THE BLOCK WAITING FOR THEM.

SO I MADE THE DECISION AT THAT TIME FROM A SIGNIFICANT DISTANCE AWAY, I ASKED OFFICER KIM TO DISCHARGE HIS 40 MILLIMETER PROJECTILE IMPACT WEAPON WHERE THESE PEOPLE WERE DEFACING CITY HALL KNOWING THAT THEY WERE LIKELY OUT OF THE EFFECTIVE RANGE OF THAT PROJECTILE IMPACT WEAPON.

Q.   OKAY.  THAT EFFECTIVE RANGE BEING 100 YARDS PER YOUR UNDERSTANDING?

A.   MORE OR LESS.  AN ESTIMATION.

Q.   AND IS SPRAY PAINTING A PHYSICAL THREAT?

A.   NO.

Q.   IS SPRAY PAINTING SOMETHING THAT COULD BE LIKELY TO CAUSE SERIOUS BODILY INJURY OR HARM TO SOMEONE?

A.   NO, IT IS NOT.

ER0212

MR. BASTIDA:  NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  THANK YOU.

ANY FURTHER QUESTIONING OF SERGEANT BYERS, MR. SYMPSON?

MR. SYMPSON:  VERY BRIEFLY.  THANK YOU.

THE COURT:  OKAY.

**AS-ON REDIRECT EXAMINATION**

BY MR. SYMPSON:

Q.   IN CONJUNCTION WITH THAT LAST LINE OF QUESTIONING BY MR. BASTIDA, I WANT TO ASK YOU FIRST, YOU MENTIONED THE DISTANCE THAT YOURSELF AND OFFICER KIM WERE FROM THE PEOPLE THAT YOU WERE DESCRIBED WERE SPRAY PAINTING AND APPEARED TO BE DRESSED SIMILAR AS TO PEOPLE THAT HAD BEEN VIOLENT EARLIER; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   SO WHEN YOU ASKED OFFICER KIM TO DISCHARGE THE 40 MILLIMETER PROJECTILE, WERE YOU ABLE TO SEE IF IT CONTACTED ANY OF THESE PEOPLE?

A.   I WAS ABLE TO SEE THAT IT DIDN'T CONTACT ANY OF THEM.

IT BASICALLY WENT SLIDING PAST THEIR FEET BECAUSE IT HAD FALLEN OUT OF THE AIR AND HIT THE GROUND AND WAS NOW TUMBLING, SLIDING ON THE GROUND.

IT DID HAVE THE DESIRED EFFECT, THOUGH.  THEY IMMEDIATELY STOPPED SPRAY POINTING CITY HALL, THEY TURNED AND STARTED RUNNING, AND I WAS ABLE TO DIRECT OTHER MOBILE RESOURCES TO GO AND APPREHEND THEM.

ER0213

BYERS AS-ON REDIRECT BY MR. SYMPSON

Q.    WERE YOU SUCCESSFUL IN APPREHENDING THEM?

A.    YES.

Q.    THEN BRIEFLY.  I WANT TO ASK, GIVEN THAT MR. BASTIDA ASKED YOU ABOUT YOU REQUESTING OFFICER KIM TO DISCHARGE HIS 40 MILLIMETER, DO YOU RECALL ANY SORT OF SIMILAR CONVERSATIONS YOU HAD WITH OFFICER ADGAR THAT NIGHT ON MAY 30TH?

A.    FROM THE VIDEO THAT I SAW TODAY, AND THAT'S THE FIRST TIME I'VE SEEN THE VIDEO SINCE THAT NIGHT, THAT I TOLD HIM IF ANYBODY WAS THROWING BOTTLES, THAT YOU CAN POP THEM, WHICH IS A COLLOQUIAL TERM FOR YOU CAN DISCHARGE YOUR PROJECTILE IMPACT WEAPON AT THEM IF THEY'RE THROWING BOTTLES AT US.

Q.    AND WHAT IS THE CONNECTION THERE BETWEEN THROWING BOTTLES AND THEN YOU CAN POP THEM?

A.    IS THAT SIMILAR TO OUR TRAINING AND THE WAY THAT WE DEPLOY THESE PROJECTILE IMPACT WEAPONS ON ROUTINE PATROL IS THAT ONCE YOU HAVE POSITIVELY IDENTIFIED SOMEONE WHO IS IN THE ACT OF, YOU KNOW, THROWING SOMETHING AT YOU OR POSING A THREAT TO LAW ENFORCEMENT, AND IF THAT THREAT IS NOT ADDRESSED IMMEDIATELY, IT'S PROBABLY GOING TO GET WORSE OR GOING TO RESULT IN SOMEBODY BEING INJURED.

SO I JUST REITERATED TO HIM THAT PEOPLE HAD BEEN THROWING BOTTLES, AND IF YOU SEE SOMEONE THROWING BOTTLES AT US, YOU'RE CLEAR TO ENGAGE THEM WITH YOUR PROJECTILE IMPACT WEAPON.

I DIDN'T PUT IT AS ELOQUENTLY AS THAT.  I SAID IF YOU SEE SOMEONE THROWING BOTTLES, YOU CAN POP THEM.

ER0214

Q.   DO YOU RECALL IF YOU EVER REQUESTED OR -- LET ME ASK YOU THIS FIRST.  WERE YOU ACTING IN A SUPERVISORY ROLL OVER OFFICER ADGAR ON THAT EVENING?

A.   I DON'T KNOW IF HE WAS PART OF THE GROUP OF PEOPLE ASSIGNED TO ME OR NOT.

AS I PREVIOUSLY STATED, IT WAS NOT MY REGULAR PATROL TEAM.  IT WAS OFFICERS FROM AROUND THE CITY, SO I CAN'T SIT HERE AND TELL YOU, UNLESS THERE IS SOME TYPE OF ROSTER FOR ME TO REFERENCE, WHETHER HE WAS SPECIFICALLY ASSIGNED TO ME OR ASSIGNED TO SOMEBODY ELSE.

HOWEVER, AT THAT TIME WE WERE EXPERIENCING A SERGEANT-TO-OFFICER RELATIONSHIP.  SO I WAS GIVING HIM DIRECTION AS A SUPERVISOR.

Q.   DID YOU EVER REQUEST OR ORDER THAT HE FIRE AT A SPECIFIC TARGET IN THE MANNER IN WHICH YOU REQUESTED OFFICER KIM DO SO?

A.   NO, I DON'T BELIEVE SO.

Q.   THANK YOU.

NOTHING FURTHER.

THE COURT:  MR. BASTIDA, ANY FOLLOW-UP?

MR. BASTIDA:  JUST ONE, YOUR HONOR.

THE COURT:  OF COURSE.

**AS-ON FURTHER RECROSS-EXAMINATION**

BY MR. BASTIDA:

Q.   I'M GOING TO READ FROM YOUR DEPOSITION TRANSCRIPT REGARDING THIS INSTANCE, SERGEANT BYERS, AT PAGE 104, LINE 2 --

SORRY, PAGE 103, LINE 24.

"QUESTION:  DO YOU EVER RECALL GIVING ANY INSTRUCTIONS TO OFFICERS ON THE USE OF THEIR PROJECTILE IMPACT WEAPON THAT DAY, MAY 30TH?

"ANSWER:  YES, I DID TELL AN OFFICER TO DISCHARGE AN" -- SORRY.  I GET A LITTLE NERVOUS.

THE COURT:  CAN YOU WRITE?  TALK AT THAT SPEED, PLEASE.

MR. BASTIDA:  SORRY.

"ANSWER:  YES, I DID TELL AN OFFICER TO DISCHARGE A PROJECTILE IMPACT WEAPON THAT DAY.

"QUESTION:  AND WHICH OFFICER WAS THAT?

"ANSWER:  HIS NAME IS RYAN KIM, K-I-M.

"QUESTION:  AND WHAT WERE THE CIRCUMSTANCES OF THAT DISCHARGE?

"ANSWER:  IT WAS AFTER THE SECOND VOLLEY, THE SECOND ATTACK ON US, WE HAD STARTED CLEARING OUT CITY HALL.  I DON'T KNOW HOW MUCH LONGER AFTER IT WAS, BUT TWO GUYS, I BELIEVE IT WAS TWO, WENT UP AND STARTED TAGGING THE EXTERIOR OF THE CITY HALL.  IT LOOKED LIKE THEY HAD SPRAY CANS.  I SHOULD SAY THEY WERE MOVING IN A WAY THAT WAS CONSISTENT WITH SOMEONE WHO WAS DOING GRAFFITI.

"KYLE" -- I BELIEVE THERE'S A MISTAKE IN THE TRANSCRIPT. "HOWEVER, PREVIOUS DAY -- AND I BELIEVE WE HAD SEEN PEOPLE LIGHTING THINGS UP ON FIRE.

ER0216

ON NOTICE THAT -- TO PLAN AND DEPLOY APPROPRIATELY FOR THE NEXT DAY AND HAD A -- IT WAS A VERY SIGNIFICANT ADVANTAGE TO ABATE ANY FURTHER KIND OF PROBLEM IN TERMS OF DANGER AND YET FACILITATE A DEMONSTRATION.

Q. AND ARE THERE ANY STEPS OR ACTIONS THAT COULD BE TAKEN BY A POLICE DEPARTMENT, OR IN THIS CASE THE SAN JOSE POLICE DEPARTMENT, TO ADDRESS THOSE EVENTS OR TO PREPARE FOR THOSE EVENTS?

A. YES, AND THEY ARE SPECIFICALLY COMMENTED ON AND ADDRESSED IN THE BASIC LEARNING DOMAIN ON PREPARATION FOR SUCH EVENTS.

Q. AND WHAT WOULD THOSE STEPS BE?

A. TO HAVE ORDERS IN PLACE, PERSONNEL, EQUIPMENT, AND TO DO THE NECESSARY RESTRICTIONS THAT MAY BE CALLED FOR BASED ON THE INFORMATION THAT HAS BEEN HARVESTED FROM A VARIETY OF SOURCES, PERSONNEL, THE INTERNET, COMMENTS; TO EMBED PERSONNEL IN AN UNDERCOVER BASIS AT THE LOCATION; TO ANNOUNCE WHERE ANY RESTRICTIONS, IN OTHER WORDS, WHAT AREAS OF THE CITY WOULD BE CLOSED, IF NECESSARY; TO IMPLEMENT CURFEWS AND ANNOUNCE THEM; AND HAVE A FIRM STRUCK STRUCTURE IN PLACE WHERE IF IT STARTS TO GO SOUTH, MY TERM, THAT THERE WOULD BE CLEAR PLANS ON WHAT TO DO NEXT, AND TO HAVE BOOKING PROCEDURES, ET CETERA.

I WROTE A NUMBER OF THOSE ORDERS WHEN I WAS A SERGEANT ON THE DEPARTMENT.

Q. MR. CLARK, IN YOUR OPINION, WHAT IS THE IMPORTANCE OF HAVING A CURFEW?

ER0217

A.   SO A CURFEW IS A TOOL THAT WOULD THEN -- BECAUSE A LOT OF THESE PROBLEMS OCCUR AT NIGHT.  SO IF YOU CLOSE SECTIONS DOWN OF THE CITY OR DECLARE A CURFEW, THEN YOU CAN ENFORCE THAT ON A LAWFUL BASIS TO KEEP PERSONS FROM GATHERING FOR MALIGNANT PURPOSES AND TO DO HARM.

Q.   YOU ALSO MENTIONED A CLOSED AREA.  WHAT DO YOU MEAN BY THAT?  WHAT IS THE POINT IN YOUR OPINION OF HAVING THAT SORT OF DEVICE OR USE?

A.   WELL, THERE IS A NUMBER OF THINGS.  TO ANNOUNCE A PLACE WHERE THE INDIVIDUALS CAN GATHER AND EXPRESS THEMSELVES AND ACCOMMODATE THEM, A PARK.  PARTS OF THIS LOCATION HAD A GATHERING POINT.  AND TO KEEP THAT IN GOOD ORDER AND CONTAIN FROM OTHER INDIVIDUALS THAT THEY WANT TO INTERFERE SO THAT EXPRESSION CAN OCCUR UNDER THE FIRST AMENDMENT, AND TO HAVE CONTACT WITH THE LEADERSHIP OF THE GROUP, IDENTIFY THEM, INTRODUCE YOURSELF, DO THOSE THINGS.

     THAT IS PREEMPTIVE AND VERY, VERY IMPORTANT WHEN YOU HAVE A SERIES OF EVENTS THAT YOU KNOW THAT IT COULD BE DIFFICULT OR EVEN DANGEROUS IF IT'S NOT -- IF THERE'S NO INTERVENTION FROM LAW ENFORCEMENT AND OTHERS.

Q.   WE'VE TALKED ABOUT CURFEWS AND CLOSED AREAS.  WHAT ABOUT SOMETHING THAT IS CALLED ACCORDING.  ARE YOU FAMILIAR WITH THAT TERM?

A.   RIGHT.  SO NOW THAT IS A TERM FOR CREATING A PERIMETER SO THAT EGRESS AND GETTING IN AND LEAVING IS COORDINATED AND

ER0218

CLARK DIRECT BY MR. JOHNSON

CONTROLLED.  A LOT OF THAT HAPPENS DURING SPORTS EVENT AND SO FORTH.

SO THAT THERE'S A COORDINATION AND A LOGICAL AND ORDERLY METHOD OF PEOPLE COMING AND GOING SO THAT THEY DON'T -- IT DOESN'T EVOLVE IN A SPONTANEOUS GATHERING THAT COULD BE OUTSIDE OF AN AREA THAT YOU WANT TO CONTROL.

Q.   MR. CLARK, YOU INDICATED EARLIER THAT GIVEN YOUR ONGOING EDUCATION AND LECTURES THAT YOU ARE FAMILIAR -- LET ME REPHRASE THAT, YOUR HONOR.

GIVEN YOUR ONGOING EDUCATION AND THE LECTURES THAT YOU'VE GIVEN AND YOUR ONGOING FAMILIARITY WITH POST STANDARDS AS WELL, ARE YOU FAMILIAR WITH WHAT IS CALLED A 40 MILLIMETER PROJECTILE WEAPON?

A.   YES.

Q.   AND BASED ON YOUR EXPERIENCE AND ONGOING EDUCATIONAL LECTURES, WHAT IS THE PURPOSE OF A 40 MILLIMETER PROJECTILE IMPACT WEAPON?  WHAT IS THE PURPOSE OF THAT?

MR. JOHNSON:  OBJECTION.  LACKS FOUNDATION.

THE COURT:  I THINK YOU'RE GOING TO HAVE THE WITNESS EXPLAIN A LITTLE BIT MORE OF THE CONTOURS OF HIS EDUCATION, LECTURES, AND POST TRAINING.

MR. SCHECHTER:  THANK YOU, YOUR HONOR.

Q.   MR. CLARK, LET ME ASK, IN TERMS OF THE LECTURES THAT YOU'VE GIVEN AND LECTURES THAT YOU'VE GIVEN ON 40 MILLIMETER PROJECTILE IMPACT WEAPONS, WHAT HAVE THOSE LECTURES DISCUSSED?

ER0219

A.   SO IT'S A REFINEMENT OF A -- DELIVERY OF KINETIC ENERGY, AND IT'S DESIGNED, AND AS I EXPLAINED IT AND AS I STUDIED IT, AND AS I EXPERIENCED, THE 37 MILLIMETER, WHICH IS VERY SIMILAR IN SIZE, BUT SMOOTHBORE BUT NOT RELIABLE AND NOT PRECISE ENOUGH FOR THE PURPOSE NEEDED TO BE ABLE TO DELIVER A KINETIC ENERGY TO A SUBJECT WITH RELIABILITY.

AND SO THE WEAPON WAS REFINED.  THE DIMENSION IS INCREASED SOMEWHAT, BUT THE BARREL IS GROOVED SO THAT IT CREATES AN ACCURACY WITH THE SIGHT SO THAT IT BECOMES WHAT IS TERMED AS TARGET SPECIFIC.

AND IN THE LITERATURE IT IS IDENTIFIED AS SUCH ALONG WITH ONE OTHER TYPE OF WEAPON IS THE BEAN BAG SHOTGUN WHICH IS TERMED ALSO TARGET SPECIFIC.

SO THE NECESSITY FOR A DESIGN TO BE ABLE TO FOCUS ON AN INDIVIDUAL AND RELIABLY WITH TRAINING, DELIVER THAT ENERGY TO THAT INDIVIDUAL FOR THE PURPOSE IS A 40 MILLIMETER.

Q.   AND, MR. CLARK, HAVE UP BEEN PRESENT OR HAVE YOU EITHER STUDIED MATERIALS OR BEEN PRESENT WHEN OTHER PEOPLE HAVE GIVEN LECTURES OR PRESENTATIONS ON THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

MR. JOHNSON:  OBJECTION.  THE QUESTION IS COMPOUND.

THE COURT:  LET'S BREAK THAT DOWN.

BY MR. SCHECHTER:

Q.   MR. CLARK, HAVE YOU, DURING YOUR TIME EITHER WHILE YOU WERE WITH THE SHERIFF'S DEPARTMENT OR WITH YOUR TIME AS A

ER0220

POLICE PRACTICES CONSULTANT, REVIEWED OR STUDIED MATERIALS REGARDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

MR. JOHNSON:  I'M SORRY.  THE QUESTION IS STILL COMPOUND.

THE COURT:  I'LL LET THAT GO.  I THINK THAT'S CLOSE ENOUGH.

THE WITNESS:  YES.

BY MR. SCHECHTER:

Q.   AND IS THAT SOMETHING THAT YOU HAVE BEEN CONTINUING TO STUDY SINCE THE TIME YOU LEFT --

THE COURT:  COULD WE FOUND OUT WHAT THEY ARE.  I WANT THE CONTOURS OF IT.  THE "YES" IS NOT GOING TO GET YOU TO A FOUNDATION.

WHAT HAVE YOU STUDIED AND WHEN HAVE YOU STUDIED IT?

THE WITNESS:  SO, YOUR HONOR, THIS IS A WEAPON ALONG WITH AN EXAMPLE WOULD BE THE TASER THAT HAS DEVELOPED AS A REFINEMENT FOR A TOOL FOR POLICE.

THE COURT:  NO, NO.  WHAT HAVE YOU STUDIED?  WHAT BOOKS HAVE YOU STUDIED?  WHAT LECTURES DID YOU ATTEND?  WHEN WERE THEY?

THE WITNESS:  I'VE GOT IT.  SO THE IACP LECTURES ALWAYS HAVE SECTIONS, AND THEY HAVE VENUES FOR THE 40 MILLIMETER.

THE POLICIES OF THE DEPARTMENTS THAT HAVE EVOLVED, IN PARTICULAR LAPD WHICH HAS BEEN A LEADER, I HAVE FOLLOWED THE

ER0221

CLARK DIRECT BY MR. JOHNSON

DEVELOPMENT, THE ACCEPTANCE, AND THE RESTRICTIONS, ET CETERA, FOR THE 40 MILLIMETER, NOT ONLY WITH THEM BUT MY OWN DEPARTMENT AS WELL AS OTHER DEPARTMENTS THROUGHOUT THE NATION.

AND THERE'S BEEN NO BOOK ON THE 40 MILLIMETER THAT I'M AWARE OF THAT I HAVE READ, BUT THE POLICY MANUALS AND THE TRAINING MATERIAL FOR THE 40 MILLIMETER WHICH ARE TYPICALLY FIVE OR SIX PAGES.

BY MR. SCHECHTER:

Q.   AND I THINK YOU HAVE INDICATED -- YOU SAID THERE ARE PRESENTATIONS ON THE 40 MILLIMETER AT THE POLICE COMMISSIONER'S CONVENTION?

A.   YES, INCLUDING THERE HAVE BEEN DEMONSTRATIONS.

Q.   AND ARE THOSE LECTURES AND DEMONSTRATIONS HELD EVERY YEAR?

A.   THERE'S ALWAYS, IN MY EXPERIENCE, SINCE THE 40 MILLIMETER WAS INTRODUCED INTO THE PROFESSION, THERE HAS ALWAYS BEEN VENUES FOR THE 40 MILLIMETER.

Q.   OKAY.

A.   AND ITS AMMUNITION.

Q.   AND HAVE YOU PERSONALLY ATTENDED LECTURES, PRESENTATIONS -- LET ME START AND BACK UP.

HAVE YOU PERSONALLY ATTENDED LECTURES AT THIS CONVENTION WHERE THE USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON WAS DISCUSSED?

A.   YES.

Q.   HOW MANY TIMES?

ER0222

Q.   NOW, DO YOU SEE THE -- WE'VE BEEN STRUGGLING ON WHAT TO CALL THIS, AND I NEED TO ASK SOMEBODY AT CITY HALL, THE ARCHITECT WHO DESIGNED THIS, WHAT THE HECK THIS IS, BUT THIS THING THAT LOOKS LIKE A -- I'VE BEEN CALLING IT A PYRAMID, BUT IT DOESN'T COME TO A POINT.  IT LOOKS LIKE MAYBE HALF A PYRAMID.

DO YOU SEE THAT?

A.   I SEE IT.  IT'S THIS RIGHT HERE (INDICATING).

Q.   NOW, I'D LIKE YOU TO TAKE YOUR EYE AND FOLLOW FROM THE TOP OF THAT STRUCTURE DOWN TO JUST BELOW WHERE THE STRUCTURE IS -- TURNS FROM DARK TO LIGHT.

DO YOU SEE THAT POINT?

A.   ARE YOU TALKING ABOUT JUST LIKE THE LAMP POST OR IS THERE A PIECE OF --

THE COURT:  YOU CAN POINT.

THE WITNESS:  OH, OKAY.  I SEE IT.

BY MR. JOHNSON:

Q.   THERE'S A LINE BELOW WHERE IT'S LIGHT AND ABOVE IT IT'S DARK?

A.   I HAVE IT.

Q.   AND NOW IF YOU WILL LOOK AT THAT FRONT CORNER AND IF YOU LOOK DOWN A LITTLE BIT AND TO THE LEFT, WHAT DO YOU SEE THERE? WHAT DOES IT LOOK LIKE TO YOU?

A.   I CAN'T MAKE IT OUT.  YOU HAVE TO -- I CAN'T MAKE IT OUT.

Q.   CAN YOU TRY TO TOGGLE THAT BETWEEN 33:14 AND 33:15.

ER0223

KEEP YOUR EYE ON THAT FIGURE, PLEASE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. JOHNSON:

Q.   WERE YOU ABLE TO SEE WHAT THAT FIGURE DID THERE?

A.   NOT EXACTLY.

MR. SCHECHTER:   YOUR HONOR, I WOULD OBJECT TO THE EXTENT THAT MR. CLARK IS BEING ASKED TO GIVE EXERT TESTIMONY ON THE NATURE OF THE VIDEO.   THAT IS NOT WHAT HE HAS BEEN DISCLOSED FOR.

THE COURT:   THIS IS SIMPLY A FOUNDATION FOR A QUESTION, SO I'M GOING TO GIVE MR. JOHNSON A MOMENT.   BUT THE WITNESS IS UNABLE TO IDENTIFY IT, SO WE NEED TO MOVE ON.

MR. JOHNSON:   WOULD YOU TRY TOGGLING IT JUST A LITTLE BIT.

THE COURT:   NO.   I THINK WE'VE HAD ENOUGH.

