No: 25-1392 and 25-5468

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KYLE JOHNSON,

        Plaintiff-Appellee

        v.

JAMES ADGAR,

        Defendant-Appellant

NO. 25-1392 and 25-5468
Consolidated

D.C. No: 5:21-cv-01849-BLF
Northern District of California,
San Jose Division

**Appellant's Excerpts of Record**

**Volume 3 of 3**

On Appeal from the United States District Court
for the Northern District of California (San Jose)
No. 5:21-cv-01849-BLF
Hon. Beth Labson Freeman

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
MALGORZATA LASKOWSKA, Senior Deputy City Attorney (187252)
BRIAN P. EGGLESTON, Senior Deputy City Attorney (289309)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Margo.Laskowska@sanjoseca.gov;
Brian.Eggleston@sanjoseca.gov

Attorneys for James Adgar

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

        PLAINTIFF,               CASE NO.  CV-21-01849 BLF

   VS.                      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 7, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 3
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,           PAGES 221 - 467

        DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                   BY:  ABIMAEL BASTIDA
                      MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0316

Q.   AND BASED ON YOUR UNDERSTANDING OF THE LASER SCAN HERE, WHAT IS THE INTERSECTION RIGHT HERE THAT IS ON THE SCREEN?

A.   I'M HORRIBLE WITH THE NAMES OF THIS INTERSECTION.  IT'S THE INTERSECTION FROM ALL OF THE POLICE OFFICER'S STANDPOINT OF VIEW, IT'S THE INTERSECTION TO THE RIGHT OF THEM, AND IT'S ALSO TO THE FAR LEFT IN THE SECURITY FOOTAGE.

THE NAME ESCAPES ME.  IF YOU CAN HELP ME OUT.

Q.   YEAH.  THE SANTA CLARA AND 4TH STREET.  DOES THAT SOUND --

A.   YEAH, THAT'S DEFINITELY -- THE MAIN STREET IS SANTA CLARA AND THEN ON THAT SIDE OF THE BUILDING IT WOULD BE 4TH STREET.

Q.   OKAY.  YOU DON'T LIVE HERE IN SAN JOSE, DO YOU, MR. FRIES?

A.   SADLY, I AM NOT SURE I COULD AFFORD SAN JOSE.

Q.   OKAY.  LET'S GO TO THE NEXT SLIDE, PLEASE.

NOW, CAN YOU EXPLAIN TO THE JURORS HERE WHAT IT IS THAT THIS PART OF THE ANALYSIS IS IN TERMS OF THE STEP RELATED TO TRACKING?

A.   SURE.  SO WE COULD SEE IN MULTIPLE VIDEOS, MULTIPLE VIDEOS WE CAN SEE THOSE BOTTLES BEING THROWN IN THE AREA.

AND SO WHAT WE DO IS WE CAN 3 DIMENSIONALLY TRACK THEIR LOCATIONS.

SO ON THIS SLIDE YOU CAN SEE IN THE UPPER RIGHT-HAND CORNER IT SAYS BOTTLE ORIGIN.

NOW, LET ME BE CLEAR, THERE ARE MULTIPLE BOTTLES BEING THROWN, SO THERE'S NOT ONE ORIGIN LOCATION.

THIS JUST HAPPENS TO BE -- ONE OF THE BOTTLES THROWN --

ER0317

THIS HAPPENS TO BE THE ORIGIN OF ONE OF THE BOTTLES THROWN, AND WE DO EACH BOTTLE INDIVIDUALLY, ONE AT A TIME.

THIS IS JUST AN EXAMPLE OF ONE OF THE BOTTLE'S ORIGINS, AND THEN IN THE LOWER RIGHT-HAND CORNER YOU SEE BOTTLE HITS. THESE ARE THE LOCATIONS CAUGHT ON CAMERA WHERE YOU SEE THOSE BOTTLES HIT THE GROUND AND START TO SPLASH.

Q.   OKAY.  CAN YOU SCROLL OVER TO THE LEFT-HAND SIDE, MR. DANG.  KEEP GOING.  KEEP GOING.  RIGHT THERE.

CAN YOU EXPLAIN TO US THE SIGNIFICANCE OF THE SCREEN GRABS AT THIS TIME, MR. FRIES?

A.   SURE.  IT'S NICE THAT YOU HAVE THE ABILITY TO ZOOM IN.  SO IF YOU COULD, WHY DON'T YOU ZOOM IN ON THOSE.

IT'S HARD TO TELL, BUT YOU CAN SEE IN THAT FIRST ONE, YOU SEE THE SCREEN PLUS SIGN FOR LACK OF A BETTER TERM.  THAT IS TRACKING A BOTTLE, AND THAT'S A STILL IMAGE THAT YOU CAN SEE. IT'S RIGHT THERE.

THEN IN THE SECOND ONE BELOW THAT YOU START TO SEE TWO PLUSES, A GREEN ONE AND A REDDISH ONE.  THOSE ARE TWO MORE.

AND THEN WE TRACK IT EVEN FURTHER IN THE BOTTOM ONE.  SO YOU CAN SEE THAT ONE.  THERE'S A BROWN ONE BEING THROWN AND IN THE MIDDLE ONE THERE'S ACTUALLY THREE.  THERE'S A RED ONE, A BROWN ONE, AND A GREEN ONE.

SO IN OUR SOFTWARE IT'S QUITE EASY, ESPECIALLY WITH SO MANY CAMERAS.  WE CAN TRACK THE LOCATIONS OF GENERALLY WHERE THEY CAME FROM AND GENERALLY WHERE THEY HIT.

ER0318

Q.   AND ARE YOU ABLE TO DETERMINE THAT TO A REASONABLE DEGREE OF TECHNICAL CERTAINTY?

A.   OH, MOST DEFINITELY.

YOU KNOW, ONCE, ONCE YOU HAVE ALL OF THESE CAMERAS TRACKED PROPERLY, IT'S A VERY SIMPLE PROCESS TO DO 3 DIMENSIONAL TRACKING.

AS A MATTER OF FACT, OUR CELL PHONES, YOU KNOW, IPHONES AND OTHER THINGS, CAN ACTUALLY DO 3 DIMENSIONAL TRACKING, YOU KNOW, ON THE FLY.

SO ONCE YOU GET TO THIS POINT, TRACKING SOMETHING 3 DIMENSIONALLY IS CHILD'S PLAY.

Q.   OKAY.   ONE OTHER QUESTION REGARDING THIS SLIDE.

THE THREE COLORED MARKERS THAT YOU JUST TESTIFIED ABOUT IN THE THREE SCREEN GRABS ON THE LEFT, BASED ON YOUR ANALYSIS, IT IS YOUR OPINION THAT THEY ALL CAME FROM -- ON THIS --

THE COURT:   LET THE WITNESS STATE HIS OPINION.

MR. BASTIDA:   SURE.

Q.   THE THREE -- THE COLORED MARKERS REGARDING THE PROJECTILES IN MID AIR --

A.   UH-HUH.

Q.   -- WHERE IS IT THAT THEY CAME FROM REGARDING YOUR ANALYSIS?

A.   SURE.   SO REGARDING OUR ANALYSIS, THEY DIDN'T ALL COME FROM ONE LOCATION, BUT THEY DID COME FROM WHAT I WOULD CALL A QUADRANT.   THEY ALL CAME FROM I WOULD SAY THE NORTHEAST

ER0319

QUADRANT OF SANTA CLARA AND EAST 4TH STREET.

ONE OF THE THINGS YOU CAN LOOK AT ON THE MAIN IMAGE.  IF YOU CAN KIND OF ZOOM IN ON THE MAIN IMAGE.  PERFECT.

YOU WILL NOTICE THAT THIS IS -- AGAIN, WHAT WE'RE LOOKING AT IS THE LASER SCAN DATA TOP DOWN.  YOU SEE ALL OF THE CIRCLES.  THOSE ARE ALL OF THE LOCATIONS WHERE THE SCANNER WAS LOCATED.

YOU CAN SEE THE LASER SCAN THE OUTLINE OF THIS VERY LARGE STRUCTURE THAT IS A SEMI CIRCLE RIGHT IN THE MIDDLE.

ONE THING WE KNOW FROM ALL OF THE VIDEOS IS ALL OF THE BOTTLES CAME FROM ESSENTIALLY EAST OF THAT STRUCTURE AND, YOU KNOW, SO IN THAT GENERAL AREA EAST OF THAT STRUCTURE.

WE DEFINITELY KNOW SOME OF THE BOTTLES CAME FROM THE GREEN AREA THAT WE MARKED HERE, AND THEN THERE'S ALSO A COUPLE OF BOTTLES THAT CAME JUST SLIGHTLY WEST OF THOSE AND SLIGHTLY SOUTH OF THOSE, BUT THOSE ARE THE TWO MAIN LOCATIONS WHERE ALL OF THE BOTTLES CAME FROM.

Q.    AND IN TERMS OF TIME, WHAT TIME PERIOD ARE WE TALKING ABOUT HERE?

A.    I MEAN, THIS ALL HAPPENS IN A MATTER OF A FEW SECONDS, THE BOTTLES BEING THROWN.

I KNOW THERE WERE SOME BOTTLES THROWN LIKE 10 MINUTES BEFORE THIS WHOLE INCIDENT, BUT WE REALLY FOCUSSED ON THE BOTTLE THROWING THAT HAPPENED THAT INSTIGATED MULTIPLE OFFICERS FIRING INTO THE CROWD.

ER0320

THE COURT: CAN YOU SPECIFY THE TIME THAT YOU'RE REFERRING TO?

THE WITNESS: CAN YOU SAY THAT AGAIN, YOUR HONOR.

THE COURT: CAN YOU SPECIFY THE TIME THAT YOU'RE REFERRING TO?

THE WITNESS: OH, I MEAN, IT'S -- THE TIMEFRAME IS LIKE -- IS ON THE DAY OF, WHICH I BELIEVE IS MAY 30TH.

THE COURT: I'M SORRY, THE EXACT HOUR AND MINUTE? I WOULD PREFER THE SECOND AS WELL.

THE WITNESS: SURE, YOUR HONOR. THE ONE CHALLENGE IS THAT MEANS THAT I HAVE TO BELIEVE THE TIME STAMP ON THESE BODY WORN CAMERAS ARE ACCURATE, AND I CAN'T.

THE COURT: OKAY. THANK YOU.

THE WITNESS: I CAN'T VERIFY THAT THEY'RE ACCURATE.

I CAN TELL YOU THAT THE TIME STAMP THAT WE USE HAVE THESE EVENTS HAPPENING AROUND 22:33:08, :09, IN THAT TIMEFRAME.

THE COURT: THANK YOU.

BY MR. BASTIDA:

Q. OKAY. YOUR WORK, MR. FRIES, DID IT ALLOW YOU ALSO TO DETERMINE THE LOCATION OF MR. JOHNSON?

A. YES, WE WERE ABLE TO TRACK MR. JOHNSON THROUGHOUT THE VIDEO, AND HE WAS EASY TO SPOT. AND ONCE WE SPOT HIM, WE WERE ABLE TO TRACK HIM THROUGHOUT THE ENTIRE INCIDENT.

Q. OKAY. GO TO THE NEXT SLIDE, PLEASE.

CAN YOU DESCRIBE WHAT THIS SCREEN IS DEMONSTRATING IN

ER0321

FRIES DIRECT BY MR. BASTIDA

TERMS OF WHAT STEP IN YOUR ANALYSIS YOU ARE?

A.   SURE.   AGAIN, ON THE LEFT-HAND SIDE OF THE CAMERA ARE STILLS THAT WE USED THAT ARE TRACKING THE 3 DIMENSIONAL LOCATION OF THESE PROJECTILES.

AND THEN ON THE MIDDLE SCREEN YOU SEE FROM THE SECURITY CAMERA OFF THE BUILDING, YOU SEE THREE SQUARES.   THOSE ARE THE LOCATIONS WHERE THOSE THREE BOTTLES THAT WE TRACKED IN THE SKY, THOSE ARE THE LOCATIONS OF WHERE THEY LANDED BEHIND -- YOU CAN SEE THAT THEY LANDED BEHIND SEVERAL OFFICERS OVER IN THE NORTHEAST QUADRANT.

ONE OF THE THINGS THAT WE DID NOTICE IS THE AREA WHERE OFFICER ADGAR WAS IN RELATIONSHIP TO WHERE THOSE WATER BOTTLES LANDED, THEY'RE ABOUT 90 FEET EAST.

Q.   AND THOSE ARE THE SAME WATER BOTTLES THAT WE WERE JUST DISCUSSING IN THE PREVIOUS SLIDE REGARDING 10:33:08?

A.   CORRECT.

Q.   OKAY.   WERE YOU ABLE TO TRACK THE LOCATION OF THE POLICE OFFICERS AT AROUND THIS TIME AT 10:33:08?

A.   YES, BECAUSE THE OFFICERS WERE CAPTURED NOT ONLY ON SECURITY CAMERAS, BUT MANY OF THE OFFICERS WERE WEARING BODY WORN CAMERAS THAT EITHER CAPTURED THEIR OWN MOVEMENTS OR CAPTURED MOVEMENTS OF THE OFFICERS TO THE LEFT OR RIGHT OF THEM.

Q.   BEFORE I MOVE ON FROM THIS SLIDE, BASED ON ALL OF THE FORENSIC VIDEO ANALYSIS YOU DID, FORENSIC VIDEO ANALYSIS, OTHER

ER0322

THAN THE BOTTLES THAT YOU DESCRIBED, AT THE TIMEFRAME OF 10:33:08, WERE THERE ANY OTHER BOTTLES CAPTURED DURING THE ANALYSIS THAT YOU PERFORMED OTHER THAN WHAT WE DISCUSSED?

A.   NO, THERE WAS A VOLLEY OF BOTTLES FOR A SHORT PERIOD OF TIME, AND THOSE ARE THE ONLY ONES THAT WERE TRACKED.

Q.   OKAY.  MR. JOHNSON WAS NOT WEARING A BODY WORN CAMERA AT THE TIME.  HOW ARE YOU ABLE TO TRACK HIM?

MR. SYMPSON:  OBJECTION TO THE FORM OF THE QUESTION.

THE COURT:  SUSTAINED.  NOT IN EVIDENCE.

BY MR. BASTIDA:

Q.   OH, LET ME BACK UP.  DID YOUR VIDEO ANALYSIS ALLOW YOU TO TRACK MR. JOHNSON'S POSITION?

A.   YES.  MR. JOHNSON WAS ABLE TO BE TRACKED NOT ONLY IN THE SECURITY CAMERA -- THERE ARE SEVERAL SECURITY CAMERAS ON THE FOOTAGE, BUT WE WERE ABLE TO TRACK MR. JOHNSON THROUGH THE BODY WORN CAMERAS AS WELL.

Q.   AND IS THAT THROUGH THE SAME FORENSIC VIDEO ANALYSIS THAT YOU'VE TESTIFIED?

A.   YES.

Q.   GO TO THE NEXT SLIDE.

WE HAVE HERE IN FRONT OF US VIDEO FOOTAGE FROM OFFICER THOMPSON.  CAN YOU EXPLAIN THE MARKINGS BOTH ON THE TOP LEFT AND TOP RIGHT SCREEN?

A.   SURE.

MR. SYMPSON:  OBJECT TO LACK OF PROPER FOUNDATION IN

ER0323

TERMS OF IDENTIFYING THE VIDEOS HERE.

THE COURT:  DO YOU NEED HIM TO RESTATE THAT?

MR. SYMPSON:  YES.  I'M OBJECTING LACK OF FOUNDATION IN TERMS OF DESCRIBING THE VIDEOS THERE AS OFFICER THOMPSON'S.

THE COURT:  OKAY.  WHY DON'T YOU LAY A FOUNDATION.

MR. BASTIDA:  OKAY.

Q.   DO YOU SEE, MR. FRIES, THAT THIS IS A SCREEN GRAB FROM A BODY WORN CAMERA ON THE TOP LEFT HAND OF THE SCREEN?

A.   YES, IT IS.

Q.   OKAY.  AND DESCRIBE WHAT IT IS THAT YOUR ANALYSIS IS CAPTURING AT THIS MOMENT?

A.   SURE.  SO A BODY WORN CAMERA THAT WAS GIVEN TO US, AND WE WERE INFORMED THAT IT WAS BEING WORN BY OFFICER THOMPSON.  WE UNDISTORTED THE VIDEO THAT IS IN THE UPPER LEFT-HAND CORNER.

AND OFFICER THOMPSON CAPTURED ON HIS OWN BODY WORN CAMERA THE SHOOTING OF HIS 40 MILLIMETER CANNISTER.

SO HIS OWN BODY WORN CAMERA TELLS US THAT HE SHOT AT THIS TIME.

IN THE UPPER RIGHT-HAND CORNER IS SECURITY FOOTAGE STILL FROM THE VIDEO THAT IS ON THE SIDE OF THE BUILDING.  THAT ALSO CAPTURES THE LOCATIONS OF OFFICER THOMPSON.

NOW, THE LOWER LEFT-HAND CORNER IS TOP DOWN OVER LASER SCAN SHOWS THE LOCATION OF OFFICER THOMPSON.

NOW, BECAUSE OUR WORLD AND THE REAL WORLD ARE IDENTICAL, IT'S REALLY EASY FOR US TO PUT A 3D MODEL MARKER OF WHERE

ER0324

FRIES DIRECT BY MR. BASTIDA

OFFICER THOMPSON IS STANDING.

IT'S CLEAR AS DAY THAT WE SEE HIM IN MULTIPLE CAMERA VIEWS.  SO WE KNOW HIS LOCATION.  WE KNOW WHEN HE SHOT BECAUSE HIS OWN BODY WORN CAMERA CAPTURED HIM SHOOTING, AND WE CAN TRACK THE LOCATION WHERE OFFICER THOMPSON IS POINTING TO, AND IN THIS CASE OUR ANALYSIS DEMONSTRATES THAT OFFICER THOMPSON IS FIRING HIS WEAPON INTO THAT NORTHEAST QUADRANT THAT WE DISCUSSED EARLIER WHERE THE BOTTLES WERE BEING THROWN FROM.

Q.   AND IN THAT SAME ANALYSIS, THE LOWER LEFT-HAND CORNER IS THE 3D SCAN TOP DOWN VIEW, IS THAT WHAT YOUR ANALYSIS HAS PROVIDED IN TERMS OF OFFICER THOMPSON'S LOCATION WITH RESPECT TO MR. JOHNSON'S LOCATION?

A.   CORRECT.  SO WHAT WE'RE DEMONSTRATING IN THE LOWER RIGHT-HAND CORNER IS WE CAN SEE KYLE JOHNSON'S LOCATION, AND WE CAN ALSO SEE WHERE OFFICER THOMPSON IS, AND WE CAN ALSO SEE WHEN OFFICER THOMPSON IS FIRING.  SO WE LEARN A LOT FROM THIS.

ONE, WE LEARN THAT OFFICER THOMPSON ISN'T FIRING TOWARDS MR. JOHNSON, AND WE CAN TRACK THE 3D LOCATION WHERE OFFICER THOMPSON IS FIRING, AND HE'S FIRING IN THE NORTHEAST QUADRANT WHILE KYLE IN THIS SITUATION, I WOULD SAY HE'S IN THE, YOU KNOW, WEST QUADRANT OR SOUTHWEST QUADRANT.

Q.   OKAY.  AND YOUR ANALYSIS, DID IT ALLOW YOU TO DETERMINE THE APPROXIMATE DISTANCE BETWEEN OFFICER KOSKA -- EXCUSE ME, OFFICER THOMPSON AND MR. JOHNSON AT THIS PRECISE MOMENT?

A.   YEAH.  AND AT THIS POINT IN TIME THEY ARE APPROXIMATELY

ER0325

74 FEET AWAY FROM EACH OTHER, PLUS OR MINUS HOW YOU'RE MEASURING.

SO IT'S JUST NICE TO KNOW THAT THEY'RE NOT VERY CLOSE TO EACH OTHER.

Q.   DID YOU RECEIVE AND ANALYZE IN YOUR WORK IN THIS CASE BODY WORN CAMERA FOOTAGE FROM OTHER OFFICERS AT THIS TIMEFRAME OF 10:33:08?

A.   YES, WE RECEIVED A LOT OF BODY WORN CAMERAS AT THIS TIME.

Q.   GO TO THE NEXT SLIDE.

DID YOU RECEIVE BODY WORN CAMERA FOOTAGE IDENTIFIED AS THAT BELONGING TO OFFICER KOSKA?

A.   YES.

Q.   AND IS WHAT IS ON THE SCREEN YOUR UNDERSTANDING OF OFFICER KOSKA'S BODY WORN CAMERA FOOTAGE AT 10:33?

A.   YES.  AND WHAT WE CAN SEE IS THE MUZZLE BLAST OF OFFICER KOSKA FIRING HIS WEAPON.

Q.   SO DID YOU PERFORM THIS SAME ANALYSIS THAT YOU DID WITH RESPECT TO OFFICER THOMPSON TO OFFICER KOSKA'S BODY WORN CAMERA?

A.   YES, WE DID THE SAME ANALYSIS, 3 DIMENSIONAL TRACKING, AND OFFICER KOSKA IS POINTING HIS GUN -- EXCUSE ME, HIS WEAPON IN THE NORTHEAST QUADRANT WHERE BOTTLES ARE BEING THROWN FROM, WHILE KYLE'S POSITION IS, AGAIN, ABOUT 80 FEET AWAY FROM HIM TO HIS WEST.

Q.   OKAY.  LET'S GO TO THE NEXT SLIDE, PLEASE.

ER0326

FRIES DIRECT BY MR. BASTIDA

DID YOU ALSO RECEIVE BODY WORN CAMERA FOOTAGE IDENTIFIED FROM OFFICER -- I'M SORRY, I SKIPPED A SLIDE.

I WANT TO IDENTIFY ON THE RIGHT-HAND SIDE, THIS IS -- THE GREEN MARKER IS OFFICER KOSKA, AND YOU'VE IDENTIFIED MR. JOHNSON'S POSITION AT THE TIME THAT OFFICER KOSKA FIRED HIS WEAPON?

A.   YEAH.  SO OFFICER KOSKA FIRED TWICE.  SO THE FIRST IMAGE WE SHOWED YOU WAS HIS FIRST SHOT, AND THIS IS HIS SECOND SHOT.

OFFICER KOSKA, YOU KNOW, THOSE TWO SHOTS ARE PRETTY CLOSE TO EACH OTHER, AND SO OFFICER KOSKA'S POSITION DOESN'T REALLY CHANGE DURING THESE TWO SHOTS AND THE LOCATION THAT HE'S ALSO FIRING INTO ALSO DOESN'T CHANGE BETWEEN THESE TWO SHOTS.

Q.   DID MR. JOHNSON'S POSITION CHANGE?

A.   HE'S CHANGED IT SLIGHTLY.  HE'S MOVED VERY SLIGHTLY.

YOU CAN SEE, YOU KNOW, IT APPEARS THAT WHEN SHOTS ARE STARTING TO BE FIRED, PEOPLE IN THE CROWD ARE STARTING TO RESPOND TO THAT, AND YOU CAN SEE MR. JOHNSON TURN AND START TO WALK AWAY AT THIS POINT.

Q.   OKAY.  OKAY.  NOW I'LL MOVE TO ANOTHER OFFICER, OFFICER MORALES.  DID YOU RECEIVE BODY WORN CAMERA FOOTAGE OF OFFICER MORALES?

A.   I DID.

Q.   DID YOU PERFORM THE SAME ANALYSIS AS THE OTHER TWO?

A.   YEAH, WE DID THE SAME ANALYSIS AND SO WITH OFFICER MORALES WHO ALSO SHOT TWICE, ONE OF THE QUESTIONS WAS IS IT POSSIBLE

ER0327

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 8, 2025

ER0328

710

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

        PLAINTIFF,              CASE NO.  CV-21-01849 BLF

   VS.                      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 10, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 5
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,            PAGES 710 - 965

      DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

  FOR THE PLAINTIFF:   MCMANIS FAULKNER
                    BY:  ABIMAEL BASTIDA
                      MATTHEW SCHECHTER
                  10TH FLOOR
                  50 WEST SAN FERNANDO STREET
                  SAN JOSE, CALIFORNIA 95113


      (APPEARANCES CONTINUED ON THE NEXT PAGE.)


  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0329

POLICE PRACTICES CONSULTANT, REVIEWED OR STUDIED MATERIALS REGARDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

MR. JOHNSON:  I'M SORRY.  THE QUESTION IS STILL COMPOUND.

THE COURT:  I'LL LET THAT GO.  I THINK THAT'S CLOSE ENOUGH.

THE WITNESS:  YES.

BY MR. SCHECHTER:

Q.   AND IS THAT SOMETHING THAT YOU HAVE BEEN CONTINUING TO STUDY SINCE THE TIME YOU LEFT --

THE COURT:  COULD WE FOUND OUT WHAT THEY ARE.  I WANT THE CONTOURS OF IT.  THE "YES" IS NOT GOING TO GET YOU TO A FOUNDATION.

WHAT HAVE YOU STUDIED AND WHEN HAVE YOU STUDIED IT?

THE WITNESS:  SO, YOUR HONOR, THIS IS A WEAPON ALONG WITH AN EXAMPLE WOULD BE THE TASER THAT HAS DEVELOPED AS A REFINEMENT FOR A TOOL FOR POLICE.

THE COURT:  NO, NO.  WHAT HAVE YOU STUDIED?  WHAT BOOKS HAVE YOU STUDIED?  WHAT LECTURES DID YOU ATTEND?  WHEN WERE THEY?

THE WITNESS:  I'VE GOT IT.  SO THE IACP LECTURES ALWAYS HAVE SECTIONS, AND THEY HAVE VENUES FOR THE 40 MILLIMETER.

THE POLICIES OF THE DEPARTMENTS THAT HAVE EVOLVED, IN PARTICULAR LAPD WHICH HAS BEEN A LEADER, I HAVE FOLLOWED THE

ER0330

DEVELOPMENT, THE ACCEPTANCE, AND THE RESTRICTIONS, ET CETERA, FOR THE 40 MILLIMETER, NOT ONLY WITH THEM BUT MY OWN DEPARTMENT AS WELL AS OTHER DEPARTMENTS THROUGHOUT THE NATION.

AND THERE'S BEEN NO BOOK ON THE 40 MILLIMETER THAT I'M AWARE OF THAT I HAVE READ, BUT THE POLICY MANUALS AND THE TRAINING MATERIAL FOR THE 40 MILLIMETER WHICH ARE TYPICALLY FIVE OR SIX PAGES.

BY MR. SCHECHTER:

Q.   AND I THINK YOU HAVE INDICATED -- YOU SAID THERE ARE PRESENTATIONS ON THE 40 MILLIMETER AT THE POLICE COMMISSIONER'S CONVENTION?

A.   YES, INCLUDING THERE HAVE BEEN DEMONSTRATIONS.

Q.   AND ARE THOSE LECTURES AND DEMONSTRATIONS HELD EVERY YEAR?

A.   THERE'S ALWAYS, IN MY EXPERIENCE, SINCE THE 40 MILLIMETER WAS INTRODUCED INTO THE PROFESSION, THERE HAS ALWAYS BEEN VENUES FOR THE 40 MILLIMETER.

Q.   OKAY.

A.   AND ITS AMMUNITION.

Q.   AND HAVE YOU PERSONALLY ATTENDED LECTURES, PRESENTATIONS -- LET ME START AND BACK UP.

HAVE YOU PERSONALLY ATTENDED LECTURES AT THIS CONVENTION WHERE THE USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON WAS DISCUSSED?

A.   YES.

Q.   HOW MANY TIMES?

ER0331

A.   WELL, EVERY TIME I GO.  THAT'S ONE OF THE WEAPONS I WANT TO SEE AND LEARN ABOUT BECAUSE IT'S CONTINUALLY BEING REFINED AND IMPROVED AND THE AMMUNITION IS A WIDE VARIETY NOW.

SO THAT'S ALWAYS A KEY POINT OF INTEREST.  AND THERE ARE SOME OTHER TOOLS THAT ARE EVOLVING THAT ARE GOING TO BE EVIDENT VERY SOON IN MY OPINION.

Q.   AND A SIMILAR QUESTION.  IN ATTENDING THIS CONVENTION, HAVE YOU BEEN PRESENT FOR DEMONSTRATIONS FOR THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

A.   YES.

Q.   AND AGAIN, IS THAT SOMETHING THAT YOU ATTEND -- OR OBSERVE THESE DEMONSTRATIONS ON A YEARLY BASIS?

A.   YES.

Q.   SO, MR. CLARK, GIVEN ALL OF THE EDUCATION AND LECTURES THAT YOU'VE GIVEN OR ATTENDED, AND DEMONSTRATIONS YOU'VE SEEN REGARDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, AND GIVEN YOUR EXPERIENCE IN THE SHERIFF'S DEPARTMENT, IN YOUR OPINION HOW SHOULD SUCH A WEAPON, THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, BE USED IN CONNECTION WITH A PROTEST?

MR. JOHNSON:  OBJECTION.  LACKS FOUNDATION.

THE COURT:  OVERRULED.

THE WITNESS:  SO THE RULE FOR A PROTEST IS THE SAME AS THE RULE FOR USE OF FORCE, WHICH IS THAT THERE MUST BE A CREDIBLE THREAT THAT RISES TO THE LEVEL OF RISK THAT WOULD JUSTIFY THIS LEVEL OF FORCE BECAUSE THE 47 -- EXCUSE ME, THE

ER0332

40 MILLIMETER IS A VERY SIGNIFICANT TRANSFER OF ENERGY, AND PER THE MANUFACTURER, HAS THE POTENTIAL TO BE LETHAL IF USED INAPPROPRIATELY.

MR. SCHECHTER:  CAN WE PUT UP EXHIBIT 211, WHICH HAS BEEN ADMITTED INTO EVIDENCE, AND SPECIFICALLY BATES NUMBER SJ411194.

AGAIN, YOUR HONOR, THIS IS A DOCUMENT WHERE THE ENTIRE DOCUMENT WAS ADMITTED.

THE COURT:  THANK YOU.

BY MR. SCHECHTER:

Q.   MR. CLARK, WOULD YOU TAKE A LOOK AT WHAT IS ON THE SCREEN. LET ME ASK YOU, BASED ON YOUR EXPERIENCE WITH THE SHERIFF'S DEPARTMENT AND YOUR ONGOING -- CONTINUED ONGOING TRAINING AND EDUCATION WITH THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, WOULD THIS BE, WHAT YOU SEE ON THE SCREEN THERE, WOULD THAT BE, IN YOUR OPINION, A PROPER USE OR WHEN IT WOULD BE PROPER TO USE A PROJECTILE IMPACT WEAPON IN CONNECTION WITH CROWD CONTROL?

A.   YES.

Q.   THANK YOU.  TAKE THAT DOWN.

IF WE CAN ALSO PUT UP EXHIBIT 236A IN THIS CASE, PAGE 2 OF THAT EXHIBIT.

AGAIN, THIS HAS ALSO ALREADY BEEN ADMITTED INTO EVIDENCE. NEXT PAGE.  OKAY.

AND IF WE COULD HIGHLIGHT -- THANK YOU.

MR. CLARK, IF YOU COULD TAKE A MOMENT TO READ THAT

ER0333

PARAGRAPH AND LET ME KNOW WHEN YOU HAVE HAD A CHANCE TO TAKE A LOOK, AND THEN I HAVE A QUESTION FOR YOU.

A.   I'VE READ IT.

Q.   AND, MR. CLARK, I THINK YOU NOTICE AT THE BEGINNING IT MENTIONS AND TALKED ABOUT THE USE OF A PROJECTILE 40 MILLIMETER, AS IT SAYS LESS-LETHAL PROJECTILE TOWARDS SOME INDIVIDUALS WHO WERE USING OR WHO WERE DOING GRAFFITI.

     DO YOU SEE THAT?

A.   YES.

Q.   IN YOUR EXPERIENCE AND GIVEN YOUR ONGOING EDUCATION WITH RESPECT TO THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, IN YOUR OPINION WOULD THIS HAVE BEEN A CORRECT USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON GIVEN THE CIRCUMSTANCES?

A.   NO.

Q.   WHY NOT?

A.   WELL, THIS IS -- AS I READ THIS STATEMENT, IT'S TO ABATE GRAFFITI BEING INFLICTED ON CITY HALL, AND THIS IN NO WAY, AS I READ IT, EQUATES TO A CREDIBLE THREAT.

Q.   THANK YOU.  TAKE THAT DOWN.

     MR. CLARK, BASED ON YOUR LAW ENFORCEMENT EXPERIENCE, POST TRAINING, AND CONTINUING EDUCATION WITH RESPECT TO THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, WAS THE USE OF THAT WEAPON DURING THE DEMONSTRATIONS THAT WERE TAKING PLACE ON THE EVENING OF MAY 30TH, 2020 BETWEEN 9:45 P.M. AND WHEN MR. JOHNSON WAS SHOT A PROPER USE OF THAT WEAPON?

ER0334

CLARK DIRECT BY MR. JOHNSON

BUT THERE IS -- I SAW NOTHING IN MY VIEW THAT THERE WAS ANYONE READY TO THROW ANYTHING OR DO ANYTHING THAT WAS GOING TO HARM ANYONE.

Q.    MR. CLARK, AND AGAIN, FOCUSSING ON THE OFFICER THAT WE SEE ON THE LEFT-HAND SIDE OF THE SCREEN, AND GIVEN YOUR EXPERIENCE AND TRAINING AND YOUR CONTINUING EDUCATION, WAS THE OFFICER SEEN THERE COMPLYING WITH POST STANDARDS?

A.    NO.

Q.    AGAIN, IN YOUR OPINION, WHY NOT?

A.    BECAUSE THE USE OF FORCE DEFINED STATEMENT IN THE TRAINING IS FORCE MUST BE NECESSARY AND APPROPRIATE IN ORDER TO BE -- IN ORDER TO BE JUSTIFIED.  APPROPRIATE AND NECESSARY.

THERE'S NOTHING IN THIS EVENT THAT I'M WATCHING OR HAS BEEN DEPICTED THAT SHOWS THAT IT IS APPROPRIATE OR NECESSARY TO FIRE A SIGNIFICANT WEAPON INTO A CROWD.

Q.    AND JUST SO WE'RE ALL CLEAR, AND AGAIN BASED ON YOUR EXPERIENCE AND EDUCATION AND TRAINING, WHEN YOU SAY NECESSARY, WHAT DID YOU MEAN BY THAT?  CAN YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY THAT TERM?

A.    SURE.  SO IF THERE IS AN ONGOING SET OF FACTS OR SERIES OF EVENTS THAT POSE AN IMMEDIATE RISK, THEN A USE OF FORCE TO ABATE THAT RISK WOULD BE APPROPRIATE AND NECESSARY.

NOW IT HAS TO BE THE LEVEL OR THE RESPONSE, NOT -- YOU CAN'T USE SUCH A HEAVY HANDED LEVEL OF FORCE TO HANDLE PEOPLE THAT ARE GATHERED AND ARE PROTESTING.

**ER0335**

AND THEY ARE NOT CULPABLE INDIVIDUALLY UNTIL A DECLARATION OF UNLAWFUL ASSEMBLY.

THEY ARE THERE, AND IF THERE'S AN INDIVIDUAL THAT THEY'RE DEALING WITH, THAT'S ONE THING.

BUT TO INDISCRIMINATELY SHOOT INTO THE CROWD OR INFLICT RECKLESS USES OF FORCE OF THIS NATURE, YOU'RE UNFORESEEABLY GOING TO INJURE AND HURT PEOPLE.

Q.   THANK YOU, MR. CLARK.

NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ALL RIGHT.  MR. JOHNSON, ANY CROSS-EXAMINATION?

MR. JOHNSON:  YES.  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

BY MR. JOHNSON:

Q.   MR. CLARK, WITH REGARD TO YOUR OPINION THAT THE SHOT THAT OFFICER ADGAR FIRED AS BEING IMPROPER, THAT OPINION IS BASED ON THE ASSUMPTION THAT OFFICER ADGAR TARGETED MR. JOHNSON, ISN'T IT?

A.   IT'S BASED ON THE ASSUMPTION THAT BECAUSE IT'S TARGET SPECIFIC, THAT ADGAR IS REQUIRED TO BE TRAINED AND PROFICIENT AND WHENEVER HE -- WHEN HE PULLS THE TRIGGER HE HAS HIS TARGET.

Q.   I APPRECIATE YOUR ANSWER, BUT DOESN'T IT FOLLOW FROM WHAT YOU'VE JUST SAID, THAT IN ORDER FOR OFFICER ADGAR'S USE OF THE 40 MILLIMETER AT THAT TIME TO BE IMPROPER, HE WOULD HAVE TO HAVE BEEN TARGETING SOMEBODY WHO WAS PEACEFUL, WHO REPRESENTED

ER0336

NO THREAT OF VIOLENCE FOR INJURY TO ANYBODY?

A.    AND THAT'S WHAT I TOOK JOHNSON TO BE.

Q.    OKAY.  SO IF WE STITCH THOSE TWO ANSWERS TOGETHER, DOESN'T IT NECESSARILY MEAN THAT YOU ARE ASSUMING THAT OFFICER ADGAR WAS TARGETING MR. JOHNSON?

           MR. SCHECHTER:  OBJECTION, YOUR HONOR.  CALLS FOR SPECULATION.

           THE COURT:  OVERRULED.

           THE WITNESS:  IN THAT REGARD, BECAUSE OF THE NATURE OF THE WEAPON AND THE REQUIRED TRAINING, THAT HE TARGETED JOHNSON, AS I TESTIFIED IN MY DEPOSITION.

BY MR. JOHNSON:

Q.    NOW, YOU USE THE TERM "CREDIBLE THREAT" IN TERMS OF THE IMPETUS FOR AN OFFICER TO USE AN INTERMEDIATE LEVEL OF FORCE; CORRECT?

A.    YES.

Q.    ISN'T IT TRUE THAT THE TERM "CREDIBLE THREAT" DOES NOT APPEAR IN THE POST LEARNING DOMAIN 20?

A.    YOU'RE CORRECT IN THAT LEARNING DOMAIN 20 IS DESCRIBED AS TOTALITY OF CIRCUMSTANCES.

Q.    OKAY.  NOW, WITH REGARD TO EXHIBIT NUMBER 108A --

       WOULD YOU PUT THAT UP, PLEASE, AND STOP THE VIDEO AT 22:23:15.

       WHILE SHE'S DOING THAT, MR. CLARK, LET ME ASK YOU JUST ONE OTHER QUESTION.  IS IT YOUR OPINION THAT INDIVIDUALS WHO GATHER

ER0337

FOR A DEMONSTRATION HAVE A LAWFUL RIGHT TO THROW THINGS AT POLICE OFFICERS?

A.   NO, THAT'S NOT MY TESTIMONY.

Q.   OKAY.  YOU WOULD AGREE WITH ME THAT THAT'S NOT THE CASE, PEOPLE WHO GATHER FOR A PROTEST DO NOT HAVE THE RIGHT TO THROW THINGS AT POLICE OFFICERS?

A.   I WOULD AGREE.

Q.   ALL RIGHT.  AND WHEN THINGS ARE THROWN AT POLICE OFFICERS, THOSE THINGS HAVE THE POTENTIAL TO CAUSE SIGNIFICANT INJURIES TO OFFICERS?

A.   SOME THINGS.

Q.   YES.  AND IT'S NOT ONLY FROM THE THING ITSELF, IS IT?

A.   I DON'T UNDERSTAND.

Q.   OKAY.  SO ISN'T IT PART OF WHAT MAKES OBJECTS THROWN AT POLICE OFFICERS SO DANGEROUS TO THEM IS THE POTENTIAL FOR AN OFFICER TO LOSE HIS BALANCE AND MAYBE FALL AND HIT HIS OR HER HEAD?

A.   MY GOODNESS.  IN THE REALM OF POSSIBILITY, I WOULD SUPPOSE, BUT OFFICERS ARE TRAINED TO BE SUREFOOTED AND ESPECIALLY HOW TO RESTRAIN AND YET BE READY WHEN THEY'RE INVOLVED IN SOMETHING LIKE THIS.

Q.   BUT THE POINT THAT I'M TRYING TO MAKE AND TO SEE IF YOU WOULD AGREE WITH ME IS THAT JUST BECAUSE SOMETHING IS THROWN AT AN OFFICER THAT MAY SEEM TO OTHERS TO BE AN INNOCUOUS ITEM, THE FACT THAT OFFICERS ARE BEING THROWN AT WITH THOSE ITEMS DOES

ER0338

HAVE THE POTENTIAL TO CAUSE OTHER THINGS TO HAPPEN?

A.    RIGHT.  AND THE ANSWER IS IT HAS TO BE REASONABLY ASSUMED. I HAVE HAD A LOT OF STUFF THROWN AT ME IN MY CAREER AND IN PARTICULAR THE -- WHAT ARE YOUR -- WHEN I WAS ON THE LINE IN THE WHITTIER RODNEY KING THING, AND I NEVER -- I CAN'T REMEMBER ANY OF MY -- ANYBODY ON OUR LINE OR ANYBODY THAT I SAW LOSE THEIR FOOTING.

SO IT'S A REASONABLE -- JUST BECAUSE A BOTTLE IS COMING YOUR WAY, THAT DOESN'T AUTOMATICALLY MAKE EVERYTHING CORRECT TO START SHOOTING AT PEOPLE PROJECTILES.

Q.    WELL, AN OFFICER WHO IS ON THE LINE AND MAYBE FOCUSSED ON AN INDIVIDUAL IN THE CROWD AND WHO DOESN'T SEE AN OBJECT COMING TOWARD HIM UNTIL THE LAST MOMENT MIGHT HAVE A DIFFERENT REACTION TO THAT THAN AN OFFICER WHO MIGHT BE WATCHING IT AND HAS TIME TO GET OUT OF THE WAY?

A.    WELL, THERE ARE A LOT OF SUPPOSITIONS.  I GUESS YOU COULD -- WE'RE SUPPOSED TO BE ALERT.  WE'RE ARMORED UP, HAVE THE HELMETS, AND HAVE THE BODY ARMOR.  THIS IS WHAT WE DO.

AND THERE ARE PEOPLE WHO GET UPSET AND THEY HAVE BOTTLED WATER AND THEY THROW IT AND SOME WANT TO PROVOKE IT EVEN FURTHER AND USE THE BOTTLE OF WATER.

BUT BOTTLES OF WATER IN MY ESTIMATION ARE NOT VERY SERIOUS AND THEY'RE PART OF WHAT WE DO.  LET ME SAY IT THAT WAY.

Q.    WELL, SOMETIMES THINGS THAT ARE NORMALLY ASSOCIATED WITH WATER BOTTLES CONTAIN OTHER THINGS, DON'T THEY?

ER0339

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 11, 2025

ER0340

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

          PLAINTIFF,            CASE NO.  CV-21-01849 BLF

    VS.                   SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 16, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 9
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 1382 - 1551

        DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

  FOR THE PLAINTIFF:   MCMANIS FAULKNER
                   BY:  ABIMAEL BASTIDA
                     MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113


        (APPEARANCES CONTINUED ON THE NEXT PAGE.)


  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                     CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

ER0341

IF THAT PERSON DOES SOMETHING THAT A REASONABLY CAREFUL PERSON WOULD NOT DO IN THE SAME SITUATION OR FAILS TO DO SOMETHING A REASONABLE PERSON WOULD DO.  AND YOU ULTIMATELY DECIDE UNDER THESE CIRCUMSTANCES HOW A REASONABLY CAREFUL PERSON WOULD HAVE ACTED, BUT SPECIFICALLY YOU HAVE TO THINK ABOUT IT, HOW A REASONABLE PERSON WOULD HAVE ACTED IN OFFICER ADGAR'S SITUATION.

NOW, I'D LIKE TO TRY TO NARROW SOME OF THESE ISSUES FOR YOU.  AGAIN, I THINK THESE ARE SOME OF THE CORE QUESTIONS.

DID OFFICER ADGAR FIRE INDISCRIMINATELY INTO THE CROWD AT 10:33?

WAS THAT PURSUANT TO A CUSTOM OR POLICY THAT ALLOWS THE INDISCRIMINATE USE OF THE 40 MILLIMETER?  OR PURSUANT TO A CUSTOM OR POLICY THAT SAYS, YOU KNOW, FORGET WHAT IS WRITTEN IN THE DUTY MANUAL, FORGET WHAT IS WRITTEN IN THE LEARNING DOMAINS, YOU DON'T HAVE TO FOLLOW THAT AND THAT'S AN UNDERSTANDING THAT IS BROADLY SHARED AMONGST ALL SAN JOSE POLICE OFFICERS, OR AT LEAST A MAJORITY OF THEM, AND IT'S SOMETHING THAT THEY CAN ASCRIBE TO AND ACT IN ACCORDANCE WITH.

SECONDLY, WAS OFFICER ADGAR SUBSTANTIALLY MOTIVATED BY THE DESIRE TO RETALIATE AGAINST MR. JOHNSON FOR EXERCISING HIS RIGHTS?

AGAIN, ADDING IN THE CUSTOM OR POLICY.  WAS THERE A CUSTOM OR POLICY THAT WAS NOT-SO SECRET THAT ALLOWED THE USE OF

ER0342

40 MILLIMETERS AGAINST PEOPLE JUST EXERCISING THEIR FIRST AMENDMENT RIGHTS OR IN THE ALTERNATIVE WHETHER IT WAS A CUSTOM OR POLICY THAT SAYS FORGET WHAT IS WRITTEN DOWN IN THOSE DUTY MANUALS, YOU DON'T HAVE TO FOLLOW THEM?

MOVING ON TO THE ACTUALLY FOURTH AMENDMENT VIOLATION.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  THIS IS 10:33 JUST BEFORE THE PROJECTILE THAT WAS FIRED THAT STRUCK MR. JOHNSON.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  WOULD YOU MIND PLAYING THAT ONE MORE TIME?

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AS YOU ALL WELL BY NOW, THE TIME IN THIS VIDEO IS 10:33 P.M.

THIS IS EXHIBIT 531, OFFICER JOSEPH'S BODY WORN CAMERA, AND THESE ARE LITERALLY THE SECONDS LEADING UP TO THE MOMENT THAT MR. JOHNSON WAS STRUCK BY A PROJECTILE THAT WAS FIRED BY OFFICER ADGAR.

PLAY IT AGAIN.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  SAME MOMENT IN TIME, JUST A SLIGHTLY DIFFERENT PERSPECTIVE.

DO YOU WANT TO PLAY THIS ONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  SAME MOMENT IN TIME, JUST A DIFFERENT

ER0343

PERSPECTIVE.

PLAY IT AGAIN.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  CONSIDER WHETHER THERE'S A RISK TO OFFICER ADGAR IN THESE MOMENTS, BUT DON'T FORGET TO CONSIDER WHETHER OR NOT THERE'S A THREAT TO THE SAFETY OF HIS FELLOW OFFICERS AND THE PROTESTORS THAT YOU SEE HERE IN THESE VIDEOS.

I CONTEND THAT ABSOLUTELY THERE IS, BECAUSE YOU CAN SEE THE AMOUNT OF BOTTLES THAT ARE BEING THROWN, AND YOU CAN HEAR THAT THEY'RE NOT ALL JUST PLASTIC BOTTLES FILLED WITH WATER, AND YOU CAN HEAR BY THE SOUND OF THE GLASS SMASHING AND BREAKING THAT THEY NEARLY HIT OFFICERS AND PROTESTORS.

SPECIFICALLY WITH THIS EXHIBIT, 527, OFFICER MORAGA'S BODY WORN CAMERA.

CAN WE PLAY IT THROUGH.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  I'LL ASK YOU TO JUST KEEP YOUR ATTENTION TO WHERE THAT CIRCLE IS AS IT PLAYS THROUGH BECAUSE I THINK AND I CONTEND THAT IN THIS VIDEO YOU SEE A PERSON THROWING A BOTTLE FROM THE LEFT CORNER OF THE TRAPEZOID WALL WE'VE BEEN TALKING ABOUT, AND I CONTEND, I BELIEVE, I THINK THE EVIDENCE SHOWS THAT THIS PERSON WAS ACTUALLY OFFICER ADGAR'S TARGET WHEN HE FIRED THE 40 MILLIMETER PROJECTILE AT APPROXIMATELY 10:33:15.

CAN WE PLAY IT THROUGH ONE MORE TIME.

ER0344

DEFENDANTS' CLOSING ARGUMENT

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  I KNOW IT'S QUICK, AND THIS IS THE BEST INFORMATION THAT WE HAVE TO WORK WITH, SO, AGAIN, THIS IS PART OF WHAT MAKES YOUR JOBS HARD AND ALSO WHAT MAKES PART OF OUR JOBS HARD IS TO REALLY SPLICE THROUGH THESE SPLIT-SECOND MOMENT DECISIONS AND TRY TO PRESENT THE EVIDENCE TO YOU AND GIVE YOU THE INFORMATION THAT YOU NEED TO ANSWER THESE QUESTIONS.

CAN WE PLAY THROUGH AGAIN.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  SAME TIME PERIOD AGAIN, BUT THIS IS EXHIBIT 519, AND THIS IS OFFICER ADGAR'S SPECIFIC PERSPECTIVE AT THE 10:33 MARK.

CAN WE PLAY IT THROUGH AGAIN.

(VIDEO PLAYING OFF THE RECORD.)

THE COURT:  SO THE NEXT SERIES OF SLIDES THAT I WANT TO SHOW YOU -- THESE -- SINCE IT IS SO HARD AND IT MOVES SO QUICK ARE STILL FRAMES FROM THE SAME EXACT VIDEO.

AND WHAT I'M ATTEMPTING TO SHOW YOU HERE IS LITERALLY THE 30 FRAMES PER SECOND THAT ARE IN BETWEEN THE SECONDS PASSING ON THE BODY WORN CAMERA ITSELF.

SO FOR EVERY SECOND FROM 22:33:12 TO 22:33:13, THERE ARE 30 SEPARATE IMAGES THAT LAST WITHIN THAT SECOND, 30 FRAMES PER SECOND.  SO I'M GOING TO TRY TO PLAY THROUGH THESE FAIRLY QUICK SO YOU CAN KIND OF SEE SOME OF THE MOTION THAT GOES ALONG WITH

ER0345

DEFENDANTS' CLOSING ARGUMENT

1448

IT, BUT I THINK IN SHOWING THESE VIDEOS AND THESE WITH IT, YOU'LL BE ABLE TO IDENTIFY WHO OFFICER ADGAR'S ACTUAL TARGET WAS, WHEN AND WHERE HE THROWS THE BOTTLE, AND WHERE HE GOES AFTER HE THROWS THE BOTTLE.

SO AGAIN, THIS IS JUST THE STILL FRAME FROM 22:33:12. AND IF WE ZOOM IN THAT TRAPEZOID AREA, YOU CAN SEE BEHIND THE PERSON IN THE WHITE THERE IS A LITTLE BIT OF A SILHOUETTE YOU CAN SEE. RIGHT THERE. THAT'S THE PERSON OFFICER ADGAR WAS TARGETING.

AND AS WE MOVE FORWARD, YOU WILL SEE AGAIN, THAT'S THE PERSON BEHIND THE PERSON IN THE WHITE, THAT'S WHO HE WAS TARGETING.

AGAIN, BLURRY, HARD TO SEE, THIS IS 30 FRAMES PER SECOND DISSECTED MINUTELY, BUT THERE'S THE TARGET RIGHT THERE.

AND UP TOP YOU CAN ACTUALLY SEE RIGHT NOW THE BOTTLE THAT HE HAS JUST THROWN IS MAKING ITS WAY ON CAMERA AND IT'S TRAVELLING WEST.

MOMENTS LATER, AGAIN, THERE'S THE PERSON BEHIND THE MAN IN WHITE, AND THERE'S THE BOTTLE AS THE TRAJECTORY CONTINUES.

THERE'S THE PERSON NOW HAVING THROWN THE BOTTLE MAKING HIS WAY EAST. THERE'S THE BOTTLE STILL FLYING FURTHER ALONG IN ITS TRAJECTORY.

AGAIN, THERE'S THE PERSON MAKING HIS WAY FURTHER EAST. YOU CAN JUST SEE THE BOTTLE STILL IN THE VERY CORNER OF THE FRAME.

ER0346

NOW WE MADE IT TO 22:33:13.  THERE'S THE PERSON RUNNING AWAY HAVING JUST THROWN THE BOTTLE.

THERE'S THE BOTTLE AS IT STARTS TO APPROACH THAT UTILITY POLE.

A LITTLE BIT FURTHER AGAIN AT 22:33:13.  THERE'S THE PERSON RUNNING AWAY, AND THERE'S THE BOTTLE.

STILL 22:33:13, THERE'S THE PERSON CONTINUING TO RUN AND THERE'S THE BOTTLE CONTINUING TO FLY.

AGAIN, 33:13, THE PERSON MAKING HIS WAY FURTHER EAST AS HE RUNS AWAY.  THERE'S THE BOTTLE GETTING FURTHER AND CLOSER TOWARDS THE OFFICERS.

AT THIS POINT, WE'RE NOW AT 33:14, THIS PERSON WHO IS RUNNING AWAY THROWING THE BOTTLE IS BEHIND THE MAN IN THE GREY SWEATSHIRT, AND YOU'LL NOTICE RIGHT THERE TO THE LEFT, THAT'S MR. JOHNSON WITH HIS HANDS ABOVE HIS HEAD WALKING AWAY.

THERE'S THE PERSON RUNNING AWAY WHO JUST THREW THE BOTTLE, AND THAT'S MR. JOHNSON RIGHT THERE.  GETTING PRETTY CLOSE.

AGAIN, RIGHT THERE AT THIS POINT, 33:14, THE PERSON THAT THREW THE BOTTLE SHOULD BE JUST BEHIND THAT PLANTER BOX, AND THERE'S MR. JOHNSON.  THEY'RE GETTING CLOSER AND CLOSER AS THE MAN WHO THREW THE BOTTLE RUNS AWAY EAST AND MR. JOHNSON INSTANTLY TRIES TO GET AWAY FROM THIS AND IS WALKING AWAY WITH HIS HANDS ABOVE HIS HEAD.

NOW THEY'RE BOTH IN THE SAME CIRCLE BECAUSE THEIR PATHS ARE CROSSING.

ER0347

AGAIN, THIS IS PROBABLY ONE OF THE LAST FRAMES BEFORE THEY DISAPPEAR BEHIND OFFICER ADGAR'S ARM THAT BLOCKS THE VIDEO CAMERA.

BUT THERE'S MR. JOHNSON AGAIN CLEARLY WITH HIS HANDS BEHIND HIS HEAD, AND JUST TO THE RIGHT OF HIM, THAT'S THE PERSON THAT OFFICER ADGAR WAS TARGETING WHEN HE FIRED HIS 40 MILLIMETER.

LAST LITTLE BIT YOU CAN SEE BEFORE THEY'RE BLOCKED FROM VIEW, AND THEY'RE BASICALLY RIGHT ON TOP OF EACH OTHER.

THIS IMAGE IS AT 33:15.  THIS IS JUST AFTER OFFICER ADGAR DISCHARGED HIS 40 MIL, AND YOU CAN SEE THAT THEY WOULD HAVE BEEN PRACTICALLY RIGHT ON TOP OF EACH OTHER.

SO I'D LIKE TO ADDRESS MR. FRIES'S TESTIMONY AT THIS POINT BECAUSE I THINK A LOT OF WHAT HE PRESENTED WAS EXTREMELY HELPFUL AND USEFUL INFORMATION.

AND A LOT OF IT I DON'T NECESSARILY DISAGREE OR HAVE MUCH DISPUTE ABOUT, BUT I DO WANT TO PUT, AGAIN, SOME OF IT INTO CONTEXT AND THE CONTEXT IS SO IMPORTANT.

SO THIS WAS AN IMAGE FROM HIS DEMONSTRATIVE EXHIBITS THAT HE SHOWED YOU AS HE GAVE HIS PRESENTATION.

AS HE TOLD YOU, HE'S ABLE TO TELL FROM HIS 3D LIDAR MAPPING CRAZY FANCY TECHNOLOGY THAT I NEVER HOPE TO UNDERSTAND PERFECTLY, THAT HE CAN TELL EXACTLY WHERE OFFICER ADGAR SHOT BASED UPON THE POSITION OF THE BARREL OF HIS 40 MILLIMETER AT THE TIME THAT IT WAS FIRED.  AND, YOU KNOW, BASED UPON HIS WORK

ER0348

AND ANALYSIS, THAT'S WHAT HE CAME UP WITH.

AND HE WAS ASKED TO IDENTIFY WHO SHOT MR. JOHNSON.  I THINK HE SUCCESSFULLY DID THAT.  I DON'T DISPUTE AND I DON'T CONTEND ANYTHING OTHERWISE.  I DO THINK IT WAS OFFICER ADGAR WHO FIRED THE PROJECTILE THAT STRUCK MR. JOHNSON.

BUT I THOUGHT SOMETHING ELSE WAS INTERESTING ABOUT IT BECAUSE IN THAT SAME DEMONSTRATIVE EXHIBIT HE DESCRIBES AND IDENTIFIES OBSTACLES DIRECTLY BEHIND THE PLANTER BOX.  AND I SAY THAT TALLER OF THOSE TWO OBSTACLES THAT IS IDENTIFIED THERE, THAT'S THE PERSON THAT OFFICER ADGAR WAS TARGETING.  THAT'S THE PERSON THAT RAN FROM THE CORNER OF THAT TRAPEZOIDAL WALL EASTWARDS TO TRY TO GET AWAY AFTER THROWING THE BOTTLE.  AND THAT SHOWS THEY'RE VERY CLOSE TO INTERSECTING AT THE POINT THAT MR. FRIES DETERMINED OFFICER ADGAR FIRED HIS PROJECTILE AND DETERMINED THE PRECISE, EXACT TRAJECTORY.

THIS WAS ANOTHER IMAGE FROM MR. FRIES'S PRESENTATION.  THIS IS FROM THE REVERSE ANGLE, SO YOU'RE LOOKING NORTH TOWARDS SANTA CLARA STREET AND THE CONSTRUCTION ZONE.  ONCE AGAIN, YOU CAN SEE THOSE TWO OBSTACLES.  SPECIFICALLY NOW THE ONE THAT IS CLOSER TO MR. JOHNSON.

WE LOOKED AT THOSE TWO OBSTACLES YOU CAN TELL THE ONE IN THE FRONT BENDING DOWN IN THE WHITE SWEATSHIRT, SO I DON'T THINK THAT'S OFFICER ADGAR'S TARGET.  BUT I DO THINK THE ONE BEHIND HIM, THE TALLER BOX, THE PERSON THAT IS WEARING BLACK, I DO THINK THAT IS OFFICER ADGAR'S TARGET WHO THREW FROM THE

ER0349

CORNER OF THE TRAPEZOIDAL WALL AND THEN FLED EAST.

AGAIN, THERE'S THE ONE THAT I SPECIFICALLY FEEL WHO OFFICER ADGAR WAS TARGETING WHEN HE FIRED.

SO FOR MR. FRIES, I MEAN, HE IS CERTAINLY AN EXPERT AND THAT TECHNOLOGY IS EXTREMELY IMPRESSIVE, AND I DON'T DISAGREE WITH, FRANKLY, ANY OF HIS CONTENTIONS.

CAN WE FIND AND TRACK MR. JOHNSON IN ANY OF THESE VIDEOS?

YEAH, I AGREE.  I DON'T ARGUE WITH THAT.

CAN WE TRACK THE LOCATION OF WHERE THROWN BOTTLES ORIGINATED?

YES, I THINK HE CAN.  I DON'T DISAGREE WITH THAT, BUT I DO HAVE SOME CONCERNS WITH THE PERTINENT VIDEOS THAT HE CHOSE TO USE TO DO HIS ANALYSIS.  BUT I DON'T DOUBT THAT THE TECHNOLOGY THAT HE DESCRIBED HAS THE CAPABILITY IF GIVEN THE APPROPRIATE VIDEOS AND APPROPRIATE INFORMATION TO DO JUST AS HE CLAIMS.

CAN WE TRACK EACH OFFICER AND WHEN THEY FIRED THEIR WEAPONS?

YES.  I HAVE NO DOUBT THAT'S EXACTLY WHAT HE DID.  AND THEN I DON'T DISPUTE, YOU KNOW, THAT HE MADE A CORRECT ANALYSIS ABOUT WHO SHOT -- AND EVEN AT LEAST PARTIALLY THE TRAJECTORY, A SNAP SECOND MOMENT IN TIME, NOT NECESSARILY AIMING OR TRAINING OR ANYTHING LIKE THAT.

CAN WE TRACK KYLE JOHNSON AND WAS HE HIT BY A PROJECTILE DURING THIS PROTEST?

AGAIN, I DON'T DISAGREE.  YES, MR. FRIES CAN AND DID DO

ER0350

THAT, AND I DON'T DISPUTE HIS FINDINGS IN TERMS OF THAT.

CAN WE TRACK WHICH OFFICER SHOT THE PROJECTILE THAT HIT KYLE JOHNSON?

YEAH. I BELIEVE HIM. YES, I THINK HE CORRECTLY IDENTIFIED OFFICER ADGAR AS THE PERSON WHO FIRED THE PROJECTILE THAT STRUCK MR. JOHNSON.

BUT I WANT YOU TO THINK OF JUST THE STILL CLIPS THAT I SHOWED YOU AND WHAT WE'VE BEEN THROUGH SO FAR TOGETHER IN THIS CASE. THOSE STILL IMAGES THAT I SHOWED YOU COMPRISED OF 3 SECONDS, AND THERE WAS 18 IMAGES WITHIN LESS THAN THOSE 3 SECONDS.

AND YOU'VE HEARD AD NAUSEAM ABOUT THIS TIMELINE, THIS 10:33 TIMELINE. WE HAVE HEARD NEARLY 30 HOURS OF TESTIMONY VIA VIDEOS OR TESTIMONY FROM THE WITNESSES OR STIPULATIONS IN THIS CASE. THAT'S A LOT OF TIME THAT WAS SPENT TRYING TO DISSECT REALLY THREE-TENTHS OF A SECOND FROM 10:33:12 TO 10:33:15.

AND THIS IS SOME OF MR. FRIES'S TESTIMONY, AND HE TOLD YOU EXACTLY HOW MUCH TIME IT TOOK. IT TOOK HIM AND HIS TEAM ABOUT 100 HOURS. SO 100 HOURS WAS A SAFE NUMBER HOW MUCH TIME HE SPENT DIVING THROUGH ALL OF THE VIDEOS IN THIS CASE, CHOOSING THE ONES HE FELT PERTINENT, AND DOING HIS ANALYSIS.

AGAIN, THERE WAS A TEAM OF SCIENTISTS, NOT JUST MR. FRIES, PHYSICALLY 3 TO 4 PEOPLE WORKING ON IT FOR THE 100 HOURS. IMAGINE THE LABOR THAT WENT INTO THAT, THE MAN HOURS, THE AMOUNT OF ATTENTION THAT WENT INTO CONDUCTING THIS ANALYSIS.

ER0351

THIS IS REGARDING THE NUMBER OF VIDEOS THAT THEY RECEIVED FOR WHICH THEY SEARCHED FOR PERTINENT VIDEOS.  PROBABLY IN THE NATURE OF 600 VIDEOS.  AS HE AGREES, THAT'S A LOT.  AND, IN FACT, THE LIST OF ALL OF THE VIDEOS THAT WERE SENT TO HIM OF WHICH HE USED 12 TAKES UP SEVERAL PAGES JUST ALONE IN HIS REPORT.

IT TAKES A VILLAGE, HE SAID, TO GET THROUGH ALL OF THE ANALYSIS AND DO THE WORK THAT THEY DID.

AND WHY AM I BRINGING IT UP NOW?  BECAUSE UNDER INSTRUCTION NUMBER 33 IT TALKS ABOUT THE TOTALITY OF THE CIRCUMSTANCES AND THE PROPER WAY AND PERSPECTIVE FROM WHICH TO EVALUATE USE OF FORCE IN THIS CASE.  AND SPECIFICALLY IT SAYS, NOT WITH THE 20/20 VISION OF HINDSIGHT.  NOT WITH 30 FRAMES PER SECOND AS WE GO THROUGH STILL FRAMES BIT, BY BIT, BY BIT, BY BIT.

THINK ABOUT WHAT I'VE BEEN DOING?  WHAT WE'VE BEEN DOING? WHAT MR. FRIES AND HIS TEAM HAVE BEEN DOING?  WE'VE BEEN DISSECTING THESE LITERALLY TENTHS OF A SECOND WITH THESE STILL FRAME IMAGES AND TRYING TO EXTRAPOLATE AS MUCH INFORMATION AS WE CAN.  AND IS THAT NOT THE DEFINITION OF LOOKING BACK WITH 20/20 VISION OF HINDSIGHT AND TRYING TO DETERMINE AND EVALUATE WAS IT REASONABLE IN THIS CASE?  WAS IT EXCESSIVE FORCE BECAUSE IT WAS INDISCRIMINATELY USED?  THAT IS EXACTLY WHAT WE'RE DOING, AND THAT'S WHAT THE LAW INSTRUCTS YOU TO BE CAREFUL WITH.

ER0352

THE PERSPECTIVE ISN'T LOOKING BACK ON IT NOW AFTER 30 HOURS OF TESTIMONY AND 18 SLIDES COMPRISING LESS THAN 3 SECONDS. YOU HAVE TO LOOK AT THE FACTS AS KNOWN TO THE OFFICER. ALL OF THE FACTS KNOWN TO THE OFFICER ARE RELEVANT TO YOUR INQUIRY. THEY ARE RELEVANT TO YOUR INQUIRY.

THE FOURTH AMENDMENT IS AN OBJECTIVE STANDARD. SO WHAT IS SPECIFICALLY IN OFFICER ADGAR'S HEAD, HIS SPECIFIC INTENT OR MOTIVE ISN'T RELEVANT TO THE INQUIRY. IT'S ULTIMATELY OBJECTIVELY WHAT IT LOOKS LIKE, BUT NOT JUDGING IT WITH 20/20 VISION OF HINDSIGHT, NO 30 FRAMES PER SECOND, AND THE TIME THAT WE HAVE ALL HAD TO CONSIDER THAT OFFICER ADGAR DID NOT HAVE HIMSELF.

SO BACK TO MR. FRIES -- THE ISSUE I DO HAVE WITH MR. FRIES, CAN WE TRACK THE LOCATION OF WHERE THE BOTTLES ORIGINATED?

AND, YES, I DON'T DISAGREE THAT HE CAN. AND MY PROBLEM IS THAT THE FACT THAT HE USED OUT OF THE 600-PLUS VIDEOS, ONLY 12 VIDEOS HE IDENTIFIED AS PERTINENT TO HIS ANALYSIS, AND HIS MATH, AND HIS RE-CREATIONS AND HIS OPINIONS IN THIS CASE. I HAVE A PROBLEM WITH THAT. I THINK IT DOESN'T PAINT THE WHOLE PICTURE.

AGAIN, HE AGREED WITH ME AT THE END OF THE DAY 12 PERTINENT VIDEOS THAT WERE IDENTIFIED OF WHICH HE USED.

SO I ASKED HIM ABOUT THAT. I SAID WOULDN'T IT HELP IF YOU HAD OTHER VIDEOS AND MIGHT THERE BE ONE CAMERA THAT CATCHES A

ER0353

PERSPECTIVE OR SOMETHING THAT THE OTHERS DON'T?  MAYBE ONE DOESN'T PICK UP THAT BOTTLE FLYING IN FRONT OF THE WALL BECAUSE IT'S BLURRY AND THE CAMERA IS MOVING AND THE OFFICER'S PERSPECTIVE IS -- KIND OF ATTENTION IS DIVIDED AT THE TIME?

AND SO HE SAYS, I CAN SIT HERE AND SAY VERY CONFIDENTLY WHETHER I DID 13TH OR 14TH VIDEO, SOMETHING THAT THESE 12 DID NOT.  THIS IS THE FULL STORY.  THAT'S WHAT HE TOLD YOU.

SO AGAIN, WHAT HE TOLD YOU WAS THAT THE ORIGIN OF ALL OF THE BOTTLES THAT WERE THROWN, ALL OF THE ITEMS THAT WERE THROWN AT 10:33, ALL OF THEM CAME FROM WHAT HE DESCRIBED AS THE SOUTHWEST QUADRANT.  AGAIN, THAT'S RIGHT ALONG 4TH STREET SOUTH OF SANTA CLARA STREET.

AND I JUST DON'T THINK THAT THAT'S ACCURATE.  I THINK IF HE HAD CONSIDERED SOME OF THE OTHER VIDEOS THAT I PLAYED FOR HIM, THAT I PLAYED FOR MR. JOHNSON HIMSELF, I THINK HE WOULD COME UP WITH A DIFFERENT CONCLUSION.

AND SO HE SAYS WHEN WE WERE TALKING ABOUT IT, YOU KNOW, I ASKED HIM, WELL, DO YOU EVER LISTEN TO WHAT THE OFFICERS ARE SAYING OR THEIR BODY LANGUAGE TO TRY TO DETERMINE WHERE SOME OF THESE ITEMS ARE ACTUALLY COMING FROM?  AND HE SAID, YOU KNOW WHAT, IT'S NOT OF ANY USE TO ME.  IT'S NOT RELEVANT.  IF THE OFFICERS SAID, HEY, YOU KNOW, LOOK OVER THERE.  WHERE'S THAT? I COULDN'T EXTRAPOLATE WHAT THE OFFICER MEANT.  SO IF I HEARD THAT INFORMATION, YOU KNOW, I DON'T HAVE ENOUGH INFORMATION AS TO WHERE THEY'RE LOOKING, WHERE "OVER THERE" IS.  SO HE

ER0354

WOULDN'T KNOW WHAT TO DO WITH THAT.

I DON'T THINK THAT'S A FAIR REPRESENTATION.

CAN YOU PRESS PLAY.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  I THINK BASED UPON THIS VIDEO THAT HE SPECIFICALLY SAID THAT HE DID NOT USE OR IDENTIFY AS 1 OF THE 12 PERTINENT VIDEOS SHOWS AN EXAMPLE AS TO JUST THAT.  YOU CAN SEE WHERE THE OFFICER IS POINTING.  THEY'RE IDENTIFYING OBJECTS THAT ARE COMING IN THE GENERAL DIRECTION, AND I THINK THAT INFORMATION IS USEFUL AND HELPFUL TO UNDERSTAND WHERE EXACTLY THE BOTTLES ARE COMING FROM.

AND GRANTED, THIS IS 10:24 NOT 10:33.  BUT THIS IS AN EXAMPLE, I SUGGEST, AS TO WHY THAT INFORMATION THAT HE SAID WAS USELESS TO HIM ACTUALLY IS USEFUL AND HELPFUL.

NOW, THIS ONE IS ACTUALLY FROM 10:33, THE SAME OFFICER, OFFICER IKEUCHI, AND IN THIS VIDEO HE DID NOT USE AND IDENTIFY AS PERTINENT.

PLEASE PRESS PLAY.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AGAIN, ONCE AGAIN, I THINK THE OFFICER IS IDENTIFYING WHERE THE BOTTLE IS COMING FROM, AND FROM HER PERSPECTIVE SHE'S POINTING OUT ONE THAT IS IN FACT CONSISTENT WITH WHAT MR. FRIES SAID COMING FROM THE WEST, COMING FROM THE 4TH STREET SIDE.

BUT AGAIN, THE POINT HERE ISN'T THAT THAT'S WHERE ALL OF

ER0355

DEFENDANTS' CLOSING ARGUMENT

THE BOTTLES CAME FROM.  SO THERE'S VALUABLE INFORMATION IN THESE VIDEOS THAT MR. FRIES DID NOT CONSIDER AND DID NOT USE TO RENDER HIS OPINION THAT HE PRESENTED TO YOU VERY COMPETENTLY SAYING ALL OF THE BOTTLES CAME FROM 4TH STREET SIDE.

AND LET'S LOOK AT WHAT MR. JOHNSON HIMSELF THOUGHT ABOUT THAT IDEA WHERE THE BOTTLES WERE COMING FROM.  I ASKED HIM, LOOKING AT THIS PORTION OF THE VIDEO -- AGAIN, THIS IS REFERENCING THAT SAME VIDEO THAT WE JUST WATCHED --

MR. JOHNSON, WOULD YOU AGREE THAT THERE'S AN ITEM BEING THROWN FROM WHAT LOOKS LIKE THE LEFT SIDE OF THAT WALL, THAT TRAPEZOIDAL WALL?

IT LOOKS LIKE ITEMS ARE BEING THROWN FROM THAT AREA, YES.

CAN WE PLAY THAT ONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  TO THE LEFT.  THIS IS AT 10:24 AGAIN.  BUT I THINK IT SHOWS WHAT THE OFFICERS ARE SEEING AND DEMONSTRATING IS RELEVANT TO THE INQUIRY, AND MR. FRIES DISAGREED WITH ME.

CAN WE PLAY THIS ONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  THAT'S THE 10:33 MARK BUT ANOTHER EXAMPLE OF WHY I THINK WHAT THE OFFICERS SAY AND DO AND DEMONSTRATE IN THE VIDEOS IS RELEVANT EVEN THOUGH MR. FRIES DISAGREED, AND EVEN THOUGH MR. JOHNSON ULTIMATELY DOES AGREE WHEN HE WATCHES THESE VIDEOS, HE CAN SEE WHERE THE BOTTLES ARE

ER0356

DEFENDANTS' CLOSING ARGUMENT

COMING FROM.

MORE ON MR. JOHNSON'S TESTIMONY. DO YOU SEE THE ITEM ON THE SCREEN HERE THAT LOOKS LIKE IT APPEARS TO BE COMING FROM THE LEFT SIDE OF THE WALL AS HE REVIEWS THE CLIPS THAT WE JUST DESCRIBED, JOSEPH BODY WORN CAMERA AT EXHIBIT 531?

HE DIDN'T REMEMBER WHEN HE FIRST -- FRANKLY, I DON'T DISBELIEVE HIM. THAT NIGHT HE DIDN'T REMEMBER ANY MORE THAN ONE BOTTLE. HE'S NOT PAYING ATTENTION TO THOSE. HE'S NOT FOCUSSING ON THOSE. I THINK HE WAS ABSOLUTELY SINCERE AND HONEST WHEN HE SAID I WAS FOCUSSED ON THE FACT THAT I JUST GOT POPPED IN THE LEG AND IT HURT LIKE CRAZY.

SO I DON'T DISCOUNT HIS MEMORY OR BELIEFS BECAUSE HE'S NOT EXPECTED TO IDENTIFY THOSE THINGS, BUT I DO COMMEND HIS HONESTY HAVING REVIEWED THESE VIDEOS SAYING, YEAH, YEAH, I DO SEE THAT NOW, THERE WAS ITEMS COMING FROM THE LEFT CLOSER TO WHERE HE WAS STANDING.

CAN YOU PLAY THAT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON: AND I THINK THAT'S WHAT HE'S TALKING ABOUT. WHEN HE REVIEWS THE VIDEO LIKE THIS ONE, EXHIBIT 534, BY OFFICER CESPEDES, I THINK HE COMES TO THE ONLY RATIONAL CONCLUSION THAT MR. FRIES HIMSELF WOULD COME TO THAT, YES, THERE WERE BOTTLES COMING FROM THE LEFT SIDE OF THE WALL CLOSER TO THE POSITION WHERE HE IDENTIFIED HIMSELF IN THE EXHIBITS.

(VIDEO PLAYING OFF THE RECORD.)

ER0357

MR. SYMPSON:  MORE OF HIS TESTIMONY.  WOULD YOU AGREE LOOKING AT THIS PORTION OF THE VIDEO -- NOW THE ONE THAT WE'VE JUST WATCHED, EXHIBIT 534, CESPEDES -- WERE YOU LOOKING AT THIS PORTION THAT THERE WAS AN ITEM BEING THROWN FROM WHAT LOOKS LIKE THE LEFT SIDE OF THE WALL.

YES, IT LOOKS LIKE THIS ITEM IS BEING THROWN FROM THAT WALL AREA, YES.

MR. FRIES IS THE ONLY PERSON NOW THAT IS DISAGREEING.

AND THEN MR. FRIES HIMSELF, THIS IS HIM AGAIN TALKING ABOUT WHY IT'S NOT USEFUL TO LISTEN TO WHAT THE OFFICERS ARE SAYING.  SOMEBODY COULD SAY LOOK TO THE LEFT.  THEIR CONTEXT TO THIS STATEMENT IS MISSING.  HE WOULD HAVE NO IDEA WHAT THEY ARE TALKING ABOUT AND YOU WOULDN'T WANT TO USE THAT IN ANY WAY TO COME UP WITH A CONCLUSION OR ANALYSIS, IT'S NOT CONCRETE, IT'S OPEN TO INTERPRETATION.  YOU REALLY DON'T WANT TO FOCUS ON FACTS OR EVIDENCE LIKE THAT.

I DISAGREE.  I THINK WHEN I WATCH THE VIDEO, I THINK I CAN GET A PRETTY GOOD SENSE OF WHERE THAT IS COMING FROM AND THE FACT THAT THE OFFICERS ARE CALLING OUT AND IDENTIFYING SPECIFIC OBJECTS AND POINTING IN DIRECTIONS AND CALLING OUT DIRECTIONS I THINK IS REALLY HELPFUL TO SEE WHERE THEY ARE COMING FROM BECAUSE AT THE END OF THE DAY, THEY WERE THE ONES ON SCENE AND EXPERIENCING IT IN REAL TIME.  THEY'RE NOT THE ONES MAKING UP THEIR MIND BASED ON 12 VIDEOS OUT OF 600.  THEY'RE SEEING EVERYTHING, THE TOTALITY OF THE CIRCUMSTANCES AS IT HAPPENS

ER0358

DEFENDANTS' CLOSING ARGUMENT

LIVE, RATHER THAN LOOKING AT A SELECTION OF PORTION OF VIDEOS WELL, WELL AFTER THE FACT AND HAVING HUNDREDS OF HOURS TO TAKE TO GET THROUGH THIS INFORMATION.

SELECTION BIAS.  I THINK THAT'S WHAT THE PROBLEM IS WITH MR. FRIES'S TESTIMONY AND HIS ANALYSIS.  AT THE END OF THE DAY YOU HAVE 600 VIDEOS.  YOU ONLY USE 12.

I SHOWED HIM ALL OF THESE VIDEOS THAT I THINK SHOWS SOME THINGS PRETTY CLEARLY, THAT THE BOTTLES WERE COMING FROM THE LEFT SIDE OF THE WALL PRETTY CLEARLY, AND HE JUST ULTIMATELY DISAGREES.  YOU KNOW, HE SAYS THOSE 12 ARE ALL I NEED, AND I'M SURE, I'M CONFIDENT -- HE TOLD YOU WITH CERTAINTY THAT HE CAPTURED EVERYTHING THAT HAPPENED.  IT DOESN'T MATTER IF HE HAD A 14TH VIDEO OR A 15TH VIDEO OR 16TH VIDEO.  BASED UPON HIS AMAZING TECHNOLOGY, JUST THOSE 12 VIDEOS CAPTURED EVERYTHING THAT THERE WAS TO CAPTURE.

I DISAGREE.  I DON'T THINK THAT IS SUPPORTED BY THE EVIDENCE THAT WE'VE ACTUALLY SEEN IN THIS CASE.

SO ANOTHER PART OF THAT SELECTION BIAS IS HE WAS HIRED TO DO A JOB AND HE KNEW WHAT THAT JOB WAS.  HE EVEN AGREED THAT HE COULD PUT IT TOGETHER AND THAT THIS WAS PROBABLY A PLAINTIFF ASKING HIM TO PUT TOGETHER THIS REPORT.  YES.

HE HAD A GOAL.  AND I KNOW HE SAID PART OF THIS WAS JUST TO MAKE AN OBJECTIVE MATH AND A RE-CREATION OF WHAT OCCURRED ON THIS CASE, BUT EVIDENCED BY THE FACT THAT HE USED ONLY 12 OUT OF 600-PLUS VIDEOS, AND SPECIFICALLY NOT THE VIDEOS THAT I

PRESENTED HIM THAT I DO THINK SHOWED EVIDENCE INCONSISTENT WITH HIS ANALYSIS AND OPINION, I THINK THAT SHOWS SELECTION BIAS AND THAT, YOU KNOW, HE KNEW HE HAD A JOB TO DO.  PART OF IT WAS IDENTIFYING THE OFFICER WHO DID IT, BUT ALSO KNOWING THAT HE'S WORKING FOR A PLAINTIFF'S ATTORNEY TO TRY TO CRAFT AN OPINION THAT I THINK WILL SUPPORT THE CONCLUSION THAT -- OR AT LEAST ALLOW THE PLAINTIFFS TO ARGUE THAT THE FORCE IN THIS CASE WAS EXCESSIVE, AND, AGAIN, THE SOLE AND EXCLUSIVE THEORY OF EXCESSIVE FORCE IS BECAUSE THAT FORCE USED WAS USED INDISCRIMINATELY.

CAN WE PLAY THAT ONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  SELECTION BIAS IS NOT A FOREIGN CONCEPT, AND, IN FACT, IT IS A CONCEPT THAT WAS DISCUSSED WHEN OFFICERS WERE HAVING DIALOGUE WITH PEACEFUL PROTESTORS THAT WERE THERE AT THE SAME TIME.

IT'S NOT A COMPLICATED, YOU KNOW, IDEA OR THEORY OR THOUGHT PROCESS TO GET BEHIND.  HE EVEN, YOU KNOW, IDENTIFIED IT HIMSELF, AND TO SOME EXTENT I THINK ACCUSED ME OF THE SAME THING, A CONFIRMATION BIAS.  IT'S WELL-KNOWN BECAUSE IT MAKES SENSE.

AND WHILE, YOU KNOW, I DON'T TAKE UMBRAGE WITH HIM SUGGESTING THAT I HAVE SOME SORT OF CONFIRMATION BIAS AS WELL, TOO, BUT I DO TAKE CONFIDENCE IN THE FACT THAT I KNOW I LOOKED AT THE VIDEOS THAT HE USED TO MAKE HIS DETERMINATION, AND I

ER0360

KNOW THAT I LOOKED AT VIDEOS THAT HE DIDN'T USE TO MAKE HIS DETERMINATION.

SO IF NOTHING ELSE, I FEEL LIKE THE CONCLUSIONS THAT I'M DRAWING ARE BASED UPON A BROADER SPECTRUM AND A MORE EVEN OR FAIR PERSPECTIVE OF WHAT ACTUALLY OCCURRED BASED UPON THE DIFFERENT VIDEOS THAT WE VIEWED TO COME TO OUR OWN DIFFERENT OPINIONS.

SO THE TOTALITY OF THE CIRCUMSTANCES.  THAT'S WHAT REALLY MATTERS IN THIS CASE.  IT'S SOMETHING THAT, FRANKLY, DIDN'T MATTER TO MR. FRIES, BECAUSE AS HE TOLD YOU, WHAT HAPPENED AT THE 10:24 MARK IS NOT IMPORTANT TO HIM, DOESN'T MAKE ANY DIFFERENCE TO HIM.

HIS QUESTION THAT HE WAS ANSWERING IS WHO FIRED THE PROJECTILE THAT STRUCK MR. JOHNSON?  AND THAT HAPPENED AT 10:33.  SO WHY WOULD I CARE ABOUT ANYTHING THAT HAPPENED AT 10:24?

I MEAN, THAT MAKES PERFECT SENSE FOR HIS ROLE AND HIS OBJECTIVE.  WHAT HAPPENED AT THAT 10:33 MOMENT THAT MR. JOHNSON WAS STRUCK, AND HE GAVE YOU THAT VERY SPECIFIC TRAJECTORY AND THAT IMAGE.  IT'S JUST LITERALLY THE MOMENT THAT THAT PROJECTILE WEAPON WAS FIRED AND WHERE IT WOULD HAVE HIT, NOT THE MOMENTS LEADING UP TO IT WHERE I THINK IN THOSE STILL FRAMES YOU CAN TELL THAT OFFICER ADGAR IS TRACKING SOMEBODY BEFORE HE GETS TO THAT ONE SINGLE MOMENT IN TIME WHERE THE TRAJECTORY LINE WAS JUST PERFECT TO HIT MR. JOHNSON.

ER0361

BUT THOSE 10 MINUTES MATTER TO OFFICER ADGAR AND THEY MATTER TO YOU BECAUSE INSTRUCTION 33 SAYS THEY SHOULD.

AGAIN, WE'RE NOT JUDGING HIS BEHAVIOR WITH THE 20/20 HINDSIGHT, VISION OF HINDSIGHT, THE PERFECT 30 FRAMES PER SECOND VISION.  WE ARE CONSIDERING THE FACTS KNOWN TO THE OFFICER THAT ARE RELEVANT TO YOUR INQUIRY.

FRANKLY, FOR OFFICER ADGAR, WHAT HAPPENED 10 MINUTES AGO WHEN THERE ARE BOTTLES COMING FROM THAT EXACT SAME AREA WHERE MR. JOHNSON IS STANDING AT 10:33 AND WHERE, AGAIN, BOTTLES AT 10:33 ARE COMING FROM THAT EXACT SAME AREA, THAT'S IMPORTANT INFORMATION THAT OFFICER ADGAR CAN AND SHOULD USE.  HE'D BE FOOLISH NOT TO USE IT WHEN TRYING TO DETERMINE WHAT IS THE BEST THING TO DO AT 10:33 AND WHETHER OR NOT THERE IS A SERIOUS THREAT TO THE OTHER OFFICERS OR THE OTHER PROTESTORS OR HIMSELF WHEN HE MAKES THE DECISION TO ULTIMATELY FIRE THE PROJECTILE IMPACT WEAPON.

FURTHER, AGAIN, INSTRUCTION 33, CONSIDER THE NATURE OF THE CRIME AND THE OTHER CIRCUMSTANCES KNOWN TO THE OFFICERS AT THE TIME THE FORCE WAS APPLIED.  THAT'S WHAT WE'RE TALKING ABOUT FOR TOTALITY OF THE CIRCUMSTANCES.  CIRCUMSTANCES KNOWN TO THE OFFICER AT THE TIME THE FORCE WAS APPLIED.

YOU ARE TO CONSIDER THOSE CIRCUMSTANCES KNOWN TO THE OFFICER WHEN YOU EVALUATE WHETHER HIS USE OF FORCE WAS EXCESSIVE.  AND AGAIN, THE SOLE EXCLUSIVE THEORY OF THE PLAINTIFFS AS TO WHY IT WAS EXCESSIVE WAS BECAUSE THE FORCE

ER0362

WOULD BE USED INDISCRIMINATELY.

JUST IN TERMS OF USING THAT PAST INFORMATION, EVEN THEIR OWN EXPERTS DO THE EXACT SAME BECAUSE IT'S NATURAL, THAT'S WHAT YOU DO, THAT'S HOW YOU LEARN, THAT'S HOW YOU EVOLVE, AND THAT'S HOW YOU GET THROUGH YOUR DAY.  YOU REALIZED WHAT HAPPENED LAST TIME, YOU KNOW IT IS GOING TO HAPPEN THIS TIME.  THEY ALWAYS SAY, YOU ONLY NEED TO LEARN ONCE NOT TO TOUCH A HOT STOVE BECAUSE YOU USE YOUR PAST EXPERIENCES TO INFORM YOUR FUTURE CONDUCT AND BEHAVIOR.

SO DR. WATKINS SAID WHEN HE IS TRYING TO PREDICT FUTURE HEALTH ISSUES, HE MAKES DECISIONS BASED ON PAST EXPERIENCES. WE CAN'T MAKE EXACT PREDICTIONS, BUT WE DO THE BEST WE CAN WITH THE INFORMATION WE HAVE AND WE HOPE FOR THE BEST.

THAT'S WHAT DOCTORS DO, TOO.

DR. MASON, SAME THING.  LONG-TERM PROJECTION IS HARD, NOT GOOD AT IT.  THE BEST PREDICTOR IS PAST EXPERIENCES.  YOU CAN'T ACCOUNT FOR THE UNPREDICTABLE.

THE UNPREDICTABLE LIKE THE LEVEL OF CHAOS ON MAY 29TH THAT WAS JUST SO UNPRECEDENTED IN SAN JOSE AND NOBODY HAD EVER DEALT WITH BEFORE.  BUT ONCE THEY LIVED THROUGH 5-29, THEY HAD ADDITIONAL INFORMATION THAT WOULD INFORM HOW THEY WOULD ACT AND RESPOND TO THE CONTINUED DEMONSTRATIONS IF THEY WERE ANYTHING LIKE MAY 29TH.

SO NOW I WANT TO GO THROUGH A SECTION AGAIN, AND THIS IS GOING TO BE MOMENTS FROM THE 22:33 TIME PERIOD JUST AS

ER0363

OFFICER ADGAR IS TRACKING AND ABOUT TO FIRE HIS PROJECTILE, BUT HOPEFULLY THIS ENCOMPASSES THE TOTALITY OF THE CIRCUMSTANCES.

SO THIS IS 22:33:12.  ONE-TENTH OF A SECOND IN TIME AS OFFICER ADGAR IS TRACKING A TARGET AND IS ABOUT TO FIRE HIS PROJECTILE IMPACT WEAPON.

AND WHAT YOU CAN, SHOULD AND THE JURY INSTRUCTIONS TELL YOU TO DO IS CONSIDER ALL OF THE CIRCUMSTANCES KNOWN TO HIM.

SO HE KNEW WHAT HAPPENED AT 10:22.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  HE KNEW WHAT HAPPENED ON MAY 29TH.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  ONE SECOND LATER, 22:33:13.  HE'S CONSIDERING WHAT HAPPENED AT 10:24 AND HE'S CONSIDERING WHAT HAPPENED ON 5-29.  IT WOULD BE FOOLISH NOT TO.  TO IGNORE THAT INFORMATION YOU OBTAINED AND JUST BE WILLFULLY BLIND TO IT AND BURY YOUR HEAD IN THE SAND, THAT'S A RECIPE FOR DISASTER.

10:33:13 HE'S STILL CONSIDERING WHAT HAPPENED AT 10:24.  CAN YOU PLAY.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  HE'S STILL CONSIDERING WHAT HAPPENED ON 5-29.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AND THOSE EXPERIENCES ARE HELPING INFLUENCE WHAT HE DOES AT 10:33:14.

10:24 P.M., THAT'S ON HIS MIND.

ER0364

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AS YOU SEE THERE -- CAN YOU PLAY THAT ONE AGAIN FOR ME.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  IN THE CENTER OF THE SCREEN SOMEBODY IS THROWING A BOTTLE RIGHT BETWEEN THE TRAPEZOIDAL WALL AND THE ARCH, THE PILLAR THAT WE DISCUSSED AND SAW IN THE SITE VIEW.

10:24.  IT WOULD BE FOOLISH NOT TO TAKE THAT INTO ACCOUNT WHEN HE SEES WHAT LOOKS TO HIM TO BE BOTTLES COMING FROM THAT SAME AREA.

AND OF COURSE HE'S GOT 5-29 ON HIS MIND, TOO, HOW BAD THINGS CAN GET.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  10:33:14, CLOSER AND CLOSER AND CLOSER IN TIME TO THE MOMENT THAT HE FIRED THE PROJECTILE THAT STRUCK MR. JOHNSON.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AGAIN, THIS IS 10:24 MOMENT.  BUT I THINK HE'S OBVIOUSLY IDENTIFYING WHAT WAS JUST DEPICTED IN THAT PREVIOUS VIDEO THAT I SHOWED YOU.

AND THIS IS INFORMATION THAT HE CAN AND SHOULD BE USING WHEN DETERMINING WHETHER OR NOT HE SHOULD FIRE AT 10:33 IN THAT SAME GENERAL AREA.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  OF COURSE HE'S GOT 5-29 ON HIS MIND

ER0365

STILL, TOO.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  HOW BAD THINGS CAN POTENTIALLY GET.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  THIS IS OFFICER ADGAR'S PERSPECTIVE, HIS BODY WORN CAMERA AGAIN IN REAL TIME AS HE HAS TO CONSIDER ALL OF THE THINGS THAT I'VE JUST HOPEFULLY DESCRIBED TO YOU WHAT HAPPENED AT 10:24, AND WHAT HAPPENED THE DAY BEFORE, AND HOW THOSE EXPERIENCES ARE INFLUENCING HIS DECISIONS HERE IN THOSE FEW BRIEF SECONDS WITH WHICH HE HAD TIME TO EVALUATE WHETHER OR NOT HE HAD A GOOD TARGET, A JUSTIFIABLE TARGET, AND HAD TO DETERMINE WHETHER OR NOT HE WAS GOING TO USE FORCE IN THAT MOMENT.

SO I WANT TO ADDRESS THE POLICY AND CUSTOM A LITTLE BIT AGAIN, AND, ONCE AGAIN, FOCUS ON THE WORD "INDISCRIMINATELY" BECAUSE THAT IS THE SOLE AND EXCLUSIVE THEORY OF THE CASE.  THE ONLY THING THAT YOU'RE GOING TO HEAR PLAINTIFF ARGUE AS TO WHY THEY ALLEGE THE FORCE USED IN THIS CASE WAS EXCESSIVE, BECAUSE THE USE OF FORCES WAS INDISCRIMINATE.

I WANT TO LOOK AT SOME OF THE DUTY MANUAL SECTIONS AS WELL, TOO.  MR. SCHECHTER SHOWED YOU SOME OF THESE, SO I WON'T SPEND TOO MUCH TIME WITH IT, BUT I DO WANT TO IDENTIFY SOME OF THE OTHER THINGS FROM A DIFFERENT PERSPECTIVE.

PHYSICAL FORCE IS A SERIOUS RESPONSIBILITY.  IT SHOULD BE EXERCISED JUDICIALLY.  EVERYBODY HAS A RIGHT TO BE FREE FROM

ER0366

EXCESSIVE FORCE.

THE DECISION BY AN OFFICER SHALL BE EVALUATED CAREFULLY AND THOROUGHLY, THOUGH, IN A MANNER THAT REFLECTS THE GRAVITY OF THAT AUTHORITY AND THE SERIOUS CONSEQUENCES OF THE USE OF FORCE.

THAT SOUNDS PRETTY INCONSISTENT WITH AN ALLEGED POLICY THAT IS NOT-SO SECRET AND BROADLY ACCEPTED AND KNOWN AND APPLIED BY MOST, IF NOT ALL, SAN JOSE POLICE OFFICERS THAT SAYS THAT WE DON'T HAVE TO WORRY ABOUT THROWING AWAY THE DUTY MANUAL AND DOING WHATEVER THE HECK WE WANT BECAUSE WHILE THIS SEEMS TO SAY PRETTY EXPLICITLY THERE ARE GOING TO BE EVALUATIONS, CAREFUL EVALUATIONS, THOROUGH EVALUATIONS, BUT THAT'S JUST NONSENSE, GARBAGE.  IT HAS NO VALUE WHATSOEVER BECAUSE IN PRACTICE, THERE IS IN FACT A CUSTOM OR A POLICY, MAYBE NOT WRITTEN, BUT SO WIDELY WRITTEN AND ACCEPTED THAT SAYS THAT WE DON'T HAVE TO DO THAT.

FURTHER ON.  OBJECTIVELY REASONABLE FORCE.  YOU SAW THIS ONE ON MR. SCHECHTER'S ARGUMENT AS WELL, TOO.

I'M FOCUSSING ON THE FACT THAT YOU HAVE GOT TO BE ANALYZING PER THE DUTY MANUAL THE PERSPECTIVE THAT A REASONABLE OFFICER POSSESSING THE SAME INFORMATION AND FACED WITH THE SAME CIRCUMSTANCES AS THE OFFICER WHO ACTUALLY USED FORCE.  THAT'S THE WHOLE TOTALITY OF THE CIRCUMSTANCES ARGUMENT.  IT'S NOT JUST IN THE JURY INSTRUCTIONS.  IT'S CODIFIED IN THE DUTY MANUAL ITSELF.  AND THE FACT THAT YOU HAVE TO TAKE ACCOUNT,

ER0367

WHERE APPROPRIATE, THAT IN THIS CASE OFFICER ADGAR HAD TO MAKE AN EXTREMELY RAPID DECISION REGARDING THE AMOUNT OF FORCE TO USE IN A TENSE, UNCERTAIN, AND RAPIDLY EVOLVING SITUATION WITH ALL OF THE INFORMATION THAT HE KNEW FROM THE 29TH AND ALL OF THAT INFORMATION THAT HE KNEW FROM 10:24 P.M.

CONSIDER WHETHER THE SUBJECT POSES AN IMMEDIATE THREAT TO THE SAFETY OF THE OFFICERS OR OTHERS.  SO WHEN THEY TELL YOU OFFICER ADGAR HAD NO REASON TO SHOOT BECAUSE NONE OF THOSE BOTTLES CAME HIS WAY OR ANYWHERE CLOSE TO HITTING HIM, IT DOESN'T MATTER SO LONG AS BOTTLES WERE PUTTING OTHER PEOPLE AT RISK, OTHER OFFICERS AT RISK, OR OTHER MEMBERS OF THE DEMONSTRATION AT RISK.

LIKE MR. SCHECHTER HONED IN ON, THIS POLICY APPLIES TO ALL USES OF FORCE.  SO AT THE END OF THE DAY, WHATEVER FORCE POLICY YOU'RE LOOKING AT, WHETHER IT'S THE 40 MILLIMETER, WHETHER IT'S THE 37 MILLIMETER, WHETHER IT'S A TASER, WHETHER IT'S A BATON, WHETHER IT'S JUST GOING HANDS ON, THIS POLICY THAT SAYS CONSIDER THE INFORMATION THAT THE OFFICER HAD, THE SAME CIRCUMSTANCES UNDER WHICH THEY ACTUALLY USED FORCE, THE FACT THAT THEY CAN'T JUDGE IT IN HINDSIGHT AND HAVE TO CONSIDER AND TAKE ACCOUNT FOR THE FACT THAT A RAPID DECISION, A TENSE AND UNCERTAIN RAPIDLY EVOLVING SITUATION.  THAT APPLIES AND IS THE FOUNDATION FOR EVERY SINGLE USE OF FORCE IN THE MANUAL WHATSOEVER AND EVERY SINGLE USE OF FORCE BY ANY MEMBER OF THE SAN JOSE POLICE DEPARTMENT.

ER0368

I THINK THAT'S PRETTY INCONSISTENT WITH A SUPPOSED UNWRITTEN CUSTOM OR POLICY THAT SAYS WE CAN JUST FIRE INDISCRIMINATELY, THE 40 MILLIMETER INDISCRIMINATELY INTO THE CROWD OR JUST THROW AWAY THE DUTY MANUAL AND IGNORE IT ENTIRELY.  I THINK IT'S PRETTY INCONSISTENT WITH THAT ALLEGATION.

AND AS IT APPLIES TO THE PROJECTILE IMPACT WEAPONS THEMSELVES, USE WHEN OBJECTIVELY REASONABLE, CONSIDERING WHAT WE JUST HEARD IN THE PREVIOUS ONE, THE CIRCUMSTANCES KNOWN TO THE OFFICERS, AND THE TIMEFRAME IN WHICH THEY HAVE TO DO IT, AND THE CHAOTIC SITUATIONS THEY HAVE TO MAKE THAT DECISION.

BUT SPECIFICALLY, REASONABLE, IF A SUSPECT IS ARMED WITH A WEAPON LIKELY TO CAUSE SERIOUS BODILY INJURY OR DEATH UNTIL THAT PERSON CAN BE SAFELY TAKEN INTO CUSTODY OR WHEN IT'S LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED.

SO THAT SECOND COMPONENT DOESN'T -- IS NOT TIED TO ANY SORT OF NECESSITY OR REQUIREMENT TO TAKE CONTROL OF A SUSPECT OR SAFELY TAKE THEM INTO CUSTODY.

SO WHEN THEY KEEP TRYING TO TELL YOU, WELL, HE DIDN'T ACTUALLY GO AND ARREST ANYBODY AND SO, THEREFORE, IT'S A VIOLATION OF POLICY, NOT UNDER L 2629.  IT SAYS, HEY, IF ITS USE IS LIKELY TO PREVENT FURTHER OR POSSIBLE SERIOUS INJURY TO PEOPLE, THEN IT'S OKAY EVEN IF YOU DON'T GO IN AND ARREST THEM, BECAUSE THAT'S ULTIMATELY WHAT THIS CASE IS ABOUT.

THE ALLEGATION AND WHAT WE CONTEND IS THAT THE OFFICERS

ER0369

DEFENDANTS' CLOSING ARGUMENT

AND THE PEACEFUL PROTESTORS THERE WERE PUT AT THREAT OF SERIOUS BODILY INJURY BECAUSE OF WHAT WAS HAPPENING IN THE CROWD AND THE ITEMS BEING THROWN IN THE CROWD.

SO THIS IS THE SECOND SCENARIO WHERE YOU SHOULD DETERMINE WHETHER OR NOT OFFICER ADGAR'S USE OF FORCE WAS REASONABLE TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED AND DON'T GET SO HUNG UP ON THINGS THAT HE VIOLATED POLICY SIMPLY BECAUSE IT WAS, FRANKLY, UNSAFE AND IMPOSSIBLE TO WADE INTO THAT CROWD AND TRY TO ARREST FOLKS OR PROVIDE MEDICAL AID.

THIS GOES BACK TO SOME OF MR. JOHNSON'S TESTIMONY AGAIN. I ASKED HIM WHETHER HE THOUGHT THAT THE PEACEFUL PROTESTORS OR THE OFFICERS WERE AT RISK OF SERIOUS BODILY INJURY BECAUSE OF THE ITEMS THAT WERE THROWN.

AND MR. JOHNSON HIMSELF, AGAIN, HONEST ALL OF THE WAY THROUGH THIS ENTIRE CASE AND TESTIMONY. YOU CAN SEE IN THE VIDEO THAT INDIVIDUALS THAT WERE FURTHER BACK TOWARDS THE BUILDING WERE THROWING ITEMS?

YES.

AND YOU HEARD THE GLASS SHATTERING?

YES.

AND YOU BELIEVE IT COULD CAUSE INJURY?

YES.

AND AFTER WATCHING THE VIDEO, ALTHOUGH HE DIDN'T HAVE THE INITIAL RECOLLECTION OR DIDN'T NECESSARILY NOTICE IT AS HE WAS EXPERIENCING THE EVENT IN REAL TIME BECAUSE HE WAS FOCUSSED ON

ER0370

GETTING OUT OF THERE AND THE INJURY TO HIS LEG.

BUT NOW LOOKING BACK AT IT AFTER WATCHING THE VIDEO, HONESTLY, YES, IT COULD HAVE BEEN A POSSIBILITY THAT SOMEONE BEING STRUCK BY THE ITEMS THAT WERE THROWN, SOME OF THEM BEING GLASS BOTTLES, COULD SERIOUSLY INJURE SOMEBODY.

SO BASED UPON THE DUTY MANUAL AND MR. JOHNSON'S OWN OBSERVATIONS HAVING WATCHED THE VIDEO AFTERWARDS, I CONTEND THAT, YES, AS WE GO BACK AND LOOK AT THE POLICY, WAS THE USE OF FORCE, THE 40 MILLIMETER AT THIS TIME LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED?

I THINK SO, AND I THINK THAT WAS AN OBVIOUS AND CLEAR INTENTION OF OFFICER ADGAR'S DISCHARGE OF THE 40 MILLIMETER AT 10:33.

MORE DUTY MANUAL.  THIS IS PROHIBITED USES OF PROJECTILE IMPACT WEAPONS.

WEAPONS WILL NOT BE USED UNTIL A SUFFICIENT NUMBER OF OFFICERS ARE PRESENT TO IMMEDIATELY TAKE CONTROL OF THE SUSPECT EXCEPT IN EMERGENCY SITUATIONS.

SO, AGAIN, THE SAME WAY THAT THEY'RE GOING TO ARGUE THAT HE DIDN'T ARREST HIM, SO THAT'S A VIOLATION OF POLICY, THEY'RE GOING TO TRY TO ARGUE THAT THEY DIDN'T PROVIDE MEDICAL ATTENTION, AND, THEREFORE, HE'S VIOLATING POLICY.

THAT'S NOT WHAT THE POLICY SAYS.  THE POLICY ACKNOWLEDGES THAT EMERGENCY SITUATIONS, THAT THAT'S NOT POSSIBLE TO DO SO, AND THAT'S EXACTLY WHAT YOU HEARD.

ER0371

THEY TRIED TO WADE INTO THAT CROWD TO FIND SOMEBODY WHO WAS STRUCK OR INJURED BY A PROJECTILE.  THEY WERE AT RISK OF BEING INUNDATED AND SWARMED BY POTENTIALLY VIOLENT MEMBERS OF THAT PROTEST.

NOT A GUARANTEE IT IS GOING TO HAPPEN, BUT THAT IS CERTAINLY A REASONABLE CONSIDERATION AND FEAR TO HAVE BASED UPON THEY KNEW FROM 10:24 P.M. AND WHAT THEY KNEW FROM MAY 29TH.  SPECIFICALLY, AT LEAST ONE OFFICER HAD BEEN KNOCKED UNCONSCIOUS BY ONE OF THE MEMBERS OF THE DEMONSTRATION.

SO GETTING BACK TO THE IDEA THAT THERE'S SOME SORT OF POLICY OR CUSTOM THAT ALLOWS OFFICERS TO INDISCRIMINATELY FIRE 40 MILLIMETER PROJECTILES INTO THE CROWD OR TO SIMPLY DISREGARD THE POLICIES AND STANDARDS.  I DON'T THINK THERE'S ANY SORT OF EVIDENCE OF THAT.  AND I WOULD ASK YOU WHAT YOU BELIEVE A POLICY OR CUSTOM IS.

I CONTEND IT HAS TO BE SOMETHING THAT IS BROADLY KNOWN AGAINST SAN JOSE POLICE DEPARTMENT OFFICERS BECAUSE IF IT'S NOT BROADLY KNOWN AGAINST THE OFFICERS, HOW COULD YOU REALLY CALL IT ANY SORT OF POLICY THAT HAS ANY EFFECT OR ANY SORT OF CUSTOM IF IT'S NOT BROADLY KNOWN AMONGST ALL OF THE OFFICERS?  IT HAS TO BE BROADLY UNDERSTOOD.  IT HAS TO BE BROADLY ACCEPTED AMONGST THE OFFICERS IF, AS I CONTEND, YOU'RE TO CONSIDER THE ACTIONS OF THE OFFICERS PART OF A CUSTOM OR A POLICY THAT THEY ARE ACTING IN ACCORDANCE WITH AND IN FURTHERANCE OF.

AND ULTIMATELY THAT THIS TYPE OF BEHAVIOR IS AUTHORIZED,

ER0372

THE INDISCRIMINATE USE OF WEAPONS OR JUST DISREGARDING THE POLICY.  YOU HAVE TO BELIEVE THAT THAT'S SANCTIONED BY SUPERIORS.

AND I THINK BY LOOKING AT THE DUTY MANUAL YOU CAN TELL IT SEEMS AT LEAST THE WRITTEN POLICY IS THAT THEY EVALUATE USE OF FORCE VERY THOROUGHLY AND CAREFULLY, AND THAT SUGGESTS THAT IGNORING THE DUTY MANUAL AND ALLOWING INDISCRIMINATE USE IS SIMPLY NOT AUTHORIZED.  SO I CONTEND EVIDENCE THAT THERE IS NOT SOME SORT OF NOT-SO SECRET CUSTOM OR POLICY THAT ALLOWS YOU TO DISREGARD THE DUTY MANUAL AND FIRE INDISCRIMINATELY.

AND TO PROVE A CUSTOM OR POLICY, THEY HAVE TO SHOW THAT IT WAS LONGSTANDING OR WIDESPREAD.  THINK OF THE EVIDENCE THAT HAS BEEN PRESENTED HERE IN TERMS OF IDENTIFYING AND PROVING THE EXISTENCE OF A LONGSTANDING CUSTOM OR POLICY.  WHAT IS THE TIME PERIOD WE'RE LOOKING AT?

MAY 29TH, 2020 AT ABOUT 5:00 P.M. WHEN THE INITIAL USE OF FORCE BY OFFICERS STARTED UP UNTIL 10:33:16 P.M.  THAT'S I THINK AS CLOSE AS YOU CAN GET TO THE MOMENT THAT MR. JOHNSON WAS STRUCK.

SO THEY'RE SAYING THAT SOMEHOW BETWEEN 5:00 P.M. ON MAY 29TH AND 10:33 P.M. SPONTANEOUSLY MANIFESTED SOME SORT OF CUSTOM OR POLICY THAT WAS SO BROADLY KNOWN AND UNDERSTOOD AND ACCEPTED BY OFFICERS THAT SAID THAT YOU CAN FIRE INDISCRIMINATELY OR JUST THROW OUT THE DUTY MANUAL, THAT DEVELOPED AND WAS A LONGSTANDING PRACTICE BECAUSE JUST OVER THE

ER0373

DEFENDANTS' CLOSING ARGUMENT

COURSE OF 24 HOURS, THAT SOMEHOW MADE ITS WAY AROUND ALL OF THE SAN JOSE PD OFFICERS, OR AT LEAST A GOOD PORTION OF THEM, THEY UNDERSTOOD THE MESSAGE, THEY ACCEPTED IT, AND THEY ACTED IN ACCORDANCE IN FURTHERANCE OF THAT POLICY.  I THINK THAT'S JUST TOO SHORT OF A TIME TO SAY THAT THERE'S ANY SORT OF LONGSTANDING PRACTICE BY LITERALLY JUST OVER -- SLIGHTLY OVER 24 HOURS.

SO THE ALTERNATIVES TO SHOW THAT WAS WIDESPREAD AND TO DEMONSTRATE THE EXISTENCE OF A WIDESPREAD CUSTOM OR PRACTICE, THINK ABOUT THE EVIDENCE THAT WAS PRESENTED TO YOU.  THAT'S WHY CONTRERAS WAS HERE, AND THAT IS WHY DIDONATO WAS HERE, AND SANDERLIN WAS HERE, AND THAT IS WHY THEY ARE MENTIONED, THE BICYCLE GUY.  THEY'RE TRYING TO IDENTIFY SINGLE INCIDENTS FROM WHICH YOU CAN EXTRAPOLATE THE FACT THAT THERE'S A WIDESPREAD PRACTICE THAT ALLOWS INDISCRIMINATE USE OR TO THROW THE DUTY MANUAL AWAY AND IGNORE IT.

FRANKLY, JUST RIGHT THERE, I THINK IT'S AN EXTREME OVERREACH TO SAY THAT YOU CAN CONSIDER A POLICY OR CUSTOM WIDESPREAD BECAUSE YOU HAVE FOUR ANECDOTAL INCIDENTS FROM WHICH TO SUGGEST THAT THERE IS A BROADLY ACCEPTED, UNDERSTOOD CUSTOM OR POLICY THAT OFFICERS ARE ACTING IN ACCORDANCE OR IN FURTHERANCE OF.

BUT FURTHERMORE, THERE'S SOMETHING ELSE THAT HER HONOR TOLD YOU DURING THE INITIAL JURY SELECTION PROCESS, AND IT WAS ABOUT GIVING INCOMPLETE INFORMATION.  AND SHE GAVE YOU THE

ER0374

EXAMPLE OF YOU'RE PULLING UP TO THE STOPLIGHT, AND THE LIGHT IS GREEN, BUT THE CARS IN FRONT OF YOU ARE STILL STOPPED. AND YOU'RE TRYING TO GET HOME, AND YOU'RE LATE, AND YOU'RE FRUSTRATED, AND YOU'RE ANGRY. AND YOU'RE SO TEMPTED TO LAY ON THAT HORN AND SAY GO, WHAT IS GOING ON.

BUT THEN YOU GET A LITTLE FURTHER UP AND YOU REALIZE THAT THE GUY IN THE WALKER WAS CROSSING THE ROAD. YOU KNOW, SO THAT'S WHY THE CARS WERE STOPPED, AND NOW YOU FEEL LIKE A JERK.

AND SHE TOLD YOU, JUST LIKE EVERY OTHER SITUATION THAT WE CONFRONT IN LIFE, YOU NEED ALL OF THE INFORMATION BEFORE YOU CAN DRAW A CONCLUSION.

AND THAT'S TRUE WHEN YOU CONSIDER THE TESTIMONY AND THE EXPERIENCES OF CONTRERAS AND DIDONATO AND SANDERLIN AND EVEN THE BICYCLE GUY. YOU DON'T HAVE ALL OF THE INFORMATION, AND IT'S HARD OR UNFAIR TO DRAW A CONCLUSION WITHOUT HAVING ALL OF THE INFORMATION.

AND JUST THINK ABOUT IT, I MEAN, IN THIS CASE YOU WENT THROUGH 18 SLIDES REPRESENTING LESS THAN 3 SECONDS, AND THERE WERE HUNDREDS OF VIDEOS ANALYZED, HUNDREDS OF HOURS CREATING CRAZY 3D LIDAR MAPS AND NEARLY 30 HOURS IN EVIDENCE.

HOW MUCH INFORMATION DO YOU HAVE ABOUT THOSE OTHER FOUR PEOPLE WHO WERE STRUCK OVER THE COURSE OF, YOU KNOW, 25, 30 HOURS FROM MAY 29TH AT 5:00 P.M. TO MAY 30TH AT 10:33? AND THEY'RE EXPECTING YOU TO ESTABLISH OR FIND THAT THERE WAS A CUSTOM OR POLICY BASED UPON FOUR ANECDOTAL INCIDENTS WHICH WE

DEFENDANTS' CLOSING ARGUMENT

HAVE VERY, VERY LITTLE INFORMATION ON.

LET'S TALK ABOUT THAT.  CONTRERAS.  WE DON'T KNOW WHAT SHE WAS HIT WITH.  WE DON'T KNOW IF IT WAS A PROJECTILE IMPACT WEAPON OR SOMETHING THROWN BY A MEMBER IN THE CROWD.  WE DON'T KNOW WHO IT WAS THAT HIT HER, WHETHER IT WAS AN OFFICER OR WHETHER IT WAS A MEMBER OF THE CROWD THAT THREW SOMETHING OR DID SOMETHING ELSE.  THERE IS JUST NO EVIDENCE OF IT.

WE DO KNOW SHE WAS ON HIGHWAY 101.  AND WE DO KNOW, AND SHE AGREED THAT SHE KNEW IT WAS ILLEGAL, BUT SOMEHOW SHE DENIED SEEING ANY SORT OF VIOLENCE UP UNTIL THE TIME SHE WAS STRUCK EVEN THOUGH THE EVIDENCE CLEARLY SHOWED THAT ON HIGHWAY 101 THERE WERE PEOPLE JUMPING ON CARS, SMASHING OUT WINDOWS, AND FIGHTING.  AND THE WHOLE MARCH BACK FROM 101 TO CITY HALL WAS FILLED WITH VIOLENCE AND BOTTLES BEING THROWN AND ITEMS BEING THROWN AND CONSTANT UNLAWFUL ASSEMBLY AND DISPERSAL ORDERS.

DIDONATO.  WHAT DON'T WE KNOW ABOUT HIM?  WE KNOW HE WAS HIT BY SOME SORT OF PROJECTILE BUT WAS THAT ONE OF THE 40 MILLIMETERS OR WAS THAT A 37 MILLIMETER?

WHEN YOU COMPARE HIS BRUISE TO MR. JOHNSON'S, MR. DIDONATO SEEMS TO BE EXTREMELY LESS SIGNIFICANT OR SERIOUS.  SO IF ANYTHING ELSE, IF YOU HAVE AN EXAMPLE OF WHAT GETTING HIT WITH A 40 MIL FROM 100 FEET, OR WHATEVER, THAT WAS DESCRIBED BY MR. FRIES, I THINK THE EVIDENCE SHOWED THAT MR. DIDONATO WAS A LOT CLOSER TO THE OFFICER WHO FIRED THE PROJECTILE AT HIM AND STILL WALKED AWAY WITH A SMALLER BRUISE AND LESS INJURY.

ER0376

THINK ABOUT IT AGAIN. THE FACT THAT THE 37 MILLIMETER, IT IS ACTUALLY ALLOWED TO BE USED FOR CROWD CONTROL PURPOSES BECAUSE IT IS NOT A DIRECT TARGET WEAPON. IT'S INTENDED TO BE SHOT INTO THE GROUND AND SKIP FIRED, MEANING WHEN THAT ROUND HIT THE GROUND, IT BREAKS OFF INTO ADDITIONAL SMALLER UNITS. AND THE IDEA, FRANKLY, IS THAT THEY BOUNCE AND HIT FOLKS AT THE LEG, AND IT MAKES A BIG SCAREY SOUND. AND, YEAH, IT PROBABLY HURTS, BUT IT'S INTENDED TO BE LESS LETHAL AND NOT HURT THAT BAD. AND THEN IT CAUSES PEOPLE TO RUN AWAY, AND THAT'S A PERMITTED USE.

SO BASICALLY WHAT I THINK THE EVIDENCE FROM DIDONATO SHOWED IS THAT AN OFFICER WAS PROBABLY FIRING THE 37 MILLIMETER APPROPRIATELY AND WITHIN POLICY WHEN THEY SKIP FIRED IT, AND THAT ROUND BOUNCED UP AND HIT MR. DIDONATO IN THE LOWER LEG, AN AREA WHICH IS A PERMITTED TARGET IF YOU'RE FIRING ONE OF THESE WEAPONS AT THESE PEOPLE, AND HE ENDED UP WITH A SLIGHT INJURY AS COMPARED TO WHAT MR. JOHNSON HIMSELF EXPERIENCED.

AND THEN SANDERLIN. SANDERLIN IS UNIQUE BECAUSE WHAT WE KNOW ABOUT HIM, WE KNEW HE WAS ON HIGHWAY 101 AS WELL. HE KNEW IT WAS ILLEGAL. AND HE KNEW THAT VIOLENCE WAS OCCURRING AT THE TIME ON HIGHWAY 101. AND HE ADMITS EVEN THAT HE HEARD UP TO TEN DISPERSAL ORDERS BEFORE HE WAS STRUCK. SO THAT GIVES YOU A CLEAR PICTURE OF WHAT WAS HAPPENING ON HIGHWAY 101 AND THEN ON THE MARCH FROM HIGHWAY 101 BACK DOWN TO CITY HALL PLAZA.

BUT WHAT WAS INTERESTING WITH MR. SANDERLIN IS HE WAS A

ER0377

DEFENDANTS' CLOSING ARGUMENT

LITTLE EVASIVE ABOUT SOME OF THE QUESTIONS I'LL SAY BECAUSE HE WAS ASKED, AT SOME POINT DID YOU HEAR POLICE AND OFFICERS OR OFFICERS USING A BULLHORN SAYING THERE WAS AN UNLAWFUL ASSEMBLY? AND HE INITIALLY SAID AT THE TIME, NO, I DIDN'T UNDERSTAND WHAT THEY WERE SAYING, SO NO.

BUT WHEN HE WAS SHOWN HIS PRIOR TESTIMONY IT WAS INCONSISTENT WITH THAT, AND HE HAD TO ULTIMATELY AGREE BECAUSE THIS IS HIS OLD TESTIMONY AND YOU CAN TELL BECAUSE IT STARTS WITH QUESTION/ANSWER JUST AS WE READ BEFORE.

QUESTION: AT SOME POINT IN TIME DID YOU HEAR POLICE AND OFFICERS -- OR OFFICERS USING A BULLHORN SAYING THERE IS AN UNLAWFUL ASSEMBLY?

AND HIS DEPOSITION TESTIMONY, PRIOR TESTIMONY, INCONSISTENT WITH WHAT HE TOLD YOU HERE WAS, YEAH, SO THERE WAS A GUY AND HE WAS SAYING THIS IS OFFICER AVILA, SAN JOSE PD, OR SOMETHING ELSE AND, UNLAWFUL ASSEMBLY, AND THEN IT WAS HARD TO HEAR.

AND HE'S ASKED, DID YOU HEAR THAT ANNOUNCEMENT MORE THAN ONCE?

OH, YEAH. OH, YEAH.

BEFORE YOU WERE SHOT?

OH, YEAH, DEFINITELY.

HOW MANY TIMES?

I DON'T KNOW. IT WAS A LOT. PROBABLY AT LEAST LIKE TEN TIMES. SOMETHING LIKE THAT.

ER0378

DEFENDANTS' CLOSING ARGUMENT

SO THAT'S PRETTY INCONSISTENT FROM MY PERSPECTIVE AS TO WHAT HE INITIALLY TOLD YOU ON THE STAND, THAT HE DIDN'T REALLY HEAR THESE ANNOUNCEMENTS, OR IF HE DID, THEY WERE SO GARBLED THAT HE DIDN'T UNDERSTAND WHAT THEY MEANT.

HE ADMITTED PREVIOUSLY THAT HE HEARD IT UP TO TEN TIMES, AND HE KNEW CLEARLY, EXACTLY WHAT THE CONTENT OF THE MESSAGE WAS.

AND FURTHER FROM HIS TESTIMONY, HE SAID, WHEN ASKED ON THE STAND IN THIS CASE, ISN'T IT TRUE THAT YOU SAW PEOPLE THROWING THINGS BEHIND A BLUE DUMPSTER?

AND HE SAID, NO, NOT TO MY KNOWLEDGE.

THAT'S WHAT HE TESTIFIED TO YOU HERE IN THIS COURTROOM.

BUT IN HIS PRIOR TESTIMONY IT WAS INCONSISTENT.

HE SAID, QUESTION:  WAS THERE A POINT IN TIME BEFORE YOU WERE SHOT THAT YOU SAW PEOPLE THROWING OBJECTS AT POLICE OFFICERS FROM BEHIND THAT BLUE DUMPSTER THAT WAS ON WHEELS?

AND HE'S ANSWERING IN A QUESTION, THROWING OBJECTS?

YEAH, YEAH, THAT'S WHAT I'M ASKING.

OH, OH, YES.  YES, I APPROACHED THE BLUE DUMPSTER?

YES.

AT ANY GIVEN TIME?

YES.

WHY WERE YOU APPROACHING THE DUMPSTERS?

BECAUSE IT WAS MY INTENTION TO STOP THE POLICE OFFICERS FROM SHOOTING THE PEOPLE THAT WERE BEHIND THE DUMPSTERS.

ER0379

SO THAT WAS HIS INTENT WHEN HE SPECIFICALLY PLACED HIMSELF IN BETWEEN OFFICERS AND PEOPLE BEHIND THE DUMPSTERS THAT WERE ENGAGING IN ACTS OF VIOLENCE AND THROWING THINGS, AND HIS POINT WAS TO TRY SHIELD VIOLENT ACTORS FROM THE POLICE OFFICERS.

AND FRANKLY, THEY WARNED HIM, GET OUT OF THE WAY.  HE GOT A WARNING, AND HE KNEW WHAT THE OFFICERS WERE TRYING TO ACCOMPLISH, AND THAT'S SPECIFICALLY WHY HE GOT IN THE MIDDLE OF THEM, HE WAS TRYING TO SHIELD THESE PEOPLE.

SO JUST TO MENTION BRIEFLY THE BICYCLE GUY AS WELL.  LET'S THINK ABOUT WHAT WE DON'T KNOW ABOUT THE BICYCLE GUY.

WHO FIRED THE PROJECTILE IMPACT WEAPON?  CLEARLY IT WAS A PROJECTILE IMPACT WEAPON, BUT WHO FIRED IT?  DON'T KNOW.

WHAT THEY WERE THINKING OR CONSIDERING OR WHAT THEIR TOTALITY OF THE CIRCUMSTANCES OR THEIR EXPERIENCE WAS, WE JUST DON'T KNOW.

AGAIN, YOU SHOULDN'T -- YOU SHOULD BE WEARY OF MAKING A CONCLUSION WITHOUT ALL OF THE INFORMATION, AND WE SIMPLY DON'T HAVE ALL OF THE INFORMATION HERE.

SO I THINK IT'S UNFAIR TO REALLY EVALUATE THIS SPECIFIC MOMENT IN TIME WITHOUT THE FULL CONTEXT, AND I THINK IT'S REALLY INAPPROPRIATE TO EXTRAPOLATE SOME SORT OF CUSTOM OR POLICY BASED UPON THREE SPECIFIC ANECDOTES AND SOME MYSTERY BICYCLE GUY WHO WE KNOW NOTHING ABOUT OR NOTHING ABOUT THE CONTENT OF HIM BEING HIT WITH A 40 MIL.

ONE OF QUESTIONS WAS, WAS HE EVEN HIT AT ALL?  I MEAN,

ER0380

DEFENDANTS' CLOSING ARGUMENT

CLEARLY THEY FIRED AT HIM, BUT HE DIDN'T SEEM TO REACT IN ANY SORT OF PAIN LIKE THE WAY DIDONATO DESCRIBED OR LIKE WE SEE WITH MR. JOHNSON HIMSELF. I COULDN'T TELL IF HE WAS HIT OR IF IT JUST STRUCK HIS BIKE. I MEAN, NONETHELESS, THE QUESTION IS WAS IT DISCHARGED? AND CLEARLY IT WAS. BUT, AGAIN, WITHOUT THE CONTEXT, WE DON'T KNOW THE CONTEXT AND THE CIRCUMSTANCES THAT HE CONSIDERED OR SHE CONSIDERED WHEN FIRING WHATEVER TYPE OF PROJECTILE THAT WAS.

AND, YOU KNOW, WHAT WE DO KNOW ABOUT THE CONTEXT AT LEAST, THERE HAD BEEN AT LEAST TWO WAVES OF VIOLENCE PRETTY SHORTLY BEFORE THAT, THE 10:24 AND 10:33 TIME PERIOD. SO THERE IS RECENT VIOLENCE HAPPENING IN THAT AREA. AND BY THE TIME HE WAS HIT, THERE HAD BEEN DISPERSAL ORDERS ISSUED IN THE CITY HALL PLAZA AREA.

SO AGAIN, I'M NOT ASKING YOU TO MAKE A DECISION ABOUT IT. I THINK WHEN YOU LOOK AT THAT VIDEO, IT'S A GUT REACTION. IT'S KIND OF LIKE, THAT LOOKS BAD, AND MAYBE THERE'S A TENDENCY TO ASSUME THE WORST OR TRY TO MAKE UP YOUR MIND OR SPECULATE ABOUT WHAT WAS OR WAS NOT GOING ON AHEAD OF TIME. AND THAT'S THE HARD PART ABOUT THIS CASE, BECAUSE AS I DESCRIBED TO YOU BEFORE, THAT'S SOMETHING NATURAL TO DO AND EVEN IN YOUR NORMAL DAY-TO-DAY LIFE AS YOU MAKE DECISIONS OR EVALUATE THINGS THAT HAVE BIG IMPACTS OR EVEN SMALL IMPACTS ON YOUR LIFE, BUT WE'RE IN AN ARTIFICIAL ENVIRONMENT. YOU'RE INSTRUCTED NOT TO SPECULATE AND TO BASE YOUR OPINION AS TO WHAT IS IN EVIDENCE

ER0381

DEFENDANTS' CLOSING ARGUMENT

AND NOT SPECULATE TO WHAT IS OR IS NOT IN EVIDENCE OUTSIDE OF THAT.

SO THAT'S WHAT MAKES THIS CASE HARD, AND I THINK THAT'S ONE OF THE REASONS THAT THEY USED THE BICYCLE GUY AS A POTENTIAL EXAMPLE. AND, FRANKLY, I THINK THAT'S WHY YOU HEARD SUCH EMOTIONAL PLEAS AND SYMPATHETIC ARGUMENTS AND COMPARISONS TO, YOU KNOW, THE EARLY 1900S AND THE HISTORY OF PROTESTING IN THE UNITED STATES, AND THE CIVIL RIGHTS MOVEMENT IN THE UNITED STATES, AND THE '60S AND '70S AND VIETNAM PROTESTS AND EVERYTHING AFTER. THESE ARE ALL THINGS THAT I DON'T THINK ANYBODY THINKS THESE ARE A BAD THING. I THINK THESE ARE NOBLE PARTS OF OUR HISTORY AND THE IDEAL THAT WE ALL SHOULD AND DO ACHIEVE TO LIVE UP TO.

BUT AGAIN, THAT'S WHAT I THINK IS GOING ON HERE.

YOU KNOW, THEY'RE ASKING YOU TO IGNORE THE JURY INSTRUCTIONS AND MAKE A DECISION OR A CONCLUSION BASED UPON SYMPATHY OR PASSION OR PREJUDICE WHEN THEY -- WHEN YOU SEE THESE IMAGES AND THEY EVOKE SUCH STRONG FEELINGS IN ALL OF US, AGAIN, THAT'S WHY IT'S SO HARD. YOU HAVE TO TAKE ALL OF THAT OUT AND BASE YOUR DECISION OFF OF THE EVIDENCE IN THIS CASE, AND THAT'S NOT NECESSARILY SOMETHING THAT COMES NATURALLY, BUT THAT'S SOMETHING THAT IS REQUIRED, AND, FRANKLY, ONE OF THE BEST PARTS OF THE INDEPENDENCE OF OUR JUDICIAL SYSTEM.

LET'S THINK ABOUT THE HYPOTHETICAL BICYCLE GUY TRIAL. IMAGINE IF WE WERE HERE ON THAT CASE. YOU CAN BET YOU'D HAVE

ER0382

CLOSE TO 30 HOURS OF TESTIMONY, AND YOU WOULD HAVE BODY WORN CAMERAS FROM ALL SORTS OF ANGLES, AND YOU WOULD HAVE HOPEFULLY THE OFFICER WHO DISCHARGED THAT WEAPON, AND HOPEFULLY THE BICYCLE GUY HIMSELF TO TELL YOU ALL ABOUT IT.  AND YOU JUST DON'T HAVE THAT.

BUT IF YOU DID, I WOULD EXPECT THAT THE PLAINTIFFS IN THAT CASE WOULD HAVE A TOTALLY DIFFERENT THEORY OF THEIR CASE AS TO WHY USE OF FORCE MIGHT BE EXCESSIVE BECAUSE HERE THEY'RE ONLY SOLELY EXCLUSIVELY SAYING THAT THE ONLY THING WRONG WITH THE USE OF FORCE IN THIS CASE WAS THAT IT WAS INDISCRIMINATE AND THAT'S WHAT MADE IT EXCESSIVE.

I'M PRETTY SURE THEY WOULD HAVE A MUCH MORE CLEAR CUT DIRECT TYPE OF CASE.  I'M SPECULATING AT THIS POINT BECAUSE WE DON'T HAVE ALL OF THE EVIDENCE.

BUT FROM WHAT I'VE SEEN AND I THINK WHAT YOU'VE SEEN, THERE'S PROBABLY A MORE EASIER OR DIRECT THEORY OF WHY THAT FORCE WAS EXCESSIVE.  ALTHOUGH WE DON'T HAVE THE INFORMATION TO EVALUATE IT, I'M PRETTY SURE THEY WOULD SAY THERE WAS NO WARRANTED USE OF FORCE AT ALL AND NO NEED TO FIRE THE PROJECTILE IMPACT WEAPON AT THE BICYCLE GUY.

BUT THAT'S NOT WHAT THEY'RE SAYING WITH RESPECT TO JOHNSON.  THEY'RE NOT SAYING IT WAS INAPPROPRIATE TO FIRE AT THAT TIME, OR THERE WASN'T THREATS OR THIS, THAT, OR THE OTHER. THEY'RE SAYING THAT IT WAS EXCESSIVE BECAUSE IT WAS INDISCRIMINATE, AND THAT'S THEIR SOLE THEORY.  AND THAT'S A

ER0383

DEFENDANTS' CLOSING ARGUMENT

TOUGH THEORY TO PROVE BECAUSE I THINK THE EVIDENCE IS QUITE THE CONTRARY.

SO GETTING BACK TO SOME OF OUR JURY INSTRUCTIONS AND THE VERDICT QUESTIONS.  FOR THE FIRST AMENDMENT RETALIATION, AGAIN, YOU HAVE TO -- THEY HAVE TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE RETALIATION FOR FIRST AMENDMENT RIGHTS FREE SPEECH AND FREE ASSEMBLY WAS A SUBSTANTIAL OR MOTIVATING FACTOR CAUSING OFFICER ADGAR SPECIFICALLY, SUBJECTIVELY WHEN WE'RE TALKING ABOUT FIRST AMENDMENT, TO INDISCRIMINATELY SHOOT THE 40 MILLIMETER PROJECTILE THAT STRUCK MR. JOHNSON ON MAY 30TH.

SO IN TERMS OF WHETHER OR NOT THERE WAS RETALIATION, AGAIN, I WOULD LIKE TO LOOK AT MR. JOHNSON'S TESTIMONY BECAUSE SINCE HE WAS THERE AND EXPERIENCED IT REAL TIME, AND I'VE HAD THE ABILITY TO WATCH THE VIDEOS AND SEE HOW THAT IMPACTS HIS OPINION IN THE CASE AND WHAT HE REMEMBERS.

BUT I ASKED HIM -- OR HE AT LEAST ANSWERS FROM THE VIDEOS THAT HE WATCHED IT APPEARS TO BE IN THE VIDEO THAT THE OFFICER STARTED FIRING IN THE CROWD AFTER THAT ONE ITEM WAS THROWN.

SO I FOLLOWED UP.  IT WAS RIGHT AFTER THAT PEACEFUL PROTESTOR WAS ALMOST HIT THAT THEY WERE -- THEY BEING THE OFFICERS -- STARTED FIRING LESS-LETHAL WEAPONS.

HE AGREED, YEP, THAT'S WHAT THE VIDEO SHOWS.

SO, FRANKLY, IF THE OFFICERS ARE FIRING IN RESPONSE TO PROJECTILES BEING THROWN AT THEM, I MEAN, ON THE ONE HAND I THINK THE RESPONSE FIRING THE LESS LETHALS IS RESPONDING TO

DEFENDANTS' CLOSING ARGUMENT                          1487

THAT VIOLENCE AND NOT RESPONDING TO SOME SORT OF MESSAGE OF THE PROTEST OR FREE SPEECH OR FREE ASSEMBLY, THROWING BOTTLES IS NOT A PROPER LAWFUL EXERCISE OF FREE SPEECH OR FREEDOM OF EXPRESSION.

SO NOT ONLY THAT, BUT I THINK IT ALSO SHOWS THAT EVEN MR. JOHNSON DOESN'T THINK THAT THE OFFICERS WERE FIRING INDISCRIMINATELY BECAUSE IF THEY WERE FIRING INDISCRIMINATELY, WHY WAIT FOR A BOTTLE TO FLY IN THE FIRST PLACE, ESPECIALLY IF THEY'RE SUPPOSEDLY MOTIVATED, ADGAR SPECIFICALLY, BUT THEN AGAIN, ALL OF THE OFFICERS BECAUSE THEY ALLEGE SOME BROAD CUSTOM OR POLICY WHERE THEY RETALIATE FOR FIRST AMENDMENT RIGHTS.

IF THAT'S THE CASE, WHY WAIT FOR THE CATALYST OF THE BOTTLES OR THE ITEMS BEING THROWN?  IF THEY REALLY HAD, AT THAT POINT, AS MR. SCHECHTER TRIED TO SUGGEST, IF THEY REALLY HAD IT AND THEY WERE OVER IT, THEY WOULDN'T WAIT FOR BOTTLES TO BE THROWN BEFORE THEY FIRED THEIR LESS-LETHAL WEAPONS.

THEY WOULDN'T WAIT UNTIL AFTER A COORDINATED ATTACK AND A COORDINATED VOLLEY, AS YOU HEARD TESTIMONY ABOUT BEFORE, RESPONDING WITH, AGAIN, LESS-LETHAL WEAPONS.

OF COURSE THEY HAVE THE POTENTIAL TO CAUSE SERIOUS INJURY AND EVEN DEATH, BUT THEY'RE DESIGNED TO SPECIFICALLY BE LESS-THAN LETHAL WHEN USED APPROPRIATELY.

AND ALL OF THE OFFICERS, YOU HAVE THEM GO THROUGH EXTENSIVE TRAINING.  AND WHILE THEY KNOW THE RISKS, THEY ALSO

ER0385

KNOW THAT THE INTENTION AND DESIGN IS TO BE LESS LETHAL. SO I THINK THAT ACTUALLY PLAYED A MAJOR ROLE IN TERMS OF THE DETERMINATION AS TO WHETHER IT WAS OBJECTIVELY REASONABLE TO USE THIS. IT IS THE OFFICER'S KNOWLEDGE AND BELIEF THAT THEY ARE USING THESE THINGS CORRECTLY. THERE'S ALWAYS A RISK, BUT IT SHOULD BE LESS-THAN LETHAL AND IT SHOULDN'T BE THAT LIKELY TO CAUSE SIGNIFICANT OR SERIOUS BODILY INJURIES.

BUT EVERY ONCE IN A WHILE IT HAPPENS. AND IF EVEN THEY HIT THE APPROPRIATE TARGET OR LOCATION LIKE MR. JOHNSON IN THE LEG -- I MEAN, THEY MENTIONED THE JOINT WAS A SORT OF SO-SO TARGET, BUT THE LEG IS GENERALLY A POSITIVE TARGET. THAT EVEN WHEN YOU'RE HITTING THE APPROVED TARGETS, YOU KNOW, SOMETIMES THINGS HAPPEN, AND YOU CAN'T ANTICIPATE THE WORST CASE SCENARIO, AND UNFORTUNATELY THAT'S WHAT HAPPENED TO MR. JOHNSON AT THIS TIME.

BUT I THINK THIS SHOWS THAT MR. JOHNSON HIMSELF KNOWS THAT THIS IS NOT THE MESSAGE THAT THEY WERE RESPONDING TO, IT WAS THE VIOLENCE, AND BECAUSE OF THAT, I THINK THAT MEANS THAT THE USE OF FORCE WAS NOT INDISCRIMINATE AND IF IT'S NOT INDISCRIMINATE UNDER THEIR THEORY OF THE CASE, IT'S NOT EXCESSIVE.

FURTHER TESTIMONY BY MR. JOHNSON AGAIN, AGAIN, SAME POINT. FROM THIS VIDEO, CAN YOU SEE THE LINE OF OFFICERS JUST STANDING THERE NOT DISCHARGING THE WEAPONS?

YEP.

ER0386

AND THEY ONLY DO SO IN RESPONSE TO THOSE ITEMS BEING THROWN AT THEM.

THAT'S WHAT IT APPEARS IN THE VIDEO.

THAT'S HEARING IT FROM MR. JOHNSON HIMSELF.

OUT OF ALL OF US HERE, HE PROBABLY HAS THE BEST INFORMATION OF WHAT WAS GOING ON, AND I THINK HIS OPINION MATTERS MORE THAN EVERYBODY ELSE WHO IS TRYING TO RE-CREATE AND EXTRAPOLATE AND MAKE CONCLUSIONS BASED UPON THE EXPERIENCE OF MR. JOHNSON AND OFFICER ADGAR AND OTHERS THAT WERE THERE WHILE WE WERE NOT.

ONCE AGAIN, IT LOOKS LIKE THE OFFICERS FIRED IN RESPONSE TO ITEMS THROWN CLOSE TO HITTING NOT JUST THEMSELVES BUT PEACEFUL PROTESTORS.

MR. JOHNSON AGREES, THAT'S WHAT IT APPEARS IN THE VIDEO, YES.

SO GOING TO THAT, AGAIN, WHETHER OR NOT THERE'S A POLICY OR CUSTOM THAT ALLOWS OFFICERS TO ESSENTIALLY VIOLATE THE FIRST AMENDMENT AND DISCHARGE WEAPONS INDISCRIMINATELY OR IN RESPONSE TO EXERCISING FREE SPEECH AND ASSEMBLY?

MR. JOHNSON DOESN'T THINK SO.

SO THAT GETS BACK TO THAT SELECTION BIAS FROM MR. FRIES'S TESTIMONY.

WOULD YOU PLAY IT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  THE REASON I'M SHOWING THESE CLIPS IS

ER0387

DEFENDANTS' CLOSING ARGUMENT

BECAUSE ULTIMATELY I THINK THIS SHOWS THAT IF YOU'RE TRYING TO ESTABLISH A CUSTOM OR A POLICY THAT IT'S OKAY TO VIOLATE FIRST AMENDMENT RIGHTS, YOU'RE NOT GOING TO HAVE INTERACTIONS LIKE THIS BETWEEN OFFICERS THAT ARE HAVING DIALOGUE WITH PEOPLE THAT ARE JUST PEACEFULLY PROTESTING.

DO YOU WANT TO PLAY THAT ONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  IT DOESN'T LOOK LIKE FIRST AMENDMENT RETALIATION TO ME.

COULD YOU DO THAT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  I THINK WHAT IS INTERESTING ABOUT THAT ONE IS NOT ONLY DOES IT SHOW LIKE A HEALTHY DIALOGUE, BUT THE PEOPLE THAT THE OFFICER HAD BEEN TALKING TO, THEY'RE ACTUALLY DEFENDING HIM AND STICKING UP FOR HIM WHEN THE OTHER GUY WALKS UP AND TRIES TO GIVE HIM A HARD TIME.

AND THE OFFICER DOESN'T RESPOND BY BLASTING HIM WITH A 40 MILLIMETER OR HITTING HIM WITH HIS BATON WHEN THE GUY COMES UP AND STARTS SAYING NASTY WORDS OR ANYTHING LIKE THAT.  HE SAYS, I RESPECT YOUR OPINION, AND YOU HAVE THE RIGHT TO DO THAT, BUT IT'S TELLING THE ACTUAL PROTESTORS HERE, THIS GUY IS ALL RIGHT.  THIS ISN'T DEREK CHAUVIN.  THIS ISN'T THE ONE WHO KILLED GEORGE FLOYD OR ANYTHING LIKE THAT.

SO I THINK IT PAINTS A MORE CLEARER PICTURE OF WHAT THE MOMENTS SPECIFICALLY LEADING UP TO AND BEFORE THE 10:33

ER0388

DEFENDANTS' CLOSING ARGUMENT

PROJECTILE WAS FIRED AS TO WHAT THE SCENE REALLY LOOKED LIKE.

THIS VIDEO IS ANOTHER EXAMPLE OF THAT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  SIX MINUTES BEFORE THAT 10:24 VOLLEY.

NOW WE'RE SEEING WHAT IS HAPPENING AT THE EAST SIDE OF SANTA CLARA AT CITY HALL PLAZA AND NOW THE WEST SIDE OF SANTA CLARA AT CITY HALL PLAZA.  THAT'S THE DIVIDE THAT IS GOING ON.  IT'S NOT WE HATE THE MESSAGE AND HOW DARE YOU GUYS EVEN SHOW UP TO ASSEMBLE AND EXERCISE YOUR FREE SPEECH.  NO, THAT'S NOT A DIALOGUE.  WE LOOK OUT FOR YOU, YOU LOOK OUT FOR US.  IT'S NOT FIRST AMENDMENT RETALIATION AND IT'S JUST NOT.  AND IT'S CERTAINLY NOT A CUSTOM OR A POLICY ALLOWING FOR FIRST AMENDMENT RETALIATION.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  PROTESTORS ARE ACTUALLY STICKING UP FOR SOME OF THE OFFICERS.  IT JUST DOESN'T LOOK LIKE FIRST AMENDMENT RETALIATION AND CERTAINLY NOT SOME SORT OF NOT-SO SECRET POLICY ALLOWING FOR OFFICERS TO DISREGARD WHAT THEY'RE TOLD IN THEIR DUTY MANUALS AND WRITTEN POLICIES.

BECAUSE AGAIN, I SUGGEST OR I CONTEND THAT A POLICY OR A CUSTOM HAS TO BE BROADLY KNOWN AND UNDERSTOOD AND ACCEPTED AND AUTHORIZED AND PEOPLE ARE ACTING IN ACCORDANCE AND IN FURTHERANCE WITH IT IF IT'S ACTUALLY REALISTICALLY REASONABLY CONSIDERED A CUSTOM OR A POLICY AS PLAINTIFFS WOULD HAVE YOU BELIEVE.

ER0389

I'M TRYING TO GET THROUGH THESE QUICKER NOW.

THE BANE ACT.  I MENTIONED THERE'S A FOURTH AMENDMENT COMPONENT AND A FIRST AMENDMENT COMPONENT.  AND THE KEY CONCEPT IN THE FOURTH AMENDMENT IS WHETHER THERE'S AN UNREASONABLE SEIZURE.  AND I CONTEND TO YOU WHAT THEY MEAN BY "UNREASONABLE SEIZURE" IN THIS CASE IS THE RIGHT TO BE FREE FROM THE USE OF EXCESSIVE FORCE.        I'M GOING TO TELL YOU GUYS AGAIN, THE ONLY SOLE EXCLUSIVE THEORY OF WHY THIS FORCE MAY HAVE BEEN EXCESSIVE AT ALL IS BECAUSE IT WAS INDISCRIMINATELY USED, AND I DON'T THINK THE EVIDENCE SUPPORTS THAT BASED UPON FIRING IN RESPONSE TO BOTTLES BEING THROWN AT PEOPLE AND SEEMINGLY IDENTIFYING SPECIFIC TARGETS WITHIN THE CROWD AND NOT JUST FIRING INDISCRIMINATELY, BLINDLY, OR, YOU KNOW, SPINNING AROUND, EYES CLOSED, AND FIRING OR IN THE ALTERNATIVE LOOKING INTO THE CROWD AND IT'S ONE BARREL IN THE FISH AND THEY'RE ALL THE SAME, AND THEY'RE GOING EENY, MEENY, MINY, MOE, THAT'S THE ONE I'M GOING TO TARGET.

I THINK THAT'S WHAT THEY WOULD NEED TO DEMONSTRATE AND HAVE EVIDENCE OF IF YOU WERE TO BELIEVE THAT THE USE OF FORCE WAS ACTUALLY INDISCRIMINATE, AND I THINK THE EVIDENCE IS TO THE CONTRARY.

INSTRUCTION 33, THIS IS GOING SPECIFICALLY TO THE FOURTH AMENDMENT.  THAT'S WHY I HAVE IT HERE AGAIN IS JUST TO REMIND YOU TO ESTABLISH AN UNREASONABLE SEIZURE IN THIS CASE.  ALBEIT THIS IS DESCRIBING THE FOURTH AMENDMENT AND NOT THE BANE ACT

CHARGE.  MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE OFFICER USED EXCESSIVE FORCE.

AND EXCESSIVE FORCE UNDER THEIR SOLE THEORY IS IT WAS EXCESSIVE BECAUSE FORCE WAS INDISCRIMINATELY USED.

SO THE BANE ACT AS IT APPLIES TO THE FIRST AMENDMENT, SIMILARLY THEY HAVE TO SHOW THAT COMMITTED ACTS OF VIOLENCE TO PREVENT THE ACTS OF FREE SPEECH OR RETALIATED FOR HAVING EXERCISED THE RIGHT TO FREE SPEECH.

ALL OF THAT ARGUMENT I JUST MADE REGARDING THE RESPONSE TO THE VOLLEY AND THE FIRE, THAT ALL APPLIES TO THE BANE ACT AND THAT'S WHAT I ASK YOU TO CONSIDER IN TRYING TO DETERMINE WHETHER OR NOT OFFICER ADGAR SPECIFICALLY WAS TRYING TO PREVENT MR. JOHNSON FROM SPECIFICALLY EXERCISING HIS RIGHTS OR RETALIATING AGAINST SPECIFICALLY MR. JOHNSON FOR HAVING DONE SO.

AGAIN, TO GET BACK TO THE CONCEPTS OF POLICIES.  I'VE DONE THIS A COUPLE OF TIMES SO I'LL TRY TO MOVE QUICK.

AGAIN, WE HAVE FOUR ANECDOTAL INCIDENTS FROM WHICH THE PLAINTIFFS WOULD ASK YOU TO EXTRAPOLATE A CUSTOM OR POLICY THAT SPONTANEOUSLY MANIFESTED OVER THE COURSE OF APPROXIMATELY 30 HOURS, FROM 5:00 P.M. ON 5-29 TO 10:33 P.M. ON 5-30.

LET'S MOVE ON TO THE NEXT CLAIM IS THE BATTERY CLAIM.  AS I MENTIONED BEFORE AT THE BEGINNING, DID THEY PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE OFFICER -- AGAIN, THIS IS THE KEY TO WHAT MAKES IT UNLAWFUL FOR AN OFFICER TO PERMIT A

ER0391

BATTERY, IT HAS TO BE UNREASONABLE BECAUSE, OF COURSE, AS THE PLAINTIFF SAID, GREAT POWER COMES GREAT RESPONSIBILITY AND PART OF THAT POWER, THEY DO HAVE THE POWER AND AUTHORITY TO USE FORCE, BUT THIS IS THE CHECK RIGHT HERE, THAT THEY USED THAT FORCE AND THEY PROVED IT WAS UNREASONABLE, YOU KNOW, THAT'S EXCEEDING THEIR RESPONSIBILITY TO USE THAT AUTHORITY JUDICIOUSLY.

THIS INSTRUCTION EXPLAINS JUST THAT CONCEPT.  ULTIMATELY TO PROVE A BATTERY, YOU HAVE TO SHOW THAT OFFICER ADGAR HARMED MR. JOHNSON WHILE USING UNREASONABLE FORCE TO ARREST OR DETAIN HIM AND SPECIFICALLY MUST PROVE THAT OFFICER ADGAR INTENTIONALLY TOUCHED OR CAUSED TO BE TOUCHED KYLE JOHNSON.

NO DISPUTE THERE.  NO DISPUTE THAT I BELIEVE OFFICER ADGAR INTENTIONALLY PULLED THE TRIGGER AND DISCHARGED THE WEAPON, BUT THAT THEY ALSO HAVE TO PROVE THAT THE USE OF FORCE WAS UNREASONABLE AND THEIR THEORY OF WHAT MAKES THIS UNREASONABLE AND EXCESSIVE IS NOT THAT HE WAS CHARGING MR. JOHNSON SPECIFICALLY FOR NO GOOD REASON OR MISTAKEN REASON, BUT BECAUSE MR. JOHNSON WAS JUST ANOTHER FISH IN THAT BARREL AND OFFICER ADGAR WAS GOING EENY, MEENY, MINY, MOE, AND HE JUST HAPPENED TO LAND ON MR. JOHNSON.

JUST FURTHER INSTRUCTIONS, AGAIN, THAT'S 36.

ONCE AGAIN, YOU HAVE TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES WHEN DETERMINING WHAT A REASONABLE AMOUNT OF FORCE IS.  THAT MEANS ALL OF THE FACTS KNOWN TO OFFICER ADGAR

ER0392

AT THE TIME, INCLUDING THE CONDUCT OF OFFICER ADGAR AND MR. JOHNSON LEADING UP TO IT.

SO ONCE AGAIN, ALL OF THAT FROM 10:24 AND EVERYTHING THAT HAPPENED ON 5-29, THAT IS PROPERLY CONSIDERED WHEN EVALUATING OFFICER ADGAR'S USE OF FORCE, BECAUSE AS HE TESTIFIED TO, HE WAS AWARE OF THOSE THINGS AND THEY ACTUALLY DID INFLUENCE AND IMPACT HIS DECISION.

MOVING QUICKLY ALONG TO THE NEGLIGENCE CLAIM.  THIS ONE IS A LITTLE BIT TRICKIER, AND IT SEEMS RELATIVELY SIMPLE.  FAILURE TO USE REASONABLE CARE.  UP TO YOU TO DETERMINE WHAT REASONABLE CARE IS UNDER THESE SAME SITUATIONS AND SAME CIRCUMSTANCES, AND IT'S UP FOR YOU TO DECIDE WHETHER OR NOT OFFICER ADGAR'S CONDUCT WAS REASONABLE.

BUT I THINK, YOU KNOW, LET'S LOOK AT THE ESSENTIAL ELEMENTS.  WAS HE NEGLIGENT?  NOT MUCH HELP AT ALL.

BUT WHEN WE GET TO THE STANDARD OF CARE, AGAIN, WE'RE LOOKING AT THE PERSPECTIVE OF SOMEBODY IN THE SAME SITUATION WOULD DO OR FAILED TO DO IN THE SAME SITUATION.

SO THAT'S, AGAIN, THE TOTALITY OF THE CIRCUMSTANCES. CONSIDER WHAT OFFICER ADGAR KNEW AT THE TIME.  SPECIFICALLY, THIS BRINGS ME BACK TO THIS SLIDE AGAIN, BUT THIS IS MR. FRIES'S TRAJECTORY AT THE MOMENT THAT OFFICER ADGAR FIRED THE WEAPON THAT ULTIMATELY STRUCK MR. JOHNSON.

AND WHAT I THINK IS PARTICULARLY TELLING HERE IS THAT, YOU KNOW, THIS IS THE PERSPECTIVE, LIKE LITERALLY, RIGHT WHEN HE

DEFENDANTS' CLOSING ARGUMENT

FIRED AND WHAT I IDENTIFIED AS ACTUALLY OFFICER ADGAR'S TARGET, I MEAN, THEY'RE BASICALLY RIGHT ON TOP OF EACH OTHER, ESPECIALLY FROM OFFICER ADGAR'S PERSPECTIVE RIGHT HERE.

SO IF HE'S TRYING TO TRAIN AND FOLLOW THE ACTUAL TARGET AS HE'S RUNNING EAST FROM THE TRAPEZOIDAL WALL AREA AS DEPICTED IN THE VIDEO, AS HE LEANS OVER, HE FINALLY CLEARS THE GUY IN THE WHITE SWEATSHIRT THAT IS IN FRONT OF HIM AND SO HE CAN AVOID HITTING THAT PERSON AND POSSIBLY LEADING THE TARGET A LITTLE BIT.  AND YOU KNOW WHAT, WHETHER IT WAS A BAD SHOT OR WHETHER MR. JOHNSON JUST HAPPENED TO GET IN THE WAY AT THE WRONG PLACE AT THE WRONG TIME, I THINK THE EVIDENCE SHOWS THAT THAT'S NOT INDISCRIMINATE IN THIS CASE WHATSOEVER.

AND THE QUESTION TO YOU ULTIMATELY IS, IS THIS EVEN NEGLIGENCE BASED UPON WHAT OFFICER ADGAR KNEW AT THE TIME, THAT THERE WAS A POTENTIAL SERIOUS THREAT THAT WAS RUNNING EAST AWAY AT THE SAME TIME, A JUSTIFIABLE TARGET THAT HE CAN HIT IF HE BELIEVES THERE'S A CHANCE THAT THAT PERSON CONTINUED TO POSE A SERIOUS THREAT AND UNFORTUNATELY JUST HAPPENED AS THAT PERSON LINED UP, THE REALITY IS THAT THEIR PATHS JUST CROSSED.

PART OF THE NEGLIGENCE THING THAT IS HARD IS THERE'S ACTUALLY POTENTIALLY MORE THAN ONE NEGLIGENT PARTY, INCLUDING MR. JOHNSON.  AND WE TALKED ABOUT THE FACT THAT AT 10:24 MR. JOHNSON EXPERIENCED THE FIRST VOLLEY OF BOTTLES, RAN AWAY BUT CAME RIGHT BACK AT 10:33.  AND I THINK THAT IN SOME SENSE IS NEGLIGENCE BECAUSE HE KNEW OR SHOULD HAVE KNOWN THAT THERE

ER0394

WERE BOTTLES FLYING FROM THE PROTESTORS AND KNEW OR SHOULD HAVE KNOWN THAT THE OFFICERS WERE RESPONDING TO THOSE VOLLEYS OF PROJECTILES BY FIRING LESS LETHALS.

BUT THEN SPECIFICALLY WE TRIED TO IDENTIFY TWO SPECIFIC PEOPLE IN THE CROWD WHOSE NEGLIGENT BEHAVIOR, YOU KNOW, MIGHT HAVE CONVINCED OFFICER ADGAR THAT THIS IS A DANGEROUS SITUATION AND IT'S APPROPRIATE TO USE FORCE.

AND SPECIFICALLY IN THIS CASE WE HAVE IDENTIFIED THOSE PEOPLE OR ATTEMPTED TO IDENTIFY THOSE PEOPLE FOR YOU.

AND THIS IS FROM MORAGA'S BODY WORN CAMERA FROM THE 10:33 MOMENT.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  YOU'LL SEE THERE IN THAT SHORT CLIP A BOTTLE THAT APPEARS TO COME FROM THE LEFT-HAND CORNER OF THE TRAPEZOIDAL WALL.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  AGAIN, THIS IS A STILL IMAGE THAT I THINK DEMONSTRATES THAT.  YOU SEE THE CIRCLE BELOW WITH THE PERSON THROWING IT AND THE CIRCLE ABOVE IS THE BOTTLE THAT WAS THROWN.

AND THIS IS THAT QUICK PERSPECTIVE FROM OFFICER ADGAR'S CAMERA HIMSELF AS AT 22:53:12.

AND THEN WE HAD AN IMAGE HERE THAT YOU'LL SEE 552A.  NOW, THESE RED MARKS ARE THINGS THAT I PUT ON MYSELF BECAUSE I DON'T HAVE THE ACTUAL PHYSICAL COPY, BUT YOU ALL RECALL THAT

ER0395

OFFICER ADGAR HIMSELF CIRCLED A DOCUMENT AND SIGNED IT, AND THAT'S THE PERSON BELOW THAT HE CIRCLED IN THAT DOCUMENT.  I ENCOURAGE YOU TO LOOK AT THAT DOCUMENT YOURSELF AND CONFIRM.

AND THEN THE OTHER PERSON THAT WE IDENTIFIED AS POTENTIALLY NEGLIGENT IS DEPICTED HERE IN PALMER'S BODY WORN CAMERA, AND HE'S GOING TO BE THE GUY RIGHT AT THE PILLAR OF THE ARCH THAT THROWS AN ITEM.  THAT'S RIGHT HERE.

AND THIS IS EXHIBIT 553.  THE RED CIRCLE HERE IS MINE, BUT YOU WILL SEE THE ONE THAT OFFICER ADGAR CIRCLED AND SIGNED ON THE STAND AND THAT IS THE PERSON HE IDENTIFIES POTENTIALLY NEGLIGENT AND WHO POTENTIALLY CAUSED HIM TO FEEL THAT HE NEEDED TO FIRE AT THAT TIME.

I'LL JUMP THROUGH A NUMBER OF THESE TO GET TO DAMAGES.

ONE THING I WANT TO KEEP IN MIND, IF YOU ULTIMATELY FIND FOR THE PLAINTIFF BASED ON THE EVIDENCE, I COMPLETELY RESPECT THAT BECAUSE THIS IS A HARD JOB TO DO.  I KNOW YOU'LL CONSIDER THE EVIDENCE AS MUCH AS POSSIBLE.

BUT IF SO, I'D LIKE TO AT LEAST SPEND THE FEW MINUTES I HAVE LEFT TO DISCUSS THE ISSUE OF DAMAGES.

SO THERE ARE SEVERAL ASSUMPTIONS THAT I THINK ARE REQUIRED TO BE MADE TO ACHIEVE THE $5.8 MILLION THAT THE PLAINTIFFS ARE SUGGESTING IS AN APPROPRIATE PAYOUT IN THIS CASE, AND THAT IS ASSUMING THAT HE HAD A SECOND PULMONARY EMBOLISM, ASSUMING THAT IF INDEED HE SUFFERED A SECOND PULMONARY EMBOLISM, IT WAS PROVOKED, MEANING THAT THEY KNOW EXACTLY WHY IT HAPPENED, THEY

ER0396

CERTIFICATE OF REPORTER


I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____

IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 20, 2025

ER0397

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KYLE JOHNSON,

Plaintiff,

v.

CITY OF SAN JOSE, et al.,

Defendants.

Case No. 21-cv-01849-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 107

This action arises out of one of the protests following the May 25, 2020 killing of George Floyd, a Black man, by Minneapolis police officers. A wave of public demonstrations followed, during which participants across the country protested Mr. Floyd's killing and disproportionate police brutality toward Black people. Plaintiff Kyle Johnson ("Mr. Johnson"), a Black man, attended one such protest on May 30, 2020 in San Jose, California. Mr. Johnson brings this suit alleging that Defendants Officer James Adgar ("Officer Adgar") and the City of San Jose (the "City," and with Officer Adgar, "Defendants") engaged in police misconduct during his participation in the protest, and that the misconduct violated his First and Fourth Amendment rights and California statutory and common law.

Presently before the Court is Defendants' Motion for Summary Judgment (the "Motion") on all claims brought by Mr. Johnson in his operative Second Amended Complaint (the "SAC"). *See* Mot., ECF No. 107. Mr. Johnson opposes the Motion. *See* Opp'n, ECF No. 116. Following the completion of briefing on the Motion, the Court heard oral argument on September 21, 2023. *See* Reply, ECF No. 120; Pl.'s Resp. to Evid. Objs., ECF No. 126; Sept. 21, 2023 Hr'g Tr. ("Tr."), ECF No. 138. Having considered the governing law and the parties' written and oral arguments, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion.

United States District Court
Northern District of California

ER0398

I.       BACKGROUND

A.       Factual Background

The following facts are undisputed unless otherwise noted.

1.       The Parties

Mr. Kyle Johnson is a Black American man who lives and works in Santa Clara County. *See* Decl. of Kyle Johnson in Opp'n to Mot. ("Johnson Decl.") ¶¶ 2–3, ECF No. 116-7; Decl. of Matthew Pritchard in Supp. of Mot. ("Pritchard Decl."), Exh. 4 ("Johnson Dep."), at 83:8–10, ECF No. 107-1.  Officer James Adgar graduated from the City of San Jose's Police Department ("SJPD") Academy in December 2017, and has been employed as a peace officer with SJPD for about six years.  Decl. of James Adgar in Supp. of Mot. ("Adgar Decl.") ¶¶ 1–2, ECF No. 107-3.

2.       The Protests

San Jose saw multiple days of protests following the killing of George Floyd, including on May 29, 2020, and May 30, 2020.  *See, e.g.*, Decl. of Jason Dwyer in Supp. of Mot. ("Dwyer Decl.") ¶ 2 & Exh. 2, ECF No. 107-4.  SJPD responded to the protests.  *See* Dwyer Decl., Exh. 2.

SJPD officers used several types of weapons while policing the protests, including 40mm and 37mm projectile impact weapons ("PIWs").  *See, e.g.*, Decl. of Lee Tassio in Supp. of Mot. ("Tassio Decl.") ¶ 9 & Exh. 2, ECF No. 105.  The 40mm PIW fires a foam baton with a 40-millimeter diameter at a target.  *See* Tassio Decl., Exh. 2, at 1.

Mr. Johnson attended a protest at San Jose's City Hall on May 30, 2020.  Johnson Decl. ¶¶ 3–4.  Officer Adgar worked at the protests in San Jose on May 29 and May 30, 2020, and on May 30 was dispatched to City Hall.  Adgar Decl. ¶¶ 1, 5.  SJPD officers stood in a "skirmish line" in front of protestors on both days.  *See id.* ¶¶ 4–5; *see also* Decl. of Jonathan Byers in Supp. of Mot. ("Byers Decl.") ¶ 2, ECF No. 107-7; Johnson Decl. ¶ 11 (describing a "line of officers").

3.       SJPD Training Practices

Every SJPD officer must graduate from a police academy that is certified by the California Commission on Peace Officer Standards and Training ("POST").  Decl. of Christopher Sciba ("Sciba Decl.") ¶ 4, ECF No. 107-6.  An officer receives a Basic Certificate after completing the initial academy, which is a 26-week program with approximately 976 hours of training, and

2

ER0399

finishing SJPD's probationary period. *Id.* ¶¶ 4, 6. Officers must complete Continuing Professional Training ("CPT") every two years to maintain their certification. *Id.* ¶ 4. Police academies can become certified by POST if they teach the POST minimum standards, which include Learning Domains ("LDs"). *Id.* ¶ 5. The SJPD police academy teaches the 43 POST LDs, including an LD on objectively reasonable force and the potential for civil and criminal liability and disciplinary action for an officer's failure to intervene to prevent the violation of a person's constitutional rights, as well as additional training, including a four-hour course devoted to PIWs. *Id.* ¶ 6–7. The additional PIW course addresses the *Graham v. Connor* factors for objectively reasonable force. *See* Sciba Decl. ¶ 8. The CPT courses required by POST and taught by SJPD between 2015 and 2020 include training on use of force, defensive tactics, force options simulator, principles of de-escalation, and de-escalation and tactical communication. *Id.* ¶ 9.

SJPD officers are also required to read and understand SJPD's Duty Manual. Tassio Decl. ¶ 4. The Duty Manual contains provisions concerning, among other issues, crowd control, use of force, and PIWs, including the 37mm launcher, 40mm launcher, and beanbag shotgun. *Id.* ¶ 9; *see also id.* at Exhs. 1, 2. SJPD only permits PIW use by officers who have completed an approved training course. *See id.* at Exh. 2, at 2. Patrol officers who have completed an approved training course are required to carry either a stun-bag shotgun or 40mm PIW launcher while on duty. *Id.* A revision to the Duty Manual dated May 22, 2020 provided that "40 mm [PIWs] that do not contain chemical agents may not be used for crowd control purposes." *Id.* at 2; *see also* Tassio Decl. ¶ 9. Rather, the 40mm PIW is intended to be fired directly at an individual target, and only when the use of the weapon is objectively reasonable to prevent serious injury. *See* Tassio Decl., Exh. 2, at 2.

### 4.   Mr. Johnson's Experience at the May 30, 2020 Protest

The parties dispute the time of Mr. Johnson's arrival at the May 30 protest. Mr. Johnson states in his declaration that he arrived at San Jose's City Hall at approximately 9:53 p.m. *See* Johnson Decl. ¶ 8. Defendants rely on Mr. Johnson's deposition testimony to assert that Mr. Johnson arrived at City Hall by 9:10 p.m. *See* Johnson Dep. 87:3–14.

At 9:19 p.m., an SJPD officer broadcast an order to disperse to the crowd in front of City

3

Hall. *See* Decl. of Daniel Morales in Supp. of Mot. ("Morales Decl."), Exh. 3 ("Video Exh. (R. Vasquez)"). Because the parties dispute the time of Mr. Johnson's arrival at the protest, they also dispute whether Mr. Johnson heard the dispersal order. *See* Johnson Decl. ¶ 17 ("From the moment I arrived at City Hall, at approximately 9:53 p.m., until after I was struck with a projectile . . . there were no unlawful assembly or dispersal orders given by any police officer.").

By about 10:11 p.m., Mr. Johnson was standing within a crowd of demonstrators in front of City Hall. Johnson Decl. ¶ 13. At two later points in time, at approximately 10:24 p.m. and 10:33 p.m., City Hall crowd members threw a volley of objects at the officers. *See id.* ¶¶ 14, 16; Byers Decl. ¶ 3. Mr. Johnson did not throw any objects. Johnson Decl. ¶ 4. Further, Mr. Johnson declares that he did not observe anyone within a 75-yard radius of him throw or attempt to throw any object at police officers. *Id.* Officers fired PIW weapons in response to each of the two volleys. *See id.* ¶¶ 14, 16; Byers Decl. ¶ 3. Each time the police officers fired their PIW weapons, Mr. Johnson and the crowd retreated. *See* Johnson Decl. ¶¶ 14, 16. At some point during the protest, Mr. Johnson was struck in the back of the leg by an object. *See id.* ¶ 17; *id.* at Exh. 1.

The parties dispute the following facts. Mr. Johnson asserts that the object that hit his leg was a PIW, and that it hit him just after about 10:33 p.m., when he and the rest of the crowd were retreating from the PIWs fired by the police after protestors threw a second volley of objects at the police. *Id.* ¶ 17. Defendants contend that Mr. Johnson was struck shortly after protestors threw the first volley of objects at the police at about 10:24 p.m. *See* Johnson Dep. 105:1–19, 146:22–150:7, 155:24–156:24, 157:20–22, 158:4–159:1.

Mr. Johnson did not see a police officer shoot a projectile at him, and did not see what object in fact struck him. *See* Johnson Dep. 119:17–19, 122:14–17. Jason Fries, an expert in forensic animation and trajectory analysis, opines—based on videos indicating the relative positions of the officers at the scene and Mr. Johnson, as well as the direction and timing of each shot fired by the officers and the timing of when Mr. Johnson's mobility was affected—that Officer Adgar fired the projectile that struck Mr. Johnson. *See* Decl. of Jason Fries in Opp'n to Mot. ("Fries Decl.") ¶¶ 6–13 & Attach. B ("Fries Report").

United States District Court
Northern District of California

4

**5.      Officer Adgar's Experience at the Protest on May 30, 2020**

On May 30, 2020, Officer Adgar was equipped with a 40mm PIW launcher while he worked at the City Hall protest.  Adgar Decl. ¶ 5.  (Before graduating from the SJPD Academy in December 2017, Officer Adgar attended a training to qualify to carry a 40mm PIW launcher.  *Id.* ¶ 2.)  Defendants assert that Officer Adgar only fired at three individuals on May 30, and that each individual had thrown a glass bottle at police.  *Id.* ¶¶ 5–8.  Pursuant to Officer Adgar's report, which Mr. Johnson disputes, Officer Adgar fired a total of five 40mm PIWs at three individuals during the protest, all at about 10:30 p.m.  *See* Adgar Decl., Exh. 2 ("Adgar Police Report"), at 1.  First, after seeing a person throwing a plastic water bottle at police and then seeing a green glass beer bottle thrown from behind a wall, Officer Adgar fired a single 40mm PIW at, and hit in the leg, an individual holding a beer bottle.  *See id.*  Then, after protestors threw multiple water bottles, glass bottles, and rocks at officers in the area, Officer Adgar observed a man wearing all black clothing throw a glass bottle, and fired two 40mm PIWs at the man.  *See id.*  He did not see if either PIW hit the man.  *See id.*  Lastly, after seeing protestors throw more rocks, water bottles, and glass bottles at officers, Officer Adgar fired two 40mm PIWs at a woman who another SJPD officer said had thrown a glass bottle.  *See id.* at 2.  Officer Adgar's body-worn camera footage indicates that he fired the first PIW at about 10:24 p.m., and the following PIWs at about 10:33 and 10:34 p.m.  *See* Adgar Decl., Exh. 3 ("Video Exh. (J. Adgar)").

**B.      Procedural History**

Mr. Johnson filed this suit in March 2021, asserting claims against the City and Doe defendants.  *See* ECF No. 1.  In September 2021, with the Court's leave and pursuant to the parties' stipulation, Mr. Johnson then filed a First Amended Complaint against the City, Officer Adgar, and Doe defendants.  *See* ECF No. 47.  Defendants filed a motion to dismiss the First Amended Complaint, which the Court granted in part and denied in part.  *See* ECF No. 67.  Mr. Johnson filed a Second Amended Complaint on July 14, 2022.  *See* Second Am. Compl. ("SAC"), ECF No. 73.  The SAC asserts two claims under 42 U.S.C. § 1983 against Officer Adgar and the City—one for violation of the Fourth Amendment for a seizure accomplished through excessive force and the second for violation of the First Amendment for retaliatory use of force.  *See id.*

5

¶¶ 68–82.  Mr. Johnson also asserts claims against Officer Adgar and the City for violation of the Bane Act, Cal. Civ. Code §§ 52.1, 52; battery; and negligence.  *Id.* ¶¶ 83–98.  Mr. Johnson seeks general and special damages; civil penalties and statutory damages under the Bane Act; punitive damages; pre- and post-judgment interest; attorneys' fees; and costs of suit.  *See id.* at Prayer for Relief.  Defendants filed a motion to dismiss the SAC in part, which the Court denied on December 12, 2022.  *See* ECF No. 85.  Defendants answered the SAC on December 20, 2022.  *See* ECF Nos. 86, 87.

Defendants filed the pending Motion for Summary Judgment on July 17, 2023.  *See* Mot.  Mr. Johnson opposed the Motion, *see* Opp'n; Defendants filed a reply in support of the Motion, *see* Reply; and Mr. Johnson filed a response to the evidentiary objections in Defendants' reply, *see* Pl.'s Resp. to Evid. Objs.  The Court heard oral argument on September 21, 2023.

## II.     EVIDENTIARY OBJECTIONS

Defendants object to the following evidence submitted by Mr. Johnson in support of his opposition to the Motion: (1) the declarations of Breanna Contreras, Pietro Di Donato, Derrick Sanderlin, and Adira Sharkey, ECF Nos. 116-1–116-4, on the ground that Mr. Johnson did not disclose these witnesses; (2) Exhibits 8, 9, 21, 30, and 36 to the Declaration of Abimael Bastida ("Bastida Declaration" or "Bastida Decl."), ECF No. 117, on the ground that they constitute testimony from undisclosed witnesses; (3) Exhibits 4 and 12–20 to the Bastida Declaration, on the grounds that (a) Mr. Johnson disclosed no authenticating person for these exhibits of news footage, commentary, and social media posts, (b) the evidence is inadmissible hearsay, (c) the evidence is incomplete and misleading, and (d) the evidence constitutes inadmissible opinion testimony; and (4) Attachment C to the Fries Report, on the ground that Mr. Fries never disclosed the video.  *See* Reply 1.

Mr. Johnson counters that (1) Breanna Contreras, Pietro Di Donato, Derrick Sanderlin, and Adira Sharkey were known to the City because they are each a plaintiff in a separate lawsuit against the City arising out of the same protests and similar unlawful conduct; (2) he identified these four witnesses in a supplemental disclosure prior to filing his opposition; (3) Exhibits 8 and 36 to the Bastida Declaration are deposition excerpts from another action of two City employees

6

who were deposed in multiple lawsuits arising from the same protests, and that one of the two employees was identified in Mr. Johnson's initial disclosures and deposed in this action; (4) Exhibits 9, 18, 21, and 30 to the Bastida Declaration are official records of the City that were disclosed in Mr. Johnson's initial disclosures and subsequently produced by the City during discovery in this action; (5) Exhibits 4 and 12–15 of the Bastida Declaration are video clips of live news coverage of the protests in downtown San Jose, while Exhibits 16–19 are clips of cell phone video footage captured by individuals present at the protests in downtown San Jose; (6) Exhibits 4 and 12–19 contain either no statements and are not hearsay, or contain statements that all fall into exceptions to the rule against hearsay, including excited utterances and public records, or are offered not for the truth of any statement but to show the actions of SJPD officers; (7) Exhibit 20 consists of Google alert emails sent to Chief Edgardo Garcia, and the emails are not subject to the rule against hearsay because they are not offered for their truth but to establish Chief Garcia's receipt of the emails at the dates and times reflected on the emails; and (8) Attachment C to the Fries Report is an enhanced zoomed-in clip of body worn camera footage produced in discovery by Defendants and listed and referenced in the Fries Report that was timely served on Defendants, and that Defendants' counsel marked as an exhibit during the deposition of Mr. Fries.  Pl.'s Resp. to Evid. Objs. 2–3.

Based on the foregoing arguments, the Court rules on Defendants' evidentiary objections as follows:

- Declarations of Breanna Contreras, Pietro Di Donato, Derrick Sanderlin, and Adira Sharkey:  OVERRULED.  Although Mr. Johnson did not disclose these four individuals until after he filed his opposition brief, the Court finds any error harmless because the City was aware of their identifies and the substance of their declarations, with the same counsel for the City having deposed each of them in connection with a lawsuit regarding the same protests and substantially the same unlawful conduct alleged in this action.  *See* Fed. R. Civ. P. 37(c)(1); Decl. of Abimael Bastida in Supp. of Pl.'s Resp. to Evid. Objs. ("Bastida Evid. Obj. Decl.") ¶¶ 3–7, ECF No. 126-1.

7

- Bastida Decl., Exhs. 8, 36:  OVERRULED.  Exhibits 8 and 36 are excerpts from the depositions of Lt. Juan Cabellos and Captain Jason Dwyer, respectively, taken in the matter of *NAACP of San Jose/Silicon Valley v. City of San Jose*, No. 21-cv-01705 (N.D. Cal.).  Captain Dwyer was identified in Plaintiff's initial disclosures and deposed in discovery in this action.  Lt. Cabellos was not identified in Mr. Johnson's initial disclosures, but is an employee of the City and has been deposed in lawsuits arising out of the same incident.  Under these circumstances, the Court finds harmless any error in Mr. Johnson's failure to disclose the deposition excerpts.  *See* Fed. R. Civ. P. 37(c)(1).

- Bastida Decl., Exhs. 9, 21, 30:  OVERRULED.  These documents were produced by the City during discovery in this action, *see* Bastida Evid. Obj. Decl. ¶ 8, and are covered by Mr. Johnson's initial disclosures identifying official records of or collected by the City regarding the protests following the murder of George Floyd, *see* Rebut. Decl. of Matthew Pritchard ("Pritchard Rebut. Decl."), Exh. A, at 6–7, ECF No. 120-1.

- Bastida Decl., Exhs. 4, 12–19:  GRANTED as to these exhibits, which are video clips of news coverage, livestreams, and cell phone video footage of the protests in downtown San Jose, on the ground that Mr. Johnson did not provide evidence by which the Court could authenticate the exhibits.  *See* Fed. R. Evid. 901; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("[U]nauthenticated documents cannot be considered in a motion for summary judgment.").  The Court notes that it does not rely on these exhibits in the following analysis, and that this ruling does not preclude Mr. Johnson from seeking to introduce these exhibits at trial with proper authentication.

- Bastida Decl., Exh. 20:  OVERRULED.  This exhibit is a set of Google alert emails sent to Chief Garcia's email with links to articles.  In light of the attribution to Chief Garcia, the Court is satisfied that this exhibit could be authenticated.  The Court overrules the hearsay objection because the emails are not offered for the

United States District Court
Northern District of California

8

truth of their contents, but rather for their existence.  The Court finds no basis for the objections that the evidence is incomplete and misleading, or constitutes opinion testimony.

- Attachment C to the Fries Report:  OVERRULED.  The attachment is a subset of a video listed and referenced in the Fries Report; Mr. Fries testified during deposition about the video from which the attachment was taken, and Defendants marked the video as an exhibit during the deposition.  *See* Bastida Evid. Obj. Decl. ¶ 10.

## III.    LEGAL STANDARD

Summary judgment is proper where the pleadings and evidence demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The current version of Rule 56 authorizes a court to grant "partial summary judgment" to dispose of less than the entire case and even just portions of a claim or defense.  *See* Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendment; *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015).  As such, a court can, "when warranted, selectively fillet a claim or defense without dismissing it entirely."  *Id.*

The moving party bears the initial burden of "either produc[ing] evidence negating an essential element of the nonmoving party's claim or defense or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party makes such a showing, the burden then shifts to the nonmoving party to produce evidence supporting its claims or defenses.  *Id.* at 1103.  In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518, 559–60 (2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment must be denied if "a fair-minded jury could return a verdict

United States District Court
Northern District of California

9

for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## IV.     DISCUSSION

Mr. Johnson brings claims against both Officer Adgar and the City for (1) violation of 42 U.S.C. § 1983 based on the Fourth Amendment right to be free of excessive force; (2) violation of 42 U.S.C. § 1983 based on the First Amendment right to be free of the retaliatory use of force; (3) violation of the Bane Act, California Civil Code §§ 52.1, 52, based on interference or attempted interference with Mr. Johnson's rights under the First and Fourth Amendments, as well as Article I, Sections 2, 3, and 13 of the California Constitution; (4) battery; and (5) negligence.  SAC ¶¶ 68–98.   Defendants seek summary judgment on all five claims.  *See* Mot. 1.  They argue that the undisputed facts preclude Mr. Johnson's Fourth Amendment and First Amendment claims against Officer Adgar and prevent him from establishing *Monell* liability against the City on the same claims, and that Mr. Johnson's three state law claims fall with the § 1983 claims.  *See generally* Mot. 9–25.  The Court addresses these arguments in turn.

### A.     Claims Under 42 U.S.C. § 1983 Against Officer Adgar

#### 1.     Legal Framework

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right."  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).  In addition, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"  *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Mr. Johnson brings § 1983 claims against Officer Adgar based on violations of the Fourth Amendment and First Amendment.  The Court addresses these in turn.

#### 2.     Fourth Amendment Claim – Excessive Force

"An objectively unreasonable use of force is constitutionally excessive and violates the Fourth Amendment's prohibition against unreasonable seizures."  *Torres v. City of Madera*, 648

10

United States District Court
Northern District of California

F.3d 1119, 1123 (9th Cir. 2011) (citing *Graham v. Connor,* 490 U.S. 386, 394–96 (1989); *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007)).  A Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied."  *Brower v. County of Inyo*, 459 U.S. 593, 597 (1989) (emphasis omitted).  "Thus, an 'unintended person … [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'"  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Brower*, 459 U.S. at 596) (alterations in original); *see also Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ("To constitute a seizure, the governmental conduct must be purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff.").  However, "an innocent bystander struck by a stray bullet from [an] officer's weapon would not have such a claim."  *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) (citing *Brower*, 459 U.S. at 597).

If a seizure has occurred, courts analyze the reasonableness of force under a totality of the circumstances inquiry, including "the severity of the crime at issue, [] whether the suspect posed an immediate threat to the safety of the officers or others, and [] whether the suspect was actively resisting arrest or attempting to evade arrest by flight," *Torres*, 648 F.3d at 1119, as well as the "type and amount of force inflicted" and "the severity of [the plaintiff's] injuries," *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).

Defendants argue that Mr. Johnson's § 1983 claim against Officer Adgar for alleged excessive force fails because (1) Mr. Johnson cannot prove that Officer Adgar fired a projectile that struck him and thereby caused his injury; (2) Mr. Johnson was not seized under the Fourth Amendment because he was not the deliberate object of Officer Adgar's force; (3) Mr. Johnson's allegations and theory mean that Officer Adgar did not have the requisite intent to seize Mr. Johnson; and (4) Officer Adgar is entitled to qualified immunity on the claim.  The Court addresses each argument in turn.

### a. Whether Officer Adgar Caused Mr. Johnson's Injury

Causation is "an implicit requirement" of a civil rights action, including an action brought under 42 U.S.C. § 1983.  *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

ER0408

A plaintiff must establish that a defendant caused his injury—*i.e.*, deprived him of a constitutional right—both proximately and in fact. *See id.* Defendants argue that Mr. Johnson cannot establish that Officer Adgar caused his injury because no evidence disputes Officer Adgar's declaration that he fired only at people other than Mr. Johnson. *See* Mot. 11–12. Mr. Johnson counters that both video evidence and the analysis of that video evidence by Plaintiff's video forensics expert, Mr. Fries, show that Officer Adgar fired PIW that hit Mr. Johnson's leg. *See* Opp'n 14–17.

The evidence before the Court is as follows. It is undisputed that Mr. Johnson did not throw a glass bottle or any other object at police officers. *See* Mot. 11; *see also* Johnson Decl. ¶ 4. It is additionally undisputed that Mr. Johnson did not see a police officer shoot a projectile at him, and did not see what object in fact struck him. *See* Johnson Dep. 119:17–19, 122:14–17. Officer Adgar states that he only fired his 40mm PIW launcher at three individuals who had thrown glass bottles at police officers. *See* Adgar Decl. ¶¶ 5–8. According to Officer Adgar's police report and body-worn camera footage, Officer Adgar fired one 40mm PIW at about 10:24 p.m., and four 40mm PIWs at approximately 10:33 and 10:34 p.m., for a total of five 40mm PIWs. *See* Adgar Police Report 1–2. Mr. Johnson's expert on forensic animation, audio/video analysis, line of sight analysis, and trajectory analysis has submitted a report concluding that the video evidence from security cameras and multiple body-worn cameras shows that "Mr. Johnson was struck and injured by a projectile fired by Officer Adgar." Fries Decl. ¶ 13; *see id.* ¶¶ 5–8; *see also* Fries Report 15.

Defendants argue that Mr. Fries's opinion must be discounted because it relies on two assumptions not supported by the evidence. *See* Mot. 12 (citing *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019)). First, Defendants contend that Mr. Fries's assumption that Mr. Johnson was struck at 10:33 p.m. is unsupported by the evidence because Mr. Johnson testified at his deposition that he was struck at 10:24 p.m. *See id.*; *see* Johnson Dep. 105:1–19, 146:22–150:7, 155:24–156:24, 157:20–22, 158:4–159:1. However, Mr. Fries explains that the video evidence he reviewed "shows that Mr. Johnson's mobility was only affected after Officer Adgar fired . . . at 10:33:17 [p.m.]." Fries Report 15. Mr. Johnson has also submitted a declaration stating that further review of the video evidence in this action has refreshed his

United States District Court
Northern District of California

12

memory since his deposition, and that he was in fact struck at about 10:33 p.m.  *See* Johnson Decl. ¶¶ 5, 23.  Second, Defendants argue that Mr. Fries's assumption that Mr. Johnson was at a specific location corresponding to where Officer Adgar aimed his 40mm PIW launcher at 10:33 p.m. is impermissible because the last video footage of Mr. Johnson shows him at a location "some distance away from the spot where [Mr. Fries] puts him at the time of Officer Adgar's shot."  Mot. 12.  Yet Mr. Fries explains that he was able to observe Mr. Johnson's "compromised mobility immediately following the moment Officer Adgar fired . . . at approximately 10:33 p.m.," Fries Decl. ¶ 8, and Mr. Johnson has submitted a declaration indicating Johnson's exact position in still photos of body-worn camera footage, *see* Johnson Decl. ¶¶ 17–18.  The Court accordingly finds that there is some factual support for Mr. Fries's opinions regarding the time at which Mr. Johnson was struck, and Mr. Johnson's precise location at that time.  *See Stephens*, 935 F.3d at 856 ("The expert's opinion must rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation.").

Although a jury is free to assess the credibility of this competing evidence, this Court must draw all reasonable inferences in favor of the nonmoving party, and on this basis the Court will consider Mr. Fries's expert opinion that Officer Adgar fired a PIW that struck Mr. Johnson at 10:33 p.m.  In doing so, the Court finds that there exists a genuine dispute of material fact regarding whether Officer Adgar caused Mr. Johnson's injury, and accordingly will deny Defendants' Motion on this ground.

### b.      Whether Mr. Johnson was Seized Under the Fourth Amendment

Defendants next raise two arguments in support of the position that Mr. Johnson cannot show a seizure under the Fourth Amendment, even if Officer Adgar did fire the PIW that struck Mr. Johnson.  *See* Mot. 13–16.

### i.      Whether Officer Adgar Intentionally Seized Mr. Johnson

First, Defendants argue that the undisputed evidence shows that even if Officer Adgar fired a projectile that struck Mr. Johnson, such conduct "was plainly an accident," so that Mr. Johnson was not seized within the meaning of the Fourth Amendment.  *See* Mot. 13–15.  That is,

13

ER0410

Defendants contend that each PIW fired by Officer Adgar on May 30, 2020 was intended to restrain one of three specific individuals who had thrown a glass bottle at police officers—thereby excluding Mr. Johnson, who did not throw any object at the officers—so that Mr. Johnson was in effect a bystander inadvertently harmed during the attempted seizure of a third party. *See id.*; *see also, e.g.*, *Lockett*, 919 F.2d at 590 n.4 (stating that although "an unarmed suspect shot by a police officer might have a [F]ourth [A]mendment claim against the officer . . . an innocent bystander struck by a stray bullet from the officer's weapon would not have such a claim"); *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 946 (E.D. Cal. 2011) ("A plaintiff that is injured collaterally or incidentally to the application of force by police against a third party cannot maintain a Fourth Amendment claim.").

Mr. Johnson counters that Officer Adgar seized him within the meaning of the Fourth Amendment, regardless of whether he was the deliberate object of Officer Adgar's force, because Officer Adgar volitionally fired 40mm PIWs at undifferentiated individuals in the crowd and struck Mr. Johnson. *See* Opp'n 18 (citing *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012) ("Regardless of whether [the plaintiff] was the specific object of governmental force, he and his fellow students were the undifferentiated objects of shots intentionally fired by the officers in the direction of that group.").  Defendants respond that *Nelson* is inapposite because the court there held that the plaintiff was intentionally seized under the Fourth Amendment where officers intentionally fired at the plaintiff as one member of the group against which they intended to use undifferentiated force, which is a separate issue from the question of "whether the *accidental* striking of a person while targeting a *different suspect* can constitute a seizure."  Reply 4.

At the hearing on this Motion, the Court noted Mr. Johnson could only rely on *Nelson* if the SAC included allegations supporting Mr. Johnson's theory that Officer Adgar had fired generally into the crowd, rather than aiming at specific third parties.[1]  *See* Tr. 60:13–25.  As further discussed at oral argument, the SAC alleges that "Officer Adgar aimed and intentionally

---

[1] Counsel for Mr. Johnson confirmed that it is not Mr. Johnson's position that Officer Adgar intentionally targeted Mr. Johnson, but rather that the officer intentionally shot into the crowd in the direction of Mr. Johnson.  Tr. 60:13–23.

14

United States District Court
Northern District of California

fired at least one 40mm foam baton projectile towards Mr. Johnson as Mr. Johnson was attempting to flee." *Id.* at 62:12–19 (quoting SAC ¶ 29).  The Court finds that this allegation provides a sufficient basis for Mr. Johnson to argue a seizure under *Nelson*, so that the question before the Court is whether the undisputed evidence shows that Officer Adgar was aiming at specific individuals, as opposed to firing into the crowd without having identified an individual suspect.

Defendants argued at the hearing on this Motion that the only—and therefore undisputed—evidence of Officer Adgar's intent is Officer Adgar's police report, which indicates that Officer Adgar fired each of his 40mm PIWs at one of three specific individuals he believed had thrown glass bottles at police officers.  *See* Tr. 13:23–14:2; Adgar Police Report 1–2; *see also* Mot. 13.  However, as noted in the Opposition, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context."  *See* Opp'n 18 (quoting *Torres v. Madrid*, 592 U.S. ----, 141 S. Ct. 989, 998 (2021)).  Accordingly, the evidence of Officer Adgar's intent therefore also includes the video evidence on record, as well as expert analyses of that video evidence.

The evidence before the Court on the question of whether Mr. Johnson was intentionally seized under the *Nelson* framework—*i.e.*, as a member of a crowd at which Officer Adgar fired without aiming at a specific target other than Mr. Johnson—is as follows.  Officer Adgar's police report indicates that he intended to fire the 40mm PIWs only at specific individuals other than Mr. Johnson who had thrown glass bottles at the police.  *See* Adgar Police Report 1–2.  However, the credibility of Officer Adgar's statements regarding his intent is a question for the jury.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  Further, Officer Adgar's police report states that his response to the second volley of objects thrown at the police was to "fire[] two 40mm [PIWs] towards [a] suspect" who had thrown a glass bottle "from inside of the crowd," and that he was "unable to see if [his] 40mm [PIWs] were effective on the suspect" "[d]ue to the size of the crowd."  Adgar Police Report 1.  There is also video evidence to consider, including footage from Officer Adgar's body-worn camera encompassing the 12 minutes from 10:23 p.m. to 10:35 p.m. on May 30, 2020, from which it is difficult to discern which

United States District Court
Northern District of California

individuals threw glass bottles and whether Officer Adgar was aiming at specific targets.  *See* Video Exh. (J. Adgar).  Lastly, Mr. Johnson's police practices expert, retired lieutenant Roger A. Clark, has submitted a report in which he opines that Officer Adgar exhibited an "unprofessional hostility towards the demonstrators and the protests."  *See* Declaration of Roger A. Clark in Opp'n to Mot. ("Clark Decl."), Exh. A ("Clark Report"), at 8, ECF No. 116-5.  Viewing this evidence in the light most favorable to Mr. Johnson, as the nonmoving party, the Court finds that a rational jury could conclude that Officer Adgar struck Mr. Johnson with a 40mm PIW after firing into the crowd without a specific target, and thereby seized Mr. Johnson within the meaning of the Fourth Amendment.  The Court will therefore deny Defendants' Motion on this ground.

**ii.      Whether Mr. Johnson's Theory of Harm Establishes Officer Adgar's Lack of Intent to Seize**

Defendants next argue that Mr. Johnson's own allegations and theory establish that Officer Adgar did not display the requisite objective intent to restrain because Officer Adgar's actions "objectively evinced the opposite: an intent to repel assaultive suspects and deter them from remaining in the area."  Mot. 15; *see id.* 15–16.  In support of this position, Defendants cite an unpublished Ninth Circuit case, *Jackson-Moeser v. Armstrong*, 765 F. App'x 299 (9th Cir. 2019), as well as decisions from the Eighth Circuit and the District of Columbia.  *See id.* at 15–16.  Mr. Johnson counters that the Ninth Circuit held in *Nelson* that firing projectiles at members of a crowd with the intent to encourage them to disperse constitutes a seizure under the Fourth Amendment.  *See* Opp'n 18 (citing *Nelson*, 685 F.3d at 877–78).  Defendants distinguish *Nelson* by noting that Officer Adgar—unlike the officers in *Nelson*—"did not confine Plaintiff in an enclosed space," but rather "confronted Plaintiff in an open plaza . . . [and] did not do anything to confine him," so that Officer Adgar's objective intent was not to restrain Mr. Johnson.  Reply 6–7.

The Court first notes that, as explained above, it finds that Mr. Johnson's allegations are sufficient to support a theory of seizure under *Nelson*.  *See supra*, at Part IV(A)(2)(b)(i).  Under *Nelson*, to establish a seizure, Mr. Johnson must prove that he was subject to an intentional application of force evincing an objective intent to restrain, regardless of whether Officer Adgar subjectively intended to repel him and whether he was in fact subdued or restrained.  *See Nelson*,

16

685 F.3d at 877; *see also California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("[T]he mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient" to constitute "the quintessential seizure of the person," *i.e.*, an arrest.) (internal punctuation omitted).  Here, the evidence before the Court includes Officer Adgar's police report, in which he states that he sought to take individuals into custody, *see* Adgar Police Report at 1–2, and Officer Adgar's body-worn camera footage, in which he fires at a woman while or directly after another officer orders her to stop, *see* Video Exh. (J. Adgar).  Drawing all inferences in favor of Mr. Johnson on this motion for summary judgment, the Court finds that this evidence is sufficient to create a disputed issue of fact as to whether a reasonable person would find that Officer Adgar objectively intended to restrain Mr. Johnson by firing at him.

Defendants repeatedly assert that Mr. Johnson's Fourth Amendment claim "depends on the theory that Officer Adgar used force while unable to 'make an arrest,'" so that he cannot prove that Officer Adgar exhibited an objective intent to restrain.  Reply 6 (citing Opp'n 22); *see also* Mot. 10, 15 (citing Pl.'s Opp'n to Mot. to Dismiss SAC in Part ("MTD Opp'n") 10, ECF No. 79).  The Court rejects this argument for three reasons.  First, each of the statements to which Defendants cite is made in support of Mr. Johnson's arguments in support of his First Amendment claim, rather than his Fourth Amendment claim.  *See* Opp'n 22; MTD Opp'n 10; *see also* SAC ¶ 33(d) (alleging Officer Adgar was not "in a position to arrest any of the people on whom he used the weapon" and used force due to disagreement with protest, following allegations on Mr. Johnson's exercise of First Amendment rights).  Second, a theory that Officer Adgar was unable to make an arrest is logically distinct from a theory that Officer Adgar did not objectively evince an intent to arrest.  That is, although the latter theory would contradict the required showing for a seizure, the former is not relevant to the analysis.  Finally, a plaintiff may advance alternate theories, including on summary judgment, as long as both are supported by the pleadings.  *See, e.g.*, *Desrosiers v. Hudson Specialty Ins. Co.*, 438 F. App'x 629, 631 (9th Cir. 2011) (reversing grant of summary judgment where one of alternative theories pled in complaint supported plaintiff's argument).  The SAC alleges that Officer Adgar was equipped with a 40mm PIW launcher and zip ties, that Officer Adgar aimed and intentionally fired at least one 40mm foam

United States District Court
Northern District of California

17

baton projectile towards Mr. Johnson, and that Mr. Johnson felt the PIW hit the back of his leg. SAC ¶¶ 28–29.  These allegations are sufficient to support a theory that Officer Adgar's conduct evinced an objective intent to restrain when he fired each 40mm PIW, and the evidence before the Court would permit a rational jury to find as much.

For the above reasons, the Court will deny summary judgment on this ground.

### c.    Qualified Immunity

Lastly, Defendants argue that the doctrine of qualified immunity protects Officer Adgar from liability under Mr. Johnson's Fourth Amendment claim.  *See* Mot. 16–17.  In evaluating this argument, the Court must "consider whether the law was clearly established at the time of the challenged conduct."  *Felarca*, 891 F.3d at 816 (citing *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015)).  The "clearly established right [at issue] must be defined with specificity."  *City of Escondido v. Emmons*, 586 U.S. ----, 139 S. Ct. 500, 503 (2019).  Defendants contend that there is no evidence that Officer Adgar intentionally fired upon and struck Mr. Johnson with a projectile, so that Mr. Johnson could at most show that Officer Adgar inadvertently or mistakenly struck Mr. Johnson while firing a 40mm PIW at a suspect who had committed felony assault on police officer (by throwing a glass bottle toward officers).  *See* Mot. 17.  Defendants thus argue that since an officer's inadvertent striking of a third party or bystander while aiming at a different individual is not a seizure under the Fourth Amendment, Mr. Johnson cannot show that Officer Adgar violated a clearly established right based on an excessive force theory.  *See id.*; Reply 9.  Mr. Johnson counters that this argument requires accepting Defendants' position that Officer Adgar inadvertently struck Mr. Johnson while firing at a specific individual other than Mr. Johnson who had committed a crime, and that the evidence, viewed in the light most favorable to Mr. Johnson, does not support such an acceptance.  *See* Opp'n 19–20.

The Court agrees with Mr. Johnson that granting qualified immunity to Officer Adgar turns on accepting Defendants' version of disputed facts.  As the Court has explained, there remain disputed facts as to whether Officer Adgar did or did not intend to strike a specific individual other than Mr. Johnson—if that intent was not present, so that Mr. Johnson was not a mere bystander, the basis for Defendants' qualified immunity argument crumbles.  *See supra*, at

18

Part IV(A)(2)(b); *see also NAACP of San Jose/Silicon Valley v. City of San Jose*, No. 21-cv-01705, 2023 WL 4983161, at *7 ("[I]t was clearly established by the Ninth Circuit in *Nelson* that an officer could not constitutionally shoot a projectile that risked causing serious harm in the direction of non-threatening individuals who had committed, at most, minor misdemeanors[.]"); *see also Sanderlin v. City of San Jose*, No. 20-cv-04824, 2023 WL 2562400, at *11 (N.D. Cal. Mar. 16, 2023) (rejecting qualified immunity argument where officers shot projectiles at participants in protest who "were not engaged in any violence towards the police, although others around them may have been").  Accordingly, qualified immunity is not appropriate at present.  *See Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 630 (9th Cir. 2022) (holding that "[c]ritical disputes of fact render[ed] summary judgment premature," including on qualified immunity rounds); *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment on qualified immunity grounds where genuine issues of fact existed regarding whether the officers violated plaintiff's Fourth Amendment rights, which were also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions).

### 3.     First Amendment Claim – Retaliatory Use of Force

Defendants also move for summary judgment on Mr. Johnson's § 1983 claim against Officer Adgar for allegedly engaging in retaliatory force against Mr. Johnson due to Mr. Johnson's participation in the May 30 protest, in violation of the First Amendment.  *See* Mot. 17–19.  As noted above, the general requirement to establish a § 1983 claim is that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right.  *See supra*, at Part IV(A)(1) (citing *Patel*, 648 F.3d at 971).  To state a § 1983 claim for retaliatory violation of the First Amendment, Mr. Johnson must plead and prove that (1) he was "engaged in a constitutionally protected activity"; (2) Officer Adgar's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity;" and (3) "the protected activity was a substantial or motivating factor" in Officer Adgar's conduct.  *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).  The final element can be demonstrated through direct or

ER0416

United States District Court
Northern District of California

circumstantial evidence, and "involves questions of fact that normally should be left for trial." *Id.*

Defendants first cursorily argue that Mr. Johnson's retaliation claim fails because he cannot prove that Officer Adgar was the source of the projectile that struck Mr. Johnson, and that the undisputed facts show that Mr. Johnson was not the deliberate object of that force. *See* Mot. 18 (citing to sections in Motion arguing Fourth Amendment issues of causation and intentional seizure). Defendants have provided no legal support for these arguments in the First Amendment context, *see id.*, and in any case the Court has found disputed issues of fact on both theories, as described above. *See supra*, at Parts IV(A)(2)(a)–(b). Accordingly, the Court will deny summary judgment on this ground.

With respect to the three elements required to plead a First Amendment retaliation claim, Defendants argue that Mr. Johnson cannot show the third element of motivating animus because (1) the record evinces no evidence that Officer Adgar interacted with Mr. Johnson prior to potentially striking him with a projectile, and (2) the evidence shows that Officer Adgar's force occurred directly after protestors threw a volley of objects at police, so that a conclusion that Officer Adgar in fact targeted Mr. Johnson with punitive force would be based on pure speculation. *See* Mot. 18–19. Mr. Johnson argues that the evidence creates a genuine dispute of fact as to Officer Adgar's motivation in firing towards him, pointing to Mr. Clark's expert opinion that Officer Adgar "demonstrated an unprofessional hostility toward the demonstrators." Opp'n 21 (quoting Clark Report 8).

The Court notes that Mr. Johnson will likely find it difficult to produce direct evidence that Officer Adgar's subjective motives for shooting were related to the protests and their subject matters. But Mr. Johnson has provided some circumstantial evidence, such as Mr. Clark's analysis of Officer Adgar's interactions with the demonstrators, *see* Clark Report 8, and the parties appear to indicate the existence of deposition testimony from Officer Adgar that the protest was "anti-police" in nature.[2] "Further, the Ninth Circuit has recognized that a short 'proximity in time

---

[2] Mr. Johnson argues that Officer Adgar acknowledged the "anti-police" nature of the protest during his deposition—and Defendants address the argument without questioning its accuracy—but that evidence is not presently before the Court. *Compare* Opp'n 21 (citing Bastida Decl., Exh. 33 ("Adgar Dep."), at 181:12–17), *with* Adgar Dep.; *see also* Reply 7.

20

United States District Court
Northern District of California

United States District Court
Northern District of California

between the protected action and the allegedly retaliatory [conduct]' supports a First Amendment claim." *Sanderlin*, 2023 WL 2562400, at *16 (quoting *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 744 (9th Cir. 2001)).  Here, Mr. Johnson was struck during the protest, *i.e.*, with no gap in time between his protected action and the alleged retaliatory force.

For these reasons, and in light of the Ninth Circuit's guidance that the motivating animus element of a First Amendment retaliation claim "involves questions of fact that normally should be left for trial," *see Index Newspapers*, 977 F.3d at 827, the Court finds that there is a genuine dispute of material fact as to whether Mr. Johnson's protected activity—protesting police brutality and the killing of George Floyd—was a "substantial or motivating factor" in the officers' conduct. Accordingly, it will deny summary judgment as to Mr. Johnson's § 1983 claim against Officer Adgar for retaliation in violation of the First Amendment.

### B.      Claims Under 42 U.S.C. § 1983 Against the City

Mr. Johnson brings the same § 1983 claims against the City for violations of the First and Fourth Amendments, and Defendants seek summary judgment on both claims. *See* Mot. 19–24.

#### 1.      Legal Framework

"The Supreme Court in *Monell* held that municipalities may only be held liable under section 1983 for constitutional violations resulting from official . . .  policy or custom." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).  "[P]olicies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, . . . and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality[.]" *Id.* at 1153 (citations omitted).  "A municipality may [also] be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).  "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving

21

force behind the constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

Defendants first argue that there can be no *Monell* liability for the City because Mr. Johnson is unable to establish that Officer Adgar violated his First and Fourth Amendment rights. *See* Mot. 19.  This argument fails because the Court has held there exist disputed issues of fact on both claims.  *See supra*, at Parts IV(A)(2)–(3).

Defendants next argue that the *Monell* claims fail because Mr. Johnson cannot show that the City had any official policy or custom—whether through an unwritten custom or practice, failure to train or supervise, or ratification—to allow excessive force or speech-based retaliation by law enforcement.  *See* Mot. 19.  The Court addresses each argument in turn.

### 2.      Custom or Practice

A municipality may be held liable on the basis of an unconstitutional policy if a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents"; rather "[t]he custom must be so persistent and widespread that it constitutes a permanent and well settled city policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (internal quotation marks and citations omitted).

Defendants argue that Mr. Johnson, to prevail on a custom-or-practice theory of *Monell* liability, would have to show the City had a "longstanding and permanent" practice of intentional, causeless targeting of non-violent protestors with 40mm PIWs because they were expressing a political message—and that the undisputed evidence establishes that the City explicitly prohibited such conduct.  *See* Mot. 20–21.  Mr. Johnson counters that the custom or practice at issue is that of the City "responding to non-violent demonstrators protesting police violence with excessive force, including the indiscriminate use of 40mm PIWs."  Opp'n 24.  He argues that the evidence establishes that SJPD officers shot multiple non-violent protestors with PIWs, including 40mm

22

United States District Court
Northern District of California

PIWs, during the protests on both May 29 and May 30, and in doing so established a custom of excessive force on May 29 that continued on May 30, and which constituted the moving force behind Mr. Johnson's injuries. *See id.* at 24–25; *see also* Tr. 42:21–44:13. Defendants counter that the alleged custom or practice is not sufficiently widespread, and that the evidence submitted concerning the multiple protestors shot with PIWs is inadmissible and irrelevant to the force allegedly experienced by Mr. Johnson. *See* Reply 10–13.

The evidence here shows that SJPD officers repeatedly shot 37mm and 40mm PIWs into the crowd during the May 29 protests. *See, e.g.*, Bastida Decl., Exh. 31 (SJPD captain recounting grant of permission to use 37mm and 40mm OC and 40mm foam baton PIWs on May 29). At one point during the May 29 protest, an SJPD sergeant shouted, "Get [expletive] foam baton 40s too," as officers shot into the crowd. *See id.*, Exh. 29, at 17:14:20–17:15:00. The evidence further shows that SJPD officers fired PIWs during the May 30 protest, *see* Adgar Rep., and supports a finding that Mr. Johnson was struck by a PIW during the May 30 protest. *See* Johnson Decl. ¶ 17. Based on this evidence, the Court finds a genuine dispute of material fact as to whether SJPD officers' repeated firing of PIWs into the May 29 and May 30 protest crowds constituted an unwritten custom or practice of engaging in excessive and/or retaliatory force against the demonstrators protesting police brutality. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147–48 (9th Cir. 2005) (reversing summary judgment after reasoning that evidence, when viewed in light most favorable to plaintiffs, permitted inference of custom or practice of constitutional violations based on series of incidents occurring on same day); *NAACP of San Jose/Silicon Valley*, 2023 WL 4983161, at *16–17 (denying summary judgment based on SJPD's use of 37mm and 40mm PIWs at May 29 protest); *cf. Sanderlin*, 2023 WL 2562400, at *21 (granting summary judgment where no plaintiff provided evidence of being struck with projectile whose use plaintiffs alleged was unconstitutional custom or practice).[3]

Because the Court concludes Mr. Johnson has raised a triable issue as to whether the City's

---

[3] The Court also notes that the *Sanderlin* plaintiffs did not argue that SJPD officers' use of PIWs on May 29 itself created a custom or practice, as Mr. Johnson does here. *See Sanderlin v. City of San Jose*, N.D. Cal. No. 20-cv-4824, Pls.' Opp'n to Defs.' Mot. Summ. J. 17–25, ECF No. 113.

ER0420

policy or custom of using PIWs against non-threatening protestors of police brutality was unconstitutional under the law established by the Ninth Circuit in *Nelson* and related cases, it will deny the motion for summary judgment on this ground.

### 3. Failure to Supervise or Failure to Train

"Under *Monell*, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). Such policies may include a failure to adequately supervise or train employees. *See, e.g.*, *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (discussing § 1983 liability based on "policy or custom of inadequately supervising . . . police officers); *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) ("A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact.") (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Liability for policies of inaction, including failures to supervise and train, requires a showing that the policy (1) "amounts to deliberate indifference to the plaintiff's constitutional rights" and (2) "caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Jackson*, 749 F.3d at 763 (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). Deliberate indifference generally "requires showing that the defendant 'was on actual or constructive notice that [the] omission would likely result in a constitutional violation.'" *Id.* (quoting *Tsao*, 698 F.3d at 1145). That is, a "pattern of similar constitutional violations . . . is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Rarely, "the possibility . . . that the unconstitutional consequences of [a policy of inaction] could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64.

Mr. Johnson asserts that the City may be held liable for the alleged violations of his First and Fourth Amendment rights based on two policies of inaction, namely, SJPD's failure to (1) supervise its officers' use of PIWs and (2) train its officers in the use of PIWs in crowd control circumstances. *See* SAC ¶¶ 38–63; Opp'n 27–31. Defendants argue that Mr. Johnson cannot

United States District Court
Northern District of California

24

United States District Court
Northern District of California

make the necessary showing that there existed either a "pattern of similar constitutional violations by untrained employees" or unsupervised police officers, or a likelihood of constitutional violations that was "so patently obvious" that the City consciously chose to allow that likelihood. *See* Mot. 22 (quoting *Connick*, 563 U.S. at 62, 64); *see also id.* at 21–24.

With respect to Mr. Johnson's failure to supervise argument, the evidence indicates that the City's express policy was that 40mm PIWs were only to be used on suspects likely to cause serious bodily injury or death, and not for general crowd control, while 37mm PIWs had specified crowd control uses. *See* Tassio Decl., Exh. 2, at 2. Additional evidence establishes that SJPD officers fired about 550 rounds of 37mm and 40mm PIWs at the May 29 protest, which resulted in widespread news coverage of which SJPD was aware. *See* Bastida Decl., Exh. 5, at 59; *id.* at Exh. 2 ("Tindall Dep."), at 168:5–171:16; *id.* at Exh. 20. Prior to the May 30 protest, officers were explicitly instructed that the Duty Manual was in effect, that "shooting indiscriminately into a crowd" was a violation of the Duty Manual, and that, given the crowd presence, they had to be "surgical" in using the 40mm PIWs. *See* Pritchard Rebut. Decl., Exh. 6 ("Dwyer Rebut. Dep."), at 173:16–175:1. Officers were both expected to ensure they themselves adhered to the Duty Manual, and supervisors were also present to monitor officers' conduct. *See* Bastida Decl., Exh. 3 ("Dwyer Dep."), at 176:5–21. The Court does not find this evidence to suggest actual or constructive notice of a "pattern" of constitutional violations based on inadequate supervision of 40mm PIWs, as "ordinarily necessary" to establish a policy of inaction demonstrating deliberate indifference to constitutional rights, nor one of the "rare" instances in which it was "patently obvious" that the supervision of 40mm PIW use during the May 30 would create § 1983 liability. *See Connick*, at 563 U.S. at 62, 64; *see also Flores v. County of Los Angeles*, 758 F.3d 1154, 1158–60 (9th Cir. 2014) (rejecting § 1983 claim based on deliberate indifference where proper course of conduct "is obvious to all without training or supervision"). Nor is the Court persuaded by Mr. Johnson's reliance on *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 943 (D. Minn. 2021), and *Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 843–44 (D. Minn. 2021), *see* Opp'n 28; Tr. 49:12–18, both of which are out-of-circuit cases evaluating a motion to dismiss.

Similarly, with respect to Mr. Johnson's failure to train argument, the undisputed evidence

25

before the Court indicates that SJPD officers, including Officer Adgar, were trained on the use of 40mm PIWs. *See, e.g.*, Tassio Decl. ¶¶ 4, 9; *id.* at Exhs. 1, 2; Adgar Decl. ¶ 2. Mr. Johnson argues that SJPD did not train its officers on using 40mm PIWs when faced with a large crowd, *see* Opp'n 30; Tr. 46:7–19, but the inquiry is not one based on hindsight. Rather, the standard requires a showing that there have been a prior recognition of inadequate training based on a pattern of constitutional violations, or circumstances under which a likely constitutional violation was so obvious that failure to do more constitutes a policy of deliberate indifference. *See Connick*, 563 U.S. at 62, 64. There is no indication of either, for the same reasons described above with respect to the failure to supervise argument.

Accordingly, the Court finds that the evidence before it does not create a dispute of material fact that the City demonstrated deliberate indifference in its supervision or training practices that caused Mr. Johnson's injury. It will grant the summary judgment motion on this ground.

### 4.     Ratification

Defendants also seek summary judgment on Mr. Johnson's final theory of *Monell* liability, *i.e.*, that Chief Garcia or other department heads ratified the force used by SJPD officers, including Officer Adgar. *See* Mot. 24. A municipality may be held liable under § 1983 if "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). "There must . . . be evidence of a conscious, affirmative choice" to ratify the conduct. *See id.* at 1347.

Defendants argue that the undisputed facts preclude a ratification theory because "no City policymaker was aware of Adgar's decision to fire the 40mm foam baton that Plaintiff claims struck him, much less that any such policymaker affirmatively and consciously approved that use of force, much less still approved of that force and the alleged basis for it." Mot. 24. Mr. Johnson counters that the unconstitutional use of PIWs was an "organized, department-wide response" that permits the presumption that the police chief was ratifying officers' actions, and that the lack of discipline of Officer Adgar or other officers supports ratification. *See* Opp'n 31 (quoting *Martinez v. City of Santa Rose*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020)). However, Mr. Johnson has

26

United States District Court
Northern District of California

pointed to no evidence that could create a material dispute of fact as to whether Chief Garcia or another official with final policy-making authority was aware that Officer Adgar had fired a 40mm PIW that hit Mr. Johnson, and made a "conscious, affirmative choice" to ratify the conduct.  *See* Opp'n 31; *see also Whiting v. City of San Jose*, No. 21-cv-05248, 2022 WL 2714968, at \*7 (N.D. Cal. July 13, 2022) (finding mere failure to discipline or reprimand officers based on statistical evidence of numerous use-of-force complaints failed to create triable issue of fact); *Estate of Adomako*, No. 17-cv-06386, 2018 WL 2234179, at \*3 (N.D. Cal. May 16, 2018) ("A police department's 'mere failure to discipline its officers does not amount to ratification of their allegedly unconstitutional actions.'") (quoting *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part*, *cert. dismissed in part*, 575 U.S. 600 (2015)).

Accordingly, the Court will grant summary judgment on this ground.

### C.     State Law Claims (Bane Act, Battery, Negligence)

Defendants also move for summary judgment on Mr. Johnson's three state law claims—*i.e.*, violation of the Bane Act; battery; and negligence—all of which are brought against both Officer Adgar and the City.  *See* Mot. 24–25; SAC ¶¶ 83–98.  The Court addresses each in turn.

#### 1.     Bane Act

Under the Bane Act, a plaintiff can seek damages "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(b)–(c).  Thus, a Bane Act claim has the same elements as an excessive force claim under the Fourth Amendment, with the additional requirement that the defendant intended to interfere with a plaintiff's constitutional rights.  *See Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018).[4]  The intent requirement does not require that the defendant have been "thinking in constitutional *or legal terms* at the time

---

[4] Unlike a § 1983 claim, however, "municipalities can be liable for Bane Act violations by their employees under the doctrine of *respondeat superior*."  *Sanderlin*, 2023 WL 2562400, at \*19 (citing *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002)).  Accordingly, the City is a proper defendant here.

27

of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Id.* (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)).  "Rather, the jury must find that the defendants 'intended not only the force, but its unreasonableness, its character as "more than necessary under the circumstances."'" *Id.* (quoting *Reese*, 2 F.3d at 885).

Defendants argue that Mr. Johnson cannot meet the Bane Act's intent requirement because he cannot show that Officer Adgar intentionally fired the 40mm PIW at Mr. Johnson, or that Officer Adgar specifically intended to violate the law.  *See* Mot. 24.  Mr. Johnson argues that a reasonable jury might conclude on the present record that Officer Adar acted with reckless disregard for his constitutional rights.  *See* Opp'n 32.  The Court agrees that Mr. Johnson has established a triable issue of fact as to whether Officer Adgar evinced reckless disregard for Mr. Johnson's constitutional rights for the same reasons it denied summary judgment based on qualified immunity—that is, because there is a material issue of fact as to whether Mr. Johnson had a clearly established right to be free from the force Officer Adgar is alleged to have inflicted, there is a related issue of fact as to whether Officer Adgar struck Mr. Johnson with a 40mm PIW and thereby recklessly disregarded that clearly established right.  *See NAACP of San Jose/Silicon Valley*, 223 WL 4983161, at *19 (denying summary judgment on Bane Act claim arising out of PIW use at the May 29 and May 30 protests on the basis that plaintiffs could show reckless disregard for their constitutional rights); *cf. Sanderlin*, 2023 WL 2562400, at *19 (granting summary judgment on Bane Act claim where plaintiff did not raise reckless disregard theory of intent).

For this reason, the Court will deny Defendants' motion for summary judgment on this ground.

### 2. Battery

Defendants argue that Mr. Johnson's battery claim fails because it requires proof of Officer Adgar's intent to use force against Mr. Johnson.  *See* Mot. 24.  For the reasons stated both above and in the Court's discussion of Defendants' qualified immunity arguments, *see supra*, at Parts IV(A)(2)(c), IV(C)(1), the Court finds Mr. Johnson has shown a genuine issue of fact as to Officer

United States District Court
Northern District of California

28

Adgar's intent, and will deny summary judgment on this ground.

### 3.   Negligence

Lastly, Defendants seek summary judgment on Mr. Johnson's negligence claim.  *See* Mot. 24–25.  Their argument is entirely predicated on the narrative that Officer Adgar struck Mr. Johnson—if at all—inadvertently, while attempting to exert reasonable force against an individual who had thrown a dangerous object at police officers.  *See id.*  Because the Court has found that there exists a triable issue of fact as to whether Officer Adgar intended to strike a specific individual, which would make Mr. Johnson a bystander, *see supra*, at Parts IV(A)(2)(a)–(b), it will deny summary judgment on this ground.

## V.   ORDER

For the foregoing reasons, the Court hereby ORDERS as follows:

(1) Defendants' motion for summary judgment on Mr. Johnson's § 1983 claim against Officer Adgar for the alleged violation of his Fourth Amendment rights is DENIED;

(2) Defendants' motion for summary judgment on Mr. Johnson's § 1983 claim against Officer Adgar for the alleged violation of his First Amendment rights is DENIED;

(3) Defendants' motion for summary judgment on Mr. Johnson's § 1983 claims against the City under *Monell* for the alleged violations of his First and Fourth Amendment rights is DENIED with respect to the theory of an alleged custom or practice of excessive force and GRANTED with respect to the theories of the City's failure to supervise or train and its ratification of unconstitutional policies; and

(4) Defendants' motion for summary judgment on Mr. Johnson's claims under California law for violation of the Bane Act, battery, and negligence is DENIED.

**IT IS SO ORDERED.**

Dated: November 13, 2023

Beth Labson Freeman
United States District Judge

United States District Court
Northern District of California

29

ER0426

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| KYLE JOHNSON, AN INDIVIDUAL, | ) | C-21-01849 BLF |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | SEPTEMBER 21, 2023 |
| | ) | |
| CITY OF SAN JOSE, A CALIFORNIA | ) | PAGES 1-71 |
| CHARTER CITY; SAN JOSE POLICE | ) | |
| DEPARTMENT OFFICER JAMES ADGAR, | ) | |
| BADGE NO. 4552, AN INDIVIDUAL; | ) | |
| DOES 2 THROUGH 50, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        MCMANIS FAULKNER
                          BY:  ABIMAEL BASTIDA
                               EVAN MILLER
                          50 WEST SAN FERNANDO STREET, 10TH FLOOR
                          SAN JOSE, CALIFORNIA  95113

FOR THE DEFENDANTS:       OFFICE OF THE CITY ATTORNEY
                          BY:  MATTHEW PRITCHARD
                          200 EAST SANTA CLARA STREET, 16TH FLOOR
                          SAN JOSE, CALIFORNIA  95113

OFFICIAL COURT REPORTER:     LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

ER0427

SAN JOSE, CALIFORNIA                    SEPTEMBER 21, 2023

P R O C E E D I N G S

(COURT CONVENED AT 9:05 A.M.)

THE COURT:  GOOD MORNING, EVERYONE.  WELCOME.  PLEASE BE SEATED.

LET'S CALL THE CASE AND GET YOUR APPEARANCES.

THE CLERK:  CALLING CASE 21-1849, JOHNSON VERSUS THE CITY OF SAN JOSE.

COUNSEL, PLEASE STATE YOUR APPEARANCES.

MR. BASTIDA:  GOOD AFTERNOON, YOUR HONOR.

ABIMAEL BASTIDA OF MCMANIS FAULKNER HERE ON BEHALF OF PLAINTIFF.  WITH ME IS MY COLLEAGUE, EVAN MILLER, AND JAIRO BUSTOS, WHO'S AN EXTERN AT OUR OFFICE.

THE COURT:  GOOD MORNING.

MR. PRITCHARD:  GOOD MORNING, YOUR HONOR.

MATTHEW PRITCHARD ON BEHALF OF DEFENDANTS.

THE COURT:  HELLO, MR. PRITCHARD.

IT'S NICE TO SEE ALL OF YOU IN PERSON.  THANK YOU.

WE ARE HAVING A LITTLE TROUBLE WITH OUR VIDEO EQUIPMENT, AND I MAY WANT YOU TO WALK THROUGH SOME OF THE VIDEO THAT YOU SUBMITTED.

BUT I THOUGHT WE'D JUST GO FORWARD BECAUSE THAT'S GOING TO TAKE SOME TIME, AND PRIMARILY I'LL BE LISTENING TO YOUR ARGUMENTS.

LET ME GO THROUGH A FEW THINGS THAT ARE ON MY MIND.

ER0428

FIRST OF ALL, THE BRIEFING WAS REALLY EXCELLENT.  I WANT TO THANK ALL OF YOU FOR PUTTING IN AN AWFUL LOT OF WORK.  IT'S ALWAYS A LOT OF WORK, AND SOMETIMES IT'S PRODUCTIVE, AND YOURS WERE REALLY EXCELLENT BRIEFS.

THIS IS A HARD CASE.  IT SEEMS TO ME -- AND I WANT TO KNOW, FOR PLAINTIFFS, THAT IT WILL BE ESSENTIAL FOR YOU TO PROVE THAT OFFICER ADGAR STRUCK MR. JOHNSON.

NOW, AT SUMMARY JUDGMENT, I JUST NEED YOU TO POINT TO SOME EVIDENCE THAT A JURY COULD CREDIT THAT COULD SUPPORT THAT DETERMINATION.

SO YOU'RE NOT PROVING ANYTHING TODAY, OF COURSE.

BUT THE CITY HAS COME FORWARD WITH REALLY VERY STRONG EVIDENCE THAT ADGAR DID NOT AIM AND HIT MR. JOHNSON, AND THAT IF HE WAS HIT BY OFFICER ADGAR AT ALL, IT WAS AS A BYSTANDER OR AS AN ACCIDENTAL HIT.

SO IT SEEMS TO ME THAT'S AT THE BASE OF THE ENTIRE CASE BASED ON THE THEORY THE PLAINTIFFS HAVE PUT FORWARD.  SO IF I'M MISTAKEN ON THAT, LET ME KNOW.

NOW, WHEN I VIEW THE VIDEO -- AND I'LL TELL YOU, I OFTEN DON'T EVEN VIEW THE VIDEOS BECAUSE IT -- BUT IT PANNED OUT IN THIS CASE.  SO OFTEN THE VIDEO IS NOT AS CLEAR AND ONE HAS TO INTERPRET THE VIDEO BASED ON ALL OF THE EVIDENCE IN THE CASE.

SO I LOOKED AT WHAT I THINK THE CITY PROVIDED ME, THE FULL 12 MINUTES FROM A LITTLE BIT BEFORE THE 10:24 TIMEFRAME THROUGH THE 10:33 TIMEFRAME THAT PURPORTS TO BE OFFICER ADGAR'S

ER0429

BODY CAM.

AND IT'S VERY HARD TO KNOW IF PLAINTIFF IS EVEN IN ANY OF THAT.  I -- I MEAN, EVERYONE IS WEARING DARK CLOTHING.

SO THEN I LOOK AT WHAT I THINK IS -- WHAT I BELIEVE WAS SUBMITTED BY PLAINTIFFS, AND I THINK IT'S BEEN ANNOTATED BY YOUR EXPERT, IT LOOKS TO BE THE BODY CAM OF A DIFFERENT OFFICER LOOKING ACROSS THE PLAZA THERE AND IT IDENTIFIES OFFICER ADGAR AND SHOWS HIM MAKING A SHOT.

BUT IN THAT ONE, I ACTUALLY CAN'T TELL WHETHER HE'S AIMING -- I CAN'T TELL WHAT HE'S DOING.  HE'S CLEARLY SHOOTING.  I DON'T KNOW WHAT HE'S AIMING AT.  I DON'T KNOW WHETHER THAT'S DURING THE GENERAL CROWD DISPERSAL TIME, BECAUSE IT APPEARED IN THE LONGER VIDEO THAT THERE'S A MOMENT AT WHICH THE CROWD IS DISPERSED AND WE SEE SOME FLASHES THAT ARE THE, I GUESS THE GAS CANISTERS OPENING.

AND SO I -- I JUST WANT YOU TO KNOW, I DON'T KNOW WHAT I'M LOOKING AT.  THAT MAKES IT VERY HARD TO WIN SUMMARY JUDGMENT ON EITHER SIDE, AND IT MAKES IT HARD AT TRIAL, BUT THAT'LL BE FOR THE JURY TO WRESTLE WITH.

SO THAT'S SORT OF A LONG-WINDED WAY TO SAY IT, BUT I JUST NEED YOU TO UNDERSTAND WHERE I'M STUCK HERE.

I KNOW WE HAVE THE ISSUE OF MR. JOHNSON'S PRIOR TESTIMONY, INTERROGATORY RESPONSES IDENTIFYING THE 10:24 TIMEFRAME.  I REALLY THINK THAT'S AN ISSUE FOR THE JURY TO GRAPPLE WITH.

AND, YOU KNOW, I MEAN, I THINK A JURY COULD SIMPLY NOT

ER0430

BELIEVE MR. JOHNSON.  THEY COULD RELY ON HIS FIRST STATEMENT.

OR A JURY COULD BE SYMPATHETIC THAT IT'S REALLY HARD TO REMEMBER, IT WAS A CHAOTIC EXPERIENCE, AND THAT HE JUST MADE A MISTAKE.  I JUST THINK THAT'S A JURY ISSUE.

SO WE DON'T EVEN KNOW THAT THERE'S -- IT MEANS THERE'S A CONTESTED ISSUE OF FACT ON THAT ISSUE, BUT I'M NOT GOING TO STRIKE THE DECLARATION AS WAS REQUESTED.

LET ME JUST LOOK AT MY OTHER NOTES.

ON THE RETALIATION CLAIM, IT'S NOT CLEAR TO ME WHETHER THE THEORY IS, AGAIN, THAT ADGAR AIMED SPECIFICALLY AT MR. JOHNSON IN RETALIATION FOR MR. JOHNSON'S PARTICIPATION, OR WHETHER THE THEORY IS THAT OFFICER ADGAR AIMED GENERALLY INTO THE CROWD AND HIT JOHNSON IN RETALIATION OF THE CROWD PROTEST.

SOME OF THIS, MR. PRITCHARD, I'LL BE GLAD TO HAVE YOU GO BACK TO THE COMPLAINT AND LET ME KNOW WHAT'S BEEN PLED, BECAUSE I KNOW YOU POINTED THAT OUT, THAT THERE ARE SOME DISCREPANCIES, AND WE DON'T BRING NEW THEORIES IN THE OPPOSITION TO SUMMARY JUDGMENT.

SO I'M STRUGGLING WITH THAT.

ONCE WE GET THROUGH ALL OF THIS, IF IT IS -- IF I DETERMINE THAT ON THE ISSUE OF WHAT WOULD BE THE FIRST PRONG OF QUALIFIED IMMUNITY, WAS THERE A CONSTITUTIONAL VIOLATION, IF I FIND THE FACTS -- THERE ARE DISPUTED FACTS, SO THAT WOULD GO TO TRIAL.

WHEN I LOOK AT QUALIFIED IMMUNITY, I -- I'M GOING TO PUT

ER0431

ASIDE ALL OF THE DEFENSE EVIDENCE AND LOOK ONLY AT THE PLAINTIFF'S THEORY OF THE CASE, AND I THINK QUALIFIED IMMUNITY DOES NOT APPLY BASED ON THE EVIDENCE THAT PLAINTIFF HAS PUT FORWARD.

SO I WOULD -- ON EITHER THE FOURTH AMENDMENT OR THE RETALIATION FIRST AMENDMENT CLAIM, I DON'T THINK QUALIFIED IMMUNITY WOULD APPLY, ALTHOUGH NELSON IS NOT THE PROPER CASE HERE, AS IT WAS IN MY SANDERLIN CASE, BECAUSE I DON'T THINK PLAINTIFF ALLEGES THAT ADGAR WAS SHOOTING INTO THE CROWD, AND HE'S NOT ALLEGING GENERALLY THAT IT WAS -- I DON'T THINK MR. JOHNSON HAS A THEORY THAT GENERALLY HE WAS THE VICTIM OF RAMPANT RETALIATION BY THE POLICE FORCE AS A WHOLE.

THIS IS A CASE AGAINST OFFICER ADGAR AND NO ONE ELSE, I THINK.  SO I WANT TO BE CLEAR ON THAT.

BUT I DON'T THINK QUALIFIED IMMUNITY APPLIES.

ON THE MONELL CLAIM, I DISMISSED THE MONELL CLAIM IN THE SANDERLIN CASE.  THE BRIEFING AND THE ARGUMENTS ARE SO DIFFERENT -- IT HAS TO DO WITH LAWYERS' STRATEGY OF CASES -- THAT I -- I FEEL LIKE I'M STARTING ALL OVER AGAIN AND I COULD FIND THE CASE GOES TO THE JURY ON MONELL IN THIS CASE WHERE I DIDN'T IN SANDERLIN.  IT'S JUST ONE OF THOSE ODD THINGS.  GOOD LAWYERING PRODUCES GOOD RESULTS OFTEN.

SO I WANT TO FOCUS ON THAT.  I DON'T -- MONELL CLAIMS ARE WICKEDLY DIFFICULT TO MAKE OUT.

I DON'T THINK THAT THE FAILURE TO TRAIN OR SUPERVISE HAS

ER0432

LEGS.  THEY RARELY DO.  AND COURTS HAVE ALWAYS SAID THEY'RE THE HARDEST ONES TO BRING FORWARD.

BUT ON THE MONELL CLAIM, I AM A LITTLE BIT -- I AM CONCERNED ABOUT THE ARGUMENT THAT THE CHIEF DID ORDER MORE PIW'S FOR THE SECOND NIGHT.  A HUGE NUMBER WERE USED THE FIRST NIGHT.  I DON'T KNOW IF ANY OF THAT PERTAINS TO WHAT ADGAR DID BECAUSE HE USED THE 40 MILLIMETER, AND I NEED TO KNOW WHETHER THIS IS REALLY A CASE ABOUT THE USE OF 40 MILLIMETER PROJECTILES VERSUS -- AND WHETHER THERE WAS ANY EVIDENCE THAT IT WAS INDISCRIMINATE SHOOTING INTO THE CROWD BY ADGAR.

SO I'M STRUGGLING ON A LOT OF THESE ISSUES AND I'M HOPING YOU'LL BRING CLARITY.

MR. PRITCHARD, I'M GOING TO TURN TO YOU FIRST.  IT'S YOUR MOTION.

MR. PRITCHARD:  THANK YOU, YOUR HONOR.  I APPRECIATE, AS ALWAYS, THE GUIDANCE.

I AGREE WITH THE COURT THAT THE ISSUE SEEMS, IN MY VIEW, TO TURN ENTIRELY ON THE QUESTION WHETHER THERE IS SUFFICIENT EVIDENCE IN THIS RECORD THAT OFFICER ADGAR INTENTIONALLY TARGETED MR. JOHNSON WITH A PROJECTILE AND, OUT OF EVERYONE IN THAT CROWD, SPECIFICALLY DECIDED TO DIRECT SOME KIND OF RETALIATORY OR PUNITIVE FORCE AT HIM.

THAT'S THE WAY THE ISSUE HAS SHARPENED I THINK IN THE BRIEFING VERY MUCH.  YOU KNOW, THERE'S A LITTLE BIT OF SORT OF INTERSTITIAL ARGUMENTS AS I SEE IT IN PLAINTIFF'S BRIEFING,

ER0433

BUT -- THAT DEALS WITH THE POSSIBILITY THAT IT'S AN ACCIDENT.

BUT TO ME, THE VERY CLEAR THEORY, ESPECIALLY WHEN YOU TIE IN MONELL AND THE RETALIATION CLAIM, THE VERY CLEAR THEORY THAT'S EMERGING HERE IS THAT OFFICER ADGAR DECIDED, OUT OF ALL OF THOSE PEOPLE, TO TARGET MR. JOHNSON AND FIRE ON HIM FOR NO PARTICULAR REASON WHATSOEVER EXCEPT THAT HE WAS AT A PROTEST, THE SUBJECT MATTER OF WHICH MR. ADGAR IS SPECULATED TO HAVE DISAGREED WITH.

ON THAT QUESTION, I THINK THE COURT HAS IT RIGHT IN DETERMINING THAT THE VIDEO EVIDENCE IS NOT GOING TO, NOT GOING TO BE DISPOSITIVE.

THAT'S TRUE EVEN WHEN YOU TAKE ON OR YOU ADD INTO THE EQUATION THE ANALYSIS OF THE VIDEOGRAPHER PLAINTIFF HAS HIRED. IT DOESN'T SHED A WHOLE LOT OF LIGHT.  WHAT IT DOES IS IT CREATES A TENDENTIOUS PRESENTATION OF A PLAUSIBLE THEORY ABOUT WHAT MIGHT HAVE HAPPENED, ABOUT IF YOU LOOK AT DIFFERENT TRAJECTORIES AND LOOK AT DIFFERENT CAMERA ANGLES AND DIFFERENT OFFICER CAMERAS, HOW PERHAPS IT COULD HAVE BEEN THE TRUTH THAT AT THE MOMENT OFFICER ADGAR FIRED, THAT'S WHEN MR. JOHNSON WAS STRUCK.  I DON'T THINK THAT'S CONCLUSIVE.

SO WHAT THAT LEAVES THE COURT WITH ON THIS RECORD IS THE OTHER EVIDENCE, AND THE OTHER EVIDENCE IS, AS THE COURT OBSERVED AT THE OUTSET, IS QUITE POWERFUL THAT THERE IS NO DISPUTE THAT OFFICER ADGAR DID NOT TARGET MR. JOHNSON.

THERE IS NO CONCEIVABLE REASON -- AND SOME OF THE CASES

ER0434

THAT I CITED THAT DEALT WITH ANALOGOUS CIRCUMSTANCES, I THINK INCLUDING PEOPLE SHOOTING AND HITTING SOMEONE ELSE BY ACCIDENT, THEY TALK ABOUT THIS.

THE COURT:  UM-HUM.

MR. PRITCHARD:  ONE OF THEM, I THINK IT WAS THE RODRIGUEZ CASE IN THE EASTERN DISTRICT, SAYS THERE'S NO REASON, EXPRESS OR CONJECTURE EVEN, THAT THIS OFFICER WOULD HAVE HAD TO TARGET THE BYSTANDER WHEN EVERYTHING WE HAVE IN FRONT OF US ON THE RECORD IS THAT THE OFFICER WAS TARGETING SOMEONE ELSE FOR AN ACTUAL CLEAR, LEGITIMATE LAW ENFORCEMENT REASON.

SO HERE WHAT YOU HAVE IS A SEQUENCE OF EVENTS THAT ARE UNDISPUTED FROM CAMERA EVIDENCE, CORROBORATED BY A POLICE REPORT THAT OFFICER ADGAR CONTEMPORANEOUSLY AUTHORED, CORROBORATED BY -- EVEN PLAINTIFF'S OWN EXPERT AGREES THAT THERE WAS A VOLLEY OF AT LEAST EIGHT OBJECTS RIGHT BEFORE THE USE OF FORCE THAT'S AT ISSUE HERE AT 10:33.

THE COURT:  WELL, BUT THE EXPERT SAYS THAT THE VOLLEY OF OBJECTS WAS OVER TO THE LEFT AND MR. JOHNSON WAS TO THE RIGHT, ESSENTIALLY.

MR. PRITCHARD:  YES.  THE EXPERT CONCLUDES -- AND I DON'T KNOW THAT WE EVEN REALLY DISPUTE -- THAT IT IS SOME FEET AWAY THAT THE VOLLEY COMES FROM.

THE COURT:  YEAH.

MR. PRITCHARD:  BUT THAT'S ACTUALLY, THAT'S ACTUALLY EXACTLY THE POINT.  OFFICER ADGAR WAS RESPONDING TO ONE OF THE

ER0435

PEOPLE SOME FEET AWAY WHO WERE RESPONSIBLE FOR THE VOLLEY, AND YOU SEE HIM IN THE VIDEO SORT OF FOLLOW HIS AIM FOR ONE OF THESE PEOPLE.

SO IT'S TRUE, OFFICER ADGAR WAS NOT SHOOTING -- THE CROWD STARTS MOVING, AND THAT'S SOME TEN SECONDS OR SO AFTER THE CROWD STARTS MOVING, AT LEAST FIVE SECONDS, BEFORE YOU CAN HEAR THE LITTLE KIND OF TENNIS BALL SOUNDS THAT HIS PIW DISCHARGING.

BUT, YES, THE FACTS ARE UNDISPUTED.  THERE IS NO SHOOTING OF MR. JOHNSON CERTAINLY FOR THE AT LEAST -- YOU KNOW, BY HIS ACCOUNT, HE GOT THERE AT 9:53, I THINK, SO HE'S THERE FOR OVER HALF AN HOUR, 40 MINUTES.  HE'S CERTAINLY NOT STRUCK WITH ANYTHING.  THERE'S NO INTERACTION BETWEEN MR. JOHNSON AND OFFICER ADGAR.

CERTAINLY THERE'S NO DISPUTE ON THIS RECORD, OFFICER ADGAR DIDN'T KNOW WHO MR. JOHNSON WAS, DIDN'T KNOW HE EXISTED OTHER THAN THAT HE'S PART OF THIS MONOLITH THAT'S THE ENTIRE PROTEST CROWD OF HUNDREDS OF PEOPLE.

SO YOU HAVE AN OFFICER WHO DOESN'T EVEN KNOW A PERSON, HAS NEVER DONE ANYTHING TO SINGLE OUT A PERSON, THAT PERSON HAS DONE NOTHING TO DRAW ATTENTION TO HIMSELF, NO FORCE IS USED AGAINST HIM FOR SOME 40 MINUTES; AND THEN YOU HAVE AN IMMEDIATE, OBVIOUS PRECIPITATING EVENT, THE VOLLEY OF AT LEAST EIGHT OBJECTS AS PLAINTIFF'S OWN EXPERT IDENTIFIES, THAT IS HURLED AT THE LINE OF POLICE OFFICERS FOR THE SECOND TIME THAT EVENING; AND THEN YOU HAVE A LAW ENFORCEMENT RESPONSE.  YOU

ER0436

HAVE A RESPONSE OF OFFICER ADGAR, AT LEAST FOUR OR FIVE OTHER OFFICERS AT THE SAME TIME, ALL USING THEIR PIW FOR THE PURPOSE THAT THEY'RE TRAINED, WHICH IS TO TARGET AN INDIVIDUAL WHO IS ENGAGING IN ASSAULTIVE CONDUCT TOWARDS THE POLICE.

YOU HAVE THAT BACKGROUND OF TRAINING AND POLICY THAT WE'VE PROVIDED THAT SAYS THAT THIS IS WHEN 40 MILS ARE SUPPOSED TO BE USED IN THE CROWD CONTEXT.  NEVER AS A CROWD CONTROL DEVICE, BUT ONLY TO TARGET ASSAULTIVE INDIVIDUALS.

YOU HAVE THIS ENTIRE BODY OF EVIDENCE ABOUT WHY OFFICER ADGAR WAS USING THE PIW AND AGAINST WHOM HE WOULD HAVE BEEN USING IT.  AGAIN, THIS INCLUDES CONTEMPORANEOUS POLICE REPORTS DESCRIBING PEOPLE WHO AREN'T MR. JOHNSON.

I MAKE THE POINT IN THE BRIEFING THAT OF COURSE YOU CAN'T ASCRIBE HIM THE ABILITY TO HAVE PRECOGNATED OR PREDICTED THAT THERE WOULD BE A LAWSUIT LATER BY SOMEONE ELSE AND WHO WOULD CREATE A POLICE REPORT THAT DESCRIBED ANOTHER PERSON.

THE COURT:  BUT THOSE ARE CREDIBILITY ISSUES THAT I CAN'T TAKE HERE.

HOLD ON ONE SECOND.

(DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE CLERK.)

THE COURT:  LET'S GO OFF THE RECORD.

(PAUSE IN PROCEEDINGS.)

THE COURT:  WE'RE GOING TO GO BACK ON THE RECORD, BUT IF YOU'RE CLOSER TO THE COURT REPORTER AND ME -- AND

ER0437

MR. BASTIDA, IF YOU CAN'T HEAR, JUST LET US KNOW, WE'LL ALL TALK LOUDER.

GO AHEAD.

MR. PRITCHARD:  OKAY.  YOUR HONOR, AS FAR AS THE CREDIBILITY ISSUE, IT'S NOT -- WHAT THE COURT CAN DO ON SUMMARY JUDGMENT, WITHOUT GETTING INTO ANY CREDIBILITY, IS DECIDE WHETHER THERE ARE FACTS ON THE RECORD THAT WOULD ALLOW A RATIONAL JURY TO COME TO A CONCLUSION ABOUT OFFICER ADGAR'S STATE OF MIND, BECAUSE THAT'S WHAT WE'RE TALKING ABOUT.  DID HE, IN FACT, INTEND TO HIT MR. JOHNSON WITH THAT PROJECTILE?

THE COURT:  WELL, BUT IT'S AN OBJECTIVE TEST, THOUGH, NOT SUBJECTIVE, ISN'T IT?

MR. PRITCHARD:  OBJECTIVE AS TO REASONABLENESS.

BUT THERE STILL HAS TO BE THE INDIVIDUAL INTENT TO STRIKE THE ACTUAL TARGET.  HE HAS TO BE THE DELIBERATE OBJECT OF FORCE.

THE COURT:  OKAY.

MR. PRITCHARD:  I'M NOT SURE WHETHER THIS IS DISPUTED, IT'S HARD FOR ME TO TELL IN THE BRIEFING, BUT IF IT IS, THIS IS NOT -- THIS IS THE PRINCIPLE OF LAW THAT, I THINK, CANNOT BE GAINSAID.  IF YOU ARE FIRING ON SOMEBODY WITH A USE OF FORCE AND YOU ACCIDENTALLY STRIKE ANOTHER UNINTENDED PERSON, THAT IS NOT A SEIZURE AND SO IT IS NOT SUBJECT TO FOURTH AMENDMENT REASONABLENESS, WHICH WOULD BE AN OBJECTIVE INQUIRY.

THE COURT:  YEAH.

ER0438

MR. PRITCHARD:  I'M ASSUMING IT'S OKAY.

SO, YOUR HONOR, THE COURT, IN A SUMMARY JUDGMENT POSTURE, LOOKS TO THE RECORD.  IS IT JUST ASSERTION, CONJECTURE, ALLEGATION ABOUT HIS INTENT?  AND THAT IS TRULY ALL THAT WE HAVE HERE.  IT'S HE WAS -- "WE THINK, FROM OUR VIDEOGRAPHER, THAT HE, IN FACT, DID STRIKE MR. JOHNSON," WHICH I THINK IS NOT BY ANY MEANS ESTABLISHED ON THIS RECORD.

BUT THEN EVEN BEYOND THAT, JUST BECAUSE HE HIT HIM, THE COURT CAN'T JUST INFER THAT HE DID SO INTENTIONALLY BASED ON THAT FACT ALONE.  THERE HAS TO BE SOME EVIDENCE THAT SUGGESTS HE DID, AND HERE INSTEAD WE HAVE A MOUNTAIN OF EVIDENCE THAT SUGGESTS HE DID NOT.

THAT'S NOT AN ISSUE THAT NEEDS TO BE TRIED BEFORE A JURY BECAUSE IT DOESN'T TURN ON ANY -- THERE'S NO DISPUTED FACT. THERE'S NOTHING TO DISPUTE HIS CLEAR TESTIMONY, THE POLICE REPORT, THE CIRCUMSTANCES, EVERYTHING THAT SHOW HE WASN'T TARGETING MR. JOHNSON.

AND THAT LEADS INTO THE RETALIATION POINT THE COURT MADE ABOUT IS THIS INDIVIDUAL OR IS IT THE CROWD?

THE ONLY THEORY THAT EMERGES FROM THE BRIEFING VERY STRENUOUSLY IS THAT OFFICER ADGAR FIRED AT MR. JOHNSON TO PUNISH HIM INDIVIDUALLY.

THERE IS NO EVIDENCE, AND THERE IS NO DISPUTE OF FACT ON THIS RECORD, THAT OFFICER ADGAR JUST SHOT WILLY-NILLY INTO THE CROWD.  HE DID SO EXACTLY THREE TIMES.  HE DOCUMENTED EACH OF

ER0439

THE THREE TIMES METICULOUSLY AND THE CIRCUMSTANCES SURROUNDING IT.

EVEN IF HE MISSED HIS TARGET -- WHICH IS, OF COURSE, THE ALLEGATION HERE -- THAT'S NOT INDISCRIMINATE FIRING.  THAT'S JUST AN ERROR.  THAT'S AN ERROR IN AIMING.

IT'S NOTHING LIKE -- AND IT'S VERY DISTINCT FROM THIS COURT'S OTHER CASES.  WHAT YOUR HONOR HAS IN FRONT OF YOU, WHAT JUDGE HAMILTON HAD IN FRONT OF HER WHERE YOU'RE TALKING ABOUT THESE INDISCRIMINATE WEAPONS LIKE THE 37 MILLIMETER WHERE YOU'RE JUST SHOOTING IT INTO A CROWD, IT'S DESIGNED TO DO THAT, OR TEARGAS, OR EVEN THE FLASH-BANG GRENADES THAT YOU SAW IN SOME OF THE VIDEO.

40 MILS ARE VERY DIFFERENT.  THEY'RE MUCH MORE AKIN TO A TRADITIONAL FIREARM.  YOU USE IT TO TARGET ONE PERSON.

IT'S NOT A CROWD DEVICE.  IT WASN'T USED AS A CROWD CONTROL DEVICE.  THERE'S NO EVIDENCE ON THIS RECORD AT ALL THAT OFFICER ADGAR USED IT AS A CROWD CONTROL DEVICE.  ALL OF EVIDENCE, AGAIN, IS THAT HE WAS USING IT TO TARGET ASSAULTIVE INDIVIDUALS.

THE COURT:  I AM A LITTLE CONCERNED THAT -- AND MAYBE THIS GOES TO THE MONELL ISSUE INSTEAD -- IS THAT I HAD UNDERSTOOD FROM THE PLAINTIFF'S BRIEFING THAT THE 40 MILLIMETER IS NOT ONLY DESIGNED TO BE TARGETED AT A RECOGNIZED SUSPECT, BUT WHERE -- THE TRAINING IS THAT THEY'RE NOT TO BE USED IN A CROWD SETTING WHERE A BYSTANDER IS LIKELY TO BE HIT.

ER0440

SO IS THAT A -- DOES THAT JUST GO TO THE <u>MONELL</u> ISSUE? BECAUSE I'M NOT SURE WE HAVE AN UNDERLYING CONSTITUTIONAL VIOLATION.  THAT'S WHERE I GET A LITTLE -- THAT'S WHERE IT GETS FUZZY FOR ME.

MR. PRITCHARD:  YES.

SO I THINK THAT THAT -- THAT MAKES SENSE TO ME, BECAUSE THE THEORY IS IT'S MORE ON THE FAILURE TO TRAIN STUFF.

BUT IT IS -- OFFICERS WERE -- THEY WERE -- AT THIS POINT, THE COMPLAINT'S ALLEGATION THAT OFFICER ADGAR WASN'T TRAINED OR THAT OFFICERS WEREN'T TRAINED GENERALLY IS FALSE.  IT'S CLEARLY FALSE ON THE RECORD.

SO THE PLAINTIFFS HAD SORT OF PIVOTED TO THIS NEW ARGUMENT THAT THEY WEREN'T TRAINED IN THE SPECIFIC CROWD CONTROL SETTING.  IN OTHER WORDS, THEY WERE TRAINED WITH THEIR 40 MILS, THEY GOT VIDEOS, THEY GOT TRAINING AT THE ACADEMY, THEY GOT ONGOING TRAINING HOW TO USE THE DEVICE, BUT IT IS AT A STATIONARY TARGET.  I DON'T KNOW HOW THIS WOULD BE ACCOMPLISHED, BUT THERE'S NO SIMULATION OF A CROWD OR ANYTHING.

THE COURT:  PAINT BALLS.

MR. PRITCHARD:  MAYBE.

THE COURT:  HOLD ON ONE SECOND.

DO WE NEED --

THE CLERK:  NO.

THE COURT:  OKAY.  SORRY.  GO AHEAD.

MR. PRITCHARD:  SO THAT IS A THEORY THAT IF THEY HAD

ER0441

TRAINED THEM TO USE IT IN A CROWD CONTROL SETTING, MAYBE THEY WOULD HAVE BEEN BETTER AT PLACING THEIR AIM WHEN THEY WERE FIRING THE DEVICE.

AND MAYBE THAT'S TRUE.  THAT'S VERY MUCH A NEGLIGENCE THEORY.  IT'S NOT A MONELL THEORY BECAUSE IT'S NOT ABOUT INTENTIONAL EXCESSIVE FORCE OR RETALIATION OR THE CONSTITUTIONAL CLAIMS HERE.

BUT I DO THINK THAT, YES, YOUR HONOR, IT'S NOT -- IT WAS NOT INCONSISTENT WITH TRAINING.  OFFICERS WERE TRAINED THAT THEY COULD USE THEIR 40 MILS NOT FOR CROWD CONTROL PURPOSES, BUT IN A CROWD SITUATION WHEN THEY WERE TRYING TO STOP SOME IMMINENT THREAT FROM SOMEBODY THROWING THINGS AT POLICE OFFICERS.  THAT WAS CONSISTENT WITH THEIR TRAINING. OFFICER ADGAR WAS ACTING CONSISTENTLY WITH HIS TRAINING.

THE POLICE DEPARTMENT HAS SINCE DETERMINED THAT IT IS -- IT MAY BE BENEFICIAL TO USE -- TO EMPHASIZE MORE IN A CROWD SETTING HOW CAREFUL YOU HAVE TO BE.

AND THAT GETS TO A QUICK MONELL POINT I'D LIKE TO ACTUALLY MAKE ON THE RECORD, IS THE POLICE DEPARTMENT IN THIS CASE ACTUALLY VERY MUCH DID RESPOND TO THE EVENTS OF THE FIRST DAY.

ON MAY 29TH, IT WAS MOSTLY A LOT -- A LOT OF WHAT YOU SEE IN ALL THE VIDEO FOOTAGE AND THE THINGS THAT MADE PEOPLE UNCOMFORTABLE WITH SAN JOSE'S USES OF FORCE ARE THE 37 MIL BECAUSE IT LOOKS SO INDISCRIMINATE.  THEY'RE JUST FIRING AND FIRING AND FIRING.

ER0442

BUT ON THE SECOND DAY, MAY 30TH, THERE WAS CONCERN ABOUT PERCEPTIONS WHEN IT CAME TO THESE THINGS, AND YOU HAVE IN THE RECORD -- THIS IS FROM CAPTAIN DWYER'S DEPOSITION -- CLEAR TESTIMONY ABOUT WHAT HE DID ON MAY 30TH TO BRIEF POLICE OFFICERS, INCLUDING OFFICER ADGAR, AND HE TOLD THEM, "ALL THE EYES ARE ON YOU.  YOU NEED TO BE SURGICAL WITH YOUR APPLICATION OF THIS TOOL.  YOU NEED TO REMEMBER WHAT THE POLICY IS AND MAKE SURE THAT YOU ABIDE BY IT."  RIGHT?

SO THIS IS, AGAIN, UNDISPUTED.

THE COURT:  UM-HUM.

MR. PRITCHARD:  THIS IS WHAT THE INCIDENT COMMANDER FOR SOME OF THE PROTESTS SAID TO HIS OFFICERS ON MAY 30TH BEFORE THE USE OF FORCE AT ISSUE HERE.

THE POLICE DEPARTMENT ALSO CHANGED ITS APPROACH BY INSTEAD OF HAVING A HUGE, LIKE, SORT OF WING OF OFFICERS THAT WOULD RESPOND TO DIFFERENT AREAS, THEY JUST STARTED OFF WITH ONE GIANT LINE WHICH WAS SUPPOSED TO BE A SORT OF, WHAT HE CALLED A SHOW OF FORCE TO DETER PEOPLE FROM ENGAGING IN LAWLESSNESS IN THE FIRST PLACE, AND I THINK IT WAS LARGELY EFFECTIVE.

SO THAT MATTERS FOR MONELL BECAUSE IT GETS AT THIS IDEA THAT THERE WAS NO KIND OF RESPONSE TO THE FIRST DAY WHEN THERE WAS.

BUT IT ALSO GETS TO THE COURT'S POINT, WHICH IS THERE WERE EFFORTS TAKEN THEN, AND THEN YOU SEE THEM AFTER THE PROTEST ABOUT EMPHASIZING THE EXTENT TO WHICH 40 MILS HAVE TO BE USED

ER0443

CAREFULLY IN THE CROWD SETTING.

BUT YES, TO THE BROADER POINT, IT IS MORE OF A NEGLIGENCE ISSUE. SHOULD THEY HAVE KNOWN TO TRAIN THIS IN A CROWD CONTROL WAY OR NOT? AND THAT'S NOT OUR CASE.

THE COURT: IT LOOKED TO ME, WHEN I SAW OFFICER ADGAR'S BODY CAM, THAT HE WASN'T IN THE LINE OF OFFICERS, HE WAS BEHIND THEM. IS THAT ACCURATE?

MR. PRITCHARD: HE -- SO THE WAY THAT THEY WERE USUALLY SET UP THROUGHOUT THE PROTESTS IS THE OFFICERS WHO HAD BATONS WERE IN THE FRONT OF THE LINE.

THE COURT: YEAH.

MR. PRITCHARD: OFFICERS WITH THE 40 MILS WERE SORT OF JUST A LITTLE BIT BEHIND THAT.

THE COURT: OKAY. THAT'S WHAT IT LOOKED LIKE. SO I WAS SEEING THAT CORRECTLY.

MR. PRITCHARD: YES.

THE COURT: OKAY.

MR. PRITCHARD: LAST POINT I'LL MAKE, YOUR HONOR, IS WITH RESPECT TO QUALIFIED IMMUNITY.

THE COURT IDENTIFIED THAT NELSON IS NOT THE APPROPRIATE PRECEDENT HERE BECAUSE THAT DOES DEAL WITH INDISCRIMINATE FORCE, LIKE PEPPER BALLS, TEARGAS, THINGS LIKE THAT.

THE COURT: UM-HUM.

MR. PRITCHARD: THE COURT CONCLUDED THAT IF THERE WAS A USE OF FORCE BY OFFICER JOHNSON, THAT --

ER0444

THE COURT:  OFFICER ADGAR.

MR. PRITCHARD:  -- QUALIFIED IMMUNITY WOULD NOT APPLY -- OFFICER ADGAR, EXCUSE ME -- QUALIFIED IMMUNITY WOULD NOT APPLY.

I'LL AGREE WITH THE COURT IN THIS SENSE:  IF THE COURT WERE TO FIND THAT THERE'S A DISPUTE OF FACT SUGGESTING THAT HE DELIBERATELY TARGETED MR. JOHNSON FOR PUNITIVE FORCE --

THE COURT:  YEAH.

MR. PRITCHARD:  -- I AGREE THAT'S CLEARLY ESTABLISHED.

THE COURT:  AND IF I FIND THAT HE DIDN'T -- THAT THERE'S NO EVIDENCE OF THAT, I DON'T EVEN THINK WE HAVE A CONSTITUTIONAL VIOLATION.

MR. PRITCHARD:  EXACTLY.

THE COURT:  SO, I MEAN, QUALIFIED IMMUNITY HAS BOTH PRONGS.

BUT IN ORDER TO SUCCEED ON A SECTION 1983 CLAIM, EVEN IN THE ABSENCE OF A QUALIFIED IMMUNITY DEFENSE, THERE HAS TO BE A CONSTITUTIONAL VIOLATION.

MR. PRITCHARD:  YES.  I THINK THEY BLEED TOGETHER IN THIS PARTICULAR CASE --

THE COURT:  THEY DO, YES.

MR. PRITCHARD:  -- GIVEN THE ARGUMENTS OF PLAINTIFF.

THE COURT:  RIGHT.  AND IT HAS NOTHING TO DO WITH MONELL.

ER0445

SO THAT'S WHY I SAID BEFORE, IT ALL COMES DOWN TO WHETHER THE PLAINTIFF HAS SUFFICIENT EVIDENCE TO PUT IN DISPUTE WHAT OFFICER ADGAR WAS DOING.

MR. PRITCHARD:  I AGREE VERY MUCH.

THE COURT:  OKAY.

MR. PRITCHARD:  OH, AND AS TO THE MONELL -- I'M SORRY, BEFORE I SIT DOWN --

THE COURT:  YEAH.

MR. PRITCHARD:  -- THAT ACTUALLY VERY MUCH INFORMS THE MONELL INQUIRY AS WELL.

THE COURT:  OKAY.

MR. PRITCHARD:  BECAUSE IF, AS IS THE CASE, AS THE COURT HAS RECOGNIZED -- AND THIS IS THE WAY IT WOULD DISPOSE OF QUALIFIED IMMUNITY AND EVERYTHING ELSE -- IF THE WHOLE THING COMES DOWN TO, DID OFFICER ADGAR INTENTIONALLY TARGET HIM, MR. JOHNSON, WITH PUNITIVE FORCE, THE FLORES CASE IN THE NINTH CIRCUIT I THINK, AMONG OTHERS, MAKES VERY CLEAR THAT THAT CAN'T BE A MONELL ISSUE, BECAUSE IF AN OFFICER DECIDES TO PUNITIVELY TARGET SOMEONE AND USE HIS AUTHORITY TO EXACT SOME KIND OF PUNISHMENT ON THEM FOR NO REASON EXCEPT PERHAPS THEY'RE BEING A PROTESTER, THE CITY HAS SO CLEARLY SAID THAT THAT'S NOT ALLOWED IN ITS POLICIES EXPLICITLY.  THAT IS A CLEAR VIOLATION, AND FLORES SAYS THAT YOU CAN'T -- A POLICE OFFICER WHO DOES SOMETHING LIKE THAT, IT'S NOT A MATTER OF A FAILURE TO TRAIN OR SUPERVISE.

ER0446

THE COURT:  OKAY.

MR. PRITCHARD:  YOU DON'T HAVE A MENOTTI-LIKE SITUATION WHERE YOU HAVE A POLICY MAKING OFFICIAL WHO IS FOUND TO HAVE MADE STATEMENTS THAT ARE VIEWPOINT DISCRIMINATORY OR THAT SUGGEST VIEWPOINT DISCRIMINATION.  YOU HAVE NOTHING LIKE THAT.

NOR DO YOU HAVE ANY OTHER DECISION -- BECAUSE MENOTTI IS NOT A CUSTOM CLAIM, BECAUSE CUSTOM AND PRACTICE REQUIRES A LONG-STANDING CLAIM.

THE COURT:  YES.

MR. PRITCHARD:  MENOTTI IS MORE ABOUT A SINGLE DECISION BY A POLICY MAKING OFFICIAL IN A SINGLE INCIDENT CAN BE POLICY OF THE CITY, BUT YOU NEED SOMETHING TO SHOW THAT THEY MADE A DECISION TO CAUSE THAT SPECIFIC CONSTITUTIONAL VIOLATION.  THERE'S NO POLICY MAKER WHO SAID "YOU'RE ALLOWED TO TARGET ANYONE PUNITIVELY WITH FORCE," SO THAT REALLY I THINK GETS RID OF THE MONELL.

THE COURT:  WELL, I THINK MY UNDERSTANDING OF MR. BASTIDA'S ARGUMENT IS A LITTLE DIFFERENT.  HE'S SAYING THAT THE DECISION BETWEEN THE 29TH AND 30TH WAS, "LET'S GO GET THEM, LET'S BREAK THIS UP, WHATEVER IT TAKES."

AND SO THAT MAY HAVE BEEN THE DIRECT CAUSE IN THEIR MIND OF OFFICER ADGAR PUNITIVELY SHOOTING AT MR. JOHNSON IS THIS, THIS "GO GET THEM, I DON'T CARE."  THERE'S THE ONE SERGEANT WHO SAYS, "LET'S, YOU KNOW, BRING THE 40S ON AS WELL, I DON'T CARE

ER0447

ABOUT THE POLICY."

I DON'T KNOW HOW MUCH TO MAKE OF THAT.  IT'S NOT PRETTY, BUT I DON'T KNOW HOW MUCH TO MAKE OF IT.

MR. PRITCHARD:  OKAY.  THAT -- YOU KNOW, I'M NOT -- THE CONTEXT OF THAT DECISION MORE BROADLY IS NOT THAT HE'S SAYING YOU CAN SHOOT PEOPLE, YOU KNOW, FOR NO REASON.  IT'S MORE ABOUT "JUST BREAK INTO THIS THING, I DON'T CARE ABOUT THE POLICY, GET THE THINGS WE NEED."

LEAVING THAT ASIDE, HE'S A SERGEANT.  HE'S NOT A POLICY MAKER.  THAT'S PRETTY CLEAR UNDER GILLETTE AND OTHER DECISIONS. HE'S JUST A DISCRETIONARY ACTOR WITHIN THE POLICE DEPARTMENT.

THERE ARE NO POLICY MAKERS ALLEGED HERE.

THE COURT:  WELL, I JUST WANT TO BE -- I'M GOING TO TAKE A LITTLE MOMENT HERE.

YOU SAY THAT THE -- IT'S THE CITY MANAGER.  I'VE BEEN THROUGH THIS WITH THE CITY BEFORE.  I'M NOT GOING THERE.

MR. PRITCHARD:  I GET IT.

THE COURT:  AND THEN YOU SAY IT'S THE CHIEF, AND IT'S DEFINITELY THE CHIEF, BUT THE CHIEF FULLY DELEGATED THE AUTHORITY TO MAKE THESE DECISIONS ON THAT NIGHT.

AND I THINK I ACTUALLY DISAGREE WITH YOU ON THE LAW.  I THINK THAT YOU CAN'T SHIELD THE CITY BY CREATING THESE, THESE LAYERS OF DECISION MAKING.

SO WE JUST DISAGREE.

MR. PRITCHARD:  I HEAR THE COURT, AND SO I WON'T

ER0448

EMPHASIZE THAT AT ALL.

THE COURT: OTHERWISE I'D LIKE TO SEE THE CITY MANAGER IN A FLAK JACKET OUT THERE ON THE STREET IF HE'S THE DECISION MAKER, AND, YOU KNOW, IT WOULD BE GREAT IF HE DID THAT, OR SHE.

MR. PRITCHARD: I THINK THAT'S A GOOD, A GOOD WAY OF PUTTING IT, BECAUSE THAT GETS AT I THINK OUR DISAGREEMENT, WHICH IS THERE'S A DIFFERENCE BETWEEN A DECISION MAKER AND A POLICY MAKER.

THE COURT: WELL --

MR. PRITCHARD: SOMEONE ON THE GROUND MAKING DECISIONS IS DIFFERENT FROM SOMEONE SETTING POLICY FOR THE CITY. BUT --

THE COURT: SO THAT'S TRUE, BUT WHEN YOU -- FOR THE WRITTEN POLICIES, I DON'T DISAGREE WITH YOU AT ALL.

BUT FOR THE WIDESPREAD CUSTOM AND PRACTICE, IT'S -- THAT'S WHERE I DISAGREE.

MR. PRITCHARD: SO THE NICE THING IS IT DOESN'T MATTER IN THIS CASE, BECAUSE THE ONLY PERSON ALLEGED TO HAVE HAD THE DELEGATED AUTHORITY THAT THE COURT'S DESCRIBING IS ASSISTANT CHIEF KNOPF.

THE COURT: RIGHT.

MR. PRITCHARD: AND THERE IS NOTHING IN THIS RECORD AT ALL TO SUGGEST THAT ASSISTANT CHIEF KNOPF TOLD ANYONE THEY COULD USE FORCE. THERE WAS NO "GO GET 'EM," THERE'S NOTHING

LIKE THAT FROM HIM, AND THAT'S THE ONE POLICY MAKER.

SO EVEN IF YOU KIND OF ALLOWED THAT TO BE A CAUSAL -- IF YOU REGARDED THAT AS A POSSIBLE CAUSAL FORCE FOR THIS FURTHER KIND OF IMPROBABLE, DID OFFICER ADGAR JUST DECIDE TO PUNISH SOMEBODY, OUT OF EVERYONE IN THE WHOLE CROWD, JUST THIS ONE PERSON, FOR SOME REASON DECIDE TO PUNISH THAT PERSON, THE CAUSAL LINE BETWEEN THAT AND ANYTHING CHIEF KNOPF DID IS NONEXISTENT.

THE COURT:  OKAY.  THE -- YOU DIDN'T TOUCH ON THE RETALIATION CLAIM.  I THINK IT'S VERY WEAK.  I DON'T SEE -- I'M SORRY, THE RATIFICATION CLAIM.

MR. PRITCHARD:  OH, RIGHT, YEAH.

THE COURT:  I'M NOT -- I DON'T THINK THAT GOES FORWARD.

MR. PRITCHARD:  YEAH, THEN I'LL LEAVE THAT ALONE.

THE COURT:  MR. BASTIDA CAN MAKE HIS BEST ARGUMENT ON THAT.

ALL RIGHT.

MR. PRITCHARD:  THANK YOU.

THE COURT:  I'LL GIVE YOU THE LAST WORD AS WELL SINCE IT'S YOUR MOTION.

THE CLERK:  I BELIEVE WE'RE ALL BACK UP AND RUNNING.

THE COURT:  THAT'S GOOD.

MR. BASTIDA:  YOUR HONOR, WOULD YOU LIKE ME TO ARGUE FROM HERE?

ER0450

THE COURT:  NO, I'D RATHER YOU COME UP TO THE PODIUM ACTUALLY.

MR. BASTIDA:  SURE.

THE COURT:  THAT'S THE TROUBLE WITH ZOOM.  WE FORGET HOW WE USED TO BE IN COURT.

MR. BASTIDA, I AM ABLE TO LOOK AT VIDEOS NOW, BUT I DON'T NEED TO.  I THINK MR. PRITCHARD HELPED ME ON SOME OF THE QUESTIONS I HAD, AND I'M GLAD TO HEAR YOUR EXPLANATION.

MR. BASTIDA:  OKAY.

THE COURT:  GOOD.

MR. BASTIDA:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.

MR. BASTIDA:  I WILL JOIN MR. PRITCHARD IN THANKING YOU FOR ALWAYS STARTING YOUR HEARINGS WITH AN ANALYSIS OF KIND OF WHERE YOU STAND.  IT REALLY IS HELPFUL.  I WILL DO MY BEST TO ADDRESS THE MANY CONCERNS THE COURT HAS.

AND IN DOING SO, I WILL TRY TO MAKE SURE THAT WE DO NOT GET JUMBLED UP BETWEEN THE ELEMENTS, THE CONSTITUTIONAL VIOLATIONS UNDER THE FOURTH AMENDMENT AND FIRST AMENDMENT -- I FEEL LIKE SOMETIMES THE WORDS GET SWITCHED UP AND USED INTERCHANGEABLY -- AND I'M NOT FAMILIAR WITH ANY PUNITIVE REQUIREMENT REQUIRED WHEN ALLEGING EXCESSIVE FORCE.

SO HAVING SAID THAT, YES, THE COURT BROUGHT UP THE FACT THAT THIS CASE ESSENTIALLY RESTS ON PLAINTIFF'S ABILITY TO SHOW SUFFICIENT EVIDENCE AT THIS POINT THAT OFFICER ADGAR WAS THE

ER0451

ONE THAT SHOT HIM.

THE COURT: YOU AGREE WITH THAT, THAT THAT'S WHAT IT COMES DOWN TO?

MR. BASTIDA: YES. BUT I WILL ADD AN ASTERISK TO THAT AND SAY, YOUR HONOR, I CANNOT OVERSTATE THAT AT THIS POINT OF THE LITIGATION, WHEN DEALING WITH A SUMMARY JUDGMENT, ALL THE INFERENCES, ALL DISPUTED FACTS SHOULD BE WEIGHED IN FAVOR OF THE PLAINTIFF.

THE COURT: YES. YES.

MR. BASTIDA: AND SO TO START OFF, THE LAW ESTABLISHES THAT AN EXPERT'S OPINION ALONE, DEPENDING ON THE FACTS OF THE CASE, CAN, BY ITSELF, CREATE A DISPUTE OF MATERIAL FACT THAT SHOULD GO TO THE JURY.

THE COURT: SO AN EXPERT'S OPINION THAT HAS A PROPER FOUNDATION IN FACTUAL EVIDENCE SUBMITTED TO THE COURT.

MR. BASTIDA: ABSOLUTELY.

THE COURT: SO I THOUGHT YOUR EXPERT'S REPORT, WITH THE FRAMES AND THE RED CIRCLES AROUND THE DIFFERENT PEOPLE, WAS VERY, VERY HELPFUL. SO WHAT I NEED TO BE SURE OF IS THAT YOUR EXPERT HAD EVIDENCE TO BACK IT UP.

SO I'VE GOT MR. JOHNSON'S DECLARATION OF "THAT'S ME IN THE CROWD."

MR. BASTIDA: YES.

THE COURT: SO WE -- I DON'T THINK ANYONE DISPUTES THAT THE RED CIRCLES AROUND THE INDIVIDUAL IN DARK CLOTHING IS

ER0452

MR. JOHNSON.

MR. BASTIDA:  RIGHT.

THE COURT:  OKAY.

MR. BASTIDA:  IN ADDITION TO THAT, YOUR HONOR, WE HAVE THE FACT THAT THE CITY PROVIDED BODY-WORN CAMERA FOOTAGE FOR ALL OF ITS OFFICERS.

WE THEN ASKED THE CITY, IN INTERROGATORIES, TO SPECIFY THE OFFICERS THAT FIRED THEIR PROJECTILE IMPACT WEAPONS DURING THE TIMEFRAME IN WHICH MR. JOHNSON WAS SHOT.

THE COURT:  YES.

MR. BASTIDA:  AND OUR EXPERT ANALYZED -- AND THIS IS IN HIS REPORT -- HE ANALYZED EVERY SINGLE ONE OF THOSE OFFICERS' CAMERAS AND THE PROJECTILE AND THE DIRECTION IN WHICH EACH OF THOSE OFFICERS WERE AIMING, COUPLED WITH THE LOCATION OF MR. JOHNSON.

THE COURT:  OKAY.

MR. BASTIDA:  AND THE ONLY ONE THAT IN ANY WAY MAKES CLEAR THAT IT WAS AIMING IN THE DIRECTION OF MR. JOHNSON BASED ON HIS LOCATION AND THE TIMING -- THAT IS THE BENEFIT OF THE BODY-WORN CAMERA FOOTAGE, IT'S ALL TIME STAMPED.

SO BASED ON THAT, IT WAS OFFICER ADGAR, GIVEN THE SEQUENCE OF THE TIMING OF EVENTS, GIVEN MR. JOHNSON'S POSITION, OFFICER ADGAR'S POSITION, AND THE TIMING OF HIS SHOOTING, IT ALL LEADS TO OFFICER ADGAR BEING THE ONE THAT SHOOTS MR. JOHNSON.

ER0453

THE COURT: OKAY. SO I WOULD AGREE WITH YOU THAT YOU HAVE SUFFICIENT EVIDENCE TO GET TO A JURY ON THAT ISSUE. SO WE HAVE EVIDENCE THAT MR. JOHNSON WAS HIT, WE HAVE EVIDENCE THAT ADGAR WAS SHOOTING THE 40 MILLIMETER, AND EVIDENCE THAT CONNECTS THE TWO.

SO THAT IS STILL NOT A CONSTITUTIONAL VIOLATION UNTIL WE ADD THE NEXT STEP UNDER THE FOURTH AMENDMENT, THAT THERE WAS -- THAT ADGAR WAS AIMING AT MR. JOHNSON, AS OPPOSED TO MR. JOHNSON BEING HIT AS A BYSTANDER BY MISTAKE.

MR. BASTIDA: YES, YOUR HONOR. THIS IS THE --

THE COURT: AND YOU DON'T DISAGREE WITH THAT REQUIREMENT?

MR. BASTIDA: I DO, YOUR HONOR, TO THE EXTENT OF WHAT IT IS THAT IT ACTUALLY REQUIRES.

THE COURT: OKAY. TELL ME.

MR. BASTIDA: THE -- THE CASE LAW -- AND NELSON TOUCHES ON THIS, BUT THERE'S OTHER CASE LAW AS WE DISCUSS IN OUR BRIEF. IT IS NOT THAT THE OFFICER INTENDED TO SPECIFICALLY TARGET THAT INDIVIDUAL. IT IS MORE THAT HE HAD A SUBJECTIVE INTENT TO ACT, TO DO WHAT HE DID.

OTHERWISE, YOUR HONOR, I MEAN, IF THE COURT WERE TO HUMOR ME HERE FOR A SECOND, IF THERE WAS NO DISPUTE THAT OFFICER ADGAR SHOT MR. JOHNSON, BUT THE --

THE COURT: WELL, THERE IS A DISPUTE. THAT'S ALL YOU NEED TO DO IS MAKE IT A DISPUTE.

ER0454

MR. BASTIDA:  NO, NO.  BUT WHAT I'M SAYING IS IF YOU HAD A CASE WHERE THE ISSUE WAS NOT WHETHER THE OFFICER SHOT THE INDIVIDUAL, BUT WHETHER OR NOT THE OFFICER SHOT THE INDIVIDUAL IN AN ALLOWABLE BODY PART, THEN AN OFFICER COULD COME IN HERE AND SAY, "YOUR HONOR, I SHOT THE INDIVIDUAL, BUT I DIDN'T INTEND TO SHOOT HIM IN THE GROIN, I INTENDED TO SHOOT HIM IN THE STOMACH."  I MEAN, IT JUST BECOMES A STANDARD THAT KEEPS MOVING.

THE COURT:  SO I DON'T ACTUALLY THINK THAT'S CORRECT.

SO I HAVE CLEAR EVIDENCE FROM OFFICER ADGAR THAT HE WAS RESPONDING TO A SPECIFIC DISTURBANCE OF OBJECTS HURLED AT THE POLICE, AND HE AIMED AT THE ASSAILANT WHO WAS NOT MR. JOHNSON, BUT MR. JOHNSON GOT HIT.  THAT'S WHAT I TAKE FROM OFFICER ADGAR'S DECLARATION AND POLICE REPORT.

SO NELSON TALKED ABOUT INDISCRIMINATELY USING THE PROJECTILES TO DISPERSE A CROWD AND THAT THAT COULD BE A SEIZURE AND EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT.

SO THERE'S NO INTENT IN THE NELSON SITUATION TO TARGET AN INDIVIDUAL.  RATHER, THE INTENT WAS TO TARGET EVERYBODY.

SO WE DON'T HAVE A NELSON SETTING HERE.  YOU DON'T -- THAT'S NOT YOUR THEORY.

MR. BASTIDA:  I -- I'M NOT COMFORTABLE CONCEDING THAT, YOUR HONOR.

THE COURT:  SO TELL ME WHERE YOU PLED IT AND WHY YOU -- AND WHY NELSON WOULD GIVE YOU THE ROOM TO PLEAD WHAT I

ER0455

THINK YOU'VE GOT.

MR. BASTIDA:  WELL, I THINK -- IF I MAY BACK UP, YOUR HONOR?

THE COURT:  UM-HUM.

MR. BASTIDA:  TO ADDRESS THE FIRST POINT OF, THIS OF WHAT THE COURT HAS BROUGHT UP, THE FACT THAT THIS IS ADGAR'S DECLARATION, WHICH CONTRADICTS -- AT LEAST RAISES A TRIABLE ISSUE WITH THE EVIDENCE AND THE CIRCUMSTANTIAL EVIDENCE, THAT ALONE SHOULD BE ENOUGH TO DEFEAT SUMMARY JUDGMENT.

THE COURT:  THAT'S WHAT I'M PRESSING ON, BECAUSE ALL I'M LOOKING FOR IS THIS THRESHOLD FOR YOU.  IT'S LOW.  YOU'RE NOT TRYING TO CONVINCE ME OF ANYTHING.  YOU JUST HAVE TO IDENTIFY YOUR EVIDENCE.

MR. BASTIDA:  THERE IS --

THE COURT:  SO THAT'S ALL I'M LOOKING FOR.  AND BECAUSE YOU'VE IDENTIFIED OFFICER ADGAR, WE NEED -- I'M ACCEPTING THAT THERE'S A DISPUTE AS TO -- AND SO FOR -- I WILL PRESUME THAT ADGAR HIT JOHNSON WITH THE 40 MILLIMETER BECAUSE YOU'VE GOT ENOUGH EVIDENCE TO TAKE THAT ISSUE TO A JURY.  OKAY.  THAT'S ONE.

BUT THAT DOESN'T GET YOU TO THE FOURTH AMENDMENT.  IF HE HIT HIM, THE DEFENSE HAS CERTAIN AVENUES TO AVERT A CONSTITUTIONAL VIOLATION, BECAUSE IF THEY -- IF YOU CAN'T BRING FORTH EVIDENCE OF DELIBERATE INDIFFERENCE, THEN IT'S MERELY NEGLIGENCE, AND WE'RE JUST NOT -- WE'RE NOT IN THAT REALM.

SO I'M LOOKING FOR WHAT EVIDENCE YOU HAVE THAT ADGAR AIMED AT JOHNSON, OR WHERE IN NELSON YOU BELIEVE THAT THAT'S NOT NECESSARY IN A CIRCUMSTANCE WHERE YOU HAVE NO EVIDENCE OF INDISCRIMINATE SHOOTING INTO A CROWD.

MR. BASTIDA:  IF I'M UNDERSTANDING CORRECTLY, YOUR HONOR, THIS IS THE WHOLE "IT WAS AN ACCIDENT" ARGUMENT.

THE COURT:  UM-HUM, THAT'S RIGHT.

MR. BASTIDA:  BUT WHAT -- I BELIEVE DEFENDANTS ARE ARGUING THE WRONG TYPE OF ACCIDENT.

THE COURT:  OKAY.

MR. BASTIDA:  THE CASE THAT -- DEFENDANTS CITE THIS CASE BROWER, A U.S. SUPREME COURT CASE, LAID IT OUT EXACTLY AT -- THE PIN CITE IS 489 U.S. 597.

AND IN BROWER, THE COURT IN BROWER GOES INTO DETAIL OF EXPLAINING THE TYPICAL ACCIDENT WHERE THERE WOULD BE NO CONSTITUTIONAL VIOLATION, AND IT SAID WHERE YOU HAD A PARKED, UNOCCUPIED POLICE VEHICLE WHOSE BRAKES SLIP AND THEN IT PINS AN INNOCENT PASSERBY UP AGAINST THE WALL --

THE COURT:  OKAY.

MR. BASTIDA:  -- THERE YOU HAVE AN ACCIDENT.  THERE WAS NO INTENT IN THE CONDUCT ENGAGED BY ANYONE, BY ANY OFFICER, THAT LED TO THE RESULT.

THE COURT:  OKAY.

MR. BASTIDA:  RIGHT?  SO THE ACCIDENT IS IN THE CONDUCT.

ER0457

HERE DEFENDANTS ARE ARGUING THE ACCIDENT WAS IN THE INTENDED RESULT.  THEY'RE NOT ARGUING THAT OFFICER ADGAR ACCIDENTALLY FIRED HIS WEAPON.  THEY'RE NOT ARGUING THAT HE -- SOMEHOW IT WAS A MISFIRE.  THEY'RE JUST ARGUING THAT HE DID NOT INTEND TO SHOOT MR. JOHNSON.

BUT THAT IS NOT WHAT THE CASE LAW ESTABLISHES, AND BROWER MAKES THAT CLEAR.

IT'S THE CONDUCT OF THE OFFICER THAT IS WHAT IS THE TEST IN TERMS OF, WAS THIS AN ACCIDENT OR NOT?

THE COURT:  HMM.

MR. BASTIDA:  AND THEN REGARDING THE EVIDENCE, YOUR HONOR, EVEN -- OFFICER ADGAR'S OWN DECLARATION IS UNDERMINED BY THE RECORD HERE THAT WE HAVE WHERE HE HIMSELF TESTIFIED THAT HE COULD NOT SEE WHERE HE WAS SHOOTING, THAT HE -- HIS REPORT, EVEN THOUGH DEFENDANTS ARGUE IT WAS CONTEMPORANEOUS, IT WAS NOT DONE UNTIL HOURS LATER AFTER A FULL DAY OF BEING IN THE FIELD.

AND MORE CONCERNING, YOUR HONOR, THE REPORTS, AS WAS TESTIFIED BY SERGEANT PALMER, WHO WAS OFFICER ADGAR'S SUPERVISOR, NO ONE EVER REVIEWED THE USE OF FORCE REPORTS. SERGEANT PALMER SAID THERE WERE JUST TOO MANY.  THEY WERE NOT REVIEWED FOR ANY INACCURACIES.

SO WE'RE RELYING HERE ENTIRELY ON OFFICER ADGAR'S WORD.

THE COURT:  WELL, THE PLAINTIFF CAN -- THE DEFENDANT CAN DO THAT, AND THAT'S WHY I'M LOOKING FOR YOUR EVIDENCE.  I'M NOT REQUIRING A LOT.  I JUST WANT TO MAKE SURE YOU HAVE IT.

ER0458

AS WE KNOW, IN ANOTHER CASE, THE CITY CHOSE TO GO UP TO THE NINTH CIRCUIT AS SOON AS I ISSUED MY ORDER.  AND I WELCOME THAT, BUT IT MEANS I DON'T HAVE A TRIAL IN THAT CASE.

SO I WANT TO MAKE SURE IF I RULE IN YOUR FAVOR, I'M DOING IT BECAUSE THERE'S A RECORD HERE SO AT LEAST THE NINTH CIRCUIT WILL AFFIRM ME.

SO HERE'S WHAT I'M LOOKING FOR.  DO YOU -- ARE YOU SAYING THEN, UNDER BROWER, THERE IS NO EXCEPTION TO AN EXCESSIVE FORCE CLAIM FOR INADVERTENTLY HITTING A BYSTANDER WHEN SOMEONE ELSE WAS TARGETED?

MR. BASTIDA:  YES, YOUR HONOR, BECAUSE THE ACCIDENT IS NOT -- WHAT THE COURT LOOKS AT IS NOT THE RESULT.

THE COURT:  ALL RIGHT.

MR. BASTIDA:  WAS THE RESULT AN ACCIDENT?  THAT DOESN'T MATTER.

THE COURT:  SO NELSON -- YOU'RE NOT RELYING ON NELSON, EITHER?

MR. BASTIDA:  NO.

THE COURT:  AND YOU'RE RELYING ON BROWER?

MR. BASTIDA:  YES.

THE COURT:  ALL RIGHT.  THEN MR. PRITCHARD WILL COME BACK AND TELL ME WHAT THE LATER APPLICATION OF BROWER HAS BEEN.

OKAY.  LET'S MOVE ON FROM THAT, BECAUSE THAT -- YOU'VE NOW -- IF I WERE TO AGREE WITH YOU ON THE APPLICATION OF THE LAW, YOU CLEARLY HAVE EVIDENCE THAT ADGAR INTENDED TO FIRE HIS

ER0459

40 MILLIMETER AT A TARGET, AND IT -- THE PERSON WHO WAS ACTUALLY HIT WAS MR. JOHNSON.  YOU HAVE EVIDENCE ON THAT.

MR. BASTIDA:  CORRECT.

THE COURT:  OKAY.  LET'S -- THEN IN TERMS OF -- AND I AGREE WITH YOU, WE NEED TO KEEP THE FOURTH AMENDMENT SEPARATE FROM THE FIRST AMENDMENT.

SO YOU'RE SAYING THEN THAT THAT IS ALL YOU NEED TO CREATE A DISPUTED ISSUE OF FACT ON THE ELEMENTS OF THE FOURTH AMENDMENT CLAIM?

MR. BASTIDA:  YES, YOUR HONOR.  AND IF YOUR HONOR WISHES, I CAN TELL YOU QUICKLY ON QUALIFIED IMMUNITY REGARDING THE FOURTH AMENDMENT.

THE COURT:  I'M NOT SO WORRIED ABOUT THAT --

MR. BASTIDA:  OKAY.

THE COURT:  -- BECAUSE I THINK YOU'RE RIGHT UNDER YOUR SET OF -- IF -- DRAWING ALL INFERENCES IN YOUR FAVOR BASED ON THE EVIDENCE YOU'VE PRESENTED, I THINK THAT THERE'S NO QUALIFIED IMMUNITY.

SO LET'S GO ON.  ON THE FIRST AMENDMENT CLAIM, NOW WE'RE DEALING WITH WHAT I THINK IS THE REQUIREMENT THAT MR. JOHNSON WAS SINGLED OUT FOR RETALIATION.

DO YOU AGREE WITH THAT?

MR. BASTIDA:  MY UNDERSTANDING OF THE ANALYSIS OF THE FIRST AMENDMENT, YOUR HONOR, IS THAT MR. JOHNSON ENGAGED IN PROTECTED ACTIVITY AND THE PROTECTED ACTIVITY WAS A SUBSTANTIAL

ER0460

OR A MOTIVATING FACTOR FOR THE CONDUCT THAT WAS USED ON HIM.

THE COURT:  SO -- YES, I THINK YOU'VE ACCURATELY STATED THE ELEMENTS.

BUT I'M LOOKING AT THE FACTS OF THIS CASE.  AGAIN, BECAUSE IT'S NOT A NELSON CIRCUMSTANCE WHERE THE POLICE WERE INDISCRIMINATELY SHOOTING INTO THE CROWD TO MOVE EVERYBODY -- WELL, THEY WERE ALL -- I MEAN, IT WAS A CHAOTIC SITUATION, BUT TO DISPERSE EVERYBODY.

THIS WAS -- IT SEEMS TO ME THAT YOUR THEORY IS THAT ADGAR HAD TO HAVE HAD -- ADGAR HAD A REASON TO PUNISH MR. JOHNSON AS OPPOSED TO PUNISH THE CROWD.

MR. BASTIDA:  I WOULD MODIFY THAT, YOUR HONOR.  I THINK THE THEORY UNDER THE FIRST AMENDMENT IS THAT THE OFFICERS AS A WHOLE --

THE COURT:  OH, YOU DIDN'T SUE THE OFFICERS AS A WHOLE.  YOU SUED ADGAR.  THIS IS A CLAIM AGAINST HIM FOR RETALIATION UNDER THE FIRST AMENDMENT.

MR. BASTIDA:  WELL, OFFICER ADGAR, YOUR HONOR, TESTIFIED IN HIS DEPOSITION THAT HE TOOK THIS DEMONSTRATION AS ANTI-POLICE.

THE COURT:  OKAY.

MR. BASTIDA:  AND MR. JOHNSON WAS THERE FOR THE PURPOSE OF PROTESTATING -- PROTESTING, EXCUSE ME, AGAINST POLICE BRUTALITY.

GIVEN THE --

ER0461

THE COURT:  I UNDERSTAND ALL OF THAT.

BUT YOUR THEORY WOULD HAVE THEN SAID, BECAUSE IT WAS ANTI-POLICE, THE POLICE SHOULD HAVE JUST SAT IN THEIR CARS AND TWIDDLED THEIR THUMBS FOR THE EVENING, THAT ANYTHING THEY DID WOULD HAVE BEEN, AS A MATTER OF LAW, RETALIATORY.

SO THE SUBJECT MATTER -- IT IS IMPORTANT WHAT THE SUBJECT MATTER WAS.

BUT YOU -- YOU'RE NOT -- YOU'RE NOT CLAIMING THE -- THAT ALL THE POLICE ON THE STREET VIOLATED MR. JOHNSON'S RIGHTS. YOU'RE SAYING OFFICER ADGAR DID.

MR. BASTIDA:  RIGHT.

THE COURT:  AND SO -- AND YOU'RE NOT SAYING ADGAR SHOT INDISCRIMINATELY INTO THE CROWD.  THOSE ARE, TO ME, TWO REALLY IMPORTANT FACTUAL ISSUES IN THIS ANALYSIS.

SO IF ADGAR HAD HAD THE 37 MILLIMETER, OR INAPPROPRIATELY USED HIS 40 MILLIMETER AND SHOT WILLY-NILLY INTO THE CROWD, I THINK THAT WOULD BE A DIFFERENT CASE.

THAT'S NOT OUR CASE.

MR. BASTIDA:  BUT HE DOES DO THAT, YOUR HONOR.

THE COURT:  WELL, HE ONLY SHOT THREE TIMES, AND HE ONLY SHOT ONE TIME IN THE FRAMES THAT ARE AT ISSUE NOW, BECAUSE YOU AGREE -- YOU NOW ARGUE THAT THE 10:24 SHOT HAS NOTHING TO DO WITH THIS CLAIM.

MR. BASTIDA:  CORRECT.

THE COURT:  AND THEN THERE WAS AN INTERMEDIATE ONE, I

DIDN'T WRITE DOWN THE TIME OF THAT ONE, AND THEN THE ONE THAT STRUCK MR. JOHNSON.

AND SO THREE SHOTS IN THE COURSE OF AN HOUR I THINK IS, AS A MATTER OF LAW, IS NOT INDISCRIMINATE SHOOTING INTO THE CROWD.

CAN -- WHAT EVIDENCE DO YOU HAVE THAT THE ONE SHOT WAS INDISCRIMINATE?

MR. BASTIDA:  OFFICER ADGAR TESTIFIED THAT HE DID NOT -- COULD NOT EVEN SEE WHERE HE WAS SHOOTING.

THE COURT:  I DON'T THINK THAT'S WHAT HE SAID.

MR. BASTIDA:  THE --

THE COURT:  I LISTENED TO THAT.  I THINK YOU ARE -- I DON'T THINK THAT'S A FAIR INFERENCE.

MR. BASTIDA:  OKAY.

THE COURT:  HE SAID HE COULDN'T -- IT'S CERTAINLY TRUE, MOST PEOPLE WERE WEARING DARK CLOTHING, AND FRANKLY, AFTER LOOKING AT THE VIDEO, I WOULD SAY THAT PEOPLE DON'T EVEN WEAR DISTINCTIVE CLOTHING INTO A CROWD BECAUSE YOU CAN BE PICKED OUT IN A SECOND.  SO THEY'RE ALL WEARING DARK CLOTHING, VIRTUALLY EVERYBODY.

MR. BASTIDA:  THE OTHER EVIDENCE, YOUR HONOR, IS -- I KNOW MY COLLEAGUE, MR. PRITCHARD, OFFERED SOME WHAT HE CALLED CONTEXT IN TERMS OF OFFICER ADGAR TRACKING AN INDIVIDUAL AND THEN FIRING.

THE COURT:  UM-HUM.

MR. BASTIDA:  THE VIDEO DOES NOT SHOW THAT, AND I

ER0463

WOULD ENCOURAGE THE COURT TO LOOK AT THAT AGAIN.

THE COURT:  I VIEWED IT MANY TIMES.

MR. BASTIDA:  BUT THE VIDEO SHOWS THAT OFFICER ADGAR, THE -- MR. JOHNSON TESTIFIED THAT -- HE WAS PRESENT.  THE VOLLEYS OF THE WATER BOTTLES THROWN AT THE OFFICERS CAME FROM AT LEAST 75 YARDS TO HIS LEFT.

THE COURT:  UH-HUH.

MR. BASTIDA:  YOU CAN SEE SOME OF THEM IN THE VIDEO.

THE COURT:  CAME FROM, OR LANDED?

MR. BASTIDA:  I WAS JUST GOING TO SAY, THEY CAME FROM 75 FEET AWAY FROM MR. JOHNSON, AND YOU CAN SEE WHERE THEY LANDED IN THE VIDEO.  OUR EXPERT IDENTIFIES IT.

THE COURT:  YEAH.

MR. BASTIDA:  NOWHERE NEAR OFFICER ADGAR.

THE COURT:  OKAY.

MR. BASTIDA:  AND CERTAINLY NOWHERE NEAR THE DIRECTION IN WHICH HE FIRED AS MR. JOHNSON WAS MOVING AWAY FROM THE AREA.

SO WHEN YOU PUT THAT TOGETHER, THE FACT THAT HE WAS -- HE DID NOT SHOOT IN ANY WAY EITHER FROM WHERE THE OBJECTS CAME TO -- CAME FROM OR WHERE THEY LANDED.

THE COURT:  SO WHAT IF IT WAS IN RESPONSE TO THE BOTTLES, BUT INDISCRIMINATE -- AN INDISCRIMINATE SHOT?  THAT'S NOT A FIRST AMENDMENT VIOLATION.  IF IT'S INDISCRIMINATE SHOOTING INTO THE CROWD BECAUSE OF POLITICAL PROTEST, THAT

ER0464

WOULD BE -- THAT WOULD MEET THE ELEMENTS.

SO THAT'S WHAT I THINK -- THAT'S WHY THIS IS SO HARD.

SO DO YOU HAVE ANY EVIDENCE THAT ADGAR'S SHOT THAT WE'RE PRESUMING FOR THIS ARGUMENT HIT MR. JOHNSON WAS IN RETALIATION FOR THE PROTEST OR IN RESPONSE TO THE BOTTLES BEING HURLED?

MR. BASTIDA:  I DO NOT HAVE ANY DIRECT EVIDENCE, YOUR HONOR, AND I THINK THE CASE LAW MAKES THAT CLEAR.

THE COURT:  CIRCUMSTANTIAL IS FINE, YES, YOU'RE EXACTLY RIGHT.

MR. BASTIDA:  SO I THINK WHAT I'VE ALREADY MENTIONED, IN ADDITION TO JUST THE GENERAL RESPONSE AND ATTITUDE OF THE SAN JOSE POLICE DEPARTMENT AS A WHOLE, OF WHICH OFFICER ADGAR IS A PART OF --

THE COURT:  AND WHAT GENERAL -- I DON'T KNOW OF A GENERAL RESPONSE.

MR. BASTIDA:  YOU HAVE CAPTAIN DWYER, WHO WAS THE INCIDENT COMMANDER, WHO TESTIFIED THAT -- WELL, IN ADDITION TO OFFICER ADGAR HIMSELF ADMITTING THAT THIS WAS ANTI-POLICE, YOU HAVE CAPTAIN DWYER TESTIFYING THAT UNLIKE A TYPICAL PROTEST WHERE POLICE ARE THERE AS NEUTRAL THIRD PARTIES TO ENSURE THAT THE PROTESTERS AND THE COUNTER-PROTESTERS CAN BOTH EXERCISE THEIR FREE SPEECH IN AN ORDERLY FASHION AND IN PEACE, HERE YOU HAVE THE PROTESTERS, OF WHICH MR. JOHNSON IS A MEMBER, AND THE POLICE, WHO IN THIS CASE GIVEN WHAT THE PROTESTERS ARE PROTESTING, ARE THE COUNTER-PROTESTERS.

ER0465

THE COURT: NO, THEY'RE NOT. THAT IS -- THAT IS FALSE. THAT IS FALSE. THAT'S WHAT I SAID. YOU NEED -- THEN YOU'RE SAYING THEY HAVE TO STAY HOME.

SO YOU NEED TO GO BEYOND THAT. WHEN THEY TAKE ACTIONS AGAINST THE CROWD THAT ARE NOT -- THAT ARE DELIBERATELY INDIFFERENT TO THE RIGHTS OF THE CROWD, YOU COULD CALL THEM COUNTER-PROTESTERS.

BUT YOU'RE SAYING THEIR MERE PRESENCE MAKES THEM THE COUNTER-PROTESTERS, AND THAT IS A MISTAKE.

MR. BASTIDA: IF I MAY, THAT IS NOT WHAT I INTENDED, YOUR HONOR.

THE COURT: OKAY.

MR. BASTIDA: I'M SAYING THE FACT THAT THEY'RE THERE, COUPLED WITH THEIR CONDUCT, THE INDISCRIMINATE SHOOTING INTO THE CROWD, THE FACT THAT CAPTAIN DWYER TESTIFIED THAT THEY WERE THERE IN FULL RIOT GEAR TO SHOW FORCE, IT WOULD HAVE BEEN SOMETHING DIFFERENT IF HE SAID "WE WERE THERE TO ENSURE THEY WERE KEEPING THE PEACE."

THE COURT: OKAY.

MR. BASTIDA: THAT'S AN ANTAGONISTIC STANCE. I'VE NEVER HEARD OF A POLICE TAKING FORCE WHEN THEY'RE THERE TO PATROL A PEACEFUL PROTEST. WE HAD A -- SO THOSE THINGS, THAT CIRCUMSTANTIAL EVIDENCE, NOT THE MERE PRESENCE ALONE, I AGREE WITH THE COURT.

THE COURT: OKAY.

ER0466

MR. BASTIDA:  NOT THE MERE PRESENCE ALONE, BUT THE FACT THAT THEY SHOWED UP IN FULL RIOT GEAR, THEY SHOWED UP TO CITY HALL IN FORMATION, THEY FACED THE CROWD, THEY WERE NOT THERE TO ENSURE THAT PEOPLE WERE ABLE TO PROTEST, BUT RATHER TO FACE THE CROWD TO SHOW FORCE TOGETHER.

THAT IS THE RETALIATORY CONDUCT THAT AT LEAST, YOUR HONOR, RAISES A TRIABLE ISSUE THAT SHOULD DEFEAT SUMMARY JUDGMENT HERE.

THE COURT:  SO I GUESS -- WELL, THIS GETS COMPLICATED, BECAUSE MR. JOHNSON'S CASE IS DIRECTED AT OFFICER ADGAR'S INDIVIDUAL CONDUCT, AND I'M -- I GATHER THAT YOU'RE OFFERING THIS OTHER EVIDENCE TO GIVE CONTEXT TO OFFICER ADGAR'S SPECIFIC CONDUCT.  IS THAT ACCURATE?

MR. BASTIDA:  YES, COUPLED WITH OFFICER ADGAR'S OWN TESTIMONY THAT HE VIEWED THIS AS AN ANTI-POLICE PROTEST.

THE COURT:  OKAY.  THAT'S HELPFUL.

ALL RIGHT.  LET'S MOVE -- CERTAINLY IF YOU HAVE MORE YOU'D LIKE TO SAY, THAT'S FINE.  I THINK WE COULD MOVE ON TO THE MONELL ISSUES.

MR. BASTIDA:  YES, YOUR HONOR.

THE COURT:  AND AS I SAID, ON QUALIFIED IMMUNITY, IF I FIND YOU HAVE SUBMITTED ENOUGH EVIDENCE TO CREATE A DISPUTE, THEN QUALIFIED IMMUNITY IS OUT THE DOOR.  SO WE DON'T NEED TO DISCUSS THAT.

MR. BASTIDA:  OKAY.

ER0467

WAS THERE ANYTHING SPECIFIC REGARDING MONELL THE COURT WANTED ME TO ADDRESS?  OTHERWISE I'LL REFER TO MY NOTES FROM YOUR EARLIER COMMENTS.

THE COURT:  WHY DON'T YOU GO AHEAD?

MR. BASTIDA:  SO I THINK THE COURT HAS IT RIGHT THAT IN THIS CASE, GIVEN WHAT WE'VE ARGUED, YOUR HONOR, THE JURY SHOULD BE PRESENTED WITH A MONELL THEORY UNDER A CUSTOM, POLICY, OR PRACTICE.

AND I DON'T WANT TO REPEAT WHAT WAS ALREADY IN OUR BRIEFS, BUT I'LL JUST SUMMARIZE FOR THE COURT HERE, THE EVENTS THAT TRANSPIRED ON MAY 29TH ESTABLISHED A CUSTOM OF THE POLICE DEPARTMENT USING EXCESSIVE FORCE AGAINST THOSE WHO WERE PEACEFULLY PROTESTING, ONE OF WHICH WAS OFFICER -- EXCUSE ME -- MR. JOHNSON.

AND SO THAT THEORY NEEDS TO BE PRESENTED TO THE JURY FOR A FACTUAL DETERMINATION.

THE COURT:  YOU'RE SAYING THAT THE CONDUCT ON THE 29TH CREATED -- IS EVIDENCE OF A WIDESPREAD CUSTOM OF EXCESSIVE FORCE AND RETALIATION?  SO I JUST NEED YOU TO ARTICULATE FOR ME WHAT IS THE CUSTOM AND PRACTICE THAT'S UNCONSTITUTIONAL HERE.

MR. BASTIDA:  THE CUSTOM AND PRACTICE IS THE USE OF EXCESSIVE FORCE, YOUR HONOR, ON PROTESTERS.

THE COURT:  OKAY.

MR. BASTIDA:  AND ESTATE OF MENDEZ, WHICH WE CITE, DOES NOT --

ER0468

THE COURT:  AND THE ONLY TIME -- SO MAY 30 IS THE DAY THAT THAT CUSTOM AND PRACTICE WAS PLAYED OUT ON MR. JOHNSON, AND YOU'RE SAYING THAT THE EVIDENCE THAT IT WAS A WIDESPREAD AND DEEPLY HELD CUSTOM AND PRACTICE WAS WHAT HAPPENED THE DAY BEFORE?

MR. BASTIDA:  YES.  AND I'LL REMIND THE COURT, THERE'S NO SPECIFIC -- THERE'S NO SPECIFIC QUANTUM OR NUMBER OF ALLEGATIONS REQUIRED TO ESTABLISH A CUSTOM AND POLICY.  IT IS HIGHLY SPECIFIC.  ESTATE OF MENDEZ KIND OF GOES INTO THAT.  IT IS HIGHLY SPECIFIC.

AND HERE, EVEN THOUGH IT ALL HAPPENED IN A VERY SHORT AMOUNT OF TIME, WE HAVE DOZENS, IF NOT HUNDREDS, OF INCIDENTS WHERE MEMBERS OF THE POLICE DEPARTMENT, EITHER INDISCRIMINATELY OR INTENTIONALLY, USED EXCESSIVE FORCE, AND IT'S CAPTURED ON VIDEO, ON LIVE BROADCASTS, WE HAVE ALLEGATIONS ON SOCIAL MEDIA, WE HAVE DECLARATIONS FROM PEOPLE WHO WERE THERE.

THE COURT:  UM-HUM.

MR. BASTIDA:  SO THAT IS WHAT ESTABLISHES IT.

THE COURT:  OKAY.  RIGHT.  IT ESTABLISHES THAT THAT'S WHAT HAPPENED ON THE 29TH.

I'M STRUGGLING WITH WHETHER THAT ESTABLISHES, AS A MATTER OF LAW, A CUSTOM AND PRACTICE THAT WAS THEN PLAYED OUT.  IT'S LIKE IT WAS BORN ON THE 29TH AND CAME OF AGE ON THE 30TH, THAT IT DOESN'T EXIST ON THE 28TH OR THE 27TH OR THE 26TH.

AND MAYBE THAT'S JUST AN ISSUE FOR THE JURY TO STRUGGLE

ER0469

WITH.

MR. BASTIDA:  I SUBMIT THAT IT IS, YOUR HONOR.

AND I WILL POINT OUT, THIS IS NOT THE FIRST INSTANCE WHERE THIS HAS HAPPENED.  MENOTTI, WHICH IS A CASE THAT WAS CITED IN YOUR HONOR'S MOTION TO DISMISS ORDER, THERE WE HAD SIMILAR INCIDENTS WHERE ANTI-WTO PROTESTERS WERE PROHIBITED FROM ENTERING, AND IT ALL HAPPENED IN A MATTER OF COUPLE DAYS, AND THE COURT THERE HELD THAT BASED ON THE FACT THAT THEY WERE PROHIBITED, THERE WERE THESE CONSTITUTIONAL VIOLATIONS AND THE FACT THAT THE OFFICERS WERE NOT DISCHARGED OR DISCIPLINED, TOGETHER, THOSE TWO THINGS, THEN THAT WAS ENOUGH TO INFER A CUSTOM AND POLICY OF -- AGAINST THE CITY, AGAINST THE GOVERNMENTAL AGENCY.

THE COURT:  OKAY.  ON YOUR TRAINING AND SUPERVISION, I'M INCLINED TO DISMISS THAT.  IT'S JUST SUCH A HARD CLAIM. YOU KNOW, HINDSIGHT, YOU COULD ALWAYS HAVE DONE A BETTER JOB.

BUT THAT'S -- IT'S REALLY CLEAR IN THE CASE LAW THAT THAT'S NOT WHAT A FAILURE TO TRAIN AND SUPERVISE CLAIM IS ABOUT, THAT IT IS -- THERE HAS TO HAVE BEEN A PRIOR RECOGNITION OF THE LAPSE IN TRAINING, NOT LOOKING BACK IN HINDSIGHT SAYING, "GOSH, I ONLY WISH THAT THE WEEK BEFORE, WE HAD ANTICIPATED THAT THE POLICE WOULD MURDER GEORGE FLOYD AND THAT OUR CITIZENS IN SAN JOSE WOULD BE SO CONCERNED THAT THEY WOULD COME AND SHOW THEIR SUPPORT FOR THE PROTECTION OF CITIZENS ON THE STREET."

SO THAT'S WHY THE TRAINING -- YOU DON'T HAVE -- THERE IS

ER0470

THE NORMAL TRAINING, AND THESE OFFICERS, THERE'S EVIDENCE THAT THESE OFFICERS WERE TRAINED ON USE OF THESE PROJECTILES.

WERE THEY TRAINED ON USE OF THESE PROJECTILES IN A PROTEST THAT INVOLVED PROTESTING POLICE CONDUCT?  WELL, THAT'S NOT WHAT THE -- THAT'S NOT WHAT THE CONSTITUTIONAL STANDARD IS.  NO ONE HAS A CRYSTAL BALL.

THAT'S WHY I'M INCLINED TO DISMISS IT IS THAT I JUST DON'T THINK YOU'VE GOT ANYTHING OTHER THAN HINDSIGHT.

MR. BASTIDA:  I UNDERSTAND, YOUR HONOR, BUT IF I MAY JUST MAKE ANY ARGUMENTS FOR PURPOSES OF --

THE COURT:  PLEASE DO.  PLEASE DO.

MR. BASTIDA:  AND I AGREE, FAILURE TO TRAIN IS PROBABLY THE MOST DIFFICULT MONELL THEORY.

THE COURT:  UM-HUM.

MR. BASTIDA:  THE ONLY THING THAT I'LL MENTION HERE THAT I BELIEVE YOUR HONOR SHOULD BE AWARE OF IS CAPTAIN DWYER TESTIFIED THAT EVEN BEFORE THE PROTEST OCCURRED, A WEEK BEFORE THE PROTEST AT LEAST, THE DEPARTMENT WAS AWARE THAT THEY WERE GOING -- THAT THERE WAS GOING TO BE A PROTEST BECAUSE THEY MONITOR SOCIAL MEDIA AND NEWS.  THEY WERE KEEPING TRACK -- THEY WERE RECEIVING EMAIL BLASTS FROM OTHER DEPARTMENTS ACROSS THE COUNTRY.  IT WAS NOT AT ALL A SURPRISE THAT THERE WAS GOING TO BE A PROTEST AT THE SAN JOSE POLICE DEPARTMENT -- EXCUSE ME -- IN THE CITY OF SAN JOSE.

THE COURT:  YEAH.

ER0471

MR. BASTIDA: BUT THEN -- AND MULTIPLE OFFICERS, INCLUDING OFFICER DWYER, TESTIFIED THAT EVERY YEAR THE SAN JOSE POLICE DEPARTMENT HAS TO DEAL WITH LARGE CROWD SIDESHOWS DURING CINCO DE MAYO.

THE COURT: UM-HUM.

MR. BASTIDA: AND SO YOU LOOK AT THAT.

AND YOU HAVE TO ALSO TAKE INTO ACCOUNT THAT THE TRAINING THAT WAS PROVIDED, AS I DON'T THINK IS DISPUTED, IT INVOLVED SERGEANT TASSIO, WHO WAS THE 30(B)(6) WITNESS PROVIDED BY THE CITY ON THE TRAINING GIVEN TO OFFICERS REGARDING USE OF FORCE WITH RESPECT TO CROWD CONTROL, HE TESTIFIED THAT THE OFFICERS' TRAINING WITH THE 40 MILLIMETER CONSISTED OF SHOOTING AT THE SHOOTING RANGE DOWN AT THE POLICE HEADQUARTERS AT A STATIONARY TARGET AT A SPECIFIED DISTANCE.

I WOULD SUBMIT TO THE COURT THAT GIVEN THE DEPARTMENT'S EXPERIENCES WITH OTHER CROWD INSTANCES AND GIVEN ITS KNOWLEDGE THAT THERE WAS GOING TO BE A PROTEST HERE IN SAN JOSE, SIMILAR TO OTHERS AROUND THE COUNTRY, THERE SHOULD HAVE BEEN SOMETHING DONE.

IT WAS OBVIOUS THAT THEY SHOULD HAVE DONE SOMETHING --

THE COURT: BUT THERE IS EVIDENCE THAT SOMETHING WAS DONE, BECAUSE THEY WERE EXPRESSLY TOLD THE LIMITATIONS OF THE USE OF THE 40 MILLIMETERS, THAT THEY WERE NOT CROWD CONTROL DEVICES, THAT WAS EXPRESS, AND THAT THERE HAD TO BE AN IDENTIFIED TARGET, AND THERE HAD TO BE A CLEAR PATH, AND IT HAD

ER0472

TO BE -- SO I THINK ALL THAT TRAINING IS THERE.

AND I THINK MR. PRITCHARD IS RIGHT, THE MOST YOU HAVE -- WHICH IS NOT ENOUGH TO GET PAST SUMMARY JUDGMENT -- IS THAT THIS OFFICER DIDN'T FOLLOW POLICY WHEN HE SHOT INTO A CROWD TRYING TO HIT A SUSPECT.

SO THAT MAY HELP YOUR EXCESSIVE FORCE CLAIM, BUT I DON'T THINK IT HELPS YOUR TRAINING CLAIM, BECAUSE AS MR. PRITCHARD POINTS OUT, ONE OFFICER'S FAILURE TO COMPLY WITH POLICY IS NOT A FAILURE OF THE TRAINING.

MR. BASTIDA:  I WOULD AGREE WITH THAT, YOUR HONOR.

BUT HERE -- TWO THINGS.  FIRST, A GOVERNMENT AGENCY CAN'T AUTOMATICALLY SHIELD ITSELF FROM LIABILITY BY POINTING AT THEIR WRITTEN POLICY WHERE IT SAYS, "YES, DON'T SHOOT INTO THE CROWD INDISCRIMINATELY, DON'T COMMIT CONSTITUTIONAL VIOLATIONS."

THE COURT:  TRUE.

MR. BASTIDA:  OR EVEN THE TRAINING THAT IS GIVEN WHEN YOU HAVE, IN FACT, EVIDENCE THAT THE SERGEANT WHO'S IN CHARGE OF THE TRAINING, DURING THE PROTEST, COMPLETELY DISREGARDS THE POLICY AND THEN ORDERS HIS OFFICERS TO BRING THE 40 MILLIMETERS TO BE USED IN A CROWD CONTROL SETTING BECAUSE HE DOES NOT CARE ABOUT THE POLICY.  AND AS YOU KNOW, HE USED LANGUAGE MUCH MORE UNPROFESSIONAL THAN THAT, BUT I'M NOT GOING TO REPEAT IT HERE IN THE COURTROOM.

SO IT'S NOT JUST A SINGLE OFFICER THAT SHOT INTO THE CROWD IN VIOLATION OF THE POLICY.  IT'S MULTIPLE OFFICERS GOING UP TO

ER0473

THE VERY OFFICER, SERGEANT, IN CHARGE OF THE TRAINING.

THE COURT:  THAT'S NOT WHAT THIS CLAIM IS ABOUT. THIS CLAIM IS ABOUT THE FAILURE OF THE TRAINING PROGRAM ITSELF, NOT THAT SERGEANT'S DISREGARD OF IT IN THE MIDDLE OF THE PROTEST.

MR. BASTIDA:  I UNDERSTAND, YOUR HONOR.  SO WHAT I WAS GETTING AT WAS --

THE COURT:  UM-HUM.

MR. BASTIDA:  GOING BACK TO WHAT I WAS SAYING, GIVEN THE FACT THAT THE DEPARTMENT KNEW THIS PROTEST WAS GOING TO HAPPEN, AND GIVEN THE EXPERIENCE WITH OTHER CROWD CONTROLS, I SUBMIT THAT IT WAS UNREASONABLE TO SEND THE OFFICERS INTO THE FIELD WITH THE 40 MILLIMETERS AT NIGHT WHEN YOU HAVE DOZENS, IF NOT HUNDREDS, OF PEOPLE IN THE CROWDS MOVING, OBSTRUCTING OFFICERS' LINE OF FIRE, WHEN THE TRAINING WAS COMPLETELY LACKING CONCERNING THAT.

THE COURT:  SO THE PROBLEM I HAVE WITH THAT IS THAT IF THEY DIDN'T SEND THEM INTO THE CROWD WITH THE 40 MILLIMETERS, THEY'D SEND THEM WITH GUNS.  A POLICE OFFICER IS REQUIRED TO HAVE HIS GUN BELT ON WHEN HE'S ON DUTY.

SO I DON'T THINK THAT -- YOU KNOW, TAKE AWAY ONE THING, AND THEN YOU LEAVE THE OFFICER WITH OPTIONS THAT NOBODY WANTS TO THINK ABOUT.

MR. BASTIDA:  I COMPLETELY AGREE, YOUR HONOR.

I WOULD SUBMIT, HOWEVER, THAT THAT DOES NOT NEGATE THE

ER0474

LIABILITY ON THE CITY FOR --

THE COURT: OKAY.

MR. BASTIDA: -- DISREGARDING AN OBVIOUS NEED FOR TRAINING, OR ADDITIONAL OR DIFFERENT TRAINING.

THE COURT: OKAY.

MR. BASTIDA: THAT'S ALL I WILL SAY ON THE FAILURE TO TRAIN THEORY.

THE COURT: OKAY.

MR. BASTIDA: IF I MAY JUST TOUCH ON THE FAILURE TO SUPERVISE?

THE COURT: SURE.

MR. BASTIDA: TWO CASES WHICH ARE NOT ADDRESSED IN DEFENDANTS' REPLY THAT WE RELIED ON IN OUR OPPOSITION, SAMAHA VERSUS CITY OF MINNEAPOLIS AND TIRADO, THEY BOTH SUPPORT THE PROPOSITION THAT IF SOMETHING IS BROADLY REPORTED AND THE GOVERNMENT AGENCY MONITORS THAT, THEN YOU CAN DEMONSTRATE THAT THE CITY WAS AWARE AND HAD KNOWLEDGE OF THAT WHICH WAS REPORTED ON.

I DON'T THINK ANYONE DISPUTES HERE THE AMOUNT OF REPORTING, LIVE NEWS BROADCASTS, SOCIAL MEDIA --

THE COURT: NO.

MR. BASTIDA: -- ALL THE LIKE OF WHAT WAS HAPPENING.

THE COURT: DWYER SAID THEY HAD BOOTS ON THE GROUND, RIGHT?

MR. BASTIDA: RIGHT. SO THAT IS UNDISPUTED.

ER0475

AND CAPTAIN DWYER CONFIRMED IN HIS DEPOSITION THAT THE DEPARTMENT OF SAN JOSE, POLICE DEPARTMENT OF SAN JOSE WAS, IN FACT, MONITORING ALL OF THAT.

YOU ALSO HAVE CHIEF GARCIA'S EMAILS THAT HE RECEIVED COUNTLESS ARTICLES DETAILING THE PROTESTS AND THEIR RESPONSES TO THE PROTESTS.

THE COURT:  YES, UM-HUM.

MR. BASTIDA:  BUT MOST CONCERNING, YOUR HONOR, IS WHAT YOU TOUCHED ON AT THE BEGINNING OF THIS HEARING, IS THE AMOUNT OF PROJECTILES EXPENDED ON THE FIRST DAY.  550 ESTIMATED PROJECTILES USED ON A SINGLE DAY ALONE.

AND WHEN YOU COMPARE THAT TO THE SEVEN ARRESTS, WHICH ACCORDING TO SAN JOSE POLICE DEPARTMENT POLICY, THE 40 MILLIMETER IS SUPPOSED TO BE USED IN AN ATTEMPT TO ARREST.

THE COURT:  YES.

MR. BASTIDA:  SO YOU'VE GOT TO TAKE INTO ACCOUNT 550 --

THE COURT:  HOW MANY 40 MILLIMETERS WERE SHOT, THOUGH?  I THINK YOU GAVE ME THE NUMBER.

MR. BASTIDA:  IT'S IN OUR PAPERS, YOUR HONOR.  I CAN LOOK IT UP.

THE COURT:  NO, NO, YOU GAVE ME THE NUMBER.  BUT IT'S ABOUT 30.  IT'S NOT -- THE 550 IS MIXING APPLES AND ORANGES BECAUSE THAT'S ALL PROJECTILES, AND THE 40 MILLIMETER IS FOR THE PURPOSE OF EFFECTUATING AN ARREST, BUT THE 37S ARE NOT.

ER0476

MR. BASTIDA:  RIGHT.  BUT FOR PURPOSES OF NOTICE --

THE COURT:  OKAY.

MR. BASTIDA:  -- I INVITE THE COURT TO GET A LITTLE BIT HIGHER LEVEL IN TERMS OF THE PROJECTILE IMPACT WEAPONS THEMSELVES.

THE COURT:  SURE.

MR. BASTIDA:  THE CITY HAD NOTICE THAT ITS OFFICERS WERE USING -- EXCUSE ME -- MISUSING THE PROJECTILE IMPACT WEAPONS THEMSELVES AND THE CITY SHOULD HAVE DONE SOMETHING.

BETWEEN MAY 29TH AND MAY 30TH, THE CITY SHOULD HAVE LOOKED INTO OR DONE SOMETHING TO ADDRESS THE FACT THAT ITS OFFICERS WERE JUST GOING THROUGH SO MANY ROUNDS IN SUCH A SHORT AMOUNT OF TIME.

THE COURT:  SO MR. PRITCHARD SAYS THAT THEY DID.

MR. BASTIDA:  I WOULD INVITE MY COLLEAGUE TO POINT TO THE RECORD ON THAT.

THE COURT:  OKAY.

MR. BASTIDA:  WHAT I WILL POINT TO IS ASSISTANT CHIEF TINDALL, WHO WAS PRESENT AT THE BRIEFING ON MAY 30TH BEFORE THE DAY'S EVENTS, HE TESTIFIED THAT NEITHER THE CROWD CONTROL TACTICS NOR THE 40 MILLIMETER OR OTHER -- OR THE USE OF OTHER PIW'S WAS DISCUSSED IN ANY WAY.

SO MR. PRITCHARD'S COMMENTS ABOUT CAPTAIN DWYER REMINDING HIS OFFICERS THAT "ALL EYES ARE ON YOU AND, YOU KNOW, THE WORLD IS WATCHING," GREAT.

ER0477

THAT DOESN'T NECESSARILY SPECIFICALLY ADDRESS THE PROBLEM HERE --

THE COURT:  OKAY.

MR. BASTIDA:  -- THE USE OF THE PROJECTILE IMPACT WEAPON.

THE COURT:  OKAY.

MR. BASTIDA:  UNLESS YOUR HONOR HAS ANY OTHER QUESTIONS?

THE COURT:  NO.  VERY WELL DONE.  THANK YOU.

MR. BASTIDA:  THANK YOU.

THE COURT:  MR. PRITCHARD, I'M GOING TO LET YOU CLOSE IT UP BECAUSE IT'S YOUR MOTION.

MR. PRITCHARD:  THANK YOU, YOUR HONOR.

ALL RIGHT.  SO I THINK THAT OUR -- THE ISSUE AS TO THE FOURTH AMENDMENT AND, IN FACT, THE FIRST AMENDMENT HAS BEEN VERY WELL SHARPENED IN A WAY THAT I THINK SHOULD BE VERY HELPFUL TO THE COURT GOING FORWARD.

IT HAS COME DOWN, IT APPEARS, TO THE LEGAL ISSUE OF WHETHER BROWER, OR ANY OTHER CASE, SUGGESTS THAT YOU CAN HOLD A POLICE OFFICER LIABLE FOR EXCESSIVE FORCE IF THEY USE FORCE AND INADVERTENTLY STRIKE A BYSTANDER, AN INNOCENT BYSTANDER WITH THAT FORCE.

I AM VERY HAPPY TO HAVE THIS CASE TURNED ON THAT LEGAL DETERMINATION, BECAUSE BROWER CERTAINLY DOES NOT SUGGEST THAT THAT'S SO.

ER0478

BROWER DOES DISCUSS THE EXAMPLE OF PURELY INADVERTENT FORCE, WHICH IS A CAR ROLLING INTO AN INNOCENT BYSTANDER.

THE COURT:  UM-HUM.

MR. PRITCHARD:  IT CERTAINLY DOES NOT LIMIT ITS, ITS STATEMENT OF WHAT IS REQUIRED FOR A SEIZURE TO THAT SPECIFIC CONTEXT.  THE COURT IN BROWER TALKS ABOUT NEEDING A MEANS INTENTIONALLY APPLIED.  IT GIVES THE EXAMPLE OF IF YOU INTEND TO BLUDGEON SOMEONE WITH A GUN AND YOU ACCIDENTALLY SHOOT THEM, YOU ARE STILL INTENDING TO USE SPECIFIC FORCE AGAINST THAT PERSON, SO IT DOESN'T MATTER IF YOU INTENDED TO USE SOME LIGHTER VERSION OF FORCE.

THAT IS VERY DISTINCT FROM WHAT WE'RE TALKING ABOUT HERE.

THE COURT:  SO DID YOU PROVIDE ME WITH A BYSTANDER CASE WHERE THE OFFICER INTENDED TO SHOOT?

MR. PRITCHARD:  MANY.

THE COURT:  OKAY.

MR. PRITCHARD:  THE COURT WILL SEE THOSE IN THE BRIEFING.

ACTUALLY, THE FUNNY THING IS I DON'T USUALLY CITE A DISTRICT OF KENTUCKY CASE FOR NO REASON, AND THE REASON I DID SO HERE, AND THAT'S THE NAPPER CASE, IS THAT IT DOES A VERY GOOD JOB SURVEYING ALL OF THE CASE LAW ON THIS.  IT ESTABLISHES THAT EVERY SINGLE CIRCUIT IS IN ACCORD THAT IF YOU STRIKE A BYSTANDER WHEN YOU'RE INTENDING FORCE AGAINST A SUSPECT, THAT THAT IS NOT A SEIZURE FOR FOURTH AMENDMENT PURPOSES.  THE

ER0479

EXAMPLES ARE, IN THE TENTH CIRCUIT, THERE'S A CASE, <u>CHILDESS</u> OR SOMETHING LIKE THAT, WHERE THEY'RE TRYING TO HIT A KIDNAPPER AND IT HITS THE HOSTAGE.  NOT A FOURTH AMENDMENT SEIZURE.

OR WHERE -- IN THE TWO DISTRICT COURT CASES I CITED FOR THIS COURT, IT'S SPECIFICALLY SOMEONE TRYING TO FIRE UPON A SUSPECT WITH A GUN AND IT'S A FRIEND OR SOMEONE ELSE WHO'S RIGHT NEXT TO HIM WHO GETS HIT BY MISTAKE BECAUSE THE AIM IS A LITTLE BIT OFF.

THE COURT:  SO LET ME JUST CHANGE THE FACTS A LITTLE BIT, BECAUSE I THINK IT MAY BE FAIR TO MR. JOHNSON'S CASE. WE'VE GOT A SITUATION WHERE BOTTLES ARE HURLED AT THE POLICE, AND WE HAVE A RESPONSE BY OFFICER ADGAR IN CLOSE PROXIMITY IN TIME.

BUT WHAT IF I CAN FAIRLY INFER THAT BECAUSE IT WAS DARK, BECAUSE EVERYONE WAS WEARING DARK CLOTHING, AND BECAUSE ADGAR DID SAY IT'S HARD TO TELL WHO IT WAS BECAUSE OF THEIR CLOTHING, THAT OFFICER ADGAR SHOT INDISCRIMINATELY INTO THE CROWD IN RESPONSE TO THE BOTTLES BEING THROWN, AND SO HE WASN'T TARGETING A PARTICULAR SUSPECT, HE WAS TARGETING THE CROWD FOR THROWING THE BOTTLE.

SO THEN MR. JOHNSON'S NOT A BYSTANDER.  HE'S ACTUALLY, AS A MEMBER OF THE CROWD, AN INTENDED TARGET.

I'M TRYING TO SPIN OUT -- BECAUSE I HAVE TO -- FAIR INFERENCES FROM THE EVIDENCE.  THEN I DON'T THINK WE HAVE A BYSTANDER.

ER0480

MR. PRITCHARD:  THAT CAN'T BE AN INFERENCE THAT THE COURT CAN DRAW, RESPECTFULLY, YOUR HONOR, ON THIS RECORD, BECAUSE -- SEVERAL THINGS.  ONE IS THE SPECIFIC METICULOUS DESCRIPTION OF WHAT HE WAS DOING, WHICH HE RECORDED WELL BEFORE THIS LAWSUIT WAS IN EXISTENCE --

THE COURT:  UM-HUM.

MR. PRITCHARD:  -- THAT GIVES THE COURT -- AND IT IS THE ONLY FACT, THE ONLY ACTUAL FACT -- I'M NOT TALKING ABOUT CONJECTURE, WE'RE NO LONGER AT THE PLAUSIBILITY PHASE, RIGHT -- THAT'S THE ONLY FACT ON RECORD THAT GETS AT WHAT OFFICER ADGAR WAS INTENDING TO DO.

THERE IS JUST NOTHING FROM WHICH A JURY COULD RATIONALLY INFER THAT HE DECIDED, DESPITE ALL OF HIS TRAINING, DESPITE THE FACT THAT HE HAD NOT DONE SO ALL THE WAY THROUGHOUT THE EVENING TO THAT POINT, THAT ALL OF A SUDDEN HE WOULD DECIDE, I JUST AM GOING TO SHOOT INTO THE CROWD.

YOU KNOW, THAT'S JUST A THEORY WITHOUT BASIS IN THE RECORD, AND HE CAN'T HAVE TO GO -- I WOULD SUBMIT SUMMARY JUDGMENT IS EXACTLY FOR THIS KIND OF THING.

THE COURT:  UM-HUM.

MR. PRITCHARD:  HE CAN'T HAVE TO FACE A TRIAL BASED ON A THEORY THAT HAS NO BASIS, AND THAT CONTRADICTS THE ONLY FACTS ON RECORD.

TO ME, IF THERE'S EVER A CASE WHERE YOU HAVE -- WHERE IT'S CLEAR THAT THERE'S NO DISPUTE ON THE RECORD TO CREATE A TRIABLE

ER0481

ISSUE AS TO AN OFFICER'S INTENDED SORT OF ACTIONS, IT'S WHERE YOU HAVE ALL THESE CIRCUMSTANCES LEADING UP TO THE ACTION, COUPLED WITH THIS REPORT THAT SAYS, "HERE'S EXACTLY WHAT I WAS DOING WHEN I DID IT," AND NONE OF WHICH SUGGESTS THAT HE COULD HAVE EVER BEEN TARGETING MR. JOHNSON OUT OF THE CROWD.

TO ME, YOUR HONOR, THAT CAN'T BE A JURY QUESTION. OTHERWISE SUMMARY JUDGMENT IS --

THE COURT:  SO THAT'S WHY I TURNED IT A LITTLE, BECAUSE I DO THINK THERE'S -- I JUST DON'T THINK IT'S PLAUSIBLE TO SAY THAT MR. JOHNSON WAS TARGETED AS THE ASSAILANT.

SO THAT'S WHY I'M LOOKING -- BECAUSE I'M STRUGGLING SO MUCH WITH WHAT WE'RE SEEING IN THE VIDEO AND HOW WE'RE STRUGGLING TO INTERPRET IT.  THAT -- DOES PLAINTIFF -- AND I'LL LET MR. BASTIDA RESPOND TO THIS -- HAVE EVIDENCE THAT ACTUALLY OFFICER ADGAR WAS JUST SHOOTING IN THE DIRECTION OF THE SUSPECT AND NOT AT THE SUSPECT?

MR. PRITCHARD:  YEAH, THERE'S NO EVIDENCE OF THAT AT ALL.  ALL THE EVIDENCE IS TO THE CONTRARY.

THE COURT:  OKAY.

MR. PRITCHARD:  AND ONE POINT THAT IS RELATED, I THINK THE COURT -- IF THE COURT DOESN'T SEE IN THE VIDEO THAT OFFICER ADGAR'S AIM IS SORT OF FOLLOWING SOMEONE FROM THE RIGHT TO LEFT, THAT'S FINE.  I THINK IT'S CLEAR, BUT I DON'T WANT TO -- YOU KNOW, WE DON'T NEED TO MAKE THAT INTO AN ISSUE IN CASE THAT IS SOMETHING THE JURY WOULD HAVE TO DECIDE.

ER0482

THE COURT: UM-HUM.

MR. PRITCHARD: WHAT'S CERTAINLY CLEAR IS THAT THE VOLLEY HAPPENS, THERE IS SOME PERIOD OF TIME THE ENTIRE CROWD IS MOVING IN THE ONE DIRECTION. IF YOU'RE LOOKING AT THE CAMERA, THEY'RE ALL MOVING FROM RIGHT TO LEFT, OKAY? THERE IS AT LEAST SOME MOVEMENT BY OFFICER ADGAR. BUT REGARDLESS, THE CROWD MOVING FROM RIGHT TO LEFT, THEY'RE ALL MOVING IN THE DIRECTION OF WHERE MR. JOHNSON IS GOING BACK, AND THAT'S WHERE MR. JOHNSON CLAIMS THAT HE WAS HIT BY OFFICER ADGAR'S PROJECTILE.

THE COURT: YEAH.

MR. PRITCHARD: THOSE ARE THE FACTS ON RECORD.

THE COURT: SO WHICH VIDEO, IS IT ADGAR'S BODY CAM OR THE OTHER ONE, THAT IS GOING TO SHOW ME THAT BETTER?

MR. PRITCHARD: YEAH, THERE ARE ONLY TWO BEFORE THE COURT.

THE COURT: I'VE GOT THE WHOLE LONG ONE, AND THEN I'VE GOT THE OTHER BODY CAM THAT'S THE SIDE VIEW FROM A DIFFERENT OFFICER.

MR. PRITCHARD: WELL, THERE'S -- THE EXPERT FOR THE FIRST TIME DISCLOSED ATTACHMENT C THAT WE NEVER HAD SEEN BEFORE WHERE HE CREATED A SORT OF EXCERPT FROM A DIFFERENT BODY-WORN CAMERA IN THE RECORD. YEAH, THAT ONE YOU CAN CERTAINLY SEE THE CROWD ALL MOVING IN ONE DIRECTION.

BUT I THINK MORE HELPFULLY, FROM OFFICER ADGAR'S

ER0483

PERSPECTIVE, BECAUSE THAT'S WHAT HE SAW AND WHAT HE WAS DOING, THERE'S NO QUESTION.  THE CROWD JUST KIND OF FLIES IN ONE DIRECTION, AND THAT'S, IN FACT, WHERE MR. JOHNSON IS WALKING, ACCORDING TO THEIR ANALYSIS, IS HE'S SORT OF WALKING BACKWARDS AS THE CROWD IS MOVING ACROSS HIM.

SO, YES, I INVITE MR. BASTIDA TO POINT TO THE RECORD WHERE IT COULD BE INFERRED THAT OFFICER ADGAR, DESPITE EVERYTHING HE DID ALL NIGHT, DESPITE HIS POLICE REPORT, DESPITE EVERYTHING, HIS SWORN TESTIMONY, THAT HE JUST DECIDED TO SHOOT AT THE CROWD WITHOUT A TARGET.  I DON'T THINK THAT EVIDENCE EXISTS.

THE COURT:  WELL, I DON'T MEAN THAT HE WAS SHOOTING AT THE CROWD WITHOUT A TARGET.  I MEAN HE'S SHOOTING IN THE DIRECTION OF WHERE HE BELIEVES HIS TARGET IS, BUT NOT WITH AN EYE ON A PARTICULAR SUSPECT.  THAT'S WHAT I'M TRYING TO SAY.

MR. PRITCHARD:  INTERESTING. OKAY.  THAT, TO ME, IS JUST NEGLIGENCE.

THE COURT:  RIGHT.

MR. PRITCHARD:  THAT'S NOT HIS -- THERE'S STILL NOT EVIDENCE THAT MR. JOHNSON WAS THE DELIBERATE TARGET OF THE FORCE.

THE COURT:  RIGHT.  WELL, THAT'S WHERE I STARTED IS, DO I NEED EVIDENCE THAT MR. JOHNSON WAS THE IDENTIFIED TARGET?

MR. PRITCHARD:  ABSOLUTELY.

THE COURT:  SO THAT'S NOT WHAT MR. BASTIDA IS TELLING ME.

ER0484

MR. PRITCHARD:  YEAH.

THE COURT:  BUT THAT'S -- I'M REALLY STRUGGLING WITH THAT.

MR. PRITCHARD:  WELL, THE COURT -- I UNDERSTAND WHY, BECAUSE THAT IS WHAT THIS HAS SHARPENED VERY MUCH INTO.  TAKE A LOOK AT RODRIGUEZ VERSUS FRESNO, TAKE A LOOK AT HERNANDEZ VERSUS CITY OF LOS ANGELES, TAKE A LOOK AT I BELIEVE IT'S LOPEZ -- I'M -- WHAT'S THE OTHER ONE?  LOPEZ IS THE CASE THAT'S CITED IN THE BRIEF.  THESE ARE DISTRICT COURT CASES THAT ARE APPLYING BROWER, AND TAKE A LOOK AT THE NINTH CIRCUIT'S CASE IN UNITED STATES VERSUS LOCKETT.

YOU KNOW, THE REASON I DON'T EMPHASIZE THAT ONE FIRST, WHICH I NORMALLY WOULD SINCE THAT'S CONTROLLING AUTHORITY, IS THAT WASN'T EXACTLY THE PURE ISSUE OF THE CASE.

THE COURT:  RIGHT.

MR. PRITCHARD:  BUT THERE'S A REASON WHY THE NINTH CIRCUIT PANEL FELT COMFORTABLE SAYING, IN DEFINITIVE TERMS, SOMEONE HIT BY A STRAY BULLET, IN OTHER WORDS, IF THEY ARE NOT THE TARGET, THAT'S NOT A SEIZURE.  THAT'S NOT A FOURTH AMENDMENT CLAIM.

YOU KNOW, PLAINTIFF COULD HAVE PLEADED THIS AS A SUBSTANTIVE DUE PROCESS CLAIM.  THEY DECIDED NOT TO.  THEY DECIDED NOT TO SAY THAT HE -- THEY DECIDED NOT TO PROCEED ON THE THEORY THAT THERE WAS FORCE USED AGAINST HIM OUTSIDE THE SEIZURE CONTEXT.

ER0485

THIS IS A FOURTH AMENDMENT CASE, AND THAT'S WHAT THE COURT HAS TO ANALYZE IT AS.

OKAY.  I THINK --

THE COURT:  SO I GUESS I -- I CAN'T LET YOU GO UNTIL I KNOW WHAT THE PLAINTIFF'S THEORY IS.

MR. PRITCHARD:  UM-HUM.

THE COURT:  AND I'M STILL CONFUSED, BECAUSE I -- I READ THE BRIEFS BELIEVING THAT THE PLED THEORY WAS THAT MR. JOHNSON WAS THE IDENTIFIED TARGET OF THE 40 MILLIMETER THAT HIT HIM.

MR. PRITCHARD:  FOR GOOD REASON.  THAT IS VERY MUCH THE THEORY OF THE COMPLAINT AND THE BRIEFING.

THE COURT:  SO I WANT -- MR. BASTIDA, IF YOU'D COME UP AS WELL, I JUST WANT TO -- AND I'VE GOT THE SECOND AMENDED COMPLAINT HERE IF WE NEED TO LOOK AT IT.

SO LET ME JUST ASK YOU AGAIN, AND THEN YOU CAN HELP ME, AND IF THERE'S SOME SUGGESTION THAT'S NOT PLED, MR. PRITCHARD CAN TELL ME.

IS IT YOUR THEORY THAT OFFICER ADGAR TARGETED MR. JOHNSON WITH HIS 40 MILLIMETER?

MR. BASTIDA:  NO, YOUR HONOR.  AND I THINK THE THEORY IS THAT OFFICER ADGAR INTENTIONALLY SHOT INTO THE CROWD IN THE DIRECTION OF MR. JOHNSON AND HIT HIM.

THE COURT:  OKAY.  SO DO WE HAVE A DIS -- AND THAT THEN CAN BRING IN THE NELSON ANALYSIS.

ER0486

MR. BASTIDA: YES. AND I APOLOGIZE, YOUR HONOR. I HAVE BEEN CORRECTED. THIS IS A NELSON THEORY THAT WE HAVE HERE.

THE COURT: YOU ARGUED NELSON IN YOUR OPPOSITION.

MR. BASTIDA: YES.

THE COURT: SO -- OKAY. SO THAT -- AND I MAY HAVE MISUNDERSTOOD THE ARGUMENTS TO TAKE IT INTO THIS, MR. JOHNSON SAYING "I WAS TARGETED."

SO YOU'RE SAYING THAT -- I MEAN -- OKAY. SO, MR. PRITCHARD, ARE YOU SUGGESTING THAT'S NOT WHAT'S PLED?

MR. PRITCHARD: YES, THAT IS NOT WHAT'S PLED.

THAT'S NOT WHAT'S PLED. IT'S NOT IN THE BRIEFING BEFORE THE COURT. IF IT WERE BEFORE THE COURT IN BRIEFING, THE BRIEFING WOULD LOOK DIFFERENT BECAUSE I WOULD HAVE CERTAINLY HAPPILY POINTED OUT WHY THAT'S NOT A VIABLE, COGNIZABLE CONSTITUTIONAL THEORY.

THAT'S NOT EVEN WHAT NELSON WAS. NELSON, AS THE COURT IS AWARE -- AS THE COURT DESCRIBED MULTIPLE TIMES DURING THE COLLOQUY WITH MR. BASTIDA, VERY -- I WOULD AGREE WITH THE COURT'S CHARACTERIZATION. WE'RE TALKING THERE ABOUT INDISCRIMINATE FORCE TO DISPERSE A CROWD OR TO, WHATEVER YOU WANT TO CALL IT WITH THAT GROUP OF STUDENTS. THAT IS VERY DIFFERENT FROM I -- YOU KNOW, I SHOT AND I DIDN'T HAVE MY TARGET WELL ENOUGH IN HAND OR IN SIGHT, THAT IT AMOUNTS TO A DELIBERATE TARGETING UNDER THE FOURTH AMENDMENT.

ER0487

THE COURT: WELL, IT COULD BE DELIBERATE INDIFFERENCE TO THE RIGHTS OF THE PROTESTERS TO SHOOT MERELY IN THE DIRECTION OF AN ASSAILANT.

MR. PRITCHARD: THAT'S A FOURTEENTH AMENDMENT THEORY, YOUR HONOR, DELIBERATE INDIFFERENCE. THAT'S NOT A FOURTH AMENDMENT THEORY, AND THAT'S NOT WHAT THIS CASE HAS BEEN PLEADED AS, OR ARGUED.

I WOULD HAVE MY OWN MANY ISSUES WITH THAT, YOUR HONOR, BUT, AGAIN, THIS WOULD REQUIRE A WHOLE SEPARATE SET OF BRIEFING BECAUSE THIS HAS NEVER BEEN A DUE PROCESS CASE. IT'S A FOURTEENTH AMENDMENT CASE, OR EXCUSE ME, FOURTH.

THE COURT: OKAY. SO I'M LOOKING AT PARAGRAPH 29 OF THE SECOND AMENDED COMPLAINT. "OFFICER ADGAR AIMED AND INTENTIONALLY FIRED AT LEAST ONE 40 MILLIMETER FOAM BATON PROJECTILE TOWARDS MR. JOHNSON AS MR. JOHNSON WAS ATTEMPTING TO FLEE."

MR. BASTIDA: YES.

THE COURT: SO THAT'S ALL IT SAYS, TOWARDS, NOT AIMED AT HIM. SO IT'S IN THE DIRECTION OF.

IT MAY -- OKAY. WELL, I MAY HAVE FOCUSSED -- I THINK I WAS GUIDED BY THE WAY YOU'VE FRAMED YOUR MOTION, WHICH IS ALL I CAN DO. BUT I'M JUST GOING TO GO BACK TO THE OPPOSITION NOW.

(PAUSE IN PROCEEDINGS.)

THE COURT: SO IT MAY BE THAT THE ISSUE THAT WOULD GO TO THE JURY IS DRAWING THE LINE BETWEEN WAS -- DID ADGAR AIM AT

ER0488

A SUSPECT WHO HAD HURLED THE BOTTLES AND INADVERTENTLY HIT MR. JOHNSON, THAT WOULD BE NO LIABILITY; OR INSTEAD, DID HE, UNDER A, MAYBE A GENEROUS THEORY UNDER NELSON, BUT A REASONABLE ONE, DID ADGAR, IN RESPONSE TO THE HURLED BOTTLE, SHOOT INDISCRIMINATELY IN THE DIRECTION OF THE ASSAILANT?

SO THAT MAY BE WHERE WE GO TO TRIAL, AND THIS HAS BEEN TREMENDOUSLY HELPFUL.

ALL RIGHT.  I THINK --

MR. PRITCHARD:  WELL --

THE COURT:  I KNOW.

MR. PRITCHARD:  I BETTER --

THE COURT:  I THINK YOU'RE FRUSTRATED.

MR. PRITCHARD:  NO, NO, NO FRUSTRATION.  BUT I DO THINK I NEED TO PUT ON THE RECORD A COUPLE QUICK THINGS.

THAT'S NOT BRIEFED AT ALL.  THE WAY THE BRIEFING HAS UNFOLDED, THE ENTIRE THEORY THAT PLAINTIFF HAS ADVANCED IS THAT OFFICER ADGAR INTENTIONALLY TARGETED, DELIBERATELY TARGETED MR. JOHNSON.  THAT'S WHAT THEIR EXPERT, ROGER CLARK, SAYS.  HIS ENTIRE -- I HAD A QUICK EXCERPT OF THIS.  HE DIDN'T EVEN CONSIDER THE CONCEPT THAT IT COULD HAVE BEEN SOMETHING ELSE BECAUSE THAT'S THE WHOLE THEORY.  THAT'S WHAT THE BRIEFING SAYS THROUGHOUT.  THAT'S THE WAY PLAINTIFF RESPONDS TO OUR ARGUMENTS IS BY SAYING THAT THE EVIDENCE IS CLEAR THAT HE TARGETED MR. JOHNSON.  THAT'S WHAT THE FIRST AMENDMENT THEORY IS. THAT'S WHAT THE FOURTH AMENDMENT THEORY IS.

ER0489

SO I'LL SAY THAT THAT'S MORE OF A WAIVER THING AND THAT'S A FAIRNESS THING.

THE COURT:  YES.

MR. PRITCHARD:  BUT ALSO, I THINK MAYBE MORE IMPORTANTLY, ON THE LAW AND THE FACTS.

ON THE LAW, WHAT THE COURT'S DESCRIBING, WHICH IS IF A POLICE OFFICER DECIDES TO FIRE A SINGLE THING, NOT AN INDISCRIMINATE DEVICE, NOT TEARGAS, NOT PEPPER BALLS --

THE COURT:  I UNDERSTAND, UM-HUM.

MR. PRITCHARD:  -- A SINGLE ROUND AT A RANDOM PERSON, BECAUSE WHEN YOU SAY "IN THE CROWD," WHAT WE'RE REALLY SAYING IS AT SOMEBODY IN THE CROWD, MAYBE WITHOUT A TARGET, RIGHT.

HERE "I'M GOING TO DO THIS, HERE'S THE CROWD, IT'LL HIT SOMEBODY, I DON'T KNOW WHO."

THAT STILL -- I'M SORRY.

THE COURT:  A JURY MAY NOT CREDIT THAT, BUT I THINK IT -- BUT I THINK IT COULD.

MR. PRITCHARD:  SO I WANT TO GET TO THAT.

BUT BEFORE I GET TO THAT LEGALLY, THAT NOTION THAT IT'S JUST, "I'M GOING TO HIT ONE PERSON IN THIS CROWD AT RANDOM," THAT IS NOT -- THAT'S STILL NOT A FOURTH AMENDMENT CLAIM. THAT'S AN ALLEGATION OF PUNITIVE OR SORT OF PURPOSELESS FORCE THAT IS NOT DIRECTED AT ANY PERSON, BUT JUST DIRECTED IN THE DIRECTION OF A PERSON.

THAT'S A FOURTEENTH AMENDMENT DUE PROCESS THEORY, AND

ER0490

THAT'S NOT WHAT THE COURT HAS IN FRONT OF IT.

SO I WOULD CERTAINLY EMPHASIZE THAT IF THAT WERE THE COURT'S CONCLUSION, THAT THERE WAS A DISPUTE THAT COULD MAKE THAT GO TO A JURY --

THE COURT:  BUT WASN'T NELSON AN EXCESSIVE FORCE CLAIM?

MR. PRITCHARD:  YES.  YES.  BUT THAT'S BECAUSE THE ALLEGATION WAS NOT THAT THEY JUST SHOT WILLY-NILLY, BUT THAT THEY DID IT AT THIS CROWD WITH THIS KIND OF DISPERSAL FUNCTION THAT THE COURT HAS DESCRIBED.

THAT'S DIFFERENT FROM, "I'M JUST GOING TO, WITHOUT ANY CAUSE AND WITHOUT ANY REAL REASON, JUST FIRE INTO A CROWD." THAT'S THE KIND OF LIKE MALICE --

THE COURT:  IT'S NOT NO REASON.  IT'S THAT IT WAS -- THERE WAS AN INCIDENT OF THE HURLING OF THE BOTTLES, THERE WAS A RECOGNITION OF A GENERAL LOCATION OF WHERE THE SUSPECT WAS, AND A SHOOTING INTO THAT AREA WHERE -- AND HERE I CAN CREDIT THE PLAINTIFF'S ARGUMENT ON ADGAR'S COMMENT OF "I COULDN'T IDENTIFY MR. JOHNSON BECAUSE EVERYONE -- THE SUSPECT BECAUSE EVERYONE WAS WEARING DARK CLOTHING," SHOWS THAT HE DIDN'T HAVE A SIGHT ON THE PERSON.  I THINK ONE COULD INFER THAT.

MR. PRITCHARD:  WELL, I'LL FINISH -- THAT'S MY LEGAL POINT.  I THINK I'LL LEAVE THAT TO ONE SIDE.

THE COURT:  OKAY.

MR. PRITCHARD:  I DON'T THINK THAT'S FOURTH

ER0491

AMENDMENT.

THE COMMENT THE COURT JUST REFERRED TO IS BEFORE MR. JOHNSON WAS STRUCK, FOR ONE THING.

THE COURT:  OH.

MR. PRITCHARD:  IT WAS 10:25 OR SOMETHING LIKE THAT.

THE COURT:  OH, OKAY.

MR. PRITCHARD:  SO WHAT YOU HAVE IS -- THE COURT OBSERVED THIS AT THE OUTSET -- THERE'S THREE TIMES FIRED:  ONE 10:24, ONE 10:33, AND THEN RIGHT AFTER THAT THERE'S ANOTHER ONE AT A WOMAN ON A SKATEBOARD THEY'RE TRYING TO ARREST.

THE COMMENT IS AFTER THE 10:24.

THE COURT:  OH.  THANK YOU.

MR. PRITCHARD:  HE GOES TO A SUPERVISOR -- AND THIS IS IN THE VIDEO -- THE SUPERVISOR ASKED HIM, WHO WAS THE PERSON THAT HE -- AND HE SAID -- OR, NO.

HE SAID, "I JUST SAW SOMEBODY DOING SOMETHING."

"WHO WAS IT?"

"HIS CLOSING IS TOO DARK, I CAN'T TELL.  I COULDN'T IDENTIFY HIM."

HE SAYS NOTHING AT ALL ABOUT HIM FIRING HIS WEAPON, AND THAT'S NOT AN INFERENCE THAT THE JURY COULD DRAW.

THE COURT:  OKAY.

MR. PRITCHARD:  SECONDLY ON THE FACTS, THAT'S NOT -- THERE IS NOTHING IN THE RECORD TO SUGGEST THIS -- IT'S NOT ONLY OUTLANDISH THAT HE JUST DECIDED TO FIRE IN THAT DIRECTION

ER0492

WITHOUT HAVING A TARGET, IT CONTRADICTS ALL OF THE EVIDENCE ON RECORD, HIS POLICE REPORT, HIS SWORN TESTIMONY, THE TRAINING THAT HE TALKED ABOUT GETTING, EVERYTHING.

THERE'S NO -- THIS CAN'T -- RESPECTFULLY, YOUR HONOR, I JUST CAN'T SEE HOW THAT COULD GO TO A JURY WHEN THERE'S NOTHING EXCEPT THAT IT'S A CONJECTURAL THEORY ABOUT WHAT MIGHT HAVE HAPPENED TO CAUSE MR. JOHNSON BEING STRUCK WHEN EVERYTHING IS CLEAR THAT IF IT DID HAPPEN, IT WAS INADVERTENT.

SO THAT'S MY SUBMISSION IF THAT'S WHERE WE'RE GOING TO GO.

THE COURT:  I UNDERSTAND.  OKAY.

MR. BASTIDA, LAST WORD.

MR. BASTIDA:  YES, AND I'LL BE BRIEF, YOUR HONOR.

I'LL JUST POINT OUT -- YOU BEAT ME TO IT -- OUR COMPLAINT DOES ALLEGE THE INTENTION ON OFFICER ADGAR'S FIRING, NOT THE INTENTION OF TARGETING MR. JOHNSON, AND THAT'S HOW WE BRIEFED OUR OPPOSITION, WHICH IS WHY WE RELY SO HEAVILY ON NELSON.

ON THE FACTS, YOUR HONOR, THIS HAS TO GO TO A JURY.  THIS CANNOT BE RELIED SOLELY ON OFFICER ADGAR'S DECLARATION.  THE JURY HAS TO BE ABLE TO VIEW THE BODY-WORN CAMERA FOOTAGE WHICH SHOWS THAT, DESPITE WHAT OFFICER ADGAR SAYS, WHICH I WILL POINT OUT TO THE COURT, OFFICER ADGAR COULD HAVE ATTEMPTED TO IDENTIFY IN THE VIDEO -- THERE'S HUNDREDS OF HOURS OF VIDEO HERE FROM ALL ANGLES, BUT YET, OFFICER ADGAR DID NOT MAKE ANY ATTEMPT TO IDENTIFY THE ALLEGED SUSPECT THAT THREW THE BOTTLE.

THE COURT:  OKAY.

ER0493

MR. BASTIDA:  NOT ONLY -- SO WHEN YOU COUPLE THAT WITH WHAT DOES -- WHAT IS SHOWN IN THE VIDEO, AND HIGHLIGHTED IN OUR EXPERT'S REPORT, WHERE THE BOTTLES CAME FROM AND WHERE THEY LANDED AND HOW OFFICER ADGAR FIRED IN THE COMPLETE WRONG DIRECTION, THAT NEEDS TO GO TO THE JURY.

AND THERE'S ALSO EVIDENCE IN THE RECORD, YOUR HONOR, THAT HIS SUPERVISOR, SERGEANT BYERS, BEFORE OFFICER ADGAR SHOT, EXPRESSLY DIRECTED HIS OFFICERS THAT "THE MOMENT SOMEONE THROWS A WATER BOTTLE, YOU SHOOT."  AND WHEN THE WATER BOTTLES WERE THROWN IN THE AIR, YOU CAN HEAR SERGEANT BYERS ON THE BODY-WORN CAMERA SAYING "LET THEM HAVE IT."

I THINK THAT GOES TO INDISCRIMINATE --

THE COURT:  I THINK THAT GOES TO LET THE PERSON WHO THREW THE BOTTLE HAVE IT, NOT TO -- YOU KNOW, I THINK IT'S NOT CONTESTED THAT MR. JOHNSON WAS A PEACEFUL PROTESTER.

MR. BASTIDA:  RIGHT.  BUT IT COULD ALSO BE INFERRED, YOUR HONOR, THAT IT'S REFERRED TO "LET THEM HAVE IT" AS IN THE CROWD.

THE COURT:  ALL RIGHT.

ALL RIGHT.  WELL, THANK YOU FOR WALKING THROUGH ALL OF THIS WITH ME.  IT'S VERY HELPFUL.

SO AS I DO FOR ALL -- AT THE END OF ALL SUMMARY JUDGMENT ARGUMENTS, THIS IS THE TIME WHEN YOU KNOW EACH OTHER'S CASES THE BEST AND YOU KNOW MY THINKING ON IT.  YOU DON'T KNOW HOW I'M GOING TO RULE, AND I'M NOT GIVING YOU A RULING TODAY.

ER0494

WHAT ARE YOU DOING ABOUT SETTLEMENT?

MR. PRITCHARD:  WE'VE HAD ONE -- SORRY.  GO AHEAD.

MR. BASTIDA:  WE WERE ORDERED TO A SETTLEMENT CONFERENCE.  WE APPEARED, YOUR HONOR, PLAINTIFF MADE A DEMAND.  THE DEFENDANTS DID NOT MAKE ANY OFFER.

THE COURT:  OKAY.

MR. BASTIDA:  AND SO WE LEFT IT AT THAT.

THE COURT:  DID YOU GO TO A MAGISTRATE JUDGE?

MR. PRITCHARD:  JUDGE DEMARCHI.

THE COURT:  JUDGE DEMARCHI, ALL RIGHT.

WE'RE IN A VERY DIFFERENT PLACE NOW.  I -- YOU KNOW, THIS IS THE KIND OF CASE, AS THEY OFTEN ARE, WHERE THE DEFENSE EVIDENCE IS VERY STRONG, AND I'M LOOKING TO SEE IF THE CASE HAS ENOUGH EVIDENCE TO GET TO A JURY.

JURIES CAN DO DIFFERENT THINGS THAN I THINK, SO THAT'S -- YOU KNOW, AND THEN I BACK OFF.  I HAVE TO EVALUATE IT AND I HAVE TO RECOGNIZE, STRONG EVIDENCE ONLY GOES SO FAR AT SUMMARY JUDGMENT.

BUT, MR. BASTIDA, YOU AND MR. JOHNSON CAN NOW EVALUATE WHAT YOUR STRENGTHS AND WEAKNESSES ARE IN GOING BEFORE A JURY.  BUT I THINK IT'S IMPORTANT TO HAVE, AND I WILL ORDER, FURTHER SETTLEMENT.

WAS IT PRODUCTIVE TO BE WITH JUDGE DEMARCHI?  ARE YOU REQUESTING TO GO TO SOMEONE ELSE?  I JUST WANT TO MAKE IT PRODUCTIVE FOR YOU.

ER0495

MR. PRITCHARD:  I THINK JUDGE DEMARCHI DID WELL.  IT WAS A SHORT SESSION BECAUSE OF THE DEMAND THAT WAS MADE.  BUT THAT'S -- IF THAT'S CHANGED, I THINK THAT WE COULD HAVE A MORE PRODUCTIVE SESSION.

THE COURT:  OKAY.

MR. PRITCHARD:  BUT NOT BECAUSE OF JUDGE DEMARCHI.  I THINK SHE'S GOOD.

THE COURT:  SHE'S VERY SKILLED.

MR. BASTIDA:  THE ONLY THING I'LL SAY TO THAT, YOUR HONOR, IT WAS SHORT, BUT ACCORDING TO THE RULES, WE PROVIDED A DEMAND AND DEFENDANTS FAILED TO PROVIDE ANY KIND OF RESPONSE, SO -- AND THAT'S WHAT WE TOLD JUDGE DEMARCHI.  WE CAN'T ENGAGE IN SETTLEMENT --

THE COURT:  YOU CAN'T.  YOU'RE NOT SUPPOSED TO BARGAIN AGAINST YOURSELF.

SO I'M EXPECTING THAT THE CITY WILL COME PREPARED TO MAKE A REASONABLE OFFER.  POSITIONS SHOULD HAVE CLARIFIED OVER THE COURSE OF DISCOVERY AND PREPARING THESE MOTIONS AND ARGUING THEM.

I MEAN, I THINK -- I THINK IT'S REALLY CLEAR TO BOTH OF YOU THE STRENGTHS AND WEAKNESSES OF YOUR CASE AND OF YOUR THEORIES, AND SO I'M -- I WILL ORDER YOU TO RETURN TO JUDGE DEMARCHI.  I'LL JUST PUT OUT AN ORDER.  SHE'S ALREADY GOT THIS.

AND TRIAL IS AFTER THE NEW YEAR, ISN'T IT?

ER0496

MR. PRITCHARD:  IT'S FEBRUARY --

MR. BASTIDA:  THE 26TH.

MR. PRITCHARD:  -- AT THE END.

THE COURT:  GOOD.  SO THERE'S PLENTY OF TIME TO GET TO SEE HER.

AND I THINK I -- IF I GRANT THE MOTION, THERE WILL BE NO TRIAL.  IF I DENY THE MOTION, I'LL SEE YOU AGAIN AT THE FINAL PRETRIAL CONFERENCE.

MR. PRITCHARD:  YES.

MR. BASTIDA:  THANK YOU VERY MUCH, YOUR HONOR.

MR. PRITCHARD:  GOOD TO SEE YOU IN PERSON, YOUR HONOR.

THE COURT:  THANK YOU.

THE CLERK:  COURT IS ADJOURNED.

(THE PROCEEDINGS WERE CONCLUDED AT 10:37 A.M.)

ER0497

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  OCTOBER 27, 2023

ER0498

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
YUE-HAN CHOW, Senior Deputy City Attorney (268266)
MATTHEW PRITCHARD, Senior Deputy City Attorney (284118)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CITY OF SAN JOSE, et al.<br><br><br>                    Defendants. | Case Number:  5:21-cv-01849-BLF<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  September 21, 2023<br>Time:  9:00 a.m.<br>Courtroom:  3, 5th Floor<br>Judge: Hon. Beth Labson Freeman<br><br>Trial: February 26, 2024 |

## <u>NOTICE OF MOTION</u>

Please take notice that on September 21, 2023, or as soon as this matter can be heard, Defendants will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all claims brought by Plaintiff.

This motion is based on the attached memorandum of points and authorities, all materials submitted in conjunction herewith, and any other materials or information that should come to the Court's attention as part of this proceeding.

**Statement of Issues to Be Decided**

1. To prove excessive force in violation of the Fourth Amendment, a plaintiff must show a police officer intentionally used force against him with the objective purpose to restrain, and that the force was unreasonable. Are Defendants entitled to judgment as a matter of law on Plaintiff's excessive force claim here, where the undisputed facts show Officer Adgar struck Plaintiff with a projectile, if at all, only inadvertently in the course of attempting to stop a third-party suspect from continuing to throw dangerous objects at police officers?

2. The central element of a First Amendment retaliation claim is speech-based animus by the defendant. Here, the undisputed facts show not only that Officer Adgar did not intentionally subject Plaintiff to force, but that the officer also never said anything to express adversity or hostility to Plaintiff's speech activity nor did anything else to suggest he targeted Plaintiff specifically based on his expression. Are Defendants entitled to judgment as a matter of law on Plaintiff's First Amendment retaliation claim?

3. Qualified immunity prohibits liability for police officers unless controlling authority or a robust consensus of persuasive authority put them on notice that their particular conduct violated the Constitution. Here, Plaintiff can point to no case in which a police officer was held to have violated the Constitution under circumstances resembling those faced by Officer Adgar, i.e., where the officer inadvertently struck a bystander in the course of using a non-lethal projectile against a suspect assaulting officers. Can Plaintiff overcome the protections of qualified immunity to hold Officer Adgar liable?

4. A city cannot be held liable for the constitutional violations of its employees unless an official policy, endorsed by its highest policymaking officials, caused the violations. Here, Plaintiff's municipal liability claim is that the City had policies to allow or cause a police officer intentionally to strike a peaceful protester based on nothing more than his presence at a protest. But the undisputed facts are that the City had robust policies that prohibited excessive force and unlawful retaliation, and its policies further required all officers to be trained specifically in the weapons they used during the events at issue. Is the City of San Jose entitled to judgment as a matter of law on Plaintiff's municipal liability claim?

5. Plaintiff's Bane Act and battery claims, like his federal claims, require him to prove Officer Adgar intentionally subjected him to force. His negligence claim requires him to prove Officer Adgar's force against a violent suspect assaulting police officers was unreasonably excessive. Are Defendants entitled to judgment as a matter of law on Plaintiff's state-law claims given that Plaintiff was not the object of Officer Adgar's force, and that Officer Adgar used the non-lethal projectile-weapon strike to stop a suspect from assaulting police officers?

ii

**TABLE OF CONTENTS**

**Introduction** ................................................................................................................... 1

**Background** ................................................................................................................... 2

    I.  San Jose Police Department policies and training on crowd control and the use of force ........ 2

    II.  Violent and disruptive protest activity beginning on May 29, 2020 ........................................ 3

    III. Protest activity and violence continue on May 30 ...................................................... 5

    IV. Plaintiff Johnson attends the protest on May 30 and is struck in the leg with an object .......... 7

**Argument** ................................................................................................................... 9

    I.  Officer Adgar is entitled to judgment as a matter of law on Plaintiff's § 1983 claims ............. 9

        A.    The undisputed facts preclude Plaintiff's Fourth Amendment claim ............................ 9

            1.  Plaintiff cannot prove that Officer Adgar fired a projectile that struck him ............ 11

            2.  Plaintiff was not the deliberate object of Officer Adgar's force and so was not seized ................................................................................................ 13

            3.  Plaintiff's own allegations and theory are that Officer Adgar had no intent to seize ........................................................................................................ 15

            4.  Qualified immunity prohibits Fourth Amendment liability under the undisputed facts ............................................................................................. 16

        B.    The undisputed facts preclude Plaintiff's First Amendment claim ............................ 17

    II. The City is entitled to judgment as a matter of law on Plaintiff's § 1983 claims .................... 19

        A.    The City did not have a custom and practice of excessive force or retaliation .............. 19

        B.    The City did not have unconstitutional training and supervision policies .................... 21

        C.    No City policymaker ratified a constitutional violation by Officer Adgar ................... 24

    III. Defendants are entitled to judgment as a matter of law on Plaintiff's state-law claims ......... 24

**Conclusion** ................................................................................................................... 25

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0501**

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Alexander v. County of Los Angeles*,
64 F.3d 1315 (9th Cir. 1995) ................................................................................ 17

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ...................................................................... 16

*Brendlin v. California*,
551 U.S. 249 (2007) .............................................................................................. 15

*Brower v. County of Inyo*,
489 U.S. 593 (1989) .................................................................................. 10, 13, 15

*Bd. Of Cnty. Comm'rs v. Brown*,
520 U.S. 397 (1997) .............................................................................................. 20

*Brown v. Ransweiler*,
171 Cal. App. 4th 516 (Cal. Ct. App. 2009) ................................................... 24, 25

*California v. Hodari D.*,
499 U.S. 621 (1991) .............................................................................................. 10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................ 9

*City & Cnty. of San Francisco v. Sheehan*,
135 S. Ct. 1765 (2015) ......................................................................................... 16

*City of Canton v. Harris*,
489 U.S. 378 (1989) .............................................................................................. 21

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) .............................................................................................. 20

*Connick v. Thompson*,
563 U.S. 51 (2011) .................................................................................... 21, 22, 24

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) ................................................................................ 9

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ........................................................................................... 16

*Eastburn v. Reg'l Fire Prot. Auth.*, ..................................................................... 23
31 Cal. 4th 1175 (Cal. Ct. App. 2003)

*Emmons v. City of Escondido*,
921 F.3d 1172 (9th Cir. 2019) .............................................................................. 16

*Estate of Strickland v. Nevada County, No. 22-15761*,
2023 U.S. App. LEXIS 13370 (9th Cir. May 31, 2023) ...................................... 17

*Flores v. County of Los Angeles*,
758 F.3d 1154 (9th Cir. 2014) ......................................................................... 22, 23

iv

*Gillette v. Delmore*,
   979 F.2d 1342 (9th Cir. 1992) .................................................................................. 20, 24

*Golick v. State of California*,
   82 Cal. App. 5th 1127 (Cal. Ct. App. 2022) ...................................................... 25

*Harper v. City of Los Angeles*,
   533 F.3d 1010 (9th Cir. 2008) ........................................................................ 11

*Hernandez v. City of Los Angeles, No. 2:19-cv-00441*,
   2021 U.S. Dist. LEXIS 259913 (C.D. Cal. Dec. 24, 2021) ............................... 13

*Howard v. City of Coos Bay*,
   871 F.3d 1032 (9th Cir. 2017) ........................................................................ 18

*Hunter v. County of Sacramento*,
   652 F.3d 1225 (9th Cir. 2011) ........................................................................ 20

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................. 4

*Index Newspapers LLC v. United States Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ..................................................................... 17, 18

*Isayeva v. Sacramento Sherriff's Dept.*,
   872 F.3d 938 (9th Cir. 2017) .......................................................................... 16

*Jackson v. City of Bremerton*,
   268 F.3d 646 (9th Cir. 2001) .......................................................................... 19

*Jackson-Moeser v. Armstrong*,
   765 F. App'x 299 (9th Cir. 2019) .................................................................... 15

*Kong Meng Xiong v. City of Merced*, ...............................................................14
   2015 U.S. Dist. LEXIS 99146 (E.D. Cal. July 29, 2015)

*Logan v. City of Pullman*, ................................................................................14
   392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005)

*Lopez v. City of Santa Maria, No. CV13-7287*,
   2016 U.S. Dist. LEXIS 9741 (C.D. Cal. Jan. 26, 2016) ................................... 14

*Lozano v. County of Santa Clara, No. 19-CV-02634*,
   2019 WL 6841215 (N.D. Cal. Dec. 16, 2019) ................................................. 19

*Martinez v. Sasse*,
   37 F.4th 506 (8th Cir. 2022) ........................................................................... 16

*Mattos v. Agarano*,
   661 F.3d 433 (9th Cir. 2011) ..................................................................... 16, 17

*McMillan v. Delgado, No. 1:19-cv-00444*,
   2021 U.S. Dist. LEXIS 187482 (E.D. Cal. Sep. 29, 2021) .............................. 25

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978) ....................................................................................... 19

v

*Napper v. Hankison*, No. 3:20-cv-764,
   2022 U.S. Dist. LEXIS 134182 (W.D. Ky. July 28, 2022) ........................................................ 13, 17

*Patel v. Kent Sch. Dist.*,
   648 F.3d 965 (9th Cir. 2011) ................................................................................................. 9

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ................................................................................................................ 9

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) .............................................................................................................. 19

*Quraishi v. St. Charles County*,
   986 F.3d 831 (8th Cir. 2021) ............................................................................................... 16

*Reese v. County of Sacramento*,
   888 F.3d 1030 (9th Cir. 2018) ............................................................................................. 24

*Rodriguez v. City of Fresno*,
   819 F. Supp. 2d 937 (E.D. Cal. 2011) ............................................................................ 13, 15

*S.B. v. County of San Diego*,
   864 F.3d 1010 (9th Cir. 2017) ............................................................................................. 16

*Sanchez v. City of Atherton*, No. 22-cv-03106-JSW,
   2023 U.S. Dist. LEXIS 3763 (N.D. Cal. Jan. 9, 2023) ........................................................ 11

*Sanderlin v. City of San Jose*, No. 20-cv-04824-BLF,
   2023 U.S. Dist. LEXIS 44551 (N.D. Cal. Mar. 16, 2023) ...................................... 15, 21, 24

*Sharp v. County of Orange*,
   871 F.3d 901 (9th Cir. 2017) ............................................................................................... 16

*Stephens v. Union Pac. R.R. Co.*,
   935 F.3d 852 (9th Cir. 2019) ............................................................................................... 12

*Talada v. City of Martinez*,
   656 F. Supp. 2d 1147 (N.D. Cal. 2009) ............................................................................... 17

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ................................................................................................................. 10

*Thompson v. Rahr*,
   885 F.3d 582 (9th Cir. 2018) ................................................................................................. 9

*Torres v. Madrid*,
   141 S. Ct. 989 (2021) ........................................................................................................... 15

*Trevino v. Gates*,
   99 F.3d 911 (9th Cir. 1996) ............................................................................................ 20, 21

*Tsao v. Desert Palace, LLC*,
   698 F.3d 1128 (9th Cir. 2012) ............................................................................................. 22

*United States v. Lockett*,
   919 F.2d 585 (9th Cir. 1990) .......................................................................................... 10, 13

vi

*Vaughn v. Parker*, No. 18-cv-2098,
  2019 U.S. Dist. LEXIS 179286 (S.D. Cal. Oct. 16, 2019) ............................................................ 25

*White v. Pauly*,
  137 S. Ct. 548 (2017) ............................................................ 16

*Wood v. Moss*,
  572 U.S. 744 (2014) ............................................................ 9

**Constitution**

U.S. Const. amend. IV ............................................................ 9

**Statutes**

42 U.S.C. § 1983 ............................................................ *passim*

Cal. Civ. Code 52 ............................................................ 9

Cal. Civ. Code 52.1 ............................................................ 9

**Rules**

Fed. R. Civ. P. 56 ............................................................ 1, 9

**Other**

Cal. Code Regs. tit. 11, § 1005 ............................................................ 2, 3, 4

Cal. Code Regs. tit. 11, § 1950 ............................................................ 2

**Introduction**

Plaintiff's theory in this lawsuit is that San Jose Police Officer James Adgar intentionally targeted and struck him with a projectile-impact weapon, and that the officer did so for no reason except that Plaintiff was attending a protest with hundreds of other people. The undisputed facts easily prove that theory false. Plaintiff has no reliable evidence that Officer Adgar fired the projectile that struck him. Regardless, the undisputed facts establish that if Officer Adgar did strike Plaintiff, he did so inadvertently while targeting a dangerous suspect throwing glass bottles at police. The Constitution does not punish police officers for accidents. Both Plaintiff's excessive-force and unlawful-retaliation claims require proof of an intentional use of force, and the latter requires in addition that expressive activity be the motivating factor for that force. Because the record is devoid of such proof, and particularly in light of the protections qualified immunity provides for an officer's good-faith mistakes of fact or law, Plaintiff's constitutional claims fail.

The record likewise forecloses Plaintiff's state-law claims. There, too, the relevant legal standards foreclose liability for unintentional force, particularly where (as here) that force was reasonable vis-à-vis its object—i.e., where there can be no dispute that it is reasonable for a police officer to target a suspect throwing glass bottles at police officers with a non-lethal foam baton so he stops his assaults. As several courts have held in analogous circumstances, such force is reasonable as a matter of law, even if the officer firing the round inadvertently strikes a nearby bystander.

Plaintiff's municipal liability claim fails because he can prove no underlying constitutional violation, and because the City of San Jose does not have a policy to allow excessive or retaliatory force against non-violent protesters. On the contrary, the facts are undisputed that the City explicitly prohibits retaliation and excessive force, trains police officers on how to use projectile-impact weapons and other force instruments, and trains police officers on how to respond properly to protests and other expressive events. Indeed, Plaintiff has no evidence that the City has ever had a policy to violate the rights of protesters. Certainly nothing about the City's training or policies could have caused the violation Plaintiff here claims: the intentional and wholly unwarranted use of a projectile against a person who had done nothing threatening. The City, like Officer Adgar, is entitled to judgment as a matter of law.

1

**Background**

The following are facts from the evidentiary record following the completion of discovery. Unless otherwise noted, all recited facts are undisputed.

**I.      San Jose Police Department policies and training on crowd control and the use of force**

The San Jose Police Department's ("SJPD") policies and training before May 30, 2020 regarding the use of projectile impact weapons ("PIW") and other force during crowd-control events were robust and specific. The policies were codified in the SJPD Duty Manual ("DM"), which all police officers were required to know. *See* Declaration of Lee Tassio, ¶ 4. The DM defined objectively reasonable force and prohibited police officers from using excessive force, whether in a crowd-control situation or any other. *Id.* ¶ 8. The DM also contained specific provisions regarding protests, riots, and other crowd-control scenarios. *Id.* ¶¶ 5-6. The DM cautioned police officers that protests and demonstrations are emotional events that require calmness and objectivity, and it explicitly mandated "equal treatment" of any "demonstrators" officers encounter. *Id.* ¶ 5.

Also included in the DM was an outline of the tools available to assist law enforcement in the difficult task of controlling violent crowds or preventing violence by individual crowd members. These tools, used by police officers across the country, include batons, oleoresin capsicum (OC) cannisters, teargas cannisters, and PIW. The PIW available to SJPD officers and outlined in the DM were the 37mm launcher ("37mm"), 40mm launcher ("40mm"), and beanbag shotgun.  *Id.* ¶ 9. The only tool at issue in this case is the 40mm. Unlike the 37mm and similar devices, the 40mm is intended to be used not for general crowd control but to target specific individuals. *See* Declaration of Mathew Pritchard, Ex. 5 (Sciba Dep.), 17:12-18:4; *id.* Ex. 6 (Dwyer Dep.), 170:18-172:21. The 40mm is used by firing a foam baton directly at a subject. *Id.* The DM provides that officers may not use the 40mm unless they have completed an approved training course on it, and it prohibits its use except to prevent serious injury. Tassio Dec. Ex. 2.

All law enforcement agencies in California must by law comply with the state's Peace Officer Standards and Training, or "POST," requirements. *E.g.*, Cal. Code Regs. tit. 11, § 1005. Any person in the state who wishes to become a police officer must be POST certified. *Id.* § 1950. Certification entails a rigorous course of training, particularly on issues related to the use of force. *See* Declaration of

2

Christopher Sciba, ¶¶ 4-8. Further, to maintain POST certification after it has been granted, officers must successfully complete continuing professionally training requirements every two years. *Id.* ¶ 4.

The SJPD's training program and requirements before May 2020 exceeded those prescribed by POST. *Id.* ¶ 6. All officers with SJPD were required to complete a 26-week Police Academy, which entailed approximately 976 hours of training. *Id.* Officers were taught about the definition and real-world meaning of objectively reasonable force, including the force appropriate in response to different levels of resistance. *Id.* ¶ 7. Officers were taught the proper way to use different force techniques, from the use of hands and control holds to batons, non-lethal weapons, and firearms. *Id.* ¶ 6. In addition to POST certification, SJPD officers were required to complete a four-hour course devoted specifically to the use of PIW. *Id.* ¶ 8. This special course taught officers how to use PIW properly, under what circumstances they are appropriate, and how best to minimize serious injury. *Id.*

Beyond what officers learned in the Academy, POST and SJPD required them to complete ongoing training. Sciba Dec. ¶¶ 4, 9. This training included many of the same topics on the use of force and other issues, including as part of a "defensive tactics update" every two years. *Id.* ¶¶ 9, 11. The defensive tactics updates covered the use of PIW. *Id.* ¶ 11. In addition, SJPD supplemented these trainings in 2018 by providing all police officers with a training video on the use of 40mm. *Id.* ¶ 10. The video discussed the effective range of 40mm projectiles, cautioned about the areas that should not be targeted, and warned of the risks 40mm PIW can pose. *Id.* The video also directed officers to the DM provisions governing PIW use. *Id.*

Police officers with SJPD were trained on crowd control and demonstrations before May 2020. Officers were taught at the Academy that they have a responsibility to protect every individual's right to free speech and assembly, regardless of the officers' own personal opinions or views. Tassio Dec. ¶ 12. The training involved both instruction and simulation exercises, and it covered dispersal orders, unlawful assembly definitions, and Ninth Circuit case law governing these concepts. *Id.* ¶ 13.

## II.     Violent and disruptive protest activity beginning on May 29, 2020

Following the May 25, 2020 death of George Floyd at the hands of Minnesota police officers, there were demonstrations across the country. Many of these demonstrations became violent and involved widespread looting and destruction of property. Commanding officers with SJPD were aware

3

of some of these events, but based on prior experiences in San Jose, they did not expect the same levels of violence or disorder to accompany any San Jose protest. *See* Declaration of Jason Dwyer, Ex. 1. Nevertheless, at 10:51 p.m. on May 28, 2020, Deputy Chief of Police David Tindall sent an email directing police officials to develop a plan to prepare for protest activity in San Jose. *Id*. The officials acted quickly to do so, creating an Incident Action Plan that was provided to commanding officers on May 29. *See id.* Ex. 2. The plan was intended "to ensure the safety of persons and property around the event," and it made clear that "[c]rowd management and protecting [F]irst [A]mendment rights of all involved is of the utmost importance." *Id.* (at p. SJ350063).

In the early afternoon of May 29, a protest crowd gathered near San Jose City Hall. *Id.* ¶ 5. Shortly after that, demonstrators began to take over streets near City Hall, blocking traffic and creating disorder. *Id.* At around 3:00 p.m., demonstrators walked onto Highway 101 amid moving traffic, creating a significant safety hazard and an incalculably large backlog of stranded motorists. *Id.*; Declaration of Daniel Morales, Ex. 1 (CAD Report p. SJ002808). Protesters jumped on motorists' vehicles, smashed their windows, and vandalized their cars. *Id.* (pp. SJ002810, SJ002834, SJ002839); https://www.ktvu.com/video/689432; *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 828 (N.D. Cal. 2019) (holding judicial notice of "publicly available news articles" is appropriate). California Highway Patrol deployed to respond to the violent crowd, intending to remove it from the highway, and requested aid from SJPD. Dwyer Dec. ¶ 5. A group of SJPD officers were deployed to the area to assist. *Id.* The officers were subjected to immediate assaults. Morales Dec. Ex. 1 (pp. SJ002839-40). Members of the crowd threw rocks, bottles, and other objects at them. *Id.* The window of at least one police vehicle was smashed. *Id.* (pp. SJ002840-41).

Finally, at 4:31 p.m., SJPD declared the violent crowd an unlawful assembly and continuously ordered it to disperse. *Id.* (p. SJ002842). All such orders were largely ignored. Dwyer Dec. ¶ 6. Police officers formed a line near Santa Clara and Eighth and Ninth Streets to effect dispersal. *Id.* Almost immediately after officers formed their line, however, the crowd of protesters rushed up to it, shouting and throwing bottles, rocks, and other objects. *Id.* Around that same time, a protester punched an officer in the police line in the face and knocked him unconscious. *Id.*

Officers tried a variety of measures to control the crowd and stem further violence from it, but

none was availing. The SJPD took the extraordinary step of broadcasting a "Code 30," which calls for all law enforcement agencies in the area to assist. *Id.* ¶ 10. The Code 30 also directs the deployment of as many SJPD officers as possible. *Id.* Numerous agencies responded, including over a hundred officers from the Santa Clara County Sheriff's Office and the Santa Clara Police Department. *Id.* These officers were, like SJPD, equipped with PIW. *Id.* Protesters continued to assault police officers with bottles, rocks, mortars, hammers, and other debris. *Id.* ¶ 8. Members of the protest started fires, including of dumpsters and furniture. *Id.* ¶ 9. A police motorcycle was disabled by a claw hammer. Morales Dec. Ex. 1 (p. SJ002860).

The unlawful assembly continued into the late evening on May 29. Contingents of the unlawful assembly moved to different areas, including a larger group that took over Plaza de Cesar Chavez Park near City Hall and set a number of trash cans there on fire. Dwyer Dec. ¶ 11. Late in the evening, after many hours of dispersal efforts, most unlawful assembly members finally dissipated, leaving an aftermath of fires, graffiti, and property damage. *Id.* Ex. 3.

### III.   Protest activity and violence continue on May 30

The following day again saw significant protest activity accompanied by violence and assaults from the crowd. At a briefing before officers started their shifts, commanders reminded them of their training and obligations regarding the use of PIW, and the importance of professionalism when dealing with protesters. *See* Pritchard Dec. Ex. 6, 92:2-93:20. Further, SJPD attempted to forestall some of the significant issues from the day before by preemptively placing police lines in the area of City Hall and designating specific arrest teams to remove lawbreakers. *Id.* 99:18-101:10, 114:7-25. Some of the officers that were part of the police line were equipped with 40mm PIW. Pursuant to SJPD policy and training, these officers were only to use their 40mm only to prevent serious injury. *Id.* 172:22-174:8. In the context of the protest, that meant using the device largely to target individuals throwing objects at police officers. *Id.* 170:18-172:21.

Once again, protesters on May 30 moved toward the police lines shortly after they were formed and assaulted police. Officers observed and were informed of some protesters handing out frozen water bottles to be launched at officers. Morales Dec. Ex. 1 (p. SJ025732). At least one protester used a potato gun to launch objects at police. *Id.* (p. SJ025743). At around 7:00 p.m., protesters lit a nearby

dumpster on fire. *Id.* (p. SJ025730). At 7:17 p.m., SJPD declared an unlawful assembly and ordered the crowd to disperse. *Id.* Ex. 2. Officers continued to declare the unlawful assembly as the night progressed, including one at 9:19 p.m. *Id.* Ex. 3 (sample officer body-worn camera footage depicting unlawful assembly announcement following objects thrown from the crowd).

As nighttime approached, the crowd of protesters around City Hall fluctuated between about 200 to 300 people. *See* Declaration of Jonathan Byers, ¶ 3. The protesters' continued assaults on police often appeared random, but after 10:00 p.m., protesters launched two coordinated volleys of objects— rocks, bottles, and other dangerous objects—at the line of officers facing City Hall. *Id.*; Adgar Dec. Ex. 3. The first of these volleys occurred around 10:24 p.m., the second around 10:33 p.m. *Id.* After each of the two coordinated volleys, officers responded by targeting the specific individuals they saw throw objects with their PIW. *Id.*; Byers Dec. ¶ 3.

Officer James Adgar was among the officers lined up in front of City Hall to contain the crowd and prevent it from violently taking over the downtown area. Officer Adgar had manned a police line the day before and witnessed the significant violence from protesters that occurred, including through the launching of dangerous objects. Adgar Dec. ¶ 4. Officer Adgar was himself struck by a glass bottle that shattered on his body. *Id.* Officer Adgar was equipped with a 40mm on May 30. *Id.* ¶ 5. As required by SJPD policy, Officer Adgar had been specifically trained on the 40mm before the Department issued it to him, which training included a "range packet" with details about the proper use of the PIW. *Id.* ¶ 2; *id.* Ex. 1. He was also up-to-date with his ongoing training, having completed a defensive tactics course in 2019. Sciba Dec. ¶ 12. Consistent with policy, and his training, Officer Adgar never used his 40mm except to target individuals in the crowd who had been or were in the process of throwing dangerous objects at police officers. Adgar Dec. ¶ 5. There were three such assaultive suspects at whom Officer Adgar directed his 40mm on May 30, and the officer documented the circumstances of each in a police report. *Id.* ¶¶ 5-8; *id.* Exs. 2 & 3 (report and camera footage).

The first discharge was at a man Officer Adgar witnessed climbing onto an elevated ledge and throwing a glass beer bottle at officers. *Id.* The man was heavyset and possibly Hispanic, with a black sweatshirt an black shorts. *Id.* This man threw the beer bottle simultaneously with other protesters throwing objects in the area. *Id.* Immediately after the man threw the bottle, Officer Adgar fired his

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0511**

40mm at the suspect's leg and appeared to succeed in striking him. *Id.* The foam baton did not stop the suspect from running away and hiding in the crowd, however, so Officer Adgar was unable to keep track of him. *Id.* The second time Officer Adgar used his 40mm was when protesters again threw bottles and rocks at officers. *Id.* Officer Adgar was able to see one of these people—again a man in all black clothing—when he threw a glass bottle. *Id.* Officer Adgar fired his 40mm at the man, but he was unable to see whether it was effective and again lost track of the man in the crowd. *Id.* Officer Adgar's third discharge of his 40mm likewise involved a suspect who had thrown a glass bottle at officers. *Id.* This time, the suspect was a blond woman with a skateboard. *Id.* Officers were chasing her and telling her to get on the ground when Officer Adgar fired at her. *Id.* As with the other 40mm discharges that night, the 40mm did not prevent the suspect from fleeing, and officers were unable to arrest her. *Id.*

**IV.    Plaintiff Johnson attends the protest on May 30 and is struck in the leg with an object**

Plaintiff Johnson decided to attend the protest on May 30. He was aware of the widespread disorder and destruction in the City from protesting the day before and was "disappoint[ed]" about it, but he elected to join the protest in downtown San Jose nevertheless. *See* Pritchard Dec. Ex. 4 (Johnson Dep.), 70:11-71:9, 75:25-76:6. After his girlfriend dropped him off nearby, Plaintiff walked to City Hall with an acquaintance. *Id.* 82:23-83:3, 85:15-86:14. He arrived within ten minutes of 9:00 p.m. and joined the crowd there. *Id.* 86:19-87:14. This was about 19 minutes before SJPD broadcasted the unlawful assembly and dispersal order over a loudspeaker at 9:19 p.m., meaning that Plaintiff was necessarily in front of City Hall when it was issued. *See* Morales Dec. Ex. 3.

Sometime after 10:00 p.m., Plaintiff was standing in City Hall plaza when he saw a person throw a bottle at police officers. This was the first time Plaintiff saw any person throw any object at police officers from the time he arrived at City Hall near 9:00 p.m. Pritchard Dec. Ex. 4, 103:1-7. Up to that point, Plaintiff also did not see any police officer use a PIW. *Id.* 105:1-19. Immediately after a protester threw this water bottle, Plaintiff testified that he saw what he thought was tear gas, accompanied by loud explosions. *Id.* 109:16-23. Plaintiff then turned away from the police line to walk away, and within a few seconds of turning around, he felt something strike his leg. *Id.* 103:13-17, 104:19-105:6, 117:20-25. He did not see any police officer shoot a projectile at him, did not see what struck him, and did not recover any object he suspected struck him. *Id.* 119:17-19, 122:14-17.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0512**

In written discovery and at his deposition, Plaintiff was asked to identify the time and place he was struck by an object using camera footage captured throughout the evening of May 30. Pritchard Dec. Ex. 1 (Interrog. Resp. 11). This included police-officer body-worn camera ("BWC") footage, which displays the exact time of any events it depicts in the upper right-hand corner. Plaintiff identified seven segments of BWC footage as showing the moment he was struck by an object. *Id.* But when Plaintiff was shown all seven of these segments at his deposition, he was unable to identify himself and testified he could not be seen getting struck by a projectile in any of them. Pritchard Dec. ¶ 4; *id.* Ex. 3, 128:13-164:8. The video segments Plaintiff identified in written discovery were, moreover, inconsistent—he claims he was struck with an object only once, yet he identified videos depicting police using PIW during two different time periods, one at 10:24 p.m. (the time of the police response to the first protester volley) and the other at 10:33 p.m. (the time of the second volley). *See id.*

Plaintiff was asked to clarify this at deposition. *Id.* He testified he was in fact struck during the first of these, i.e., at around 10:24 p.m. *Id.* 146:22-150:7, 155:24-156:24, 157:20-22, 158:4-159:1. He believed this because a woman in the BWC footage calls out the throwing of a bottle immediately after officers used their PIW at 10:24, which Plaintiff specifically recalled as consistent with what he experienced. *Id.* 149:17-150:7, 156:16-24. This is also consistent with Plaintiff's unequivocal assertion that he was struck after the first bottle was thrown and during the first instance in which police used their PIW—i.e., the first coordinated volley and police response at 10:24 p.m. *Id.* 105:1-19.

Despite this clear testimony, Plaintiff has hired a videographer who opines that Plaintiff was actually struck after officers responded to the *second* volley of bottles—at 10:33 p.m—which in turn leads the videographer to conclude that Officer Adgar fired the projectile he believes hit Plaintiff. Pritchard Dec. Ex. 2. Although no video depicts Plaintiff being struck by an object, and although Plaintiff testified that he was struck after the first volley of objects was thrown at officers at about 10:24 p.m., the videographer only considers the police response to the second volley, at around 10:33 p.m., as the time within which Plaintiff could have been struck. *Id.* at 8. The videographer then finds certain frames where Plaintiff appears before the police use of force at 10:33 p.m. and, based on the direction Plaintiff can be seen walking in those frames, purports to pinpoint where Plaintiff would have been standing sometime later, at which point the videographer assumes Plaintiff would have been hit.

8

*Id.* at 15-16. Having divined the location and time Plaintiff was struck, the videographer then analyzes the different angles from which police officers using PIW appear to fire around that time, and concludes based on this analysis that Officer Adgar fired a projectile that struck Plaintiff. *Id.* at 17.

<u>Argument</u>

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants bear the initial burden to show there is no genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Defendants need only highlight the absence of evidence supporting Plaintiff's claims to obtain summary judgment. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Plaintiffs must then identify admissible evidence establishing a material issue for trial. Fed. R. Civ. P. 56(c), (e).

Plaintiff's operative Second Amended Complaint alleges five claims against Officer Adgar and the City of San Jose: under 42 U.S.C. § 1983 for (1) excessive force in violation of the Fourth Amendment and (2) unlawful retaliation under the First Amendment; and under state law for (3) violation of the California Bane Act (Cal. Civ. Code 52.1 & 52), (4) battery, and (5) negligence.

**I.      Officer Adgar is entitled to judgment as a matter of law on Plaintiff's § 1983 claims**

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Because Plaintiff brings his claim against Officer Adgar in his individual capacity as a government official, the doctrine of qualified immunity applies. That doctrine "protects government officials from liability for civil damages unless a plaintiff [proves] (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (cleaned up). The Court analyzes these questions in "two distinct steps," though it may do so "in either order." *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Both are "questions of law." *Id.*

**A.  The undisputed facts preclude Plaintiff's Fourth Amendment claim**

The Fourth Amendment is not a proscription against all unreasonable law-enforcement conduct; it is concerned only with unreasonable "seizures." U.S. Const. amend. IV. Thus, to establish a Fourth

9

Amendment violation, a plaintiff must prove two things: (1) that he was intentionally seized, and (2) that the seizure was unreasonable. *E.g.*, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

A person subject to law-enforcement force is only seized within the meaning of the Fourth Amendment when a police officer *intentionally* applies the force against that person for the purpose of "taking possession" of him. *California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("From the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'"); *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("[A] Fourth Amendment seizure . . . [occurs] only when there is a governmental termination of freedom of movement *through means intentionally applied*."). Thus, by definition, a person whom police officers unintentionally or accidentally subject to force while attempting to detain another has not been seized. *See Brower*, 489 U.S. at 596 ("[T]he Fourth Amendment addresses misuse of power, not . . . accidental effects . . . .") (cleaned up); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) ("[A]n innocent bystander struck by a stray bullet . . . would not have [a Fourth Amendment] claim."). Rather, the plaintiff must have been the intended target of the force, and the force must have been used with the purpose of effecting an actual seizure.

Plaintiff's excessive force claim here turns on his allegations that "Officer Adgar aimed and intentionally fired" a 40mm foam baton that struck his leg on May 30, and that the officer did so without the "ability to [] arrest" Plaintiff. Dkt. 73, ¶ 29; Dkt. 79 (Pltf's Opp. to Mot. to Dismiss), p.10. Those allegations are false, as the undisputed facts make clear, and Plaintiff's claim against Officer Adgar fails for four independent reasons. First, Plaintiff cannot prove on this evidentiary record that Officer Adgar fired a projectile that struck him. Second, the facts are undisputed that *if* Officer Adgar's projectile struck Plaintiff, it was an accident that occurred while the officer targeted another person, and such accidental force against a bystander can never constitute a Fourth Amendment seizure. Third, Plaintiff explicitly predicates his claims on the theory that Officer Adgar was not attempting to seize him with his use of the PIW. Thus, even if Plaintiff could prove Officer Adgar purposefully struck him, Plaintiff's own allegations and theory would show the relevant force was intended not to restrain but to repel, thus precluding any Fourth Amendment claim. Fourth, even if Plaintiff could establish an unreasonable seizure, no clearly established law put Officer Adgar on notice that his conduct was unlawful, so qualified immunity precludes Fourth Amendment liability against him.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0515**

### *1. Plaintiff cannot prove that Officer Adgar fired a projectile that struck him*

"In a § 1983 action, the plaintiff must [] demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). To make this showing, "the plaintiff must establish both causation-in-fact and proximate causation." *Id.* Thus, a person who alleges a particular defendant is liable under § 1983 for an injury resulting from excessive force must prove that that particular defendant used the force alleged to cause that injury. *See id.*; *see also Sanchez v. City of Atherton*, No. 22-cv-03106-JSW, 2023 U.S. Dist. LEXIS 3763, at *9 (N.D. Cal. Jan. 9, 2023) (rejecting theory that plaintiff struck by projectile at protest was "entitled to seek relief for his injury from officers [who] were present at the demonstrations even though he cannot identify which . . . caused his injury").

Plaintiff cannot satisfy this basic causation element of his § 1983 claim. According to Plaintiff's allegations and testimony, he did not throw a glass bottle or other object in the direction of police at any point during May 30. Yet Officer Adgar has testified that he used his 40mm to fire only upon three different individuals, all of whom had thrown objects at police officers, and none of whom had a physical appearance similar to Plaintiff. There is no fact in the record to dispute Officer Adgar's testimony that he fired only at people who were not Plaintiff. On the contrary, there is substantial video evidence depicting the exact circumstances in which Officer Adgar fired his 40mm. That video evidence shows Officer Adgar fired the device in exactly three different incidences: first at a suspect at 10:24 p.m.; then at another suspect at 10:33 p.m.; and once more at a final suspect at about 10:34 p.m. Each time Officer Adgar fired, it was immediately after one of the two coordinated volleys from protesters that precipitated multiple officers firing at the same time. These facts leave no dispute that Officer Adgar fired in response to objects being thrown at police, and that his 40mm rounds were directed at the people responsible for those objects—none of whom, according to Plaintiff's testimony and corroborating evidence concerning his appearance, could have been Plaintiff.

Plaintiff can offer no evidence to the contrary. Neither Plaintiff nor any other witness purports to have witnessed Officer Adgar (or any other police officer, for that matter) fire a PIW at Plaintiff. Likewise, no video evidence on record shows Plaintiff being struck by a police projectile, much less a projectile that Officer Adgar fired. In lieu of such competent evidence, Plaintiff can point only to the

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0516**

opinion of his hired videographer, whom Plaintiff proffers as an expert. But an expert's opinion "cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir. 2019). As noted, the videographer's opinion that Officer Adgar struck Plaintiff relies on two main assumptions. The first is that Plaintiff was struck sometime around 10:33 p.m. The second, which is a predicate of the first, is that Plaintiff maintained his exact path of travel following a brief sighting of him on camera, which in turn would have put him in an area where Plaintiff's videographer thinks Officer Adgar's PIW was aimed at 10:33. Both assumptions are unsupported by the facts.

First, the only evidence on record is that Plaintiff was struck at 10:24 p.m. (presumably at an altogether different location), not 10:33. Plaintiff so testified. He also testified without reservation that he felt the object strike his leg after the first bottles were thrown, and that this was the first time since 9:00 p.m. officers ever used their PIW, which was at 10:24 p.m. Plaintiff was sure about this fact, testifying that he never left City Hall plaza after arriving, and that "if [officers used their PIW] by the time I was there, then I would have seen it." *See* Pritchard Dec. Ex. 4, 105:11-106:8. Yet Plaintiff's videographer did not even consider the possibility that Plaintiff was struck at the time he indicated in testimony. This is the essence of an "assumption[] that [is] not supported by evidence." *Id.*

Likewise unwarranted is the videographer's assumption that Plaintiff was at a particular location corresponding to where Officer Adgar aimed his 40mm at 10:33. The last Plaintiff can be seen in any video on record is on a City Hall security camera, which shows him at a location some distance away from the spot where the videographer puts him at the time of Officer Adgar's shot. Yet based only on the fact that Plaintiff was walking in a particular direction in the last frame where he appears, the videographer purports to pinpoint Plaintiff's exact later location in a chaotic and ever-moving crowd, which location happens to be in the area where Officer Adgar seems to have been aiming. Such unsupported leaps of deduction at odds with Plaintiff's own testimony, and such transparent reasoning backward from a preconceived conclusion, cannot create a genuine fact dispute. Because the record lacks evidence establishing that Plaintiff was struck by a projectile from Officer Adgar, he cannot prove the causation element of his claim, and it fails at the outset.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0517**

### 2. *Plaintiff was not the deliberate object of Officer Adgar's force and so was not seized*

The federal circuit courts are "unanimous" in holding that "bystanders inadvertently harmed by state force" directed at another are not seized and so cannot "assert Fourth Amendment claims." *See Napper v. Hankison*, No. 3:20-cv-764, 2022 U.S. Dist. LEXIS 134182, at *60-61 (W.D. Ky. July 28, 2022) (collecting decisions from every circuit). This includes the Ninth Circuit, which held in *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) that "an innocent bystander struck by a stray bullet from [an] officer's weapon would not have [an excessive force] claim." *See also, e.g.*, *Hernandez v. City of Los Angeles*, No. 2:19-cv-00441, 2021 U.S. Dist. LEXIS 259913, at *19 (C.D. Cal. Dec. 24, 2021) ("[T]here is no Fourth Amendment claim when the plaintiff is accidently injured during the seizure of a third party.") (citing *Lockett*) (cleaned up). This follows as a matter of logic—since the Fourth Amendment proscribes only intentional uses of force, force that inadvertently results in injury to a third party cannot fall within the Amendment's ambit. *E.g.*, *Brower*, 489 U.S. at 596.

Here, there is no genuine dispute that in all three documented instances where Officer Adgar fired his PIW, he did so to target a specific suspect who had engaged in assaultive conduct toward police officers—*not* Plaintiff. Officer Adgar made these facts clear in a contemporaneous police report documenting each of his PIW uses and describing the individuals targeted, in his testimony at deposition doing the same, and in a sworn declaration. The record thus precludes Plaintiff's outlandish allegation that Officer Adgar "intentionally aimed" and fired at Plaintiff despite Plaintiff having done nothing threatening or assaultive. Dkt. 73, ¶ 29. There is simply no basis for that allegation, and no rational factfinder could find so nefarious a motive on the undisputed facts.

All of which means that if Officer Adgar fired a projectile that struck Plaintiff, his striking of Plaintiff was plainly an accident. And the Constitution does not punish police officers for accidents. Just as with a "stray bullet," a stray projectile's hitting a bystander cannot constitute a seizure. *Lockett*, 919 F.2d at 590 n.4. So it cannot form the basis for a Fourth Amendment claim. *See id.*

Case law illustrates the point. In *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937 (E.D. Cal. 2011), a police officer shot the plaintiff while she standing next to a third party. The officer testified that he intended to shoot the third party after he fled from officers and reached toward his waistband, and that one of his two shots struck plaintiff, who was standing immediately next to the third party, by

13

accident. *Id.* at 943, 948. The plaintiff, however, argued that the officer shot her intentionally, and she even filed a declaration asserting her belief to that effect based on her "proximity, position and physical contact" with the third party. *Id.* at 947. The court granted summary judgment to the officer. *Id.* at 948. The court first reaffirmed that "a person can only be seized for Fourth Amendment purposes if that person was the 'deliberate object' of the exertion of force intended to terminate freedom of movement." *Id.* at 946. Turning to the plaintiff's argument that the officer shot her "intentionally," the court noted that the officer's "actions were 'intentional' only in the sense that [he] volitionally drew his side arm, aimed at what he thought was [the third-party suspect], and volitionally pulled the trigger." *Id.* at 947. But "such volitional action is not sufficient" under the Fourth Amendment, the court held. *Id.* Because the facts revealed that the officer "had no reason, expressed or conjectural, to seek to restrain Plaintiff," the record left no dispute that she was not seized. *Id.* at 948. This was true, the court noted finally, even if there were facts in dispute about the threat level the third-party suspect posed. *See id.*

Likewise on point is the district court's decision in *Lopez v. City of Santa Maria*, No. CV13-7287, 2016 U.S. Dist. LEXIS 9741 (C.D. Cal. Jan. 26, 2016). There, as in this case, a police officer discharged his weapon at a dangerous suspect and inadvertently struck the plaintiff, who was standing next to the suspect, in the leg. *Id.* at *11-13. The plaintiff alleged this use of force violated the Fourth Amendment, but the court rejected that claim. In a detailed and thoughtful analysis of applicable Fourth Amendment principles, the court held that for a seizure to occur, "the individual against whom the force was applied must have been the object of the detention or taking." *Id.* (cleaned up). Thus, because no jury could "conclude that [defendant] intentionally shot plaintiff, there was no seizure within the meaning of the Fourth Amendment." *Id.* at *24.; *see also Kong Meng Xiong v. City of Merced*, 2015 U.S. Dist. LEXIS 99146 (E.D. Cal. July 29, 2015) (granting summary judgment to officers who inadvertently shot plaintiff, situated behind a fence where the intended target exited, because "even [if] officers heard people arguing over the fence and knew that there may have been others behind [it], there is no evidence they intentionally shot at anyone other than [the suspect]"); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (finding that where the police deployed OC spray on the first floor of a two-story building, none of plaintiffs on the second floor who suffered secondary exposure were seized, as they were not among those officers targeted with the OC).

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

ER0519

Taking as true Plaintiff's representations that he did nothing assaultive on May 30, Officer Adgar "had no reason, expressed or conjectural, to" fire his 40mm at him. *Rodriguez*, 819 F. Supp. 2d at 948. And the officer has made clear he would never have done so. The record leaves no dispute that Officer Adgar never intentionally used force against Plaintiff, meaning Plaintiff was not intentionally seized as a matter of law. This is an independent reason why his Fourth Amendment claim fails.

### 3. Plaintiff's own allegations and theory are that Officer Adgar had no intent to seize

In *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021), the Supreme Court reaffirmed the basic principle that a "seizure requires the use of force with intent to restrain, as opposed to force applied . . . for some other purpose." *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021). Thus, the mere fact that a police officer uses force against a person cannot, in itself, establish a seizure. *Id.* The relevant Fourth Amendment question "is whether the [force used] objectively manifests an intent to restrain." *Id.*; *see also Brower*, 489 U.S. at 596 (holding that to constitute a seizure, a "detention or taking [of a person by police] must be willful"). Moreover, to prove a seizure based not on the submission to a show of authority but on the mere fact that force was used, the plaintiff must establish this objective intent to restrain "unambiguous[ly]." *Jackson-Moeser v. Armstrong*, 765 F. App'x 299, 299 (9th Cir. 2019) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)); *Sanderlin v. City of San Jose*, No. 20-cv-04824-BLF, 2023 U.S. Dist. LEXIS 44551, at *26 (N.D. Cal. Mar. 16, 2023) (Freeman, J.) (holding that a plaintiff not relying on the theory that she reasonably "believed" based on a police show of authority "that [she was] not free to leave" must prove "'an unambiguous intent to restrain'").

Here, much of Plaintiff's argument for why Officer Adgar's use of force was unconstitutional turns on the theory that he fired his PIW "without an apparent ability to make an arrest." Dkt. 79, p.10. That theory is false—had the assaultive suspects targeted with Officer Adgar's 40mm not fled and hid in the crowd, nothing would have stopped him from arresting them. But more important is that for purposes of Plaintiff's Fourth Amendment claim, his theory directly precludes the argument that Officer Adgar unconstitutionally seized him. For if true, the theory would mean that the objective circumstances surrounding Officer Adgar's use of force did *not* show and "unambiguous intent to restrain." *Jackson-Moeser v. Armstrong*, 765 F. App'x at 299. Rather, they objectively evinced the opposite: an intent to repel assaultive suspects and deter them from remaining in the area to continue

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0520**

throwing things at officers. Under Plaintiff's own arguments, then, Officer Adgar's force did not constitute a seizure, which is a third and independent reason Plaintiff's Fourth Amendment claim fails. *See id.*; *Quraishi v. St. Charles County*, 986 F.3d 831, 840 (8th Cir. 2021); *Martinez v. Sasse*, 37 F.4th 506, 510 (8th Cir. 2022) (rejecting argument that there is "a constitutional distinction between force used for repulsion that momentarily restricts forward movement and force used for dispersion," and holding that the latter cannot constitute a seizure); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 48 (D.D.C. 2021) (dismissing excessive force claim because "the officers [using teargas, rubber bullets, and similar projectiles] dispersed the protesters—they did not restrain them or attempt to seize them in place").

### 4.   Qualified immunity prohibits Fourth Amendment liability under the undisputed facts

Once qualified immunity is pleaded as a defense, "the burden is on the plaintiff to prove" the violation of a clearly established right. *Isayeva v. Sacramento Sherriff's Dept.*, 872 F.3d 938, 946 (9th Cir. 2017); *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019). "For a right to be clearly established . . . existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). A plaintiff cannot define the asserted right "at a high level of generality," lest he "convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id*. (cleaned up). Instead, a plaintiff "must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officials] *in this case* that *their particular conduct* was unlawful." *Sharp v. County of Orange,* 871 F.3d 901, 911 (9th Cir. 2017); *Wesby*, 138 S. Ct. at 590 (holding that right must be defined with "a high 'degree of specificity'"). Courts in this circuit in particular have been the object of pointed admonitions by the Supreme Court to take qualified immunity more seriously, particularly in Fourth Amendment matters. *See City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015); *S.B. v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) (discussing the need to "heed [the Supreme Court's] holdings" and avoid the "misstep[]" of denying qualified immunity except as to the "'plainly incompetent' officer").

Qualified immunity also protects a police officer's reasonable and good-faith mistakes of fact.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0521**

*Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) ("Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (cleaned up); *Estate of Strickland v. Nevada County*, No. 22-15761, 2023 U.S. App. LEXIS 13370, at \*11 (9th Cir. May 31, 2023). Thus, if a police officer's use of force results from a good-faith mistake concerning the object of the force or the amount of force necessary in a given circumstance, he may not be held liable. *See id.*; *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1321 (9th Cir. 1995) (holding that the "reasonableness of [police] officers' conduct is tested by objective good faith under the circumstances"); *Talada v. City of Martinez*, 656 F. Supp. 2d 1147, 1158 (N.D. Cal. 2009) (holding that a police officer who makes a mistake of fact in identifying a suspect but who acts in "good faith should not have to fear litigation or monetary damages if their conduct is objectively reasonable under the circumstances").

Here, given the utter absence of any evidence that Officer Adgar intentionally fired upon and struck Plaintiff with a projectile, it is hard to imagine what case Plaintiff could point to in endeavoring to show the officer violated a clearly established right. Even if Plaintiff could prove Officer Adgar was responsible for a projectile that struck Plaintiff, no precedent would have put Officer Adgar on notice that the inadvertent or mistaken striking of a bystander violated the Fourth Amendment. That is, no case has ever found a police officer liable for excessive force based on his inadvertently striking an innocent bystander while firing a non-lethal foam baton round at a suspect who has committed felony assault on police officers. On the contrary, every circuit has held that such an accident does *not* constitute a Fourth Amendment seizure and so cannot be the basis for excessive force liability. *E.g.*, *Napper*, 2022 U.S. Dist. LEXIS 134182 at \*60-61 (surveying applicable case law). Thus, even if it were found that Officer Adgar struck Plaintiff with his 40mm by mistake, he would be entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

### B. The undisputed facts preclude Plaintiff's First Amendment claim

Plaintiff's First Amendment retaliation claim requires him to prove (1) he was "engaged in a constitutionally protected activity," (2) Officer Adgar's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) "the protected activity was a substantial or motivating factor in [Officer Adgar's] conduct." *Index Newspapers LLC v. United States*

17

*Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).  Plaintiff's retaliation claim fails for several reasons. First, as established above, *supra* Section I.A.1., Plaintiff cannot prove that Officer Adgar used force on him at all and therefore cannot prove the causation element of § 1983. Second, also as established above, *supra* Section I.A.2, even if Plaintiff could prove Officer Adgar's projectile struck him, the undisputed facts are that Plaintiff was not the deliberate object of that force. By definition, Officer Adgar's force cannot have been motivated by retaliatory animus against Plaintiff if the officer did not even know or intend Plaintiff to be the object of that force.

Third, and finally, even if Plaintiff could prove Officer Adgar intentionally used force against him, the undisputed facts foreclose the inference that Plaintiff's expressive activity had anything to do with that force. Completely absent from this record is any evidence that Officer Adgar said or did anything to Plaintiff leading up to the time of his force. Plaintiff can proffer no fact to show Officer Adgar told Plaintiff he was not allowed to express any particular idea or message, or somehow expressed "opposition to [Plaintiffs'] speech" at the protest. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1045 (9th Cir. 2017) (noting the types of cognizable "[c]ircumstantial evidence" that "can create a 'genuine issue of material fact on the question of retaliatory motive'"). Nor can Plaintiff show that Officer Adgar struck him with a projectile near in time to hearing or perceiving any expressive message Plaintiff communicated. *See id.* (noting that such temporal proximity is generally required to establish retaliation). Indeed, Plaintiff did not even engage in any speech or expressive activity outside his mere physical presence at a political demonstration.

Against this void of evidence suggesting retaliatory animus is the undisputed context in which Officer Adgar's force occurred: immediately after protesters in the crowd of which Plaintiff was a part targeted police officers by throwing objects at police officers in two coordinated volleys. In other words, the record leaves no doubt as to the obvious, and obviously legitimate, law-enforcement purpose of Officer Adgar's force. There is simply no evidentiary basis for assuming some other motive.

To uphold Plaintiff's claim, a factfinder would have to conclude that for reasons unknown, and unknowable, Officer Adgar decided to risk his career and violate his ethical duties by targeting Plaintiff with wholly punitive force for no reason other than that Plaintiff was standing with 200-300 other people expressing the exact same "message" and doing the exact same thing. To call such a conclusion

18

speculative would be an understatement. No rational jury could infer the requisite retaliatory animus by Officer Adgar on this factual record. Such a finding would be baseless and subject to judicial vacatur as a matter of law. Officer Adgar is entitled to summary judgment on Plaintiff's First Amendment claim.

**II.      The City is entitled to judgment as a matter of law on Plaintiff's § 1983 claims**

A municipal entity cannot be sued as a "person" under § 1983 unless an "official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). This means "a municipality cannot be made liable by application of the doctrine of *respondeat superior*" for the constitutional violations of its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). Rather, a plaintiff must show that the municipality itself caused a constitutional violation through a policy set by its "properly constituted legislative body" or by "officials whose acts or edicts may fairly be said to represent official policy." *Id.* at 480 (internal quotations omitted). "A 'policy' consists of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's policymaking] officers." *Lozano v. County of Santa Clara*, No. 19-CV-02634, 2019 WL 6841215, at *17 (N.D. Cal. Dec. 16, 2019).

Plaintiff's theory of *Monell* liability here is that the City can be held liable for an employee's alleged violation of the First and Fourth Amendments through a single use of force on a single instance. Plaintiff must therefore prove (1) Officer Adgar intentionally used excessive force and retaliated against him; and (2) that an official City of San Jose policy caused each of those constitutional violations. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001). As established, *supra* Argument Section I, Plaintiff cannot on this record prove that Officer Adgar violated his First and Fourth Amendment rights, so his *Monell* claim fails at the outset. *Id.* The claim fails for the additional reason that the City of San Jose had no official policy on or before May 30, 2020 to cause or allow excessive force or speech-based retaliation by law enforcement.

As can best be determined from the docket, Plaintiff asserts three *Monell* theories: unconstitutional custom and practice; a failure to train and supervise; and ratification. None has merit.

**A.  The City did not have a custom and practice of excessive force or retaliation**

To prevail on the theory that the City had a custom and practice of violating the Constitution, Plaintiffs must prove "the existence of a widespread practice" in San Jose that "is so permanent and

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0524**

well settled as to constitute a 'custom or usage' with the force of law.'" *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom . . . must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy [in the city]."). The terms "longstanding," "well settled," and "permanent" in these formulations are not verbal filler. They define an essential element of any custom-and-policy claim. As the Ninth Circuit put it, "[t]he series of qualifiers in this definition [of a *Monell* custom or practice]— 'permanent,' 'widespread,' 'well-settled,' and 'standard operating procedure'—emphasize that a practice must be pervasive and of significant duration." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011). Were it otherwise, liability for a custom and practice would "collapse into *respondeat superior*." *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 434 (1997).

It is difficult to discern the precise nature of Plaintiff' custom-and-practice theory here, or how it could fit within this framework. In his pleading, Plaintiff devotes most allegations concerning policy to issues such as "skip[-]fire munitions," "multi-target munitions," and "kettling." *See* Dkt. 73 ¶ 38. But Plaintiff does not claim he was struck with a "skip[-]fire" or "multi-target" munition, and he certainly was not "kettled," so these allegations are irrelevant. Plaintiff also devotes considerable ink to the argument that the City has a "permanent and well settled [sic] . . . history" of "discrimination towards people of color" during protests. But Plaintiff has not asserted an equal protection claim or otherwise alleged he was targeted based on race. So, again, it is unclear why Plaintiff would include such (factually unsupported) assertions, apart perhaps from the desire to grab headlines.

Plaintiff's claim is, rather, that a police officer fired a 40mm at him[1] based only on his presence at protest. That is, Plaintiff does not claim Officer Adgar violated the Constitution by accidentally hitting him with the 40mm while targeting suspects engaged in felony assaults (nor could, consistently with controlling case law); he instead claims the officer violated the Constitution by *intentionally* and without cause *targeting him*. So, to prevail on a custom-and-practice theory, Plaintiff must prove *this* type of egregious conduct has a longstanding and permanent place in San Jose police practices. In other

---

[1] Plaintiff does not allege any other force was used against him, and he has not identified any other use of force that affected him in discovery responses. *See* Pritchard Dec. Ex. 3 (Interrog. Resp. 17).

20

words, Plaintiff must prove that it has long been the City's "standard operating procedure" to permit police deliberately to target non-violent protesters with 40mm foam baton strikes for no reason other than that they were expressing a political message. *See Trevino*, 99 F.3d at 918.

Plaintiff has no evidence of such a history or culture within the SJPD. On the contrary, the record amply demonstrates that SJPD policy is the exact opposite. Before May 2020, the City explicitly prohibited differential treatment of any person based on speech, viewpoint, or any other protected basis, and SJPD policy made clear that the First Amendment rights of demonstrators must be safeguarded. The City's policies further prohibited excessive force and specified that 40mm PIW could only be used by trained officers and only under limited conditions—i.e., to target suspects who presented a direct threat of serious injury, such as by assaulting police officers. On the other side of the equation, Plaintiff has no evidence of a single instance in which a non-violent person has been shot with a 40mm based only on his presence at a protest, much less a widespread pattern of multiple police officers committing such a violation of SJPD policy without consequence. *See id.* Plaintiff cannot by any stretch make the significant showing that the City had a longstanding practice of permitting excessive and retaliatory force against peaceful protesters. *See id.*; *Sanderlin*, 2023 U.S. Dist. LEXIS 44551 at *72 (rejecting custom-and-practice theory because there is no evidence that the City's "policies or customs were 'so persistent and widespread [as to] constitute[] a permanent and well settled city policy'"). His custom-and-practice claim therefore fails.

### B.  The City did not have unconstitutional training and supervision policies

The theory that a city's inadequate training or supervision led to an employee's constitutional violation is generally indistinguishable from *respondeat superior* liability, which *Monell* and its progeny prohibit. *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (cautioning against allowing "*de facto respondeat superior* liability on municipalities"). Failure-to-train or -supervise claims are therefore the "most tenuous" of *Monell* theories. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). They are only cognizable "in [the] limited circumstance[]" where policymakers' "deliberate indifference to [constitutional] rights" caused the claimed violation. *Id.* at 61. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (cleaned up). Plaintiff must show the City's policymakers were on "notice that [the

21

City's] omission would likely result in a constitutional violation" and made the "deliberate or conscious choice to countenance the possibility of [that] violation." *Tsao v. Desert Palace, LLC*, 698 F.3d 1128, 1143–44 (9th Cir. 2012). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62. Without such a pattern, City policymakers "can hardly be said to have deliberately chosen a [training or supervision] program that will cause [such] violations." *Id*. The exception is the "rare" case where the need for a particular training or supervision program is "so patently obvious" that the failure to institute it can evince deliberate indifference even without a prior pattern of violations. *Id.* at 64.

Plaintiff does not claim, and certainly has no evidence of, a "pattern of similar violations by untrained" or unsupervised police officers in the past. *Id*. He must therefore prove that this is one of the "rare" cases in which deliberate indifference can be shown without such a pattern; i.e., he must show the City's training and supervision program before the protest was so blatantly deficient that it would have be "patently obvious" to City policymakers that the failure to institute additional training and supervision policies would result in excessive and retaliatory force. *See id.*

Plaintiff cannot make this showing. Controlling in this respect is the Ninth Circuit's *Flores v. County of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014). The court there considered whether a county could be liable under a failure to train/supervise theory after one of its deputies sexual assaulted the plaintiff. *Id.* at 1157. The court held it could not and affirmed dismissal of the plaintiff's complaint. *Id.* at 1159. Because the plaintiff alleged no longstanding "pattern of sexual assaults" by county deputies, she was required to show hers was one of the "rare" circumstances in which the likelihood of constitutional violations was "so patently obvious" that county policymakers consciously chose to allow that likelihood. *See id.* The plaintiff could not make that showing. *Id.* at 1160. The county was not required to presume its deputies would use their authority to commit the crime of sexual assault. *See id.* On the contrary, the court held, there is "every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law." *Id.* And "[w]here the proper response is obvious to all without training or supervision, then the failure [to provide such a program cannot be] so likely to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." *Id.*

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0527**

Here, the constitutional violation Plaintiff alleges is that a police officer intentionally and without cause shot him with a 40mm merely because he was standing amid other people as part of a political protest. Were that allegation true, it would represent conduct so obviously unlawful that policymakers could presume City police officers would know better. Stated differently, if a police officer is willing so flagrantly to violate the law by targeting a person with a 40mm based on nothing more than that person's presence at a protest, no additional program of training or supervision could make a difference. *See id.* This principle defeats Plaintiff's claim, as it did in *Flores*.

Plaintiff's claim would be equally unavailing if predicated on the theory that Officer Adgar struck Plaintiff by mistake. The City could not be held liable for a failure to train or supervise on that theory because police officers striking people by mistake is not a constitutional violation. Thus, the purported failure by policymakers to anticipate and prevent police officers from accidental strikes could never represent a conscious decision to allow *intentional* constitutional violations like excessive force or speech-based retaliation. That would, rather, be a quintessential claim of negligent training or supervision in the nature of tort, which is not cognizable under § 1983 (or, for that matter, state law, *e.g.*, *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1183 (Cal. Ct. App. 2003) (noting that state law has abolished negligence claims against public entities)).

Finally, even if Plaintiff could overcome these hurdles, the evidentiary record squarely forecloses any finding of deliberate indifference by City policymakers with respect to the City's training and supervision program. Before May 30, 2020, SJPD policies and practices regarding officer training in the use of PIW were robust and exceeded the requirements of California state law in multiple respects. *Supra* Background Section I. The SJPD's policy manual outlined with specificity when and how PIW or other force could be used; different crowd-control devices and the restrictions on them; and the significant First Amendment considerations governing protests and expressive activity. *Id.* Since at least 2016, officers with SJPD have been trained on the use of 40mm. *Id.* The SJPD even provided an additional specific training video to every police officer (which video was also reviewed in briefings) regarding the use of 40mm PIW in 2018. *Id.* And all of this training is in addition to the significant training required of every SJPD officer, including specific training on crowd-control and ongoing training regarding the use of PIW and other force options. *Id.* It is no wonder,

23

given these extensive and longstanding training and supervision policies, that Plaintiffs can point to no prior constitutional violations in the protest context.

It would be unprecedented, and in contravention of all applicable legal standards, to find deliberate indifference on this record. It could not have been obvious to City policymakers, much less "so patently obvious" as to dispense with all notice requirements, that SJPD's considerable training and supervision program was so deficient that SJPD officers would invariably violate the Constitution in providing crowd control in response to a massive protest event like the George Floyd protest. *Connick*, 563 U.S. at 64. Indeed, this Court has already so held. *See Sanderlin*, 2023 U.S. Dist. LEXIS 44551 at *75-81 (rejecting failure-to-train theory based on analogous arguments and evidence).

### C.  No City policymaker ratified a constitutional violation by Officer Adgar

To prove *Monell* liability under a ratification theory, Plaintiff must show that "an official with final policymaking authority ratified [Officer Adgar's allegedly] unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). Such ratification must evince "a conscious, affirmative choice" by the policymaker "to endorse [Officer Adgar's alleged] actions." *Gillette*, 979 F.2d at 1347. It is unclear whether Plaintiff is pursuing a ratification theory at this juncture. If so, it is meritless. The facts are undisputed that no City policymaker was aware of Adgar's decision to fire the 40mm foam baton that Plaintiff claims struck him, much less that any such policymaker affirmatively and consciously approved that use of force, much less still approved of that force and the alleged basis for it. *See id.* These undisputed facts preclude any ratification theory.

### III.    Defendants are entitled to judgment as a matter of law on Plaintiff's state-law claims

Because it is undisputed that Officer Adgar did not intentionally fire his 40mm at Plaintiff, Plaintiff's Bane Act and battery claims—both of which, like Plaintiff's § 1983 claims, require proof of the intent to use force against him—fail at the outset. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 (Cal. Ct. App. 2009) (setting for elements of battery claim); *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) (same for Bane Act). The Bane Act further requires proof that a police officer specifically intended to violate the law, which the undisputed facts here foreclose. *Id.*

Plaintiff's negligence claim necessarily fails on the undisputed facts as well. Under California law, when a police officer inadvertently strikes a bystander in the course of using force, the Court

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0529**

analyzes the reasonableness of that force against the *object* of the force, *not* the bystander who was inadvertently struck. *Golick v. State of California*, 82 Cal. App. 5th 1127, 1139 (Cal. Ct. App. 2022) ("[L]aw enforcement officers do not 'owe bystanders a duty different from the duty they owe to a suspect, [i.e.,] to use reasonable force under [the] circumstances.'"). In other words, the Court in determining whether there has been a breach of the duty of care for negligence purposes employs the same reasonableness analysis as in any excessive force case: it asks whether the governmental interest in using the force was significant enough to justify the intrusion *on the person who was its deliberate object*. *Brown*, 171 Cal. App. 4th at 533 ("[B]ecause [defendant's] use of force against [the suspect] was reasonable, [he] may not be held liable to the [bystander plaintiff] for any injury that may have resulted from that same use of force."). And there can be no question that Officer Adgar's decision to fire a non-lethal foam baton at the leg of a suspect who was throwing glass and other dangerous objects at police was reasonable.

Exactly on point in this respect is *Vaughn v. Parker*, No. 18-cv-2098, 2019 U.S. Dist. LEXIS 179286 (S.D. Cal. Oct. 16, 2019). There, the plaintiff was a bystander inadvertently struck in the face by a 40mm when a correctional officer fired the weapon in response to a nearby fight. *Id.* at *14-15. The plaintiff sued for negligence, but the court rejected the claim. *Id.* at *29. Based on its analysis of Fourth Amendment excessive force standards, the court held the officer's use of the 40mm "was within the range of reasonable conduct under the circumstances" of the dangerous fight, despite that Plaintiff and the fighters "were close to each other." *Id.* at *15, *29. The negligence claim therefore necessarily failed. *Id.* (citing state case holding officer could be not held negligent "for missing her target and shooting an innocent bystander" while trying to stop a fight). So too here, because the undisputed facts show Officer Adgar's use of the 40mm to target assaultive suspects during an unlawful assembly was reasonable, Plaintiff's negligence claim based on being inadvertently struck in the leg necessarily fails. *See id.*; *McMillan v. Delgado*, No. 1:19-cv-00444, 2021 U.S. Dist. LEXIS 187482, at *28 (E.D. Cal. Sep. 29, 2021) (holding officers acted reasonably when firing at individuals in crowd to stop them from fighting, even though round struck plaintiff, an innocent bystander who was close by).

## **Conclusion**

Defendants respectfully request that the Court grant summary judgment in their favor.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0530**

Respectfully submitted,

NORA FRIMANN, City Attorney

Dated:  July 17, 2023

By:  ___/s/*Matthew Pritchard*_____
           MATTHEW PRITCHARD
           Sr. Deputy City Attorney

Attorneys for Defendants

26

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

5:21-cv-01849-BLF

2037697

**ER0531**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF** Northern District of California

**Form 1. AMENDED** Notice of Appeal from a Judgment
or Order of a United States District Court

U.S. District Court case number: | 5:21-cv-01849-BLF; 9th Cir. case no. 25-1392

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | March 16, 2021

Date of judgment or order you are appealing: | Jan. 31, 2025 & Aug. 15, 2025

Docket entry number of judgment or order you are appealing: | Dkts. 260 & 301

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

James Adgar

Is this a cross-appeal?   ○ Yes    ⦿ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?   ⦿ Yes    ○ No

If yes, what is the prior appeal case number?   | 25-1392

Your mailing address (if pro se):

City: | State: | Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** | /s/ Malgorzata Laskowska | **Date** | August 27, 2025

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

Form 1                                                                   *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

James Adgar

Name(s) of counsel (if any):

Malgorzata Laskowska , Sr. Deputy City Attorney

Address: 200 East Santa Clara Street, 16th Floor, San Jose, CA 95113

Telephone number(s): 408-535-1900

Email(s): margo.laskowska@sanjoseca.gov; cao.main@sanjoseca.gov

Is counsel registered for Electronic Filing in the 9th Circuit?    ⊙ Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Kyle Johnson

Name(s) of counsel (if any):

James McManis, Esq,
Matthew Schechter. Esq.
Abimael Bastida, Esq.

Address: 50 West San Fernando Street, 10th Floor San Jose, CA 95113

Telephone number(s): (408) 279-8700

Email(s): mschechter@mcmanislaw.com, abastida@mcmanislaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                            *1*                            *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

## Appellants

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?    ○ Yes    ○ No

## Appellees

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *2*                    *New 12/01/2018*

**ER0534**

# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** Northern District of California

## Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: | 5:21-cv-01849-BLF

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | March 16, 2021

Date of judgment or order you are appealing: | August 15, 2025

Docket entry number of judgment or order you are appealing: | Dkt. 301

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

James Adgar

Is this a cross-appeal?  ○ Yes    ⦿ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?  ⦿ Yes    ○ No

If yes, what is the prior appeal case number?  | 25-1392

Your mailing address (if pro se):

City: | State: | Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** | /s/ Malgorzata Laskowska | **Date** | August 27, 2025

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

Form 1                                                                 *Rev. 06/09/2022*

ER0535

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

James Adgar

Name(s) of counsel (if any):

Malgorzata Laskowska , Sr. Deputy City Attorney

Address: 200 East Santa Clara Street, 16th Floor, San Jose, CA 95113

Telephone number(s): 408-535-1900

Email(s): margo.laskowska@sanjoseca.gov; cao.main@sanjoseca.gov.

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Kyle Johnson

Name(s) of counsel (if any):

James McManis, Esq,
Matthew Schechter. Esq.
Abimael Bastida, Esq.

Address: 50 West San Fernando Street, 10th Floor San Jose, CA 95113

Telephone number(s): (408) 279-8700

Email(s): mschechter@mcmanislaw.com, abastida@mcmanislaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *1*                    *New 12/01/2018*

ER0536

Continued list of parties and counsel: *(attach additional pages as necessary)*

## Appellants

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?    ○ Yes    ○ No

## Appellees

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *2*                    *New 12/01/2018*

ER0537

# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** Northern District of California

### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

U.S. District Court case number: | 5:21-cv-01849-BLF

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | March 16, 2021

Date of judgment or order you are appealing: | January 31, 2025

Docket entry number of judgment or order you are appealing: | Dkt. 260

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

James Adgar

Is this a cross-appeal?  ○ Yes   ⦿ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?  ○ Yes   ⦿ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: | State: | Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** | /s/ Ardell Johnson | **Date** | March 3, 2024

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

Form 1                                              *Rev. 06/09/2022*

ER0538

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

| |
|---|
| James Adgar |

Name(s) of counsel (if any):

| |
|---|
| Ardell Johnson, Assistant City Attorney |

Address: | 200 East Santa Clara Street, 16th Floor, San Jose, CA 95113

Telephone number(s): | 408-535-1900

Email(s): | cao.main@sanjoseca.gov, Ardell.Johnson@sanjoseca.gov

Is counsel registered for Electronic Filing in the 9th Circuit?    ⦿ Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

| |
|---|
| Kyle Johnson |

Name(s) of counsel (if any):

| |
|---|
| James McManis, Esq, <br> Matthew Schechter. Esq. <br> Abimael Bastida, Esq. |

Address: | 50 West San Fernando Street, 10th Floor San Jose, CA 95113

Telephone number(s): | (408) 279-8700

Email(s): | mschechter@mcmanislaw.com, abastida@mcmanislaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *1*                    *New 12/01/2018*

**ER0539**

Continued list of parties and counsel: *(attach additional pages as necessary)*

## Appellants

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

## Appellees

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *2*                    *New 12/01/2018*

**ER0540**

# U.S. District Court
## California Northern District (San Jose)
## CIVIL DOCKET FOR CASE #: 5:21-cv-01849-BLF

Johnson v. City of San Jose
Assigned to: Judge Beth Labson Freeman
Referred to: Magistrate Judge Virginia K. DeMarchi
      Magistrate Judge Nathanael M. Cousins (Settlement)
Case in other court: USCA, **25-01392**
                 USCA, **25-05468**
Cause: 42:1983 Civil Rights Act

Date Filed: 03/16/2021
Date Terminated: 01/31/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Kyle Johnson**

represented by **Abimael J. Bastida De Jesus**
McManis Faulkner
50 W. San Fernando Street
10th Floor
San Jose, CA 95113
408-279-8700
Fax: 408-279-3244
Email: abastida@mcmanislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James McManis**
McManis Faulkner
A Prodfessional Corporation
50 West San Fernando Street, 10th Floor
San Jose, CA 95113
(408) 279-8700
Fax: (408) 279-3244
Email: jmcmanis@mcmanislaw.com
*ATTORNEY TO BE NOTICED*

**Matthew Schechter**
McManis Faulkner
50 West San Fernando Street, 10th Floor
San Jose, CA 95113
(408) 279-8700
Email: mschechter@mcmanislaw.com
*ATTORNEY TO BE NOTICED*

**Priya Swaminathan**
McManis Faulkner LLP
CA
50 W. San Fernando St.
10th Floor
Ste 10th Floor
San Jose, CA 95113
408-918-2027

ER0541

Email: pswaminathan@mcmanislaw.com
*ATTORNEY TO BE NOTICED*

**Tianqi Michael Sun**
McManis Faulkner
50 W. San Fernando Street
Ste 10th Floor
San Jose, CA 95113
408-279-8700
Email: tsun@mcmanislaw.com
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

| | | |
|---|---|---|
| **City of San Jose**<br>*a California charter city* | represented by | **Ardell Johnson**<br>San Jose City Attorney's Office<br>200 East Santa Clara Street<br>16th Floor<br>San Jose, CA 95113-1905<br>408-535-1900<br>Fax: 408-998-3131<br>Email: CAO.Main@sanjoseca.gov<br>*ATTORNEY TO BE NOTICED* |

**Benjamin Ardell Johnson**
Office of the City Attorney
200 East Santa Clara Street
16th Floor
San Jose, CA 95113-1905
408-535-1900
Fax: 408-998-3131
*ATTORNEY TO BE NOTICED*

**James Huang**
Office of the City Attorney, City of San Jose
California
200 E. Santa Clara Street
Ste 16th Floor
San Jose, CA 95113
408-535-1900
Email: james.huang@sanjoseca.gov
*ATTORNEY TO BE NOTICED*

**Nicholas Sympson**
San Jose City Attorney's Office
200 East Santa Clara St.
16th Floor
San Jose, CA 95113
408-535-1900
Email: nicholas.sympson@sanjoseca.gov
*ATTORNEY TO BE NOTICED*

**Nora Valerie Frimann**
200 East Santa Clara St., 16th Floor
San Jose, CA 95113
408-535-1900
Email: cao.main@sanjoseca.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **San Jose Police Department Officer James Adgar, Badge No. 4552** | represented by | **Ardell Johnson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **James Huang**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Nicholas Sympson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Miscellaneous**

| | | |
|---|---|---|
| **Timothy Harper** | represented by | **Ardell Johnson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert Ross Powell**<br>Powell & Associates<br>925 West Hedding Street<br>San Jose, CA 95126<br>(408) 553-0201<br>Fax: (408) 553-0203<br>Email: rpowell@rrpassociates.com |

| Date Filed | # | Docket Text |
|---|---|---|
| 10/17/2025 | 308 | ORDER of USCA as to 268 Notice of Appeal to the Ninth Circuit, filed by San Jose Police Department Officer James Adgar, Badge No. 4552, 303 Notice of Appeal to the Ninth Circuit, filed by San Jose Police Department Officer James Adgar, Badge No. 4552. (gba, COURT STAFF) (Filed on 10/17/2025) (Entered: 10/20/2025) |
| 09/10/2025 | 307 | Transcript Designation Form (Laskowska, Margo) (Filed on 9/10/2025) (Entered: 09/10/2025) |
| 09/10/2025 | 306 | Transcript Designation Form (Laskowska, Margo) (Filed on 9/10/2025) (Entered: 09/10/2025) |
| 08/28/2025 | 305 | USCA Case Number **25-5468** for 303 Notice of Appeal to the Ninth Circuit, filed by San Jose Police Department Officer James Adgar, Badge No. 4552. (gba, COURT STAFF) (Filed on 8/28/2025) (Entered: 08/28/2025) |
| 08/27/2025 | 304 | USCA Appeal Fees received $ 605 receipt number 27QT81TM re 303 Amended Notice of Appeal to the Ninth Circuit, filed by San Jose Police Department Officer James Adgar, Badge No. 4552. (gba, COURT STAFF) (Filed on 8/27/2025) (Entered: 08/27/2025) |

| 08/27/2025 | 303 | AMENDED NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by San Jose Police Department Officer James Adgar, Badge No. 4552. Appeal of Order on Motion for Attorney Fees, Order on Motion for Judgment as a Matter of Law, 301 , Judgment, Terminated Case 260 (Pay.gov Agency Tracking ID 511019379.) (Laskowska, Margo) (Filed on 8/27/2025) (Entered: 08/27/2025) |
|---|---|---|
| 08/27/2025 | 302 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by San Jose Police Department Officer James Adgar, Badge No. 4552. Appeal of Order on Motion for Attorney Fees,, Order on Motion for Judgment as a Matter of Law, 301 (Appeal fee FEE NOT PAID.) (Laskowska, Margo) (Filed on 8/27/2025) (Entered: 08/27/2025) |
| 08/15/2025 | 301 | **ORDER GRANTING IN PART AND DENYING IN PART 267 DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW; AND GRANTING IN PART 263 PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS. Signed by Judge Beth Labson Freeman on August 15, 2025. (blflc2, COURT STAFF) (Filed on 8/15/2025) (Entered: 08/15/2025)** |
| 07/28/2025 | 300 | RESPONSE re 298 Order July 22, 2025 filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Related document(s) 298 ) (Johnson, Ardell) (Filed on 7/28/2025) (Entered: 07/28/2025) |
| 07/28/2025 | 299 | Submission of the Transcript from the Deposition of Lee Tassio with the Marked Portions that Plaintiff Contends is Related to Uncompensated Monell Claim per re 298 Order filed by Kyle Johnson. (Related document(s) 298 ) (Bastida De Jesus, Abimael) (Filed on 7/28/2025) (Entered: 07/28/2025) |
| 07/22/2025 | 298 | **ORDER DIRECTING FURTHER SUBMISSIONS REGARDING 296 JOINT DISCOVERY CHART. Signed by Judge Beth Labson Freeman on July 22, 2025. (blflc2, COURT STAFF) (Filed on 7/22/2025) (Entered: 07/22/2025)** |
| 07/07/2025 | 297 | **Minute Entry for proceedings held before Magistrate Judge Nathanael M. Cousins. Settlement session held on 7/7/2025.**<br><br>**Discussions continue; response to proposal due to settlement judge by 7/11, noon.**<br><br>(Not reported.)<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Date Filed: 7/7/2025) (Entered: 07/07/2025) |
| 07/02/2025 | 296 | Joint Discovery Chart re 287 Order filed by Kyle Johnson. (Related document(s) 287 ) (Bastida De Jesus, Abimael) (Filed on 7/2/2025) (Entered: 07/02/2025) |
| 06/10/2025 | 295 | **Minute Entry for proceedings held before Magistrate Judge Nathanael M. Cousins. Further Settlement Conference held on 6/10/2025.**<br><br>**Discussions continue; response to proposal due to settlement judge by 5:00 PM, 6/12/25.**<br><br>Schechter and Bastida, for plaintiff.<br>Johnson and Sympson, for defendants.<br><br>Ended 2:35 PM (Not reported.)<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Date Filed: 6/10/2025) (Entered: 06/10/2025) |

| | | |
|---|---|---|
| 06/09/2025 | 294 | CORRECTED CLERK'S NOTICE SETTING ZOOM HEARING.<br><br>Settlement Conference set for **6/10/2025**, at 01:00 PM before Magistrate Judge Nathanael M. Cousins. This proceeding will be held via a Zoom meeting.<br><br>**Meeting Access:** All counsel may access the meeting information at https://www.cand.uscourts.gov/nc<br>*Please click subheading +Join Non-Public Hearings.*<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Filed on 6/9/2025). (Entered: 06/09/2025) |
| 06/09/2025 | 293 | **SEE CLERK'S NOTICE AT DKT. 294** (lmh, COURT STAFF) (Filed on 6/9/2025) Modified on 6/9/2025 (lmh, COURT STAFF). (Entered: 06/09/2025) |
| 06/04/2025 | 292 | Further Supplemental Declaration of Abimael Bastida in Support of 263 MOTION for Attorney Fees and Costs filed byKyle Johnson. (Related document(s) 263 ) (Bastida De Jesus, Abimael) (Filed on 6/4/2025) (Entered: 06/04/2025) |
| 06/02/2025 | 291 | CLERK'S NOTICE SETTING Further Settlement Conference for 6/10/2025, at 01:00 PM before Magistrate Judge Nathanael M. Cousins in San Jose, Courtroom 5, 4th Floor.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Filed on 6/2/2025) (Entered: 06/02/2025) |
| 05/20/2025 | 290 | TRANSCRIPT ORDER for proceedings held on 5/15/25 before Judge Beth Labson Freeman by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, for Court Reporter Summer Fisher. (Johnson, Ardell) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/19/2025 | 289 | Transcript of Proceedings held on 05/15/2025, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 288 Transcript Order ) Redaction Request due 6/9/2025. Redacted Transcript Deadline set for 6/20/2025. Release of Transcript Restriction set for 8/18/2025. (Related documents(s) 288 ) (Fisher, Summer) (Filed on 5/19/2025) (Entered: 05/19/2025) |
| 05/15/2025 | 288 | TRANSCRIPT ORDER for proceedings held on 05/15/2025 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Summer Fisher. (Bastida De Jesus, Abimael) (Filed on 5/15/2025) (Entered: 05/15/2025) |
| 05/15/2025 | 287 | **ORDER REQUIRING SUPPLEMENTAL MATERIALS REGARDING 263 PLAINTIFF'S FEE MOTION. Signed by Judge Beth Labson Freeman on May 15, 2025. (blflc2, COURT STAFF) (Filed on 5/15/2025) (Entered: 05/15/2025)** |

| | | |
|---|---|---|
| 05/15/2025 | 286 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 5/15/2025 re** 263 **MOTION for Attorney Fees** *and Costs* **Filed by Kyle Johnson,** 267 **MOTION for Judgment as a Matter of Law filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Oral Argument Heard on Motions. Matters taken under submission - Court to issue written orders.**<br>**Total Time in Court: 2:31.**<br>**Court Reporter: Summer Fisher.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Ardell Johnson, Nicholas Sympson.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(tsh, COURT STAFF) (Date Filed: 5/15/2025) (Entered: 05/15/2025)** |
| 04/29/2025 | 285 | Declaration of Abimael Bastida in Support of 263 MOTION for Attorney Fees *and Costs (SUPPLEMENTAL)* filed byKyle Johnson. (Related document(s) 263 ) (Bastida De Jesus, Abimael) (Filed on 4/29/2025) (Entered: 04/29/2025) |
| 04/25/2025 | 284 | **CLERK'S NOTICE RESETTING MOTION HEARINGS.**<br>**Motion Hearings as to** 267 **MOTION for Judgment as a Matter of Law,** 263 **MOTION for Attorney Fees** *and Costs* **reset for 5/15/2025 09:00 AM in San Jose, Courtroom 1, 5th Floor before Judge Beth Labson Freeman.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>**(tsh, COURT STAFF) (Filed on 4/25/2025) (Entered: 04/25/2025)** |
| 04/21/2025 | 283 | **ORDER REQUIRING SUPPLEMENTAL DECLARATION REGARDING MOTION FOR ATTORNEYS' FEES. Signed by Judge Beth Labson Freeman on April 21, 2025. (blflc2, COURT STAFF) (Filed on 4/21/2025) (Entered: 04/21/2025)** |
| 04/14/2025 | 282 | Declaration of Nicholas Sympson in Support of 281 Reply to Opposition/Response *To Defendants' Motion For Judgment As A Matter Of Law* filed byCity of San Jose. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Related document(s) 281 ) (Sympson, Nicholas) (Filed on 4/14/2025) (Entered: 04/14/2025) |
| 04/14/2025 | 281 | REPLY (re 267 MOTION for Judgment as a Matter of Law ) *to Plaintiff's Opposition to Defendants' Motion for Judgment As A Matter Of Law* filed byCity of San Jose. (Sympson, Nicholas) (Filed on 4/14/2025) (Entered: 04/14/2025) |
| 04/04/2025 | 280 | REPLY (re 263 MOTION for Attorney Fees *and Costs* ) filed byKyle Johnson. (Attachments: # 1 Declaration of Abimael Bastida)(Bastida De Jesus, Abimael) (Filed on 4/4/2025) (Entered: 04/04/2025) |
| 04/02/2025 | 279 | ERRATA re 277 Admitted Exhibits *Regarding Joint Certification of Counsel Regarding Admitted Exhibits* by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Exhibit Exhibit 198, # 2 Exhibit Exhibit 236a) (Johnson, Ardell) (Filed on 4/2/2025) (Entered: 04/02/2025) |
| 04/01/2025 | 278 | Received one USB drive re 277 . (smc, COURT STAFF) (Filed on 4/1/2025) (Entered: 04/01/2025) |
| 03/28/2025 | 277 | Joint Certification of Counsel Regarding Admitted Exhibits by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose.. (Sympson, Nicholas) (Filed on 3/28/2025) (Entered: 03/28/2025) |
| 03/27/2025 | 276 | JOINT Certification of Counsel Regarding Exhibits not Admitted by Kyle Johnson.. (Bastida De Jesus, Abimael) (Filed on 3/27/2025) (Entered: 03/27/2025) |

| | | |
|---|---|---|
| 03/26/2025 | 275 | OPPOSITION/RESPONSE (re 267 MOTION for Judgment as a Matter of Law ) filed byKyle Johnson. (Attachments: # 1 Declaration of Abimael Bastida)(Bastida De Jesus, Abimael) (Filed on 3/26/2025) (Entered: 03/26/2025) |
| 03/14/2025 | 274 | Declaration of James P. Schratz in Support of 273 Opposition/Response to Motion for Attorneys' Fees filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Exhibits 1-28) (Related document(s) 273 ) (Johnson, Ardell) (Filed on 3/14/2025) (Entered: 03/14/2025) |
| 03/14/2025 | 273 | OPPOSITION/RESPONSE (re 263 MOTION for Attorney Fees and Costs) filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Declaration of Ardell Johnson in Support) (Johnson, Ardell) (Filed on 3/14/2025) (Entered: 03/14/2025) |
| 03/10/2025 | 272 | USCA Appeal Fees received $ 605 receipt number 511019379 re 268 Notice of Appeal to the Ninth Circuit filed by San Jose Police Department Officer James Adgar, Badge No. 4552. (gba, COURT STAFF) (Filed on 3/10/2025) (Entered: 03/11/2025) |
| 03/07/2025 | 271 | **ORDER GRANTING 269 STIPULATION TO EXTEND TIME TO FILE OPPOSITION TO, AND REPLY IN SUPPORT OF, DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW. Signed by Judge Beth Labson Freeman on March 7, 2025. (blflc2, COURT STAFF) (Filed on 3/7/2025) (Entered: 03/07/2025)** |
| 03/06/2025 | 269 | STIPULATION WITH PROPOSED ORDER to Extend Time to File Opposition to, and Reply in Support of Defendants' Motion for Judgment as a Matter of Law filed by Kyle Johnson. (Schechter, Matthew) (Filed on 3/6/2025) Modified on 3/6/2025 (gba, COURT STAFF). (Entered: 03/06/2025) |
| 03/05/2025 | 270 | USCA Case Number **25-1392** for 268 Notice of Appeal to the Ninth Circuit filed by San Jose Police Department Officer James Adgar, Badge No. 4552. (gba, COURT STAFF) (Filed on 3/5/2025) (Entered: 03/06/2025) |
| 03/03/2025 | 268 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by San Jose Police Department Officer James Adgar, Badge No. 4552. Appeal of Judgment, Terminated Case 260 (Appeal fee FEE NOT PAID.) **25-1392** (Johnson, Ardell) (Filed on 3/3/2025) (Entered: 03/03/2025) |
| 02/28/2025 | 267 | MOTION for Judgment as a Matter of Law; Memorandum of Points and Authorities in Support filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 5/8/2025 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 3/14/2025. Replies due by 3/21/2025. (Attachments: # 1 Declaration Decl. of Johnson ISO Defendants' Motion for Judgment as a Matter of Law) (Johnson, Ardell) (Filed on 2/28/2025) (Entered: 02/28/2025) |
| 02/24/2025 | 266 | **ORDER GRANTING 265 STIPULATION TO EXTEND TIME TO FILE OPPOSITION TO, AND REPLY IN SUPPORT OF, PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS. Signed by Judge Beth Labson Freeman on February 24, 2025. (blflc2, COURT STAFF) (Filed on 2/24/2025) (Entered: 02/24/2025)** |
| 02/24/2025 | 265 | STIPULATION WITH PROPOSED ORDER re 263 MOTION for Attorney Fees *and Costs Joint Stipulation and Proposed Order to Extend Time to File Opposition and Reply re Plaintiff's Motion for Attorney's Fees* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, Timothy Harper. (Johnson, Ardell) (Filed on 2/24/2025) (Entered: 02/24/2025) |

| | | |
|---|---|---|
| 02/14/2025 | 264 | BILL OF COSTS by Kyle Johnson. Objections due by 2/28/2025. (Attachments: # 1 Declaration of Abimael Bastida)(Bastida De Jesus, Abimael) (Filed on 2/14/2025) (Entered: 02/14/2025) |
| 02/14/2025 | 263 | MOTION for Attorney Fees *and Costs* filed by Kyle Johnson. Motion for Attorney Fees Hearing set for 5/1/2025 09:00 AM in San Jose, Courtroom 1, 5th Floor before Judge Beth Labson Freeman. Responses due by 2/28/2025. Replies due by 3/7/2025. (Attachments: # 1 Declaration of Abimael Bastida, # 2 Declaration of James McManis, # 3 Declaration of Allen Ruby, # 4 Declaration of James Wagstaffe, # 5 Proposed Order) (Bastida De Jesus, Abimael) (Filed on 2/14/2025) (Entered: 02/14/2025) |
| 02/05/2025 | 262 | **Minute Entry for proceedings held before Magistrate Judge Nathanael M. Cousins. Further settlement communications with all sides held 2/4-2/5/2025.**<br><br>**No settlement. No further conference requested.**<br>**Settlement conference has concluded without a settlement.**<br><br>(Not reported.)<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Date Filed: 2/5/2025) (Entered: 02/05/2025) |
| 01/31/2025 | 261 | **\*\*\*Civil Case Terminated.\*\*\***<br>**(tsh, COURT STAFF) (Filed on 1/31/2025) (Entered: 01/31/2025)** |
| 01/31/2025 | 260 | **JUDGMENT Signed by Judge Beth Labson Freeman on 1/31/2025. (Attachments: # 1 Verdict)(tsh, COURT STAFF) (Filed on 1/31/2025) (Entered: 01/31/2025)** |
| 01/30/2025 | 259 | **Minute Entry for proceedings held before Magistrate Judge Nathanael M. Cousins. Settlement Conference held on 1/30/2025.**<br><br>**No settlement; discussions continue. Parties to provide update to settlement judge on 2/4 as to whether they wish to reconvene 2/7, at 10:00 AM in Courtroom 5.**<br><br>McManis, Schecter, Bastida, with client Johnson.<br>Ardell Johnson for City.<br><br>Ended 3:30 PM; Not reported.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Date Filed: 1/30/2025) (Entered: 01/30/2025) |
| 01/24/2025 | 258 | CLERK'S NOTICE SETTING Settlement Conference for 1/30/2025, at 01:30 PM in San Jose, Courtroom 5, 4th Floor before Magistrate Judge Nathanael M. Cousins. Updated statements to be exchanged and submitted by 1/29/2025, 01:30 PM.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(lmh, COURT STAFF) (Filed on 1/24/2025) (Entered: 01/24/2025) |
| 01/23/2025 | | CASE REFERRED to Magistrate Judge Nathanael M. Cousins for Settlement. (lmh, COURT STAFF) (Filed on 1/23/2025) (Entered: 01/24/2025) |
| 01/23/2025 | 257 | Transcript of Proceedings Trial Volume 10 held on 01/22/2025, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be |

| | | |
|---|---|---|
| | | purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Redaction Request due 2/13/2025. Redacted Transcript Deadline set for 2/24/2025. Release of Transcript Restriction set for 4/23/2025. (Fisher, Summer) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 256 | Transcript of Proceedings, Volume 9 held on 01/16/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 255 | Transcript of Proceedings, Volume 8, held on 01/15/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 254 | Transcript of Proceedings, Volume 7, held on 01/14/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 253 | Transcript of Proceedings, Volume 6, held on 01/13/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 252 | Transcript of Proceedings, Volume 5, held on 01/10/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 251 | Transcript of Proceedings, Volume 4, held on 01/08/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until |

| | | |
|---|---|---|
| | | the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 250 | Transcript of Proceedings, Volume 3, held on 01/07/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 249 | Transcript of Proceedings, Volume 2, held on 01/06/2025, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 248 | Transcript of Proceedings, Volume 1, held on 01/03/2025, before Judge Freeman. Court Reporter, Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 4/23/2025. (Rodriguez, Irene) (Filed on 1/23/2025) (Entered: 01/23/2025) |
| 01/23/2025 | 246 | **JURY VERDICT.**<br>**(tsh, COURT STAFF) (Filed on 1/23/2025) (Additional attachment(s) added on 1/23/2025: # 1 Jury Verdict pages 10, 11, and 12 taken prior to correction of inconsistency) (tsh, COURT STAFF). (Entered: 01/23/2025)** |
| 01/23/2025 | 247 | **ORDER OF REFERENCE TO MAGISTRATE JUDGE NATHANAEL COUSINS FOR SETTLEMENT. Signed by Judge Beth Labson Freeman on January 23, 2025. (blflc2, COURT STAFF) (Filed on 1/23/2025) (Entered: 01/23/2025)** |
| 01/22/2025 | 245 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial completed on 1/22/2025.**<br>**Deadline to file exhibits by 2/3/2025.**<br>**Total Time in Court: 54 Minutes.**<br>**Court Reporter: Summer Fisher.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson.**<br>**(tsh, COURT STAFF) (Date Filed: 1/22/2025) (Additional attachment(s) added on 1/23/2025: # 1 Jury Note # 3) (tsh, COURT STAFF). (Additional attachment(s) added on 1/23/2025: # 2 Jury Note # 3, # 3 Jury Note # 4, # 4 Jury Note # 5, # 5 Jury Note # 6, # 6 Jury Note # 7, # 7 Jury Note # 8, # 8 Jury Note # 9) (tsh, COURT STAFF). (Entered: 01/23/2025)** |
| 01/21/2025 | 244 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial/Deliberations held on 1/21/2025.**<br>**Total Time in Court: 0:00.** |

| | | |
|---|---|---|
| | | Court Reporter: Summer Fisher.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.<br>Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/21/2025) (Additional attachment(s) added on 1/23/2025: # **1** Jury Note #1, # **2** Jury Note #2) (tsh, COURT STAFF). (Entered: 01/22/2025) |
| 01/17/2025 | 243 | Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial/Deliberations held on 1/17/2025.<br>Total Time in Court: 0:00.<br>Court Reporter: Summer Fisher.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.<br>Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/17/2025) (Entered: 01/22/2025) |
| 01/16/2025 | 242 | Final Jury Instructions.<br>(tsh, COURT STAFF) (Filed on 1/16/2025) (tsh, COURT STAFF). (Entered: 01/22/2025) |
| 01/16/2025 | 241 | Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/16/2025.<br>Total Time in Court: 4:43.<br>Court Reporter: Irene Rodriguez.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.<br>Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/16/2025) (Entered: 01/22/2025) |
| 01/15/2025 | 240 | Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/15/2025.<br>Total Time in Court: 1:45.<br>Court Reporter: Irene Rodriguez.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.<br>Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/15/2025) (Additional attachment(s) added on 1/23/2025: # **1** Court Exhibit # 1) (tsh, COURT STAFF). (Entered: 01/22/2025) |
| 01/15/2025 | 236 | STIPULATED List of Admitted Trial Exhibits by Kyle Johnson.. (Bastida De Jesus, Abimael) (Filed on 1/15/2025) (Entered: 01/15/2025) |
| 01/14/2025 | 239 | Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/14/2025.<br>Total Time in Court: 3:51.<br>Court Reporter: Irene Rodriguez.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.<br>Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/14/2025) (Entered: 01/22/2025) |
| 01/14/2025 | 235 | ORDER DENYING **230** DEFENDANTS' ADMINISTRATIVE MOTION TO SUPPLEMENT EXHIBIT LIST. Signed by Judge Beth Labson Freeman on January 14, 2025. (blflc2, COURT STAFF) (Filed on 1/14/2025) (Entered: 01/14/2025) |
| 01/13/2025 | 238 | Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/13/2025.<br>Total Time in Court: 6:47.<br>Court Reporter: Irene Rodriguez.<br>Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter. |

| | | |
|---|---|---|
| | | Defendant Attorney: Nicholas Sympson, Ardell Johnson.<br>(tsh, COURT STAFF) (Date Filed: 1/13/2025) (Entered: 01/22/2025) |
| 01/12/2025 | 231 | OBJECTIONS to 230 Administrative Motion to Supplement Exhibit List by Kyle Johnson. (Sun, Tianqi) (Filed on 1/12/2025) (Entered: 01/12/2025) |
| 01/10/2025 | 237 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/10/2025.**<br>**Total Time in Court: 7:03.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson.**<br>**(tsh, COURT STAFF) (Date Filed: 1/10/2025) (Entered: 01/22/2025)** |
| 01/10/2025 | 230 | ADMINISTRATIVE MOTION to Supplement Exhibit List filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Responses due by 1/14/2025. (Huang, James) (Filed on 1/10/2025) (Entered: 01/10/2025) |
| 01/09/2025 | 229 | OBJECTIONS to Court's Order Excluding Audio of Video (Trial Exhibits 125A and 138A) by Kyle Johnson. (Sun, Tianqi) (Filed on 1/9/2025) (Entered: 01/09/2025) |
| 01/09/2025 | 228 | NOTICE of Manual Filing Plaintiff's Trial Exhibits 125A and 138A by Kyle Johnson (Sun, Tianqi) (Filed on 1/9/2025) (Entered: 01/09/2025) |
| 01/08/2025 | 234 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/8/2025.**<br>**Total Time in Court: 6:28.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson.**<br>**(tsh, COURT STAFF) (Date Filed: 1/8/2025) (Entered: 01/12/2025)** |
| 01/07/2025 | 233 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Trial held on 1/7/2025.**<br>**Total Time in Court: 6:08.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson.**<br>**(tsh, COURT STAFF) (Date Filed: 1/7/2025) (Entered: 01/12/2025)** |
| 01/07/2025 | 227 | **ORDER GRANTING IN PART 221 ADMINISTRATIVE MOTION TO AMEND WITNESS LIST. Signed by Judge Beth Labson Freeman on January 7, 2025. (blflc2, COURT STAFF) (Filed on 1/7/2025) (Entered: 01/07/2025)** |
| 01/06/2025 | 232 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Selection and Jury Trial held on 1/6/2025.**<br>**Total Time in Court: 6:06.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson.**<br>**(tsh, COURT STAFF) (Date Filed: 1/6/2025) (Entered: 01/12/2025)** |
| 01/06/2025 | 226 | SUPPLEMENTAL JOINT Stipulation as to Undisputed Facts filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 1/6/2025) (Entered: 01/06/2025) |
| 01/03/2025 | 225 | OPPOSITION/RESPONSE (re 221 Administrative Motion to Allow Plaintiff to Amend his Witness List) filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Declaration of Johnson ISO Defendants |

| | | |
|---|---|---|
| | | Opposition to Plaintiffs Administrative Motion to Allow Plaintiff to Amend His Witness List) (Johnson, Ardell) (Filed on 1/3/2025) (Entered: 01/03/2025) |
| 01/03/2025 | 224 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Jury Selection Day 1 held on 1/3/2025.**<br>**Total Time in Court: 33 Minutes.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael J. Bastida, Matthew Schechter.**<br>**Defendant Attorney: Nicholas Sympson, Ardell Johnson, James Huang.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(tsh, COURT STAFF) (Date Filed: 1/3/2025) (Entered: 01/03/2025)** |
| 01/03/2025 | 223 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 1/3/2025) (Entered: 01/03/2025) |
| 01/02/2025 | 222 | JOINT Stipulation as to Undisputed Facts filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 1/2/2025) Modified on 1/2/2025 (gba, COURT STAFF). (Entered: 01/02/2025) |
| 12/31/2024 | 221 | Administrative Motion to Allow Plaintiff to Amend his Witness List filed by Kyle Johnson. Responses due by 1/6/2025. (Attachments: # 1 Declaration of Tianqi Sun, # 2 Proposed Order) (Sun, Tianqi) (Filed on 12/31/2024) (Entered: 12/31/2024) |
| 12/31/2024 | 220 | OBJECTIONS to re 215 Trial Brief by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/31/2024) (Entered: 12/31/2024) |
| 12/30/2024 | 219 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 12/30/2024) (Entered: 12/30/2024) |
| 12/27/2024 | 218 | TRIAL BRIEF by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/27/2024) (Entered: 12/27/2024) |
| 12/27/2024 | 217 | Proposed Jury Instructions by Kyle Johnson *AMENDED JOINTLY PROPOSED JURY INSTRUCTIONS*. (Bastida De Jesus, Abimael) (Filed on 12/27/2024) (Entered: 12/27/2024) |
| 12/27/2024 | 216 | Proposed Form of Verdict by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose *Jointly Submitted Jury Verdict Form*. (Johnson, Ardell) (Filed on 12/27/2024) (Entered: 12/27/2024) |
| 12/27/2024 | 215 | TRIAL BRIEF *Defendants'* by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 12/27/2024) (Entered: 12/27/2024) |
| 12/23/2024 | 214 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/23/2024) (Entered: 12/23/2024) |
| 12/20/2024 | 213 | Brief *PLAINTIFF KYLE JOHNSON'S SUPPLEMENTAL BRIEF REGARDING DISPERSAL ORDERS* filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/20/2024) (Entered: 12/20/2024) |
| 12/20/2024 | 212 | Proposed Voir Dire by Kyle Johnson *FURTHER JOINTLY REVISED PROPOSED JURY QUESTIONNAIRE*. (Bastida De Jesus, Abimael) (Filed on 12/20/2024) (Entered: 12/20/2024) |
| 12/18/2024 | 211 | JOINTLY Revised Proposed Jury Questionnaire by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/18/2024) M (Entered: 12/18/2024) |

| | | |
|---|---|---|
| 12/17/2024 | 210 | **ORDER GRANTING 200 STIPULATION AND PLAINTIFF'S ADMINISTRATIVE MOTION TO ALLOW PLAINTIFF'S EXPERT DR. HARLAN WATKINS TO APPEAR REMOTELY AT TRIAL. Signed by Judge Beth Labson Freeman on December 17, 2024. (blflc2, COURT STAFF) (Filed on 12/17/2024) (Entered: 12/17/2024)** |
| 12/16/2024 | 209 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: In Chambers Jury Instruction Conference held on 12/16/2024.**<br>**Total Time in Court: 6:15.**<br>**Court Reporter: Not Reported.**<br>**Plaintiff Attorney: Abimael Bastida De Jesus.**<br>**Defendant Attorney: Ardell Johnson.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(tsh, COURT STAFF) (Date Filed: 12/16/2024) (Entered: 12/16/2024)** |
| 12/16/2024 | 208 | REVISED Proposed Jury Questionnaire by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San. (Johnson, Ardell) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 207 | Proposed Punitive Damages Jury Verdict Form by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 206 | Proposed Jury Instructions for Bifurcation of Punitive Damages by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/16/2024 | 205 | REVISED Proposed Jury Verdict Form by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Johnson, Ardell) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/13/2024 | 204 | AMENDED Special Verdict Form by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/13/2024) (Entered: 12/13/2024) |
| 12/13/2024 | 203 | **ORDER REQUIRING PROPOSED JURY INSTRUCTION REGARDING BIFURCATION OF PUNITIVE DAMAGES. Signed by Judge Beth Labson Freeman on December 13, 2024. (blflc2, COURT STAFF) (Filed on 12/13/2024) (Entered: 12/13/2024)** |
| 12/13/2024 | 202 | **ORDER REGARDING PLAINTIFF'S OBJECTIONS AND RESPONSE TO COURT'S ORDER RE: MOTIONS IN LIMINE. Signed by Judge Beth Labson Freeman on December 13, 2024. (blflc2, COURT STAFF) (Filed on 12/13/2024) (Entered: 12/13/2024)** |
| 12/13/2024 | 201 | **ORDER REGARDING PLAINTIFF'S OBJECTION TO DECLARATION OF JAMES ADGAR IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 3. Signed by Judge Beth Labson Freeman on December 13, 2024. (blflc2, COURT STAFF) (Filed on 12/13/2024) (Entered: 12/13/2024)** |
| 12/10/2024 | 200 | ADMINISTRATIVE MOTION to Allow Plaintiff's Expert Dr. Harlan Watkins to Appear Remotely at Trial filed by Kyle Johnson. Responses due by 12/16/2024. (Attachments: # 1 Declaration of Tianqi Sun, # 2 Proposed Order Stipulation and Proposed Order)(Sun, Tianqi) (Filed on 12/10/2024) (Entered: 12/10/2024) |
| 12/10/2024 | 199 | Declaration of Abimael Bastida in Support of 172 Opposition/Response to Motion, *In Limine No. 2* filed byKyle Johnson. (Related document(s) 172 ) (Bastida De Jesus, Abimael) (Filed on 12/10/2024) (Entered: 12/10/2024) |

| | | |
|---|---|---|
| 12/10/2024 | 198 | **ORDER REGARDING 195 ADMINISTRATIVE MOTION SEEKING UNLOCKED PDF EXHIBITS. Signed by Judge Beth Labson Freeman on December 10, 2024. (blflc2, COURT STAFF) (Filed on 12/10/2024) (Entered: 12/10/2024)** |
| 12/06/2024 | 197 | NOTICE of Appearance filed by Matthew Schechter on behalf of Kyle Johnson (Schechter, Matthew) (Filed on 12/6/2024) (Entered: 12/06/2024) |
| 12/06/2024 | 196 | OPPOSITION to Plaintiff's Administrative Motion for Order Instructing Defendants to Provide Unlocked PDF Exhibits re 195 Administrative Motion for Order Instructing Defendants to Provide Unlocked PDF Exhibits by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Declaration of Ardell Johnson iso Defendants' Objection to Plaintiffs Administrative Motion) (Johnson, Ardell) (Filed on 12/6/2024) (Entered: 12/06/2024) |
| 12/05/2024 | 195 | ADMINISTRATIVE Motion for Order Instructing Defendants to Provide Unlocked PDF Exhibits filed by Kyle Johnson. Responses due by 12/9/2024. (Attachments: # 1 Declaration of Abimael Bastida, # 2 Proposed Order) (Bastida De Jesus, Abimael) (Filed on 12/5/2024) (Entered: 12/05/2024) |
| 12/03/2024 | 194 | **ORDER REGARDING BIFURCATION AT TRIAL. Signed by Judge Beth Labson Freeman on December 3, 2024. (blflc2, COURT STAFF) (Filed on 12/3/2024) (Entered: 12/03/2024)** |
| 12/03/2024 | 193 | OBJECTIONS to Declaration of James Adgar in Support of Opposition to Plaintiff's Motion in Limine No. 3 192 Declaration in Support by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/03/2024 | | Received Flash Drive as Exhibit A to 192 Declaration in Support of Opposition to Plaintiff's Motion in Limine No. 3. Submitted by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (dhm, COURT STAFF) (Filed on 12/3/2024) (Entered: 12/03/2024) |
| 12/02/2024 | 192 | Declaration of James Adgar *In Support of Opposition to Plaintiff's Motion in Limine No. 3* filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Huang, James) (Filed on 12/2/2024) (Entered: 12/02/2024) |
| 12/02/2024 | 191 | OBJECTIONS to *OBJECTION TO BIFURCATION REGARDING LIABILITY AT TRIAL* by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/2/2024) (Entered: 12/02/2024) |
| 12/02/2024 | 190 | RESPONSE re 187 Order on Motion in Limine,,,,,,,,, *PLAINTIFF'S OBJECTIONS AND RESPONSE TO COURT'S ORDER RE: MOTIONS IN LIMINE* by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/2/2024) (Entered: 12/02/2024) |
| 12/02/2024 | 189 | Proposed Form of Verdict by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose . (Huang, James) (Filed on 12/2/2024) (Entered: 12/02/2024) |
| 11/12/2024 | 188 | Transcript of Pretrial Proceedings held on 10/31/2024, before Judge Freeman. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 2/10/2025. (Rodriguez, Irene) (Filed on 11/12/2024) (Entered: 11/12/2024) |

| | | |
|---|---|---|
| 11/06/2024 | 187 | **ORDER RE: 160 161 162 163 164 165 MOTIONS IN LIMINE. Signed by Judge Beth Labson Freeman on November 6, 2024. (blflc2, COURT STAFF) (Filed on 11/6/2024) (Entered: 11/06/2024)** |
| 11/04/2024 | 186 | **ORDER FOLLOWING FINAL PRETRIAL CONFERENCE. Signed by Judge Beth Labson Freeman on November 4, 2024. (blflc2, COURT STAFF) (Filed on 11/4/2024) (Entered: 11/04/2024)** |
| 11/04/2024 | 185 | **ORDER RE 166 JOINT PRETRIAL CONFERENCE STATEMENT. Signed by Judge Beth Labson Freeman on November 4, 2024. (blflc2, COURT STAFF) (Filed on 11/4/2024) (Entered: 11/04/2024)** |
| 11/04/2024 | 184 | TRANSCRIPT ORDER for proceedings held on October 31, 2024 before Judge Beth Labson Freeman by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, for Court Reporter Irene Rodriguez. (Huang, James) (Filed on 11/4/2024) (Entered: 11/04/2024) |
| 11/01/2024 | 183 | TRANSCRIPT ORDER for proceedings held on 10/31/24 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Irene Rodriguez. (Bastida De Jesus, Abimael) (Filed on 11/1/2024) (Entered: 11/01/2024) |
| 10/31/2024 | 182 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Pretrial Conference held on 10/31/2024.**<br>**Scheduling Conference set for 12/16/2024 09:00 AM in San Jose, Courtroom 1, 5th Floor before Judge Beth Labson Freeman.**<br>**Total Time in Court: 3:00.**<br>**Court Reporter: Irene Rodriguez.**<br>**Plaintiff Attorney: Abimael Bastida De Jesus, Priya Swaminathan.**<br>**Defendant Attorney: Ardell Johnson, Nicholas Sympson, James Huang.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Date Filed: 10/31/2024) (Entered: 10/31/2024) |
| 10/29/2024 | 181 | RESPONSE re 165 MOTION in Limine *NO. 3 TO PRECLUDE ADMISSION OF IMAGES AND OTHER MEDIA EVIDENCE DEPICTING VIOLENCE, OFFICER INJURIES AND PROPERTY DAMAGE ON MAY 29-30 PLAINTIFF'S NOTICE OF ELECTRONIC SUBMISSION OF MEDIA ADDRESSED IN ECF NO. 165* by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/29/2024) (Entered: 10/29/2024) |
| 10/29/2024 | 180 | RESPONSE re 161 MOTION in Limine *#2 PLAINTIFF'S NOTICE OF ELECTRONIC SUBMISSION OF MEDIA ADDRESSED IN ECF NO. 161* by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/29/2024) (Entered: 10/29/2024) |
| 10/28/2024 | 179 | **ORDER REQUIRING SUBMISSION OF MEDIA ADDRESSED IN ECF NOS. 161 AND 165. Signed by Judge Beth Labson Freeman on October 28, 2024. (blflc2, COURT STAFF) (Filed on 10/28/2024) (Entered: 10/28/2024)** |
| 10/25/2024 | 178 | Proposed Form of Verdict by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose . (Johnson, Ardell) (Filed on 10/25/2024) (Entered: 10/25/2024) |
| 10/24/2024 | | Electronic filing error. Incorrect event used. The correct event is **OPPOSITION/RESPONSE.** Filer is reminded not to use the MOTION category if it's not a motion. [err101] Re: 168 MOTION in Limine *#1 City of San Jose's Opposition to Plaintiff's MIL#1* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, 170 MOTION in Limine *#3 City of San Jose's Opposition to Plaintiff's MIL#3* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, 169 MOTION in Limine *#2 City of San Jose's Opposition to Plaintiffs MIL#2* filed by San Jose Police Department Officer James Adgar, Badge No. |

| | | |
|---|---|---|
| | | 4552, City of San Jose (mcl, COURT STAFF) (Filed on 10/24/2024) (Entered: 10/25/2024) |
| 10/24/2024 | 177 | Proposed Jury Instructions by Kyle Johnson *JOINTLY PROPOSED JURY INSTRUCTIONS*. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 176 | Proposed Form of Verdict by Kyle Johnson . (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 175 | Proposed Voir Dire by Kyle Johnson *JOINTLY PROPOSED JURY QUESTIONNAIRE*. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 174 | Statement *JOINTLY PROPOSED PRELIMINARY STATEMENT TO THE JURY* by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 173 | OPPOSITION/RESPONSE (re 162 MOTION in Limine #3 ) *PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE OF ALLEGATIONS AND COMPLAINTS BY OTHER PROTEST PARTICIPANTS* filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 172 | OPPOSITION/RESPONSE (re 161 MOTION in Limine #2 ) *PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE EXPERT OPINION TESTIMONY AND ANIMATION OF EVENTS* filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 171 | OPPOSITION/RESPONSE (re 160 MOTION in Limine #1 ) *PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT THE USE OF TOOLS AND TACTICS OTHER THAN 40MM FOAM PROJECTILES* filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 170 | MOTION in Limine #3 *City of San Jose's Opposition to Plaintiff's MIL#3* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Johnson, Ardell) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 169 | MOTION in Limine #2 *City of San Jose's Opposition to Plaintiffs MIL#2* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Johnson, Ardell) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/24/2024 | 168 | MOTION in Limine #1 *City of San Jose's Opposition to Plaintiff's MIL#1* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Johnson, Ardell) (Filed on 10/24/2024) (Entered: 10/24/2024) |
| 10/18/2024 | 167 | **REMINDER RE: CHAMBERS COPIES. Signed by Judge Beth Labson Freeman on October 18, 2024. (blflc2, COURT STAFF) (Filed on 10/18/2024) (Entered: 10/18/2024)** |
| 10/17/2024 | 166 | Pretrial Conference Statement by Kyle Johnson *JOINT PRETRIAL CONFERENCE STATEMENT AND PROPOSED ORDER*. (Bastida De Jesus, Abimael) (Filed on 10/17/2024) (Entered: 10/17/2024) |

| | | |
|---|---|---|
| 10/17/2024 | 165 | MOTION in Limine *NO. 3 TO PRECLUDE ADMISSION OF IMAGES AND OTHER MEDIA EVIDENCE DEPICTING VIOLENCE, OFFICER INJURIES AND PROPERTY DAMAGE ON MAY 29-30* filed by Kyle Johnson. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Bastida De Jesus, Abimael) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 164 | MOTION in Limine *NO. 2 TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING ANY DISPERSAL ORDERS ISSUED ON MAY 30, 2020, AND PLAINTIFF'S ALLEGED VIOLATIONS OF SUCH ORDERS* filed by Kyle Johnson. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Bastida De Jesus, Abimael) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 163 | MOTION in Limine *NO. 1 TO EXCLUDE THE USE OR ADMISSION OF EVIDENCE RELATING TO DEFENDANT JAMES ADGAR'S CHARACTER OR REPUTATION* filed by Kyle Johnson. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/24/2024. (Bastida De Jesus, Abimael) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 162 | MOTION in Limine *#3* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/31/2024. Replies due by 11/7/2024. (Attachments: # 1 Declaration iso MILs)(Johnson, Ardell) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 161 | MOTION in Limine *#2* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/31/2024. Replies due by 11/7/2024. (Attachments: # 1 Declaration iso MILs)(Johnson, Ardell) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 160 | MOTION in Limine *#1* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 10/31/2024 01:30 PM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/31/2024. Replies due by 11/7/2024. (Attachments: # 1 Declaration iso MILs)(Johnson, Ardell) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 159 | NOTICE of Appearance filed by Ardell Johnson on behalf of San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose (Johnson, Ardell) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 158 | NOTICE of Appearance filed by Nicholas Sympson on behalf of San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose (Sympson, Nicholas) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 10/17/2024 | 157 | STIPULATION *JOINT STATEMENT OF PROPOSED STIPULATIONS* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 10/17/2024) (Entered: 10/17/2024) |
| 04/25/2024 | 156 | VACATE Deadlines re 155 ORDER CONTINUING TRIAL. (tsh, COURT STAFF) (Filed on 4/25/2024) (Entered: 08/05/2024) |
| 04/25/2024 | | RESET TRAIL DATES re 155 ORDER CONTINUING TRIAL. Jury Selection set for 1/6/2025 09:00 AM; Jury Trial set for 1/6/2025, 1/7/2025, 1/8/2025, 1/9/2025, 1/10/2025, 1/13/2025, 1/14/2025, 1/15/2025, 1/16/2025, 1/17/2025 09:00 AM in San Jose, Courtroom 1, 5th Floor before Judge Beth Labson Freeman. (tsh, COURT STAFF) (Filed on 4/25/2024) (Entered: 04/25/2024) |

| | | |
|---|---|---|
| 04/23/2024 | 155 | **ORDER CONTINUING TRIAL. Signed by Judge Beth Labson Freeman on 4/23/24. (blflc2, COURT STAFF) (Filed on 4/23/2024) (Entered: 04/23/2024)** |
| 04/22/2024 | 154 | NOTICE by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose *OF WITHDRAWAL OF COUNSEL, MATTHEW PRITCHARD* (Pritchard, Matthew) (Filed on 4/22/2024) (Entered: 04/22/2024) |
| 01/22/2024 | 153 | Transcript of Proceedings held on 12/14/2023, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 151 Transcript Order ) Redaction Request due 2/12/2024. Redacted Transcript Deadline set for 2/22/2024. Release of Transcript Restriction set for 4/22/2024. (Related documents(s) 151 ) (Fisher, Summer) (Filed on 1/22/2024) (Entered: 01/22/2024) |
| 12/22/2023 | 152 | NOTICE by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose *of Withdrawal of Counsel Yue-Han Chow* (Chow, Yue-Han) (Filed on 12/22/2023) (Entered: 12/22/2023) |
| 12/21/2023 | 151 | TRANSCRIPT ORDER for proceedings held on 12/14/23 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Summer Fisher. (Bastida De Jesus, Abimael) (Filed on 12/21/2023) (Entered: 12/21/2023) |
| 12/21/2023 | 150 | **ORDER GRANTING IN PART AND DENYING IN PART 110 112 DEFENDANTS' *DAUBERT* MOTIONS TO EXCLUDE EXPERT TESTIMONY OF ROGER CLARK AND DR. HARLAN WATKINS. Signed by Judge Beth Labson Freeman on 12/21/2023. (mdllc, COURT STAFF) (Filed on 12/21/2023) (Entered: 12/21/2023)** |
| 12/18/2023 | | Reset Trial Dates re 149 ORDER GRANTING 148 STIPULATED REQUEST TO CONTINUE TRIAL DATE, FINAL PRETRIAL CONFERENCE, AND RELATED DEADLINES. Final Pretrial Conference set for 10/31/2024 01:30 PM. Jury Selection set for 11/29/2024, 12/2/2024 09:00 AM.Jury Trial set for 12/2/2024, 12/3/2024, 12/4/2024, 12/5/2024, 12/6/2024, 12/9/2024, 12/10/2024, 12/11/2024, 12/12/2024, 12/13/2024 09:00 AM in San Jose, Courtroom 1, 5th Floor before Judge Beth Labson Freeman. (tsh, COURT STAFF) (Filed on 12/18/2023) (Entered: 12/18/2023) |
| 12/18/2023 | 149 | **ORDER GRANTING 148 STIPULATED REQUEST TO CONTINUE TRIAL DATE, FINAL PRETRIAL CONFERENCE, AND RELATED DEADLINES. Signed by Judge Beth Labson Freeman on 12/18/2023. (mdllc, COURT STAFF) (Filed on 12/18/2023) (Entered: 12/18/2023)** |
| 12/15/2023 | 148 | STIPULATION WITH PROPOSED ORDER *STIPULATED REQUEST TO CONTINUE PRETRIAL CONFERENCE AND TRIAL* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 12/15/2023) (Entered: 12/15/2023) |
| 12/14/2023 | 147 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 12/14/2023 re 110 MOTION to Strike *Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Roger Clark* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose, 112 MOTION to Strike *Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose.** |

| | | |
|---|---|---|
| | | **Total Time in Court: 58 Minutes.**<br>**Court Reporter: Summer Fisher.**<br>**Plaintiff Attorney: Abimael Bastida, Tianqi Sun.**<br>**Defendant Attorney: Yue-Han Chow.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Date Filed: 12/14/2023) (Entered: 12/14/2023) |
| 12/12/2023 | 146 | **ORDER REGARDING DECEMBER 14, 2023 HEARING ON DEFENDANTS'** *DAUBERT* **MOTIONS. Signed by Judge Beth Labson Freeman on 12/12/2023. (mdllc, COURT STAFF) (Filed on 12/12/2023) (Entered: 12/12/2023)** |
| 12/06/2023 | 145 | NOTICE of Change In Counsel by Abimael J. Bastida De Jesus (Bastida De Jesus, Abimael) (Filed on 12/6/2023) (Entered: 12/06/2023) |
| 12/06/2023 | 144 | NOTICE of Appearance by Priya Swaminathan (Swaminathan, Priya) (Filed on 12/6/2023) (Entered: 12/06/2023) |
| 12/06/2023 | 143 | **CLERK'S NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR HEARING and NOTICE OF REQUIRED REGISTRATION.**<br><br>Motion Hearing as to 112 MOTION to Strike /Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins set for 12/14/2023 09:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.<br><br>Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf<br><br>**Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than 12/12/2023, at 12:00 PM PST.**<br><br>General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Filed on 12/6/2023) (Entered: 12/06/2023) |
| 12/05/2023 | 142 | **ORDER DENYING AS MOOT 141 PLAINTIFF'S ADMINISTRATIVE MOTION TO ALLOW EXPERTS TO APPEAR REMOTELY AT** *DAUBERT* **HEARING. Signed by Judge Beth Labson Freeman on 12/5/2023. (mdllc, COURT STAFF) (Filed on 12/5/2023) (Entered: 12/05/2023)** |
| 12/05/2023 | 141 | ADMINISTRATIVE MOTION to Allow Plaintiff's to Appear Remotely at the December 14, 2023 Hearing on Daubert Motions filed by Kyle Johnson. Responses due by 12/11/2023. (Attachments: # 1 Declaration of Tianqi Sun, # 2 Proposed Order)(Sun, Tianqi) (Filed on 12/5/2023) (Entered: 12/05/2023) |
| 11/27/2023 | 140 | **ORDER DIRECTING PARTIES TO SUBMIT CHAMBERS COPIES. Signed by Judge Beth Labson Freeman on 11/27/2023. (mdllc, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |

| | | |
|---|---|---|
| 11/13/2023 | [139](#) | **ORDER GRANTING IN PART AND DENYING IN PART [107](#) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. Signed by Judge Beth Labson Freeman on 11/13/2023. (mdllc, COURT STAFF) (Filed on 11/13/2023) (Entered: 11/13/2023)** |
| 10/27/2023 | [138](#) | Transcript of Proceedings held on 9-21-23, before Judge Beth Labson Freeman. Court Reporter Lee-Anne Shortridge, email: lee-anne_shortridge@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [133](#) Transcript Order ) Release of Transcript Restriction set for 1/25/2024. (Related documents(s) [133](#) ) (las, ) (Filed on 10/27/2023) (Entered: 10/27/2023) |
| 10/11/2023 | [137](#) | REPLY (re [112](#) MOTION to Strike *Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins* ) filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Huang, James) (Filed on 10/11/2023) (Entered: 10/11/2023) |
| 10/11/2023 | [136](#) | REPLY (re [110](#) MOTION to Strike *Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Roger Clark* ) filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # [1](#) Supp Decl. of Chow ISO Defendants' Motion to Exclude Expert Testimony of Roger Clark)(Chow, Yue-Han) (Filed on 10/11/2023) (Entered: 10/11/2023) |
| 10/11/2023 | 135 | **Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Settlement Conference held on 10/11/2023.**<br><br>**Case did not settle.**<br><br>**Plaintiff's Attorney: Abimael Bastida; plaintiffs representative: Kyle Johnson. Defendants' Attorney: Yue-Han Chow, Matthew Pritchard; defendants representative: James Adgar; Jaime Jimenez.**<br><br>**No Reported. Time:9:30 a.m.-10:40 a.m.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Date Filed: 10/11/2023) (Entered: 10/11/2023)** |
| 09/27/2023 | 134 | CLERK'S NOTICE SETTING FURTHER SETTLEMENT CONFERENCE. A Further Settlement Conference is set for 10/11/2023 at 09:30 AM in San Jose, Courtroom 2, 5th Floor before Magistrate Judge Virginia K. DeMarchi.<br><br>The parties shall submit short (updated) letters re settlement which shall be due two business days prior to 10/11/2023.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Filed on 9/27/2023) (Entered: 09/27/2023) |
| 09/22/2023 | [133](#) | TRANSCRIPT ORDER for proceedings held on 09/21/2023 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Lee-Anne Shortridge. (Bastida De Jesus, Abimael) (Filed on 9/22/2023) (Entered: 09/22/2023) |
| 09/21/2023 | [132](#) | **ORDER REFERRING CASE TO JUDGE VIRGINIA K. DEMARCHI FOR SETTLEMENT CONFERENCE. Signed by Judge Beth Labson Freeman on 9/21/2023. (mdllc, COURT STAFF) (Filed on 9/21/2023) (Entered: 09/21/2023)** |

| | | |
|---|---|---|
| 09/21/2023 | 131 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 9/21/2023 re 107 MOTION for Summary Judgment filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Total Time in Court: 1:33.**<br>**Court Reporter: Lee-Anne Shortridge.**<br>**Plaintiff Attorney: Abimael Bastida, Evan Miller.**<br>**Defendant Attorney: Matthew Pritchard.**<br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Date Filed: 9/21/2023) (Entered: 09/21/2023)** |
| 09/20/2023 | 130 | OPPOSITION/RESPONSE (re 110 MOTION to Strike */Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Roger Clark* ) *Plaintiff Kyle Johnson's Opposition to Defendants' Motion to Exclude Expert Testimony of Roger A. Clark* filed byKyle Johnson. (Attachments: # 1 Declaration)(Sun, Tianqi) (Filed on 9/20/2023) (Entered: 09/20/2023) |
| 09/20/2023 | 129 | OPPOSITION/RESPONSE (re 112 MOTION to Strike */Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins* ) *Plaintiff Kyle Johnson's Opposition to Defendants' Motion to Exclude Expert Testimony of Dr. Harlan Watkins* filed byKyle Johnson. (Attachments: # 1 Declaration)(Sun, Tianqi) (Filed on 9/20/2023) (Entered: 09/20/2023) |
| 09/19/2023 | 128 | OPPOSITION/RESPONSE (re 107 MOTION for Summary Judgment ) *Plaintiff ordered to refile opposition to Defendants motion for summary judgment per Court order (ECF No. 124)* filed byKyle Johnson. (Attachments: # 1 Declaration of Breanna Contreras, # 2 Declaration of Pietro Di Donato, # 3 Declaration of Derrick Sanderlin, # 4 Declaration of Adira Sharkey, # 5 Declaration of Roger Clark, # 6 Declaration of Jason Fries, # 7 Declaration of Kyle Johnson, # 8 Declaration of Abimael Bastida)(Bastida De Jesus, Abimael) (Filed on 9/19/2023) (Entered: 09/19/2023) |
| 09/18/2023 | 127 | **ORDER RE HEARING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. Signed by Judge Beth Labson Freeman on 9/18/2023. (mdllc, COURT STAFF) (Filed on 9/18/2023) (Entered: 09/18/2023)** |
| 09/15/2023 | 126 | REPLY (re 107 MOTION for Summary Judgment ) *PLAINTIFF'S RESPONSE TO DEFENDANTS' EVIDENTIARY OBJECTIONS* filed byKyle Johnson. (Attachments: # 1 Declaration of Abimael Bastida in Support of Plaintiff Kyle Johnson's Response to Defendants' Evidentiary Objections)(Bastida De Jesus, Abimael) (Filed on 9/15/2023) (Entered: 09/15/2023) |
| 09/14/2023 | 125 | **CLERK'S NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR HEARING and NOTICE OF REQUIRED REGISTRATION.**<br><br>Motion Hearing as to 107 MOTION for Summary Judgment filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose set for 9/21/2023 09:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.<br><br>Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf<br><br>**Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than 9/19/2023, at 12:00 PM PST.** |

| | | |
|---|---|---|
| | | General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Filed on 9/14/2023) (Entered: 09/14/2023) |
| 09/14/2023 | 124 | **ORDER GRANTING IN PART AND DENYING IN PART 118 PLAINTIFFS ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTYS MATERIAL SHOULD BE SEALED. Signed by Judge Beth Labson Freeman on 9/14/2023. (mdllc, COURT STAFF) (Filed on 9/14/2023) (Entered: 09/14/2023)** |
| 09/13/2023 | 123 | **ORDER GRANTING 121 PLAINTIFF'S ADMINISTRATIVE MOTION FOR LEAVE TO FILE RESPONSE TO DEFENDANTS' EVIDENTIARY OBJECTIONS; REQUIRING TWO-PAGE RESPONSE BY SEPTEMBER 15, 2023. Signed by Judge Beth Labson Freeman on 9/13/2023. (mdllc, COURT STAFF) (Filed on 9/13/2023) (Entered: 09/13/2023)** |
| 09/13/2023 | 122 | Proposed Order re 121 ADMINISTRATIVE MOTION For Leave To File a Response to Defendants' Evidentiary Objections by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 9/13/2023) (Entered: 09/13/2023) |
| 09/12/2023 | 121 | ADMINISTRATIVE MOTION For Leave To File a Response to Defendants' Evidentiary Objections filed by Kyle Johnson. Responses due by 9/18/2023. (Attachments: # 1 Declaration of Abimael Bastida In Support of Plaintiff Kyle Johnson's Administrative Motion for Leave to File a Response to Defendants' Evidentiary Objections)(Bastida De Jesus, Abimael) (Filed on 9/12/2023) (Entered: 09/12/2023) |
| 09/05/2023 | 120 | REPLY (re 107 MOTION for Summary Judgment ) *to Plaintiff's Opposition to Summary Judgment* filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Rebt. Decl. of Pritchard ISO Defendants' Reply to Plaintiff's Opp to Summary Judgment)(Pritchard, Matthew) (Filed on 9/5/2023) (Entered: 09/05/2023) |
| 08/25/2023 | 119 | Declaration of Yue-Han Chow *In Partial Support of Plaintiff's Motion to File Under Seal* filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Chow, Yue-Han) (Filed on 8/25/2023) (Entered: 08/25/2023) |
| 08/22/2023 | 118 | Administrative Motion to File Under Seal *Defendants' Material (CORRECTION OF DOCKET # 115 )* filed by Kyle Johnson. (Attachments: # 1 Declaration of Abimael Bastida, # 2 Proposed Order, # 3 Exhibit 2, # 4 Exhibit 22, # 5 Exhibit 24, # 6 Exhibit 29, # 7 Exhibit 31, # 8 Exhibit 32, # 9 Exhibit 39, # 10 Exhibit C)(Bastida De Jesus, Abimael) (Filed on 8/22/2023) (Entered: 08/22/2023) |
| 08/18/2023 | 117 | Declaration of Abimael Bastida in Support of 115 ADMINISTRATIVE MOTION to consider whether another party's material should be sealed , 116 Opposition/Response to Motion, filed byKyle Johnson. (Related document(s) 115 , 116 ) (Bastida De Jesus, Abimael) (Filed on 8/18/2023) (Entered: 08/19/2023) |
| 08/18/2023 | 116 | OPPOSITION/RESPONSE (re 107 MOTION for Summary Judgment ) filed byKyle Johnson. (Attachments: # 1 Declaration of Breanna Contreras, # 2 Declaration of Pietro Di Donato, # 3 Declaration of Derrick Sanderlin, # 4 Declaration of Adira Sharkey, # 5 Declaration of Roger Clark, # 6 Declaration of Jason Fries, # 7 Declaration of Kyle Johnson)(Bastida De Jesus, Abimael) (Filed on 8/18/2023) (Entered: 08/18/2023) |

| | | |
|---|---|---|
| 08/18/2023 | 115 | **\*Erroneous Entry - Please refer to document 118** ADMINISTRATIVE MOTION to consider whether another party's material should be sealed filed by Kyle Johnson. Responses due by 8/22/2023. (Attachments: # 1 Declaration of Abimael Bastida in Support of Plaintiff's Administrative Motion to Consider Whether Another Party's Material Should be Sealed, # 2 Proposed Order Granting Plaintiff's Administrative Motion to Consider Whether Another Party's Material Should be Sealed)(Sun, Tianqi) (Filed on 8/18/2023) Modified on 8/22/2023 (slh, COURT STAFF). (Entered: 08/18/2023) |
| 08/10/2023 | 114 | **ORDER GRANTING 113 STIPULATION TO EXTEND BRIEFING SCHEDULE FOR DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY. Signed by Judge Beth Labson Freeman on 8/10/2023. (blflc2, COURT STAFF) (Filed on 8/10/2023) (Entered: 08/10/2023)** |
| 08/10/2023 | 113 | STIPULATION WITH PROPOSED ORDER *EXTENDING BRIEFING SCHEDULE FOR DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 8/10/2023) (Entered: 08/10/2023) |
| 08/08/2023 | 112 | MOTION to Strike */Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 12/14/2023 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 8/22/2023. Replies due by 8/29/2023. (Attachments: # 1 Declaration ISO of Daubert Motion)(Huang, James) (Filed on 8/8/2023) (Entered: 08/08/2023) |
| 08/07/2023 | 111 | **\* DUPLICATE ENTRY. SEE 112 \*** MOTION to Strike */Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Dr. Harlan Watkins* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 12/14/2023 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 8/21/2023. Replies due by 8/28/2023. (Attachments: # 1 Declaration ISO of Daubert Motion)(Huang, James) (Filed on 8/7/2023) Modified on 8/8/2023 (mcl, COURT STAFF). Modified on 8/8/2023 (tsh, COURT STAFF). (Entered: 08/07/2023) |
| 08/07/2023 | 110 | MOTION to Strike */Daubert Motion - Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Roger Clark* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 12/14/2023 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 8/21/2023. Replies due by 8/28/2023. (Attachments: # 1 Declaration ISO of Daubert Motion)(Chow, Yue-Han) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | 109 | NOTICE of Appearance by James Huang *for City of San Jose* (Huang, James) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 07/19/2023 | 108 | **Order re 104 July 13, 2023 Discovery Dispute. Signed by Magistrate Judge Virginia K. DeMarchi on 7/19/2023. (vkdlc1, COURT STAFF) (Filed on 7/19/2023) (Entered: 07/19/2023)** |
| 07/17/2023 | 107 | MOTION for Summary Judgment filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 9/21/2023 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 8/28/2023. Replies due by 9/5/2023. (Attachments: # 1 Declaration of Matthew Pritchard ISO MSJ, # 2 Declaration of Daniel Morales ISO MSJ, # 3 Declaration of James Adgar ISO MSJ, # 4 Declaration of Jason Dwyer ISO MSJ, # 5 Declaration of Lee Tassio ISO |

| | | |
|---|---|---|
| | | MSJ, # 6 Declaration of Christopher Sciba ISO MSJ, # 7 Declaration of Jonathan Byers ISO MSJ)(Pritchard, Matthew) (Filed on 7/17/2023) (Entered: 07/17/2023) |
| 07/17/2023 | 106 | NOTICE of Change In Counsel by Abimael J. Bastida De Jesus (Bastida De Jesus, Abimael) (Filed on 7/17/2023) (Entered: 07/17/2023) |
| 07/14/2023 | 105 | CLERK'S NOTICE re 104 Joint Discovery Letter Brief. Plaintiff shall deliver electronic copies of the Rule 30(b)(6) deposition transcripts of witnesses Zuniga, Sciba, Dwyer, and Tassio to Judge DeMarchi by noon on July 17, 2023. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (vkdlc1, COURT STAFF) (Filed on 7/14/2023) (Entered: 07/14/2023) |
| 07/13/2023 | 104 | Joint Discovery Letter Brief filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/05/2023 | 103 | **ORDER GRANTING 102 STIPULATED REQUEST FOR ORDER EXTENDING EXPERT DISCOVERY CUT-OFF. Signed by Judge Beth Labson Freeman on 7/5/2023. (blflc2, COURT STAFF) (Filed on 7/5/2023) (Entered: 07/05/2023)** |
| 06/30/2023 | 102 | STIPULATION WITH PROPOSED ORDER *EXTENDING EXPERT DISCOVERY CUT-OFF* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/08/2023 | 101 | Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Settlement Conference held on 6/8/2023.<br><br>Case did not settle. Parties may contact Judge DeMarchi's CRD to schedule a further settlement conference at a later date.<br><br>Plaintiff's Attorney: James McManis, Abimael Bastida; plaintiffs representative: Kyle Johnson.<br>Defendants' Attorney: Yue-Han Chow, Matthew Pritchard; defendants representative: James Adgar.<br><br>No Court Reporter. Time 9:30a.m.-11:05a.m.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Date Filed: 6/8/2023) (Entered: 06/08/2023) |
| 06/05/2023 | 100 | CLERK'S NOTICE SETTING SETTLEMENT CONFERENCE. A Settlement Conference is set for 6/8/2023 at 09:30 AM in San Jose, Courtroom 2, 5th Floor. This is an in court proceeding and all appearances shall be in person.<br><br>The deadline for submission of settlement conference statements and confidential settlement letters is 9:00 AM on 6/7/2023.<br><br>The parties shall comply with Judge DeMarchi's Standing Order re Settlement Conference Procedures at http://www.cand.uscourts.gov/vkdorders, which includes instructions for the submission of Settlement Conference Statements and Confidential Settlement Letters in advance of the conference.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*, Set/Reset Deadlines as to (amk, COURT STAFF) (Filed on 6/5/2023) (Entered: 06/05/2023) |
| 05/25/2023 | 99 | **Order re 96 April 17, 2023 Discovery Dispute. Signed by Magistrate Judge Virginia K. DeMarchi. (vkdlc1, COURT STAFF) (Filed on 5/25/2023) (Entered: 05/25/2023)** |

| 05/01/2023 | 98 | **ORDER GRANTING 97 STIPULATION TO MODIFY CASE SCHEDULE. Signed by Judge Beth Labson Freeman on 5/1/2023. (blflc2, COURT STAFF) (Filed on 5/1/2023) (Entered: 05/01/2023)** |
|---|---|---|
| 04/28/2023 | 97 | STIPULATION WITH PROPOSED ORDER *to Modify Case Management Schedule* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Chow, Yue-Han) (Filed on 4/28/2023) (Entered: 04/28/2023) |
| 04/17/2023 | 96 | Joint Discovery Letter Brief filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Chow, Yue-Han) (Filed on 4/17/2023) (Entered: 04/17/2023) |
| 03/20/2023 | 95 | **STIPULATED PROTECTIVE ORDER. Signed by Magistrate Judge Virginia K. DeMarchi. (vkdlc1, COURT STAFF) (Filed on 3/20/2023) (Entered: 03/20/2023)** |
| 03/17/2023 | 94 | STIPULATION WITH PROPOSED ORDER : *Proposed Stipulated Protective Order* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Redlined Version of Proposed Stipulated Protective Order)(Chow, Yue-Han) (Filed on 3/17/2023) (Entered: 03/17/2023) |
| 02/22/2023 | 93 | **ORDER GRANTING 91 ADMINISTRATIVE MOTION TO CONTINUE CASE MANAGEMENT DEADLINES AS MODIFIED BY THE COURT. Signed by Judge Beth Labson Freeman on 2/22/2023. (blflc2, COURT STAFF) (Filed on 2/22/2023) (Entered: 02/22/2023)** |
| 02/21/2023 | 92 | OPPOSITION/RESPONSE (re 91 ADMINISTRATIVE MOTION to Continue Case Management Deadlines ) filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Attachments: # 1 Declaration of Chow ISO Opp to Plaintiff's Admin Motion to Cont. Case Mgmt Deadlines)(Chow, Yue-Han) (Filed on 2/21/2023) (Entered: 02/21/2023) |
| 02/16/2023 | 91 | ADMINISTRATIVE MOTION to Continue Case Management Deadlines filed by Kyle Johnson. Responses due by 2/21/2023. (Attachments: # 1 Declaration of Abimael Bastida In Support of Administrative Motion to Continue Case Management Deadlines, # 2 Proposed Order)(Bastida De Jesus, Abimael) (Filed on 2/16/2023) Modified on 2/17/2023 (mcl, COURT STAFF). (Entered: 02/16/2023) |
| 12/29/2022 | 90 | Transcript of Proceedings held on 12/01/2022, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 84 Transcript Order ) Redaction Request due 1/19/2023. Redacted Transcript Deadline set for 1/30/2023. Release of Transcript Restriction set for 3/29/2023. (Related documents(s) 84 ) (Fisher, Summer) (Filed on 12/29/2022) (Entered: 12/29/2022) |
| 12/22/2022 | 89 | **ORDER GRANTING 88 STIPULATION TO EXTEND FACT DISCOVERY DEADLINE AND DEADLINE FOR JUDICIAL SETTLEMENT CONFERENCE. Signed by Judge Beth Labson Freeman on 12/22/2022. (blflc2, COURT STAFF) (Filed on 12/22/2022) (Entered: 12/22/2022)** |

| | | |
|---|---|---|
| 12/21/2022 | 88 | STIPULATION WITH PROPOSED ORDER *to Extend Fact Discovery Deadline and Deadline for Judicial Settlement Conference* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Chow, Yue-Han) (Filed on 12/21/2022) (Entered: 12/21/2022) |
| 12/20/2022 | 87 | Answer to Amended Complaint 73 Amended Complaint, *Plaintiff's Second* by San Jose Police Department Officer James Adgar, Badge No. 4552. (Pritchard, Matthew) (Filed on 12/20/2022) Modified on 12/21/2022 (kmg, COURT STAFF). (Entered: 12/20/2022) |
| 12/20/2022 | 86 | Answer to Amended Complaint 73 Amended Complaint, *Plaintiff's Second* byCity of San Jose. (Pritchard, Matthew) (Filed on 12/20/2022) (Entered: 12/20/2022) |
| 12/12/2022 | 85 | **ORDER DENYING 74 PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT. Signed by Judge Beth Labson Freeman on 12/12/2022. (blflc2, COURT STAFF) (Filed on 12/12/2022) (Entered: 12/12/2022)** |
| 12/12/2022 | 84 | TRANSCRIPT ORDER for proceedings held on 12/01/2022 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Summer Fisher. (Bastida De Jesus, Abimael) (Filed on 12/12/2022) (Entered: 12/12/2022) |
| 12/01/2022 | 83 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 12/1/2022 re 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose.**<br>**Total Time in Court: 20 Minutes.**<br>**Court Reporter: Summer Fisher.**<br>**Plaintiff Attorney: Abimael Bastida, Evan Miller.**<br>**Defendant Attorney: Matthew Pritchard.**<br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Date Filed: 12/1/2022) (Entered: 12/01/2022)** |
| 11/28/2022 | 82 | **CLERK'S NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR HEARING and NOTICE OF REQUIRED REGISTRATION.**<br><br>Motion Hearing as to 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part set for 12/01/2022 09:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.*<br><br>*Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf*<br><br>***Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than 11/30/2022, at 12:00 PM PST.***<br><br>*General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.*<br><br>*Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/*<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.) (tsh, COURT STAFF) (Filed on 11/28/2022) (Entered: 11/28/2022)* |

| | | |
|---|---|---|
| 10/14/2022 | 81 | NOTICE of Appearance by Evan Louis Miller (Miller, Evan) (Filed on 10/14/2022) (Entered: 10/14/2022) |
| 10/11/2022 | 80 | REPLY (re 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part* ) *to Plaintiff's Opp to MTD SAC In Part* filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Pritchard, Matthew) (Filed on 10/11/2022) (Entered: 10/11/2022) |
| 09/28/2022 | 79 | OPPOSITION/RESPONSE (re 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part* ) *CORRECTION OF DOCKET # 77* filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 9/28/2022) (Entered: 09/28/2022) |
| 09/28/2022 | 78 | **ORDER STRIKING 77 PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS. Signed by Judge Beth Labson Freeman on 9/28/2022. (blflc2, COURT STAFF) (Filed on 9/28/2022) (Entered: 09/28/2022)** |
| 09/27/2022 | 77 | * ERRONEOUS ENTRY. SEE 79 * OPPOSITION/RESPONSE (re 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part* ) filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 9/27/2022) Modified on 9/29/2022 (mcl, COURT STAFF). (Entered: 09/27/2022) |
| 08/17/2022 | | ***Deadlines terminated. Set/Reset Deadlines as to 76 Order on Stipulation, 74 MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part*. Responses due by 9/27/2022. Replies due by 10/11/2022. (mcl, COURT STAFF) (Filed on 8/17/2022) (Entered: 08/18/2022) |
| 08/17/2022 | 76 | **ORDER GRANTING 75 STIPULATION TO EXTEND BRIEFING SCHEDULE. Signed by Judge Beth Labson Freeman on 8/17/2022. (blflc4, COURT STAFF) (Filed on 8/17/2022) (Entered: 08/17/2022)** |
| 08/16/2022 | 75 | STIPULATION WITH PROPOSED ORDER *to Extend Briefing Schedule* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Pritchard, Matthew) (Filed on 8/16/2022) (Entered: 08/16/2022) |
| 08/12/2022 | 74 | MOTION to Dismiss *Plaintiff's Second Amended Complaint In Part* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 12/1/2022 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 8/26/2022. Replies due by 9/2/2022. (Pritchard, Matthew) (Filed on 8/12/2022) (Entered: 08/12/2022) |
| 07/14/2022 | 73 | SECOND AMENDED COMPLAINT *FOR DAMAGES, DEMAND FOR JURY TRIAL* against San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Filed byKyle Johnson. (Bastida De Jesus, Abimael) (Filed on 7/14/2022) Modified on 7/15/2022 (mcl, COURT STAFF). (Entered: 07/14/2022) |
| 07/06/2022 | 72 | CLERK'S NOTICE. In view of the parties status report re the timing of a settlement conference in this matter, Judge DeMarchi directs the parties to confer about mutually agreeable dates for a settlement conference to be held no later than January 31, 2023. <br><br> Please note that Judge DeMarchi generally conducts settlement conferences on Wednesdays, Thursdays, and Fridays. <br><br> After conferring, the parties should coordinate scheduling of the conference with Judge DeMarchis Courtroom Deputy. <br><br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Filed on 7/6/2022) (Entered: 07/06/2022) |

| | | |
|---|---|---|
| 06/10/2022 | 71 | **ORDER GRANTING 70 STIPULATION TO EXTEND DEADLINE TO FILE AMENDED COMPLAINT by Judge Beth Labson Freeman. (blflc2, COURT STAFF) (Filed on 6/10/2022) (Entered: 06/10/2022)** |
| 06/09/2022 | 70 | STIPULATION WITH PROPOSED ORDER *TO EXTEND TIME TO FILE AMENDED COMPLAINT (CIVIL L.R. 6-1(B) AND 6-2)* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 6/9/2022) (Entered: 06/09/2022) |
| 04/05/2022 | 69 | **ORDER GRANTING 68 STIPULATION TO EXTEND TIME TO FILE AMENDED COMPLAINT by Judge Beth Labson Freeman. Amended Pleading due by 6/14/2022. Response to Amended Pleading due by 7/14/2022. (blflc2, COURT STAFF) (Filed on 4/5/2022) (Entered: 04/05/2022)** |
| 04/05/2022 | 68 | STIPULATION WITH PROPOSED ORDER *TO EXTEND TIME TO FILE AMENDED COMPLAINT (CIVIL L.R. 6-1(B) AND 6-2)* filed by Kyle Johnson. (Bastida De Jesus, Abimael) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 03/16/2022 | 67 | **ORDER GRANTING IN PART WITH LEAVE TO AMEND IN PART AND DENYING IN PART 53 MOTION TO DISMISS by Judge Beth Labson Freeman. (blflc2, COURT STAFF) (Filed on 3/16/2022) (Entered: 03/16/2022)** |
| 02/25/2022 | 66 | NOTICE of Change In Counsel by Abimael J. Bastida De Jesus (Bastida De Jesus, Abimael) (Filed on 2/25/2022) (Entered: 02/25/2022) |
| 01/24/2022 | 65 | Transcript of Proceedings held on 12/16/2021, before Judge Beth Labson Freeman. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 63 Transcript Order ) Redaction Request due 2/14/2022. Redacted Transcript Deadline set for 2/24/2022. Release of Transcript Restriction set for 4/25/2022. (Related documents(s) 63 ) (Fisher, Summer) (Filed on 1/24/2022) (Entered: 01/24/2022) |
| 01/05/2022 | 64 | **ORDER Requesting Status Report Re Timing of Settlement Conference. Signed by Magistrate Judge Virginia K. DeMarchi on 1/5/2022. (vkdlc1, COURT STAFF) (Filed on 1/5/2022) (Entered: 01/05/2022)** |
| 12/22/2021 | 63 | TRANSCRIPT ORDER for proceedings held on 12/16/2021 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter Summer Fisher. (Peek, Christine) (Filed on 12/22/2021) (Entered: 12/22/2021) |
| 12/16/2021 | 62 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Motion Hearing held on 12/16/2021 re 53 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose.**<br>**Total Time in Court: 34 Minutes.**<br>**Court Reporter: Summer Fisher.**<br>**Plaintiff Attorney: Christine Peek, Evan Miller.**<br>**Defendant Attorney: Matthew Pritchard.**<br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Date Filed: 12/16/2021) (Entered: 12/16/2021)** |
| 12/08/2021 | 61 | **CLERKS NOTICE CONVERTING MOTION HEARING TO ZOOM WEBINAR. Motion Hearing as to 53 MOTION to Dismiss *Plaintiff's First Amended Complaint* set for 12/16/2021 09:00 AM before Judge Beth Labson Freeman will be held via a** |

| | | |
|---|---|---|
| | | Zoom webinar.<br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at <u>https://www.cand.uscourts.gov/blf</u>**<br><br>**Court Appearances: Ad vanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than December 14, 2021 at 2:00 PM PST.**<br><br>**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup: <u>https://www.cand.uscourts.gov/zoom/</u>.**<br><br>*(This is a text -only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Filed on 12/8/2021) (Entered: 12/08/2021) |
| 11/01/2021 | 60 | **ORDER REQUESTING COURTESY COPIES. Signed by Judge Beth Labson Freeman on 11/1/2021. (blflc2, COURT STAFF) (Filed on 11/1/2021) (Entered: 11/01/2021)** |
| 10/29/2021 | 59 | REPLY (re 53 MOTION to Dismiss *Plaintiff's First Amended Complaint* ) *TO PLAINTIFFS OPPOSITION TO MTD FAC* filed bySan Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Pritchard, Matthew) (Filed on 10/29/2021) (Entered: 10/29/2021) |
| 10/22/2021 | 58 | OPPOSITION/RESPONSE (re 53 MOTION to Dismiss *Plaintiff's First Amended Complaint* ) filed byKyle Johnson. (Peek, Christine) (Filed on 10/22/2021) (Entered: 10/22/2021) |
| 10/13/2021 | 57 | **ORDER GRANTING 56 STIPULATION TO EXTEND BRIEFING ON MOTION TO DISMISS by Judge Beth Labson Freeman. (blflc2S, COURT STAFF) (Filed on 10/13/2021) (Entered: 10/13/2021)** |
| 10/13/2021 | 56 | STIPULATION WITH PROPOSED ORDER *to Enlarge Time for Briefing on Defendants' MTD* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. (Pritchard, Matthew) (Filed on 10/13/2021) (Entered: 10/13/2021) |
| 10/08/2021 | 55 | **ORDER Requesting Status Report Re Timing of Settlement Conference. Signed by Judge Virginia K. DeMarchi on 10/8/2021. (vkdlc1S, COURT STAFF) (Filed on 10/8/2021) (Entered: 10/08/2021)** |
| 10/06/2021 | 54 | WAIVER OF SERVICE Returned Executed filed by Kyle Johnson. Service waived by San Jose Police Department Officer James Adgar, Badge No. 4552 waiver sent on 9/28/2021, answer due 11/29/2021. (Peek, Christine) (Filed on 10/6/2021) (Entered: 10/06/2021) |
| 10/01/2021 | 53 | MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Motion Hearing set for 12/16/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 10/15/2021. Replies due by 10/22/2021. (Pritchard, Matthew) (Filed on 10/1/2021) (Entered: 10/01/2021) |
| 10/01/2021 | 52 | CLERK'S NOTICE SETTING TELEPHONE CONFERENCE. Telephone Conference with counsel is set for 10/8/2021 11:00 AM before Magistrate Judge Virginia K. |

| | | |
|---|---|---|
| | | DeMarchi. The parties are to Dial: 1-877-848-7030 access code: 6982082. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Filed on 10/1/2021) (Entered: 10/01/2021) |
| 09/30/2021 | 51 | MOTION Further Conference with Judge DeMarchi and [PROPOSED] Order filed by San Jose Police Department Officer James Adgar, Badge No. 4552, City of San Jose. Responses due by 10/14/2021. Replies due by 10/21/2021. (Chow, Yue-Han) (Filed on 9/30/2021) Modified on 10/1/2021 (mclS, COURT STAFF). (Entered: 09/30/2021) |
| 09/23/2021 | 50 | First Amended Complaint Summons Issued as to San Jose Police Department Officer James Adgar, Badge No. 4552. (mclS, COURT STAFF) (Filed on 9/23/2021) (Entered: 09/23/2021) |
| 09/23/2021 | 49 | Proposed Summons. (Peek, Christine) (Filed on 9/23/2021) (Entered: 09/23/2021) |
| 09/20/2021 | 48 | **ORDER TERMINATING 27 MOTION TO DISMISS AS MOOT; VACATING HEARING. Signed by Judge Beth Labson Freeman on 9/20/21. (blflc2S, COURT STAFF) (Filed on 9/20/2021) (Entered: 09/20/2021)** |
| 09/17/2021 | 47 | AMENDED COMPLAINT *(FIRST AMENDED)* against City of San Jose, San Jose Police Department Officer James Adgar, Badge No. 4552. Filed byKyle Johnson. (Peek, Christine) (Filed on 9/17/2021) (Entered: 09/17/2021) |
| 09/17/2021 | 46 | **ORDER GRANTING 45 STIPULATION TO FILE FIRST AMENDED COMPLAINT. Signed by Judge Beth Labson Freeman on 9/17/2021. (blflc2S, COURT STAFF) (Filed on 9/17/2021) (Entered: 09/17/2021)** |
| 09/17/2021 | 45 | STIPULATION WITH PROPOSED ORDER *Allowing Filing of First Amended Complaint* filed by Kyle Johnson. (Peek, Christine) (Filed on 9/17/2021) (Entered: 09/17/2021) |
| 09/10/2021 | 44 | CLERK'S NOTICE Per discussion with the parties, the Court vacates the settlement conference set for September 16, 2021. The parties shall confer and arrange with Judge DeMarchis courtroom deputy to set a settlement conference within the next 60 days. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Filed on 9/10/2021) (Entered: 09/10/2021) |
| 09/10/2021 | 43 | **Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Telephone Conference held on 9/10/2021. Pre-Settlement Telephone conference held. Plaintiff Attorney: Christine Peek. Defendant Attorney: : Yue-Han Chow, Matthew Pritchard. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Date Filed: 9/10/2021) (Entered: 09/10/2021)** |
| 09/03/2021 | 42 | Transcript of Proceedings of the official sound recording held on 07/22/21, before Judge Beth Labson Freeman. FTR/Transcriber Echo Reporting, Inc., telephone number (858) 453-7590 echoreporting@yahoo.com. Tape Number: FTR 11:16-11:34. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 37 Transcript Order, ) Redaction Request due 9/24/2021. Redacted Transcript Deadline set for 10/4/2021. Release of Transcript Restriction set for 12/2/2021. (Related documents(s) 37 ) (tgj, COURT STAFF) (Filed on 9/3/2021) (Entered: 09/03/2021) |

| | | |
|---|---|---|
| 08/12/2021 | 41 | CLERK'S NOTICE SETTING SETTLEMENT CONFERENCE.<br><br>A Settlement Conference is hereby set for September 16, 2021 09:30 AM before Magistrate Judge Virginia K. DeMarchi.<br><br>A Pre-Settlement Telephone Conference call with counsel only is set for September 10, 2021 10:00AM.<br><br>The parties shall comply with Judge DeMarchi's Standing Order re Settlement Conference Procedures at http://www.cand.uscourts.gov/vkdorders, which includes instructions and deadlines for the submission of Settlement Conference Statements and Confidential Settlement Letters in advance of the conference.<br><br>Video and Conference Call information will be emailed to counsel.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* Settlement Conference set for 9/16/2021 09:30 AM in San Jose, - Videoconference Only. Telephone Conference set for 9/10/2021 10:00 AM in San Jose, - Telephonic Only before Magistrate Judge Virginia K. DeMarchi. (pmcS, COURT STAFF) (Filed on 8/12/2021) (Entered: 08/12/2021) |
| 07/23/2021 | 39 | SUMMONS Returned Executed by Kyle Johnson. City of San Jose served on 4/8/2021, answer due 4/29/2021. (Peek, Christine) (Filed on 7/23/2021) Modified on 8/3/2021 (tshS, COURT STAFF). (Entered: 07/23/2021) |
| 07/23/2021 | | Electronic filing error. Incorrect event used. [err101]Please re-file in its entirety using correct event "Summons Returned Executed" Re: 35 Certificate of Service fi led by Kyle Johnson (dhmS, COURT STAFF) (Filed on 7/23/2021) (Entered: 07/23/2021) |
| 07/22/2021 | 40 | **CASE MANAGEMENT SCHEDULING ORDER:Fact Discovery Cutoff February 17, 2023, Deadline to Disclose Experts March 24, 2023, Deadline to Disclose Rebuttal Experts April 21, 2023, Expert Discovery Cutoff May 26, 2023, Last Day to File Dispositive Motions June 15, 2023, Last Day to File Opposition July 27, 2023, Last Day to File Reply August 24, 2023. Last Day to Hear Dispositive Motions set for 9/21/2023 09:00 AM. Final Pretrial Conference set for 1/25/2024 01:30 PM. Jury Selection set for 2/23/2024, 2/26/2024 09:00 AM. Jury Trial set for 2/26/2024, 2/27/2024, 2/28/2024, 2/29/2024, 3/1/2024, 3/4/2024, 3/5/2024, 3/6/2024, 3/7/2024, 3/8/2024 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Signed by Judge Beth Labson Freeman on 7/22/2021.**<br>**(tshS, COURT STAFF) (Filed on 7/22/2021) (Entered: 08/03/2021)** |
| 07/22/2021 | 38 | **Minute Entry for proceedings held before Judge Beth Labson Freeman: Initial Case Management Conference held on 7/22/2021.**<br>**FTR Time: 11:16 - 11:34.**<br>**Plaintiff Attorney: Christine Peek, Cherrie Tan via Zoom Webinar.**<br>**Defendant Attorney: Matthew Prtchard, Yue-Han Chow via Zoom Webinar.**<br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Date Filed: 7/22/2021) . (Entered: 07/30/2021)** |
| 07/22/2021 | 37 | TRANSCRIPT ORDER for proceedings held on 07/22/2021 before Judge Beth Labson Freeman by Kyle Johnson, for Court Reporter FTR - San Jose. (Peek, Christine) (Filed on 7/22/2021) **Transcriber: Echo Reporting.** Modified on 8/2/2021 (lmh, COURT STAFF). (Entered: 07/22/2021) |

| | | |
|---|---|---|
| 07/22/2021 | 36 | **ORDER REFERRING CASE TO JUDGE VIRGINIA K. DEMARCHI FOR SETTLEMENT CONFERENCE. Signed by Judge Beth Labson Freeman on July 22, 2021. (blflc2S, COURT STAFF) (Filed on 7/22/2021) (Entered: 07/22/2021)** |
| 07/22/2021 | 35 | CERTIFICATE OF SERVICE by Kyle Johnson *Proof of Service (Summons and Complaint)* (Peek, Christine) (Filed on 7/22/2021) (Entered: 07/22/2021) |
| 07/19/2021 | 34 | **CLERK'S NOTICE CONVERTING CASE MANAGEMENT CONFERENCE TO ZOOM WEBINAR. Case Management Conference set for 7/22/2021 11:00 AM before Judge Beth Labson Freeman will be held via a Zoom webinar.** <br><br> **Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/blf** <br><br> **Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at blfcrd@cand.uscourts.gov no later than July 20, 2021 at 2:00 PM.** <br><br> **General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.** <br><br> **Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.** <br><br> ***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tshS, COURT STAFF) (Filed on 7/19/2021) (Entered: 07/19/2021)** |
| 07/14/2021 | 33 | JOINT CASE MANAGEMENT STATEMENT *AND RULE 26(f) REPORT* filed by Kyle Johnson. (Peek, Christine) (Filed on 7/14/2021) (Entered: 07/14/2021) |
| 06/28/2021 | 32 | REPLY (re 27 MOTION to Dismiss ) *to Plaintiff's Opposition to Motion to Dismiss* filed byCity of San Jose. (Pritchard, Matthew) (Filed on 6/28/2021) (Entered: 06/28/2021) |
| 06/15/2021 | 31 | OPPOSITION/RESPONSE (re 27 MOTION to Dismiss ) *Plaintiff Kyle Johnson's Corrected Opposition to Defendant City of San Jose's Motion to Dismiss CORRECTION OF DOCKET # 30* filed byKyle Johnson. (Peek, Christine) (Filed on 6/15/2021) (Entered: 06/15/2021) |
| 06/14/2021 | 30 | **\*Disregard See dkt 31 for Corrections\*** OPPOSITION/RESPONSE (re 27 MOTION to Dismiss ) *Plaintiff Kyle Johnson's Opposition to Defendant City of San Jose's Motion to Dismiss* filed by Kyle Johnson. (Peek, Christine) (Filed on 6/14/2021) Modified on 6/15/2021 (sfbS, COURT STAFF). (Entered: 06/14/2021) |
| 05/26/2021 | 29 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *by Defendant City of San Jose* (Pritchard, Matthew) (Filed on 5/26/2021) (Entered: 05/26/2021) |
| 05/26/2021 | 28 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *Plaintiff's ADR Certification* (Peek, Christine) (Filed on 5/26/2021) (Entered: 05/26/2021) |
| 05/24/2021 | 27 | MOTION to Dismiss filed by City of San Jose. Motion Hearing set for 12/16/2021 09:00 AM in San Jose, Courtroom 3, 5th Floor before Judge Beth Labson Freeman. Responses due by 6/14/2021. Replies due by 6/28/2021. (Pritchard, Matthew) (Filed on 5/24/2021) (Entered: 05/24/2021) |
| 05/11/2021 | 26 | **ORDER GRANTING 24 STIPULATED REQUEST FOR SCHEDULING ORDER REGARDING AMENDMENT OF COMPLAINT. Signed by Judge Beth Labson** |

| | | |
|---|---|---|
| | | Freeman on 3/11/2021. (blflc2S, COURT STAFF) (Filed on 5/11/2021) (Entered: 05/11/2021) |
| 05/11/2021 | 25 | **Stipulated Protective Order. Signed by Judge Virginia K. DeMarchi on 5/11/2021. (vkdlc1S, COURT STAFF) (Filed on 5/11/2021) (Entered: 05/11/2021)** |
| 05/10/2021 | 24 | STIPULATION WITH PROPOSED ORDER *STIPULATED REQUEST FOR SCHEDULING ORDER REGARDING AMENDMENT OF COMPLAINT* filed by Kyle Johnson. (Peek, Christine) (Filed on 5/10/2021) (Entered: 05/10/2021) |
| 05/07/2021 | 23 | **ORDER GRANTING 21 STIPULATION TO EXTEND BRIEFING TIME. Signed by Judge Beth Labson Freeman on 5/7/2021. (blflc2S, COURT STAFF) (Filed on 5/7/2021) (Entered: 05/07/2021)** |
| 05/06/2021 | 22 | Proposed Order *Corrected Proposed Stipulated Protective Order [Correction of Docket # 20* by Kyle Johnson. (Attachments: # 1 Redline version)(Peek, Christine) (Filed on 5/6/2021) (Entered: 05/06/2021) |
| 05/06/2021 | 21 | STIPULATION WITH PROPOSED ORDER *TO ENLARGE TIME FOR BRIEFING ON DEFENDANT'S MOTION TO DISMISS* filed by City of San Jose. (Pritchard, Matthew) (Filed on 5/6/2021) (Entered: 05/06/2021) |
| 05/05/2021 | 20 | **\*Filing Error. Disregard, See dkt 22 for corrected Proposed Order** *[Proposed] Stipulated Protective Order* by Kyle Johnson. (Peek, Christine) (Filed on 5/5/2021) Modified on 5/6/2021 (sfbS, COURT STAFF). (Entered: 05/05/2021) |
| 04/23/2021 | 19 | **ORDER ON MOTION TO RELATE CASES. Case C-21-1849-BLF is NOT related to case C-21-1705-PJH. Signed by Judge Phyllis J. Hamilton on 4/23/2021. (kcS, COURT STAFF) (Filed on 4/23/2021) (Entered: 04/23/2021)** |
| 04/15/2021 | 18 | **RELATED CASE ORDER re 21-cv-00519-SVK. Signed by Judge Susan van Keulen on 4/15/2021. (svklc2S, COURT STAFF) (Filed on 4/15/2021) (Entered: 04/15/2021)** |
| 04/12/2021 | 17 | **CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE AFTER REASSIGNMENT.**<br>**Case Management Statement due by 7/15/2021. Initial Case Management Conference set for 7/22/2021 11:00 AM in San Jose, Courtroom 3, 5th Floor.**<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br>(tshS, COURT STAFF) (Filed on 4/12/2021) (Entered: 04/12/2021) |
| 04/05/2021 | 16 | **ORDER DENYING 8 MOTION TO RELATE. Signed by Judge Beth Labson Freeman on 4/5/2021.(blflc4S, COURT STAFF) (Filed on 4/5/2021) (Entered: 04/05/2021)** |
| 04/05/2021 | 15 | RESPONSE re 8 MOTION to Relate Case *City of San Jose's Motion to Relate Timothy Harper and Derrick Sanderlin Case* by Timothy Harper. (Attachments: # 1 Certificate/Proof of Service)(Powell, Robert) (Filed on 4/5/2021) (Entered: 04/05/2021) |
| 04/01/2021 | 14 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Beth Labson Freeman for all further proceedings. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Magistrate Judge Virginia K. DeMarchi remains as referral judge assigned to case. Reassignment Order signed by Clerk on 4/1/2021. (Attachments: # 1 Notice of Eligibility for Video Recording)(bwS, COURT STAFF) (Filed on 4/1/2021) (Entered: 04/01/2021)** |

| 04/01/2021 | 13 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. *This is a text only docket entry; there is no document associated with this notice.* (pmcS, COURT STAFF) (Filed on 4/1/2021) (Entered: 04/01/2021) |
| --- | --- | --- |
| 04/01/2021 | 12 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by City of San Jose.. (Chow, Yue-Han) (Filed on 4/1/2021) (Entered: 04/01/2021) |
| 03/30/2021 | 11 | NOTICE of Appearance by Matthew W Pritchard */ City of San Jose* (Pritchard, Matthew) (Filed on 3/30/2021) (Entered: 03/30/2021) |
| 03/29/2021 | 10 | OPPOSITION/RESPONSE (re 8 MOTION to Relate Case *City of San Jose's Motion to Relate Timothy Harper and Derrick Sanderlin Case* ) filed byKyle Johnson. (Attachments: # 1 Certificate/Proof of Service)(Peek, Christine) (Filed on 3/29/2021) (Entered: 03/29/2021) |
| 03/26/2021 | 9 | CLERK'S NOTICE Re: Consent or Declination: Defendants shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 4/2/2021. (pmcS, COURT STAFF) (Filed on 3/26/2021) (Entered: 03/26/2021) |
| 03/25/2021 | 8 | MOTION to Relate Case *City of San Jose's Motion to Relate Timothy Harper and Derrick Sanderlin Case* filed by City of San Jose. (Chow, Yue-Han) (Filed on 3/25/2021) (Entered: 03/25/2021) |
| 03/19/2021 | 7 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Kyle Johnson.. (Peek, Christine) (Filed on 3/19/2021) (Entered: 03/19/2021) |
| 03/17/2021 | 6 | Summons Issued as to City of San Jose. (dhmS, COURT STAFF) (Filed on 3/17/2021) (Entered: 03/17/2021) |
| 03/17/2021 | 4 | Case assigned to Magistrate Judge Virginia K. DeMarchi. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 3/31/2021. (haS, COURT STAFF) (Filed on 3/17/2021) (Entered: 03/17/2021) |
| 03/16/2021 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 6/8/2021. Initial Case Management Conference set for 6/15/2021** |

| | | |
|---|---:|---|
| | | **01:30 PM in San Jose, Courtroom 2, 5th Floor. (dhmS, COURT STAFF) (Filed on 3/16/2021) (Entered: 03/17/2021)** |
| 03/16/2021 | 3 | Certificate of Interested Entities by Kyle Johnson *Plaintiff's Certification of Interested Entities or Persons* (Peek, Christine) (Filed on 3/16/2021) (Entered: 03/16/2021) |
| 03/16/2021 | 2 | Proposed Summons. (Peek, Christine) (Filed on 3/16/2021) (Entered: 03/16/2021) |
| 03/16/2021 | 1 | COMPLAINT *for Damages, Declaratory and Injunctive Relief; Demand for Jury Trial* against City of San Jose ( Filing fee $ 402, receipt number 0971-15709043.). Filed byKyle Johnson. (Attachments: # 1 Civil Cover Sheet)(Peek, Christine) (Filed on 3/16/2021) (Entered: 03/16/2021) |