No: 25-1392 and 25-5468

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

KYLE JOHNSON,

      Plaintiff-Appellee

v.

JAMES ADGAR,

      Defendant-Appellant

NO.  25-1392 and 25-5468
Consolidated

D.C. No: 5:21-cv-01849-BLF
Northern District of California,
San Jose Division

## Appellant's Opening Brief

On Appeal from the United States District Court
for the Northern District of California (San Jose)
No. 5:21-cv-01849-BLF
Hon. Beth Labson Freeman

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
MALGORZATA LASKOWSKA, Senior Deputy City Attorney (187252)
BRIAN P. EGGLESTON, Senior Deputy City Attorney (289309)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Margo.Laskowska@sanjoseca.gov;
Brian.Eggleston@sanjoseca.gov

Attorneys for James Adgar

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Statement of Jurisdiction ...................................................................................... 3

Issues Presented ..................................................................................................... 5

Statement of the Case ............................................................................................ 6

Summary of Argument ........................................................................................ 14

Standard of Review .............................................................................................. 17

Argument .............................................................................................................. 18

    I.   Officer Adgar is entitled to qualified immunity on Plaintiff's excessive force claim and the trial court erred in concluding otherwise. .............................. 18

        A. Under *Puente*, Officer Adgar's use of force was objectively reasonable as a matter of law and therefore did not violate Plaintiff's right to be free from unreasonable seizures. .......................................................................... 19

        B. Even if it had been unreasonable, Officer Adgar's use of force did not violate any clearly established right of Plaintiff. ........................................ 26

    II.  The evidence is legally insufficient to support a finding that Officer Adgar shot indiscriminately into the crowd, as necessary to constitute a seizure under *Nelson*. ................................................................................................. 32

    III. Officer Adgar is entitled to judgment as a matter of law on Plaintiff's Bane Act claim, because there has been no violation of a clearly delineated right. 38

Conclusion ............................................................................................................ 41

Statement of Related Cases ................................................................................. 42

Certificate of Compliance for Briefs ................................................................... 43

## Cases

*Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021) ............................ 17

*Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988) ............................................. 4

*Cornell v. City & Cty. of S.F.*, 17 Cal. App. 5th 766 (Cal. Ct. App. 2017) .................. 39

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) .................................................... 27

*Graham v. Connor*, 490 U.S. 386 (1989) ...................................................................... 37

*In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067 (9th Cir. 2020) ................... 17

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ........................................ passim

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ....................................................................... 37

*Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024) ........................................ passim

*Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) ............................ 38

*Ridgeway v. Walmart Inc*, 946 F.3d 1066 (9th Cir. 2020) .......................................... 17

*United States v. Lockett*, 919 F.2d 585 (9th Cir. 1990) ............................................... 32

## Statutes

28 U.S.C. § 1291 .............................................................................................................. 3

28 U.S.C. § 1331 .............................................................................................................. 3

28 U.S.C. § 1367 .............................................................................................................. 3

42 U.S.C. § 1983 ....................................................................................................... 16, 41

Bane Act, Cal. Civ. Code § 52.1(b) .......................................................................... 16, 38

## Rules

Fed. R. App. P. 3 .............................................................................................................. 3

Fed. R. App. P. 4 .............................................................................................................. 3

Fed. R. Civ. P. 50 ........................................................................................................... 12

# INTRODUCTION

The present action is a negligence claim masquerading as a constitutional tort. In the midst of a violent protest in the City Hall Plaza of San José, California, Officer James Adgar received orders to target individuals engaging in violence with his projectile impact weapon. Plaintiff Kyle Johnson suffered a bruise to the back of his left leg when one of Adgar's foam baton rounds accidentally struck him instead of the intended target. Johnson sued Adgar in federal court, alleging that his use of the projectile impact weapon constituted excessive force in violation of the Fourth Amendment, in addition to several other claims.

The trial court denied Adgar's claim of qualified immunity, despite the fact that the use of intermediate force is well established as a reasonable response to the kinds of violence Adgar was facing. In reaching this conclusion, the trial court found the facts of this case comparable to a 2012 case where an officer, in order to disperse a college student standing peacefully in a breezeway while attending a party, shot the student in the eye with a pepper ball, causing permanent damage to his vision.

At trial, Kyle Johnson used an expert-created digital reconstruction of the events to argue that Johnson wasn't particularly close to the violent protestors and therefore the jury should infer his injury wasn't actually accident. Instead, he asked

1

the jury to conclude that Adgar had ignored the directives of his superiors to target only violent protestors and had instead simply shot haphazardly into the crowd without any particular target in mind. The trial court denied Adgar's motion for judgment as a matter of law, determining that such a conclusion was within the discretion of a reasonable jury. As a result, Officer Adgar is now branded as a violator of constitutional rights, based simply on the fact that he missed a target in the midst of a chaotic, violent protest.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, because the complaint asserted claims arising under federal law, and under 28 U.S.C. § 1367(a), because the court exercised supplemental jurisdiction over related state-law claims.

The district court entered final judgment on January 31, 2025, 1-ER-46, and Defendant James Adgar filed a timely notice of appeal on March 3, 2025, 3-ER-538. Fed. R. App. P. 4(a)(1)(A). Defendant also timely filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), which the district court denied on August 15, 2025. 1-ER-2. In the same order, the district court also awarded attorney's fees to Plaintiff. 1-ER-2.

On August 27, 2025, Defendant timely amended the earlier notice of appeal to include both the judgment and the order denying in part Defendant's Rule 50(b) motion, 3-ER-532. Fed. R. App. P. 4(a)(4)(A)(1). In an excess of caution, Defendant simultaneously filed a separate notice of appeal regarding the award of attorney's fees to Plaintiff, 3-ER-535. Fed. R. App. P. 4(a)(1)(A). With the parties' consent, the appeals were consolidated. *See* Fed. R. App. P. 3(b)(2).

This Court has jurisdiction under 28 U.S.C. § 1291 because the appeals are taken from a final judgment and from a post-judgment order that is final and

3

independently appealable. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988).

1. Is Officer Adgar entitled to qualified immunity on Plaintiff's excessive force claim, where he followed directives from his supervising sergeant to utilize a well-established intermediate force option against individuals engaging in violent, criminal behavior who posed a threat to public safety and the safety of the officers?

