C.A. Nos. 25-1392 and 25-5468 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

KYLE JOHNSON,

Plaintiff-Appellee,

v.

JAMES ADGAR,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of California

The Hon. Beth Labson Freeman, United States District Judge
No. 5:21-cv-01849-BLF

---

## APPELLEE'S ANSWERING BRIEF

---

James McManis, State Bar No. 40958
Matthew Schechter, State Bar No. 212003
Abimael Bastida, State Bar No. 303355
McMANIS FAULKNER
50 West San Fernando Street, 10th Floor
San Jose, California 95113
(408) 279-8700

Attorneys for Plaintiff and Appellee,
KYLE JOHNSON

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................8

JURISDICTIONAL STATEMENT .................................................................10

STATEMENT OF ISSUES PRESENTED .......................................................11

STATEMENT OF THE CASE .........................................................................12

STANDARD OF REVIEW ...............................................................................21

    I.     REVIEW OF APPLICATION OF QUALIFIED
          IMMUNITY. ...................................................................................21

    II.    REVIEW OF TRIAL COURT'S DENIAL OF ADGAR'S
          RENEWED MOTION FOR JUDGMENT AS A MATTER
          OF LAW. ........................................................................................23

    III.   REVIEW OF THE JURY'S VERDICT. ....................................24

SUMMARY OF THE ARGUMENT .................................................................24

ARGUMENT .....................................................................................................27

    I.     THE DISTRICT COURT CORRECTLY HELD ADGAR
          WAS NOT ENTITLED TO QUALIFIED IMMUNITY
          AS TO JOHNSON'S FOURTH AMENDMENT CLAIM. ......28

        A.    Adgar's Use Of Force Violated Johnson's Rights...........29

        B.    This Court's Precedent Clearly Established The
             Rights At Issue, And The Unlawfulness Of Adgar's
             Conduct, As Of May 30, 2020.............................................30

            1.     Adgar Improperly Seeks to Rely on *Puente* to
                 Determine What Was Clearly Established at
                 the Time of His Conduct. ........................................31

2.    Adgar May Not Invoke Qualified Immunity Through High-Level Generalities in an Attempt to Make the Facts of this Case Look Like Those in *Puente*. ...................34

3.    *Puente* is Distinguishable From the Case at Bar. ...................38

II.    THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT THAT ADGAR SEIZED JOHNSON AND VIOLATED HIS FOURTH AMENDMENT RIGHTS. ...................44

A.    The Applicable Standard Of Review Forecloses Adgar's Invitation For This Court To Reweigh Evidence And Redraw Inferences In His Favor. ...........45

B.    There Is Sufficient Evidence To Support The Jury's Verdict That Adgar Seized Johnson When He Shot Indiscriminately Into The Crowd. ...................47

C.    Adgar's Reference To Counsel's Argument At The Summary Judgment Hearing Is A Red Herring Unhelpful To The Court's Analysis. ...................53

III.    JOHNSON PRESENTED SUFFICIENT EVIDENCE AT TRIAL TO SUPPORT THE JURY'S VERDICT THAT ADGAR VIOLATED THE BANE ACT. ...................54

CONCLUSION ...................60

# TABLE OF AUTHORITIES

**Cases**

*A.D. v. Cal. Highway Patrol,*
712 F.3d 446 (9th Cir. 2013)......................................................28, 29, 30

*Anderson v. Creighton,*
483 U.S. 635 (1987).............................................................................34, 37

*Anderson v. Liberty Lobby,*
477 U.S. 242 .............................................................................................46

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011).............................................................................34, 37

*Bell v. Williams,*
108 F.4th 809 (9th Cir. 2024) ...............................................23, 24, 25

*Benavidez v. County of San Diego,*
993 F.3d 1134 (9th Cir. 2021)................................................................21

*Brendlin v. California,*
551 U.S. 249 (2007)..................................................................................48

*Brosseau v. Haugen,*
543 U.S. 194 (2004)..................................................................................32

*Brower v. County of Inyo,*
489 U.S. 593 (1989)............................................................................45, 49

*Castro v. County of Los Angeles,*
833 F.3d 1060 (9th Cir. 2016)................................................................24

*Ciminillo v. Streicher,*
434 F.3d 461 (6th Cir. 2006).................................................................37

*Deorle v. Rutherford,*
272 F.3d 1272 (9th Cir. 2001).............................................................37

*Estate of Aguirre v. County of Riverside,*
131 F.4th 702 (9th Cir. 2025) ...........................................25, 28, 29, 30

*Gallick v. Baltimore & O.R. Co.,*
372 U.S. 108 (1963) ............................................................50

*Gilbrook v. City of Westminster,*
177 F.3d 839 (9th Cir. 1999) ...........................................24

*Guillemard-Ginorio v. Contreras-Gomez,*
585 F.3d 508 (1st Cir. 2009) ............................................30

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ..........................................................32

*Harper v. City of Los Angeles,*
533 F.3d 1010 (9th Cir. 2008) ....................................23, 58

*Hernandez v. Mesa,*
582 U.S. 548 (2017) ..........................................................31

*Hope v. Pelzer,*
536 U.S. 730, (2002) .........................................................32

*Jensen v. EXC, Inc.,*
82 F.4th 835 (9th Cir. 2023) ...........................................27

*Johnson v. Jones,*
515 U.S. 304 (1995) ..........................................................33

*Josephs v. Pacific Bell,*
443 F.3d 1050 (9th Cir. 2006) ..........................................28

*Kisela v. Hughes,*
584 U.S. 100 (2018) ..........................................................32

*Lal v. California,*
746 F.3d 1112 (9th Cir. 2014) ..........................................28

*Luna v. Cnty. Of Riverside,*
No. EDCV 21-0467 JGB (SPX), 2023 WL 7803386
(C.D. Cal. Oct. 20, 2023) ...................................................56

*Nelson v. City of Davis,*
685 F.3d 867 (9th Cir. 2012).................25, 26, 31, 36, 37, 44, 45, 49, 50

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
20 F.4th 466 (9th Cir. 2021) ......................................................24

*Ortiz v. Jordan,*
562 U.S. 180 (2011) ...................................................................33

*Puente v. City of Phoenix,*
123 F.4th 1035 (9th Cir. 2024) .........................26, 27, 31, 38, 39, 40, 41

*Reese v. County of Sacramento,*
888 F.3d 1030 (9th Cir. 2018).........................28, 29, 30, 55, 57

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ...........................................................28, 46

*Sanderlin v. Dwyer,*
116 F.4th 905 (9th Cir. 2024) ..................26, 32, 33, 36, 37, 48

*Sandoval v. Cnty. Of Sonoma,*
912 F.3d 509 (9th Cir. 2018)...............................................56, 57

*Shafer v. Cnty. of Santa Barbara,*
868 F.3d 1110 (9th Cir. 2017)..................................................34

*Thompson v. Mahre,*
110 F.3d 716 (9th Cir. 1997).....................................................22

*Thomson v. Hodgson,*
150 F.4th 1097 (9th Cir.) ..........................................................23

*Torres v. Madrid,*
592 U.S. 306 (2021) ...........................................................47, 48

*United States v. Lockett,*
919 F.2d 585 (9th Cir. 1990)......................................................49

*Venegas v. County of Los Angeles,*
153 Cal.App.4th 1230 (2007) ....................................................57

*White v. Pauly,*
580 U.S. 73 (2017) .............................................................34, 35

## Statutes

28 U.S.C. § 1291 .................................................................................11

28 U.S.C. § 1331 .................................................................................10

28 U.S.C. § 1343 .................................................................................10

28 U.S.C. § 1367 .................................................................................10

42 U.S.C. § 1983 .................................................................................10

Cal. Civ. Code § 52.1(b)-(c) ................................................................55

## Rules

9th Cir. Rule 28 ..................................................................................10

9th Cir. Rule 30 ..................................................................................22

Fed. R. App. P. 4(a)(1)(A) ..................................................................11

Fed. R. App. P. 4(a)(4) ........................................................................11

Federal Rule of Civil Procedure 50 ..............................................25, 27

Federal Rule of Civil Procedure 50(b) ...............................................22

Federal Rule of Civil Procedure 54(a) ...............................................11

## INTRODUCTION

The adage, "the third time is the charm," does not apply in litigation. This appeal is Adgar's third attempt to use *Puente v. City of Phoenix* – a case decided just two weeks before trial in this matter – to take this case away from the hands of the jury. The District Court rightfully denied Adgar's motion for judgment as a matter of law during trial and again after the jury's verdict. Even so, Adgar now brings forth this appeal making the same arguments he made to the District Court. In doing so, as he did in the court below, Adgar relies on a self-serving characterization of the evidence and testimony while at the same time giving no weight to the jury's factual findings.