(VIDEO PLAYING OFF THE RECORD.)

THE WITNESS:   SO THERE'S A POSSIBILITY THAT THERE'S A BOTTLE, I THINK, OR AN OBJECT IF YOU FOLLOW UP.   IS THAT AN -- THAT'S AN INDIVIDUAL THERE THROWING IN THAT DIRECTION, IS THAT WHAT YOU'RE OFFERING?

BY MR. JOHNSON:

Q.   I'M ASKING YOU IF THAT LOOKS LIKE THAT TO YOU?

A.   NO, I WOULD NOT BE ABLE TO TESTIFY WITH CERTAINTY THAT THAT'S WHAT IS HAPPENING.   THERE WERE EXPERTS THAT ENHANCED,

ER0224

NOT ME.

Q.   ALL RIGHT.  AND HAVE YOU RELIED ON THOSE EXPERT ENHANCEMENTS IN ANY WAY IN FORMING YOUR OPINION?

A.   ONLY THAT IT APPEARED TO BE A REASONABLE IDENTIFICATION OF THE INJURY TO MR. JOHNSON.

Q.   I TAKE IT YOU WOULD AGREE THAT TO THE EXTENT THAT THERE IS A RISK TO OFFICER SAFETY OR CIVILIAN SAFETY OF THE PROTESTORS OR DEMONSTRATORS, THAT OFFICERS -- THAT POSE A RISK OF SERIOUS INJURY OR HARM TO THOSE INDIVIDUALS, OFFICERS WOULD BE WITHIN THE LEARNING DOMAIN TO USE INTERMEDIATE FORCE TO ADDRESS THAT THREAT?

A.   DOES SUCH A THING EXIST?

        THE COURT:  I'M SORRY, WHAT SUCH THING?

        THE WITNESS:  I DON'T KNOW IF I UNDERSTOOD THE QUESTION.

BY MR. JOHNSON:

Q.   WELL, LET ME ASK YOU THIS, I'M GOING TO ASK YOU TO ASSUME THAT THERE IS AN INDIVIDUAL OR INDIVIDUALS AT THIS PROTEST THAT OFFICER ADGAR SAW THROWING WATER BOTTLES OR OTHER OBJECTS TOWARD THE CROWD AND THE LINE OF POLICE OFFICERS.

     UNDER THOSE CIRCUMSTANCES WOULD IT BE YOUR OPINION THAT HE WOULD BE JUSTIFIED IN ADDRESSING THAT THREAT WITH INTERMEDIATE FORCE?

A.   YES.

        MR. SCHECHTER:  OBJECTION.  LACKS FOUNDATION.

ER0225

THE COURT:  OVERRULED.

THE WITNESS:  THE ANSWER WOULD BE YES.

MR. JOHNSON:  GREAT.  THANK YOU.

THE COURT:  MR. SCHECHTER, REDIRECT FOR THIS WITNESS?

MR. SCHECHTER:  YES, YOUR HONOR.  THANK YOU.

### REDIRECT EXAMINATION

BY MR. SCHECHTER:

Q.   MR. CLARK, BACK DURING DIRECT YOU MENTIONED THAT THE 40 MILLIMETER PROJECTILE IMPACT WEAPON IS WHAT YOU SAID TARGET SPECIFIC?

A.   YES.

Q.   GIVEN YOUR EXPERIENCE AND TRAINING AND ONGOING EDUCATION, WHAT DO YOU -- IN YOUR OPINION WHAT DOES THAT MEAN, TARGET SPECIFIC?

A.   THAT IT IS A -- PER THE DESIGN AND DEPLOYMENT A RELIABLE TOOL TO DELIVER SIGNIFICANT KINETIC ENERGY TO A SPECIFIC PERSON THAT WOULD BE POSING A CREDIBLE THREAT AND FROM A RELIABLE DISTANCE.  THAT'S THE BEAUTY OF THE 40 MILLIMETER, YOU DON'T HAVE TO GET CLOSE.

Q.   MR. CLARK, IN YOUR OPINION WHEN OFFICER ADGAR -- I'M GOING TO TRY THAT AND START THAT OVER.

MR. CLARK, GIVEN YOUR EXPERIENCE AND TRAINING AND ONGOING EDUCATION AND KNOWLEDGE OF POST STANDARDS, WHEN OFFICER ADGAR FIRES HIS 40 MILLIMETER PROJECTILE IMPACT WEAPON, IN YOUR

ER0226

CLARK REDIRECT BY MR. SCHECHTER

OPINION DOES HE NEED TO ENSURE THAT THERE IS A CLEAR TARGET?

A.    ABSOLUTELY.

Q.    IN YOUR OPINION, GIVEN YOUR EXPERIENCE AND BACKGROUND AND TRAINING AND ONGOING EDUCATION, WHEN AN OFFICER FIRES A 40 MILLIMETER PROJECTILE IMPACT WEAPON, DO THEY NEED TO BE AWARE OR CONSIDER THE LETHALITY OF THAT WEAPON?

A.    YES.

        MR. SCHECHTER:  ONE MOMENT, YOUR HONOR.

        (DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

BY MR. SCHECHTER:

Q.    MR. CLARK, GIVEN YOUR BACKGROUND AND TRAINING AND EXPERIENCE AND ONGOING EDUCATION, WHEN AN OFFICER INTENDS TO FIRE A 40 MILLIMETER PROJECTILE IMPACT WEAPON, DO THEY NEED TO BE AWARE OF, AND I'LL USE THE TERM, QUOTE-UNQUOTE, "INNOCENT BYSTANDERS" WHO ARE IN THE VICINITY OF A PARTICULAR TARGET?

A.    YES.

Q.    AND IN YOUR OPINION WHY DO THEY NEED TO BE AWARE OF THOSE BYSTANDERS?

A.    BECAUSE THE PROJECTILE, ONCE IT LEAVES THE BARREL, CANNOT BE RECALLED, AND IT IS OF A VERY SIGNIFICANT USE OF FORCE.  YOU WILL NOT, LIKE ANY PROJECTILE YOU FIRE, YOU WILL NOT EXPOSE INNOCENT CIVILIANS TO THAT DANGER.

        THAT'S WHY THE 37 MILLIMETER IS NEVER USED IN THAT REGARD.

        MR. SCHECHTER:  NO FURTHER QUESTIONS, YOUR HONOR.

        THE COURT:  MR. JOHNSON, ANYTHING ELSE?

ER0227

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

*Irene Rodriguez*

IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 11, 2025

ER0228

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

              PLAINTIFF,               CASE NO.  CV-21-01849 BLF

    VS.                      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 13, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 6
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,            PAGES 966 - 1195

        DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                       BY:  ABIMAEL BASTIDA
                          MATTHEW SCHECHTER
                       10TH FLOOR
                       50 WEST SAN FERNANDO STREET
                       SAN JOSE, CALIFORNIA 95113

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0229

OFFICERS AT THAT POINT WERE PRETTY DEFENSELESS. THEY HAD THE TOOLS THERE TO REACT, BUT THEY HADN'T HAD THE AUTHORIZATION TO REACT. THEY WERE DRESSED.

WE'RE NOT LIKE SOME OF THOSE CITIES THAT HAVE THE TURTLE GEAR, THE CATCHER'S GEAR THAT CAN BLOCK ROCKS AND THINGS LIKE THAT. THEY HAVE THEIR HELMET AND A LONG STICK, AND THAT'S IT. EVERYTHING ELSE WAS JUST THEIR NORMAL UNIFORM THAT THEY WEAR TO WORK EVERY DAY. SO THAT'S NOT A LOT OF PROTECTION FROM WHAT WAS BEING THROWN AT THEM AND THEN LATER ON THINGS LIKE FIREWORKS LAUNCHED AT THEM, POTATO GUNS.

SO I AUTHORIZED THE 37 MILLIMETERS, AND THAT IS THE PROJECTILE THAT FIRES BASICALLY AT AN ANGLE INTO THE GROUND. IT WAS A TECHNIQUE AND TACTIC THAT WE ADOPTED FROM LAPD, LOS ANGELES POLICE DEPARTMENT, AND IT WAS DESIGNED TO BASICALLY CREATE SHOCK AND AWE. IT WASN'T DESIGNED TO HAVE DIRECT TARGETING. I THINK IT DEPLOYS 3 TO 5 RUBBER LITTLE PROJECTILES THAT ONCE YOU FIRE IT INTO THE GROUND, THE IDEA IS THAT THE INERTIA OF THOSE PROJECTILES IS PRETTY MUCH REDUCED SIGNIFICANTLY TO WHERE IT'S NOT GOING TO SERIOUSLY INJURE SOMEBODY IF IT HITS THEM.

AS A MATTER OF FACT, OUR CHIEF OF POLICE, EDDIE GARCIA AT THE TIME, WANTED TO SEE AND I DON'T KNOW SO MUCH FEEL, BUT HE GOT TO FEEL THE EFFECTS OF THAT TOOL. THEY FIRED AT HIM, AND ONE OF THEM HIT HIM ON HIS BACK SIDE. AND HE AUTHORIZED IT AFTER THAT. HE REALIZED IT WASN'T GOING TO BE SOMETHING THAT

ER0230

DWYER AS-ON DIRECT BY MR. JOHNSON

WAS PHYSICALLY AS DANGEROUS AS MAYBE IT SOUNDED OR IT LOOKED, BUT IT WAS DESIGNED TO CREATE THE APPEARANCE THAT WE WERE UTILIZING THAT TOOL TO CREATE SHOCK AND AWE, A LOUD BANG, AND A BRIGHT FLASH.

Q. LET ME ASK YOU THIS, WHAT IS A SKIRMISH LINE?

A. A SKIRMISH LINE IS A SERIES OF OFFICERS THAT IS ORGANIZED AND ORIENTED TOWARD A CROWD TO LIMIT ACCESS OR TO PREPARE TO MOVE A CROWD.

IT'S BASICALLY JUST A LINE OF OFFICERS, BUT IT'S DONE IN AN ORGANIZED FASHION.

Q. AND DO YOU KNOW WHY IT'S CALLED A SKIRMISH LINE?

A. WELL, A SKIRMISH -- I DIDN'T LOOK THIS UP THIS MORNING -- IS A LITTLE KERFUFFLE, LIKE A DUST-UP, LIKE A FIGHT.

Q. IS THE SKIRMISH LINE A TYPICAL POLICE TACTIC FOR WHEN THERE'S A CROWD INVOLVED?

A. I WOULD SAY IT DEPENDS ON THE CROWD.

SO IF THE CROWD IS PEACEFUL, THEN MORE THAN LIKELY NOT, PARTICULARLY IN, I WOULD SAY, THE LAST 20 YEARS, MAYBE 15 YEARS AFTER THINGS LIKE FERGUSON AND GEORGE FLOYD AND OTHERS, IF YOU HAVE A PEACEFUL PROTEST, I DON'T THINK PEOPLE JUST THROW UP SKIRMISH LINES BY ROPE. I THINK IT'S SOMETHING THAT IS DONE IN RESPONSE TO THE BEHAVIOR OF THE CROWD.

IF YOU HAVE A CROWD THAT IS VIOLENT OR COMMITTING CRIMES, A SKIRMISH LINE IS AN APPROPRIATE RESPONSE TO THAT.

Q. HOW DO OFFICERS, HOW DO SAN JOSE POLICE DEPARTMENT

ER0231

DWYER AS-ON DIRECT BY MR. JOHNSON

OFFICERS DEAL WITH -- LET ME REPHRASE IT THIS WAY.

WHAT ARE THE PROTOCOLS WITHIN THE SAN JOSE POLICE DEPARTMENT FOR DEALING WITH INDIVIDUALS WITHIN A LARGE CROWD WHO ARE COMMITTING CRIMES?

A.   WE'RE TRAINED ON A TACTIC CALLED ENCIRCLEMENT, SO YOU WOULD START WITH A SKIRMISH LINE, A LINE -- IMAGINE A LINE OF OFFICERS.  AND WE IDENTIFY SOMEONE WHO IS ASSAULTING OFFICERS, MAYBE THROWS A GLASS BOTTLE, OR A ROCK, OR SOMETHING AT OFFICERS, AND WE HAVE IDENTIFY THAT INDIVIDUAL THROUGH HIS CLOTHING OR HER CLOTHING OR THEIR PHYSICAL DESCRIPTION, AND WE PLAN TO ARREST THAT INDIVIDUAL.

IT'S NOT AS SIMPLE AS JUST WALKING INTO A CROWD THAT WE KNOW TO BE AT LEAST PARTIALLY VIOLENT OR VIOLENT ENTITIES WITHIN THE CROWD.

WE HAVE TO BASICALLY SEND A TEAM OF OFFICERS WITH A WEDGE, DRIVE THE CROWD AND KIND OF PART THE WATERS, FOR LACK OF A BETTER TERM, ENCIRCLE.  SO ALL OF THE OFFICERS THAT DRIVE THROUGH THE CROWD FORM A CIRCLE AROUND THE SUSPECT, AND THEN YOU HAVE TWO OFFICERS THAT GO HANDS ON AND HANDCUFF THAT INDIVIDUAL AND TAKE HIM AWAY.

SO THAT'S A TACTIC THAT WOULD PROBABLY UTILIZE BETWEEN SEVEN AND TEN OFFICERS.

Q.   WAS THAT TACTIC USED ON EITHER MAY 29TH OR MAY 30TH?

A.   NO.

Q.   WHY NOT?

ER0232

A.   WE WERE COMPLETELY OVERWHELMED.  I REMEMBER GETTING TAKEN TO TASK OR KIND OF GETTING SWEATED BY OUR COMMAND STAFF BECAUSE THEY WANTED TO KNOW WHY WE WERE NOT ARRESTING PEOPLE.

AND IT'S TOUGH TO TRY TO EXPLAIN WHAT YOU'RE SEEING OVER THE PHONE TO THEM.

I SAID WE CAN'T ARREST ANYONE.  WE DON'T HAVE THE PEOPLE. I DON'T HAVE ENOUGH OFFICERS TO SEND INTO THE CROWD SAFELY, A, AND, B, EVEN IF I DID, THE PEOPLE IN THIS CROWD WERE PLAYING A GAME OF HIT AND RUN.  THEY WOULD HIT US WITH DEBRIS AND RUN BACK INTO THE CROWD.  AND THERE WERE PROTESTS MIXED IN WITH THEM, BUT THEY WOULD HIDE AMONGST THE PEACEFUL PROTESTORS, SO TO MAKE IT DIFFICULT FOR THEM TO TARGET, TO MAKE IT DIFFICULT FOR THEM TO FIND AND/OR ARREST.

SO MAY 29TH, MAKING ARRESTED, THE WHOLE IDEA OF MASS ARRESTS THAT PEOPLE TALK ABOUT IN THESE RIOTS, IT WAS AN IMPOSSIBILITY.

WE CALLED FOR CODE 30 IN THE COUNTY, WHICH MEANS WE CALL ALL AVAILABLE AGENCIES IN THE COUNTY TO SEND US RESOURCES AND I BELIEVE WE HAD APPROXIMATELY 300 SHOW UP TO SAP.

AND EVEN THEN, YOU KNOW, THE SITUATION WAS SO FAST AND VOLATILE THAT AS SOON AS THEY WOULD THROW SOMETHING AT US OR LAUNCH SOMETHING AT US, THEY WOULD RUN.

BUT YOU DON'T HAVE TIME TO PUT TOGETHER AN ENCIRCLEMENT TEAM, AGREE TO A PLAN, AND DEPLOY THAT TEAM BEFORE THE PERSON HAS ALREADY RUN A BLOCK AWAY AND NOW YOU'RE NOT GOING TO BE

ER0233

ABLE TO DO IT.

SO WE DIDN'T -- I DON'T KNOW THAT WE MADE ANY ARRESTS ON MAY 29TH.

YEAH, WE WERE JUST TRYING TO SURVIVE OUT THERE.  WE WERE NOT TRYING TO ARREST PEOPLE.

Q.   WHAT OPTIONS DID THE DEPARTMENT HAVE, THAT THE OFFICERS WHO WERE ON SCENE HAVE TO STOP THE ACTIVITIES THAT WERE POTENTIALLY HARMFUL TO OTHER OFFICERS OR PROTESTORS?

A.   SO AS PART OF THE SKIRMISH LINE TACTIC THEY HAVE THE 40 MILLIMETER WHAT WE CALLED GRENADIERS OR 40 MILLIMETER OFFICERS BEHIND THEM, 37 MILLIMETER OFFICERS BEHIND THEM THAT HAVE THOSE TOOLS.

THOSE REQUIRE -- THE 37 MILLIMETERS REQUIRE AUTHORIZATION.

THE SHORT ANSWER TO YOUR QUESTION IS THAT THEY HAVE 42-INCH WOODEN BATONS.  THAT'S ALL THEY HAVE.  THEY HAVE PEPPER SPRAY.

THE CROWD -- IT'S NOT THE APPROPRIATE TOOL FOR THAT ENVIRONMENT.  THE CROWD WAS TOO FAR AWAY, AND EVEN WHEN THE CROWD GOT CLOSE, YOU WORRY ABOUT THINGS LIKE CROSS CONTAMINATION, THE SPRAY AFFECTING YOU AS WELL AS THE SUSPECT.

I'M AWARE OF JUST THE PHYSICAL FACE-TO-FACE, HAND-TO-HAND SKIRMISHES FOR LACK OF A BETTER TERM, WHERE PEOPLE WERE GRABBING BATONS, PUSHING OFFICERS, SLAPPING THEIR HELMETS AND SLAPPING THEIR FACE MASKS.  IT'S NOT AN ENVIRONMENT THAT WAS CONDUCIVE TO A TASER.  IT WASN'T AN ENVIRONMENT THAT WAS

ER0234

CONDUCIVE TO PEPPER SPRAY.

CHEMICAL AGENTS?  YES, ON A LARGER SCALE WHICH WE USED LATER, BUT THE LITTLE CANNISTER THAT THE OFFICERS CARRY ON THEIR BELT WAS NOT A GOOD OPTION FOR THESE CIRCUMSTANCES.

SO AS I MENTIONED BEFORE, WHEN I GOT THERE, THEY WERE JUST STANDING THERE HOLDING THE LINE, NOT USING FORCE AND HAVING FORCE BEING USED ON THEM AND MANY OF THEM WERE BEING INJURED.

Q.   SO LET'S TALK ABOUT THE 40 MILLIMETER --

THE COURT:  WOULD IT BE A GOOD TIME TO BREAK FOR 15 MINUTES?

MR. JOHNSON:  CERTAINLY.

THE COURT:  I WAS LOOKING FOR A GOOD TIME AND WASN'T FINDING IT.

ALL RIGHT.  LADIES AND GENTLEMEN, LET'S TAKE OUR MORNING BREAK.  WE'LL TAKE A 15 MINUTE BREAK AND COME BACK AT 5 MINUTES TO 11:00.

THE CLERK:  COURT IS IN RECESS.

(RECESS FROM 10:41 A.M. UNTIL 10:59 A.M.).

THE COURT:  PLEASE BE SEATED EVERYONE.  WE'RE BACK ON THE RECORD.

AND SO I DON'T INTERRUPT MR. JOHNSON, WE ARE GOING TO EXTEND THIS SESSION UNTIL 12:15 TO ACCOMMODATE ONE JUROR'S REQUEST.  WE'LL TAKE OUR LUNCH BREAK FROM 12:15 TO 1:15 TODAY. JUST A MINOR MODIFICATION.

MR. JOHNSON:  THANK YOU, YOUR HONOR.

ER0235

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 13, 2025

ER0236

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

PLAINTIFF,                    CASE NO.  CV-21-01849 BLF

VS.                           SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA    JANUARY 14, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 7
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,                PAGES 1196 - 1344

DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:    MCMANIS FAULKNER
                      BY:  ABIMAEL BASTIDA
                           MATTHEW SCHECHTER
                      10TH FLOOR
                      50 WEST SAN FERNANDO STREET
                      SAN JOSE, CALIFORNIA 95113

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0237

Q.   GEOGRAPHICALLY?

A.   YES.

Q.   AND WHAT WAS YOUR FIRST ASSIGNMENT IN TERMS OF WHERE YOU WERE -- YOUR DISTRICT WHEN YOU WERE A PATROL OFFICER?

A.   I WAS ASSIGNED WITHIN THE SOUTHERN DIVISION AND THE AREA WOULD HAVE SPECIFICALLY BEEN WHERE THE APARTMENT COMPLEX, WHERE THE WOODS APARTMENT COMPLEX AS WELL AS THE FLEA MARKET, THE BERRYESSA -- OR NOT THE BERRYESSA, THE CAPITAL FLEA MARKET AND THE DRIVE-INS AND THERE'S MOBILE HOMES DOWN THERE AND JUST IN A GENERAL GEOGRAPHICAL AREA, IT WOULD BE THAT LOCATION.

Q.   ROUGHLY SOUTH AND MAYBE A LITTLE EAST OF THE DOWNTOWN SAN JOSE AREA?

A.   YES.

Q.   WHAT IS IT LIKE IN THAT DISTRICT?  WHAT IS THE TYPE OF JOB OR WHAT ARE THE TYPES OF CRIMES OR THINGS THAT YOU MIGHT ENCOUNTER OR EXPERIENCE IN THAT DISTRICT?

A.   I MEAN, EVERY AREA IS UNIQUE.  DUE TO THE DENSITY OF THE APARTMENT COMPLEX THAT IS REFERRED TO, IT WAS CALLED THE WOODS, IT'S A VERY LARGE COMPLEX, AND THERE WOULD BE EVERYTHING FROM DOMESTIC VIOLENCE TO PSYCHIATRIC, TO THEFT, TO ROBBERIES BURGLARIES, CARJACKINGS, AND IT ENCOMPASSED ALL OF IT WHILE I WAS THERE.

Q.   TO YOUR KNOWLEDGE, IS THAT CONSIDERED LIKE A BUSY DISTRICT OR IS THAT LIKE A LIGHT DUTY DISTRICT, OR SOMETHING IN BETWEEN?

A.   IT'S EXTREMELY BUSY.

ER0238

Q.   I GUESS I JUST MADE THIS ASSUMPTION, BUT LET ME MAKE SURE I'M CORRECT.

SO ONCE YOU PASSED YOUR FIELD TRAINING, WAS THAT YOUR FIRST ASSIGNMENT AS A PATROL OFFICER OR NOT SOME SORT OF INVESTIGATOR OR SOMETHING LIKE THAT?

I AM SORRY.  YES, I'LL JUST START OVER.  THANK YOU.

I FEEL LIKE I MADE AN ASSUMPTION THAT YOUR FIRST ASSIGNMENT WAS A PATROL OFFICER.  IS THAT ACCURATE OR WERE YOU LIKE IN INVESTIGATIONS OR A DETECTIVE OR SOMETHING LIKE THAT?

A.   NO.  THAT'S -- YOU'RE TYPICALLY ASSIGNED STRAIGHT INTO THE BEAT STRUCTURE, AND THAT WAS MY FIRST ASSIGNMENT.

Q.   AS A PATROL OFFICER?

A.   YES.

Q.   NOW, YOU MENTIONED IN THE ACADEMY THAT YOUR LESS-LETHAL TRAINING WAS WITH THE STUN BAG SHOTGUN; CORRECT?

A.   YES.

Q.   AND AT SOME POINT ONCE YOU ACTUALLY BECAME AN OFFICER AND WERE FINISHED WITH THE ACADEMY, DID YOU TRAIN ON THE 40 MILLIMETER LESS-LETHAL DEVICE?