2. Where a plaintiff bears the burden of proof to show that an officer's use of force was not intended for someone else, can that plaintiff effectively shift the burden of proof onto the officer by doing nothing more than attempting to discredit the targets identified by the officer?

3. Was there a clearly delineated right in May 2020 not to be subjected to foam baton rounds from a projectile impact weapon when one is participating in a protest that has turned violent?

## STATEMENT OF THE CASE

This case arose from a demonstration in the City of San José that began on May 29, 2020, and continued through May 30, in which hundreds of people gathered to protest a Minneapolis police officer responsible for the death of George Floyd. 2-ER-187:1–12; 2-ER-199:13–18. The level of violence and destruction characterizing these protests was unprecedented in recent city history. 2-ER-187:1–12 (Sergeant Byers testifying that the protests of May 29 and 30 were "significantly more violent and destructive than anything I've experienced in my 15 years as a police officer"); 2-ER-191:13–192:9 (explaining that the area had become so dangerous for police officers that they were unable to perform a basic wellness check, which then escalated to a confirmed suicide, which officers were still unable to respond to due to the total loss of control over the downtown area); 2-ER-192:24–193:1 ("People would, as I'm standing right there, run up with a brick and smash the windshield of a patrol car and say "F You Nazi KKK," and turn and run away. And we couldn't do anything about it because of the numbers of people."); 2-ER-198:2–15 ("There were dumpsters that were set on fire, and then they would push those dumpsters up against buildings. Those buildings had people inside of them. The fire department was not able to respond to a lot of stuff on the 29th because then people would start verbally threatening the firefighters, and the

firefighters are not equipped to deal with hostile crowds.").

The protests of May 30 started off less chaotic and violent than the previous day's riots and were largely confined to the area around San José City Hall Plaza. 2-ER-188:13–18. But the character of the protests shifted as dusk fell, and the actions of various protestors began resembling the violent and destructive behavior from the prior day. 2-ER-189:3–190:2; 2-ER-201:23–203:2. It was into this developing scene that both Plaintiff Kyle Johnson and Defendant Officer James Adgar entered on the evening of May 30, 2020. Kyle Johnson joined the protest in City Hall Plaza at 9:53 p.m. 2-ER-128:12–129:1. Officers were already present at the scene conducting crowd control and forming a skirmish line. 2-ER-131:22–132:11; 2-ER-149:11–22. Around the same time, Office Adgar was deployed to City Hall Plaza and arrived at 10:13 p.m., armed with—among other tools—a 40mm projectile impact weapon ("PIW").[1] 2-ER-72 at 22:12:50–22:13:30.

At 10:17 p.m., Officer Adgar's supervising officer assigned him to a post and instructed him that, if anyone started throwing bottles, Adgar was to engage them with his PIW. 2-ER-72 at 22:17:40–22:18:00 ("So, anyone starts throwing bottles, I

---

[1] A 40mm direct impact weapon is a target-specific means of delivering kinetic energy. 2-ER-219:23–220:10. Its purpose and function are comparable to those of a stun bag shotgun, 2-ER-240:13–241:2, but it fires foam baton rounds instead of stun bags, 2-ER-261:4–7. It is generally considered an "intermediate force option." 2-ER-177:24–178:11.

want you to pop 'em."); 2-ER-214:3–25 (explaining "pop them, which is a colloquial term for you can discharge your projectile impact weapon at them").

At 10:24 p.m. some people at City Hall Plaza began throwing bottles and other things at police officers. 2-ER-155:10–21, 2-ER-160:11–161:9. Officers responded to the thrown objects with various devices causing many protestors, including Kyle Johnson, to scatter. 2-ER-264:1–23. Less than ten minutes later, however, the protestors, including Kyle Johnson, returned to occupy the Plaza. Kyle Johnson did not throw anything and was peaceful the entire time he was there.

At 10:33 p.m. another volley of objects was thrown at the officers. 2-ER-160:11–161:9. In responding to this second volley of projectiles, Officer Adgar fired his PIW, accidentally[2] hitting Kyle Johnson in the back of the left leg and causing a bruise. 2-ER-144:5–20; 2-ER-263:21–264:23; 2-ER-65–66. About a month later, Plaintiff was diagnosed with a pulmonary embolism, which doctors believed was precipitated by a blood clot originating at the site of the original bruise. 2-ER-168:5–170:21; 2-ER-168:5–170:21.

Plaintiff filed suit and, in January 2025, a jury trial commenced on Kyle Johnson's claims against Officer Adgar for excessive force in violation of the Fourth Amendment, retaliation in violation of the First Amendment, interference with his

---

[2] At no point did Plaintiff contend that Officer Adgar intentionally targeted him.

constitutional rights in violation of California's Bane Act, battery, and negligence. 2-ER-120:19–121:14. He also pressed two *Monell* claims against the City of San José in the same trial. 2-ER-121:15–17.

At trial, Officer Adgar testified that, in discharging his PIW, he was targeting an individual he had seen observed something.[3] Attempting to reconstruct, after the fact, the exact events of that night, Officer Adgar reviewed body-worn camera ("BWC") footage from the incident and identified in 2-ER-112 the person he believed he had been targeting.[4] In the BWC footage, the individual identified by Officer Adgar can be seen running in Plaintiff's direction shortly before Officer Adgar discharges his PIW.[5] In another piece of BWC footage from several seconds later, Officer Adgar again identified an individual he believed could be the one that had prompted the discharge of his weapon.[6]

The theory of the case argued by Officer Adgar in closing argument was

---

[3] 2-ER-264:6–11 ("At that point I saw someone throw something or in the process of throwing it, which caused me to focus on that individual, try to aim at that individual, and track him through the crowd, and at that point once I believed I had that person identified, I pulled the trigger and used my 40 millimeter.").
[4] 2-ER-112; 2-ER-251:22–253:25; 2-ER-88 at 22:33:14; 2-ER-256:25–258:23; 2-ER-72 at 22:33:14.
[5] 2-ER-88 at 22:33:12-16.
[6] 2-ER-114; 2-ER-254:12–256:22. Due to the different angles and poor image quality, it is difficult to determine whether the individuals identified in Exhibits 2-ER-111 and 2-ER-114 are the same person or if there were two separate individuals.

simple: the individual he had been targeting was the individual from 2-ER-88

(identified in 2-ER-111) and Plaintiff was simply the unfortunate victim of a stray

projectile.[7]

Plaintiff, in closing, argued roughly three distinct theories for why Officer

Adgar's discharge of his PIW was unreasonable. The first theory sounded primarily

in negligence: that Officer Adgar had failed to exercise adequate care to guard

against the risk of harming an innocent bystander when discharging his PIW.[8] The

---

[7] 3-ER-344:13–24 ("[T]he evidence shows that this person was actually Officer Adgar's target when he fired the 40 millimeter projectile at approximately 10:33:15."); 3-ER-394:9–12 ("[W]hether it was a bad shot or whether Mr. Johnson just happened to get in the way at the wrong place at the wrong time, I think the evidence shows that that's not indiscriminate…."); *see generally* 3-ER-344:13–394:19 (arguing that Plaintiff and the individual in Exhibit 2-ER-111 would have been right on top of each other at the time Officer Adgar fired).