Following the murder of George Floyd, countless people participated in protests throughout the country. Some protests turned violent while others did not. San Jose was no different.

Adgar's own trial testimony, as well as that of his fellow officers and the corroborating video evidence presented, make clear that on May 29, 2020, protests in downtown San Jose turned violent with property vandalized, vehicles burned, and many individuals shot by law enforcement with projectile impact weapons. Despite Adgar's

characterization in his Opening Brief, however, May 30, 2020, was much different and paled in comparison. The protest in front of San Jose City Hall, which Johnson attended, was generally peaceful. Even so, Adgar fired his 40 millimeter projectile impact weapon – intended solely to be used when objectively reasonable to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death, or in situations where its use is likely to prevent any person from being seriously injured – intentionally and indiscriminately into the crowd. One of the 40 millimeter foam baton rounds he fired, which are approximately half the size of a "Red Bull" can, struck Johnson, restraining him and ultimately resulting in lifelong injuries that Johnson suffers to this day.

The evidence presented to the jury over the course of the trial was more than sufficient to support the jury's verdict in favor of Johnson on his claims for excessive force under the Fourth Amendment and California's Bane Act. Moreover, the trial court correctly held that Adgar was not entitled to qualified immunity. Therefore, this Court should affirm the judgment following the jury's verdict, the District Court's order on Adgar's post-trial motion for judgment as a matter of

law, and the District Court's order awarding attorneys' fees and costs to Johnson.

## JURISDICTIONAL STATEMENT

Pursuant to Ninth Circuit Rule 28-2.2, Plaintiff and Appellee, Kyle Johnson ("Johnson"), submits the following statement of jurisdiction:

Johnson's claims arise under the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the laws of the State of California. This action was filed in the U.S. District Court for the Northern District of California. The District Court's jurisdiction over this case was proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

On January 22, 2025, the jury returned a verdict in favor of Johnson on all of his causes of action alleged against Defendant and Appellant, Officer James Adgar ("Adgar"), and in favor of Defendant, the City of San Jose ("the City"), on all causes of action alleged against it. 1-ER-0047–58. Judgment was entered according to the jury's verdict on January 31, 2025. *Id.* at 0046. The District Court's judgment constitutes a final decision of the District Court conferring

appellate jurisdiction on this Court pursuant to 28 U.S.C. § 1291 and Federal Rule of Civil Procedure 54(a). Defendants filed a renewed motion for judgment as a matter of law on February 28, 2025 (Doc. 267), and then filed a Notice of Appeal as to the judgment on March 3, 2025. 3-ER-0538–540.

On August 15, 2025, the District Court entered its order granting in part and denying in part Defendants' renewed motion for judgment as a matter of law, and granting in part Johnson's motion for attorneys' fees and costs. 1-ER-0002–45. Adgar timely filed a Notice of Appeal on August 27, 2025. 3-ER-0535–537; *see also id.* at 532–534; Fed. R. App. P. 4(a)(1)(A), 4(a)(4).

## STATEMENT OF ISSUES PRESENTED

1) Given the applicable facts of the case, and the law as it existed as of the date of the incident, was Adgar on notice of the clearly established law governing the situation he faced?

2) Did Johnson present sufficient evidence at trial to support the jury's verdict that Adgar engaged in excessive force and violated Johnson's Fourth Amendment rights?

3)     Did Johnson present sufficient evidence at trial to support the jury's verdict in favor of Johnson as to his Bane Act claim?

**STATEMENT OF THE CASE**

The death of George Floyd at the hands of police officers on May 25, 2020, was a catalyst for nationwide protests.  Protests began in San Jose on May 29, 2020, and lasted several days.  Kyle Johnson did not participate in any protests on May 29th.  He did, however, attend the protest at San Jose's City Hall Plaza on May 30, 2020.  He had no weapon on him, nor did he have any object to throw at anyone.  SER-0006:22–0007:5.  He was there to show support for "the black and brown community" with no intention of doing anything else other than peacefully protest.  2-ER-0130:1–22.

It is undisputed that Johnson arrived at City Hall Plaza at approximately 9:53 p.m.  2-ER-0130:23–0131:3.  It is also undisputed that for the next 45 minutes, Johnson remained at the plaza.  He did not engage in any way with the police officers present, nor did he ever throw anything at anyone.  2-ER-0132:12–0133:2.  During the entire time Johnson is at the plaza up until the moment he is struck in the leg, he does not hear any orders by the police commanding the protestors to

12

disperse (2-ER-0138:16–0139:8), does not hear any statement declaring an unlawful assembly (2-ER-0138:16–0139:8), and is never directly instructed to leave the plaza by an officer. 2-ER-0138:16–0139:8. Thus, Johnson was under no duty to disperse or leave the plaza. *See* SER-0057:24–0058:19 (Lt. Lee Tassio, who trained officers on crowd control and use of force, testified that no one has a duty to disperse until police have told them to do so and police would not disperse a crowd without a dispersal order first).

At approximately 10:24 p.m. on May 30th, people in the crowd threw a volley of objects – primarily plastic water bottles – at the officers. 2-ER-0084, 91, and 95. Johnson did not throw any objects and he did not observe other people in his vicinity throwing any objects. 2-ER-0132:12–0133:4. In response, the officers fired their Projectile Impact Weapons (PIW) into the crowd. 2-ER-0084, 0091, and 0095. However, the officers did not arrest, or attempt to arrest, anyone immediately after firing their PIWs. 2-ER-0084, 0091, and 0095. Johnson was not struck during the officers' response to this first volley. *See* SER-0022:2–0023:2 (Johnson confirming that despite being asked about videos depicting events at approximately 10:24 p.m., he was

injured at 10:33 p.m.); *see also* SER-0184.  After Johnson and the crowd initially retreated, they then returned to the front area of the City Hall Plaza.  SER-0024:17–0025:9.

At approximately 10:33 p.m., people in the crowd threw a second volley of objects – again, primarily water bottles – at the officers.  2-ER-0088; SER-0176, SER-0180, SER-0184, SER-0188.[1]  Again, Johnson did not throw any objects, but observed one water bottle thrown from the intersection of Fourth Street and Santa Clara Street – approximately 70 yards away from Johnson – which landed behind the police line but not strike anyone.  2-ER-0133:5–0134:6.  Johnson also did not observe anyone around him or in his vicinity throw any objects at police officers, make any sort of throwing motion, or injure any officer.  2-ER-0137:11–0138:2; SER-0105:20–0107:10.  As before, the officers, including Adgar, responded by firing their PIWs into the crowd.  2-ER-0088; SER-0176, SER-0180, SER-0184, SER-0188.

The baton ammunitions fired into the crowd are about half the size of a "Red Bull" can and travel at 240-260 feet per second, which

---

[1] While the brief uses standard time to refer to when events occurred, the video exhibits use 24-hour time via a timestamp in the upper right hand corner of the videos.

translates to approximately 170 miles per hour. SER-0061:24–0062:2; SER-0054:10–17; SER-0213. The shot that Adgar fired struck Johnson in the back of the left leg, and Johnson is seen limping away after being struck and eventually collapsed to the ground. SER-0192. The video further shows that when Adgar fired the shot that hit Johnson, Johnson was not throwing anything or engaging in any conduct that could reasonably be deemed a threat. SER-0176. Instead, he was turned around, with his back to the officers, his hands on his head, and walking away. SER-0176. Having been struck in the back of the leg, Johnson limped away, and ultimately fell to the ground near the rotunda of City Hall Plaza where two other people – not police officers – came to his aid. SER-0192. Johnson sustained serious bodily injuries, including pulmonary embolisms, and as a result has long-term medical effects. 2-ER-0064-66; SER-0014:23–0016:1. Johnson filed suit against the City and Adgar. SER-0148.