A.   YES.

Q.   AND DO YOU RECALL ABOUT WHEN YOU WERE FIRST TRAINED OR QUALIFIED WITH THAT -- WITH THE 40 MIL?

A.   I DON'T HAVE THE EXACT DATE, BUT I REMEMBER IT WAS EITHER THE END OF 2018 TO THE BEGINNING OF 2019.  AROUND THAT TIMEFRAME.

ER0239

Q.   SO THAT WOULD HAVE BEEN MORE OR LESS LIKE AFTER A YEAR OF YOU BEING AN ACTUAL OFFICER ON THE PATROL BEAT?

A.   YES.

Q.   NOW, WHEN YOU WENT THROUGH THE 40 MILLIMETER TRAINING, CAN YOU DESCRIBE FOR US WHAT THAT TRAINING ENTAILED?

A.   IT'S SIMILAR TO THE STUN BAG WITH THE AREAS THAT YOU'RE ALLOWED TO TARGET.  SO THAT AREA IS COVERED IN THE CLASSROOM PORTION AS WELL AS THE DISTANCE -- AND AGAIN, I'LL SPEAK SLOWLY ON THIS PART -- THE NOMENCLATURE OF THE WEAPON, SO THAT WAY YOU UNDERSTAND HOW IT FUNCTIONS AND HOW TO OPERATE IT.  AND THEN YOU HAVE TO USE IT IN A RANGE IN STRIKING THE TARGET AND QUALIFY WITH IT.

Q.   DOES THAT TRAINING ALSO INCLUDE THE -- WHEN IT'S JUSTIFIABLE TO USE THE 40 MILLIMETER BASED UPON THE CIRCUMSTANCES YOU'RE CONFRONTING?

A.   IT IS ALMOST IDENTICAL TO THE STUN BAG, SO THAT PORTION IS COVERED.

Q.   OKAY.  SO THAT THEORY IS AS YOU DESCRIBED EARLIER, THE DIFFERENT TIERS OF FORCE, BOTH IN TERMS OF TRAINING WITH THE LESS-LETHAL SHOTGUN, BUT FORCE IN GENERAL, THAT STILL APPLIES TO THE 40 MILLIMETER?

A.   THE 40 MILLIMETER AND THE STUN BAG ARE INTERCHANGEABLE AS TOOLS.

PATROL OFFICERS CARRY THE STUN BAG AND IT'S A REQUIREMENT AND WHILE THE 40 MILLIMETER HAS A SLIGHTLY DIFFERENT

ER0240

APPLICATION.  IN GENERAL, THERE'S VERY LITTLE DIFFERENCE BETWEEN THE APPLICATION OF A STUN BAG AND A 40 MILLIMETER.

Q.  OKAY.  SO THEN DID YOU RECEIVE ANY QUALIFICATION OR DO YOU GET A CERTIFICATE OR SOMETHING AFTER YOU COMPLETE THE TRAINING ON THE 40 MILLIMETER SUCCESSFULLY?

A.  YES.  YOU GO THROUGH IT WITH THE RANGE, BUT THERE'S NOT A CERTIFICATE.  THERE SHOULD -- AND AGAIN, THIS IS ADMINISTRATIVE, BUT YOU ARE APPROVED TO CARRY IT AFTER THAT.

Q.  AND THERE'S SOME WAY TO DISTINGUISH YOU FROM AN OFFICER WHO HASN'T DONE THE 40 MILLIMETER TRAINING?

A.  YES.  YOU DON'T GET ISSUED ONE AND CAN'T CHECK ONE OUT UNLESS YOU'VE COMPLETED THE TRAINING.

Q.  SO WERE YOU THEN ISSUED ONE ONCE YOU COMPLETED THAT TRAINING, I'LL SAY SOMEWHERE AROUND JANUARY OF 2019 I THINK IS THE RIGHT TIMEFRAME?

A.  IT WOULD BE IN THAT GENERAL TIMEFRAME, YES.  AS SOON AS I COMPLETED THE TRAINING COURSE, I WAS ISSUED A 40 MILLIMETER LAUNCHER.

Q.  AND YOU MENTIONED YOU'RE REQUIRED TO CARRY I THINK EITHER THE STUN BAG SHOTGUN OR THE 40 MILLIMETER AS A PATROL OFFICER; RIGHT?

A.  YES.

Q.  ONCE YOU WERE QUALIFIED IN THE 40 MILLIMETER, DO YOU PICK AND CHOOSE WHICH ONE YOU WANT TO USE ON ANY PARTICULAR DAY, OR IS IT JUST FULL ON 40 MILLIMETER FROM THERE ON OUT?

ER0241

A.   YOU CAN TAKE OUT BOTH.  IT'S NOT SOMETHING YOU CAN'T DO, YOU JUST WOULDN'T.

IF I HAD A CAR PARTNER OR WAS RIDING WITH ANOTHER OFFICER THAT WAS NOT QUALIFIED WITH THE 40 MILLIMETER, WE WOULD ALSO TAKE A STUN BAG IN CASE THAT OFFICER HAD TO USE FORCE WITH A STUN BAG.  EVEN THOUGH WE WERE IN THE CAR TOGETHER, HE CANNOT OPERATE AND USE MY 40 MILLIMETER.

Q.   OKAY.  ONCE YOU WERE QUALIFIED, DID YOU BRING THE 40 MILLIMETER WITH YOU EVERY DAY WHEN YOU WERE ON PATROL?

A.   YES.

Q.   OKAY.  SINCE THE TIME YOU FIRST QUALIFIED WITH THE 40 MILLIMETER UP UNTIL MAY OF 2020, WAS THERE ANY SORT OF ADDITIONAL TRAINING OR REFRESHER COURSES, OR ANYTHING LIKE THAT THAT YOU RECALL, SPECIFICALLY WITH THE USE OF THE 40-MILLIMETER?

A.   YES, THERE IS A QUALIFICATION THAT YOU HAVE TO COMPLETE YEARLY.  I BELIEVE IT'S EVEN QUARTERLY NOW.

AND THERE'S ADDITIONAL ONGOING TRAINING THROUGHOUT THE DEPARTMENT, AND IT'S BEEN A VERY LONG TIME.  SO I RECEIVED A LOT OF TRAINING ON IT SINCE THEN, BUT REMEMBERING THE AMOUNT THAT I DID PRIOR TO 2020, I COULDN'T GIVE A SPECIFIC NUMBER, BUT I BELIEVE FOUR TO FIVE BETWEEN WHEN IT WAS ISSUED IN 2020.

Q.   DID YOU EVER -- STRIKE THAT, AND I'LL START OVER.

WAS THERE ANY OCCASION WHERE YOU DIDN'T PASS THE, YOU KNOW, RECURRING QUALIFICATIONS OR ANYTHING LIKE THAT THAT

ER0242

YOU'VE DESCRIBED?

A.   NO.

Q.   NEVER BEEN DISQUALIFIED FROM CARRYING IT?

A.   NO.

Q.   OKAY.  NOW, YOU MENTIONED SORT OF ON GOING TRAINING.  IT SOUNDED TO ME LIKE MORE BROADLY THAN SPECIFICALLY ONGOING OR LESS-LETHAL TRAINING IN THE DEPARTMENT; IS THAT CORRECT?

A.   YES, THERE'S ONGOING TRAINING BOTH WITHIN THE DEPARTMENT AND REQUIRED BY THE STATE.

Q.   AND WHAT KIND OF ONGOING TRAINING, ASIDE FROM THE LESS-LETHAL STUFF, WOULD YOU PARTICIPATE IN THROUGH THE DEPARTMENT?

A.   THERE'S INFORMAL TRAINING AND STRUCTURED TRAINING.  SO THROUGH THE DEPARTMENT THERE MAY BE, IF WE'RE REFERRING TO THE INFORMAL TRAINING, THAT MAY BE YOUR SUPERVISOR OR TEAM GOING THROUGH THE TRAINING AS MORE OF A REFRESHER KIND OF TO MAKE SURE THAT YOU'RE ON THE SAME PAGE.

THE STRUCTURED TRAINING, AND AGAIN, IT'S NOT THE RIGHT TERM, I APOLOGIZE, BUT I'LL JUST REFER TO IT AS THAT, THAT IS A SCHEDULED TRAINING PUT ON BY THE DEPARTMENT TO EITHER QUALIFY OR UPDATE ON POLICY.

Q.   WHEN YOU SAY POLICIES, CAN YOU GIVE US AN EXAMPLE OF SOME OF THE POLICIES THAT THEY MIGHT UPDATE YOU ON OR GIVE YOU CONTINUED TRAINING ON AT THE DEPARTMENT?

A.   IN SPECIFIC REGARDS TO LESS LETHAL?

ER0243

BEFORE YOU WROTE YOUR REPORT?

A.   I KNOW I MADE AN ATTEMPT.  I CAN'T RECALL IF I WATCHED EVERY SECOND OF IT, BUT I KNOW I REVIEWED IT.

Q.   WHEN YOU WERE ON DUTY FROM ROUGHLY 2:00 O'CLOCK IN THE AFTERNOON TO 2:00 O'CLOCK IN THE MORNING, WAS YOUR BODY CAM ACTIVATED MOST OF THE TIME?

A.   YES, I TRIED TO HAVE IT ACTIVATED EVEN RIGHT WHEN I WAS BEING DEPLOYED, AND TRIED TO KEEP IT ACTIVATED THROUGHOUT THE DURATION OF MY EMPLOYMENT.

Q.   SO WOULD YOU HAVE COME AWAY WITH MAYBE NOT EXACTLY, BUT CLOSE TO 12 HOURS OF BODY WORN CAMERA FOOTAGE AT THAT POINT?

A.   NO, BECAUSE WE'RE NOT DEPLOYED IMMEDIATELY, AND IT'S NOT ACTIVATED WHEN WE'RE JUST AMONGST OTHER OFFICERS WHEN WE'RE OUTSIDE.  UNLESS WE'RE ENGAGING WITH THE PUBLIC, THEN IT'S NOT GOING TO BE TURNED ON.

Q.   NOT 12 THEN, BUT FAIR TO SAY MULTIPLE HOURS OF BODY WORN CAMERA FOOTAGE?

A.   IF I WAS DEPLOYED, THEN I HAD IT ACTIVATED AND TRIED TO KEEP IT ACTIVATED.  BATTERY LIFE FOR SOME OF THEM DIE QUICKLY SO IF WE'RE NOT ENGAGED WITH THE PUBLIC AND IF WE'RE NOT -- FOR EXAMPLE, IF I WAS ON THE PRISONER SHUTTLE OR TRANSPORT BUS ON THE WAY THERE, I MAY NOT ACTIVATE IT UNTIL SECONDS BEFORE I GET OFF.

Q.   WHEN YOU FIRST FINISHED THE BRIEFING AT THE SAP CENTER, DO YOU KNOW OR RECALL WHERE THE FIRST LOCATION THAT YOU WERE

ER0244

DEPLOYED TO IN THE CITY WAS?

A.   I BELIEVE IT WAS THE SAME LOCATION AS THE DAY BEFORE ON THE 29TH, IN THE AREA OF 5TH AND SANTA CLARA.

Q.   I WANT TO ASK YOU -- I'LL BREAK IT DOWN THIS WAY, WHAT WAS YOUR EXPERIENCE LIKE ON THE 30TH FROM THE TIME THAT YOU ARRIVED ON SCENE AS YOU JUST DESCRIBED, 5TH AND SANTA CLARA, UP UNTIL LET'S SAY 9:30 P.M.?  CAN YOU DESCRIBE WHAT YOU WERE DOING DURING THAT PERIOD OF TIME, IF YOU RECALL?

A.   SO MY TEAM WAS ASSIGNED AFTER MULTIPLE TEAMS HAD ALREADY BEEN DEPLOYED AND THEY WERE CALLING FOR ADDITIONAL RESOURCES DUE TO THE GROWING CROWD SIZE.

Q.   DID YOU RESPOND TO THAT CALL FOR REQUESTED OFFICERS AT THAT POINT THEN?

A.   I JUST WAIT UNTIL THE COMMAND DECISION IS MADE TO SEND CERTAIN TEAMS, AND THEN ONCE WE RESPOND TO AN AREA, THEN WE WERE PUT IN POSITION BASED ON WHERE THEY NEED RESOURCES.

Q.   THROUGHOUT THAT TIME PERIOD, ROUGHLY TALKING ABOUT 2:00 O'CLOCK TO 9:30 P.M., DID YOU SEE ANY SORT OF VIOLENT BEHAVIOR FROM ANY MEMBERS OF THE DEMONSTRATIONS WHEN YOU WERE WORKING?

A.   IT WAS OFF AND ON.  THERE HAVE ALWAYS BEEN, EVEN ON THE DAY BEFORE, SEGMENTS OF CALM WHERE NO ONE IS DOING -- CERTAIN CROWDS ARE NOT ENGAGING IN VIOLENT ACTIVITY.

BUT IT CHANGES QUICKLY, AND THE SAME CAN BE SAID ABOUT THE 30TH, IT JUST -- WE HAD MORE RESOURCES AVAILABLE TO DEAL WITH THE PROBLEM.

ER0245

Q.   HAD YOU SEEN OR EXPERIENCED ON THE 30TH MEMBERS OF THE DEMONSTRATION THROWING ITEMS AT OFFICERS?

A.   YES.

Q.   NOW I WANT TO JUMP FORWARD TO MORE OF THE TIME PERIOD IN QUESTION.

CAN WE PRESENT PLAINTIFF'S 112 TO OFFICER ADGAR.

DO YOU RECOGNIZE WHAT IS DEPICTED IN THIS STILL FRAME?

A.   YES.  THAT WOULD BE THE PRISONER TRANSPORT THAT THEY WERE USING TO SHUTTLE OFFICERS INTO THE DOWNTOWN AREA.

Q.   IS THIS WHAT YOU RODE TO THE DOWNTOWN AREA WHEN YOU WERE DEPLOYED?

A.   YES.

Q.   THIS IS LABELLED AS BODY CAM FOOTAGE FOR MAY 30TH, 2020, AT APPROXIMATELY 10:12 P.M.; IS THAT RIGHT?

A.   YES.

MR. SYMPSON:  YOUR HONOR, I BELIEVE IT MIGHT HAVE ALREADY BEEN ADMITTED INTO EVIDENCE, BUT I DON'T SEE IT PUBLISHED YET, SO IF NOT, I WOULD ASK TO MOVE PLAINTIFF'S 112 INTO EVIDENCE.

THE COURT:  HAS THAT BEEN ADMITTED?

THE CLERK:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  IT WILL BE SHOWN TO THE JURY.

MR. SYMPSON:  THANK YOU.

AND CAN WE JUST PLAY A FEW SHORT SECONDS OF THIS PORTION

ER0246

RIGHT HERE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   NOTICE THERE'S NO AUDIO PLAYING AT THE MOMENT.  DO YOU KNOW WHY THAT WOULD BE?

A.   THERE'S A BUFFER ON THE CAMERA.  IT'S A 30 SECOND BUFFER. SO THERE'S A VIDEO RECORDING FOR EVERY 30 SECONDS ON THE LOOP, ONCE I ACTIVATE IT, THAT'S WHEN THE AUDIO STARTS.

Q.   SO DOES THAT MEAN THAT 30 SECONDS INTO THIS FOOTAGE, THAT'S WHEN THE AUDIO STARTS TO KICK IN?

A.   YES.

Q.   AND CAN WE STOP RIGHT THERE.

WHAT DID YOU JUST HEAR RIGHT THERE, THE AUDIO KICKING IN?

A.   YES, AND YOU CAN SEE I'M TAPPING THE CAMERA TO ACTIVATE IT.

Q.   OH.  IS THAT HOW YOU ACTIVATE IT, YOU JUST TAP IT SOMEHOW?

A.   YOU DOUBLE TAP THE CENTER OF THE CAMERA, AND THAT ACTIVATES.  SO THERE'S A 30 SECOND CONTINUOUS LOOP ON A VIDEO RECORDING, AND ONCE YOU ACTIVATE THE CAMERA, THE AUDIO KICKS IN.

Q.   DO YOU RECOGNIZE THE LOCATION WHERE IT LOOKS LIKE YOU JUST GOT OFF THE BUS?

A.   YES.

Q.   IS THAT 5TH AND SANTA CLARA THAT YOU DESCRIBED BEFORE?

A.   YES.

ER0247

Q.   SO DOES THIS SHOW BASICALLY YOUR ARRIVAL AT THIS LOCATION AT 10:13 P.M.?

A.   YES.

Q.   CAN WE PLAY THROUGH TO APPROXIMATELY 22:14:00.

     (VIDEO PLAYING OFF THE RECORD.)

          MR. SYMPSON:  STOP THERE.  THANK YOU.

Q.   SO THIS SHOWS BASICALLY YOUR ARRIVAL ON THE SCENE AND WHAT IT LOOKED LIKE WHEN YOU WERE FIRST DROPPED OFF THERE AT 10:13?

A.   YES.

Q.   AND YOU HEAR CHANTING IN THE BACKGROUND?

A.   YES.

Q.   I WANT TO ASK YOU, AS YOU'RE WALKING OFF THAT BUS AT ABOUT 10:13 P.M., THAT WAS NOT YOUR FIRST DEPLOYMENT OF THE DAY; RIGHT?

          MR. BASTIDA:  OBJECTION.  LEADING.

          THE COURT:  SUSTAINED.

BY MR. SYMPSON:

Q.   WAS THIS YOUR FIRST DEPLOYMENT OF THE DAY AT 10:13?

A.   I DON'T BELIEVE SO, BUT I DON'T HAVE AN EXACT MEMORY OF ANYTHING BEFORE THIS IN THE DAY.

Q.   OKAY.  I WANT TO ASK YOU, AS YOU'RE ARRIVING AS SHOWN IN THIS FOOTAGE AT 10:13 P.M., IF YOU RECALL, WHAT'S GOING THROUGH YOUR MIND AS YOU GET OFF THE BUS HERE?

A.   THERE'S A LOT OF THINGS GOING THROUGH MY MIND.  AGAIN, THE DAY BEFORE HAD BEEN A VERY LONG AND EXHAUSTING DAY, SO YOU'RE

ER0248

Q.   SO HE DESCRIBED TO YOU WHAT HE WAS DOING THERE SAYING LOOK OUT FOR PEOPLE THROWING BOTTLES?

A.   YES.

Q.   IS THAT WHAT YOU WERE EXPECTING YOUR ROLE WAS GOING TO BE WHEN YOU TAPPED HIM OUT?

A.   YES.

Q.   CAN WE ADVANCE TO 22:17:40 AND I'LL ASK TO PLAY TO 22:18:00.

     (VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   DO YOU KNOW WHO YOU WERE SPEAKING WITH IN THAT CLIP?

A.   THAT WOULD BE SERGEANT BYERS.

Q.   AND HE WOULD HAVE BEEN ONE OF YOUR SUPERVISORS AT LEAST FOR THE DAY; RIGHT?

A.   HE IS A SUPERVISOR, HE IS A SERGEANT, SO HE OUTRANKS ME, AND SO IF HE'S NOT DEPLOYED ALREADY, THEN YES, HE WOULD HAVE BEEN ONE OF MY SUPERVISORS.

Q.   AND HOW DID YOU INTERPRET THE INSTRUCTIONS THAT HE'S GIVING YOU THERE?

A.   HE'S PUTTING ME IN A LOCATION AND GIVING ME DIRECTION SIMILAR TO WHERE I WAS BEFORE, JUST IN A DIFFERENT LOCATION, THAT IF I SEE SOMEONE THROWING SOMETHING OR BOTTLE, TO USE MY 40 MILLIMETER TO PREVENT THAT FROM HAPPENING.

Q.   OKAY.   PERFECT.

     I WANT TO JUMP AHEAD OF THIS.   CAN WE SWITCH TO

ER0249

PLAINTIFF'S 113, PLEASE.  CAN WE PLAY 22:22:04?

ACTUALLY, DO YOU RECOGNIZE THE SCENE THERE DEPICTED?

A.   YES.

Q.   IS THAT MAY 30TH, 2020, AT APPROXIMATELY 10:22 P.M.?

A.   YES.

Q.   FAIR AND ACCURATE REPRESENTATION OF THE SCENE AT THAT TIME?

A.   YES.

MR. SYMPSON:  MAY I PLACE PLAINTIFF'S 113 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. BASTIDA:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(DEFENDANTS' EXHIBIT 113 WAS RECEIVED IN EVIDENCE.)

MR. SYMPSON:  MAY I PUBLISH?

THE COURT:  YES.

MR. SYMPSON:  AND CAN YOU PLAY THAT THROUGH FOR MAYBE ABOUT 10 SECONDS.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  CAN WE GO BACK TO 22:22:04?

Q.   LOOKING AT THAT, AND I'LL KIND OF DIRECT YOU TO KIND OF THE CENTER OF THE SCREEN BASICALLY JUST TO THE RIGHT OF THE WOMAN IN THE FRONT WITH THE FACE MASK.

DO YOU SEE SOMEONE YOU RECOGNIZE TO BE KYLE JOHNSON THERE? IF WE MOVE THE CURSOR TO THE LEFT?

ER0250

ADGAR DIRECT BY MR. SYMPSON

A.    I MIGHT BE LOOKING AT THE WRONG WOMAN.  I'M SORRY.

Q.    SO TO THE RIGHT OF THIS WOMAN, GENTLEMAN STANDING KIND OF SURROUNDED BY THE LIGHT IN THE BACKGROUND?

        MR. BASTIDA:  OBJECTION.  LACKS FOUNDATION AND CALLS FOR SPECULATION.

        THE COURT:  SUSTAINED.  YOU CAN LAY A FOUNDATION AS TO WHETHER HE RECOGNIZES MR. JOHNSON.

BY MR. SYMPSON:

Q.    SIMPLY, DO YOU RECOGNIZE MR. JOHNSON THERE, OR NO?

A.    YES.

Q.    OKAY.  CAN WE DO A FRAME BY FRAME PLAY-THROUGH AT 22:24:24 THROUGH 22:24:27.

        (VIDEO PLAYING OFF THE RECORD.)

        MR. SYMPSON:  I'LL DIRECT YOUR ATTENTION TO THE LEFT OF THAT BIG WALL AREA AND I'LL ASK YOU IF YOU SEE ANYBODY IN SOME SORT OF THROWING MOTION.

        (VIDEO PLAYING OFF THE RECORD.)

        MR. SYMPSON:  CAN WE GO BACK SPECIFICALLY TO 22:24:26.

        YOU KNOW, I MAY HAVE THE WRONG EXHIBIT UP.  I'M GOING TO JUMP AHEAD TO THE 10:33 TIMEFRAME.

        CAN WE SWITCH TO DEFENSE 527, PLEASE.

        CAN YOU PLAY A FRAME BY FRAME FROM 22:33:13 TO 22:33:15.

        MR. BASTIDA:  TO CONFIRM, 20 OR 22?

        MR. SYMPSON:  22:33:13 TO 22:33:15.

ER0251

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   I'LL DIRECT YOUR ATTENTION TO THE BOTTOM CORNER OF THAT WALL STRUCTURE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   DO YOU SEE THERE WHAT APPEARS TO BE SOME SORT OF THROWING MOTION?