[8] *E.g.*, Tr. 2-ER-282:10–12 ("[W]hen you fire a 40 millimeter projectile impact weapon, you need to ensure that you're aiming at a clear target."); 2-ER-284:23–285:3 ("[W]hen you're using this particular weapon, you want to be sure of your target, the back stop, what is behind the target, and beyond. You want to be able to see when you're firing at something, what is behind your target, not just the target itself."); 2-ER-285:25–286:3 ("And if you're going to use it in a crowd setting, you want to have a clear picture so that you're making sure you're not going to hit an innocent bystander or if you miss your target, that you hit someone else instead."); 2-ER-286:25–287:5 ("[O]ther things that you also need to consider are crowd density, what sort of visibility do you have? Daylight? Nighttime? The officer's own specific visibility, what can he or she see? And the number of possibly violent actors in the crowd as compared to the crowd size as a whole."); 2-ER-294:8–15 ("What are all of the things, even though he was trained, he did not do? He fired into a crowd without being able to aim at the person who was supposedly posing a threat."); 2-ER-294:18–24 ("He had no clear picture to make sure he wouldn't hit

second theory also sounded in negligence: that targeting an individual who had thrown a bottle did not justify the risk of harming innocent bystanders.[9] The third and final theory adopted a much more extreme position: that Officer Adgar wasn't targeting bottle-throwers at all with his PIW; instead, he was simply shooting haphazardly into the crowd with no concern for whom he hit.[10]

In support of this third theory, Plaintiff proffered two lines of argument. The first was that Officer Adgar harbored a retaliatory animus toward the protestors due to the general anti-police sentiments expressed.[11] The second line of argument was that all alternative explanations for the discharge of his weapon were so implausible,

---

an innocent bystander, and, of course, he did, Mr. Johnson. I submit to you, ladies and gentlemen, that there was a lack of careful judgment, a lack of care, a lack of concern for the protestors who were gathered in front of Officer Adgar when he fired his 40 millimeter weapon and the shot that struck Mr. Johnson that evening.").

[9] *E.g.* 2-ER-308:17–309:21 (arguing that the shooting was unjustified because the target had already thrown the bottle and therefore was not a sufficiently serious threat); *id.* ("It showed a lack of care. It showed a lack of judgment. It showed a lack of concern for the other individuals in the plaza at that same time."); 2-ER-310:18–311:10 ("In front of him there was no immediate threat. The bottle was already thrown. There's nobody making any throwing motions in Officer Adgar's direction…. If this was different, if the person was about to throw—he saw the bottle and he fired, that would be one thing. That's not what the evidence is.").

[10] *E.g.* 2-ER-292:25–293:2 ("I submit to you, ladies and gentlemen, that Mr. Johnson was struck by the round fired by officer Adgar because Officer Adgar was not targeting someone, he was firing indiscriminately into the crowd.").

[11] *E.g.* 2-ER-297:3–5 ("This was Officer Adgar's opportunity to retaliate against the protestors who were out there that evening.").

the lack of an any target should be inferred simply from the absence of any explanation for his actions.[12]

The jury returned a verdict for plaintiff, finding liability on all claims except the two *Monell* claims against the City. 1-ER-47–58. Defendant Adgar filed a timely motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). The trial court granted the motion in part and denied it in part. The trial court granted the motion with respect to Plaintiff's claim for retaliation under the First Amendment, concluding that the jury's finding of retaliatory animus by Officer Adgar was not supported by substantial evidence. 1-ER-18. The trial court accordingly also granted the motion as to Plaintiff's Bane Act claim insofar as the claim was predicated on a First Amendment violation. 1-ER-19. The trial Court denied the motion in all other respects.

Plaintiff also filed a motion for attorney's fees. The trial court granted the motion in part, awarding attorney's fees but in a lesser amount than initially

---

[12] *E.g.* 2-ER-292:21–293:2 ("If Officer Adgar was targeting the individual making a throwing motion over by that trapezoid face, how does he hit someone where Mr. Johnson was standing? I submit to you, ladies and gentlemen, that Mr. Johnson was struck by the round fired by Officer Adgar because Officer Adgar was not targeting someone, he was firing indiscriminately into the crowd."); 2-ER-295:20–24 ("So when Officer Adgar fired the shot that struck Mr. Johnson, no chance of actually striking an agitator or anyone engaged—potentially who was engaged and who was a threat. He simply wanted to shoot. He did so indiscriminately without a clear target, and Mr. Johnson suffered as a result.").

requested by Plaintiff. 1-ER-45. Defendant Adgar timely appealed the judgment, the denial of his Rule 50(b) motion, and the district court's award of attorney's fees. The jury's verdicts against Officer Adgar on Plaintiff's state law claims for negligence and battery have not been challenged and are uncontested for purposes of this appeal.

## SUMMARY OF ARGUMENT

During a series of protests that one sergeant described as "significantly more violent and destructive than anything I've experienced in my 15 years as a police officer," 2-ER-187:1–12, Officer James Adgar was tasked with keeping an eye out for individuals engaging in acts of violence and deploying his 40 millimeter projectile impact weapon against them, 2-ER-214:3–25. The use of intermediate force options like the 40 millimeter is widely considered a standard and appropriate response to such conduct. *E.g.* 2-ER-225:17–24. A comparison of the facts in this case with the facts from a recent Ninth Circuit case, *Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024), where even higher levels of force were found to be reasonable as a matter of law in similar circumstances, amply demonstrates the absolute propriety of Officer Adgar's conduct in this situation.