At trial, Adgar sought to conflate the events of May 29th with the events on May 30th. In his Opening Brief, Adgar heavily cites trial testimony provided by Sergeant Jonathan Byers ("Byers"), who testified at length about the "violent and destructive behavior" he witnessed on

15

May 29th.  *See* Opening Brief, pp. 6-7 (citing 2-ER-187–203).  However,

a more complete view of the evidence presented to the jury made clear

the same was not true for May 30th.  While Byers testified that on May

30th he ordered an officer to fire a 40 millimeter PIW round at

individuals doing graffiti about 100 yards away (SER-0068:3–0070:25),

he conceded that spray painting is not a physical threat, but

nevertheless gave the order because the "vandals" could become

"emboldened" if police didn't do anything.  *Id.*  Moreover, the testimony

and evidence showed that, aside from the few volleys of water bottles,

the crowd at City Hall plaza was vastly peaceful.[2]  As one officer put it,

up until 10:19 p.m., minutes before the first volley of objects thrown at

police, the protest was "primarily peaceful" (SER-0089:17–23), and the

interactions between officers and protestors were "peaceful, cordial,

*friendly almost.*"  SER-0090:1–0091:10 (emphasis added)).  In addition,

---

[2] *See generally* SER-0063:18–25 ("no significant incidents where the crowd did anything particularly violent"); 2-ER-0201:3–0202:10 (people were primarily "chanting relatively peaceful.  A couple of arrests happened, but nothing major");  SER-0064:21–0065:22 (recognizing only "select people" were "sporadic[ally]" throwing objects at police but otherwise protest was "relatively peaceful"); SER-0066:7–0067:9 (from 10:00 p.m. to 10:40 p.m., "the throwing of the items was the only physical attack we saw").

16

the police had better coordinated response and more police resources on May 30th than May 29th. 2-ER-0245:17–25; SER-0095:19–21. Simply put, despite whatever "violent and destructive" behavior the officers faced on May 29th, the same was not true on May 30th.

At trial, the jury heard extensive testimony from Johnson's video forensic expert, Jason Fries, both on direct and via Adgar's lengthy cross-examination. Fries testified about the detailed process that was used to analyze the videos provided to him. SER-0026:10–0042:16. He further testified that he was able to track Johnson's movements at City Hall Plaza (3-ER-0321:19–23; 3-ER-0323:11–19; SER-0047:8–10); the location of police officers at or around 10:33:08 p.m. (3-ER-0322:17–23; SER-0046:12–21, SER-0047:20–25); and the location or quadrant from where bottles were being thrown at or about the time when Johnson was struck by the projectile. 3-ER-0317:14–0319:6; 3-ER-0319:18–0321:16; 3-ER-0321:25–0322:16; SER-0047:11–19. Fries testified that, based on his analysis, not only was the projectile that struck Johson fired by Adgar (SER-0044:17–0045:23, SER-0048:5–16), but that the other officers who fired PIWs at the scene at or around that same time

17

could not have fired the shot that struck Johnson. 3-ER0324:7–0325:21, 3-ER-0326:10–24, SER-0043:19–0044:16.

Johnson's police practices expert, Roger Clark, testified on the Peace Officer Standards and Training (POST) applicable to all officers in California (SER-0073:6–8, SER-0074:5–0075:25), as well as on the use of 40 millimeter projectile impact weapons for use of crowd control regarding riots and protests. Clark explained to the jury that in using a 40mm PIW weapon, there must be a credible threat that arises to the level of risk that would justify the level of force and the officer must ensure that there is clear target since the weapon is target specific. 3-ER-0332:14–0333:18; *see also* SER-0216. Having reviewed the evidence in this case, Clark testified at trial that Adgar's use of the 40mm PIW when it struck Plaintiff was not a proper use of the weapon, nor was it in compliance with POST. SER-0076:21–0077:14, SER-0077:23–0078:7, SER-0078:24–0079:4, SER-0079:21–0082:7, SER-0184; *see also* 2-ER-0226:23–0227:22.

The jury also heard from Lieutenant Lee Tassio, who, at the time of the protests, trained San Jose Police Department ("SJPD") officers on the use of force, crowd control, and the use of PIW weapons. SER-

18

0052:11–0053:17. Tassio testified about the specific circumstances for which officers, like Adgar, are trained and required to consider in terms of reasonable force in a crowd control setting, including visibility, crowd size and crowd density. SER-0059:3–0060:2. Captain Jason Dwyer, the commander in charge on May 30, 2020, also testified that officers were not allowed to discharge their 40 millimeter PIW at an individual "who was not a threat of violence, was not in the process of throwing anything, but who only failed to obey a verbal order to disperse." SER-0087:20–0088:1; *see also* SER-0097:12–25 (Adgar confirming the same).

More importantly, the jury heard from Adgar who, during cross-examination, acknowledged that he was well aware of the two circumstances that the duty manual set out as being proper situations to use a 40mm PIW (SER-0096:10–0097:11, SER-0201); that in using a 40mm PIW, he was "to be sure of [his] target, backstop, and beyond" (SER-0098:10–0099:4, SER-0175); and that he was trained not to fire a 40mm PIW into a crowd unless he could actually aim at the person who is posing a threat. SER-0100:7–12. Adgar also admitted on cross-examination that while his report from the day in question stated that he "fired one 40 millimeter foam baton less-lethal projectile towards the

19

suspect that had the beer bottle in his hand earlier as he attempted to flee" (SER-0103:9–12), in reality, at the time he fired the 40mm PIW, he did not see a beer bottle in the suspect's hand, nor did he see the suspect even throw a bottle. SER-0103:13–18. Adgar further testified that when he fired two 40mm PIW projectiles "[at] a male adult wearing all black clothing throw[ing] a glass bottle towards officers from inside the crowd … by the time [he] fired, the bottle had already been thrown." 2-ER-0261:4–11. Adgar did not even see where the projectiles he fired eventually hit. 2-ER-0261:12–19.

Johnson testified that at the time he was struck he did not see anyone throwing anything besides water bottles at the time he was struck; did not see any officer get injured; and that in the moment before he was hit, the majority of the crowd was standing around talking to each other. 2-ER-0137:11–0138:2; *see also* SER-0104:3–0107:10 (Johnson identifying himself on SER-0217–0218 and describing what happened at the time of his injury on SER-0188.)

In addition to witness testimony, and the written SJPD policy and training materials regarding use of the 40mm PIW weapons, the jury saw multiple videos depicting the moments leading up to and when

Adgar fired his weapon, what the crowd was doing at that moment, and what, if anything, was allegedly being thrown in Adgar's direction. *See, e.g.*, 2-ER-0088; SER-0176, SER-0180, SER-0184, SER-0188. Photos were admitted into evidence that reflected where Adgar allegedly saw someone making a throwing motion that led to him firing his PIW and where Johnson was standing at that same moment in time (2-ER-0111–0112 and SER-0217–0218), and that the two positions are not in close proximity.

With the exception of his *Monell* claims against the City of San Jose, the jury returned a verdict in favor of Johnson and against Adgar on every claim. 1-ER-0047–0058.

**STANDARD OF REVIEW**

## I. REVIEW OF APPLICATION OF QUALIFIED IMMUNITY.

Adgar contends that the standard of review on the question of whether he was entitled to qualified immunity question is de novo, citing to *Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). (Opening Brief, p. 17.) *Benavidez*, though, was an appeal following the grant of a motion to dismiss with prejudice (*Benavidez*, 993 F.3d at 1141), not after a trial and jury verdict.