A.   YES.

Q.   AND SOME SORT OF PROJECTILE COMING FROM THAT GENERAL AREA, TOO?

A.   YES.

MR. SYMPSON:   YOUR HONOR, MAY I APPROACH THE WITNESS FOR WHAT HAS BEEN MARKED FOR IDENTIFICATION AS DEFENSE 552A?

THE COURT:   YES.

BY MR. SYMPSON:

Q.   DO YOU RECOGNIZE WHAT THAT IS?

A.   YES.

Q.   AND DOES THAT APPEAR TO BE A STILL SHOT OR A SCREENSHOT FROM THAT SAME CLIP THAT YOU WERE JUST WATCHING?

A.   YES.

Q.   NOW, BEFORE, WHEN WE PLAYED THE CLIP ITSELF, YOU IDENTIFIED A PERSON WHO APPEARED TO BE THROWING SOMETHING?

A.   YES.

Q.   AND DID THAT KIND OF BEHAVIOR GIVE YOU ANY SORT OF

ER0252

CONCERN?

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  OVERRULED.

THE WITNESS:  YES.

BY MR. SYMPSON:

Q.   AND DO YOU SEE THE PERSON IN THE SCREENSHOT IN FRONT OF YOU WHO GAVE YOU CONCERN DEPICTED THERE?

FOCUSSING ON THE FRONT CORNER OF THE WALL?

A.   YES.

Q.   IF I GAVE YOU A BLACK SHARPIE, WOULD YOU BE ABLE TO CIRCLE THAT PERSON?

(HANDING.)

THANK YOU.  I'LL JUST HAVE YOU HOLD ON TO THAT MARKER.

SHOWING DEFENSE COUNSEL -- OR EXCUSE ME, SHOWING PLAINTIFF'S COUNSEL.

MR. SYMPSON:  YOUR HONOR, MAY I MOVE DEFENSE 552A INTO EVIDENCE?

THE COURT:  IS THERE ANY OBJECTION?

MR. BASTIDA:  NO, YOUR HONOR, JUST MY OBJECTIONS AS STATED EARLIER.

THE COURT:  I DON'T KNOW WHAT THAT IS.

MR. BASTIDA:  MY LEADING OBJECTIONS THAT YOU OVERRULED.

THE COURT:  THAT'S OVERRULED, AND I WILL ADMIT IT.

(DEFENDANTS' EXHIBIT 552A WAS RECEIVED IN EVIDENCE.)

ER0253

THE COURT:  MR. SYMPSON, I'M GOING TO ASK THAT YOU HAVE OFFICER ADGAR INITIAL THE EXHIBIT.  I THINK YOU'RE FAMILIAR WITH THAT PRACTICE.

MR. SYMPSON:  CERTAINLY, YOUR HONOR.

Q.   AND WOULD YOU INITIAL THAT PHOTOGRAPH?

A.   INITIALS OR --

Q.   SIGNATURE IS FINE.

THE COURT:  SURE.

BY MR. SYMPSON:

Q.   AND THAT'S YOUR SIGNATURE IN THE UPPER LEFT-HAND CORNER?

A.   IT IS.

Q.   CAN WE SWITCH TO PLAINTIFF'S 107 IDENTIFIED AS PALMER BODY WORN CAMERA.

CAN WE PLAY 22:33:25 TO 22:33:27, FRAME BY FRAME.

I'LL FOCUS YOUR ATTENTION TO THE WALL OR THAT KIND OF PILLAR IN THE SCREEN THERE.  AND IF WE CAN PLAY THAT THROUGH.

YOU CAN PLAY IT FULL SPEED ACTUALLY.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  PAUSE IT THERE.

Q.   DO YOU RECOGNIZE ANYBODY IN THAT VIDEO CLIP WHO APPEARS TO BE THROWING AN ITEM?

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  OVERRULED.

THE WITNESS:  YES.

///

ER0254

BY MR. SYMPSON:

Q.   TO WHAT EXTENT, IF AT ALL, DID THAT GIVE YOU CAUSE FOR CONCERN?

         MR. BASTIDA:  SAME OBJECTION.  LEADING.

         THE COURT:  WHY DON'T YOU ASK HIM IN NON-LEADING WAY.

BY MR. SYMPSON:

Q.   WHEN YOU SEE THAT BEHAVIOR, BASED ON YOUR TRAINING AND EXPERIENCE, WHAT DO YOU THINK?

A.   BASED ON MY TRAINING AND EXPERIENCE, THAT PERSON IS IN THE ACT OF COMMITTING AN ASSAULT ON A PEACE OFFICER, LIKELY TO CAUSE GREAT BODILY INJURY, BUT I DON'T KNOW WHAT HE'S THROWING, AND AT THAT POINT BASED WHAT WE'VE EXPERIENCED AND THE TYPES OF THINGS I'VE SEEN THROWN, I KNOW IT VERY WELL COULD BE ANY ITEM THAT THEY HAVE ACCESS TO.  IT COULD HAVE BEEN A FLASH BANG THAT DIDN'T GO OFF.  IT COULD HAVE BEEN ANYTHING.

    SO I DON'T KNOW WHAT HE'S THROWING.  BUT I KNOW HE'S IN THE MOTION AND PREPARING TO THROW SOMETHING AND THEN DOES THROW SOMETHING.  SO LIKELY TO HIT AN OFFICER OR SOMEONE ELSE RUNNING THAT IS THERE AT THE PROTEST.

         MR. SYMPSON:  YOUR HONOR, MAY I APPROACH WITH WHAT HAS BEEN IDENTIFIED AS DEFENSE EXHIBIT 553 FOR IDENTIFICATION?

         THE COURT:  YES.

BY MR. SYMPSON:

Q.   DO YOU RECOGNIZE WHAT IS DEPICTED HERE?

ER0255

A.   YES.

Q.   AND WHAT IS THAT?

A.   IT'S A STILL SHOT FROM THE BODY WORN CAMERA THAT WE JUST VIEWED.

Q.   DO YOU SEE THE PERSON THAT YOU IDENTIFIED AS PRESENTING YOU WITH SOME CONCERN?

A.   YES.

Q.   AND COULD YOU CIRCLE THAT PERSON AND THEN INITIAL THE DOCUMENT?

I'LL SHOW IT TO PLAINTIFF'S COUNSEL.

MR. SYMPSON:  YOUR HONOR, AT THIS POINT I WOULD ASK TO MOVE DEFENSE 553 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. BASTIDA:  JUST THE ONES ALREADY STATED, YOUR HONOR.

THE COURT:  I DON'T KNOW WHAT THOSE ARE.

MR. BASTIDA:  LEADING.

THE COURT:  THE OBJECTION IS OVERRULED, AND I WILL ADMIT 553.

AGAIN, WOULD YOU HAVE THE WITNESS SIGN THE EXHIBIT THAT HE --

(DEFENDANTS' EXHIBIT 553 WAS ADMITTED.)

MR. SYMPSON:  YES, HE HAS THIS TIME.

THE COURT:  HE DID ALREADY.  THANK YOU.

MR. SYMPSON:  COULD WE GO BACK TO PLAINTIFF'S 112,

ER0256

PLEASE.  AND CAN WE ADVANCE TO 22:33:14.

AND I WANT TO GO SLOWLY FRAME BY FRAME THROUGH THIS PORTION AND WHEN WE GET TO -- BASICALLY WHEN 14 IS ABOUT TO ROLL OVER TO 15, KEEP YOUR FOCUS RIGHT ON THE BOTTOM LEFT-HAND CORNER OF THE TRAPEZOIDAL WALL STRUCTURE RIGHT THERE.

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  OVERRULED.

MR. SYMPSON:  CAN YOU PLAY THAT PORTION.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AND YOU CAN GO BACK AGAIN AND DO THE 14 TO 15 ROLLOVER.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   RIGHT THERE BEFORE THE HANDLE OF YOUR 40 MILLIMETER COVERS THAT CORNER, DO YOU SEE SOMEBODY AT THE CORNER OF THAT WALL LIKE WE SAW IN THE PREVIOUS EXHIBIT YOU CIRCLED WITH THE FIRST OF THE TWO EXHIBITS THAT I HAD YOU CIRCLE?

MR. BASTIDA:  OBJECTION.  LEADING.  LACKS FOUNDATION.

THE COURT:  SUSTAINED.  CAN'T YOU JUST ASK HIM WHAT HE SEES?

BY MR. SYMPSON:

Q.   WHAT DO YOU SEE?

A.   SO IT'S A LITTLE GRAINY, BUT FOCUSSING ON THAT ONE SPECIFIC AREA, I BELIEVE I SEE A MAJORITY OF THE CROWD

ER0257

BEGINNING TO RUN, AND ONE INDIVIDUAL TURNS AND MAKES A THROWING MOTION.

Q.   WOULD THAT BE CONSISTENT -- HOW WOULD THAT COMPARE TO THE FIRST EXHIBIT I PRESENTED TO YOU THAT I HAD YOU CIRCLE THAT PERSON?

A.   I'M SORRY, COULD YOU REPEAT THE QUESTION?

Q.   YEAH.  SO WHAT YOU JUST DESCRIBED HERE IN THIS VIDEO IS SOMEBODY IN A THROWING MOTION, HOW DOES THAT COMPARE TO THAT FIRST STILL IMAGE I SHOWED YOU, AND I THINK IT'S STILL IN FRONT OF YOU, IN TERMS OF THAT SPECIFIC LOCATION?

A.   IT'S --

        MR. BASTIDA:  OBJECTION.  LACKS FOUNDATION.

        THE COURT:  OVERRULED.

        THE WITNESS:  IT'S THE SAME LOCATION.

BY MR. SYMPSON:

Q.   CAN YOU TELL BY COMPARING THAT STILL SHOT IN FRONT OF YOU AND THIS VIDEO AS TO WHETHER OR NOT THAT IS THE SAME PERSON?

        MR. BASTIDA:  OBJECTION.  LEADING.  LACKS FOUNDATION.

        THE COURT:  OVERRULED.

        THE WITNESS:  BASED ON THE CAMERA ANGLES AND EVERYTHING I HAVE SEEN IN FRONT OF ME, AT LEAST ON THESE CAMERAS, THAT STILLSHOT, IT'S THE SAME PERSON.

BY MR. SYMPSON:

Q.   AND AS WE'RE PLAYING THIS --

ER0258

Q. CAN WE PLAY THROUGH 22:33:14 AND JUST FULL SPEED FOR A FEW SECONDS.

THAT'S FINE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON: PAUSE RIGHT THERE.

Q. SO DOES THAT SHOW YOU THE ACTUAL TIME THAT YOU FIRED?

A. YES.

MR. BASTIDA: OBJECTION. LEADING.

THE COURT: OVERRULED.

BY MR. SYMPSON:

Q. AND CAN YOU TELL, HAVING WATCHED THAT, IF YOU FIRE AFTER OR BEFORE YOU CAN SEE THAT PERSON AT THE CORNER IN THAT THROWING MOTION THAT YOU DESCRIBED?

MR. BASTIDA: OBJECTION. LACKS FOUNDATION. LEADING.

THE COURT: OVERRULED ON LACKS FOUNDATION. THE QUESTION IS LEADING.

BY MR. SYMPSON:

Q. CAN YOU TELL LOOKING AT THIS AT 22:33:14/15, IF YOU HAVE OR HAVE NOT FIRED YOUR 40 MILLIMETER YET?

A. JUST GO WITH THE TIME AGAIN.

Q. 22:33:14, CAN YOU TELL HAVING WATCHED THAT IF AT THAT PRECISE SECOND YOU HAD FIRED YOUR 40 MILLIMETER YET?

A. IT DOESN'T APPEAR THAT I HAVE.

MR. SCHECHTER: YOUR HONOR, I HATE TO INTERRUPT --

ER0259

THE COURT:  I'M NOT GOING TO HAVE DOUBLE OBJECTIONS.

MR. SCHECHTER:  I WAS GOING TO ASK FOR A BRIEF SIDE-BAR TO ADDRESS SOMETHING WITH THE COURT SEPARATELY.

NOT TO DO WITH AN OBJECTION, I WANTED TO ADDRESS SOMETHING WITH THE COURT AT SIDE-BAR.

THE COURT:  ALL RIGHT.  EXCUSE US, LADIES AND GENTLEMEN.

(SIDE-BAR CONFERENCE OFF THE RECORD.)

THE COURT:  THANK YOU.

MR. SYMPSON, YOU HAVE 6 MINUTES REMAINING IN YOUR ALLOTTED TIME.  YOU CAN USE IT AS YOU WISH.

MR. SYMPSON:  NO FURTHER QUESTIONS FOR THE OFFICER.

THE COURT:  ALL RIGHT.  OFFICER.  YOU'RE GOING TO HAVE TO WAIT.

YOU'RE GOING TO BE CROSS-EXAMINED.

MR. SYMPSON:  YOUR HONOR, WOULD YOU LIKE ME TO HAND THESE EXHIBITS BEFORE --

THE COURT:  GIVE THEM TO MS. SALINAS-HARWELL.

MR. SYMPSON:  THANK YOU.

(HANDING.)

**CROSS-EXAMINATION**

BY MR. BASTIDA:

Q.   GOOD AFTERNOON, MR. ADGAR.

A.   GOOD AFTERNOON.

Q.   ON MAY 30TH -- EXCUSE ME, ON MAY 29TH, 2020, YOU WERE

ER0260

I WANT TO STOP THERE.  ISN'T IT TRUE THAT AT THE MOMENT YOU FIRED THE 40 MILLIMETER, THE BOTTLE WAS ALREADY THROWN?

A.   CAN YOU REPEAT WHAT I WROTE.

Q.   SURE.  "I SAW A MALE ADULT WEARING ALL BLACK CLOTHING THROW A GLASS BOTTLE TOWARDS OFFICERS FROM INSIDE THE CROWD.  I FIRED TWO 40 MILLIMETER FOAM BATON LESS-LETHAL PROJECTILES TOWARDS THE SUSPECT."

A.   YES.

Q.   I JUST WANT TO -- YOU FIRED AFTER THE BOTTLE WAS THROWN?

A.   BASED ON MY RECOLLECTION, BY THE TIME I FIRED, THE BOTTLE HAD ALREADY BEEN THROWN.

Q.   OKAY.  THEN YOU GO ON TO SAY, "DUE TO THE SIZE OF THE CROWD FLEEING THE AREA, I WAS UNABLE TO SEE IF MY 40 MILLIMETER FOAM BATON LESS-LETHAL PROJECTILES," PLURAL, "WERE EFFECTED ON THE SUSPECT"?

A.   CORRECT.

Q.   SO IT'S TRUE THAT YOU WERE NOT ABLE TO SEE WHERE YOUR PROJECTILES HIT?

A.   ON THAT SPECIFIC CASE, YES.

Q.   OKAY.  AND IS IT TRUE THAT AT ANY MOMENT THAT YOU FILED YOUR 40 MILLIMETER ON MAY 30TH, YOU DID NOT ATTEMPT TO PROVIDE MEDICAL AID TO ANYONE?

A.   I NEVER HAD THE OPPORTUNITY TO.  SO, NO, I DID NOT.

Q.   GOING BACK TO THIS LAST INSTANCE.  YOU DID NOT PROVIDE ANY TYPE OF WARNING THAT YOU WERE GOING TO USE FORCE BEFORE FIRING

ER0261

THE 40 MILLIMETER PROJECTILE WEAPON; CORRECT?

A.   I DON'T BELIEVE SO, NO.

Q.   YOU TOLD US ABOUT THE BOTTLE THAT STRUCK YOU ON MAY 29TH, BUT IT'S TRUE THAT ON MAY 30TH, YOU WERE NOT HIT WITH ANYTHING ON THAT DAY; CORRECT?

A.   BASED ON MY RECOLLECTION, I WAS NOT HIT WITH ANYONE.

Q.   IN FACT, ON MAY 30TH, 2020, YOU WERE NOT AWARE OF ANY OF YOUR FELLOW OFFICERS BEING INJURED ON MAY 30TH; ISN'T THAT RIGHT?

A.   WITH A SERIOUS INJURY, I WASN'T AWARE.

I KNEW THEY WERE STRUCK BY BOTTLES AND DEBRIS, BUT I DIDN'T KNOW IF ANYBODY HAD ACTUALLY ANY REPORTABLE INJURY.

(SOUND.)

THE CLERK:   SORRY, YOUR HONOR.

BY MR. BASTIDA:

Q.   I'M GOING TO READ FROM YOUR DEPOSITION DATED FEBRUARY 2ND, 2023.  AT PAGE 124, LINE 18 TO PAGE 125, LINE 1.

"QUESTION:  DID YOU OBSERVE ANY OFFICER BEING STRUCK BY AN OBJECT WHO SUFFERED MORE THAN JUST A MINOR INJURY TO YOUR KNOWLEDGE?

"ANSWER:  TO MY KNOWLEDGE, I DON'T -- I'M NOT AWARE OF INJURIES THAT OTHER OFFICERS SUFFERED FROM ANY STUFF THROWN AT THEM."

YOU DIDN'T ARREST ANYONE ON MAY 30TH; CORRECT?

A.   NO.

ER0262

Q.   AND SINCE THE PROTESTS UP UNTIL THE DATE OF YOUR

DEPOSITION, FEBRUARY OF 2023, NO ONE FROM THE POLICE DEPARTMENT

EVER TOLD YOU THAT ANY OF YOUR CONDUCT WITH RESPECT TO THE

40 MILLIMETER PROJECTILE WEAPON WAS AGAINST POLICY; CORRECT?

A.   CORRECT.

Q.   AND SIMILARLY, NO ONE EVER TOLD YOU THAT YOUR REPORTING IN

CONNECTION TO THE USE OF THE 40 MILLIMETER PROJECTILE WEAPONS

ON THOSE DAYS WAS INACCURATE OR SOMEHOW DEFICIENT; CORRECT?

A.   NO, I WAS NEVER INFORMED OF ANY PROBLEMS WITH WHAT I DID.

Q.   OKAY.

YOUR HONOR, IF I MAY JUST HAVE A MOMENT?

THE COURT:  OF COURSE.

(DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

MR. BASTIDA:  NO FURTHER QUESTIONS AT THIS TIME,

YOUR HONOR.

THE COURT:  THANK YOU.

MR. SYMPSON, REDIRECT.

MR. SYMPSON:  YES, PLEASE.

**REDIRECT EXAMINATION**

BY MR. SYMPSON:

Q.   OFFICER ADGAR, WOULD YOU PLEASE EXPLAIN TO THE JURY WHY

YOU FIRED THE PROJECTILE THAT WE'VE SEEN EXPLAINED TO YOU AT OR

AROUND THE TIME OF 10:33 P.M.?

A.   AT THAT TIME THERE WAS AN EARLIER VOLLEY OF THINGS BEING

THROWN IN THE GENERAL AREA THAT HAS BEEN DESCRIBED IN DIFFERENT

ER0263

WAYS SINCE BEING HERE, BUT THE WALL, AND INITIALLY ONE WAS THROWN, WHAT APPEARED FROM THE SAME AREA FURTHER TO THE WEST, WHICH I BEGAN -- USUALLY WHEN THERE WAS ONE, THERE WAS MORE. SO AT THAT POINT I BEGAN APPROACHING THE SKIRMISH LINE AND TRYING TO OBSERVE THE CROWD.

AT THAT POINT I SAW SOMEONE THROW SOMETHING OR IN THE PROCESS OF THROWING IT, WHICH CAUSED ME TO FOCUS ON THAT INDIVIDUAL, TRY TO AIM AT THAT INDIVIDUAL, AND TRACK HIM THROUGH THE CROWD, AND AT THAT POINT ONCE I BELIEVED I HAD THAT PERSON IDENTIFIED, I PULLED THE TRIGGER AND USED MY 40 MILLIMETER.

Q.   AND WE SAW THAT YOU ALSO FIRED YOUR 40 MILLIMETER AROUND THE -- WHAT I'M CALLING THE 10:24 VOLLEY.

DO YOU RECALL THAT?

A.   YES.

Q.   AND DO YOU HAVE A RECOLLECTION AS TO WHY YOU FIRED THE PROJECTILES AT OR AROUND THE TIME OF 10:24 P.M.?

A.   THE SAME REASON.  THERE WAS SOMEONE THROWING AN OBJECT FROM WITHIN THE CROWD AROUND THAT PILLAR.

Q.   WHY DIDN'T YOU GIVE ANY SORT OF WARNING THAT YOU FIRED AT 10:24 OR 10:33?

A.   I COULD YELL AT THE TOP OF MY LUNGS AND NO ONE WOULD HAVE HEARD ME ANYWAY.

Q.   AND WHY DIDN'T YOU PROVIDE SOME SORT OF MEDICAL TREATMENT AFTER FIRING YOUR 40 MILLIMETER?

ER0264

ADGAR REDIRECT BY MR. SYMPSON

A.   IF I HAD TAKEN THEM INTO CUSTODY OR IF THEY HAD APPROACHED SAYING THEY HAD BEEN HIT, THEN WE WOULD HAVE AND I WOULD HAVE OFFERED MEDICAL AID.

BUT THAT WAS NEVER THE OPPORTUNITY.  THE PEOPLE THAT WERE HIT OFTEN -- IF NOT ARRESTED, THEY FLED INTO THE BACK OF THE CROWD OR AWAY FROM US.

Q.   WHY DIDN'T YOU MAKE ANY ARRESTS AFTER YOU FIRED YOUR 40 MILLIMETER?

A.   FOR THE SAME REASON.  THERE WERE SAFETY CONCERNS, AND I REMEMBER ON THE ONE THAT HAPPENED AT -- LATER IN THE EVENING, I THINK AT BOTH CASES, FLASH BANGS WERE DEPLOYED AND I HAVE NO CONTROL OVER THAT, AND I DON'T KNOW WHAT THE OTHER OFFICERS TO MY RIGHT OR LEFT ARE SEEING.  SORRY.

AND AT THAT POINT, I DON'T KNOW HOW THE CROWD IS GOING TO REACT.  I'M FOCUSSING ON WHAT I CAN SEE, AND THE CROWD REACTS HOW THE CROWD REACTS.

AND IF THEY RUN AND I CAN'T CHASE AFTER THAT PERSON, THEN I CAN'T CHASE AFTER THAT PERSON.

Q.   CAN YOU DESCRIBE FOR US AS YOU'RE KIND OF PLAYING FREE SAFETY AS WE HEARD IN THE VIDEO, SPECIFICALLY WHAT TYPE OF BEHAVIOR YOU WERE LOOKING OUT FOR?

A.   SO --

MR. BASTIDA:  OBJECTION.  BEYOND THE SCOPE.

THE COURT:  IT SEEMS TO BE BEYOND THE SCOPE OF CROSS.

ER0265

MR. SYMPSON:  MAYBE I CAN PREFACE IT THIS WAY.

Q.   MR. BASTIDA WAS ASKING YOU ABOUT YOUR DECISION MAKING PROCESS ON MAY 30TH DURING CROSS-EXAMINATION.

DO YOU RECALL THAT?

A.   YES.

Q.   AND CAN YOU TELL ME ABOUT WHAT YOU WERE LOOKING FOR AS YOU WERE PLAYING FREE SAFETY AND HOW IT AFFECTED YOUR DECISION MAKING PROCESS?

MR. BASTIDA:  SAME OBJECTION.

THE COURT:  OVERRULED.