In allowing this case to go to trial, the district court erroneously found the facts of this case to be analogous to a 2012 case in which officers used project impact weapons loaded with pepper balls to expedite the dispersal of a group of college students standing peacefully in the breezeway of an apartment complex at which they had been attending a party. *See Nelson v. City of Davis*, 685 F.3d 867, 872 (9th Cir. 2012). Even if a jury could reasonably find Officer Adgar's use of force in this case to be unreasonable, *Nelson* could not possibly have put him on notice that

14

his very different conduct was prohibited under these very different circumstances. There is not, and there was not in May 2020, a clearly delineated right to be free from uses of intermediate force when continuing to engage in a protest that has turned violent.

Based on earlier procedural developments, in presenting his excessive force claim at trial, Plaintiff was limited to presenting a theory that Officer Adgar had shot indiscriminately into the crowd without having any particular target in mind. Plaintiff attempted to prove this by showing that Adgar was acting out of retaliatory intent, due to the anti-police sentiments expressed in the protests. However, the trial court correctly found that there was insufficient evidence to support a finding of retaliatory intent on the part of Officer Adgar. Plaintiff also attempted to prove the shooting was indiscriminate by arguing that the targets identified by Officer Adgar were too implausible to be believed. Essentially, he attempted to show that the majority of thrown bottles were coming from a different location, arguing that if Adgar had been targeting the individuals throwing bottles, he should have been aiming in some other direction instead.

As an initial matter, such evidence standing alone is of far too little probative value to support an inference that Officer Adgar disregarded his instructions to target bottle-throwers and instead shot haphazardly into a crowd of peaceful

protestors for no reason. But more importantly, such an approach is tantamount to shifting the burden of proof onto Officer Adgar, requiring him to convince the jury that he really did have the targets he purported to.

Because Officer Adgar is entitled to judgment as a matter of law, the Court should reverse the judgment in Plaintiff's favor with respect to his § 1983 claim for violation of his Fourth Amendment rights and with respect to his California Bane Act claim, which was predicated on the same constitutional violation. The attorney's fee award should also be vacated, as it was awarded to plaintiff as the prevailing party on the claims predicated on a Fourth Amendment violation.

## STANDARD OF REVIEW

A district court's decision on qualified immunity is reviewed de novo. *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). The denial of a motion for a judgment as a matter of law is also reviewed de novo. *In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067, 1077 (9th Cir. 2020). Where sufficiency of the evidence is challenged on appeal, the jury's verdict is reviewed to determine if it is supported by "substantial evidence." *Id.* "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion from the same evidence." *Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1082 (9th Cir. 2020).

I. **Officer Adgar is entitled to qualified immunity on Plaintiff's excessive force claim and the trial court erred in concluding otherwise.**

At trial, the uncontroverted evidenced showed that, in the moments leading up to Officer Adgar's use of his 40 millimeter projectile impact weapon ("PIW"), protestors at City Hall Plaza were throwing objects toward police officers on the scene. This fact was demonstrated in video footage from numerous vantage points, *see, e.g.*, 2-ER-88, 2-ER-68; testified to by witnesses, including Plaintiff, *see* 2-ER-137:11–13; and conceded during Plaintiff's closing argument, *see* 2-ER-278:19–279:2. Further, no evidence was introduced to contradict Officer Adgar's testimony that he witnessed individuals engaging in these actions, *e.g.* 2-ER-246:1–3; 2-ER-264:6–11.

Due to the exigent safety concerns presented by such actions, even Plaintiff's expert on police practices conceded that the use of intermediate force[13] against such individuals would be justified under the circumstances. *See* 2-ER-225:17–24 ("Q. Well, let me ask you this, I'm going to ask you to assume that there is an individual or individuals at this protest that Officer Adgar saw throwing water bottles or other objects toward the crowd and the line of police officers. Under

---

[13] A PIW is considered an intermediate force option, 2-ER-177:24–178:11, and Plaintiff's police practices expert agreed that the intermediate force standard applies to PIWs. *Compare* 3-ER-332:14–25 *with* 3-ER-337:13–16.

those circumstances would it be your opinion that he would be justified in addressing that threat with intermediate force? A. Yes.").

Based on these undisputed facts, Officer Adgar is entitled to qualified immunity, both because his use of a PIW under the circumstances was objectively reasonable as a matter of law and because his conduct did not violate any Fourth Amendment right that was clearly established in May 2020.

**A.** **Under *Puente*, Officer Adgar's use of force was objectively reasonable as a matter of law and therefore did not violate Plaintiff's right to be free from unreasonable seizures.**

**1.** ***Puente* provides the touchstone for how Officer Adgar's actions should be evaluated.**

Faced with an unruly crowd that had begun resorting to violence, Officer Adgar remained within constitutional bounds when he utilized his PIW—a form of intermediate force[14]—to prevent further escalation of the situation. Instructive in this regard is *Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024). In that case, faced with a protest that had turned violent, officers cleared the area using "targeted munitions like pepper balls,"[15] *id.* at 1046-47, "to disperse the remaining individuals, particularly those that PPD officers perceived as aggressive," *id.* at

---

[14] *See* n. 13 above.

[15] "Pepperballs … combine the kinetic impact of a projectile with the sensory discomfort of pepper spray." *Nelson v. City of Davis*, 685 F.3d 867, 873 (9th Cir. 2012).

1059. Multiple plaintiffs who had been struck by the projectiles sued, claiming violations of their First and Fourth Amendment rights. *Id.* at 1047. The district court denied summary judgment as to the Fourth Amendment claims brought by plaintiffs Yedlin, Travis, and Guillen, *id.* at 1049, and the officers appealed, *id.* at 1050. The panel's analysis of each plaintiff's excessive force claim is instructive on how Officer Adgar's actions should be evaluated under the circumstances he faced.

### a. Plaintiff Yedlin

Plaintiff Yedlin's claim was discussed first. As with Plaintiff Kyle Johnson, there was no contention that Yedlin had engaged in any criminal or violent behavior. *Id.* at 1058. However, he "was standing near the fence [separating the protestors from police and the public]" and "began shaking it with some force." *Id.* at 1046. To force Yedlin back from the fence, grenadiers fired pepper balls at him and he was "was struck several times by pepper balls—in the face, lower back, and in three places on the legs." *Id.* at 1057.