Johnson acknowledges that "[w]hether a right is 'clearly established' so that a public official who violated that right would have no qualified immunity is … reviewed de novo[,] … [and that] application of law to the facts to determine whether on those facts, qualified immunity is established, is [also] reviewed de novo, because the determination of qualified immunity on facts not genuinely at issue is for the court." *Thompson v. Mahre*, 110 F.3d 716, 721 (9th Cir. 1997) (citation omitted). At the same time, "the party that prevailed at trial is entitled to have the evidence construed in a light most favorable to it, and the question is whether the evidence was so one-sided that one party would have to prevail as a matter of law." *Thompson*, 110 F.3d at 721.[3]

---

[3] This Court's local rule for the excerpts of record states that "[u]nless the entire set of excerpts will be submitted in a single volume of no more than 300 pages[,]" Volume 1 of the excerpts of record is to contain only the "decisions being appealed, reviewed, or collaterally challenged, whether oral or written, final or interim." 9th Cir. Rule 30-1.4(a). Here, Adgar's excerpts contain only one District Court decision: the written order denying Adgar's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). *See* 1-ER-0002–45.

As a result, although it is not clearly stated in Adgar's opening brief, it is Johnson's understanding that only the District Court's order denying Adgar's renewed motion for judgment as a matter of law is at issue on appeal as to the qualified immunity issue.

## II. REVIEW OF TRIAL COURT'S DENIAL OF ADGAR'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW.

With respect to Adgar's appeal of the denial of his motion for judgment as a matter of law, this Court reviews that denial de novo. *Thomson v. Hodgson*, 150 F.4th 1097, 1102 (9th Cir.), *reh'g denied*, 154 F.4th 1154 (9th Cir. 2025). However, while "[q]uestions of law raised before the case went to the jury are reviewed de novo, even following a jury verdict" (*id.*), when otherwise considering the denial of a renewed motion for judgment as a matter of law after a jury trial, this Court "do[es] not reweigh the evidence or substitute [its] preferred result. [It] must uphold the jury's verdict if it is 'supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'" *Bell v. Williams*, 108 F.4th 809, 818 (9th Cir. 2024) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008)). "Additionally, [this Court] 'must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Bell*, 108 F.4th at 818 (quoting *Harper*, 533 F.3d

at 1021); *see also id.* at 1021, fn. 9; *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999).

## III.   REVIEW OF THE JURY'S VERDICT.

"A jury verdict will be upheld if supported by substantial evidence." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 476 (9th Cir. 2021). This Court "'may not weigh the evidence but simply ask[s] whether the plaintiff has presented sufficient evidence to support the jury's conclusion.'" *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016)). "[F]indings of fact will be reversed only when the evidence 'permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Optronic Techs.*, 20 F.4th at 476 (quoting *Castro*, 833 F.3d at 1066).

## SUMMARY OF THE ARGUMENT

This appeal is another effort by Adgar to relitigate a jury verdict that is fully supported by the trial record. Testimony from officers on scene at the protest on May 30th, as well as video capturing the moments leading up to the shooting that caused Johnson's injury, make clear that the protest that evening was generally peaceful aside from a few select people sporadically throwing water bottles at officers. Even

so, Adgar used excessive force when he intentionally and indiscriminately fired a 40 millimeter PIW into the crowd striking Johnson in the leg as he was walking away, hands up, unarmed, and posing no threat.  This was the jury's finding at the conclusion of trial. The District Court correctly denied Adgar's Rule 50 motion, and this Court's review is constrained by a highly-deferential, post-verdict standard: it must view the evidence in the light most favorable to Johnson, draw all reasonable inferences in his favor, and disregard contrary evidence the jury was not required to accept as true.  *Bell, supra*, 108 F.4th at 818.  Under this standard Adgar may not ask this Court to substitute his preferred narrative for the jury's findings.

Adgar is not entitled to qualified immunity.  The first prong of this analysis – whether there was a Constitutional violation – has already been resolved by the jury's verdict, and must be upheld if it is supported by the evidence.  *Estate of Aguirre v. County of Riverside*, 131 F.4th 702, 707 (9th Cir. 2025).  On the second prong – whether existing law as of May 30, 2020, put Adgar on notice that his conduct was unlawful – *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), established that firing a projectile impact weapon capable of causing serious bodily

25

injury at non-threatening individuals who, at most, may have committed minor offenses, violates the Fourth Amendment. *Id.* at 886-887. This Court's decision, in *Sanderlin v. Dwyer*, 116 F.4th 905 (9th Cir. 2024) – arising out of the same San Jose George Floyd protests – reaffirmed *Nelson's* particularized rule in this context.

Adgar's reliance on *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), must fail because it was not the law at the time of the incident and cannot apply retroactively, and is also factually distinguishable from the facts of this case. Additionally, the jury's finding that Johnson was seized is supported by well-settled Fourth Amendment judicial precedent. *See* 1-ER-0007–009 (District Court's well-reasoned analysis on seizure).

Finally, Adgar's argument that there was an improper shift of the burden at trial is directly contradicted by the evidence itself, the District Court's jury instructions, and the special verdict.

The District Court properly denied Adgar's post-trial motion for judgment as a matter of law, and this Court should affirm the judgment.

## **ARGUMENT**

Adgar seeks to frame the issue on appeal as whether it was erroneous for the District Court to "allow[] this case to go to trial[.]" (Opening Brief, p. 14.) This framing is incorrect. Adgar raised that sufficiency-of-the-evidence issue in his Rule 50 motion, and the District Court correctly denied it. To the extent Adgar now argues that he is entitled to qualified immunity or that Johnson did not prove his case, "the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Jensen v. EXC, Inc.*, 82 F.4th 835, 856 (9th Cir. 2023).

Here, Adgar's implicit attempts to make this a "purely legal issue" in order to vacate the jury's verdict must fail because his argument rests entirely on (1) *Puente v. City of Phoenix, supra* – a factually distinguishable case – while sidestepping on-point Ninth Circuit precedent, and (2) the improper rejection the jury's findings of fact, i.e., permissible inference and credibility determinations, contrary to the applicable standard for a sufficiency of the evidence analysis.

**I. THE DISTRICT COURT CORRECTLY HELD ADGAR WAS NOT ENTITLED TO QUALIFIED IMMUNITY AS TO JOHNSON'S FOURTH AMENDMENT CLAIM.**

"'In determining whether an officer is entitled to qualified immunity, [a court] consider[s] (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.'" *Reese v. County of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)).

Although this review is done under a de novo standard, this Court "'give[s] significant deference to the jury's verdict and to the nonmoving parties (here, [Johnson]) when deciding whether that decision was correct.'" *Estate of Aguirre, supra*, 131 F. 4th at 706-707 (quoting *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)).  Moreover, the Court must "'draw all reasonable inferences in' the nonmoving party's favor" (*Estate of Aguirre*, 131 F. 4th at 707 (quoting *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)), while also "'disregard[ing] all evidence favorable to the moving party that the jury is not required to believe.'" *Estate of Aguirre*, 131 F. 4th at 707 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

"This is a highly deferential standard." *Estate of Aguirre*, 131 F. 4th at 707.

## A.    <u>Adgar's Use Of Force Violated Johnson's Rights.</u>

Adgar's argument that he did not violate Johnson's Fourth Amendment rights because his "use of force was objectively reasonable as a matter of law" (Opening Brief, pp. 19-26), must fail because the jury's verdict has resolved this question against Adgar.

As noted above, the first prong of the qualified immunity analysis is to determine if there was a violation of a constitutional right. *See Reese, supra*, 888 F.3d at 1037. When that prong is being considered at the motion to dismiss, or summary judgment, stage of the proceedings, "a court may grant qualified immunity if the plaintiffs have not made out a constitutional violation, based on the facts alleged or 'shown.'" *A.D., supra*, 712 F.3d at 456.

Here, however, Johnson has not simply "alleged" or "shown" facts sufficient to make out the constitutional violation. Instead, the jury's verdict in his favor has established that Adgar violated Johnson's right to be free from excessive force. 1-ER-0047–0048. "When … a jury has found (with reasonable support in the evidence) a constitutional

violation by a police officer, we view the jury's verdict as sufficient to deny him qualified immunity on the first prong of the analysis." *Estate of Aguirre, supra*, 131 F. 4th at 707 (internal quotation marks omitted); *see also A.D.*, 712 F.3d at 450, 456; *Reese*, 888 F.3d at 1037.