THE WITNESS:  SO IT'S A FOOTBALL ANALOGY.  YOU'RE IN THE BACK OBSERVING THE CROWD, AND YOU ARE LOOKING FOR POTENTIAL THREATS.  THE OFFICERS AT THE FRONT ON THE SKIRMISH LINE DON'T HAVE ANYTHING BEYOND A LONG -- IT'S 42-INCH WOODEN STICK AND THEIR HELMETS WITH A PLASTIC SHIELD THAT COVERS THEIR FACE.  SO THEY ARE FOCUSSED ON THE PEOPLE THAT ARE CONFRONTING THEM, THAT ARE WALKING UP TO THEM.

THEY DON'T HAVE THE OPPORTUNITY TO SEE ANY THREATS THAT ARE FURTHER BACK, SO FROM MY POSITION, I'M ABLE TO SEE A LITTLE BIT MORE OF WHAT'S HAPPENING BEYOND THAT FIRST LINE OF PROTESTORS.

Q.   DO YOU KNOW WHAT PRE-ASSAULTIVE INDICATORS ARE?

A.   YES.

Q.   WHAT ARE THEY?

MR. BASTIDA:  OBJECTION.  BEYOND THE SCOPE.

ER0266

CERTIFICATE OF REPORTER


I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 14, 2025

ER0267

08:40AM

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

      PLAINTIFF,         CASE NO.  CV-21-01849 BLF

  VS.              SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 15, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,  VOLUME 8
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,         PAGES 1345 - 1381

      DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

  FOR THE PLAINTIFF:   MCMANIS FAULKNER
                  BY:  ABIMAEL BASTIDA
                    MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0268

TO WORK OUT THE JURY INSTRUCTIONS AND VERDICT FORMS, AND IT HAS ALL -- IT HAS BEEN A COLLABORATIVE PROCESS, NOT WITHOUT OBJECTIONS, BUT THERE'S NOTHING THAT IS IN THESE INSTRUCTIONS THAT THE COURT ADDED WITHOUT THE EITHER APPROVAL OR CONSIDERATION OF SPECIFIC OBJECTIONS BY COUNSEL.

IS THAT ACCURATE?

MR. BASTIDA:  YES, YOUR HONOR.

MR. JOHNSON:  WE AGREE, YOUR HONOR.

THE COURT:  OKAY.

MR. JOHNSON:  I GUESS THE ONLY OTHER THING, AND I DON'T KNOW IF THIS IS THE APPROPRIATE TIME TO RAISE IT, IS WE DID HAVE AN OBJECTION TO REMOVING THE ORIGINAL QUESTION 1 TO THE VERDICT FORM.

THE COURT:  WHY DON'T YOU STATE THAT OBJECTION NOW.

MR. JOHNSON:  YES.  THE ORIGINAL QUESTION ON THE VERDICT FORM WAS -- AND I DON'T HAVE IT EXACTLY.

THE COURT:  LET'S SEE IF I HAVE A COPY OF THE VERDICT FORM.  I HAVE EVERYTHING ELSE.  I DON'T HAVE A COPY OF IT.

MR. JOHNSON:  THE ORIGINAL QUESTION WAS DID KYLE JOHNSON PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT JAMES ADGAR INDISCRIMINATELY SHOT A 40 MILLIMETER PROJECTILE THAT STRUCK KYLE JOHNSON?

AND WE THOUGHT THAT INSTRUCTION WAS APPROPRIATE BASED ON THE FACTUAL THEORY THAT PLAINTIFF HAD PUT FORWARD, AND THE

ER0269

INSTRUCTION TO THAT WOULD HAVE SAID IF THE ANSWER TO QUESTION 1 IS YES, ANSWER QUESTION 2.  IF THE ANSWER TO QUESTION 1 IS NO, PLEASE DATE AND SIGN THIS VERDICT FORM AND RETURN IT TO THE COURT.

I KNOW THE COURT DID EXPRESS SOME CONCERN ABOUT HOW THAT QUESTION STOOD ALONE AND WAS UN -- SEEMED TO BE UNTETHERED TO THE FOURTH AMENDMENT VIOLATION.

WE OFFERED TO MODIFY THE INSTRUCTION TO SAY THAT IF THE ANSWER TO QUESTION 1 WAS -- WELL, IF THE ANSWER TO QUESTION 1 WAS -- WELL, OUR PROPOSED MODIFICATION WAS TO THE INSTRUCTION THAT THEY WOULD ANSWER QUESTION 1 AND THEN PROCEED TO ANSWER QUESTION 2.

SO THAT WOULD ALLOW THEM TO MAKE A FACTUAL FINDING ON WHAT WE THINK IS THE PREDOMINANT ISSUE OF PLAINTIFF'S THEORY, WHETHER OR NOT THERE IS AN INDISCRIMINATE FIRING, AND THEN PROCEED SEPARATELY TO THE FOURTH AMENDMENT EXCESSIVE FORCE CLAIM.

THE COURT:  MR. BASTIDA, COMMENTS?

MR. BASTIDA:  YES, YOUR HONOR.

IT'S SIMILAR AND TIED TO PLAINTIFF'S OBJECTION TO INSTRUCTION 32, WHICH IS THAT -- HAVING THAT QUESTION, NUMBER 1, IN THE VERDICT FORM, TOTALLY SUBSTITUTES AND TAKES THE PLACE OF WHAT THE LAW REQUIRES, WHICH IS FOR THE JURY TO CONSIDER THE GRAHAM FACTORS.

SO DESPITE THE FACT THAT THIS MAY BE PLAINTIFF'S MAIN

ER0270

THEORY OR THE THEORY OF THE CASE, THE LAW STILL REQUIRES THAT THE JURY ANALYZE THE EVIDENCE WITH THE GRAHAM FACTORS IN MIND.

UNLESS THE COURT HAS ANY SPECIFIC QUESTIONS, THAT WOULD BE FINE.  THAT'S OUR POSITION, YOUR HONOR.

THE COURT:  THANK YOU.  ALL RIGHT.

THE OBJECTION BY THE DEFENDANTS WAS FULLY ARTICULATED IN OUR CONFERENCE AND CONSIDERED AND SO MAKING A RECORD OF IT HERE.  I AGREE WITH DEFENDANTS THAT THE INDISCRIMINATE USE OF FORCE WAS THE PLAINTIFF'S THEORY OF THE CASE FOR THE CONSTITUTIONAL VIOLATION, AND AS I MENTIONED BEFORE, THAT IS EVIDENCED THROUGHOUT THE DOCUMENTATION IN THE CASE, INCLUDING PLAINTIFF'S NEUTRAL STATEMENT OF THE CASE WRITTEN BY PLAINTIFF.

ONE THING THAT WAS A LITTLE TRICKY HERE, I MUST SAY, IS THAT ON DECEMBER 27TH THE PARTIES FILED A JOINTLY APPROVED VERDICT FORM THAT INCLUDED QUESTION NUMBER 1 THAT HAS NOW BEEN EXCLUDED BY ME.

IN CAREFULLY CONSIDERING THE REQUEST BY PLAINTIFFS TO REMOVE IT, AND IN AGREEING WITH PLAINTIFF TO REMOVE THE QUESTION, I HAVE DETERMINED THAT, AS MR. BASTIDA ARTICULATES, THAT A QUESTION THAT HAS SUCH A GREAT FORCE IN THE CASE TO ESSENTIALLY SHUT DOWN THE CONSTITUTIONAL ANALYSIS IN ONE FINDING OF FACT WOULD PREEMPT THE JURY'S OBLIGATION TO CONSIDER AND WEIGH THE GRAHAM FACTORS.

AND SO I HAVE AGREED TO ELIMINATE THAT QUESTION NUMBER 1.

BUT WHAT I HAVE ALSO DETERMINED IS THAT THAT REMAINS

ER0271

1380

PLAINTIFF'S THEORY OF THE CASE, AND THE DEFENSE MAY ARGUE AS STRONGLY AS THEY WANT IN THE JURY'S CONSIDERATION OF THE GRAHAM FACTORS THAT IT'S ONLY IF IT'S INDISCRIMINATE USE THAT PLAINTIFF'S CASE PREVAILS.  THAT'S ARGUMENT, BUT I DON'T THINK IT IS A PROPER FINDING OF FACT BY THE JURY TO HAVE SUCH A PREEMINENT ROLE IN THE JURY'S CONSIDERATION OF THE VERDICT FORM.

IT WAS SET UP AS THE FIRST QUESTION.

AND FRANKLY, AS ORIGINALLY SUBMITTED, IF THEY WERE TO HAVE SAID NO TO QUESTION NUMBER 1, WAS IT -- OR YES TO NUMBER 1, WAS IT INDISCRIMINATE, THEY WERE TOLD TO DATE AND SIGN THE FORM AND THEY WOULD HAVE BEEN DONE ON AWFUL THE CLAIMS.  AND I FELT THAT THAT WOULD HAVE IMPROPERLY CAUSED THE JURY TO CONSIDER ONLY ONE FACT, AND NOT TO APPLY ALL OF THE FACTS THAT THEY FIND TO THE LAW AS I'VE GIVEN IT TO THEM.

AND SO I'VE ELIMINATED THAT FACTUAL FINDING GIVEN THE WAY THAT IT WAS PRESENTED.

I AM NOT IN ANY WAY LIMITING THE DEFENSE ARGUMENT, AND I WILL COMMENT THAT I ALSO HAVE REMINDED THE PLAINTIFF THAT THEY MUST STICK TO THEIR THEORY OF THE CASE AND NOT INTRODUCE A NEW THEORY, AND IT MAY -- BECAUSE SHOULD THE PLAINTIFF WIN AND THE CITY COMES IN ASKING FOR A NEW TRIAL, THAT KIND OF ARGUMENT COULD BE GROUNDS FOR A NEW TRIAL, WHICH WOULD BE TRULY TRAGIC.

SO I AM EMPHASIZING MY ADMONITION TO COUNSEL ON THIS ISSUE.  FRANKLY, THERE'S A LOT OF EVIDENCE TO ARGUE IN A LOT OF

ER0272

DIFFERENT WAYS.  THAT WILL BE FOR ALL OF YOU TO PROVIDE TO THE JURY BASED ON YOUR INTERPRETATION OF THAT EVIDENCE FOR THEM.

ALL RIGHT.  I THINK THAT TAKES CARE OF IT.

WE DO NEED TO MEET OFF THE RECORD TO FINISH UP THAT VERDICT FORM.  SO I'D LIKE TO DO THAT RIGHT NOW.

MR. JOHNSON AND OFFICER ADGAR, YOU ARE WELCOME, BUT NOT REQUIRED TO STAY.  I'LL LEAVE THAT TO YOU.

COUNSEL, IF YOU WOULD JOIN ME IN CHAMBERS AGAIN.

THE CLERK:  COURT IS ADJOURNED.

(COURT ADJOURNED AT 10:29 A.M.)

ER0273

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 15, 2025

ER0274

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

　　　　　PLAINTIFF,　　　　　　　CASE NO.  CV-21-01849 BLF

　　VS.　　　　　　　　　　　　SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA　　JANUARY 16, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,　　VOLUME 9
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,　　　　　　PAGES 1382 - 1551

　　　　　DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:　　MCMANIS FAULKNER
　　　　　　　　　　　BY:  ABIMAEL BASTIDA
　　　　　　　　　　　　　MATTHEW SCHECHTER
　　　　　　　　　　　10TH FLOOR
　　　　　　　　　　　50 WEST SAN FERNANDO STREET
　　　　　　　　　　　SAN JOSE, CALIFORNIA 95113


（APPEARANCES CONTINUED ON THE NEXT PAGE.）


OFFICIAL COURT REPORTER:　　IRENE L. RODRIGUEZ, CSR, RMR, CRR
　　　　　　　　　　　　　　CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0275

RECOMMENDATION.

SO FOR CLOSING ARGUMENTS WE START WITH THE PLAINTIFF, AND THEN MOVE TO THE DEFENSE, BUT THE PLAINTIFF GETS TO DO A REBUTTAL, A FINAL CLOSING ARGUMENT, BECAUSE THEY BEAR THE BURDEN OF PROOF.  SO YOU WILL HEAR FROM THE PLAINTIFF'S TEAM TWO TIMES, BUT THE DEFENSE ONLY ONCE.  I HAVE LIMITED THEIR TIME.  SO THEY'RE ON THE CLOCK, AS YOU KNOW THEY HAVE BEEN THROUGHOUT THE CASE.

BUT I THINK I HAVE GIVEN THEM AMPLE TIME TO PROVIDE YOU WITH THEIR ARGUMENTS ON HOW YOU SHOULD CONSIDER THE EVIDENCE.

SO WITH THAT, LET ME TURN TO THE PLAINTIFFS.  AND WHO WILL BE ADDRESSING THE JURY?

ALL RIGHT.  MR. SCHECHTER, GOOD MORNING.

MR. SCHECHTER:  GOOD MORNING.

**(PLAINTIFF'S GAVE THEIR CLOSING ARGUMENT.)**

MR. SCHECHTER:  MAY IT PLEASE THE COURT, LADIES AND GENTLEMEN OF THE JURY, GOOD MORNING.

BEFORE I START, ON BEHALF OF MYSELF, MY COLLEAGUE, MR. BASTIDA, AND MOST IMPORTANTLY, KYLE JOHNSON, LET ME SAY THANK YOU.

I'M SURE MOST OF YOU DID NOT EXPECT TO START 2025 SERVING ON JURY DUTY, BUT WE DO THANK YOU FOR BEING HERE.  WE THANK YOU FOR COMING IN AND GIVING YOUR HONEST RESPONSES TO THE JURY QUESTIONNAIRES, TO THE QUESTIONS DURING VOIR DIRE, FOR BEING HERE FOR THE LAST TWO WEEKS AND BEING ATTENTIVE, TAKING NOTES,

ER0276

LISTENING TO THE WITNESSES, WATCHING OR SEEING THE EXHIBITS.

WE DO APPRECIATE THE TIME YOU HAVE PUT IN HERE.  OBVIOUSLY IT'S AN INTERRUPTION IN YOUR DAILY LIVES.  THIS IS IMPORTANT TO MR. JOHNSON, AND WE DO APPRECIATE YOU BEING HERE, AND THANK YOU FOR YOUR SERVICE.

WHEN GEORGE FLOYD WAS KILLED BY POLICE OFFICERS BACK ON MAY 25TH, 2020, IN MINNEAPOLIS, MINNESOTA, IT WAS THE CATALYST FOR NATIONWIDE PROTESTS.

AND HERE IN SAN JOSE THERE WERE SEVERAL DAYS OF PROTESTS, AND THOSE STARTED ON MAY 29TH OF 2020.

IN PARTICULAR, I WANT TO TURN INITIALLY HERE TO MAY 30TH, 2020, AND THAT'S WHERE KYLE JOHNSON, ALONG WITH A FRIEND OF HIS AND A THIRD PARTY, DECIDED THAT THEY WERE GOING TO ATTEND THE GEORGE FLOYD PROTESTS THAT WERE TAKING PLACE THAT EVENING AT SAN JOSE'S CITY HALL PLAZA.

THE THREE OF THEM, AS YOU HEARD, ARRIVED AROUND 9:53 P.M. MR. JOHNSON WASN'T CARRYING ANY SIGNS WITH HIM WHEN HE WAS THERE, HE WASN'T CARRYING ANY WEAPONS WITH HIM.  IN FACT, HE WASN'T CARRYING ANYTHING TO THROW.  HE WAS SIMPLY THERE TO SHOW HIS SUPPORT, AS HE TESTIFIED, FOR THE BLACK AND BROWN COMMUNITY.

AND IN DOING THAT, HE WAS EXERCISING A RIGHT THAT EVERYONE HERE IN THIS COURTROOM HAS, AND THAT'S THE RIGHT UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION OF FREEDOM OF SPEECH AND FREEDOM OF ASSEMBLY.

ER0277

AND AT THE SAME TIME HE ALSO HAD THE RIGHT AGAIN, GUARANTEED TO ALL OF US UNDER THE CONSTITUTION, AND THAT IS THE FOURTH AMENDMENT RIGHT TO BE FREE FROM UNLAWFUL SEIZURE.

NOW, OVER THE NEXT 45 MINUTES OR SO KYLE REMAINED AT THE PLAZA, HE NEVER ENGAGED WITH THE POLICE.  THERE'S BEEN NO TESTIMONY THAT HE WAS GETTING UP IN AN OFFICER'S FACE, THAT HE WAS YELLING ANYTHING, HE WAS NEVER THROWING ANYTHING AT THE POLICE OFFICERS WHO WERE PRESENT THAT EVENING.

MORE IMPORTANTLY, DURING THE TIME THAT HE'S THERE UP UNTIL WHEN HE IS SHOT, HE NEVER HEARS A SINGLE ORDER TO DISPERSE, NO COMMANDS TO LEAVE CITY HALL PLAZA, NO ANNOUNCEMENT THAT THERE'S AN UNLAWFUL ASSEMBLY, NOT EVEN AN OFFICERS COMING UP TO HIM AND SAYING, SIR, YOU NEED TO LEAVE.

AND, IN FACT, I WANT TO DIRECT YOU TO LIEUTENANT TASSIO WHEN HE TESTIFIED THAT HE ACKNOWLEDGED THAT NO ONE HAS A DUTY TO DISPERSE UNTIL THE POLICE FIRST TELL THEM TO DO SO.  AND THEY WOULD NOT DISPERSE A CROWD WITHOUT MAKING A DECLARATION OF A DISPERSAL ORDER FIRST.

NOW, AS WE APPROACHED 10:30 ON THE EVENING OF MAY 30TH, AND YOU'VE SEEN ON MULTIPLE VIDEOS THAT HAVE BEEN SHOWN TO YOU DURING THE COURSE OF THIS TRIAL, YOU START TO SEE SOME BOTTLES THAT WERE BEING THROWN BY CERTAIN PEOPLE THERE AT THE PLAZA.

AGAIN, THERE'S BEEN NO EVIDENCE PRESENTED THAT MR. JOHNSON WAS EVER ONE OF THOSE INDIVIDUALS.

AND I THINK WE HEARD THAT, YOU KNOW, A LOT OF IT WAS

ER0278

PLASTIC WATER BOTTLES.  I ACKNOWLEDGE IT WASN'T NECESSARILY ALL PLASTIC WATER BOTTLES.

BUT THERE'S BEEN NO TESTIMONY THAT AS WE APPROACH THAT 10:30 TIMEFRAME THAT PEOPLE WERE THROWING BRICKS OR ANY LARGE PIECES OF DEBRIS OR ANYTHING LIKE THAT.

WE DID HEAR OFFICER ADGAR WHEN HE WAS ON THE STAND ABOUT BEING STRUCK BY A GLASS BOTTLE AND SEEING PEOPLE COLLECT DEBRIS.  BUT REMEMBER, THAT WAS THE DAY BEFORE.  THIS IS ON MAY 29TH.

ON MAY 30TH, OFFICER ADGAR TESTIFIED THAT HE WAS NEVER STRUCK BY ANY GLASS BOTTLES OR ANY BOTTLES.  SO MAKE SURE YOU KEEP THE DATES IN YOUR MIND THERE.

WE ALSO HEARD TESTIMONY, OR I BELIEVE WE MAY HAVE HEARD ON THE VIDEO ABOUT A POTATO GUN ON THE DATE OF MAY 30TH.  AGAIN, A DIFFERENT LOCATION.  NOT AT CITY HALL PLAZA.  THERE HAS BEEN NO TESTIMONY OR EVIDENCE PRESENTED TO YOU THAT THERE WAS ANY POTATO GUNS SEEN AT CITY HALL PLAZA THAT EVENING OR THAT A POTATO GUN WAS FIRED BY ANYONE PRESENT THAT EVENING.

THEN WE GET TO JUST A LITTLE AFTER, 10:33 P.M., AND THERE ARE A FEW BOTTLES THAT ARE THROWN, AND SAN JOSE POLICE OFFICERS, INCLUDING OFFICER ADGAR, FIRED THEIR 40 MILLIMETER PROJECTILE WEAPON INTO THE CROWD AT THAT POINT.

AND IF WE COULD PUT UP EXHIBIT 210 AND SPECIFICALLY BATES NUMBERED SJ411120.

AND, LADIES AND GENTLEMEN, AS YOU HEARD THE JUDGE SAY, I

ER0279

WILL BE MENTIONING SOME EXHIBITS AS WE GO ALONG.  SOME WILL BE PUT UP ON THE SCREEN AND SOME ARE JUST TO REFRESH YOUR MEMORY OF THEM.

YOU WILL HAVE THE OPPORTUNITY TO SEE ALL OF THOSE EXHIBITS DURING YOUR DELIBERATION IF YOU CHOOSE TO DO SO.

SO, LADIES AND GENTLEMEN, AS YOU SEE ON THE SCREEN THERE, THAT IS WHAT IS FIRED BY A 40 MILLIMETER PROJECTILE IMPACT WEAPON.

IT'S NOT SMALL.  AS YOU CAN SEE THERE, IT TRAVELS AT APPROXIMATELY 240 TO 260 FEET PER SECOND AND TO TRANSLATE TO NUMBERS THAT WE CAN UNDERSTAND, THAT'S APPROXIMATELY 170 MILES PER HOUR.

THE SHOT THAT OFFICER ADGAR FIRED STRUCK MR. JOHNSON IN THE BACK OF THE LEFT LEG.  AND AS YOU SAW, AND THIS WAS IN EXHIBIT 120A, IT WAS A VIDEO THERE, AFTER BEING STRUCK, MR. JOHNSON NOTICEABLY AND OBVIOUSLY LIMPS AWAY FROM WHERE HE WAS STRUCK, EVENTUALLY COLLAPSES TO THE GROUND.  WE SEE A COUPLE OF PEOPLE COME OVER TO TRY TO GIVE HIM ASSISTANCE, BUT HE DOES NOT GET UP.  HE SIMPLY STAYS THERE AFTER BEING STRUCK.

I REMIND YOU, HOWEVER, WHEN MR. JOHNSON WAS HIT BY THE PROJECTILE, HE WASN'T THROWING ANYTHING.  HE WASN'T EVEN ENGAGING WITH OFFICER ADGAR.  HE DID NOT, AS HE TESTIFIED, SEE ANYONE NEXT TO HIM OR IN HIS IMMEDIATE VICINITY THROW ANYTHING OR EVEN MAKE ANY SORT OF THROWING MOTION.

INSTEAD, HE HAD TURNED AROUND, HANDS ON TOP OF HIS HEAD,

ER0280

PLAINTIFF'S CLOSING ARGUMENT

AND WAS WALKING AWAY FROM THE OFFICERS.

NOW, WHEN MR. BASTIDA PRESENTED HIS OPENING STATEMENT TO YOU BACK ON MAY -- OR JANUARY 6TH, HE MENTIONED THAT WITH GREAT POWER COMES GREAT RESPONSIBILITY, AND I THINK THAT'S IMPORTANT BECAUSE I SUBMIT TO YOU, LADIES AND GENTLEMEN, THE POLICE DO HAVE GREAT POWER. THEY HAVE THE POWER TO STOP PEOPLE, THEY HAVE THE POWER TO ARREST PEOPLE, AND THEY HAVE THE POWER UNDER THE RIGHT CIRCUMSTANCES TO USE LESS LETHAL OR EVEN LETHAL FORCE AGAINST PEOPLE.