The officers did not defend their use of intermediate force on the basis of any threat of violence posed by Yedlin or those around him. *Id.* at 1058. Rather, their justification was "the severity of the security problem at issue … and the immediate threat that Yedlin's actions [shaking the fence] created in that regard." *Id.* The panel concluded that, "as a matter of law, Defendants' use of force against Yedlin

was a reasonable response that was commensurate to the PPD's strong interest in avoiding any breach of the fence." *Id.* at 1058-59 (internal quotations, alterations omitted).

### b. Plaintiff Travis

Plaintiff Travis was also not accused of any violent behavior or resisting arrest. *Id.* at 1059. She simply "approached the moving skirmish line in order to 'get a shot of [it]' with her camera." *Id.* at 1059. "After taking her photos, Travis turned and began to slowly walk away from the police line, at which point police fired a weapon toward her at close range…. Viewing the record in the light most favorable to Travis, she was targeted with a 'muzzle blast'—a burst of chemical powder with irritating properties—as well as pepper spray and an unknown projectile." *Id.* There was no contention that Travis posed any threat of violence, but she was "between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers." *Id.* The panel held that the officers' use of intermediate force in this context was objectively reasonable as a matter of law, noting that Travis's position between the officers and the wrongdoers "does not diminish the [officers'] strong interests in addressing the lawlessness behind her." *Id.* In reaching this conclusion, the panel did not consider in isolation the specific need for force against Travis, but rather assessed the force used against

Travis as part of an overall reasonable crowd-control strategy: "Viewing all the circumstances in context, the repeated applications of force made by the advancing officers, including the particular blast that impacted Travis, were reasonable measures to accomplish the [police department's] substantial interests in public safety." *Id.*

### c. Plaintiff Guillen

Plaintiff Guillen is the only plaintiff for whom the *Puente* panel found a triable issue of fact as to whether the force used against her was objectively unreasonable. Guillen was walking away from the police line when "[s]he was hit by a projectile of some kind in her stomach and upper hip, causing her to bleed." *Puente*, 123 F.4th at 1060. The panel noted multiple factors that distinguished her case from that of Yedlin and Travis, including that the video evidence did not show any unlawful or threatening conduct occurring in Guillen's vicinity prior to the use of force, that Guillen did not engage in any personal conduct that itself presented any risk to public safety, that no dispersal order had been given, and that Guillen was not disobeying any orders and was confused about what she was supposed to do. *Id.* at 1061. Nonetheless, as discussed further below, the panel concluded that the officers were entitled to qualified immunity on Guillen's claim.

**2. Under *Puente*, Officer Adgar's use of intermediate force in response to emergent public safety concerns was objectively reasonable as a matter of law.**

Here, Officer Adgar was faced with a hostile crowd that was resorting to violence and intervention was necessary to prevent the threat to public safety from escalating. Under these circumstances, the use of intermediate force to respond to the threat of violence to police and others was objectively reasonable. In reviewing the panel's analysis in *Puente*, several principles stand out as significant to the facts of this case.

First, if force is being used in response to concerns for safety, the specific target against whom force is used does not necessarily have to be the one posing a threat of violence. In *Puente*, the force used on Yedlin was justified by the officers' "strong interest in avoiding any breach of the fence" separating police from the protestors, not by any concern that Yedlin himself would engage violent acts or criminal activity. *See Puente*, 123 F.4th at 1058. The same was true of Plaintiff Travis, who had not engaged in any criminal or violent behavior at all. *Id.* at 1059. The panel in *Puente* acknowledged that, "[v]iewing the record in the light most favorable to Travis, she was targeted with a 'muzzle blast' … as well as pepper spray and an unknown projectile," *id.* at 1059, but nonetheless found the use of intermediate force reasonable in addressing the violent crowd of which she was a

part. In light of this, Plaintiff's arguments that it was excessive to use intermediate force against individuals whose "bottle ha[d] already been thrown," 2-ER-308:23–24, are unavailing. Even setting aside the possibility that those individuals had additional objects to use as weapons, their potential for inciting others to violence was more than sufficient to justify use of PIW to address the concern.

Second, the use of projectile impact weapons for crowd control purposes is not necessarily unreasonable. In *Puente*, the police officers "formed a 'skirmish line' and moved north on Second Street, using pepper balls to disperse the remaining individuals," including Travis. *Id.* The PIWs in this instance were clearly being used solely for crowd control, but their use was nonetheless found objectively reasonable as a matter of law. *Id.* Plaintiff's arguments that Officer Adgar was constitutionally prohibited from using his PIW as a means of crowd control, *e.g.* 2-ER-293:8–10, is likewise unavailing.

The same is true of Plaintiff's arguments that deployment of a PIW is excessive unless consistent with SJPD policy to limit its use to incapacitating a suspect "armed with a weapon likely to cause serious bodily injury or death" or "where its use is likely to prevent any person from being seriously injured." 2-ER-309:1–8 (quoting 2-ER-78 (SJPD Policy on the Use of Projectile Impact Weapons)). Indeed, the discharge of PIWs against *Puente* plaintiffs Yedlin and Travis would

have violated all of the SJPD policy guidelines relied on by Plaintiff in this case, yet both uses were found to be constitutionally permissible.

Finally, the interests served by a particular instance of force should be considered in the context of the overall responsive strategy it is a part of. In considering whether the force used against plaintiff Travis was reasonable, the *Puente* panel did not attempt to assess whether the specific incremental benefit of using force against Travis justified the conduct; rather, the panel considered this specific use of force in its relationship to a coordinated strategy employed by multiple officers acting in concert. *Puente*, 123 F.4th at 1059 ("Viewing all of the circumstances in context, the repeated applications of force made by the advancing officers, including the particular blast that impacted Travis, were reasonable measures to accomplish the PPD's substantial interests in public safety.").

Viewing all facts in the light most favorable to Plaintiff and drawing all reasonable inference in his favor, Officer Adgar was faced with a crowd of protestors, some of whom were throwing various objects at the officers. Officer Adgar responded to this situation as instructed by his supervising sergeant, employing his projectile impact weapon, an application of even less force than used

against Plaintiffs Yedlin and Travis in *Puente*.[16] Just as with Travis, the individual actually struck by Adgar's projectile was a peaceful protestor whose conduct—if considered in isolation—would not justify the use of force. While it is natural to have some sympathy for Kyle Johnson under these circumstances, the inescapable conclusion is that Officer Adgar's use of intermediate force was a reasonable response to the overall situation he confronted.