According to the jury's view of the facts, and based on substantial evidence presented at trial (*see* Section II., *post*), Adgar violated Johnson's rights in using excessive force by firing his 40mm PIW which struck Johnson in the back of the leg.

## B. This Court's Precedent Clearly Established The Rights At Issue, And The Unlawfulness Of Adgar's Conduct, As Of May 30, 2020.

Given the jury's verdict, the question as to whether qualified immunity is appropriate turns on the "clearly established" prong. Still, "'deference to the jury's view of the facts *persists throughout each prong of the qualified immunity inquiry.*'" *A.D., supra*, 712 F.3d at 456 (quoting *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 528 (1st Cir. 2009) (emphasis added)).

When considering the applicable facts of the case and giving deference to the jury's view of those facts, as well as evaluating the state of the law as of the date of the incident, Adgar was on notice of the

clearly established law governing the situation he faced, and, as a result, the District Court correctly concluded that Adgar was not entitled to qualified immunity.

       1.    <u>Adgar Improperly Seeks to Rely on *Puente* to Determine What Was Clearly Established at the Time of His Conduct.</u>

Adgar's qualified immunity argument is wholly contingent on the decision in *Puente v. City of Phoenix, supra*. *Puente*, like any case defining clearly established law, is fact-specific. The facts of *Puente*, however, are not applicable here. Instead, as the District Court correctly ruled below, *Nelson v. City of Davis, supra*, clearly established, at the time of Adgar's conduct, the law governing the situation he faced. Therefore, Adgar's argument lacks merit.

In analyzing the clearly established prong of qualified immunity, "[t]he dispositive inquiry [] is whether it would be clear to a reasonable officer that his conduct was unlawful in *the situation he confronted*." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (internal quotation marks and citation omitted; emphasis added). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law *at the time of*

31

*the conduct." Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*) (emphasis added); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Brosseau*).

"The 'clearly established' inquiry that [a court] undertake[s] when evaluating an officer's assertion of qualified immunity is bound up with the precept of notice—*notice means prior notice, not notice after the fact." Sanderlin, supra*, 116 F.4th at 916 (emphasis added); *see also Hope v. Pelzer*, 536 U.S. 730, 739, (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."). Thus, "a court may not rely on 'subsequent legal developments' favorable to the plaintiff to clearly establish the law, because the officer cannot 'fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.'" *Sanderlin*, 116 F.3d at 916 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At the same time, "[there is] no reason to treat subsequent legal developments that are favorable to the defendant officer any differently from subsequent legal developments favorable to the plaintiff…. [T]he need for prior notice is a two-way street.'" *Sanderlin*, 116 F.3d at 916 (internal quotation marks and citation omitted).

*Puente* – a case decided on December 19, 2024, more than four years after the events at issue here took place – has no relevance to the "clearly established" prong analysis applied to Adgar's conduct on May 30, 2020. This Court's reasoning in *Sanderlin* makes clear that although subsequent legal decisions "may elucidate whether the officer has committed a constitutional violation at all[,]" "the officer *cannot* take advantage of subsequent developments in the law to argue that the right was not clearly established at the time he committed the violation. *Sanderlin*, 116 F.4th at 917 (emphasis added).

Accordingly, Adgar cannot rely on – and this Court should not consider – *Puente* in assessing whether the law was "clearly established" for purposes of qualified immunity. Moreover, the fact that Adgar did not immediately appeal the denial of his motion for summary judgment on the qualified immunity question[4] underscores the irrationality of his present attempt argue *Puente* applies retroactively.

---

[4] As reiterated in *Ortiz v. Jordan*, 562 U.S. 180 (2011), "immediate appeal from the denial of summary judgment on a qualified immunity plea is available when the appeal presents a purely legal issue, illustratively, the determination of what law was clearly established at the time the defendant acted." *Id.* at 188 (internal quotation marks omitted); *see also Johnson v. Jones*, 515 U.S. 304, 313 (1995).

2. Adgar May Not Invoke Qualified Immunity Through High-Level Generalities in an Attempt to Make the Facts of this Case Look Like Those in *Puente.*

Courts begin their inquiry into "whether a constitutional violation was clearly established by defining the law at issue in a concrete, particularized manner." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Moreover, the Supreme Court has repeatedly warned lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also id.* (emphasizing that general propositions are not helpful in determining whether the specific conduct was clearly established as violative).

Here, Adgar's "clearly established" analysis fails because it is framed in broad and general propositions. *See, e.g.,* Opening Brief, p. 5 (framing issue of qualified immunity based on Adgar's use of a "well-established intermediate force option against individuals engaging in violent, criminal behavior who posed a threat to public safety and the safety of the officers"); *id.* at p. 15 ("There is not, and there was not in

34

May 2020, a clearly delineated right to be free from uses of intermediate force when continuing to engage in a protest that has turned violent"); *id.* at p. 23 ("Adgar was faced with hostile crowd that was resorting to violence and intervention was necessary to prevent the threat to public safety from escalating").  As referenced above, testimony from the officers, as well as video evidence, made clear to the jury that the protest on May 30th was generally peaceful.  *See, ante*, pp. 16-17.

Even so, *White* established that courts must resist "high level generality" framing when assessing qualified immunity because such abstract framing could obscure what existing law clearly has been established.  *White, supra*, 580 U.S. at 79 (warning that the clearly established law must be "particularized" to the facts of the case). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  *Id*. (Internal quotation marks and citation omitted).

That same concern should apply with equal force to a defendant officer's characterization of the encounter.  It is unhelpful to this Court's analysis for Adgar to use generalized terms – "violent behavior," "threat

to public," "protest turned violent" – that do not identify in a particularized fashion what he faced on May 30th that justified his use of force. What Adgar attempts to do runs contrary to the Court's analysis, i.e., Johnson must particularize the clearly established law to the facts, while Adgar may blur the facts into generalities to make the law appear unclear.

The law on May 30, 2020, was not unclear. At the time of Adgar's conduct, *Nelson, supra*, established the unlawfulness of shooting a projectile weapon capable of causing serious and permanent injury indiscriminately into a group of protestors who did not pose an imminent risk to public safety. *Nelson,* 685 F.3d at 886-887. Accordingly, Adgar was on notice.

Moreover, in *Sanderlin, supra*, another suit against other members of the SJPD arising out of the same protests that led to this lawsuit, this Court affirmed denial of qualified immunity based on the particularized facts of the case. The Court reiterated the clearly established law that "'[t]he firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors … constitute[d] unreasonable

36

force in violation of the Fourth Amendment.'"  *Sanderlin*, 116 F.4th at 915 (quoting *Nelson*, 685 F.3d at 886); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001); *Ciminillo v. Streicher*, 434 F.3d 461, 466-469 (6th Cir. 2006) (concluding that, even during the course of a riot, an officer "was on notice that it is unreasonable to use beanbag propellants against individuals who pose no immediate risk to officer safety.").

This contradicts Adgar's implicit argument that once objects are thrown, "intermediate force" becomes presumptively reasonable.  *See* Opening Brief, pp. 1, 23 (stating, in vague terms and with no supporting legal citation, that Adgar's use of "intermediate force" is well established as a reasonable response to the kinds of "violence" he was facing).  Indeed, while the case law has consistently and repeatedly held that the right alleged to have been violated "must [be] … 'clearly established' in a more particularized, and hence more relevant, sense" (*Anderson, supra*, 483 U.S. at 640), and that courts are "not to define clearly established law at a high level of generality" (*Ashcroft, supra*, 563 U.S. at 742), Adgar seeks to rely on exactly the type of generality

37

that has been criticized in a misplaced attempt to shoehorn the facts of this case into those of *Puente*.