BUT BECAUSE THE POLICE HAVE THAT POWER, THEY HAVE A GREAT RESPONSIBILITY TO USE IT PROPERLY. AND I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT IS NOT WHAT HAPPENED IN THIS CASE.

YOU HEARD FROM MR. ROGER CLARK, A POLICE PRACTICES EXPERT, AND HE GAVE TESTIMONY ABOUT THE POST STANDARDS, AND THAT'S THE POLICE OFFICERS STANDARDS AND TRAINING.

AND, OF COURSE, HE ALSO TALKED ABOUT THE VARIOUS SUBJECTS AND MATTERS THAT THEY COVER DURING THAT TRAINING. IT'S TRAINING THAT EVERY SINGLE OFFICER IN THE STATE OF CALIFORNIA RECEIVES. AND WE'VE HEARD MULTIPLE OFFICERS HERE, INCLUDING OFFICER ADGAR, TESTIFY THAT THEY RECEIVED THAT TRAINING WHEN THEY JOINED THE POLICE FORCE.

AND AS PART OF THAT TRAINING, THEY ARE GOING TO GET EDUCATION ON THE USE OF FORCE THAT WILL BE NECESSARY AND APPROPRIATE, OR I SHOULD SAY WILL BE APPROPRIATE OR NECESSARY AND LAWFUL, GIVEN THE CONDUCT THAT AND THE CIRCUMSTANCES THAT

ER0281

THE OFFICERS FIND THEMSELVES IN.  THEY RECEIVE EDUCATION ON CROWD MANAGEMENT, CROWD CONTROL, HOW TO HANDLE DEMONSTRATIONS, PROTESTS, RIOTS, HOW TO ADDRESS THOSE SITUATIONS, AND, AGAIN, WHAT IS APPROPRIATE AND NECESSARY UNDER THOSE CIRCUMSTANCES?

MR. CLARK ALSO TOLD YOU THAT WHEN USING A 40 MILLIMETER PROJECTILE IMPACT WEAPON DURING A PROTEST, THE RULE FOR THAT WEAPON IS THE SAME FOR THE USE OF FORCE.  THERE MUST BE A CREDIBLE THREAT THAT RISES TO A LEVEL OF RISK TO JUSTIFY THE FORCE.

AND THAT WHEN YOU FIRE A 40 MILLIMETER PROJECTILE IMPACT WEAPON, YOU NEED TO ENSURE THAT YOU'RE AIMING AT A CLEAR TARGET.

REMEMBER, WE HAVE HEARD TESTIMONY THE 40 MILLIMETER IS A TARGETED WEAPON.  IT'S NOT MEANT TO JUST BE FIRED WILLY NILLY. YOU ARE TO BE TARGETING SOME TARGET THAT YOU ARE FIRING THAT WEAPON AT.

IN ADDITION TO THE POST STANDARDS, WE HAVE THE SAN JOSE POLICE DEPARTMENT DUTY MANUAL, AND THAT'S A DUTY MANUAL THAT EVERY OFFICER IS EXPECTED TO COMPLY WITH.

AND AGAIN, THE OFFICERS TESTIFIED HERE AND ACKNOWLEDGED THAT THAT WAS THE CASE.

AND SO IF WE CAN PUT UP EXHIBIT 151A, AND PARTICULARLY THE SECOND PAGE, SO SJ278677, OR I SHOULD SAY THE SECOND PAGE OF THIS EXHIBIT.  THERE ARE PARTICULAR PAGES WITHIN THIS EXHIBIT.

AND IF WE LOOK AT THAT FIRST -- THE USE OF FORCE, THE

SECOND PARAGRAPH THERE ON USE OF FORCE.  AND THAT SECOND PARAGRAPH THE SECOND SENTENCE STARTING WITH "THE DEPARTMENT."

IT SAYS, "THE DEPARTMENT FINDS AND DECLARES THAT EVERY PERSON HAS A RIGHT TO BE FREE FROM EXCESSIVE USE OF FORCE BY OFFICERS ACTING UNDER COLOR OF LAW."

NOW, I WANT TO PAUSE HERE FOR A MINUTE BECAUSE WE'VE HEARD COLOR OF LAW.  YOU'RE GOING TO SEE COLOR OF LAW IN THE VERDICT FORM.  I WANT TO REMIND YOU OF THIS, THE JUDGE READ TO YOU A STIPULATION THAT THE PARTIES AND DEFENSE HAD AGREED TO.  AND SHE SAID, YOU NO LONGER HAVE TO DECIDE THESE FACTS, THEY ARE AGREED, YOU ARE TO ACCEPT THEM AS HAVING BEEN ESTABLISHED.  IT MAKES YOUR JOB EASIER.  ON THESE PARTICULAR POINTS, YOU DON'T HAVE TO DISCUSS ANYTHING, THEY ARE DONE.

ONE OF THOSE PARTICULAR FACTS WAS THAT JAMES ADGAR WORKED AS A SAN JOSE POLICE DEPARTMENT OFFICER ON MAY 29TH AND MAY 30TH OF 2020 AND WAS ONE OF THE OFFICERS ON DUTY ACTING UNDER COLOR OF LAW.

NOT IN DISPUTE.  OFFICER ADGAR WAS ACTING UNDER COLOR OF LAW ON THE NIGHT IN QUESTION.

IT WAS ALSO READ TO YOU THAT OFFICER ADGAR DID NOT ARREST ANYBODY ON THE NIGHT OF MAY 30TH, 2020.

YOU CAN TAKE THAT DOWN.  THANK YOU.

IF WE CAN ACTUALLY, IN THE SAME EXHIBIT, GO TO PAGE 278694.  I WANT TO TURN TO L 2629.

AND THIS IS THE DUTY MANUAL THAT TALKS ABOUT THE USE OF

ER0283

PROJECTILE IMPACT WEAPONS. AND AS IT SAYS THE LAST SENTENCE IN THE FIRST PARAGRAPH, "BECAUSE PROJECTILE IMPACT WEAPONS HAVE THE POTENTIAL TO CAUSE SERIOUS INJURY OR DEATH, THIS TYPE OF WEAPON WILL ONLY BE USED IN THE FOLLOWING CIRCUMSTANCES."

1. "WHEN IT IS OBJECTIVELY REASONABLE," OBJECTIVELY, NOT SUBJECTIVE, "OBJECTIVELY REASONABLE TO INCAPACITATE SUSPECTS ARMED WITH A WEAPON LIKELY TO CAUSE SERIOUS BODILY INJURY OR DEATH UNTIL THE SUSPECT CAN BE CONTROLLED AND SAFELY TAKEN INTO CUSTODY."

OR NUMBER 2. "WHEN AN OBJECTIVELY," AGAIN, "OBJECTIVELY REASONABLE IN SITUATIONS WHERE ITS USE IS LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED."

AND IF WE GO DOWN THAT SAME PAGE TO L 2629.5. AND THIS IS TITLED 37 MILLIMETER. BUT IF YOU LOOK AT THAT SECOND SENTENCE IN THE FIRST PARAGRAPH THAT "STUN BAG SHOTGUNS AND 40 MILLIMETER PROJECTILE IMPACT WEAPONS MAY ONLY BE USED IN ACCORDANCE WITH SECTION L 2629," THAT'S THE ONE THAT I JUST READ TO YOU THAT WE WERE LOOKING AT, "AND MAY NOT BE USED FOR CROWD CONTROL PURPOSES AS A METHOD FOR CROWD DISPERSAL."

I WANT TO TURN NOW TO EXHIBIT 65.

EXHIBIT 65, AS YOU CAN SEE, IS A TRAINING MANUAL FOR THE USE OF A 40 MILLIMETER PROJECTILE IMPACT WEAPON.

IF WE GO TO PAGE 2, AND SPECIFICALLY ITEM NUMBER 6 ON THAT PAGE, AS YOU CAN SEE, WHEN YOU'RE USING THIS PARTICULAR WEAPON, YOU WANT TO BE SURE OF YOUR TARGET, THE BACK STOP, WHAT IS

ER0284

BEHIND THE TARGET, AND BEYOND.  YOU WANT TO BE ABLE TO SEE WHEN YOU'RE FIRING AT SOMETHING, WHAT IS BEHIND YOUR TARGET, NOT JUST THE TARGET ITSELF.

AND IN TERMS OF THE TARGET, IF WE GO TO PAGE 4, IT SHOWS THE COLOR CODE THERE AS TO THE AREAS OF THE BODY.  THE GREEN BEING THE MAIN AREAS THAT YOU SHOULD AIM AT, YELLOW BEING -- BUT THE RED AREAS POTENTIALLY LETHAL.  YOU SHOULD NOT BE FIRING YOUR WEAPONS AT THOSE RED AREAS THAT YOU ARE TARGETING A PERSON.

YOU CAN TAKE THAT DOWN.  THANK YOU, MR. DANG.

I WANT TO REMIND YOU ALSO OF WHAT OFFICER ADGAR SAID WHILE HE WAS ON THE STAND.  HE ACKNOWLEDGED THAT HE IS AWARE OF THE POLICE DEPARTMENT DUTY MANUAL AND THE RULES THAT THEY SET FORTH AS TO WHEN YOU CAN PROPERLY USE A 40 MILLIMETER PROJECTILE IMPACT WEAPON.

HE WAS TRAINED THAT HE IS NOT TO SHOOT A 40 MILLIMETER PROJECTILE IMPACT WEAPON INTO A CROWD UNLESS HE COULD ACTUALLY AIM AT THE PERSON WHO IS POSING A THREAT.

HE AGREED OR ACKNOWLEDGED THAT THE 40 MILLIMETER IS A TARGET SPECIFIC WEAPON.  SO THEY'RE TRAINED AND TAUGHT THAT IT IS ONLY SUPPOSED TO BE USED ON A SPECIFIC TARGET.

AGAIN, HE SAID THE 40 MILLIMETER IS NOT TO BE USED FOR CROWD CONTROL.  THIS IS ALL CONSISTENT WITH WHAT WE'VE BEEN TALKING ABOUT, POST STANDARDS, THE DUTY MANUAL.

AND IF YOU'RE GOING TO USE IT IN A CROWD SETTING, YOU WANT

TO HAVE A CLEAR PICTURE SO THAT YOU'RE MAKING SURE YOU'RE NOT GOING TO HIT AN INNOCENT BYSTANDER OR IF YOU MISS YOUR TARGET, THAT YOU HIT SOMEONE ELSE INSTEAD.

AND HE ALSO SAID THAT HIS UNDERSTANDING OF THE POLICY, AND THIS IS FROM HIS DEPOSITION, IT WOULD NOT BE JUSTIFIED TO SHOOT SOMEONE WITH A 40 MILLIMETER PROJECTILE IMPACT WEAPON IF ALL THEY'RE THROWING IS A PLASTIC WATER BOTTLE WITH WATER IN IT. THIS WAS OFFICER ADGAR'S TESTIMONY.

WE ALSO HEARD QUITE A BIT OF TESTIMONY ABOUT THE TOTALITY OF THE CIRCUMSTANCES, WHAT YOU HAVE TO CONSIDER WHEN YOU'RE CONSIDERING USE OF FORCE.

IF WE COULD GO BACK TO EXHIBIT 151A AND THIS WOULD BE PAGE 278677.

AND IF WE LOOK AT THE OBJECTIVELY -- THIS IS L 2602, OBJECTIVELY REASONABLE FORCE.  THE SECOND HALF OF THE PAGE, THE BOTTOM HALF OF THAT PAGE.

ABOUT HALF WAY DOWN IT TALKS ABOUT IMPORTANT FACTORS TO BE CONSIDERED.  AND IT SAYS, "IMPORTANT FACTORS TO BE CONSIDERED WHEN DECIDING HOW MUCH FORCE TO BE USED TO APPREHEND OR SUBDUE A SUBJECT INCLUDE, BUT ARE NOT LIMITED TO, THE SEVERITY OF THE CRIME AT ISSUE," THE CIRCUMSTANCES FOR WHICH BOTH THE OFFICERS AND SUSPECT ARE THERE, WHETHER THE SUBJECT POSES AN IMMEDIATE THREAT TO THE SAFETY OF OFFICERS OR OTHERS, AND IS THE SUBJECTIVELY RESISTING ARREST OR ATTEMPTING TO EVADE ARREST?

LIEUTENANT TASSIO TESTIFIED ON OTHER THINGS THAT YOU ALSO

ER0286

NEED TO CONSIDER ARE CROWD DENSITY, WHAT SORT OF VISIBILITY DO YOU HAVE? DAYLIGHT? NIGHTTIME? THE OFFICER'S OWN SPECIFIC VISIBILITY, WHAT CAN HE OR SHE SEE? AND THE NUMBER OF POSSIBLY VIOLENT ACTORS IN THE CROWD AS COMPARED TO THE CROWD SIZE AS A WHOLE.

AND I SUBMIT TO YOU -- TAKE THAT DOWN -- I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT IN THESE CIRCUMSTANCES THAT WE FOUND OURSELVES, THEY WERE NOT BEING CONSIDERED ON MAY 30TH AT 10:33 P.M. WHEN MR. JOHNSON WAS SHOT.

NOW, WE ALSO HEARD ABOUT OFFICERS DRAWING ON THEIR PAST EXPERIENCES SO THAT WHAT HAPPENED IN THE CITY OF SAN JOSE ON MAY 29TH MAY AFFECT HOW THEY RESPONDED ON MAY 30TH OR IF OFFICERS SAW PEOPLE MAKING THROWING MOTIONS THAT SOMEONE HAD THINGS IN THEIR HAND, THEN IT'S REASONABLE TO THINK THAT THEY MAY HAVE SOMETHING IN THEIR HAND HERE.

I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT THAT SORT OF UNDERSTANDING OR APPLICATION IS ESSENTIALLY WHAT EAT THE RULE. IT WOULD ALMOST ESSENTIALLY MOOT THE POST STANDARDS AND THE DUTY MANUAL.

NOW, REMEMBER WHAT WE HAD ON MAY 29TH. IT WAS ADMITTEDLY A CHAOTIC DAY. LARGE CROWDS, UNPRECEDENTED LEVELS OF PROTESTS AND FOR THE CITY OF SAN JOSE.

THERE WERE IN SOME AREAS CONFRONTATIONS, THERE WAS LOOTING, VANDALISM, PROTESTS ON THE FREEWAY, FIRES BEING SET. SO I'M NOT TRYING TO MINIMIZE IN ANY WAY WHAT OCCURRED ON

ER0287

MAY 29TH. I THINK ANY OF US WHO WERE HERE IN THE CITY THAT DAY REMEMBER IT AND JUST WERE SURPRISED ABOUT SEEING THINGS THAT WE DON'T USUALLY SEE HERE.

AT THE SAME TIME, THAT WASN'T WHAT WAS HAPPENING ON THE 30TH IN THE EVENING AT CITY HALL PLAZA. WE SAW VIDEOS THAT EARLIER THAT NIGHT OR EARLIER IN THE 9:00 O'CLOCK HOUR THE PLAZA WAS RELATIVELY EMPTY. WE SAW VIDEOS OF PROTESTS CALMLY AND POLITELY CHATTING WITH OFFICERS.

OFFICER ADGAR TESTIFIED THAT THEY HAD MORE RESOURCES AVAILABLE TO THEM ON THE 30TH THAN THEY DID ON THE 29TH. SO THE CONDITIONS WERE DIFFERENT. THE CIRCUMSTANCES WERE DIFFERENT.

AND I WOULD SUBMIT, LADIES AND GENTLEMEN, THAT IF IT'S SIMPLY, WELL, IT LOOKS LIKE THEY'RE ABOUT TO THROW SOMETHING SO I'M GOING TO FIRE MY WEAPON, IF ALL THAT IS NECESSARY, AS I SAID, I'M NOT SURE WHY WE HAVE THE POST STANDARDS OR WHY WE NEED THE DUTY MANUAL BECAUSE I SUBMIT WE END UP WITH SOME OF THE FOLLOWING THINGS THAT WE HAVE HEARD ABOUT OVER THE PAST TWO WEEKS.

WE HAD SERGEANT BYERS TESTIFY THAT HE HAD ONE OF HIS OFFICERS FIRE A 40 MILLIMETER WEAPON AT PEOPLE WHO WERE ENGAGING IN GRAFFITI THAT WERE 100 YARDS AWAY. THEY WERE NOT DIRECTING ANYTHING TOWARDS THE OFFICERS, AND THEY WERE NOT THROWING ANYTHING, AND THERE'S NO TESTIMONY THAT THEY WERE THREATENING OR ESSENTIALLY PUTTING OTHER PEOPLE AT RISK. THEY

ER0288

PLAINTIFF'S CLOSING ARGUMENT

WERE SIMPLY DOING GRAFFITI.

THAT'S NOT CONSISTENT WITH POST STANDARDS.  THAT'S NOT CONSISTENT WITH SAN JOSE POLICY.

ACCORDING TO SERGEANT BYERS, IF THEY DO NOTHING, THEY MAY SIMPLY BECOME EMBOLDENED.

WELL, THERE'S NO EVIDENCE THAT THAT'S WHAT WAS GOING TO HAPPEN.  AND, YOU KNOW, POLICE OFFICERS, AS WE TALKED ABOUT BACK IN VOIR DIRE, THEY ARE PEOPLE.  THEY'RE LIKE ANY OF US.  NONE OF US HAVE THE ABILITY TO SEE INTO THE FUTURE.

WE HEARD LIEUTENANT TASSIO SAY ON A VIDEO BACK ON MAY 29TH, "I DON'T GIVE AN F ABOUT THE POLICY RIGHT NOW."

YOU SAW A VIDEO THAT WAS ADMITTED AS EXHIBIT 107A IN WHICH AN INDIVIDUAL WAS RIDING ON A BICYCLE GOING PAST CITY HALL PLAZA.  THE BICYCLIST IS NOT APPROACHING ANY OF THE OFFICERS AND HE IS NOT THROWING ANYTHING AT THE OFFICERS.  IN FACT, HE'S JUST HOLDING A GUITAR.  AND HE IS SHOT WITH A LESS-LETHAL PROJECTILE WEAPON.  HE'S NOT ARRESTED.  HE'S NOT GIVEN ANY MEDICAL ATTENTION.

WE HEARD CAPTAIN DWYER TALK ABOUT HOW PROTESTORS WERE ATTACKING THE POLICE EVEN THOUGH ON MAY 30TH WHEN MR. JOHNSON WAS SHOT, THERE WAS NOT A WAVE OF PROTESTORS RUSHING THE POLICE.  IN FACT, AS YOU WILL SEE AS WE GO ON HERE IN VIDEO, THEY WERE RUNNING AWAY.

THERE WASN'T WAVES OF BOTTLES OR ROCKS OR ANYTHING BEING THROWN AT THE OFFICERS AT THIS TIME.

ER0289

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  SO WE CAN GO BACK A LITTLE BIT.  SO THIS IS WHAT WE HAVE THE CROWD LOOKING LIKE JUST SHORTLY BEFORE OFFICER ADGAR FIRES.

IF WE CAN PLAY A LITTLE BIT, AS YOU CAN SEE PEOPLE WERE STANDING THERE MILLING ABOUT.  PAUSE IT FOR A MOMENT.

YOU CAN SEE PEOPLE STARTING TO RUN AWAY AND MOVE IN THE DIRECTION AWAY FROM THE POLICE OFFICERS.  AND AS WE SEE ON THE FAR RIGHT-HAND SIDE OF THE SCREEN THERE -- AND PLAY A LITTLE MORE AND PAUSE IT RIGHT THERE.  AS YOU CAN SEE THE OFFICER WITH THE FOOT ON THE SIDEWALK, THAT'S OFFICER ADGAR, THAT'S AS HE'S ABOUT TO FIRE THE 40 MILLIMETER WEAPON AND THAT'S THE SHOT THAT THEN STRIKES KYLE JOHNSON.

AND IF WE CAN NOW PLAY THE VIDEO THAT IS EXHIBIT 106A.

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  SAME SCENE, JUST A DIFFERENT ANGLE. IF WE CAN PLAY THAT, PLEASE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  AGAIN, IF WE CAN GO BACK TO THE START OF THAT VIDEO AND JUST PLAY IT AGAIN.

DO YOU SEE NOW PEOPLE MOVING AWAY?

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  PAUSE IT THERE FOR AN SEC.

AGAIN, NOT SEEING -- THERE WAS A BOTTLE KIND OF FAR IN THE DISTANCE IN THE BACK, BUT NO BOTTLES COMING TOWARDS THIS BODY

ER0290

WORN CAMERA OR IMMEDIATE VICINITY.

START IT UP A LITTLE BIT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  STOP IT AGAIN.  AGAIN, THAT'S OFFICER ADGAR RIGHT THERE WITH HIS FOOT ON THE SIDEWALK AS HE'S FIRING HIS 40 MILLIMETER.

NOW, SOME THINGS I WANT TO RE-EMPHASIZE HERE.  AGAIN, WHEN THAT SHOT WAS FIRED, MR. JOHNSON WAS WALKING AWAY FROM THE OFFICERS WITH HIS HANDS UP.  HE'S STRUCK IN THE BACK OF THE LEG.

AS YOU CAN SEE, THE CROWD WAS RETREATING.  THEY WERE MOVING AWAY FROM THE OFFICERS.  THEY WERE NOT RUSHING TOWARDS THEM.  THEY WERE MOVING AWAY FROM THE OFFICERS WHEN OFFICER ADGAR FIRED.

IN THE VIDEO, THERE'S NO BOTTLES THAT WERE BEING THROWN FROM WHERE KYLE WAS -- MR. JOHNSON WAS BEING SHOT AT.  WE DIDN'T SEE ANY BOTTLES COME RIGHT THERE NEAR THE BODY WORN CAMERA OF THAT OFFICER.  OBVIOUSLY THAT'S NOT OFFICER ADGAR'S CAMERA, SO I SUBMIT TO YOU, LADIES AND GENTLEMEN, THERE WAS NO CREDIBLE THREAT OF HARM AT THIS POINT.

RATHER, OFFICER ADGAR IS RESPONDING TO BOTTLES BEING THROWN FROM 100 OR 150 FEET AWAY FROM HIM AND NOT LANDING NEAR HIM.

AND INDEED HE TESTIFIED THAT WHEN HE WAS DEPOSED BACK IN FEBRUARY OF 2022, SO LESS THAN TWO YEARS AFTER THE EVENTS ON

ER0291

THIS VIDEO, AS TO ALL OF THE SUSPECTS, AS TO THE SUSPECTS HE SHOT AT ON MAY 30TH, HE COULD NOT RECALL IF HE SAW ANY PERSON IN THE PROCESS OF COMMITTING A CRIME AND COULD NOT EVEN RECALL IF HE CONSIDERED ANY OF THEM A THREAT WHEN HE FIRED.

NOW I'D LIKE TO TURN TO EXHIBIT 108A AND SPECIFICALLY I WANT TO GO TO 22:33:17 ON THAT VIDEO.

THANK YOU.  WE SEE OFFICER ADGAR IN THE VERY LEFT CORNER OF THE SCREEN.  HIS WEAPON IS UP.  HE'S ABOUT TO, IF NOT ALREADY, ABOUT TO FIRE THE WEAPON.

WE HEARD OFFICER ADGAR AND HE TESTIFIED AND HE CIRCLED ON AN EXHIBIT WHERE HE SAW SOMEONE HE BELIEVED WAS MAKING A THROWING MOTION.  AND THAT EXHIBIT IS IN EVIDENCE AS 552A.