**B. Even if it had been unreasonable, Officer Adgar's use of force did not violate any clearly established right of Plaintiff.**

Even if there were a triable issue of fact as to whether Officer Adgar's use of force was reasonable under the circumstances presented, no clearly established law at the time would have put Officer Adgar on notice that his use of a projectile impact weapon would be unconstitutional under the circumstances he faced. Plaintiff has identified only a single case as purportedly putting Officer Adgar on notice that his actions in this situation might implicate the Fourth Amendment: *Nelson v. City of Davis*, 685 F.3d 867, 872 (9th Cir. 2012). This argument is unavailing because *Nelson* is materially distinguishable from this case and therefore

---

[16] Officer Adgar's use of force involved only the impact of a projectile, while the officers in *Puente* used pepper balls, which "combine the kinetic impact of a projectile with the sensory discomfort of pepper spray." *Nelson v. City of Davis*, 685 F.3d 867, 873 (9th Cir. 2012).

did not "clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

As an initial matter, the force used in *Nelson* was greater than the force used by Officer Adgar in this case. Officer Adgar used a simple projectile impact weapon, while the officers in *Nelson* shot the plaintiff with a pepper ball, which is essentially a simultaneous combination of pepper spray and a projectile impact weapon. *Nelson*, 685 F.3d at 873-74. More importantly, in *Nelson*, the use of force at issue was not responding to any violence or public safety concern. Although there were "scattered bottles being thrown" in other areas, the use of pepper balls was not precipitated by that. The pepper balls were instead being used for the purpose of dispersing a group of peaceful individuals elsewhere. *Id.* at 873 ("[T]he officers armed with pepperball guns assembled under [Sergeant] Wilson's command in front of the others. Their purpose was to use their weapons in order to 'disperse' the remaining students and make way for the advancing 'skirmish line.'"). Thus, "in the final analysis, the only governmental interest involved in the application of force to Nelson and his friends was the officers' desire to clear the complex of the party-going individuals." *Id.* at 883.

The facts of this case stand in stark contrast to *Nelson*. Here, Officer Adgar was not tasked with dispersing peaceful protestors, but was instead instructed by

his supervising officer to use his PIW to engage individuals he saw throwing things. 2-ER-214:3–25; 2-ER-72 at 22:17:40–22:18:00. He did so in direct and immediate response to a volley of objects being thrown from the crowd Kyle Johnson was standing in. 2-ER-160:11–161:9, 2-ER-263:21–264:23; 2-ER-72 at 22:32:59– 22:33:30. Nothing in *Nelson* could possibly have put Officer Adgar on notice that following this directive by his sergeant was constitutionally impermissible under these circumstances.

The decision in *Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024), is also highly relevant to this analysis, as the panel in that case analyzed what was and was not "clearly established" by *Nelson* for purposes of qualified immunity. Both the *Puente* court's characterization of the facts in *Nelson* and its identification of factual differences that were sufficient to materially distinguish *Nelson* from the *Puente* plaintiffs' claims are instructive here.

In explaining why the defendants were entitled to qualified immunity on plaintiff Travis's claim notwithstanding *Nelson*, the panel explained that *Nelson*

> similarly dealt with the use of projectile chemical tools against an unruly group. But the defendants in Nelson deployed force against a group of college partiers at an apartment complex who had already been effectively confined by police and were peacefully awaiting instructions on how and when they could leave. Furthermore, there was no objective indication of any threatening or dangerous behavior. These differences,

among others, make clear that Nelson is materially distinguishable and thus does not clearly establish the law governing this case.

*Puente*, 123 F.4th at 1060 (internal quotations, citations omitted).

All of the distinguishing features identified by the panel in *Puente* are also present in this case. Here, the protestors stood in stark contrast to the "group of college partiers" in *Nelson*, and neither Plaintiff nor the crowd he was in had "already been effectively confined by police." There were many points of egress from City Hall Plaza, making arrests impossible as a practical matter. 2-ER-208:1–23; 2-ER-209:18–21. And not only were there "objective indicia" of threatening or dangerous behavior, there was *actual* threatening and dangerous behavior. 2-ER-155:10–21, 2-ER-160:11–161:9. Accordingly, as with plaintiff Travis's claim, *Nelson* cannot and does not clearly establish the law governing the facts faced by Officer Adgar on May 30, 2020.

The panel's analysis of why *Nelson* was " 'materially distinguishable' in several respects" from Guillen's claim, *id*. at 1062, is also instructive:

> First, *Nelson* emphasized the overall "absence of exigency involved" in the officers' dispersal of the gathering at issue in that case…. "[T]he desire to [clear the apartment complex of rowdy college partiers] quickly, in the absence of any actual exigency, [could not] legitimize the application of force when it is not otherwise justified." Thus, Nelson did not involve the larger exigent public safety concerns that are present in the overall context of this case.
> Second, we emphasized in *Nelson* that Nelson was part of a group of "students gathered with [him] in the breezeway" of the apartment,

> which was a separate and "very narrow and confined space," and that several of the "defendant officers stated in their depositions that they did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior." Although there was no apparent misconduct in Guillen's immediate area at the time that she was struck, she was not in a discretely separate zone from those down the block in the Free Speech Zone who were still engaged in such acts. Moreover, the officers were reasonably concerned about the possibility of troublemakers "circulat[ing] anonymously within the larger crowd of protesters."

*Id.* at 1062 (internal citations omitted) (line breaks added).

Here, there was clearly an exigency involved. Protestors were engaging in violent behavior that raised public safety concerns, which Plaintiff's own expert conceded would justify the use of intermediate force. *See* 2-ER-225:17–24.