Therefore, when Adgar fired his 40mm PIW striking Johnson in the back of the leg as he was walking away with his hands up, unarmed, and posing no threat of violence, it was clearly established that such conduct was unlawful. Notably, Adgar's brief never mentions the *Sanderlin* opinion, and thus ignores the most on-point Ninth Circuit case involving the use of projectile impact weapons in the context of protests.

### 3. *Puente* is Distinguishable From the Case at Bar.

*Puente* is distinguishable from this case both procedurally and factually. From a procedural standpoint, *Puente* was decided at the summary judgment stage. Thus, unlike here, there was no jury verdict against the officers and all of the deference to the jury's findings that go with it.

Factually, the concerns regarding the circumstances of the crowd, and the police officers' response, in *Puente* are simply not comparable or similar to what was presented at trial in this case. *Puente* involved a crowd of approximately 6,000 people along with the "use of unidentified

gas and pyrotechnic devices by agitators dispersed throughout a crowd, escalating violence toward the officers, an organized attempt to breach a police line, and the exigent concern of presidential security[]" (*Puente, supra*, 123 F.4th at 1063), which led to the use of chemical tools by police in an effort to disperse the crowd.

By contrast, the crowd at City Hall Plaza on the evening of May 30, 2020, was significantly smaller, approximately 200 people (2-ER-0130:23–0131:3), and the evidence presented at trial demonstrated that during the time Johnson was present, the worst conduct of a few individuals in the crowd was to throw bottles at the officers. *See, e.g.,* SER-0066:7–0067:9. Indeed, Adgar testified he was not injured by anything thrown on May 30th, and was not aware of any other officers that suffered injuries from items being thrown at them, 2-ER-0262:3– 23. Unlike the officers in *Puente* who used <u>pepper balls</u> intended to be used to disperse crowds, Adgar and his fellow officers used 40mm projectile <u>impact</u> weapons, which were explicitly forbidden from being used for the purpose of dispersing crowds. *See, e.g.,* SER-0086:19–23 (40 millimeter baton round to be used solely in two explicit scenarios listed in Duty Manual). Although Adgar glosses over this distinction by

repeatedly using the phrase "use of intermediate force," it is important to note that not all intermediate force is the same. The PIWs used by Adgar and his fellow officers were not intended to be used for crowd dispersal because of the high risk of serious bodily injury and even death. SER-0071:18–0072:16 (Sergeant Christopher Sciba explaining training material at SER-0209 regarding the risk of blunt trauma injuries caused by PIWs). Also, in *Puente*, the officers issued multiple warnings to the protestors not to throw objects and to remain peaceful using a long-range acoustic device ("LRAD"). *See Puente*, 123 F.4th at 1045 ("The [police] used the LRAD to make continuous announcements to warn people not to throw objects"); *see also id.* at 1046 (police vehicle began repeatedly communicating unlawful-assembly declarations as well). The evidence at trial established that not a single warning or dispersal order was given from the moment Johnson arrived at City Hall to the moment he was struck in the leg. 2-ER-0138:16–0139:8. And no warning about the potential use of force was given before Adgar and his fellow officers fired their 40mm PIWs.

Even when officers in *Puente* determined the use of force was necessary, they did not target peaceful protestors and were careful at

first to only fire pepper balls at the ground in front of the people suspected of trying to breach the police fence. *Puente*, 123 F.4th at 1045. Notably, the officers in *Puente* did not indiscriminately fire into crowd even when the agitators mixed with peaceful protestors. *Id.* at 1046 (officers ordered to used "targeted munitions" "to drive back any threatening or *aggressive* individuals" (emphasis added)); *see also id.* at 1047 (officers used non-lethal munitions "against *particular* individuals continuing to throw objects or otherwise act aggressively" (emphasis added)). Only when the violence from within the crowds kept escalating did the officers in *Puente* use less lethal chemical – not impact – weapons targeted at the crowd with the intent to disperse the entire crowd. *Id.* at 1046-1047.

Despite Adgar's efforts to characterize the crowd as "hostile" (Opening Brief, p. 23), there is nothing in the record to show that the protesters on May 30th were using gas or pyrotechnic devices or that there was any attempt to breach the police line. Furthermore, during the time that Johnson was at City Hall Plaza and before his injury, the record demonstrates that the police never issued any directive to leave the area, never gave a dispersal order, never warned of potential use of

41

force, and never made a declaration of unlawful assembly. It is telling that Adgar relies on conjecture as to the actions of others, not Johnson, to support the use of the PIW. *See* Opening Brief, p. 24 ("Even setting aside the *possibility* that the those individuals had additional objects to use as weapons, their *potential* for inciting others to violence was more than sufficient to justify use of PIW to address the *concern*." (emphasis added)).

Adgar also seeks to rely on incomplete testimony to argue that Johnson's police practices expert, Roger Clark, conceded that intermediate force was justified given the protestors "violent behavior." Opening Brief, p. 30. Adgar points to Clark's response to a single question asked of him during cross-examination. *Id.* (citing 2-ER-0225:17–24). However, Adgar does not mention that the question asked of Clark was not only a hypothetical one – "I'm going to ask you to assume that ..." (2-ER-0225:17–18) – but also that the question only asked if the hypothetical situation would allow for the use of "intermediate force" without defining what that type of force would entail. 2-ER-0225:21–23. Adgar then infers that "intermediate force"

means firing 40mm PIW indiscriminately into the crowd as a way to justify his conduct. Not so.

Instead, Clark testified that he agreed with the San Jose Police Department policy regarding the use of a projectile impact weapon for crowd control which stated that it was to be used "when objectively reasonable to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody; [or] … when objectively reasonable in situations where its use is likely to prevent any person from being seriously injured." SER-0216; SER-0055:10, SER-0055:16–0056:7; *see also* SER-0205. Clark also testified that, at the time Adgar fired his 40mm PIW, Adgar was neither using the weapon properly for purposes of crowd control, nor was he in compliance with POST standards. *See* SER-0076:21–0078:7, SER-0079:1–3, SER-0079:21–0080:19, and SER-0081:4–15; *see also* SER-0184. Clark also commented that "bottles of water in my estimation are not very serious and they're part of what we do." 3-ER-0339:11–23.

Simply put, the "emergent public safety concerns" from *Puente* – the lynchpin for Adgar's argument – are not present in this case. The

factual circumstances of this case are much more analogous to those found in *Nelson v. City of Davis, supra.* Like in *Nelson*, while the officers may have had some interest in clearing City Hall Plaza, there was no exigent circumstances which justified their use of force. *Id.* at 880-881. Further, like in *Nelson*, Johnson was not part of any group inciting violence during the protest; instead he was struck while retreating with his hands up behind his head. *Id.* at 881.

The particular facts of this case make clear that Adgar did not face the same factual scenario the officers in *Puente* faced. Rather, like the District Court correctly ruled, *Nelson* applies here. 1-ER-0008–0009.

## II. THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT THAT ADGAR SEIZED JOHNSON AND VIOLATED HIS FOURTH AMENDMENT RIGHTS.

Adgar's attack on the sufficiency of the evidence to support the jury's finding that Adgar shot indiscriminately into the crowd to constitute a seizure is a duplication of what was already argued in the Rule 50 Motion below. As the District Court correctly laid out in its order (*see* 1-ER-0002–0019), this argument must fail.

It is well settled law that there is a seizure under the Fourth Amendment "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted). Thus, "[a] seizure occurs *even when an unintended person or thing is the object of the detention or taking*, [as long as] the detention or taking itself [is] willful," and not as a result of "an unknowing act." *Id.* at 596 (citations omitted; emphasis added); *see also Nelson, supra*, 685 F.3d at 876 ("To constitute a seizure, the governmental conduct must be purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff.").

The evidence at trial supports the jury's finding that Adgar acted willfully, that his willful act led to Plaintiff being struck in the leg by a projectile fired from Adgar's 40mm PIW, and that Plaintiff was seized as a result.

### A. The Applicable Standard Of Review Forecloses Adgar's Invitation For This Court To Reweigh Evidence And Redraw Inferences In His Favor.