BUT THE PERSON HE CIRCLED IS ON THAT TRAPEZOIDAL FIGURE THERE TOWARDS THE RIGHT.

WE ALSO HAVE MR. JOHNSON WHO CIRCLED WHERE HE WAS STANDING WHEN HE WAS SHOT BY OFFICER ADGAR THAT EVENING.  THAT'S EXHIBIT 440.  AND ACCORDING TO WHERE HE WAS, HE WAS STANDING BY THE FACE OF THE WESTERN PLAZA ARCHWAY THERE ON THE LEFT.

THOSE TWO POSITIONS ARE NOT NEXT TO EACH OTHER, LADIES AND GENTLEMEN.

AND IF OFFICER ADGAR WAS TARGETING THE INDIVIDUAL MAKING A THROWING MOTION OVER BY THAT TRAPEZOID FACE, HOW DOES HE HIT SOMEONE WHERE MR. JOHNSON WAS STANDING?

I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT MR. JOHNSON WAS STRUCK BY THE ROUND FIRED BY OFFICER ADGAR BECAUSE

ER0292

OFFICER ADGAR WAS NOT TARGETING SOMEONE, HE WAS FIRING INDISCRIMINATELY INTO THE CROWD.

AND THERE'S NO DISPUTE THAT OFFICER ADGAR DID INTENTIONALLY FIRE HIS WEAPON. THERE'S BEEN NO EVIDENCE PRESENTED TO YOU THAT THE GUN MISTAKENLY WENT OFF, THAT IT WAS AN ACCIDENT, HE DIDN'T MEAN TO PULL THE TRIGGER. NOTHING LIKE THAT. HE MEANT TO RAISE AND FIRE HIS WEAPON.

MR. CLARK, WHEN HE WAS ON THE STAND, TESTIFIED AT THIS PARTICULAR MOMENT THE USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON WAS NOT A PROPER USE FOR CROWD CONTROL BECAUSE THE FORESEEABLE CONSEQUENCES IS A SIGNIFICANT INJURY BECAUSE OF THE NATURE OF THAT WEAPON INTO AN AREA WITH NO CREDIBLE THREAT.

MR. CLARK ALSO TESTIFIED BASED ON HIS TRAINING, HIS EXPERIENCE, HIS EDUCATION, HIS REVIEW OF THE VIDEOS THAT THE 40 MILLIMETER -- USING A 40 MILLIMETER AT THAT TIME WAS ALSO NOT PROPER BECAUSE MR. JOHNSON HIMSELF WAS NOT A CREDIBLE THREAT.

AGAIN, MR. JOHNSON WAS LEAVING. HE HAD NOTHING IN HIS HANDS. HE HAD THROWN NOTHING. HE WAS NOT BEING PROVOCATIVE.

MR. CLARK FURTHER TESTIFIED, THIS WAS NOT IN COMPLIANCE WITH POST STANDARDS. WHY? BECAUSE MR. JOHNSON DID NOT FIT IN THE CATEGORY OF RESISTIVE OR ASSAULTIVE, COMBATIVE OR THREATENING.

HE WAS LEAVING THE AREA AND WAS DOING NOTHING OTHER THAN THAT WHEN THE WOUND WAS INFLICTED.

ER0293

AND AGAIN, I WANT TO CIRCLE BACK TO THOSE TOTALITY OF CIRCUMSTANCES FACTORS THAT I MENTIONED THAT WE TALKED ABOUT EARLIER.

AGAIN, WE TALKED ABOUT CROWD DENSITY, WE TALKED ABOUT VISIBILITY, WE TALKED ABOUT SEVERITY OF THE CRIME AT ISSUE, AND THE NUMBER OF VIOLENT ACTORS IN THE CROWD AS COMPARED TO THE SIZE OF THE CROWD AS A WHOLE.

AND LET ME COME BACK TO -- AND WE TALKED ABOUT OFFICER ADGAR'S TESTIMONY AS TO THE 40 MILLIMETER AND ALL OF THE UNDERSTANDING HE HAD BASED ON THE TRAINING THAT HE RECEIVED AS A MEMBER OF THE SAN JOSE POLICE DEPARTMENT.

AND WHAT ARE ALL OF THE THINGS, EVEN THOUGH HE WAS TRAINED, HE DID NOT DO?

HE FIRED INTO A CROWD WITHOUT BEING ABLE TO AIM AT THE PERSON WHO WAS SUPPOSEDLY POSING A THREAT. ALTHOUGH I SUBMIT TO YOU, LADIES AND GENTLEMEN, THERE WAS NO CREDIBLE THREAT POSED, PERIOD, AT THAT POINT. HE HAD NO CLEAR TARGET.

HE HAD NO CLEAR PICTURE TO MAKE SURE HE WOULDN'T HIT AN INNOCENT BYSTANDER, AND, OF COURSE, HE DID, MR. JOHNSON.

I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT THERE WAS A LACK OF CAREFUL JUDGMENT, A LACK OF CARE, A LACK OF CONCERN FOR THE PROTESTORS WHO WERE GATHERED IN FRONT OF OFFICER ADGAR WHEN HE FIRED HIS 40 MILLIMETER WEAPON AND THE SHOT THAT STRUCK MR. JOHNSON THAT EVENING.

HOW DID WE GET HERE? HOW DID WE END UP AT THIS POINT?

ER0294

PLAINTIFF'S CLOSING ARGUMENT

WELL, WE HEARD FROM THE OFFICERS THAT THEY WERE OVERWHELMED DURING THE COURSE OF THOSE TWO DAYS, LONG EXTENDED HOURS, THEY WERE FATIGUED, THEY DIDN'T HAVE TIME TO NECESSARILY EAT, SOMETIMES DIDN'T HAVE TIME TO USE THE RESTROOM, FRUSTRATION OF THE PROTESTORS, A LOT OF ANTI-POLICE SENTIMENT OVER THE COURSE OF THOSE DAYS.

WE HEARD FROM I BELIEVE IT WAS SERGEANT BYERS, BUT I MAY HAVE THE WRONG OFFICER, BUT WE DID HEAR FROM ONE OF THE OFFICERS TALK ABOUT HOW HE HAD GANG MEMBERS THREATENING HIM OVER THE COURSE ON THE 29TH.

WE HEARD FROM CAPTAIN DWYER THAT THE ENTIRE RIOT, AS HE PUT IT, WAS ANTI-POLICE, POLICE HAVING BIAS OF PEOPLE OF COLOR, PEOPLE PROTESTING ABOUT NOT APPLYING NO MEDICAL ATTENTION TO PERSONS IN DISTRESS.

AND IMPORTANTLY, ALL OF THE VARIOUS FACTS THAT WE WERE TALKING ABOUT WERE OCCURRING, INDIVIDUAL ON THE BIKE WHO WAS SHOT, PEOPLE WHO WERE SHOT WHO WERE DOING GRAFFITI, THE OFFICERS WHO WERE ENGAGED IN THESE ACTS, NO ONE WAS REPRIMANDED.  NO SUPERVISORS CONDEMNED THEIR ACTIONS.

SO WHEN OFFICER ADGAR FIRED THE SHOT THAT STRUCK MR. JOHNSON, NO CHANCE OF ACTUALLY STRIKING AN AGITATOR OR ANYONE ENGAGED -- POTENTIALLY WHO WAS ENGAGED AND WHO WAS A THREAT.  HE SIMPLY WANTED TO SHOOT.  HE DID SO INDISCRIMINATELY WITHOUT A CLEAR TARGET, AND MR. JOHNSON SUFFERED AS A RESULT.

I WANT TO PUT UP NOW SOME OF THE JURY INSTRUCTIONS AND PUT

ER0295

THEM IN CONJUNCTION WITH THE VERDICT FORM THAT YOU WILL RECEIVE ONCE YOU'RE BACK IN THE JURY ROOM THAT YOU'LL HAVE TO COMPLETE. AND FIRST I WANT TO PUT UP INSTRUCTION NUMBER 30 AND PUT THAT UP SIDE BY SIDE WITH PAGE 4 OF THE VERDICT FORM.

INSTRUCTION NUMBER 30 IS THE ONE ABOUT FIRST AMENDMENT, AND THIS IS A CONSTITUTIONAL CLAIM ASSERTED BY MR. JOHNSON AND THAT HE WAS DEPRIVED OF HIS RIGHTS UNDER THE FIRST AMENDMENT WHEN HE WAS STRUCK IN THE BACK OF THE LEG.

AND OF COURSE PART OF THE QUESTIONS OR THE THINGS YOU'RE GOING TO HAVE TO ANSWER IS WAS HE ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY?

I SUBMIT TO YOU, LADIES AND GENTLEMEN, THE ANSWER TO THAT IS YES.  HE WAS ENGAGED IN THE RIGHT OF FREEDOM OF SPEECH, FREEDOM OF ASSEMBLY.  WE TALKED ABOUT THAT AT THE VERY START.

DID KYLE JOHNSON PROVE THAT JAMES ADGAR ACTED UNDER COLOR OF LAW?  QUESTION 10.  NOTICE THIS QUESTION IS ON A COUPLE OF PLACES ON THIS VERDICT FORM.

AS WE'VE SAID, THAT'S BEEN PROVEN.  IT'S BEEN STIPULATED TO.  THAT'S AN AUTOMATIC YES.  YOU DON'T HAVE TO DISCUSS IT. JUST CHECK AND YOU CAN MOVE RIGHT ON.

DID MR. JOHNSON PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE RETALIATION -- IN RETALIATION FOR EXERCISING HIS FIRST AMENDMENT RIGHTS, FOR BEING OUT THERE, FOR PROTESTING, WAS A MOTIVATING FACTOR THAT CAUSED OFFICER ADGAR TO INDISCRIMINATELY SHOOT?

ER0296

I SUBMIT TO YOU, LADIES AND GENTLEMEN, YES, IT WAS. AGAIN, AFTER ALL OF THESE DAYS OF ANTI-POLICE SENTIMENT AND THE RIOTS AND THE CHANTING AND THE OFFICERS HAD HAD ENOUGH, AND THIS WAS OFFICER ADGAR'S OPPORTUNITY TO RETALIATE AGAINST THE PROTESTORS WHO WERE OUT THERE THAT EVENING.

IF WE CAN NOW PUT UP INSTRUCTION 32 SIDE BY SIDE WITH PAGE 2 OF THE VERDICT FORM. THE VERDICT FORM AND INSTRUCTIONS DON'T NECESSARILY GO IN THE SAME ORDER.

INSTRUCTION 32, AND VERDICT FORM PAGE 2.

NOW, THIS, LADIES AND GENTLEMEN, IS THE FOURTH AMENDMENT CONSTITUTIONAL VIOLATION ASSERTED BY MR. JOHNSON.

AND THIS FIRST PART IS THE ONE DIRECTED TOWARDS OFFICER ADGAR DIRECTLY. IN THIS CASE MR. JOHNSON IS MAKING TWO DIFFERENT ALLEGATIONS. ONE IS THAT HE WAS UNLAWFULLY SEIZED.

AND AS THE INSTRUCTION SAYS THERE RIGHT IN THE MIDDLE OF PAGE IT SAYS, "A DEFENDANT SEIZES THE PLAINTIFF'S PERSON WHEN HE RESTRAINS THE PLAINTIFF'S LIBERTY THROUGH COERCION, PHYSICAL FORCE, OR A SHOW OF AUTHORITY."

AGAIN, A SEIZURE CAN BE A MOMENT, THERE DOESN'T HAVE TO BE A TIME LIMIT HERE. AND I WOULD SUBMIT TO YOU THAT WHEN MR. JOHNSON WAS STRUCK AND THEN HAD TO LIMP AWAY AND COLLAPSE TO THE GROUND, THAT WAS A SEIZURE. THAT WAS ALL NECESSARY.

BUT THE OTHER HALF OF THIS IS THE EXCESSIVE FORCE CLAIM, AND THAT BEING THAT OFFICER ADGAR USED EXCESSIVE FORCE AGAINST KYLE JOHNSON. I WOULD SUBMIT TO YOU THAT'S WHAT HAPPENED HERE.

ER0297

AND THE FIRING OF THE 40 MILLIMETER WEAPON INDISCRIMINATELY, THAT WAS EXCESSIVE.  THERE WAS NO CREDIBLE THREAT, THERE WAS NO RISK OF SERIOUS BODILY INJURY, AND THERE WAS NO RISK OF DEATH, AND THAT'S BOTH TO OFFICERS OR TO OTHER PEOPLE IN THE CROWD AT THAT TIME.

AND I THINK IT'S IMPORTANT -- AGAIN, OFFICER ADGAR INTENTIONALLY FIRED HIS WEAPON.  THERE'S NO DISPUTE HERE THAT HE DID SO BY MISTAKE.  HE POINTED THE WEAPON, HE FIRED IT.

SO I WOULD SUBMIT TO YOU THAT MR. JOHNSON HAS PROVEN THE ELEMENTS FOR THIS PARTICULAR VIOLATION, WHETHER IT'S SEIZURE, WHETHER IT'S THE EXCESSIVE FORCE, OR BOTH.  AND OBVIOUSLY THAT WILL BE FOR YOU TO DECIDE ONCE YOU'RE IN THE JURY ROOM.

AND THEN IF WE COULD GO TO INSTRUCTION 33 AND THEN PAGE 3 OF THE VERDICT FORM.

WHILE THAT'S GETTING PUT UP THERE I'LL SAY THIS PARTICULAR SECTION AND SECTION OF THE VERDICT FORM IS THE CLAIM AGAINST THE CITY ITSELF.

SO THIS GOES BACK TO WHETHER OR NOT THAT THERE WAS A CUSTOM, A WIDESPREAD CUSTOM OR PRACTICE THAT THE CITY HAD IN ALLOWING OFFICERS TO USE LESS-LETHAL WEAPONS, INCLUDING THE 40 MILLIMETER INDISCRIMINATELY OR IN DISREGARD OF THE CITY'S WRITTEN POLICIES OR STANDARDS.

WE'VE PUT -- THEY'RE IN EVIDENCE.  I'VE SHOWN THEM TO YOU EARLIER WHAT THE CITY'S DUTY MANUAL SAYS, WHEN IT'S APPROPRIATE TO USE THE 40 MILLIMETER PROJECTILE WEAPON; AGAIN, SUSPECTS

ER0298

ARMED WITH A WEAPON LIKELY TO CAUSE SERIOUS BODILY INJURY OR DEATH OR OBJECTIVELY REASONABLE WHERE IT'S USE IS LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED.

THAT IS NOT THE SITUATION, I SUBMIT TO YOU, THAT WE HAD WHEN MR. JOHNSON WAS SHOT BY THE 40 MILLIMETER WEAPON FIRED BY OFFICER ADGAR AT ABOUT 10:33 P.M. ON THE EVENING OF MAY 30TH, 2022.

WE HAVE SEEN, AS WE WENT THROUGH, THE VARIOUS ACTS THAT THE SAN JOSE POLICE DEPARTMENT HAD BEEN ENGAGING IN OVER THE COURSE OF THE 29TH AND THE 30TH.  AGAIN, THE SHOOTING OF THE PEOPLE DOING GRAFFITI AND THE SHOOTING OF THE PEOPLE ON THE BIKE, AND THE INJURIES SUFFERED BY MR. DIDONATO, BY MS. CONTRERAS, MR. SANDERLIN BEING STRUCK IN THE GROIN, ALL LESS-LETHAL PROJECTILES.

THESE ARE THE CUSTOM AND PRACTICE THAT THE SAN JOSE POLICE DEPARTMENT WAS ENGAGING IN DURING THESE PROTESTS AND DEMONSTRATIONS THOSE TWO DAYS, AND THOSE WERE NOT CONSISTENT WITH THE WRITTEN POLICY OF THE SAN JOSE POLICE DEPARTMENT OR OF THE POST TRAINING STANDARDS THAT EVERY OFFICER RECEIVES.

WE ALSO HAVE, IF WE CAN PUT UP INSTRUCTION NUMBER 237 AND THE VERDICT FORM PAGE 9.  I'M NOT GOING THROUGH EVERY INSTRUCTION AS YOU CAN SEE AND EVERY PART OF THE VERDICT FORM. I JUST WANT TO HIGHLIGHT CERTAIN THINGS FOR YOU.  OBVIOUSLY YOU'LL HAVE TO WORK YOUR WAY THROUGH THE FORM QUESTION BY

QUESTION AND IT WILL TELL YOU HOW TO PROCEED.

NOW, THIS IS THE NEGLIGENCE CLAIM THAT MR. JOHNSON HAS ALLEGED.  AND WITH RESPECT TO THIS FIRST PART OF THE INSTRUCTION IT JUST SAYS THESE ARE THE ELEMENTS THAT HAVE TO BE PROVEN, WAS OFFICER ADGAR NEGLIGENT?

AND I SUBMIT TO YOU HE WAS.  AND WE'LL COME BACK TO THAT IN A MINUTE A LITTLE MORE.

WAS KYLE JOHNSON HARMED?

I SUBMIT TO YOU HE WAS.

AND WAS OFFICER ADGAR'S NEGLIGENCE A SUBSTANTIAL FACTOR IN CAUSING THAT HARM?

AND I THINK IF WE NOW GO TO INSTRUCTION 38, AND SO WE CAN LEAVE UP THE VERDICT FORM, INSTRUCTION 38, THERE FOR THE LEFT.

SO THIS IS THE BASIC STANDARD OF CARE WHEN WE TALK ABOUT NEGLIGENCE.  "IT'S THE FAILURE TO USE REASONABLE CARE TO PREVENT HARM TO ONESELF OR TO OTHERS."

AND I SUBMIT TO YOU, LADIES AND GENTLEMEN, THE REASON THAT OFFICER ADGAR WASN'T NEGLIGENT IS BECAUSE THERE WERE STANDARDS OF CARE HE HAD TO COMPLY WITH.  THAT'S THE POST STANDARDS. IT'S THE SAN JOSE POLICE DEPARTMENT MANUAL.  IT TELLS OFFICERS HOW THEY'RE TO HANDLE THEMSELVES, HOW THEY ARE TO USE THEIR WEAPONS, HOW THEY ARE TO USE FORCE AND WHEN IT IS PROPER AND WHEN IT IS NOT.  AND IN FAILING TO COMPLY WITH THOSE WRITTEN POLICIES AND STANDARDS, HE WAS NOT -- HE FAILED TO USE REASONABLE CARE WITH RESPECT TO PREVENTING HARM, IN THIS CASE

ER0300

TO MR. JOHNSON.

SO I SUBMIT TO YOU THAT AS TO THE VERDICT FORM ITSELF WHEN ANSWERING THE QUESTIONS FOR NEGLIGENCE, THAT THE ANSWER TO THOSE THREE QUESTIONS WOULD BE YES.

AND I DO -- I'M GOING TO GO BACK HERE.  I MISSED -- ONE THING I WANTED TO SAY.  WE WERE TALKING ABOUT THE FIRST AMENDMENT EARLIER.

AND IN PARTICULAR, IF WE CAN BRING UP JUST INSTRUCTION NUMBER 30.

IF WE CAN GO JUST TO THE SENTENCE UNDER ITEM NUMBER 3. ACTUALLY, IF WE CAN BRING UP BOTH 3 AND THE SENTENCE UNDERNEATH THERE.

AGAIN, WITH THE FIRST AMENDMENT IT SAYS ONE OF THE THINGS THAT HAS TO BE PROVEN IS THE PLAINTIFF'S ACTIVITY, THE PROTECTED ACTIVITY, THIS BEING THE FIRST AMENDMENT ACTIVITY, IS A SUBSTANTIAL OR MOTIVATING FACTOR IN WHAT CAUSED OFFICER ADGAR TO ACT.

BUT NOTE, A SUBSTANTIAL OR MOTIVATING FACTOR IS A SIGNIFICANT FACTOR, BUT IT MAY NOT BE THE ONLY FACTOR, BUT I JUST WANT YOU TO KEEP IN MIND WHEN YOU'RE DELIBERATING AND CONSIDERING THAT PART OF THE VERDICT FORM IN THE JURY ROOM.

TAKE THAT DOWN.  THANK YOU.

I DO WANT TO BRIEFLY TOUCH ON MR. FRIES'S TESTIMONY.  HE WAS ON THE STAND FOR QUITE A BIT OF TIME.  HE WAS THE ONLY PERSON THAT CAME IN HERE AND TESTIFIED ABOUT DOING A FORENSIC

ER0301

ANALYSIS OF ALL OF THE VIDEOS THAT WERE BEING -- THAT OCCURRED THERE THAT HAD TAKEN PLACE AT CITY HALL PLAZA. AND HE WAS LOOKING AT IF HE COULD IDENTIFY KYLE JOHNSON IN THESE VIDEOS, IF HE COULD DETERMINE WHEN AND WHERE THE WATER BOTTLES, OR THE BOTTLES WERE BEING THROWN FROM, WHERE DID THEY COME FROM, WHERE DID THEY LAND, I.E., COULD HE TRACK THEM THROUGH THE AIR? COULD HE TRACK THE MOVEMENTS OF THE OFFICERS THAT WERE USING PROJECTILE IMPACT WEAPONS AT CITY HALL PLAZA THAT EVENING? AND WHEN THEY FIRED, AND IF SO, WHAT DIRECTION DID THEY FIRE IN? WAS HE ABLE TO FIND EVIDENCE OF WHEN MR. JOHNSON WAS STRUCK? AND IF SO, COULD HE DETERMINE WHICH OFFICER FIRED THE WEAPON THAT STRUCK MR. JOHNSON?

AND I WILL NOT GO INTO ANY DETAIL. YOU HEARD HIM EXPLAIN IN DETAIL ABOUT THE STEPS THAT HE AND HIS TEAM DO, ANALYZING, SYNCING THE VIDEOS, THE LASER SCANS, AND EVERYTHING THAT HE DID TO PUT TOGETHER AND CREATE THE MODEL AND YOU, OF COURSE, SAW THE DEMONSTRATIVE THAT HE PLAYED FOR YOU DURING HIS TESTIMONY.

OF COURSE, IF THE JURY HAS, IF YOU WANT, IF YOU CAN'T REMEMBER, YOU CAN ALWAYS ASK FOR READ BACK OF TESTIMONY, AND YOU CAN HEAR EXACTLY WHAT HE SAID. I'M NOT GOING TO STAND HERE AND REPEAT THAT FOR YOU NOW.

BUT WHAT DID WE HEAR FROM MR. FRIES? ULTIMATELY WHAT DID HIS ANALYSIS TELL US? THAT WE KNOW FROM THE VIDEOS THAT THE BOTTLES CAME FROM ESSENTIALLY OVER BY THE CORNER OF 4TH AND SANTA CLARA, ESSENTIALLY IF YOU'RE FACING CITY HALL, TO THE

ER0302

RIGHT OF THAT TRAPEZOIDAL FACE.

THEY WERE ABLE TO TRACK MR. JOHNSON'S MOVEMENTS AND THE OFFICERS WHO FIRED.  THE OFFICER WHO IS CLOSEST TO MR. JOHNSON WAS OFFICER ADGAR.  THAT OFFICER ADGAR WAS THE ONLY ONE IN A POSITION TO IMPACT MR. JOHNSON, AND THAT WHEN OFFICER ADGAR FIRES, THE GUN IS POINTED IN THE DIRECTION OF MR. JOHNSON.