The uncontroverted evidence also shows that Plaintiff was in the City Hall Plaza courtyard, an area that no reasonable jury could conclude is a "very narrow" or "confined" space, especially after a site visit. *E.g.* 2-ER-72 at 22:33:50-22:34:30. And Plaintiff was not in a "discretely separate zone" from the individuals who were engaging in violent behavior justifying the use of intermediate force. Both Plaintiff and the violent protestors were all in City Hall Plaza together and could not be separated from the peaceful protestors.[17] 2-ER-232:2–233:13 (Captain Dwyer

---

[17] To be sure, Plaintiff's expert, Fries, tried to characterize the violent protestors as in a separate area of the plaza. 3-ER-319:23–320:1 ("They [the thrown objects] didn't all come from one location, but they did come from what I would call a

testifying that procedures for isolating suspects in a crowd were unsuccessful because "the people in this crowd were playing a game of hit and run. They would hit us with debris and run back into the crowd. And there were protests mixed in with them, but they would hide amongst the peaceful protestors, so to make it difficult for them to target, to make it difficult for them to find and/or arrest."). Thus, unlike in *Nelson*, the violent protestors in City Hall Plaza were for all practical purposes "indistinguishable" from the peaceful ones. *Nelson*, 685 F.3d at 883 ("While it is undisputed that there were individuals hurling both bottles and expletives at officers, it is also undisputed that Nelson and his companions were not among them, and the individuals causing the problems were not so numerous that the two categories of partygoers were indistinguishable.").

In light of all the facts that "materially distinguish" *Nelson* from the present case, Officer Adgar was not on notice of any clearly established law governing the situation he faced.

---

quadrant. They all came from I would say the northeast quadrant of Santa Clara and East 4th Street."); 3-ER-325:20–21 ("Kyle in this situation, I would say he's in the, you know, west quadrant or southwest quadrant."). But being at two different locations in the same plaza is even less "discretely separate" than being "down the block," as the protestors were in *Puente*.

**II. The evidence is legally insufficient to support a finding that Officer Adgar shot indiscriminately into the crowd, as necessary to constitute a seizure under *Nelson*.**

In seeking summary judgment on Plaintiff's Fourth Amendment claim, Officer Adgar argued that (a) there was no evidence Officer Adgar was targeting Plaintiff, and (b) as an innocent bystander inadvertently harmed by state force directed at the violent protestors, Plaintiff did not have an actionable claim for an unreasonable seizure of his person. *See* 3-ER-518:1–20 (citing *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) (stating that "an innocent bystander struck by a stray bullet from [an] officer's weapon would not have [an excessive force] claim")). At the hearing on this motion, the trial court appeared ready to grant summary judgment against Plaintiff on this basis. 3-ER-454:6–9 (Trial Court: "So that is still not a constitutional violation until we add the next step under the Fourth Amendment, that there was—that Adgar was aiming at Mr. Johnson, as opposed to Mr. Johnson being hit as a bystander by mistake."); 3-ER-455:15–21 ("*Nelson* talked about indiscriminately using the projectiles to disperse a crowd…. there's no intent in the *Nelson* situation to target an individual. Rather, the intent was to target everybody."); 3-ER-457:1–4 ("So I'm looking for what evidence you have that Adgar aimed at Johnson, or where in *Nelson* you believe that that's not

32

necessary in a circumstance where you have no evidence of indiscriminate shooting into a crowd.").

At first, Plaintiff disclaimed any theory based on *Nelson* and instead argued that an innocent bystander *would* have an excessive force claim. 3-ER459:16–18 (Counsel: "Was the result an accident? That doesn't matter." Court: So *Nelson*— you're not relying on *Nelson*, either?" Counsel: "No."). However, when it later became apparent the argument would not succeed, Plaintiff accepted the trial court's invitation to adopt a *Nelson* theory instead. 3-ER-486:7–487:3 (Court: "Is it your theory that Officer Adgar targeted Mr. Johnson with his 40 millimeter?" Counsel: "No, your honor. And I think the theory is that Officer Adgar intentionally shot into the crowd in the direction of Mr. Johnson and hit him." Court: "Okay…. and that then can bring in the *Nelson* analysis." Counsel: "Yes. And I apologize, your honor. I have been corrected. This is a *Nelson* theory that we have here.")

As a result of this development, the trial court expressly limited Plaintiff to that theory trial. *See*, e.g., 2-ER-271:8–12, 2-ER-272:18–25 ("I agree with Defendants that the indiscriminate use of force was the plaintiff's theory of the case for the constitutional violation …. and I will comment that I also have reminded the plaintiff that they must stick to their theory of the case and not

introduce a new theory….”). But the evidence adduced at trial was simply insufficient to support a finding of indiscriminate shooting actionable under *Nelson*.

In *Nelson*, the panel found that Nelson had been seized despite the fact that "he was not individually targeted by officers," because "[r]egardless of whether Nelson was the specific object of governmental force, he and his fellow students were the undifferentiated objects of shots intentionally fired by the officers in the direction of that group." *Nelson v. City of Davis*, 685 F.3d 867, 876-77 (9th Cir. 2012). The evidence adduced at trial in this case was simply insufficient to support a similar finding here. In *Nelson*, the finding of an undifferentiated shooting was based on the fact that officers "were instructed by [Sergeant] Wilson to 'shoot at the crowd,'" *id.*, which simply did not occur here. In fact, quite the opposite was true. In this case, Officer Adgar's supervising sergeant specifically instructed him to target only individuals who were throwing objects at police officers. 2-ER-214:3–25; 2-ER-72 at 22:17:40-22:18:00.

In addition to the objective evidence that Officer Adgar's purpose to target specific individuals, Officer Adgar provided corroborating testimony that he was indeed acting pursuant to his directives when Kyle Johnson was injured. 2-ER-264:6–11 ("At that point I saw someone throw something or in the process of throwing it, which caused me to focus on that individual, try to aim at that

individual, and track him through the crowd, and at that point once I believed I had that person identified, I pulled the trigger and used my 40 millimeter.").

Although the jury was not required to credit this testimony, it apparently did. The jury found that the individuals identified in Exs. 2-ER-111and 2-ER-114—who had been captured on film appearing to throw things—had been negligent and that the negligence of both had been a substantial factor in causing or contributing to Plaintiff's harm. 1-ER-56–57. Importantly, the only theory presented to the jury on the negligence of those individuals was that they threw or appeared to throw bottles. No evidence was introduced to support a finding that they were negligent in any other manner. Similarly, the only theory presented to the jury on how the individuals' negligence had contributed to Mr. Johnson's harms was that one or both of them had been Officer Adgar's actual target when he discharged the PIW that struck Mr. Johnson. No evidence was introduced that could support a finding of causation through any other means.