In reviewing the District Court's denial of Adgar's Rule 50 motion, the reviewing court must view the evidence in the light most favorable

to the verdict and draw all reasonable inferences in favor of Johnson – the prevailing party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). This Court may not make credibility determinations or weigh the evidence. *Id.* These functions, and the "drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 150-151 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255).

Adgar's "legally insufficient" argument is a recycling of the arguments he presented in support of his Rule 50 motion that the District Court carefully considered and rejected. *See* 1-ER-0007–0009. Adgar repackages the same "no seizure absent specific intended target" premise he argued in his post-trial motion and re-argues it here as "insufficient evidence." Moreover, Adgar's argument hinges on the request that this Court credit Adgar's version of events (he aimed at a bottle-thrower target) and discount the direct, circumstantial, documentary, and video evidence supporting the verdict, as well as the credibility-based inferences the jury made in reaching its verdict. This is not permissible.

Notably, Adgar does not contend, and no evidence was presented at trial indicating otherwise, that he fired his 40MM PIW accidentally. Indeed, Adgar concedes that "[he] pulled the trigger and used [his] 40 millimeter."  (Opening Brief, p. 34-35 (citing 2-ER-0264:6–11). Similarly, Adgar does not contend, and no evidence was presented otherwise, that the 40 millimeter foam baton fired from his PIW was not the object that struck Johnson in the leg.  *See* Opening Brief, p. 34 (conceding Adgar intentionally fired his 40 millimeter PIW striking Johnson as he allegedly "target[ed] specific individuals" when Johnson was injured).  Thus, Adgar's argument boils down to whether there is sufficient evidence to support the jury's finding that Adgar had an intent to restrain under a Fourth Amendment analysis.

**B.** **There Is Sufficient Evidence To Support The Jury's Verdict That Adgar Seized Johnson When He Shot Indiscriminately Into The Crowd.**

The Supreme Court has made clear that a seizure occurs when officers apply physical force to a person with intent to restrain, even if the person does not submit or is not subdued.  *Torres v. Madrid*, 592 U.S. 306, 325 (2021).  The inquiry is objective: whether the challenged conduct "objectively manifests an intent to restrain."  *Id.* at 317.  Courts

"rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.*; *see also Brendlin v. California*, 551 U.S. 249, 260 (2007) (rejecting efforts to introduce subjectivity). Notably, and as the District Court recognized, "[t]he Ninth Circuit has subsequently applied *Torres* in another case arising out of the San Jose George Floyd protests to conclude that, viewing the facts in the light most favorable to the plaintiff, 'a reasonable factfinder could find that [an officer] objectively manifested an intent to restrain' when he used a 40mm PIW on the plaintiff, because that PIW 'is chiefly designed, intended, and used for the purpose of incapacitating its target.'" 1-ER-0007:23–28 (quoting *Sanderlin, supra*, 116 F.4th 905, 913).

Nothing in *Torres* imposes a requirement that the officer intend to restrain a particular person, or even that the officer correctly perceive the identity of the person ultimately struck. The operative question is whether the conduct – here, intentionally discharging a 40mm projectile impact weapon into a crowd – objectively manifests intent to restrain a person (or persons) through physical force.

That is precisely what *Nelson* holds in the crowd-control projectile context. There, students were the "undifferentiated objects of shots

48

intentionally fired by the officers in the direction of that group," and Nelson was seized despite not being individually targeted. *Nelson, supra*, 685 F.3d at 876-877. *Nelson's* formulation is not a carveout from *Torres*; it is an application of the same objective principle: a deliberately fired projectile aimed into a group can objectively manifest intent to restrain members of that group through physical force, whether or not the officer cares which specific member is hit.

Adgar's reliance on "innocent bystander" language change does not change the analysis. The Supreme Court in *Brower v. County of Inyo*, 489 U.S. 593 (1989), made clear that a seizure requires "governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 597 (emphasis in original). The dictum Adgar relies upon from *United States v. Lockett*, 919 F.2d 585 (9th Cir. 1990) (*see* Opening Brief, p. 32), illustrates an important distinction: when an officer intentionally targets one person and accidentally strikes another, the non-targeted person is not seized. This does not control, however, where the jury finds the officer *intentionally* fired into a crowd with an "absence of concern" regarding the ultimate recipient of the use of force because, under *Nelson*, the crowd itself is the object of

the force and the officer's volitional act is still directed at persons in that group. *See Nelson, supra*, 685 F.3d at 876.

Adgar's referencing the individuals identified in Trial Exhibits 552a and 553 as the individuals he allegedly was targeting (Opening Brief, p. 9, fn. 6 (citing 2-ER-0111 and 2-ER-0114)), in support of his argument that he was not indiscriminately shooting into the crowd is flawed. First, special verdicts should stand and courts must attempt to reconcile the jury's findings before overturning a verdict. *See Gallick v. Baltimore & O.R. Co.*, 372 U.S. 108, 119 (1963). Second, the more logical explanation is that the jury could rationally conclude the conduct of the individuals identified in these exhibits was a substantial factor in the chain of events – their conduct escalated tensions or contributed to the conditions that led to the use of PIW by officers – without accepting that Adgar was in fact specifically aiming at either individual when he fired and struck Johnson. Nothing in the jury's finding that these individuals appeared to throw things and engaged in negligent conduct required the jury to find that therefore Adgar's shot was aimed at either of them.

Similarly, Adgar's argument that Johnson somehow shifted the burden of proof onto Adgar to prove that he did have a legitimate target (Opening Brief, pp. 35-37), is unsupported by the record. First, and foremost, the District Court properly instructed the jury to "find the facts from all the evidence in the case" and to apply the law as it is given to the jury to those facts. SER-0109–0110. The jury was specifically instructed on the burden of proof, as well as the elements necessary for Johnson to prove his causes of action as an unreasonable seizure both generally and with excessive force. SER-0111–0114. Moreover, each of the 27 questions relating to jury's findings regarding liability in the special verdict form include the same language regarding Johnson's burden of proof: "Did *Kyle Johnson* prove by a preponderance of evidence that […]." 1-ER-0047-0055 (emphasis added).

At trial, Johnson presented evidence – on direct and cross, and via documents and video – and then made his argument at closing as to how the jury could interpret the evidence. Adgar had the same opportunity to elicit evidence in "opposition," and to make contrary arguments at closing. Ultimately, the jury was "persuaded by the evidence that [Johnson's] claim [was] more probably true than not

51

true".  *See* SER-0111; *see also* 1-ER-0048 (jury's verdict responses regarding Johnson's Fourth Amendment claim).  This does not equate to a shifting in the burden of proof or that Johnson relied on mere speculation.

The evidence presented at trial more than sufficiently shows that Adgar *intended* to fire his PIW when he fired the shot that struck Johnson.  Indeed, Adgar admitted, both in cross and via his written use of force report, that he intended to fire his weapon on the two occasions that he did so on May 30, 2020.  *See* SER-0101:18–0102:10, SER-0103:9–12, SER-0103:22–25.  Whether or not Johnson was the specific target when Adgar fired his weapon is not the question.  Rather, he was the undifferentiated object of the shot intentionally and indiscriminately fired by Adgar in the direction of where Johnson was located, which then struck Plaintiff causing him to limp away and eventually collapse onto the ground, i.e., his freedom of movement was restrained.  *See* SER-0008:21–0009:7, SER-0010:9–0013:2 (describing the events depicted on SER-0192); *see also* SER-0020:2–0021:14.

In appealing, Adgar now seeks to have this Court view the "objective evidence" he refers to (Opening Brief, p. 34), from Adgar's and

only Adgar's perspective.  That is directly counter to how the weight of the evidence is to be considered.

### C. Adgar's Reference To Counsel's Argument At The Summary Judgment Hearing Is A Red Herring Unhelpful To The Court's Analysis.