AND I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT ALL THAT MEANS IS THAT OFFICER ADGAR, WHEN HE PULLED THE TRIGGER, COULD NOT HAVE BEEN TARGETING THE INDIVIDUAL HE IDENTIFIED AND CIRCLED IN EXHIBIT 552A.

IT'S ALSO IMPORTANT TO REMEMBER, WE HEARD MR. FRIES TESTIFY, THAT THERE WERE SHOTS BEING FIRED AND THINGS THAT WERE HAPPENING ABOUT 10 MINUTES EARLIER THAN THAT.  THAT WASN'T RELEVANT TO THE ANALYSIS.  THAT DOESN'T HELP TELL US WHAT WAS HAPPENING WHEN MR. JOHNSON WAS STRUCK.

AND, OF COURSE, TO THE EXTENT THAT THERE WERE EVENTS OR PEOPLE WHO MADE THROWING MOTIONS AFTER THE FACT, AGAIN, WHAT HAPPENED AFTER MR. JOHNSON WAS STRUCK, THE EVENTS ALREADY HAPPENED.  THERE'S NOTHING MORE AT THAT POINT AND ANYTHING AFTER IS NOT RELEVANT AT THAT POINT.

NOW, LET ME TURN HERE NOW TO MR. JOHNSON'S INJURIES.

WE SAW -- IF WE COULD PUT UP EXHIBIT NUMBER 2 -- WE SAW THE PHOTOS THAT MR. JOHNSON HIMSELF TOOK OF THE INJURIES HE SUFFERED AFTER BEING STRUCK BY THE 40 MILLIMETER PROJECTILE.

YOU CAN SEE THERE THAT I BELIEVE THE ONE ON THE RIGHT WAS

ER0303

TAKEN A COUPLE OF DAYS AFTER HE WAS HIT, AND THE ONE ON THE LEFT WAS FROM ROUGHLY A WEEK OR SO LATER.

YOU HEARD HIM TESTIFY.  HE WENT TO THE HOSPITAL ON THREE OCCASIONS, EACH TIME WITH INCREASINGLY MORE PAIN.

AND FINALLY -- WE CAN TAKE THE PHOTOS DOWN.  THANK YOU. -- ON THE THIRD VISIT THE DOCTORS AT KAISER, AND THIS IS RIGHT IN JUNE OF 2020, DISCOVERED HE HAD BLOOD CLOTS, PULMONARY EMBOLISM, AND THE DOCTORS TOLD HIM THIS WAS BECAUSE OF THE INJURY HE SUFFERED ON MAY 30TH, 2020.  IT'S IN THE MEDICAL RECORDS.  THE MEDICAL RECORDS OF COURSE ARE IN EVIDENCE.

AND OF COURSE WE HAVE DR. WATKINS, AND I'M GOING TO GET TO HIM MORE IN A BIT, BUT DR. WATKINS ALSO TESTIFIED THAT THE BLOOD CLOT, THE PULMONARY EMBOLISM FROM JUNE OF 2020 WAS A DIRECT RESULT OF MR. JOHNSON BEING SHOT ON MAY 30TH, 2020.

MR. JOHNSON IS PUT ON A REGIMEN OF ANTICOAGULANTS, AND I'LL JUST SAY BLOOD THINNERS GOING FORWARD, IT'S EASIER TO SAY. HE SUCCESSFULLY COMPLETES THAT REGIMEN.

NOW WE'RE IN MARCH OF 2021.  AND HE'S HAVING DIFFICULTY BREATHING, AND HE GOES BACK TO THE ER, AND HE'S DIAGNOSED WITH ANOTHER PULMONARY EMBOLISM.  AND HE'S TOLD THAT THIS AGAIN IS DUE TO THE INJURY THAT HE SUFFERED ON MAY 30TH, 2020.  AND AS A RESULT, MR. JOHNSON IS ON BLOOD THINNING MEDICATIONS FOR THE REST OF HIS LIFE.

I MENTIONED DR. WATKINS JUST BEFORE.  HE TESTIFIED HERE VIA ZOOM AT TRIAL.  AND DR. WATKINS IS A CARDIOLOGIST, BUT HE'S

ER0304

ALSO BOARD CERTIFIED IN INTERNAL MEDICINE. HE IS, AS THEY WOULD SAY IN THE PROFESSION, AN INTERNIST. AND WHY IS THAT IMPORTANT? BECAUSE AN INTERNAL MEDICINE DOCTOR FOCUSES ON PREVENTION, DIAGNOSIS, AND THE TREATMENT OF INJURY IN ADULTS, WHICH MEANS THAT THEY PROVIDE COMPREHENSIVE CARE FOR ADULTS, THEY HAVE TO HAVE A BROAD KNOWLEDGE OF ALL SORTS OF DIFFERENT DISEASES.

DR. WATKINS TESTIFIED THAT AMONG THE THINGS THAT HE'S TRAINED IN ARE HEMATOLOGY, DISEASES OF THE BLOOD; GASTROENTEROLOGY, FOCUSES ON INTESTINES IN THE STOMACH; AND PULMONOLOGY, WHICH IS THE LUNGS.

DR. WATKINS REVIEWED THOSE THOUSANDS OF PAGES OF MEDICAL RECORDS THAT ARE IN EVIDENCE HERE IN TRIAL, BUT HE ALSO DID AN INDEPENDENT PERSONAL MEDICAL EXAM OF MR. JOHNSON. HE HAD HIM COME IN AND HE SAW HIM FACE TO FACE, AND HE DID AN EXAM OF HIM.

AND DR. WATKINS TESTIFIED THAT OTHER THAN THE ULCERATIVE COLITIS, THAT WE'VE HEARD MR. KYLE JOHNSON TESTIFY ABOUT AND WHICH, OF COURSE, IS SOMETHING ONE CAN MANAGE, MR. JOHNSON WAS IN GOOD HEALTH.

DR. WATKINS AGREES WITH THE KAISER PHYSICIANS THAT THE PULMONARY EMBOLISMS THAT KYLE SUFFERED IN JUNE WERE DUE TO THE INJURY THAT OCCURRED ON MAY 30TH, AND DR. WATKINS ALSO SAID IN HIS EXPERT OPINION THAT THE SECOND CLOT IN MARCH OF 2021, ALSO DUE TO BEING STRUCK BY THE PROJECTILE IMPACT WEAPON BACK ON MAY 30TH OF 2020.

ER0305

PLAINTIFF'S REBUTTAL ARGUMENT

LAWYER, HE IS NOT A VIDEO FORENSIC ANALYST. HE IS SIMPLY SAYING, THIS IS HOW I SEE THE VIDEOS. THIS IS MY INTERPRETATION.

HE SIMPLY IS PUTTING TO YOU HIS POSITION, WHAT HE THINKS HE'S SEEING, BUT HE DIDN'T DO THE ANALYSIS THAT MR. FRIES AND HIS TEAM DID. AND, OF COURSE, HE IS POINTING OUT SHAPES, BLOBS, SHADOWS.

OFFICER ADGAR DIDN'T DO THAT WHEN HE WAS ON THE STAND. YOU KNOW, THE VIDEOS ARE IN EVIDENCE. WE'RE NOT TAKING ISSUE WITH THAT.

BUT OFFICER ADGAR DIDN'T, YOU KNOW, IDENTIFY ALL OF THESE THINGS.

OFFICER ADGAR WASN'T PUTTING, YOU KNOW, THESE RED CIRCLES. THAT'S BEING DONE BY THE DEFENSE IN TERMS OF PRESENTING THEIR CLOSING ARGUMENT TO YOU.

AGAIN, IT'S ARGUMENT. BUT THAT'S WHAT IT IS, JUST AS WHAT I'M GIVING YOU HERE, IT'S ARGUMENT.

BUT THAT'S NOT WHAT YOU HEARD FROM OFFICER ADGAR. IT'S NOT WHAT YOU HEARD FROM MR. FRIES.

AND THE SAME GOES FOR MR. JOHNSON AND WHAT, YOU KNOW, HE THOUGHT HE SAW OR HOW HE SAW THE VIDEOS. AGAIN, MR. JOHNSON IS NOT A VIDEO FORENSIC ANALYST, SO HE DOES NOT HAVE THE BACKGROUND AND EXPERIENCE AND EDUCATION THAT MR. FRIES DOES.

THIS IS WHAT HE DOES. THIS IS HIS JOB. HE'S BEEN DOING THIS NOW FOR I THINK IT WAS OVER TEN YEARS. HE'S DONE THIS IN

ER0306

PLAINTIFF'S REBUTTAL ARGUMENT

THOUSANDS OF DIFFERENT CASES. THIS IS NOT SOME FRESH DOE-EYED PERSON WHO HAS NEVER DONE THIS BEFORE. HE'S AN EXPERIENCED INDIVIDUAL.

SO WHAT I WANT TO DO IS -- IF WE CAN BRING UP VIDEO -- IT WAS 100A.

AGAIN, I PLAYED THIS VIDEO FOR YOU EARLIER. THIS IS I THINK THE SURVEILLANCE CAM AND AGAIN WE SEE -- PAUSE RIGHT THERE. RIGHT THERE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER: YOU CAN SEE IN THE MIDDLE OF SCREEN, THAT'S MR. JOHNSON. YOU CAN SEE HIS HANDS BEHIND HIS HEAD. HE'S WALKING AWAY.

NOW, I'D LIKE YOU -- I'M GOING TO ASK YOU TO FOCUS INITIALLY ON -- YOU CAN SEE SORT OF THE PERSON IN THE WHITE SWEATSHIRT OR GREY SWEATSHIRT BEHIND THE PLANTER.

BUT FOCUS TO THE PERSON BEHIND HIM, THAT WOMAN, I THINK IT'S A WOMAN, AND YOU CAN PLAY THE VIDEO BACK, AND I BELIEVE THAT WAS THE PERSON IDENTIFIED BY MR. SYMPSON THAT HE THOUGHT OFFICER ADGAR WAS TRACKING. WATCH WHERE SHE GOES.

SHE GOES BACK TOWARDS THE SIDEWALK AND BACK TOWARDS THE STREET, NOT COMING FROM THAT TRAPEZOID AREA THAT OFFICER ADGAR HAD IDENTIFIED THE PERSON HE SAW THROW THE BOTTLE.

BY CONTRAST IF WE GO BACK TO THAT STARTING POINT AND WE SEE THE PERSON CROUCHING FROM BEHIND THE PLANTER THERE IN THE GREY, AND IF WE REWIND IT BACKWARDS, WHERE DO THEY COME FROM?

ER0307

AND IF WE COULD SEE AND GO BACKWARDS, THEY COME FROM MAYBE DIRECTLY OVER.  IT'S HARD TO TELL.  BUT, AGAIN, I'M NOT SURE NECESSARILY IF THAT'S THE PERSON EITHER.

SO LOOKING AT THIS, I'M NOT SURE IF EITHER OF THOSE TWO PEOPLE WERE THE PERSON THAT OFFICER ADGAR HAD SAID IS WHO HE HAD SEEN EARLIER AND THEN WAS ATTEMPTING, WAS TARGETING WHEN HE FIRED HIS 40 MILLIMETER PROJECTILE IMPACT WEAPON.

BUT I THINK IF WE NOW GO AND TAKE A LOOK AT EXHIBIT -- THE VIDEO IN EXHIBIT 108.

NOW OBVIOUSLY HERE WE GET A DIFFERENT PERSPECTIVE.

AGAIN, WHEN OFFICER ADGAR THERE IS ABOUT TO FIRE -- AND AS YOU HEARD FROM MR. SYMPSON, HE BELIEVES HE WAS TRACKING AND AIMING AT THIS PERSON WHO THREW THE BOTTLE.  LADIES AND GENTLEMEN, THE BOTTLE -- PUTTING ASIDE WHETHER -- AGAIN, I SUBMIT TO YOU THAT WASN'T THE PERSON WHO THREW THE BOTTLE BASED ON MR. FRIES'S TESTIMONY.

THAT BEING SAID, THE BOTTLE HAD ALREADY BEEN THROWN.  THAT PERSON WASN'T, WASN'T -- THERE'S NOTHING THAT SAYS THAT THAT PERSON WAS NOW HOLDING A BOTTLE.  THERE'S BEEN NO TESTIMONY THAT THAT PERSON WAS ABOUT TO THROW A BOTTLE.  THERE'S NO EVIDENCE THAT HE'S RUNNING TOWARDS OFFICERS WITH A BOTTLE IN HIS HAND.

THE BOTTLE HAS ALREADY BEEN THROWN.  SO I SUBMIT TO YOU WHAT'S THE THREAT?  WHY IS OFFICER ADGAR SHOOTING AT THIS PERSON?

ER0308

AND, YES, ONE OF THE CONDITIONS IS ARMED WITH A WEAPON LIKELY TO CAUSE SERIOUS BODILY INJURY OR DEATH.  WHERE IS THE WEAPON?

THE BOTTLE, AGAIN, IS GONE.  IT'S NOT IN HIS -- THIS IS THE PERSON WHO THREW IT BEFORE AND CAN'T BE HOLDING IT NOW.  OUT OF THE HAND ALREADY.

AND THE OTHER CONDITION, WHERE ITS USE IS LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED.  THEY'RE RUNNING AWAY.

AGAIN, NOT LOOKING TO THROW ANYTHING.  THERE'S NOTHING THAT SAYS THAT THEY WERE ABOUT TO THROW ANYTHING.  WHO ARE THEY ABOUT TO BE SERIOUSLY INJURED?

I SUBMIT TO YOU THERE WASN'T ANY.  THERE WAS NO REASON FOR OFFICER ADGAR TO BE FIRING HIS 40 MILLIMETER PROJECTILE IMPACT WEAPON AT THAT INDIVIDUAL AT THAT PARTICULAR TIME WHEN IT STRUCK MR. JOHNSON.

AND AS SUCH, YES, HIS SHOOTING WAS INDISCRIMINATE.  IT SHOWED A LACK OF CARE.  IT SHOWED A LACK OF JUDGMENT.  IT SHOWED A LACK OF CONCERN FOR THE OTHER INDIVIDUALS IN THE PLAZA AT THAT TIME.  IT WAS CONTRARY TO POLICY.  IT WAS CONTRARY TO POST STANDARDS.

AGAIN, WE TALK ABOUT TOTALITY OF THE CIRCUMSTANCES.  AND IF WE CAN PUT UP INSTRUCTION 33 WHICH TALKS ABOUT EXCESSIVE FORCE AND TALKS ABOUT THE CIRCUMSTANCES.

THESE ARE THE CIRCUMSTANCES THAT YOU HAVE TO CONSIDER AS

ER0309

INSTRUCTED BY THE JUDGE YESTERDAY.  THIS IS THE LAW.

AS YOU WILL SEE WHEN THEY GET UP THERE, AND PARTICULARLY THE FIRST THREE -- YOU KNOW, THERE'S EIGHT CIRCUMSTANCES.  AND OF COURSE, AS IT SAYS, YOU ARE TO CONSIDER ALL OF THEM.  BUT IN PARTICULAR I WANT TO FOCUS ON THE FIRST THREE:  THE NATURE OF THE CRIME, AGAIN, AT THAT POINT, AND OTHER CIRCUMSTANCES KNOWN TO THE OFFICERS.  AS WE SAW THE VIDEO, THE CROWD IS RUNNING AWAY FROM HIM.  NO ONE IS RUNNING TOWARD HIM AND NO ONE IS THROWING ANYTHING IN HIS DIRECTION.

HE'S NOT FIRING TO OFFICERS OR ANYBODY OVER BY 4TH AND SANTA CLARA TO THE EXTENT THERE WERE INDIVIDUALS THROWING BOTTLES OVER THERE.  THAT'S NOT WHERE HE'S SHOOTING AT.  HE'S SHOOTING IN HIS FORWARD DIRECTION.

AGAIN, WAS THERE AN IMMEDIATE THREAT TO THE SAFETY OF OFFICERS OR TO OTHERS?

TO THE EXTENT THAT THERE WAS A THREAT TO OFFICERS DOWN THE STREET, NOT WHERE OFFICER ADGAR WAS FIRING.

IN FRONT OF HIM THERE WAS NO IMMEDIATE THREAT.  THE BOTTLE WAS ALREADY THROWN.  PEOPLE WERE RUNNING AWAY.  THERE'S NOBODY MAKING ANY THROWING MOTIONS IN OFFICER ADGAR'S DIRECTION AT THIS TIME.

AND AGAIN, THE AMOUNT OF TIME THAT HE HAD TO DETERMINE THE AMOUNT OF FORCE THAT WAS NECESSARY AND CHANGING CIRCUMSTANCES.

WELL, I WOULD SUBMIT, LADIES AND GENTLEMEN, IF THE PERSON NO LONGER HAD A BOTTLE IN THEIR HAND, THE CIRCUMSTANCES HAD

ER0310

CHANGED.

IF THIS WAS DIFFERENT, IF THE PERSON WAS ABOUT TO THROW -- HE SAW THE BOTTLE AND HE FIRED, THAT WOULD BE ONE THING. THAT'S NOT WHAT THE EVIDENCE IS.  THAT IS NOT WHAT THE TESTIMONY HAS BEEN.

AS I SAID, THE BOTTLE HAS ALREADY BEEN THROWN AT THIS POINT.  SO, YES, IN THIS CASE CONSIDERING ALL OF THE CIRCUMSTANCES, I SUBMIT TO YOU IT WAS AN EXCESSIVE USE OF FORCE.  HE WAS FIRING INDISCRIMINATELY, AND THAT'S WHY YOU SHOULD FIND FOR MR. JOHNSON ON THAT PARTICULAR CAUSE OF ACTION.

I DO WANT TO ADDRESS THE BATTERY AND THE NEGLIGENCE.  I DO AGREE WITH MR. SYMPSON THAT WHEN IT COMES TO THE CONSTITUTIONAL CLAIMS, FOURTH AMENDMENT VIOLATIONS, THE FIRST AMENDMENT VIOLATIONS, AND ALSO THE BANE ACT, INDISCRIMINATE USE OF FORCE, THAT IS THE ARGUMENT HERE.  I AGREE WITH HIM ON THAT.

THAT IS NOT THE LAW FOR BATTERY AND NEGLIGENCE.  SO THOSE ARE NOT CONSTITUTIONAL BASED CLAIMS.

SO THE INDISCRIMINATE USE OF FORCE, THAT'S NOT THE STANDARD HERE, AND THAT'S NOT WHAT THE INSTRUCTIONS WERE EITHER, LADIES AND GENTLEMEN.

AND IF WE CAN PUT UP THE INSTRUCTION FOR BATTERY, WHICH IS INSTRUCTION NUMBER 36.

BRING IN THE TOP FOUR OR FIVE THAT HAVE TO BE PROVEN.

THERE WE GO.  JAMES ADGAR INTENTIONALLY TOUCHED OR CAUSED TO BE TOUCHED KYLE JOHNSON.

ER0311

PLAINTIFF'S REBUTTAL ARGUMENT

BUT NUMBER 2, HE USED UNREASONABLE FORCE.  THE WORD "INDISCRIMINATE" WHEN IT COMES TO THIS PARTICULAR CLAIM AND NOT A CONSTITUTIONAL CLAIM, NOT PART OF THE INSTRUCTION, NOT PART OF THE QUESTIONS THAT YOU'LL BE ASKED ON THE VERDICT FORM.

SO THE INDISCRIMINATE ISSUE, YES, WHEN IT COMES TO EXCESSIVE FORCE, WHEN IT COMES TO THE UNLAWFUL SEIZURE, WHEN IT COMES TO THE FIRST AMENDMENT RETALIATION, WHEN IT COMES TO WHETHER THE CITY SHOULD ALSO BE RESPONSIBLE FOR OFFICER ADGAR'S ACTIONS AND WE'RE TALKING ABOUT INDISCRIMINATE, I AGREE, THAT'S WHAT YOU'VE BEEN INSTRUCTED ON AND THAT'S THE LAW.  THAT'S NOT WHAT IT IS FOR BATTERY.

DON'T GET THOSE TWO CONFUSED.  DON'T APPLY ONE STANDARD TO ALL OF THOSE CLAIMS.  THAT'S NOT WHAT YOU'RE BEING ASKED TO DO HERE.

AND AGAIN, THAT'S THE SAME FOR NEGLIGENCE.

AND IF WE CAN PUT UP THE NEGLIGENCE VERDICT FORM, AND THAT BEING PAGE 9.  AND IF WE CAN JUST BRING IN JUST FOR THAT FIRST QUESTION.  DID THE PLAINTIFF, DID MR. JOHNSON PROVE BY A PREPONDERANCE OF THE EVIDENCE -- AGAIN, YOU'LL SEE THAT THROUGHOUT THE VERDICT FORM, I'M REMINDING YOU OF THE STANDARD OF PROOF -- THAT JAMES ADGAR NEGLIGENTLY SHOT, NEGLIGENTLY SHOT?

AGAIN, NOTHING ABOUT INDISCRIMINATE SHOOTING WITH RESPECT TO NEGLIGENCE.  DID HE SHOOT NEGLIGENTLY?  DID HE FAIL TO EXERCISE THE PROPER STANDARD OF CARE?

ER0312

PLAINTIFF'S REBUTTAL ARGUMENT

AND AGAIN, I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT THE PROPER STANDARD OF CARE WAS THE DUTY MANUAL THAT TOLD OFFICERS HOW THEY'RE TO USE THE 40 MILLIMETER WEAPON, HOW IT SHOULD BE USED IN SITUATIONS INVOLVING USE OF FORCE, WHEN IT CAN AND CANNOT BE USED FOR CROWD CONTROL.

HE DID NOT COMPLY -- AND HE SAID HE TESTIFIED HE WAS AWARE AND HE WAS TRAINED IN ALL OF THIS AND HE KNEW ALL OF THIS.  HE DID NOT FOLLOW THOSE STANDARDS.  HE ACTED IN A NEGLIGENT MANNER AND AS A RESULT OF THAT NEGLIGENT ACTION MR. JOHNSON WAS INJURED.

AND I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT A REASONABLY CAREFUL PERSON SEEING SOMEONE RUNNING AWAY, NO WEAPON, NOT CHARGING AT THEM, FLEEING THE SCENE, KNOWING WHAT THEY KNEW ABOUT TRAINING AND THE USE OF THESE WEAPONS AND THEIR PROPER USE WOULD NOT HAVE FIRED IN THAT CIRCUMSTANCE AND THUS HIS ACTIONS WERE NEGLIGENT.

WITH RESPECT TO DAMAGES, YOU HEARD, LADIES AND GENTLEMEN, INSURANCE IS NOT FOR YOU TO CONSIDER.  THE TESTIMONY WAS THAT MR. JOHNSON HAD $50,000 IN COSTS AND PAST MEDICAL DAMAGES. THAT'S THE DAMAGES.

OF COURSE, YOU HEARD MR. SYMPSON TALK ABOUT THE DATE THAT THOSE COSTS WERE COMPILED TO.

WELL, AS TO THE FUTURE MEDICAL DAMAGES, THE FUTURE MEDICAL DAMAGES, OF COURSE, WERE COMPILED BACK THEN AS WELL.  THEY WERE RUNNING BACK WHEN DR. ALLMAN, AS SHE SAID, COMPILED HER REPORT,

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 20, 2025

ER0314