But even if the jury had not accepted Officer Adgar's testimony that he was acting pursuant to orders, Officer Adgar did not bear the burden of proving that fact. Plaintiff bore the burden of proving by a preponderance of the evidence that Officer Adgar was actually ignoring the orders of his sergeant by firing indiscriminately into the crowd rather than targeting a suspect.

Plaintiff presented two basic theories to try to prove this fact. The first was that Officer Adgar had a motive to retaliate against the protestors in general and should be presumed to have acted based on that motive. *E.g.* 2-ER-297:3–5 (arguing in closing that "this was Officer Adgar's opportunity to retaliate against the protestors who were out there that evening."). However, the trial court correctly concluded that the evidence was insufficient to support any finding of a retaliatory animus on the part of Officer Adgar. 1-ER-18:2–3 ("[T]he Court determines that the jury's finding of retaliatory animus by Officer Adgar is not supported by substantial evidence.").

In addition to the theory of retaliatory animus, Plaintiff also attempted to argue that Officer's Adgar's purported targets were simply not plausible and so an undifferentiated shooting should be inferred from the lack of any other explanation. *E.g.* 2-ER-292:21–293:2 (arguing in closing that "if Officer Adgar was targeting the individual making a throwing motion over by that trapezoid face, how does he hit someone where Mr. Johnson was standing? I submit to you, ladies and gentlemen, that Mr. Johnson was struck by the round fired by Officer Adgar because Officer Adgar was not targeting someone, he was firing indiscriminately into the crowd."); 2-ER-302:22–303:10 (making a similar argument regarding the origin of some of the

thrown bottles as determined by the digital models constructed by Plaintiff's expert).

Any inference that Plaintiff was the target of an undifferentiated shooting rather than an innocent bystander, based solely on the fact that no alternative has been proffered by a defendant, would amount to little more than speculation. This evidence simply does not have sufficient probative value to carry Plaintiff's burden of proof on this issue by a preponderance of the evidence. Even worse, treating such an inference as sufficient has the practical effect of shifting the burden of proof onto the defendant officer to prove that he *did* have a credible, legitimate target.

The perils of such an approach become apparent when considered in the context of the Supreme Court's admonition that police conduct should not be evaluated "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Allowing an adverse inference in this context is even worse—it essentially penalizes Officer Adgar for the fact we don't have 20/20 hindsight vision of his intended target. Permitting a jury to infer a constitutional violation on the basis of evidence with so little probative value would not "ensure that officers may go about their work without undue apprehension of being sued." *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019). Accordingly, the Court should find the evidence legally

insufficient to prove that Officer Adgar lacked a legitimate target when he fired the foam projectile that struck Plaintiff.

**III. Officer Adgar is entitled to judgment as a matter of law on Plaintiff's Bane Act claim, because there has been no violation of a clearly delineated right.**

The Bane Act prohibits interference with "the exercise or enjoyment … of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civ. Code § 52.1(b). A claim under the Bane Act requires a predicate constitutional violation to be actionable. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). As a result, Plaintiff's Bane Act claim cannot survive, since Ofc. Adgar's use of force in these circumstances was objectively reasonable and did not violate plaintiff's constitutional rights.

But Plaintiff's Bane Act claim also fails for an additional reason. While a constitutional violation is a necessary element of such a claim, "the Bane Act imposes an additional requirement beyond a finding of a constitutional violation." *Id*. Establishing liability requires plaintiff to prove a Defendant acted with "specific intent to violate the plaintiff's constitutional rights." *Id*. at 1042-43. There are two requirements for a finding of specific intent. The first is a purely legal determination that requires the Court to determine if the constitutional right is "clearly delineated

and plainly applicable under the circumstances of the case." *Cornell v. City & Cty. of S.F.*, 17 Cal. App. 5th 766, 803 (Cal. Ct. App. 2017). The second is a factual determination that inquires if the defendant committed the act in question with the particular purpose of depriving plaintiff of that constitutional right. *Id.* Alternatively, the second requirement can be met by proving the defendant acted in reckless disregard of the right at issue. *Id.* at 804.

Plaintiff's Bane Act claim does not survive either test. The right plaintiff asserts in this case is Fourth Amendment protection from being accidentally subjected to intermediate force applied in direct response to a quickly unfolding threat to public safety, while participating in a protest that has turned violent. Such a right is not clearly delineated now, much less in May 2020. Accordingly, Plaintiff's Bane Act claim fails the legal determination.

Further, the evidence at trial was insufficient as a matter of law to establish Adgar had a specific intent to interfere with the rights plaintiff asserted. Essentially conceding the inability to establish Adgar's actual intent, plaintiff pursued the reckless disregard angle. That approach failed as well because it cannot be disputed that Adgar only fired projectiles when people threatened the safety of officers and others by throwing objects. Even Plaintiff's police practices expert agreed that use of intermediate force was justified if officer Adgar saw someone throwing water

bottles toward the line of officers. 2-ER-225:17–24. Accordingly, Adgar's actions

cannot reasonably be viewed as in reckless disregard of Plaintiff's rights under

these circumstances.

## Conclusion

For the foregoing reasons, the judgment in favor of Plaintiff on his § 1983 claim based on a Fourth Amendment violation, as well as his claim for violation of California's Bane Act, should be reversed. Accordingly, the attorney's fees, which were award to Plaintiff as the prevailing party on those claims, should be vacated.

Respectfully submitted,

NORA FRIMANN, City Attorney

Dated:  November 6, 2025                By:  */s/Brian Eggleston*
                                        BRIAN EGGLESTON
                                        Sr. Deputy City Attorney

                                        Attorneys for Defendant-Appellant

## Statement of Related Cases

Counsel for Defendant-Appellant hereby certifies that there are no cases related to these appeals known to be currently pending in this Court at this time.

Respectfully submitted,

NORA FRIMANN, City Attorney


By: */s/Brian Eggleston*
BRIAN EGGLESTON
Sr. Deputy City Attorney
Attorneys for Defendant-Appellant

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-1392 and 25-5468 Consolidated

I am the attorney or self-represented party.

This brief contains 9,500 words or less, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature /s/ Brian Eggleston          Date:  November 6, 2025

43