Adgar quotes select statements made during the hearing on Adgar's motion for summary judgment.  (Opening Brief, pp. 32-33.) Further, Adgar seems to argue that it was the Court who introduced the idea that *Nelson* was relevant to the analysis of whether Adgar's conduct constituted a seizure.  *Id*. at p. 33 ("However, when it became apparent the argument would not succeed, Plaintiff accepted the trial court's invitation to adopt a *Nelson* theory instead.").  What Adgar does not include is what was alleged by Johnson since the beginning of this lawsuit in the operative complaint – that Adgar, without a specific target, fired into the crowd and in the direction of Johnson.  *See* SER-0154 at ¶ 29, SER-0160 at ¶ 49.  What Adgar also fails to mention is that, both in the  opposition to, and during oral argument on, the summary judgment motion, Johnson argued that because Adgar fired in the direction towards Johnson – but not at Johnson specifically – *Nelson* applied.  *See* SER-0132–0133; *see also* 3-ER-0486:13–23, 0488:1–19.

Thus, the Court correctly ruled that issue was one for the jury to decide: "[D]id Adgar aim at a suspect who had hurled the bottles and inadvertently hit Mr. Johnson, that would be no liability; or, instead, did he, under a, maybe generous theory under *Nelson*, but a reasonable one, did Adgar, in response to the hurled bottle, shoot indiscriminately in the direction of the assailant?" 3-ER-0488:24–0489:7; *see also* 3-ER-0410–0412. The issue ultimately went to the jury who found that in response to the hurled objects, Adgar shot indiscriminately in the direction of the crowd and struck Johnson.

## III. JOHNSON PRESENTED SUFFICIENT EVIDENCE AT TRIAL TO SUPPORT THE JURY'S VERDICT THAT ADGAR VIOLATED THE BANE ACT.

Adgar, repeating the argument that he made in the trial court, contends that the jury's verdict in favor of Johnson's cause of action under California's Bane Act was not supported by sufficient evidence given that (a) "Adgar's use of force … was objectively reasonable and did not violate [Johnson's] constitutional rights[;]" and (b) Johnson failed to prove that Adgar "acted with specific intent to violate [Johnson's] constitutional rights." (Opening Brief, p. 38 [internal quotation marks and citation omitted].) Adgar's argument fails as it ignores or

misinterprets the relevant facts, and is not supported by law.  The

jury's verdict was correct and supported by the evidence, and the trial

court correctly denied Adgar's post-trial Rule 50 motion on this

particular issue.  The judgment on the Bane Act claim should be

affirmed.

A plaintiff can seek damages under the Bane Act "if a person or

persons, whether or not acting under color of law, interferes[, or

attempts to interfere,] by threat, intimidation, or coercion … with the

exercise or enjoyment by any individual … of rights secured by the

Constitution or laws of the United States, or of the rights secured by the

Constitution or laws of this state."  Cal. Civ. Code § 52.1(b)-(c).  Thus, a

Bane Act claim has the same elements as an excessive force claim under

the Fourth Amendment, with the additional requirement that the

defendant intended to interfere with a plaintiff's constitutional rights.

*See Reese, supra*, 888 F.3d at 1045.

As to Adgar's claim that he did not violate Johnson's Fourth

Amendment rights, that argument lacks merit.  Adgar argues that the

right at issue is "protection from being accidentally subjected to

intermediate force applied in direct response to a quickly unfolding

threat to public safety, while participating in a protest that has turned violent." (Opening Brief, p. 39.) As an initial matter, as set out above (*see* Section I, *ante*), Adgar did violate Johnson constitutional rights and did violate clearly established law. Even so, Adgar cites no authority that, for purposes of the Bane Act, the right at issue can be defined in a narrow fashion and with various qualifiers. This is significant given that "[t]he clearly delineated and plainly applicable standard is nowhere as exacting as the clearly established law requirement under § 1983." *Luna v. Cnty. Of Riverside*, No. EDCV 21-0467 JGB (SPX), 2023 WL 7803386, at \*15 (C.D. Cal. Oct. 20, 2023) (internal quotation marks omitted), *appeal dismissed*, No. 23-3522, 2024 WL 4802282 (9th Cir. May 29, 2024). Thus, "[a]t a broad level of generality, it is of course indisputable that the right to be free from [excessive force] is well-established and clearly delineated." *Sandoval v. Cnty. Of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018).

Moreover, to the extent Adgar is attempting to argue that Johnson lacked a clearly delineated right under a qualified immunity analysis (*see* Opening Brief, p. 39 ["Such a right is not clearly delineated now, much less in May 2020"]), that argument fails as "qualified immunity of

the kind applied to actions brought under [§ 1983] does not apply to actions brought under [the Bane Act]." *Venegas v. County of Los Angeles*, 153 Cal.App.4th 1230, 1246 (2007); *see also Reese, supra*, 888 F.3d at 1040-1041 (noting that qualified immunity is not available for Bane Act claims and citing *Venegas*).

In terms of the specific intent requirement, it does not require that the defendant have been "thinking in constitutional *or legal terms* at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Id.* at 1045 (internal quotation marks omitted; italics in original); *see also Sandoval, supra*, 912 F.2d at 520 ("[S]pecific intent can be shown even if the defendant did not in fact recognize the unlawfulness of his act but instead acted in reckless disregard of the constitutional right." [internal quotation marks omitted]). Thus, "the jury must find that the defendant[] intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Reese, supra*, 888 F.3d at 1045 (internal quotation marks omitted).

The only evidence Adgar points to in seeking to show a lack of intent or reckless disregard, is that he "only fired projectiles when people threatened the safety of officers and others by throwing objects." (Opening Brief, p. 39.)  This, though, requires one to accept as true Adgar's version of events and deem his testimony credible, even though that is inconsistent with the controlling standard of review.  *See Harper, supra*, 533 F.3d at 1021 (in considering an appeal of the denial of a renewed Rule 50 motion, the Court "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe.").

Adgar attempts to rely on the testimony of Johnson's police practices expert, Roger Clark, that "intermediate use of force was justified if officer Adgar saw someone throwing water bottles toward the line of officers."  Opening Brief, pp. 39-40.  As discussed in detail above (*see, ante*, pp. 42-43), Adgar plucks a single sentence from Mr. Clark's response to a incomplete hypothetical question, while also ignoring the rest of his testimony that paints a more complete picture of his opinions.  When one considers Mr. Clark's complete testimony, along

with the other testimonial, documentary, and video evidence presented to the jury in the light most favorable to Johnson, and giving deference to the jury's verdict and the reasonable credibility inferences it drew in reaching that verdict, the record contains more than sufficient evidence to conclude that Adgar acted with specific intent or a reckless disregard. Because there is no basis on which to conclude that the jury's verdict in favor of Johnson on his Bane Act claim is incorrect or unreasonable, both the jury's verdict and the District Court's subsequent denial of Adgar's Rule 50 motion on this issue should be affirmed.

///

///

///

///

///

## CONCLUSION

Having made multiple motions to dismiss, a motion for summary judgment, and post-verdict motions, Adgar once again attempts to rewrite history. The jury made its findings and found that Adgar violated Johnson's Fourth Amendment rights, as well as California's Bane Act. This appeal does nothing to change that. Accordingly, the judgment in this case should be affirmed and the District Court's order awarding fees and costs to Johnson as the prevailing party in an action under Section 1983 should remain in place.

Dated: February 6, 2026     McMANIS FAULKNER

*/s/Abimael Bastida*
JAMES McMANIS
MATTHEW SCHECHTER
ABIMAEL BASTIDA

Attorneys for Plaintiff and Appellee,
KYLE JOHNSON

# STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellee states that there are no related cases pending in this Court.

Dated:  February 6, 2026                    McMANIS FAULKNER

*/s/Abimael Bastida*
JAMES McMANIS
MATTHEW SCHECHTER
ABIMAEL BASTIDA

Attorneys for Plaintiff and Appellee,
KYLE JOHNSON

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-1392 and 25-5468 (consolidated)

I am the attorney or self-represented party.

**This brief contains** 10,468 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Abimael Bastida **Date** 02/06/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 25-1392 and 25-5468 (consolidated)

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

APPELLEE'S ANSWERING BRIEF; APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD, VOLUME 1 OF 1; and MOTION FOR LEAVE TO TRANSMIT CERTAIN EXHIBITS

**Signature** | /s/ Abimael Bastida | **Date** | 02/06/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*