C.A. Nos. 25-1392 and 25-5468 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

KYLE JOHNSON,

Plaintiff-Appellee,

v.

JAMES ADGAR,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of California

The Hon. Beth Labson Freeman, United States District Judge
No. 5:21-cv-01849-BLF

---

**APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD**

**VOLUME 1 OF 1**

---

James McManis, State Bar No. 40958
Matthew Schechter, State Bar No. 212003
Abimael Bastida, State Bar No. 303355
McMANIS FAULKNER
50 West San Fernando Street, 10th Floor
San Jose, California 95113
(408) 279-8700

Attorneys for Plaintiff and Appellee,
KYLE JOHNSON

# INDEX

| Docket No. | Document | Date Filed | Page |
|---|---|---|---|
| 249 | Excerpts of Jury Trial Transcript, Volume 2, on 1/6/2025 | 01/23/2025 | SER-0004 |
| 250 | Excerpts of Jury Trial Transcript, Volume 3, on 1/7/2025 | 01/23/2025 | SER-0018 |
| 252 | Excerpts of Jury Trial Transcript, Volume 5, on 1/10/2025 | 01/23/2025 | SER-0050 |
| 253 | Excerpts of Jury Trial Transcript, Volume 6, on 1/13/2025 | 01/23/2025 | SER-0084 |
| 254 | Excerpts of Jury Trial Transcript, Volume 7, on 1/14/2025 | 01/23/2025 | SER-0093 |
| 242 | Excerpts from Jury Instructions | 01/16/2025 | SER-0109 |
| 128 | Plaintiff Kyle Johnson's Opposition to Defendants' Motion for Summary Judgment | 09/19/2023 | SER-0115 |
| 73 | Second Amended Complaint for Damages | 07/14/2022 | SER-0148 |
| 277 | Trial Exhibit 65 [Excerpt] - Less Lethal 40m Launcher & Stunbag Projectile Impact Weapons Safety Update Training | 03/28/2025 | SER-0173 |
| 277 | Trial Exhibit 100a - City Hall West Plaza Video | 03/28/2025 | SER-0176 |
| 277 | Trial Exhibit 106a - T. Takash 5/30 BWC [22.33.03-22.33.40] | 03/28/2025 | SER-0180 |

| Docket No. | Document | Date Filed | Page |
|---|---|---|---|
| 277 | Trial Exhibit 108a - A. Brown 5/30 BWC [22.32.54-22.33.52] | 03/28/2025 | SER-0184 |
| 277 | Trial Exhibit 112c - J. Adgar 5/30 BWC [22.32.59-22.33.38] | 03/28/2025 | SER-0188 |
| 277 | Trial Exhibit 120a - City Hall Rotunda Pantry Exit Video Excerpt | 03/28/2025 | SER-0192 |
| 277 | Trial Exhibit 151a - SJPD 2020 Duty Manual- (SJ278383, SJ278677-78, SJ278690, SJ278694-5) | 03/28/2025 | SER-0196 |
| 277 | Trial Exhibit 155 - SJPD Duty Manual Revisions re Projectile Impact Weapons | 03/28/2025 | SER-0203 |
| 277 | Trial Exhibit 181 [Excerpt] - Sciba Less Lethal Devices Training | 03/28/2025 | SER-0207 |
| 277 | Trial Exhibit 210 [Excerpt] - Less Lethal Training | 03/28/2025 | SER-0211 |
| 277 | Trial Exhibit 211 [Excerpt] - MFF Metro Academy Training | 03/28/2025 | SER-0214 |
| 277 | Trial Exhibit 440 - 527 Moraga BWC Screenshot [22.33.14] Marked by Johnson on 1/14/25 | 03/28/2025 | SER-0217 |

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

              PLAINTIFF,            CASE NO.  CV-21-01849 BLF

    VS.                       SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 6, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 2
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,           PAGES 25 - 220

        DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                      BY:  ABIMAEL BASTIDA
                         MATTHEW SCHECHTER
                      10TH FLOOR
                      50 WEST SAN FERNANDO STREET
                      SAN JOSE, CALIFORNIA 95113

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

SER-0004

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:          OFFICE OF THE CITY ATTORNEY
                             BY:  ARDELL JOHNSON
                                  JAMES HUANG
                                  NICHOLAS SYMPSON
                             16TH FLOOR
                             200 EAST SANTA CLARA STREET
                             SAN JOSE, CALIFORNIA 95113


ALSO PRESENT:                MCMANIS FAULKNER
                             BY:  GALENSTEIN DANG, PARALEGAL
                             10TH FLOOR
                             50 WEST SAN FERNANDO STREET
                             SAN JOSE, CALIFORNIA 95113

SER-0005

JOHNSON DIRECT BY MR. BASTIDA

A.   YES, THAT'S CORRECT.

Q.   AND DO YOU REMEMBER APPROXIMATELY WHAT TIME IT WAS THAT YOU ARRIVED AT ST. JAMES PARK?

A.   IT WAS PROBABLY AROUND 9:30.  MAYBE A LITTLE BIT AFTER THAT.

Q.   OKAY.  WHEN YOU MET UP WITH YOUR FRIEND, WAS HE ALONE?

A.   NO.  I MET UP WITH MY FRIEND, BRANDON SIMON, AND HE HAD A FRIEND NAMED DANNY THAT WAS WITH HIM AS WELL.

Q.   ANYONE ELSE?

A.   NO.

Q.   DO YOU RECALL WHAT YOU WERE WEARING THAT DAY?

A.   YES.  I WAS WEARING A DARK BLUE ZIP UP JACKET WITH BLUE JEANS AND CREAM OR TAN COLORED SHOES.  I ALSO HAD A FACE MASK.

Q.   LIKE A COVID MASK OR WHAT KIND OF FACE MASK?

A.   IT WAS ACTUALLY A BANDANA THAT WAS GIVEN TO ME BY BRANDON. AT THE TIME COVID WAS IN FULL EFFECT AND THERE WERE NO FACE MASKS, AND SO HE PROVIDED A BANDANA FOR ME TO COVER MY FACE.

Q.   OKAY.  CORRECT ME IF I'M WRONG, IT SOUNDS LIKE YOU WERE WEARING IT BECAUSE OF THE COVID THAT WAS GOING ON AT THAT MOMENT?

A.   YES, THAT'S CORRECT.

Q.   AT THAT TIME WHAT DID YOU HAVE ON YOUR PERSON IN TERMS OF OBJECTS?

A.   MY WALLET, MY KEYS, AND MY CELL PHONE.

Q.   DID YOU HAVE ANY WEAPONS ON YOUR PERSON?

SER-0006

A.   NO, ABSOLUTELY NOT.

Q.   ASSUMING YOU DID NOT -- ASSUMING YOU WOULD NOT BE INCLINED TO THROW YOUR WALLET OR YOUR CELL PHONE OR YOUR KEYS, DID YOU HAVE ANY OBJECT THAT COULD HAVE BEEN THROWN?

A.   NO, I DID NOT.

Q.   SO ONCE YOU ARRIVED AT ST. JAMES PARK AND MET UP WITH YOUR FRIEND MR. SIMON AND THE OTHER INDIVIDUAL, I THINK YOU SAID HER NAME WAS DANNY?

A.   YES, THAT'S CORRECT.

Q.   WHAT DID YOU DO AT THAT POINT?

A.   WE DECIDED TO START WALKING DOWN 3RD STREET AND THEN WE MADE A LEFT ON TO SANTA CLARA STREET.

Q.   AND WHERE WERE YOU HEADED?

A.   WE WERE HEADED TOWARDS THE PLAZA, THE CITY HALL BUILDING.

Q.   OKAY.  MR. DANG, COULD YOU PLEASE PUT ON MR. JOHNSON'S SCREEN EXHIBIT 102 AT TIME STAMP 21:53?

         MR. DANG:  102 AT TIME STAMP 21:53?

         MR. BASTIDA:  YES, AND PLAY APPROXIMATELY 30 SECONDS OF THAT.

         THE WITNESS:  I DON'T HAVE THAT.

BY MR. BASTIDA:

Q.   YES.  IT TAKES A LITTLE WHILE.

     IS THE SCREEN IN FRONT OF YOU NOW, MR. JOHNSON?

A.   YES, IT IS.

Q.   AND DO YOU SEE YOURSELF ON THE SCREEN?

SER-0007

WATER BOTTLE FLYING?

A.   I SAW THE WATER BOTTLE IN THE AIR AND IT LANDED, AND THAT'S WHEN I DECIDED TO TURN AWAY FROM THE POLICE LINE AND COVER MY HEAD WITH MY HANDS AND START WALKING AWAY.

Q.   OKAY.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   PAUSE IT.  DO YOU SEE YOURSELF ON THE SCREEN, MR. JOHNSON?

A.   YES, I DO.

Q.   COULD YOU TO THE BEST OF YOUR ABILITY DESCRIBE WHERE YOU ARE?

A.   THERE'S A GENTLEMAN IN A GREY SHIRT OR GREY SWEATER AND I'M JUST TO THE LEFT OF HIM.  I HAVE MY HANDS COVERING THE BACK OF MY HEAD, AND I CAN SEE, BECAUSE OF MY TAN SHOES AND MY DARK CLOTHING ON TOP.

Q.   AND YOU'RE WALKING AWAY FROM THE POLICE LINE?

A.   YES, THAT IS CORRECT.

Q.   OKAY.  GO AHEAD.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   GENERALLY, IS THIS THE MOMENT THAT YOU WERE STRUCK?

A.   YES.

Q.   AND WHERE WERE YOU HIT?

A.   I WAS HIT IN THE BACK OF MY LEFT LEG.

Q.   OKAY.  DO YOU RECALL WHETHER THE IMPACT MAY HAVE CAUSED

SER-0008

YOUR BODY TO DO ANYTHING?  FALL DOWN OR ANYTHING?

A.   IT SENT A SHOCK TO MY BODY AND KIND OF MADE ME JUMP.

Q.   AND THEN WERE YOU ABLE TO MOVE AWAY FREELY OR --

A.   UM --

Q.   GO AHEAD.

A.   YES, MY MOVEMENT WAS IMPAIRED.  I HAD A SEVERE LIMP, BUT I WAS ABLE TO GET TO A POINT WHERE I FELT SAFE.

Q.   SO IT DID NOT CAUSE YOU TO FALL DOWN, BUT IT -- I APOLOGIZE.

          THE COURT:  THE COURT REPORTER NEEDS THE QUESTION ONE AT A TIME.  RESTATE THE QUESTION, PLEASE.

          MR. BASTIDA:  YES, YOUR HONOR.

Q.   YOU WERE -- WERE YOU ABLE TO STILL GET AWAY FROM THAT GENERAL AREA?

A.   YES.

Q.   OKAY.  AND WHERE DID YOU HEAD TO?

A.   I HEADED TOWARDS THE ACTUAL BUILDING OF THE CITY HALL PLAZA, LIKE THE BACK OF THE PLAZA AWAY FROM THE POLICE LINE.

Q.   OKAY.  DID YOU HAPPEN TO SEE THE OBJECT THAT STRUCK YOU?

A.   NO, I DID NOT.

Q.   OKAY.  DID YOU HAPPEN TO SEE THE OFFICER OR WHO MAY HAVE CAUSED THE INJURY ON YOU?

A.   NO, I DID NOT.  MY BACK WAS TURNED TO THE POLICE LINE.

Q.   OKAY.

          MR. BASTIDA:  CAN WE PULL UP 106?

SER-0009

A.   NO.

Q.   DID ANY OFFICER COMMUNICATE, EITHER VERBALLY OR NON-VERBALLY, TO YOU THAT YOU WERE NOT ALLOWED TO BE THERE?

A.   NO, NOT AT ALL.

Q.   DID YOU OBSERVE ANY OFFICER COMMUNICATE TO THE CROWD AS A WHOLE, IN ANY WAY VERBALLY OR NON-VERBALLY, THAT THEY HAD TO LEAVE THE AREA?

A.   NO.

CAN WE SHOW EXHIBIT 120, PLEASE.

MR. DANG:  THIS WILL BE EXHIBIT 120A EXCERPTED AT VIDEO TIME STAMP 9:36:13 TO 9:38:40.

BY MR. BASTIDA:

Q.   MR. JOHNSON, PLEASE TAKE A LOOK AT THIS CLIP, AND LET ME KNOW WHEN YOU'RE DONE.

(VIDEO PLAYING OFF THE RECORD.)

MR. BASTIDA:  GO AHEAD AND PAUSE IT, PLEASE.

Q.   IN THAT SEGMENT THAT WE'VE SEEN, DID YOU SEE YOURSELF ON THE SCREEN?

A.   YES, I DID.

Q.   AND CAN YOU DESCRIBE WHAT YOU SAW?

A.   I SAW MYSELF RUNNING WITH A NOTICEABLE LIMP, AND I WAS HEADING BACK TOWARDS THE BUILDING OF CITY HALL.

Q.   AND IS THIS BEFORE OR AFTER YOU WERE SHOT?

A.   THIS WAS AFTER I WAS HIT.

Q.   OKAY.  ANY REASON TO BELIEVE THAT WHAT IS SHOWN ON THE

SER-0010

SCREEN IS NOT ACCURATE?

A.    NO.

          MR. BASTIDA:  YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED.

          THE COURT:  ANY OBJECTION?

          MR. SYMPSON:  NO, YOUR HONOR.

          THE COURT:  IT WILL BE ADMITTED.

     (PLAINTIFF'S EXHIBIT 120 WAS RECEIVED IN EVIDENCE.)

          MR. BASTIDA:  I WOULD ASK THAT WE PUBLISH IT TO THE JURY, AND FOR PURPOSES OF SPEEDING THIS UP, IF WE CAN START IT FROM THE BEGINNING.

          THE COURT:  IT CAN BE PUBLISHED.

          MR. BASTIDA:  THANK YOU.

     (VIDEO PLAYING OFF THE RECORD.)

          MR. BASTIDA:  PAUSE IT RIGHT THERE, MR. DANG.

Q.    MR. JOHNSON, ARE YOU ABLE TO SEE YOURSELF THERE OR NOT QUITE?

A.    YES, I AM.

Q.    AND DESCRIBE TO THE JURY WHERE YOU SEE YOURSELF ON THE SCREEN?

A.    FURTHER OFF TO THE LEFT BY THE STEPS IT LOOKS LIKE, OR JUST PAST THE GENTLEMAN IN THE BICYCLE ON THE FAR LEFT.

Q.    OKAY.

A.    JUST BEHIND HIM.

Q.    OKAY.  SO I SEE, IF I'M LOOKING FROM THE SCREEN AT THE

LEFT MOST SIDE?

A.    UH-HUH.

Q.    AS I'M SCANNING ACROSS, I SEE THE PERSON ON THE BICYCLE?

A.    YES.

Q.    AND I SEE A SECOND INDIVIDUAL BEHIND THAT FURTHER AWAY FROM THE CAMERA.  IS THAT THE INDIVIDUAL THAT YOU'RE DESCRIBING AS YOURSELF?

A.    YES, SIR.

Q.    OKAY.

      PRESS PLAY.

      (VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.    WHAT IS GOING ON AT THIS MOMENT?

A.    AT THIS MOMENT, I FELT SAFE ENOUGH TO BE TUCKED BACK INTO A CORNER AWAY FROM THE POLICE LINE, AND I'M REALIZING THE SHOCK OF THE INJURY THAT JUST OCCURRED WHEN I GOT STRUCK BY THE 40 MILLIMETER ROUND.

Q.    AND I SEE TWO INDIVIDUALS IN YOUR VICINITY.  CAN YOU DESCRIBE WHAT IS GOING ON WITH THEM?

A.    I DON'T KNOW WHO THEY ARE.  THEY JUST SAW THAT I WAS HURT, AND ASKED IF THEY CAN HELP IN ANY WAY.

Q.    OKAY.  DID THEY PROVIDE HELP?

A.    MORE SO MORAL SUPPORT, BUT NO MEDICAL HELP WAS GIVEN.

Q.    OKAY.  DID YOU UNDERSTAND THEM TO BE -- YOU DIDN'T UNDERSTAND THEM TO BE POLICE PERSONNEL OR IN ANY WAY RELATED TO

SER-0012

MEMBERS OF LAW ENFORCEMENT; CORRECT?

A.   CORRECT, I DIDN'T THINK THEY WERE LAW ENFORCEMENT.

Q.   OKAY.

PLAY THE REST OF THE CLIP, MR. DANG.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   MR. JOHNSON, CAN YOU DESCRIBE THE LAST 5 SECONDS OF WHAT WE JUST WATCHED?

A.   YEAH.  YOU SEE -- EXCUSE ME.  YOU SEE ME WALKING AWAY FROM THAT BACK CORNERED AREA.  I WAS VERY FAMILIAR WITH THE AREA. I'VE WORKED IN DOWNTOWN FOR A LITTLE BIT, AND I WAS TRYING TO MAKE MY WAY TOWARDS 6TH AND 7TH STREET.

Q.   AND WOULD THAT BE AWAY OR CLOSER TO THE POLICE OFFICER LINE?

A.   AWAY FROM THEM.

Q.   OKAY.  AND WERE YOU ABLE TO ULTIMATELY GET TO 6TH OR 7TH STREET?

A.   YES, I WAS.

Q.   AND WHAT HAPPENED AT THAT POINT?

A.   AT THAT POINT I WAS ABLE TO GET IN FRONT OF THE ELEMENTARY SCHOOL, HORACE MANN, I BELIEVE IT WAS, AND I WAS ABLE TO BE PICKED UP.

Q.   AND WHO PICKED YOU UP?

A.   MY THEN GIRLFRIEND AT THE TIME, CAMILLE MIGUEL.

Q.   AND WHERE DID SHE TAKE YOU?

SER-0013

Q.   WERE YOU THEN PUT ON ANY TYPE OF MEDICATION?

A.   YES.  AFTER MY VISIT AND MY STAY IN THE HOSPITAL, I WAS GIVEN A MEDICATION CALLED XARELTO, WHICH IS A BLOOD THINNING MEDICATION.

Q.   DID YOU RECEIVE ANY OTHER KIND OF DIAGNOSTIC TESTING OR IMAGING AT THAT TIME, WHILE YOU WERE ADMITTED AT THE HOSPITAL?

A.   THEY JUST DID THE ULTRASOUND OF MY LEG.

Q.   OKAY.  WHEN YOU WERE DISCHARGED, WHAT INSTRUCTIONS -- OR WHAT WAS YOUR -- LET ME REPHRASE.  WHEN YOU WERE DISCHARGED, WHAT WAS THE MEDICAL MEDICATIONS YOU WERE PRESCRIBED ON, IF ANY?

A.   I WAS PRESCRIBED FOR XARELTO FOR 21 DAYS, AND THEN AFTER THAT 21-DAY REGIMEN I WAS TOLD TO TRANSFER OVER TO PRADAXA, BECAUSE THEY HAD AN ANTI OR LIKE -- IN CASE I HAD AN ALLERGIC REACTION, THEY HAD MEDICATION TO FIGHT THAT.

Q.   DID YOU HAVE ANY OTHER VISITS TO THE HOSPITAL AFTER THAT INITIAL ADMISSION?

A.   YES, I DID.

Q.   WHEN WAS THE NEXT TIME?

A.   SO I WENT THROUGH A SIX MONTH REGIMEN OF THE XARELTO AND PRADAXA, AND ABOUT TWO MONTHS AFTER THAT I WAS HAVING DIFFICULTY BREATHING AND I WAS -- I WENT TO THE ER.

Q.   I JUST WANT TO CONFIRM, YOU WENT TO THE ER BECAUSE OF THE DIFFICULTY BREATHING OR BECAUSE THERE WAS STILL PAIN IN YOUR LEG?

SER-0014

A.   BECAUSE I HAD DIFFICULTY BREATHING.

Q.   OKAY.  AND WHAT WERE THE CIRCUMSTANCES OF -- WHAT WAS YOUR UNDERSTANDING AS TO WHAT WAS THE CAUSE TO THE DIFFICULTY BREATHING?

A.   THEY DID A SCAN OF MY CHEST.  I'M NOT EXACTLY SURE WHAT THE SCAN WAS CALLED, BUT THAT'S WHERE THEY WERE ABLE TO FIND PULMONARY EMBOLISMS.

Q.   WHERE?

A.   IN MY LUNGS.

Q.   DO YOU RECALL WAS IT ONE OR MORE THAN ONE?

A.   I THINK IT WAS ONE.  I'M NOT TOO SURE.

Q.   OKAY.  AND DID YOU HAVE ANY UNDERSTANDING AS TO THE CAUSE OF THE PULMONARY EMBOLISM?

A.   I HAVEN'T HAD THEM BEFORE THE INCIDENT, AND THE DOCTORS ALSO BELIEVED THAT IT WAS AS A RESULT OF THE INJURY.

Q.   SO I JUST WANT TO CONFIRM, BEFORE THAT VISIT TO THE HOSPITAL WHERE THEY FOUND A PULMONARY EMBOLISM IN YOUR LUNG, YOU NEVER, EVER HAD ANY PULMONARY EMBOLISMS IN YOUR LIFE?

A.   NO.

Q.   GIVEN YOUR PREVIOUS MEDICAL CONDITIONS, THE TWO THAT WE SPOKE ABOUT EARLIER, DID -- TO YOUR KNOWLEDGE, DID EITHER OF THOSE PUT YOU AT RISK FOR PULMONARY EMBOLISMS?

A.   NO, NOT TO MY KNOWLEDGE.

Q.   IS THERE ANY HISTORY IN YOUR FAMILY THAT YOU KNOW OF FOR PULMONARY EMBOLISMS OR BLOOD CLOTS?

SER-0015

A.   NO.

Q.   DOES ANYONE IN YOUR FAMILY ALSO HAVE ULCERATIVE COLITIS?

A.   YES.

Q.   AND WHO IS THAT?

A.   MY MOTHER.

Q.   AND TO YOUR KNOWLEDGE HAS SHE EVER SUFFERED BLOOD CLOTS?

A.   NO.

Q.   TO YOUR KNOWLEDGE HAS SHE EVER SUFFERED PULMONARY EMBOLISMS?

A.   NO.

Q.   DOES ANYONE ELSE ALSO HAVE ULCERATIVE COLITIS?

A.   I THINK MY BROTHER MAY HAVE TRACES OF IT, BUT IT WAS NEVER CONFIRMED.

Q.   OKAY.  HAS HE EVER HAD ANY BLOOD CLOTS TO YOUR KNOWLEDGE?

A.   NO.

Q.   WHAT ABOUT PULMONARY EMBOLISMS?

A.   NO.

Q.   OKAY.  DID YOU END UP HAVING ANY OTHER PULMONARY EMBOLISMS AFTER THAT INITIAL ONE IN YOUR LUNG?

A.   NO.

Q.   DID YOU THEN HAVE TO GO BACK TO THE DOCTOR AT ANY POINT AFTER THE PULMONARY EMBOLISM THAT WAS FOUND IN YOUR LUNG?

A.   YES, I DID.

Q.   OKAY.  AND FOR WHAT REASON?

A.   I HAD A COLONOSCOPY, THAT WAS ONE OTHER TIME, AND THEN I

SER-0016

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 7, 2025

SER-0017

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

      PLAINTIFF,          CASE NO.  CV-21-01849 BLF

  VS.              SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 7, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,  VOLUME 3
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,        PAGES 221 - 467

      DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                 BY:  ABIMAEL BASTIDA
                    MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

SER-0018

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:          OFFICE OF THE CITY ATTORNEY
                             BY:  ARDELL JOHNSON
                                  JAMES HUANG
                                  NICHOLAS SYMPSON
                             16TH FLOOR
                             200 EAST SANTA CLARA STREET
                             SAN JOSE, CALIFORNIA 95113


ALSO PRESENT:                MCMANIS FAULKNER
                             BY:  GALENSTEIN DANG, PARALEGAL
                             10TH FLOOR
                             50 WEST SAN FERNANDO STREET
                             SAN JOSE, CALIFORNIA 95113

SER-0019

Q.   I WANT TO SWITCH GEARS NOW.

YESTERDAY YOU TESTIFIED, AND WE SAW A VIDEO OF YOU AT THE PROTEST.  AND THERE WAS A VIDEO THAT WE SAW OF YOU WALKING AWAY, AND AT A PERSON POINT THE VIDEO SHOWED YOU LAYING AN THE GROUND.

DO YOU REMEMBER THAT?

A.   YES, I DO.

Q.   AND WHY DID YOU LAY ON THE GROUND?

A.   I WAS IN PAIN FROM BEING STRUCK WITH A PROJECTILE IN THE BACK OF MY LEG.

Q.   AND APPROXIMATELY FOR HOW LONG DID YOU LAY ON THE GROUND?

A.   IT COULDN'T BE MORE THAN JUST A FEW MINUTES.

Q.   OKAY.  TO CLARIFY, WHAT WAS THE REASON FOR YOU LAYING DOWN ON THE GROUND?

A.   I WAS IN SEVERE PAIN FROM BEING STRUCK, AND I DIDN'T FEEL I COULD WALK NORMALLY.

Q.   OKAY.  YOU TOLD US ALSO ABOUT THE MOMENT THAT YOU WERE STRUCK.  YOU FELT THE MOMENT THAT YOU WERE STRUCK?

A.   YES.

Q.   AND WHAT PHYSICAL REACTION DID YOU HAVE TO THAT INSTANT, THAT MOMENT?

A.   IT WAS A SHOCK BEING STRUCK IN THE BACK OF MY LEG, AND IT MADE ME TAKE A MISSTEP, AND IT KIND OF MADE ME SEEM LIKE I JUMPED A LITTLE BIT.

Q.   AND DID THAT AFFECT -- WERE YOU THEN AFFECTED AS YOU MADE

SER-0020

YOUR WAY TOWARDS THE BACK OF CITY HALL?

A.   YES, I WAS.

Q.   AND I WANT TO CLARIFY.  AND THAT'S WITH RESPECT TO -- IS THAT WITH RESPECT TO YOUR ABILITY TO WALK AND MOVE FREELY?

A.   YES, I HAD A SEVERE LIMP FROM BEING STRUCK.

Q.   OKAY.  MY FINAL QUESTION AT THIS MOMENT, MR. JOHNSON, AND IT MAY SEEM A LITTLE BIT OF AN ODD QUESTION GIVEN WHAT YOU'VE TOLD US HERE TODAY, BUT DID YOU CONSENT IN ANY WAY TO HAVE -- TO BE STRUCK IN THE LEG?

A.   NO, ABSOLUTELY NOT.

Q.   DID YOU IN ANY WAY CONSENT OR AGREE TO ANY TYPE OF USE OF FORCE TO BE APPLIED ON YOU ON THAT DAY?

A.   NO, ABSOLUTELY NOT.

Q.   OKAY.

        MR. BASTIDA:  NO FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

        THE COURT:  ALL RIGHT.  THANK YOU.

    CROSS-EXAMINATION?  MR. SYMPSON, IS THAT YOU?

        MR. SYMPSON:  YES, YOUR HONOR.

        THE COURT:  THANK YOU.

                    **CROSS-EXAMINATION**

BY MR. SYMPSON:

Q.   GOOD MORNING, MR. JOHNSON.

A.   GOOD MORNING.

Q.   I DON'T THINK WE'VE FORMALLY MET.  MY NAME IS NICK SYMPSON

SER-0021

BY MR. BASTIDA:

Q.   OKAY.  MR. SYMPSON THEN WALKED YOU THROUGH A FEW EXHIBITS,

EXHIBIT 526, EXHIBIT 528, EXHIBIT 530, EXHIBIT 533, AND I'M NOT

GOING TO ASK THAT THEY BE PUT THEM UP, BUT THEY WERE ALL TIME

STAMPED 10:24 P.M. APPROXIMATELY.

     DO YOU REMEMBER BEING SHOWN THOSE VIDEOS?

A.   YES.

Q.   OKAY.  AND WHAT TIME WERE YOU INJURED, AT WHAT TIME WERE

YOU HIT WITH THE PROJECTILE?

A.   AT APPROXIMATELY 10:33.

Q.   OKAY.  AND CAN YOU PUT UP EXHIBIT 108A PREVIOUSLY

ADMITTED.

          MR. DANG:  108A.

          MR. BASTIDA:  THANK YOU.

Q.   MR. JOHNSON, DO YOU SEE THE VIDEO IN FRONT OF YOU?

A.   YES, I DO.

Q.   ONE MOMENT, PLEASE.

     (DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

          MR. BASTIDA:  OKAY.  MR. DANG, GO AHEAD AND PLAY THE

VIDEO AND I'LL TELL YOU WHEN TO PAUSE.

Q.   BEFORE YOU DO, MR. JOHNSON, FOR EVERYONE'S BENEFIT, DO YOU

SEE THE TIME STAMP AT THE TOP CORNER?

A.   YES.

Q.   AND WHAT DOES THE TIME STAMP SAY?

A.   IT SAYS 22:32:54.

Q.   AND DO YOU UNDERSTAND THAT TO BE 10:32?

A.   YES, THAT'S CORRECT.

Q.   OKAY.  GO AHEAD AND PLAY.

(VIDEO PLAYING OFF THE RECORD.)

MR. BASTIDA:  THANK YOU.

Q.   MR. JOHNSON, DO YOU SEE -- IS THIS THE MOMENT, APPROXIMATELY, WHEN YOU WERE STRUCK WITH THE PROJECTILE?

A.   YES.

Q.   AND I WANT YOU TO FOCUS IN PRETTY MUCH THE CENTER OF THE VIDEO.  YOU SEE THIS GENTLEMAN WITH THE GREY SWEATER?

A.   YES, I DO.

Q.   OKAY.  I'M GOING TO ASK MR. DANG TO REPLAY THE VIDEO AND AS IT'S REPLAYING, I WANT YOU TO OBSERVE THE VIDEO AND LOOK OUT FOR ANY OBJECTS THAT ARE COMING FROM THIS DIRECTION?

A.   OKAY.

MR. BASTIDA:  GO AHEAD AND RESTART IT, PLEASE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. BASTIDA:

Q.   MR. JOHNSON, DID YOU SEE ANY OBJECTS COMING FROM THAT DIRECTION THAT I ASKED YOU TO FOCUS ON?

A.   I'M SORRY, WHAT WAS THE QUESTION?

Q.   DID YOU SEE ANY OBJECTS COMING FROM THE AREA THAT I WAS ASKING YOU TO FOCUS ON?

A.   NO, I DID NOT.

Q.   OKAY.  YOU SEE THIS -- I DON'T EVEN KNOW.  I THINK WE'RE

SER-0023

CARDIOMYOPATHY, YOU WANTED TO BE SURE THAT DIAGNOSIS WAS CORRECT SO YOU GOT THAT SECOND OPINION FROM STANFORD; RIGHT?

A.   YES, WE DID GET A SECOND OPINION.

Q.   AND THEY AGREED THAT YOU IN FACT -- THEY AGREED WITH THE DIAGNOSIS; RIGHT?

A.   I BELIEVE THAT'S TRUE, YES.

Q.   AND MR. BASTIDA ASKED YOU A LITTLE BIT ABOUT THE TIME PERIOD AT 10:24 AND THEN AGAIN AT 10:33 P.M. ON MAY 30TH.

DO YOU RECALL THAT?

A.   YES.

Q.   AND DO YOU RECALL THAT ULTIMATELY WHEN YOU AND I WERE WATCHING THE VIDEOS OF THE 10:24 YOU COULD IDENTIFY YOURSELF AT ONE POINT AT THE BEGINNING OF THE VIDEO, AND THEN YOU DISAPPEARED AFTER THE VOLLEY BECAUSE YOU SOUGHT REFUGE SOMEWHERE?

A.   IN ONE OF THE VIDEOS, YES, I SAW MYSELF.

Q.   BUT JUST TO BE CLEAR, BY THE TIME 10:33 ROLLED AROUND, YOU HAD COME UP TO ROUGHLY THE SAME POSITION THAT YOU WERE IN PRIOR TO THE VOLLEY AT 10:24?

A.   SO ARE YOU ASKING FROM THE FIRST VOLLEY AT 10:24, DID I RETURN BACK TO THAT GENERAL AREA?

Q.   YES, LET ME ASK IT MORE CLEARLY.  AT 10:24 YOU LEFT THAT AREA WHEN THE LESS-LETHAL WEAPONS WERE FIRED, BUT THEN YOU CAME BACK TO THAT AREA BEFORE 10:33?

A.   WHEN THE FIRST VOLLEY HAPPENED, I RETREATED TOWARDS THAT

SER-0024

CENTER AREA OF THE PLAZA, AND THEN AROUND 10:33 OR JUST BEFORE THAT I WAS EVENTUALLY BACK WHERE THE PLANTERS WERE.

Q.   OKAY.  SO EVEN THOUGH -- I MEAN, I UNDERSTAND YOU TOLD ME THAT EARLIER.  YOU DON'T REMEMBER THE IMPACT AS BEING THE MOST IMPORTANT PART OF THE NIGHT, UNDERSTANDABLY, BUT NOW WATCHING THE VIDEO, EVEN THOUGH YOU HAD SEEN THE LESS-LETHALS FIRED IN YOUR DIRECTION AND YOU WANT AND SOUGHT REFUGE, YOU STILL CAME BACK; RIGHT?

A.   YES, I WAS STANDING IN THE PLANTER AREA.

Q.   OKAY.  AND YOU HAD SAID YESTERDAY, I BELIEVE, THAT YOU HAD NEVER HEARD ANY SORT OF DISPERSAL ORDERS OR ANYTHING LIKE THAT; CORRECT?

A.   YES, I DIDN'T HEAR ANY DISPERSAL ORDERS.

Q.   OKAY.  BUT ISN'T IT SAFE TO SAY THAT YOU WERE ON NOTICE, AFTER HAVING WATCHED THESE VIDEOS NOW AT 10:24, THAT THE CITY HALL PLAZA WAS A LITTLE OUT OF HAND IF FOR NO OTHER REASON THAT THERE WERE OFFICERS FIRING LESS-LETHAL WEAPONS?

A.   I WASN'T GIVEN ANY DISPERSAL ORDERS AND I DIDN'T NECESSARILY BELIEVE THAT IT WOULD HAPPEN AGAIN, SO I DID NOT DISPERSE.

Q.   BUT AT THE SAME TIME, YOU SAID YOU'RE UNCOMFORTABLE IN CROWDS, AND YOU DON'T LIKE TO BE IN BIG CROWDS, AND YOU'RE CONCERNED ABOUT THINGS THAT COULD HAPPEN.

SO YOU'RE TELLING ME THAT AFTER THAT VOLLEY AT 10:24, THE LESS-LETHAL WEAPONS IS FIRED, SCARY ENOUGH FOR YOU TO GO SEEK

SER-0025

IF THAT'S TRUE, CAN YOU FIND EVIDENCE OF HIM BEING HIT BY A PROJECTILE?

AND THEN IF WE CAN FIGURE OUT, YES, WE CAN SEE WHERE HE WAS HIT, WHERE HE WAS HIT, AND WHEN HE WAS HIT, CAN YOU FIGURE OUT WHO WAS THE OFFICER WHO SHOT THAT?

THOSE WERE BASICALLY THE MAIN QUESTIONS THAT WERE ASKED OF US.

AND THEN OUR JOB IS TO SIMPLY GO, OKAY, LET'S SEE IF WE HAVE THE ABILITY TO ANSWER THESE QUESTIONS.

Q. NOW BEFORE WE GET -- WELL, WITHOUT TELLING ME THE ANSWERS TO THOSE QUESTIONS, WERE YOU ABLE TO DETERMINE THAT YOU COULD PROVIDE ANSWERS TO THOSE QUESTIONS?

A. YES, AFTER LOOKING AT THE VIDEOS AND DOING OUR WORK, WE ALWAYS TELL OUR CLIENTS IN THE VERY BEGINNING, LOOK, WE CAN'T GUARANTEE WE CAN ANSWER ALL OF YOUR QUESTIONS. ALL WE CAN DO IS USE THE SCIENTIFIC METHOD AND SEE IF THEY ARE AVAILABLE.

IN THIS PARTICULAR CASE EVERY QUESTION THAT WAS ASKED OF US, WE WERE ABLE TO DO OUR ANALYSIS AND COME UP WITH AN APPROPRIATE ANSWER.

Q. THANK YOU. BEFORE WE GET INTO WHAT THOSE ANSWERS WERE, I WANT TO MAKE SURE THAT THE JURY UNDERSTANDS HOW WE GET THERE.

A. SURE. ME, TOO.

Q. AND CAN YOU DESCRIBE TO THE JURY WHAT THE FIRST STEP IS IN GETTING TO THOSE ANSWERS?

A. SURE. SO, AGAIN, THE VERY FIRST STEP IS A LASER SCANNER

SER-0026

AND THE LASER SCAN OF THE AREA.

THIS IS A SLIDE OR A VIDEO OF THE COMPANY THAT ACTUALLY MAKES THE LASER SCAN.  THIS IS A LITTLE VIDEO THAT THEY PUT TOGETHER.  I THINK IT'S A GOOD VIDEO.  IT'S A GREAT WAY TO EXPLAIN WHAT A LASER SCANNER IS TO SOMEONE WHO HAS NEVER SEEN ONE BEFORE.

MR. BASTIDA:  WE WOULD LIKE TO PLAY THE VIDEO, YOUR HONOR.

THE COURT:  NO OBJECTION.

MR. SYMPSON:  NO.

THE COURT:  OKAY.

MR. BASTIDA:  I BELIEVE IT HAS SOUND.

THE WITNESS:  SO THIS IS A LASER SCANNER.  THIS IS THE LEICA, L-E-I-C-A, SCANNER THAT WE USE.

SO WHAT A LASER SCANNER DOES IS THAT IT LITERALLY SENDS OUT A LASER BEAM.  AND LIKE THIS ANIMATION DEMONSTRATES, IT'S ALMOST SLICING UP THE WORLD.  IT'S SENDING OUT A BEAM OF LIGHT AND CALCULATING HOW LONG IT TAKES FOR THAT LIGHT TO COME BACK AND HIT THE SCANNER.

AND SO AS YOU'LL SEE IN THIS THING, IT WILL SEND SOMETHING OUT AND IT KNOWS HOW FAST IT COMES BACK, AND IT CAN MEASURE VERY PRECISELY TO MULTIPLE DECIMAL POINTS EXACTLY HOW FAR AWAY THE OBJECT IT HITS.

NOW REALIZE IT CAN DO THAT IN 3 DIMENSIONS:  X, Y, AND Z.

SO IT HITS SOMETHING, AND IT KNOWS IT'S X, IT KNOWS IT'S

SER-0027

FRIES DIRECT BY MR. BASTIDA

Y, IT KNOWS IT'S Z.  ESSENTIALLY IT'S 3 DIMENSIONAL.

THIS IS WHAT THE LASER SCAN LOOKS LIKE AT THE END OF IT. AGAIN, IT'S LIKE A 3D INTERACTIVE MODEL.

SO AS YOU'LL SEE, THE LASER SCANNER PICKS UP EVERYTHING. IT PICKS UP THE OBJECT, IT PICKS UP ITS COLOR, IT PICKS UP ITS SHAPE.  AND SO LIKE IN THIS EXAMPLE THEY USED -- THEY WERE LASER SCANNING A CEMENT PLANT.

BUT AS YOU CAN IMAGINE, NOW WE KNOW EVERYTHING 3 DIMENSIONALLY WE CAN EVER POSSIBLY WANT ABOUT THIS CEMENT PLANT.  AND WHEN YOU'RE GOING TO EXTRACT 3D DATA FROM A 2D VIDEO, YOU NEED TO HAVE A STRONG UNDERSTANDING OF THE 3 DIMENSIONAL SPACE AND NOTHING IS STRONGER THAN USING A LASER SCANNER.

SO WE WENT OUT TO THE SITE OF THE INCIDENT IN SAN JOSE, AND WE APPLIED THIS LASER SCANNER.  I THINK WE SET THE LASER SCANNER UP IN 18 DIFFERENT POSITIONS, WHICH ALLOWED US TO ESSENTIALLY CREATE A PERFECT 3D MODEL OF THE ENVIRONMENT.

REAL QUICK.  YOU SEE THIS PHOTOGRAPH THAT IS BEING DISPLAYED IN FRONT OF YOU.  THIS IS A PHOTOGRAPH THAT THE SCANNER TAKES AS WELL AS IT SCANS.  AND THE INTERESTING THING ABOUT THIS CASE IS THERE ARE SECURITY CAMERAS ON THIS BUILDING THAT CAPTURE KEY MOMENTS AND NOW YOU CAN SEE THAT THE LASER SCANNER CAPTURES EXACTLY WHERE THOSE CAMERAS ARE.

SO IN ORDER TO DO OUR ANALYSIS, IT'S REALLY IMPORTANT THAT WE KNOW THE EXACT LOCATION OF A CAMERA, BECAUSE WHAT WE'RE

SER-0028

GOING TO DO IS ESSENTIALLY RECREATE 3 DIMENSIONALLY IN OUR WORLD WHAT ACTUALLY HAPPENED IN THE VIDEO.

SO LASER SCANNING THE SECURITY CAMERAS IS VERY HELPFUL.

BY MR. BASTIDA:

Q.   DO YOU RECALL, MR. FRIES, APPROXIMATELY HOW MANY CAMERAS THERE WERE IN WHICH YOU IDENTIFIED DURING THE SCANNING PROCESS?

MR. SYMPSON:  OBJECTION.  VAGUE.  I'M SORRY.

MR. BASTIDA:  I WILL REPHRASE IT.

THE COURT:  THE OBJECTION WAS IT WAS VAGUE.  CAN YOU RESTATE?

MR. BASTIDA:  I CAN REPHRASE, YES.

THE COURT:  THANK YOU.

BY MR. BASTIDA:

Q.   WHEN YOU WERE SCANNING THE INCIDENT AREA, AND MAYBE THIS WILL HELP ME UNDERSTAND BETTER, THIS LEICA SCANNER THAT YOU JUST TOLD US ABOUT, IS IT -- DOES IT DO THE SCANNING FROM ONE LOCATION OR DO YOU HAVE TO PLACE IT IN MULTIPLE DIFFERENT LOCATIONS TO DO A COMPLETE SCAN?

A.   YEAH.  IN ORDER TO SCAN -- THE SCANNER IS LIKE A HUMAN BEING.  IT CAN ONLY SCAN WHAT IT CAN SEE.

SO IF YOU WANT TO SCAN THIS ROOM AND YOU PUT THE SCANNER WHERE I AM, I CAN SEE A LARGE PORTION OF THIS ROOM, BUT I CAN'T SEE PAST WALLS, I CAN'T SEE BEHIND CHAIRS, I CAN'T SEE THROUGH PEOPLE.

SO IF I WANT TO SCAN THIS ROOM COMPLETELY, I'M GOING TO

SER-0029

HAVE TO MOVE THIS SCANNER IN MULTIPLE LOCATIONS SO THAT THE SCANNER IS NEVER BLOCKED FROM WHAT IT WANTS TO SCAN.

SO SEE LIKE THIS, WE'RE GOING TO SET THE SCANNER UP TYPICALLY ANYWHERE FROM 10 TO 20 DIFFERENT LOCATIONS, THEREFORE, ESSENTIALLY WE STITCH THESE ALL TOGETHER AND THE END RESULT IS THAT THERE'S NO AREA THAT IS QUOTE, "BLINDED OR BLOCKED" BY THE SCANNER.

Q.   OKAY.  AND IS THAT WHAT YOU DID IN THIS PROCESS?

A.   YEAH.  IN THIS PROCESS -- I CAN'T REMEMBER THE EXACT AMOUNT OF SCANS, BUT IT WAS TYPICALLY FROM 10 TO 20 DIFFERENT LOCATIONS.

Q.   AND -- OKAY.  SO IT SOUNDS TO ME LIKE THAT'S STEP NUMBER 1.

WHAT IS THE NEXT STEP IN YOUR PROCESS?

A.   SO THE NEXT STEP IN OUR PROCESS THAT WE NOW HAVE TO DEAL WITH VIDEO AND THE VIDEO CAN HAVE DISTORTION IN IT.

WHILE OUR SOFTWARE CAN ACTUALLY DO ALL OF THE CALCULATIONS WITHOUT MOVING THE DISTORTION, AS HUMAN BEINGS, WE FIND IT'S JUST EASIER TO REMOVE THE DISTORTION SO WE'RE DEALING WITH AN UNDISTORTED WORLD IN OUR ANALYSIS.

SO THERE ARE TWO TYPES OF CAMERAS WE'RE DEALING WITH IN THIS CASE:  BODY WORN CAMERAS WORN BY THE OFFICERS AND SECURITY CAMERAS ON THE SIDE OF THE BUILDINGS.  THEY BOTH HAVE THEIR OWN VERSION OF DISTORTION, AND SO WE GO THROUGH A PROCESS OF UNDISTORTING THAT VIDEO.

SER-0030

Q.   OKAY.  DID YOU DO THAT PROCESS OF UNDISTORTING THE VIDEO TO EVERY VIDEO THAT YOU RECEIVED FOR THE PURPOSES OF DOING THE WORK THAT YOU WERE RETAINED TO DO IN THIS CASE?

A.   YES.  THERE WERE SOME VIDEOS GIVEN TO US THAT WE LATER DECIDED HAVE NO REAL VALUE TO OUR PROCESS, SO WE'RE NOT GOING TO TAKE THE TIME TO, YOU KNOW, UNDISTORT VIDEO THAT WE DIDN'T USE.

BUT WE DEFINITELY LOOKED AT AT LEAST NINE DIFFERENT VIDEO FEEDS, AND WE UNDISTORTED ALL OF THOSE.

Q.   OKAY.  AND THAT INCLUDED THE VIDEOS THAT YOU UNDISTORTED, DID THAT INCLUDE BOTH BODY WORN CAMERA FOOTAGE AND SECURITY CAMERA FOOTAGE?

A.   IT DID.  THE SECURITY CAMERA FOOTAGE, THE DISTORTION OF THAT WAS VERY MINOR, ALMOST NON-EXISTENT, BUT BODY WORN CAMERAS, DUE TO THE NATURE OF BODY WORN CAMERAS, THEY HAVE WHAT IS CALLED A BARREL DISTORTION.

IF YOU LOOK AT THE IMAGE THAT IS ON THE SCREEN RIGHT NOW, IF YOU LOOK AT THE BODY WORN CAMERA IMAGE ON THE LEFT, YOU'LL SEE THREE WHAT I BELIEVE ARE FLAG POLES RIGHT THERE IN THE UPPER RIGHT-HAND CORNER WHERE THE TEXT OF BODY WORN IS AXON BODY 3.

IF YOU LOOK AT THOSE POLES, YOU CAN TELL THEY DON'T LOOK STRAIGHT, THEY LOOK BENT.  WE KNOW THEY'RE STRAIGHT.  WE LASER SCAN THEM, WE KNOW THEY'RE STRAIGHT.

THAT'S BARREL DISTORTION.

SER-0031

SO BODY WORN CAMERAS TYPICALLY HAVE A LARGE BARREL OF DISTORTION.  WE KNOW THAT THE VIDEO CAMERAS ON THE VIDEO FEEDS WERE A DIFFERENT QUALITY CAMERA AND THEY ACTUALLY -- THEIR DISTORTION WAS SO SMALL THAT IT WAS ALMOST INSIGNIFICANT.

Q.   OKAY.  GO TO THE NEXT SLIDE, PLEASE.

IS THIS SLIDE HERE IN FRONT THAT WE'RE ALL SEEING, IS THAT ANOTHER EXAMPLE OF THE DIFFERENCE IN WHAT ONE CAN SEE WHEN THE VIDEO IS UNDISTORTED VERSUS WHEN IT'S A RAW FEED?

A.   YEAH.  SO IF YOU LOOK ON THE RIGHT-HAND SIDE, THAT'S A RAW FEED STRAIGHT FROM AN AXON BODY 3 CAMERA.

AGAIN, YOU CAN SEE, YOU KNOW, THE POLES ARE A CLEAR GIVEAWAY THAT THERE'S DISTORTION.

YOU CAN ALSO LOOK IN THE LOWER RIGHT-HAND CORNER WHERE YOU SEE THE CURVE IN THE SIDEWALK, AND YOU CAN SEE THAT THAT LOOKS LIKE A CURVED SIDEWALK, WHICH IT ISN'T.

SO IF YOU GO TO THE LEFT SIDE, WE'VE UNDISTORTED IT.  WE'VE TAKEN OUT.  AND NOW YOU CAN SEE THE FLAG POLES ARE STRAIGHT LIKE THEY'RE SUPPOSED TO, AND IF YOU LOOK AT THE LOWER RIGHT CORNER, YOU CAN SEE NOW THE SIDEWALK IS STRAIGHT.

SO WE JUST REMOVED THAT DISTORTION SO THAT NOW EVERY PIXEL IS EQUAL TO EACH OTHER.

AND IN THE DISTORTED VIDEO, SOME PIXELS ARE MORE DISTORTED, SOME AREN'T.  WE JUST LEVELLED THE PLAYING FIELD.  NOW EVERYTHING IS THE SAME.

Q.   OKAY.  THIS DISTORTION PROCESS, HOW DOES THAT COME INTO

SER-0032

YOUR ANALYSIS AS YOU ARE TRYING TO DETERMINE THE QUESTIONS THAT YOU WERE ASKED TO IDENTIFY IN THIS CASE?

A.   SURE.   AGAIN, YOU KNOW, WE'VE BEEN ASKED TO SIT THERE AND TRY TO FIGURE OUT 3 DIMENSIONALLY WHERE EVERYBODY WAS LOCATED, WHETHER IT'S OFFICERS, OR WHETHER IT'S MR. JOHNSON, WHETHER IT'S PEOPLE THROWING WATER BOTTLES.   EVERYBODY WANTS TO KNOW WHERE ARE THEY?

AND BY UNDISTORTING THE VIDEO AND MAKING ALL OF THE PIXELS EQUAL, WE CAN NOW REALIZE THAT THE MATH THAT WE DO IS GOING TO BE THE SAME WHETHER THE MATH IS IN THE MIDDLE OF THE CAMERA OR IN THE CORNER.   IT DOESN'T MATTER.

THE ANALYSIS AND THE MATH ARE ALL GOING TO BE UNDISTORTED, AND IT JUST ALLOWS FOR A CLEANER WORKFLOW.

AGAIN, OUR SOFTWARE HAS NOW BECOME SO ADVANCED THAT IT DOESN'T NEED US TO REMOVE THE DISTORTION, BUT I'M A LITTLE OLD SCHOOL, I LIKE TO GET RID OF IT.

Q.   GOOD.   ONCE THE VIDEOS ARE UNDISTORTED, AS YOU'VE EXPLAINED SO FAR, WHAT IS THE NEXT STEP?

A.   WELL, AT THAT POINT IN TIME IT'S A THING CALLED CAMERA MATCHING.

AGAIN, IN ORDER FOR US TO TRACK WHAT SOMEBODY DID IN A VIDEO, WE ESSENTIALLY NEED TO RECREATE WHAT THEY DID INSIDE OF OUR SOFTWARE SO THAT OUR WORLD AND OUR COMPUTER WORLD ARE DOING THE EXACT SAME THING, EVERYTHING IS IDENTICAL.

SO STEP 1, THE 3D ENVIRONMENT WHERE THIS INCIDENT HAPPENED

SER-0033

AND OUR 3D WORLD HAVE TO BE THE SAME.

SO THE GREAT THING ABOUT LASER SCANNING IS THAT THE LASER SCANS THE ENVIRONMENT, AND NOW THE LASER SCAN AND THE ENVIRONMENT, OUR 3D WORLD AND THEIR REAL WORLD ARE THE SAME.

THE NEXT THING IS WE HAVE TO PUT CAMERAS IN OUR WORLD THAT ARE IDENTICAL IN THE SAME LOCATIONS AS THE CAMERAS IN THE REAL WORLD.

NOW, FOR SECURITY CAMERAS ON THE SIDE OF A BUILDING, THAT'S REALLY EASY.  THE LASER SCAN LITERALLY PICKED UP EXACT LOCATIONS.

SO THOSE ARE EASY.  OUR SOFTWARE WILL THEN DO WHAT IS CALLED CAMERA LASER BASED PHOTOGRAMMETRY, WHERE IT WILL CALCULATE THE 3 DIMENSIONAL LOCATION OF THE CAMERA MATHEMATICALLY.

SO IF YOU LOOK ON THIS IMAGE ON THE LEFT-HAND SIDE YOU SEE A STILL IMAGE FROM THE SECURITY CAMERA, YOU SEE THESE OUTLINES OF THE STREET, YOU SEE OUTLINES OF A POLE, YOU SEE OUTLINES OF PLANTER BOXES.

THE FACT THAT OUR OUTLINES LINE UP PERFECTLY WITH THOSE THINGS, THOSE THINGS THAT YOU SEE ARE OUR 3D WORLD.  SO ESSENTIALLY OUR 3D WORLD AND THE REAL WORLD ARE BEING VIEWED IDENTICALLY THROUGH THE SAME CAMERA.

ONE CAMERA ON THE LEFT IS THE ACTUAL SECURITY CAMERA THAT WAS AT THE SCENE.

THE CAMERA ON THE RIGHT IS ITS TWIN BROTHER.  IT'S CLONED

SER-0034

INSIDE OF OUR 3D WORLD.

SO BY CAMERA MATCHING THESE TWO WORLDS, THESE TWO WORLDS ARE IDENTICAL.

Q.   OKAY.  I KNOW THIS IS A VERY TECHNICAL PART OF THE ANALYSIS, SO I WOULD LIKE TO GIVE YOU THE OPPORTUNITY TO EXPLAIN WHEN YOU'RE DOING THIS CAMERA MATCHING, WHAT EXACTLY IT IS.

A.   SURE.

Q.   AND I THINK --

A.   SO IF YOU GO TO THE NEXT SLIDE, PLEASE.

SO HERE'S A CONCEPT OF WHAT CAMERA MATCHING IS.  WHAT YOU SEE HERE IN THE LOWER RIGHT-HAND CORNER IS A PHOTOGRAPH OF A CAMERA THAT WAS SET UP IN A LIVING ROOM.

AND YOU COULD SEE THE CAMERA IS STATIONARY.  IT'S NOT MOVING.

TO THE LEFT IS THE IMAGE THAT CAMERA TOOK.  SO LET'S SAY IF YOU LOOK IN THAT PICTURE TO THE LEFT, YOU SEE A SMALL BUNNY TOY ON THE GROUND, YOU SEE A TRICYCLE BEHIND IT, YOU SEE A FIREPLACE.  TO THE FAR LEFT YOU SEE WHAT LOOKS LIKE SOME TYPE OF ARTWORK.

AND LET'S SAY YOU HAVE A PHOTOGRAPH AND YOU SAY, YOU KNOW, JASON, WE REALLY WANT TO KNOW EXACTLY WHERE THAT BUNNY IS, BUT THAT BUNNY IS GONE.  IT'S NOT THERE ANYMORE.  HOW CAN YOU FIGURE OUT WHERE IT IS LOCATED?

AND ALL WE HAVE TO DO TO FIGURE OUT WHERE THAT BUNNY IS

SER-0035

LOCATED IS RECREATE OUR 3D WORLD TO HAVE A CAMERA IN THE SAME LOCATION.

SO IF YOU GO TO THE NEXT SLIDE.

NOW IMAGINE SOMEONE IS STANDING THERE. WE'VE TAKEN A PHOTOGRAPH OF THEM.

NOW IMAGINE YOU WANT TO KNOW EXACTLY WHERE THAT PERSON IS STANDING.

IF I GAVE YOU THIS PHOTOGRAPH AND I TOLD YOU TO COME INTO THIS LIVING ROOM AND I SAID, OKAY, I WANT YOU TO STAND WHERE THAT GUY IS STANDING.

AS A HUMAN BEING, YOU WOULD LOOK AT THIS PHOTOGRAPH AND YOU WOULD GO, OKAY, HE'S STANDING IN FRONT OF A FIREPLACE. I'M GOING TO GO STAND IN FRONT OF THE FIREPLACE. IT LOOKS LIKE HIS FEET ARE JUST ON THE EDGE OF THE CARPET, I'M GOING TO PUT MY FEET ON THE EDGE OF THE CARPET. IT LOOKS LIKE HE'S SLIGHTLY TO THE LEFT OF THE FIREPLACE. YOU CAN JUST KIND OF FIGURE OUT WHERE THIS GUY IS STANDING WITHOUT ANY MATH. JUST LOOK.

THEN, I MAY ASK YOU, WELL, WHERE WAS THE CAMERA LOCATED THAT TOOK THE PHOTOGRAPH?

YOU WOULD GO AND YOU WOULD LOOK AT THE ROOM AND YOU WOULD FIGURE OUT, WELL -- YOU KNOW, YOU KIND OF WOULD BE ABLE TO FIGURE OUT WHERE THIS GUY IS STANDING AND WHERE THE PHOTOGRAPH IS.

IF YOU SHOW THE NEXT PHOTOGRAPH. SAME THING. NOW YOU HAVE ANOTHER PERSON STANDING, AND IT APPEARS TO BE THAT THEY'RE

SER-0036

TO THE RIGHT OF THE OTHER PERSON.

IF YOU BRING UP THE NEXT PHOTOGRAPH.

HERE'S A SITUATION.  NOW THESE TWO PEOPLE ARE STANDING NEXT TO EACH OTHER, BUT IN REALITY THEY'RE NOT.  THESE ARE TWO DIFFERENT PHOTOGRAPHS TAKEN AT TWO DIFFERENT TIMES.  THESE TWO PEOPLE AREN'T ACTUALLY NEXT TO EACH OTHER.

BUT ONE THING YOU CAN IMMEDIATELY TELL IS GO, HEY, ONE OF THESE GUYS SEEMS TO BE TALLER THAN THE OTHER ONE.  IF I KNOW EXACTLY HOW TALL THE TALLER PERSON IS, CAN I CALCULATE HOW TALL THE SHORTER PERSON IS?

AND THE ANSWER IS WITH THE MATH, OF COURSE YOU CAN.

IF I TELL YOU -- BECAUSE WE LASER SCAN THE AREA -- I KNOW EXACTLY HOW TALL THE MANTEL IS, I KNOW EXACTLY HOW BIG THE ROOM IS, I KNOW EXACTLY THE SIZE OF THE CARPET, AND I KNOW ALL OF THESE THINGS.  AND GIVE ME A PHOTOGRAPH OF THIS SHORTER PERSON, AND I TELL YOU THE OTHER PERSON IS 6'1".

WELL, THEN WE CAN VERY EASILY THROUGH ANALYSIS CALCULATE, WELL, IF HE'S 6'1", THEN THE GUY NEXT TO HIM HAS TO BE 5'6".

THEN FINALLY, THE NEXT PHOTOGRAPH IS NOW IMAGINE WE TOOK THESE TWO PEOPLE AND PUT THEM ON TOP OF EACH OTHER, I CAN THEN SIT THERE AND GO, WELL, HE'S CERTAINLY SHORTER.

NOW, IMAGINE IN MY 3D WORLD I CAN DO WHATEVER I WANT.  AND I MAKE THAT LITTLE PERSON -- I GROW HIM AND MAKE HIM BIGGER AND BIGGER UNTIL HE'S THE SAME HEIGHT AS THE OTHER PERSON.  AND I THEN I CAN CONTROL THAT.

SER-0037

AND I CAN ASK MY SOFTWARE, OKAY, HOW BIG DO I HAVE TO MAKE THAT GUY TO BE THE SAME HEIGHT AS THE OTHER PERSON?

AND THE SOFTWARE WOULD COME BACK AND TELL ME YOU HAVE TO MAKE HIM EXACTLY 73 AND A QUARTER INCHES TALL.

WELL, GREAT.  I JUST CALCULATED THE HEIGHT OF SOMEBODY WITHOUT EVER KNOWING THEIR HEIGHT.

PHOTOGRAMMETRY IS THE PROCESS.  BUT IN ORDER TO DO ALL OF THIS MATH, IN ORDER TO FIGURE THIS OUT, IN ORDER TO ANSWER THESE QUESTIONS, WE HAVE TO PUT OUR CAMERA IN THE SAME EXACT LOCATION IN OUR WORLD AS THE CAMERA IN THE REAL WORLD.

SO SECURITY CAMERAS ARE REALLY EASY.  THEY'RE IN THE LASER SCANNER.

BODY WORN CAMERAS ARE ALSO EASY BECAUSE EVERY TIME A BODY WORN CAMERA MOVES LEFT, RIGHT, FORWARD, BACK, THE IMAGE CHANGES, LEFT, RIGHT, FORWARD, BACK.

AND SO FRAME BY FRAME BY FRAME WE CAN JUST CALCULATE THE EXACT LOCATION OF A BODY WORN CAMERA.

THE NICE THING ABOUT BODY WORN CAMERAS IS THAT THEY'RE CONNECTED TO THE BODY, AND SO IF I CAN TELL YOU WHERE THE BODY WORN CAMERA IS, THAT MEANS I KNOW WHERE THE OFFICER IS.

INTERESTING IN THIS CASE, THERE WERE SO MANY CAMERAS. WE'RE NOT USUALLY THIS LUCKY.  THERE WERE SO MANY CAMERAS THAT CAPTURED EVERYBODY'S MOVEMENTS THAT WE COULD TRACK AN OFFICER OR MR. JOHNSON NOT IN ONE VIDEO, NOT IN TWO VIDEOS, BUT IN SOMETIMES AS MANY AS NINE VIDEOS.

SER-0038

AND THAT'S THE PROCESS OF CAMERA MATCHING THAT IS NEEDED TO DO THIS WORK.

Q.   IS IT THE FACT THAT THERE WERE SO MANY CAMERAS, IS THAT MORE OR LESS HELPFUL TO DO THE CAMERA MATCHING PROCESS?

A.   THE MORE -- IT WAS DEFINITELY MORE HELPFUL.  THERE'S A POINT WHERE YOU GET DIMINISHED RETURNS.  LIKE A TENTH CAMERA WASN'T GOING TO HELP US.

SO WE HAD MORE THAN ENOUGH DATA TO WORK WITH.

Q.   ONCE YOU DO THE CAMERA MATCHING AND YOU'VE LASER SCANNED THE SCENE AND YOU'VE UNDISTORTED THE VIDEO AND THEN YOU'VE CAMERA MATCHED ALL OF THE VIDEO, WHAT IS THE NEXT STEP?

A.   WELL, NOW THAT -- THE NEXT STEP IS, AGAIN, WE WERE GIVEN -- AND, AGAIN, WE WERE GIVEN MANY, MANY VIDEOS.

THE NEXT STEP IS WE WANT TO SYNC ALL OF THESE VIDEOS, RIGHT?

IF I HAVE ONE VIDEO THAT SHOWS A MOTION OF SOMEBODY BUT IT'S NOT SYNCED TO ANOTHER VIDEO THAT SHOWS THAT MOTION, AND WE TRY TO TRACK THIS PERSON, WE WILL BE CONFUSED.  WE'RE LIKE, HE LOOKS TO BE IN TWO PLACES AT ONCE.

BY SYNCING ALL OF THE VIDEOS TOGETHER, WE KNOW WHATEVER LOCATION AN OBJECT OR PROJECTILE AN OFFICER IS IN VIDEO 1, THAT OFFICER OR PROJECTILE OR PERSON WILL BE IN THE SAME EXACT POSITION IN ALL OF THE VIDEOS.

IN THIS PARTICULAR CASE IT WAS EASY TO MATCH ALL OF THESE VIDEOS BECAUSE THERE WAS A FLASH BANG, THERE WAS A BRIGHT LIGHT

SER-0039

AT SOME POINT IN TIME, AND ALL OF THESE CAMERAS CAPTURED THAT BRIGHT LIGHT.

SO ALL WE HAVE TO DO IS FIND THAT BRIGHT LIGHT IN ALL OF THE CAMERAS, SYNC THEM UP, LINE THEM TOGETHER, AND THEN THEY'RE NOW ALL ON THE SAME TIMEFRAME.

Q.   THE BODY WORN CAMERA FOOTAGE AS YOU SEE ON THE SCREEN -- AND SO FAR WHAT HAS BEEN PRESENTED IN COURT IN TERMS OF BODY WORN CAMERA FOOTAGE, TYPICALLY HAS WHAT YOU SEE ON THE RIGHT UPPER HAND SIDE -- UPPER HAND CORNER, EXCUSE ME, DATE AND TIME STAMP.

DO YOU SEE THAT?

A.   I DO.

Q.   DOES THAT IN ANY WAY EITHER BENEFIT OR NOT THE SYNCING OF THE VIDEO?

A.   THE ONLY THING THIS LET'S US KNOW -- AND AGAIN, OFFICER INVOLVED SHOOTINGS ARE A NUMBER THING THAT WE DEAL WITH.

BODY WORN CAMERAS ARE THE NUMBER ONE VIDEO THAT WE DEAL WITH.

AND I CAN TELL YOU THROUGH MASS EXPERIENCE, THOSE CAMERAS ARE NOT ALL SYNCED TOGETHER.  SO THE TIME YOU SEE ON ONE CAMERA, YOU CAN'T SIMPLY SAY IF ONE CAMERA SAYS THE STRIKE AT MIDNIGHT, YOU CAN'T SIT THERE AND GO, THEREFORE, WHEN IT SAYS STRIKE AT MIDNIGHT IN ANOTHER OFFICER'S CAMERA, THAT THOSE TWO MIDNIGHTS ARE THE SAME.

WE'VE SEEN TIME AND TIME AGAIN THESE NUMBERS SEPARATE AND

SER-0040

BE OFF.

WE CAN'T TRUST THAT, BUT WE CAN TRUST OUR LOUD SOUNDS, LOUD FLASHES, ANYTHING IN THE VIDEO THAT WE CAN CAPTURE AND ANYTHING ELSE.

A PRIME EXAMPLE, NOT THAT I WORK IN HOLLYWOOD, BUT I'VE DONE WORK IN HOLLYWOOD.  AND WE HAVE ALL SEEN WHERE THEY SIT THERE AND GO FROM THE CAMERA AND THEY GO ACT 1, SCENE 1, TAKE 1.

THE REASON WHY THEY DO THAT IS ALL OF THE CAMERAS ARE CAPTURING THAT, AND WHEN THAT THING HITS DOWN AND GOES LIKE THAT, THAT'S HOW ALL THE EDITORS CAN SYNC ALL OF THE CAMERAS TOGETHER BECAUSE THAT IS VERIFIABLE AND THAT'S GOING TO BE ACCURATE TO A 30TH OF A SECOND, AND SO THAT'S WHAT WE DO IN THIS CASE.

Q.   THAT'S INTERESTING.  I ACTUALLY NEVER KNEW WHY THEY DID THAT, BUT THAT MAKES SENSE NOW.

OKAY.  SO YOU SYNCED ALL OF THE VIDEO.  WHAT IS THE NEXT STEP?

A.   ONCE THEY ARE SYNCED -- SO HERE IS THE THING, THESE ARE ALL SYNCED TOGETHER.  AND WHAT IS NICE IS THAT WE CAN THEN START TO ANSWER QUESTIONS.  WE HAVE A 3D ENVIRONMENT THAT IS IDENTICAL TO THE INCIDENT.  WE HAVE CAMERA LOCATIONS THAT ARE IDENTICAL TO THE LOCATION OF THE INCIDENT.

WE NOW CAN GO -- WE HAVE OUR OWN 3D WORLD.  YOU SIT THERE AND GO, POINT TO ANYTHING IN A VIDEO CAMERA, POINT TO ANYTHING

SER-0041

THAT YOU SEE IN ANY OF THESE VIDEOS, AND YOU ASK ME WHERE IS THAT?

IF IT'S A BUILDING, I CAN TELL YOU WHERE THAT IS BECAUSE IT'S IN THE LASER SCANNER.

WHERE IS A PERSON? WELL, GREAT. ALL I'VE GOT TO DO IS MAKE A 3D MODEL OF A PERSON AND MOVE THEM IN MY 3D WORLD.

LOOKING AT IT FROM THE SAME CAMERA, I'M LOOKING AT THIS 3D MODEL OF A PERSON THROUGH THE SAME LENS THAT CAPTURES THAT PERSON.

THERE'S ONLY ONE PLACE ON EARTH THAT I CAN PUT THAT PERSON AND THEY LINE UP PERFECTLY. THEIR FEET ARE THERE AND EVERYTHING IS WHERE THEY'RE SUPPOSED TO BE.

SO THE NEXT THING IS SIMPLY JUST TRACK. IN THIS SITUATION WE WERE ASKED TO JUST TRACK PROJECTILES, TRACK PEDESTRIANS, TRACK OFFICERS, AND THAT'S THE FINAL STEP IS TRACKING THESE PERSON'S MOTIONS 3 DIMENSIONALLY.

Q. I SEE ON THESE DIAGRAMS A FEW MARKINGS ON THE RIGHT-HAND SIDE OF THIS SCAN OF CITY HALL.

DO YOU SEE THOSE?

A. YEAH. SO THOSE THREE MARKS THAT YOU SEE ARE ESSENTIALLY -- THEY'RE T POINTS INSIDE OF OUR SOFTWARE, AND OUR SOFTWARE IS TRACKING THE 3 DIMENSIONAL LOCATION OF BOTTLES BEING THROWN IN THE AREA.

SO THIS PARTICULAR SHOT RIGHT HERE, THE THREE BOTTLES ARE ACTUALLY IN MID-FLIGHT IN THIS ONE SHOT.

SER-0042

DID YOU ALSO RECEIVE BODY WORN CAMERA FOOTAGE IDENTIFIED FROM OFFICER -- I'M SORRY, I SKIPPED A SLIDE.

I WANT TO IDENTIFY ON THE RIGHT-HAND SIDE, THIS IS -- THE GREEN MARKER IS OFFICER KOSKA, AND YOU'VE IDENTIFIED MR. JOHNSON'S POSITION AT THE TIME THAT OFFICER KOSKA FIRED HIS WEAPON?

A. YEAH. SO OFFICER KOSKA FIRED TWICE. SO THE FIRST IMAGE WE SHOWED YOU WAS HIS FIRST SHOT, AND THIS IS HIS SECOND SHOT.

OFFICER KOSKA, YOU KNOW, THOSE TWO SHOTS ARE PRETTY CLOSE TO EACH OTHER, AND SO OFFICER KOSKA'S POSITION DOESN'T REALLY CHANGE DURING THESE TWO SHOTS AND THE LOCATION THAT HE'S ALSO FIRING INTO ALSO DOESN'T CHANGE BETWEEN THESE TWO SHOTS.

Q. DID MR. JOHNSON'S POSITION CHANGE?

A. HE'S CHANGED IT SLIGHTLY. HE'S MOVED VERY SLIGHTLY.

YOU CAN SEE, YOU KNOW, IT APPEARS THAT WHEN SHOTS ARE STARTING TO BE FIRED, PEOPLE IN THE CROWD ARE STARTING TO RESPOND TO THAT, AND YOU CAN SEE MR. JOHNSON TURN AND START TO WALK AWAY AT THIS POINT.

Q. OKAY. OKAY. NOW I'LL MOVE TO ANOTHER OFFICER, OFFICER MORALES. DID YOU RECEIVE BODY WORN CAMERA FOOTAGE OF OFFICER MORALES?

A. I DID.

Q. DID YOU PERFORM THE SAME ANALYSIS AS THE OTHER TWO?

A. YEAH, WE DID THE SAME ANALYSIS AND SO WITH OFFICER MORALES WHO ALSO SHOT TWICE, ONE OF THE QUESTIONS WAS IS IT POSSIBLE

SER-0043

THAT OFFICER MORALES IS THE ONE WHO ULTIMATELY IMPACTED MR. JOHNSON, AND OUR ANALYSIS DEMONSTRATES THAT'S NOT POSSIBLE BECAUSE WHILE OFFICER MORALES SHOT TWICE, MR. JOHNSON IS ALREADY TAKING COVER AND IS POSITIONED BEHIND IT LOOKS LIKE A CEMENT PLANTER.  SO WE KNOW THAT HE'S NOT IN A POSITION TO BE HIT BY OFFICER MORALES DURING SHOT 1 OR SHOT 2.

AND AT THIS POINT IN TIME WE DIDN'T MEASURE HOW FAR APART THEY ARE.  BUT AT THIS POINT IT'S EXTREME.  THEY'RE NOWHERE NEAR EACH OTHER.

Q.   AND I THINK THERE'S ANOTHER OFFICER.

DID YOU RECEIVE BODY WORN CAMERA OF OFFICER VILLARUZ?

A.   YES.  AGAIN, WITH OFFICER VILLARUZ, WE SEE HE DISCHARGES HIS WEAPON ONCE.  IT'S A 40 MILLIMETER CANNISTER.

AGAIN, WHEN HE SHOOTS, KYLE IS ALREADY BEHIND A BARRIER, SO WE'RE FULLY AWARE THAT OFFICER VILLARUZ CANNOT BE THE ONE WHO IS IMPACTING MR. JOHNSON.

Q.   OKAY.  DID YOU ALSO RECEIVE BODY WORN CAMERA FOOTAGE OF OFFICER ADGAR?

A.   YES, WE DID.

Q.   AND DID YOU PERFORM THE SAME ANALYSIS?

A.   YES, WE DID.

Q.   AND WHAT OPINION, IF ANY, DID YOU FORM REGARDING OFFICER ADGAR'S -- THE ANALYSIS PERFORMED REGARDING HIS BODY WORN CAMERA?

A.   SURE.  THE INTERESTING THING WAS OFFICER ADGAR HAPPENED TO

SER-0044

BE -- ONE, HE HAPPENED TO BE, OUT OF ALL OF THE OFFICERS WHO WE TRACKED WHO FIRED INTO THE CROWD, OFFICER ADGAR IS THE CLOSEST ONE TO MR. JOHNSON.

THE OTHER THING THAT WE NOTICED THAT WE WERE ABLE TO TRACK QUITE CLEARLY WAS WE COULD TRACK THE MOMENT THAT OFFICER ADGAR SHOOTS.  WE CAN PICK IT UP IN MULTIPLE CAMERAS.

NOT ONLY DOES THE SECURITY CAMERA PICK IT UP WHEN OFFICER ADGAR SHOOTS, BUT HIS OWN BODY WORN CAMERA PICKS UP WHEN HE SHOOTS.

SO AGAIN, WE HAVE TWO SOURCES TO TRACK BOTH MR. KYLE JOHNSON'S POSITION AND OFFICER ADGAR.  AND IN THAT ANALYSIS, ONE OF THE THINGS THAT BECAME CLEAR WAS THAT THE MOMENT -- THE DAY THAT OFFICER ADGAR WAS THE ONLY OFFICER WHO WAS IN A POSITION TO IMPACT MR. JOHNSON.

TWO, BY WHEN HE'S SHOOTING, HIS GUN IS POINTED DIRECTLY AT MR. JOHNSON.

AND THREE, AFTER MR. JOHNSON GETS HIT, APPEARS TO GET HIT, YOU CAN SEE IN THE VIDEO THAT HE STARTS TO LIMP.

AND, THEREFORE, ALL OF THE ANALYSIS COMING TOGETHER DEMONSTRATES THAT, YOU KNOW, OFFICER ADGAR HAD A FREE LINE OF SIGHT SHOT ON MR. JOHNSON.  AND WHEN HE FIRED HIS WEAPON, OUT OF ALL OF THE OTHER OFFICERS, HE'S THE ONLY ONE THAT IS CAPABLE OF HITTING MR. JOHNSON.

Q.   OKAY.  DID YOU PERFORM ANY VIDEO ANALYSIS OTHER THAN -- LET ME REPHRASE THAT.  I WANT TO MAKE SURE THAT I ASK THAT

SER-0045

CORRECTLY.

WHY IS THAT YOU --

THE COURT:  THERE'S WATER RIGHT THERE.

THE WITNESS:  IT'S THE WATER THAT CAUSED IT.

THE COURT:  YOU HAVE WATER?

THE WITNESS:  YEAH.

THE COURT:  OKAY.

THE WITNESS:  EXCUSE ME.

THE COURT:  GIVE HIM A SECOND.

BY MR. BASTIDA:

Q.   I FORGOT MY QUESTION NOW.

WHY WERE THESE OFFICERS RELEVANT, OFFICERS -- AT LEAST THEIR BODY WORN CAMERA FOOTAGE, OFFICERS ADGAR, THOMPSON, KOSKA, MORALES AND VILLARUZ?

A.   WELL, IT WASN'T JUST THE BODY WORN CAMERAS THAT WERE IMPORTANT BECAUSE OTHER OFFICER'S BODY WORN CAMERAS ALSO WERE A VALUABLE HELP.  THESE WERE THE OFFICERS THAT WERE CAUGHT ON CAMERA USING AND DISCHARGING THEIR WEAPONS.

Q.   AT WHAT TIME?

A.   AT THE TIME AROUND WHEN MR. JOHNSON GOT HIT, WHICH IS AROUND 22:33:14 I BELIEVE.

Q.   OKAY.  AND JUST FOR CLARIFICATION, THE 22 IS THE HOUR, THE 33 IS MINUTES, AND THE 08 IS DOWN A TENTH SECOND; CORRECT?

A.   CORRECT, SECOND.  NOT TENTH.

Q.   SORRY, SECOND.

SER-0046

BASED ON YOUR ANALYSIS, THE FORENSIC ANALYSIS THAT YOU DID, WERE THERE ANY OTHER OFFICERS THAT FIRED WITHIN THAT 5 SECOND, 10 SECOND TIMEFRAME AT THE 10:33 MARK?

A.   NO.

Q.   AND SO DO YOU HAVE AN OPINION AS TO WHETHER -- ACTUALLY, WE CAN GO TO THE NEXT SLIDE.  SO I THINK IT'S PROBABLY BETTER IF WE GO THROUGH WHAT YOU WERE ASKED TO DO.

YOU TESTIFIED EARLIER THAT YOU WERE ASKED CAN YOU FIND AND TRACK MR. JOHNSON IN ANY OF THE VIDEOS?

A.   YES, WE WERE ABLE TO TRACK MR. JOHNSON IN MULTIPLE VIDEOS.

Q.   AND WERE YOU ABLE TO TRACK THAT LOCATION OF WHERE THE WATER BOTTLES WERE ORIGINATING FROM, THE ONES THAT WERE THROWN?

A.   YES.  THE BOTTLES WERE PICKED UP QUITE CLEARLY IN THE VIDEO, AND, THEREFORE, WE WERE ABLE TO TRACK THEIR LOCATION AND THEIR ORIGIN.

Q.   AND I JUST WANT TO CLARIFY.  THIS IS AT THE TIME, WITHIN A FEW SECONDS, OF MR. JOHNSON'S BEING STRUCK, THIS IS THE ANALYSIS THAT YOU PERFORMED, THE RELEVANT ANALYSIS?

A.   YES, CORRECT.

Q.   THE NEXT TASK THAT YOU WERE ASKED TO DO IS CAN YOU TRACK EACH OFFICER AND WHEN THEY FIRED THEIR WEAPON?  WERE YOU ABLE TO DO THAT?

A.   YES.  AGAIN, MOST OF THE BODY WORN CAMERAS, THERE ARE CERTAIN CAMERAS THAT EVERY TIME AN OFFICER FIRED, THE EVIDENCE OF THEIR FIRING WERE CAUGHT ON MULTIPLE CAMERAS.

SER-0047

Q.   AND WERE YOU ABLE TO VERIFY THAT MR. JOHNSON WAS HIT WITH A PROJECTILE WEAPON -- EXCUSE ME, A PROJECTILE IMPACT WEAPON?

A.   YEAH, WE COULD SEE THAT MR. JOHNSON GOES FROM WALKING TO LIMPING RIGHT AFTER OFFICER ADGAR SHOT HIS WEAPON.

Q.   OKAY.  AND YOU KIND OF GOT AHEAD OF ME THERE ON THE LAST QUESTION.  YOU WERE ABLE TO TRACK WHICH OFFICER SHOT MR. JOHNSON?

A.   YEAH, IT WAS -- I'LL BE HONEST WITH YOU, YOU KNOW, WHEN WE WERE ASKED TO FIND OUT WHICH OFFICER STRUCK MR. JOHNSON, ONCE WE DID THE ANALYSIS, IT WAS PRETTY EASY.  THESE OFFICERS WERE NOT STANDING NEAR EACH OTHER, AND THEY WERE NOT ALL FIRING IN THE SAME DIRECTION.

     ONLY ONE OFFICER WAS FIRING IN THE DIRECTION OF KYLE JOHNSON DURING THE ENTIRE ORDEAL, AND SO IT MADE IT REALLY EASY TO NARROW DOWN THAT IT WAS OFFICER ADGAR WHO ULTIMATELY IMPACTED HIM.

Q.   OKAY.  CAN YOU PULL UP EXHIBIT 50, PLEASE.

     YOUR HONOR, MAY I HAVE A MOMENT TO DISCUSS SOMETHING WITH MR. DANG?

          THE COURT:  YES, OF COURSE.

     (DISCUSSION OFF THE RECORD.)

          MR. BASTIDA:  I THINK, YOUR HONOR, IT MIGHT BE BENEFICIAL IF WE ASK FOR A SIDE-BAR.

          THE COURT:  OKAY.  SURE.

     LADIES AND GENTLEMEN, WE'RE GOING TO STEP OUT IN THE

SER-0048

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 8, 2025

SER-0049

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

                PLAINTIFF,          CASE NO.  CV-21-01849 BLF

     VS.                      SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 10, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,  VOLUME 5
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 710 - 965

          DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                  BY:  ABIMAEL BASTIDA
                     MATTHEW SCHECHTER
                  10TH FLOOR
                  50 WEST SAN FERNANDO STREET
                  SAN JOSE, CALIFORNIA 95113

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:           OFFICE OF THE CITY ATTORNEY
                              BY:  ARDELL JOHNSON
                                   JAMES HUANG
                                   NICHOLAS SYMPSON
                              16TH FLOOR
                              200 EAST SANTA CLARA STREET
                              SAN JOSE, CALIFORNIA 95113


ALSO PRESENT:                 MCMANIS FAULKNER
                              BY:  GALENSTEIN DANG, PARALEGAL
                              10TH FLOOR
                              50 WEST SAN FERNANDO STREET
                              SAN JOSE, CALIFORNIA 95113

SER-0051

**AS-ON CROSS-EXAMINATION**

BY MR. BASTIDA:

Q.   GOOD MORNING, LIEUTENANT.

A.   GOOD MORNING.

Q.   THANK YOU FOR BEING HERE TODAY.

ARE YOU EMPLOYED BY THE CITY OF SAN JOSE?

A.   YES.

Q.   WERE YOU EMPLOYED BY THE CITY OF SAN JOSE ON MAY 29TH, 2020?

A.   YES.

Q.   WERE YOU EMPLOYED BY THE CITY OF SAN JOSE ON MAY 30TH, 2020?

A.   YES.

Q.   AND WHAT WAS YOUR TITLE AT THAT TIME?

A.   SERGEANT.

Q.   AT THAT TIME AS A SERGEANT, WHAT RANKS DID YOU OVERSEE?

A.   OFFICERS.

Q.   ANY OTHER RANKS?

A.   NO.

Q.   PRIOR TO MAY 29TH, 2020, DID YOU HAVE ANY ROLE ON TRAINING -- EXCUSE ME, ANY ROLE IN TRAINING SJPD OFFICERS ON THE USE OF FORCE?

A.   YES.

Q.   AND SAME QUESTION.  PRIOR TO MAY OF 2020, DID YOU HAVE ANY ROLE ON TRAINING OFFICERS ON CROWD CONTROL?

SER-0052

A.   YES.

Q.   AND WHAT ABOUT TRAINING OFFICERS WITH RESPECT TO LESS-LETHAL AMMUNITIONS, ALSO KNOWN AS PROJECTILE WEAPONS?

A.   YES.

Q.   WHEN DID YOU FIRST -- IN YOUR ROLE WITH THE SAN JOSE POLICE DEPARTMENT, WHEN DID YOU FIRST START TRAINING OFFICERS ON THE USE OF FORCE, APPROXIMATELY?

A.   FOR USE OF FORCE, I BELIEVE I BEGAN AROUND 2014.

Q.   WHAT ABOUT WITH RESPECT TO CROWD CONTROL?

A.   2013.

Q.   AND THEN THE PROJECTILE IMPACT WEAPONS?

A.   2018 APPROXIMATELY.

Q.   THANK YOU.  WERE YOU ON DUTY ON MAY 29TH, 2020 IN YOUR ROLE AS SERGEANT WITH THE SAN JOSE POLICE DEPARTMENT?

A.   YES.

Q.   AND IS THAT THE SAME FOR MAY 30TH, 2020?

A.   YES.

        MR. BASTIDA:  YOUR HONOR, I WOULD LIKE TO DESIGNATE LIEUTENANT TASSIO AND ALLOW -- AND QUESTION HIM UNDER FEDERAL RULES OF EVIDENCE 611(C)(2) AS AN ADVERSE WITNESS.

        THE COURT:  NO OBJECTION?

        MR. SYMPSON:  NO OBJECTION, YOUR HONOR.

        THE COURT:  YOU MAY.

        MR. BASTIDA:  THANK YOU, YOUR HONOR.

BY MR. BASTIDA:

SER-0053

Q.   AND GO -- I THINK THE FOLLOWING PAGE AFTER THIS ONE, IS THAT THE MUNITION ROUNDS FOR THE 37 MILLIMETER?

A.   YES.

Q.   AT THE TIME IN MAY OF 2020?

A.   YES.

Q.   IF YOU WOULD, PLEASE, GO TO PAGE 4 OF THE DOCUMENT.

IS THAT AN ACCURATE DEPICTION OF THE AMMUNITION FOR THE 40 MILLIMETER PROJECTILE IMPACT WEAPONS?

A.   YES.

Q.   AT THE TIME IN MAY OF 2020?

A.   YES.

Q.   AND IS THIS ALSO OFTEN REFERRED TO AS A 40 MILLIMETER FOAM BATON ROUND?

A.   YES.

Q.   AND IN MAY OF 2020, WAS IT STILL ACCURATE THAT THE VELOCITY OF THIS ROUND WAS 240 TO 260 FEET PER SECOND?

A.   YES.

Q.   AND WAS IT STILL ACCURATE AT THAT TIME THAT THE MINIMUM SAFE DISTANCE WAS 10 FEET?

A.   YEAH.  SO THAT'S A SELF-IMPOSED MINIMUM SAFE DISTANCE THAT WE TEACH THE OFFICERS.  IT'S NOT -- THE MANUFACTURER STATES IT CAN BE USED AT POINT-BLANK RANGE, BUT WE TEACH OUR OFFICERS TO HAVE A MINIMUM SAFE DISTANCE FOR WEAPONS RETENTION SAFETY. THERE'S NO MANUFACTURER RECOMMENDATION FOR MINIMUM SAFE DISTANCE FOR THIS ROUND.

SER-0054

YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. SYMPSON:  YES, YOUR HONOR.  I WOULD OBJECT 403 AND 407 AS TO SUBSEQUENT REMEDIAL MEASURES.

MR. BASTIDA:  THE DATE IS MAY 22ND.

MR. SYMPSON:  I'M SORRY.  WITHDRAWN.  I'M SORRY.  I HAD THE DATE WRONG.

THE COURT:  IT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 155 WAS RECEIVED IN EVIDENCE.)

MR. BASTIDA:  AND THAT IT BE PUBLISHED TO THE JURY, PLEASE?

THE COURT:  YES.

MR. BASTIDA:  AND LET'S GO TO I BELIEVE IT'S THE NEXT PAGE.

Q.   THIS IS DEALING, LIEUTENANT, AS YOU CAN SEE, WITH THE USE OF PROJECTILE IMPACT WEAPONS POLICY FROM THE DUTY MANUAL; IS THAT CORRECT?

A.   YES.

Q.   AND THIS WAS A REVISION OR UPDATE THAT WAS PUT INTO EFFECT ON MAY 22ND, 2020?

A.   YES.

Q.   OKAY.  AND IT'S MY UNDERSTANDING THAT THE ADDITION IS WHAT IS UNDERLINED UNDER -- WITH THE -- WHERE IT SAYS NOTE?

A.   CORRECT.

Q.   OKAY.  BUT EVERYTHING ELSE WAS ALREADY IN EFFECT; CORRECT?

A.   CORRECT.

Q.   OKAY.  THE TWO BULLET POINTS THAT YOU SEE RIGHT ABOVE THE ADDITION, THAT WAS THE POLICY IN EFFECT ON MAY 29TH AND MAY 30TH, 2020?

A.   THIS WHOLE THING, INCLUDING THE UNDERLINED SECTIONS, WERE IN EFFECT ON MAY 29TH AND MAY 30TH.

Q.   OKAY.  AND JUST BELOW ON THE NEXT SECTION, L 2629.5, THAT WAS ALSO IN EFFECT ON MAY 29TH AND MAY 30TH?

A.   YES.

Q.   OKAY.  LET'S GO TO THE NEXT PAGE, PLEASE.

     AND I CALL YOUR ATTENTION TO THE BULLET POINTS, THE NUMBER POINTS, I'M SORRY, IN THE MIDDLE OF THE PAGE.  SPECIFICALLY NUMBER 4.

     WITH RESPECT TO THE 37 MILLIMETER, OFFICERS WERE TRAINED TO FOLLOW THE POLICY WHICH STATES THAT THE 37 MILLIMETER ROUND SHOULD ONLY BE EXPELLED WHEN THERE IS SUFFICIENT DISTANCE BETWEEN THE OFFICER AND THE CROWD TO ALLOW THE ENERGY OF THE ROUND, ONCE IT STRIKES THE GROUND, TO SUFFICIENTLY DISSIPATE IN ORDER TO PREVENT ANY SUBSTANTIAL RISK OF INJURY TO ANY PERSON; IS THAT CORRECT?

A.   YES.

Q.   THANK YOU.  CAN YOU ZOOM OUT OF THAT, PLEASE.

     OKAY.  DO OFFICERS PERIODICALLY RECEIVE TRAINING ON SAFETY UPDATES REGARDING PROJECTILE IMPACT WEAPONS?

SER-0056

VIOLENT OR TUMULTUOUS BEHAVIOR OR BOISTEROUS BEHAVIOR THAT ENDANGERS THE PUBLIC OR IS ENDANGERS VIOLENT OR SEVERE PROPERTY DAMAGE, THEN WE'RE DECLARING AN UNLAWFUL ASSEMBLY.

SO YOU HAVE TO BASICALLY -- BASICALLY IT'S GOTTEN TO THE POINT WHERE WE CAN'T DIFFERENTIATE BETWEEN THE PEACEFUL PROTESTOR AND THE PERSON WHO IS COMMITTING THE VIOLENT ACTS, THERE'S TOO MANY PEOPLE COMMITTING VIOLENT ACTS OR UNLAWFUL ACTS TO SEPARATE THEM FROM THE PEACEFUL PROTESTORS, AND WE'RE JUST SAYING THAT THIS HAS ARISEN OUT OF CONTROL TO THE POINT WHERE EVERYONE IS IN DANGER OR THE COMMUNITY ITSELF IS IN DANGER, SO WE WOULD HAVE TO DISPERSE THE ENTIRE CROWD.

Q.   WOULD IT BE FAIR TO SAY THAT THE LEVEL OF HOSTILITY IN THE CROWD IS A CONSIDERATION WHEN DETERMINING WHETHER THERE ARE ENOUGH FORCES IN POSITION TO SUPPORT THAT CROWD MOVEMENT?

MR. BASTIDA:  OBJECTION.  LEADING.

THE COURT:  SUSTAINED.

BY MR. SYMPSON:

Q.   IN A SCENARIO WHERE THERE ARE NOT ENOUGH FORCES IN POSITION TO SUPPORT CROWD MOVEMENT, DOES THAT -- WOULD THAT RENDER THE ASSEMBLY THEN LAWFUL BECAUSE YOU CAN'T MAKE THE UNLAWFUL DISPERSAL ORDER?

A.   I'M SORRY.  COULD YOU ASK THE QUESTION AGAIN.

Q.   OKAY.  I'LL TRY THAT AGAIN.

IS AN ASSEMBLY LAWFUL DESPITE THE CONDUCT AND BEHAVIOR WITHIN THE ASSEMBLY SO LONG AS THERE HAS BEEN NO DECLARATION OF

SER-0057

AN UNLAWFUL ASSEMBLY?

MR. BASTIDA:  OBJECTION.  FOUNDATION.  OBJECTION. LACKS FOUNDATION.

THE COURT:  OVERRULED.

THE WITNESS:  IT'S NOT NECESSARILY THAT THE ASSEMBLY IS LAWFUL STILL, IT'S JUST THAT WE HAVE NOT ORDERED PEOPLE TO LEAVE THE AREA YET BECAUSE WE'RE NOT PREPARED TO DO SO.

IT'S LIKE SAYING JUST BECAUSE I HAVEN'T TOLD YOU TO STOP COMMITTING A CRIME, THE CRIME YOU'RE COMMITTING IS LEGAL.

WE'RE JUST WAITING UNTIL IT'S MOST ADVANTAGEOUS FOR US TO DECLARE IT AN UNLAWFUL ASSEMBLY, BUT NOBODY HAS A DUTY TO DISPERSE UNTIL WE ORDER THEM TO DO SO.

BY MR. SYMPSON:

Q.  UNDERSTOOD.  THANK YOU.

ARE YOU PROHIBITED FROM ENGAGING IN ANY SORT OF CROWD CONTROL MEASURES WITHOUT AN UNLAWFUL ASSEMBLY DISORDER OR, EXCUSE ME, UNLAWFUL ASSEMBLY ORDER?

A.  WE WOULD NOT DISPERSE A CROWD WITHOUT A DISPERSAL ORDER FIRST.

Q.  WHAT IF WITHIN THE CROWD THERE ARE PEOPLE ARMED WITH WEAPONS OR ENGAGING IN ACTS OF VIOLENCE OR THREATENING SERIOUS BODILY HARM TO OTHER MEMBERS OF THE DEMONSTRATION OR OFFICERS?

A.  WE TRAIN THE OFFICERS TO ENGAGE THOSE PEOPLE AS INDIVIDUALS COMMITTING A CRIME, AND WE TRY TO ADDRESS THEM INDIVIDUALLY WITHOUT -- SO OBVIOUSLY WE'RE POLICE OFFICERS.  IF

SER-0058

DISPERSAL ORDER?

A.   YES.

Q.   YOU ALSO TALKED ABOUT -- TOUCHED ON THE CIRCUMSTANCES AGAIN THAT AN OFFICER SHOULD CONSIDER IN DETERMINING THE REASONABLENESS OF THE USE OF FORCE THAT HE OR SHE APPLIES IN ANY SPECIFIC MOMENT.

DO YOU RECALL THAT?

A.   YES.

Q.   OKAY.  AND I BELIEVE YOU RATTLED OFF A FEW EXAMPLES.

BUT I WANTED TO ASK, IN THE CROWD CONTROL CONTEXT, WOULD THE SIZE -- THE SIZE OF THE CROWD WOULD ALSO BE A CIRCUMSTANCE THAT AN OFFICER SHOULD TAKE INTO ACCOUNT?

A.   YES.

Q.   AND AS WELL AS THE DENSITY OF THE CROWD WITH RESPECT TO ANY SPECIFIC TARGETS, THAT SHOULD ALSO BE A CIRCUMSTANCE THAT IS TAKEN INTO ACCOUNT?

A.   YES.

Q.   AND WOULD THE VISIBILITY, AND I MEAN THE GENERAL VISIBILITY, YOU KNOW, IF IT'S DAYTIME VERSUS NIGHTTIME -- OBVIOUSLY IT'S DARK AT NIGHT -- WOULD THAT ALSO BE A CIRCUMSTANCE THAT THE OFFICERS TAKE INTO ACCOUNT?

A.   YES.

Q.   AND WHAT ABOUT IN TERMS OF THE OFFICER'S OWN VISIBILITY, YOU KNOW, WHETHER ANYTHING IS OBSTRUCTING HIS OR HER VIEW FROM ANY INTENDED TARGET, SHOULD THAT ALSO BE A CIRCUMSTANCE TO TAKE

SER-0059

INTO ACCOUNT?

A. YES.

Q. AND WOULD THE NUMBER OF -- I THINK YOU USED THE PHRASE VIOLENT ACTORS OR VIOLENT PROTESTORS. I DON'T WANT TO PUT WORDS IN YOUR MOUTH, BUT WHICH ONE IS IT?

IN TERMS OF A CROWD CONTROL SETTING, THE INTENDED TARGET THAT AN OFFICER MIGHT WANT TO FILE A PROJECTILE IMPACT WEAPON, WOULD IT BE A CIRCUMSTANCE TO CONSIDER THE NUMBER OF INDIVIDUALS THAT ARE ENGAGING IN VIOLENT BEHAVIOR AS OPPOSED TO THE NUMBER OF INDIVIDUALS WHO ARE NOT? IS THAT A CIRCUMSTANCE THAT THE OFFICER SHOULD ALSO TAKE INTO ACCOUNT?

A. I GUESS I'M A LITTLE -- COULD YOU PLEASE RESTATE THE QUESTION. I'M SORRY.

Q. YEAH, YEAH. THAT WAS NOT WORDED VERY WELL.

YOU TESTIFIED AS TO THE CROWD AND THE CIRCUMSTANCES THAT THE OFFICER SHOULD TAKE INTO ACCOUNT; CORRECT?

A. YES.

Q. AND YOU TESTIFIED THAT THERE ARE TIMES WHEN AN OFFICER MAY NEED TO USE FORCE ON A SPECIFIC VIOLENT ACTOR WITHIN THE CROWD; CORRECT?

A. YES.

Q. AND I BELIEVE YOU TESTIFIED THAT THERE COULD BE MORE THAN ONE VIOLENT ACTOR WITHIN A CROWD; CORRECT?

A. YES.

Q. OKAY. MY QUESTION IS, SHOULD THE OFFICER ALSO TAKE INTO

Q.   THANK YOU.  GOOD AFTERNOON, SERGEANT.

A.   GOOD AFTERNOON.

Q.   ARE YOU CURRENTLY EMPLOYED WITH THE CITY OF SAN JOSE?

A.   YES.

Q.   AND WHAT IS YOUR TITLE WITH THE CITY OF SAN JOSE CURRENTLY?

A.   I'M CURRENTLY A SERGEANT WITH THE CITY OF SAN JOSE.

Q.   WERE YOU EMPLOYED BY THE CITY OF SAN JOSE ON MAY 29TH AND MAY 30TH OF 2020?

A.   YES.

Q.   AND WHAT WAS YOUR TITLE ON THOSE DAYS?

A.   I WAS A SERGEANT ASSIGNED TO PATROL.

Q.   ARE YOU FAMILIAR WITH THE PROTESTS THAT OCCURRED IN SAN JOSE ON THOSE DAYS, MAY 29TH AND MAY 30TH, 2020?

A.   YES.

Q.   YOU'VE BEEN TRAINED TO USE PROJECTILE IMPACT WEAPONS BY THE SAN JOSE POLICE DEPARTMENT; CORRECT?

A.   YES.

Q.   AND THAT WOULD INCLUDE THE 40 MILLIMETER BATON?

A.   YES.

Q.   DO YOU RECALL TESTIFYING OR GIVING SWORN TESTIMONY IN A DEPOSITION IN THIS CASE ON JANUARY 25, 2023?

A.   YES.

Q.   AND YOU TESTIFIED AT THAT TIME THAT THE 40 MILLIMETER BATON ROUND IS ABOUT THE -- ABOUT HALF THE SIZE OF A RED BULL

SER-0061

CAN; CORRECT?

A.   THAT'S CORRECT, MORE OR LESS.

Q.   IN YOUR TRAINING REGARDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, YOU HAVE BEEN TRAINED THAT THERE ARE APPROVED AND UNAPPROVED ZONES TO TARGET ON A SUSPECT'S BODY PART; CORRECT?

A.   THAT'S SOMEWHAT CORRECT.  THERE ARE AREAS THAT ARE PREFERRED TARGETS FOR THE LESS-LETHAL PROJECTILE IMPACT WEAPONS; THERE ARE SOME AREAS THAT YOU SHOULD AVOID BUT ARE NOT FORBIDDEN; AND THEN OTHER AREAS THAT YOU SHOULD REALLY NOT TARGET.

Q.   AND THAT WOULD BE, FOR EXAMPLE, THEIR HEAD BECAUSE IF SOMEONE WERE TO BE SHOT IN THE HEAD, THEY COULD DIE?  IF SOMEONE WERE TO BE SHOT WITH A 40 MILLIMETER WEAPON IN THE HEAD, THEY COULD DIE POTENTIALLY?

A.   THAT'S CORRECT, THAT'S WHY WE CALL THEM LESS LETHAL. THERE'S NO GUARANTEE THAT IT'S NOT GOING TO KILL SOMEBODY.  SO THAT IS CORRECT, WE DO NOT TRY TO TARGET THE HEAD.

Q.   OKAY.  AND IS THAT ALSO TRUE FOR THE GROIN?

A.   YES.

Q.   IF WE CAN PULL UP EXHIBIT 210 THAT HAS ALREADY BEEN ADMITTED, PLAINTIFF'S EXHIBIT 210.

     GO TO PAGE 7 OF THE DOCUMENT.

          MR. DANG:  PAGE 7.

BY MR. BASTIDA:

SER-0062

A.   WE WERE ALSO -- A HEAVY EMPHASIS ON THERE WERE GOING TO BE PEOPLE OUT THERE EXPRESSING FREEDOM OF SPEECH AND PART OF OUR JOB IS TO HELP FACILITATE THAT IN A SAFE AS POSSIBLE MANNER.

BUT, YES, PROTECTING PEOPLE, LIFE, PROPERTY, AND ALSO ALLOWING PEOPLE TO LET THEIR VOICES BE HEARD.

Q.   OKAY.  AND DO YOU RECALL WHETHER MORE SPECIFICALLY WITH RESPECT TO FREEDOM OF SPEECH, ANOTHER ONE OF THE GOALS FOR THE INCIDENT PLAN WAS CROWD MANAGEMENT AND PROTECTING FIRST AMENDMENT RIGHTS OF ALL INVOLVED IS OF THE UTMOST IMPORTANCE?

A.   YES.

Q.   YOU CAN TAKE THAT DOWN.  NO.

AS A SERGEANT ON MAY 30TH, DID YOU OVERSEE OTHER SAN JOSE POLICE OFFICERS?

A.   YES.

Q.   AND WHAT RANK WOULD THAT BE?

A.   SO I'M THE RANK OF SERGEANT.  I WAS SUPERVISING PATROL OFFICERS.

Q.   WERE YOU SUPERVISING PATROL OFFICERS AT CITY OF SAN JOSE THAT EVENING ON MAY 30TH, 2020?

A.   YES.

Q.   AND ISN'T IT TRUE THAT WHEN YOU TESTIFIED IN THIS CASE, YOU STATED THAT DURING THE DAY ON MAY 30TH YOU DID NOT RECALL ANY SIGNIFICANT INCIDENTS WHERE THE CROWD DID ANYTHING PARTICULARLY VIOLENT?

A.   YES.

SER-0063

Q.    WHY DID YOU CALL FOR ADDITIONAL HELP AT THAT POINT?

A.    IT WAS MORE THAN WE COULD HANDLE.  WE HAD THREE DIFFERENT TEAMS OUT THERE.  I WAS ONE OF THREE SERGEANTS.  WE WERE SPREAD PRETTY THIN FROM 4TH STREET TO 6TH STREET TRYING TO HOLD CITY HALL.

I MEAN, WE WERE OUTNUMBERED, YOU KNOW, 10, 20 TO 1.  I DON'T KNOW.  THERE WAS A LOT OF PEOPLE THERE.

AND THEN THE VOLUME THAT THEY WERE ABLE TO THROW AT US WAS SIGNIFICANT THAT IT WAS ONLY GOING TO BE A MATTER OF TIME UNTIL BEFORE OFFICERS WERE GOING TO START GETTING MAJORLY INJURED AND GOING DOWN, AND THOSE OFFICERS WERE GOING TO NEED TO BE PULLED OFF THE LINE, RESCUED, THEY WERE GOING TO NEED EMERGENCY MEDICAL HELP.

THERE WERE GOING TO BE PROTESTORS THAT WERE GOING TO GET INJURED EVENTUALLY WITH HOW CLOSE THESE ROCKS AND BOTTLES WERE COMING TO THEM.

SO IT WAS GOING TO CAUSE A MAJOR OFFICER SAFETY AND PUBLIC SAFETY ISSUE.

AND UP UNTIL THAT POINT THINGS HAD BEEN RELATIVELY OKAY. SO THAT WAS WHY I CALLED FOR ADDITIONAL RESOURCES.

Q.    WHEN YOU DESCRIBED EARLIER IN THE DAY ON THE 30TH THAT THE CROWDS WERE MORE CALM AND BENIGN AND TO WHAT EXTENT, IF AT ALL, DID YOU SEE ANY USE OF FORCE AGAINST THOSE CROWDS BY POLICE OFFICERS?

A.    IT WAS VERY SPECIFIC AND INDIVIDUAL.  SOMEBODY IN THE

SER-0064

CROWD WAS CLEARLY WANTING TO TAKE IT BEYOND CHANTING AND YELLING, AND THEY WOULD EVENTUALLY GRAB SOMETHING AND THROW IT AT THE COPS, AND THEN THAT SPECIFIC PERSON WAS HIT USUALLY WITH A PROJECTILE IMPACT WEAPON, A 40 OR A STUN BAG, AND THEN OFFICERS WOULD FORM A TEAM AND GO ARREST THAT PERSON.

AND THE CROWD WOULD GET VERY AGITATED, BUT WE WOULD TAKE THAT PERSON BACK TO THE POLICE LINE.  THEY'RE NOW IN OUR CUSTODY.  WE WOULD GET THEM MEDICAL HELP, AND THEN EVENTUALLY TAKE THEM TO JAIL.

SO THAT HAPPENED A COUPLE OF TIMES, BUT IT WASN'T LIKE A CONSTANT THING.  IT WAS HERE OR THERE, VERY SPORADIC.

Q.   LIKE A COUPLE OF BAD ACTORS THAT WERE SPECIFICALLY IDENTIFIED AND TARGETED?

A.   EXACTLY.

Q.   NOW, AROUND THE 10:00 TO 10:40 MARK, YOU DESCRIBED THEM AS -- I'LL DESCRIBE THEM AS WAVES OR THESE COORDINATED ATTACKS. IN BETWEEN THESE WAVES OR COORDINATED ATTACKS, WAS IT RELATIVELY PEACEFUL IN THOSE MOMENTS?

A.   YES.  THE CROWD WOULD GET AMPED UP WHEN THIS WOULD HAPPEN AND THEY WOULD STAY IN AN ELEVATED STATE, BUT AGAIN, NOT EVERYBODY THERE WAS INVOLVED IN TRYING TO HARM THE POLICE AND OTHER PEOPLE.  IT WAS SELECT PEOPLE THAT WERE DOING IT.

IT WAS SOMETIMES HARD TO IDENTIFY WHO THESE PEOPLE WERE BECAUSE OF THE SIZE OF THE CROWD, BECAUSE IT WAS NIGHT, BECAUSE THERE WERE A BUNCH OF LIGHTS OUT THERE AND SOMETIMES THEY TRY

SER-0065

SHOWED YOU RIGHT BEFORE THE QUESTION, THE PERSON HEARD SPEAKING IS HEARD SAYING THE POTATO GUN THREAT IS ON SAN FERNANDO STREET?

A.   I DON'T KNOW.  I'D HAVE TO LISTEN TO IT AGAIN.

Q.   OKAY.  LET ME ASK YOU THIS WAY, WERE YOU AWARE -- LET ME BACK UP.

     MR. SYMPSON ALSO, FOR A NUMBER OF HIS QUESTIONS, GAVE YOU A TIMEFRAME ON MAY 30TH FROM 10:00 P.M. TO 10:40 P.M.

     DO YOU RECALL THAT?

A.   YES.

Q.   AND YOU ANSWERED QUESTIONS WITH RESPECT TO THAT TIMEFRAME. AND I HAVE A QUESTION FOR YOU WITH RESPECT TO THAT TIMEFRAME.

     DURING THAT TIMEFRAME, WERE YOU PERSONALLY AWARE OF ANY THREAT REGARDING THE POTATO GUN AT CITY HALL PLAZA?

A.   NO.

Q.   OKAY.  DURING THAT SAME TIMEFRAME, DID YOU OBSERVE ANY -- I BELIEVE YOU TESTIFIED AS TO DUMPSTER FIRES WITH RESPECT TO YOUR EXPERIENCE WITH THE PROTESTS.

     DURING THAT TIMEFRAME DID YOU OBSERVE ANY DUMPSTER FIRES AT CITY HALL PLAZA?

A.   FROM 10:00 TO 10:40?

Q.   CORRECT.

A.   I DID NOT.

Q.   DID YOU OBSERVE ANY OF YOUR FELLOW POLICE OFFICERS PHYSICALLY ATTACK -- PUTTING ASIDE ANY PROJECTILES OR ITEMS

SER-0066

BEING THROWN, YOU'VE TESTIFIED TO THAT, BUT ASIDE FROM THAT,

DID YOU SEE ANY OF YOUR FELLOW POLICE OFFICERS BEING ATTACKED

PHYSICALLY BY PROTESTORS?

A.   NO.

Q.   WERE YOU YOURSELF IN ANY WAY THREATENED OR ATTACKED?

AGAIN, PUTTING ASIDE YOUR TESTIMONY REGARDING ANY ITEMS THAT

YOU MIGHT HAVE SEEN THROWN.

A.   NO.   THE THROWING OF THE ITEMS WAS THE ONLY PHYSICAL

ATTACK THAT WE SAW.

Q.   OKAY.   YOU ALSO TESTIFIED DURING MR. SYMPSON'S

EXAMINATION -- YOU TESTIFIED THAT DURING THE BRIEFING ON MAY

30TH, BEFORE YOU WERE DEPLOYED OUT IN DOWNTOWN SAN JOSE THERE

WAS A BRIEFING.

     DO YOU RECALL?

A.   YES.

Q.   AND YOU TESTIFIED DURING MR. SYMPSON'S EXAMINATION THAT

PART OF WHAT WAS DISCUSSED DURING THAT BRIEFING WAS FREE

SPEECH, PROTECTION, AND FIRST AMENDMENT RIGHTS.

     DO YOU RECALL THAT?

A.   YES.

Q.   I -- YOU WERE DEPOSED IN THIS CASE, AGAIN, ON JANUARY 25,

2023, AND AT THAT TIME YOU WERE ASKED ABOUT THAT BRIEFING --

          THE COURT:   I'M SORRY.   YOU CAN EITHER READ THE

DEPOSITION OR SHOW IT TO THE WITNESS AND THEN SUMMARIZE IT.

          MR. BASTIDA:   YES.   "QUESTION:   REGARDING THAT

SER-0067

WITH GRAFFITI.  THEY WERE TAGGING THE EXTERIOR OF THE CITY HALL BUILDING.

Q.   CAN WE PULL UP EXHIBIT 238 AGAIN, PLEASE.  IT'S ALREADY BEEN ADMITTED INTO EVIDENCE.

AND THIS IS WHAT YOU TESTIFIED EARLIER IS YOUR NARRATIVE REPORT THAT YOU REPORT?

A.   YES.

Q.   AND AT THE END OF THE DAY ON MAY 30TH, I THINK YOU SAID IT MIGHT HAVE BEEN EARLY HOURS OF MAY 31ST AS WELL?

A.   THAT'S CORRECT.

Q.   IF YOU WILL PLEASE, GO TO THE SECOND PAGE, IF YOU WILL PLEASE, THAT IS SJ05127.  SCROLL BACK UP.  RIGHT THERE.

DO YOU SEE THE PARAGRAPH IN FRONT OF YOU, SERGEANT BYERS?

A.   YES, SIR.

Q.   AND I'M GOING TO READ FROM THE SENTENCE -- THIS IS YOUR -- THIS IS YOUR REPORT; CORRECT?

A.   THAT'S CORRECT.

Q.   IT SAYS, "I SAW THE SUBJECTS FROM A DISTANCE OF APPROXIMATELY 100 YARDS AWAY.  THEY HAD BACKPACKS AND NUMEROUS UNIDENTIFIED OBJECTS IN THEIR HANDS.  FEARING THAT THEY WOULD USE THESE OBJECTS TO HARM POLICE UPON BEING CONFRONTED, I ORDERED OFFICER R. KIM NUMBER 4460 TO FIRE ONE 40 MILLIMETER LESS-LETHAL PROJECTILE TOWARDS THE VANDALS."

DO YOU SEE THAT?

A.   YES, I DO.

SER-0068

Q.   AM I READING THIS CORRECTLY TO MEAN THAT YOU OR YOUR OFFICERS HAD NOT YET CONFRONTED THESE INDIVIDUALS BUT YOU SAW THEM FROM APPROXIMATELY 100 YARDS AWAY?

A.   CORRECT.

Q.   AND EVEN THOUGH ALL YOU SAW WAS THAT THEY HAD BACKPACKS AND NUMEROUS UNIDENTIFIED OBJECTS IN THEIR HANDS, YOU NEVERTHELESS INSTRUCTED OFFICER KIM TO FIRE A LESS-LETHAL PROJECTILE AT THESE INDIVIDUALS?

A.   BUT YOU'RE LEAVING OUT THE FIRST PART OF THAT PARAGRAPH WHERE I SAID WE NOTICED A GROUP OF SUSPECTS SPRAY PAINTING CITY HALL.

BASED ON MY TRAINING AND EXPERIENCE, SUBJECTS WHO USE GRAFFITI IN THIS FASHION ARE OFTEN PART OF RIOTS OR WILL CARRY WEAPONS OR PROJECTILES TO USE AGAINST THE POLICE AND WILL FIGHT THE POLICE ONCE CONFRONTED.

AND THEN THE PART THAT IS HIGHLIGHTED.

Q.   I SEE THAT.  SO IS IT YOUR TESTIMONY HERE TODAY THAT BASED ON YOUR KNOWLEDGE AND EXPERIENCE, EVERY INDIVIDUAL THAT YOU COME ACROSS THAT IS SPRAY PAINTING IS A PERSON THAT WILL LIKELY CARRY WEAPONS OR PROJECTILES TO USE AGAINST THE POLICE?

A.   THAT MISSTATES WHAT I WROTE IN MY REPORT AND WHAT MY TESTIMONY IS.

I KNOW THAT PEOPLE THAT WILL GO RIGHT IN FRONT OF THE POLICE ABOUT 100 YARDS AWAY AND START SPRAY PAINTING CLEARLY IN VIEW OF THE POLICE ARE ALMOST INVITING A CONFRONTATION WITH THE

SER-0069

POLICE.  SO WE CAN DO NOTHING AND ALLOW THEM TO DEFACE CITY

HALL.

WHEN THAT HAPPENS, THEY BECOME EMBOLDENED AND THEN THEY

START LIGHTING THINGS ON FIRE, AND THEN MORE PEOPLE COME, AND

THEN THEY DETERMINE THAT THE COPS ARE NOT GOING TO DO ANYTHING.

ONE OF THE OTHER OPTIONS I HAD WAS TO SEND OFFICERS OVER

THERE.  SIMILAR TO THE NIGHT BEFORE, IF I START GETTING TWO OR

THREE OFFICERS THAT ARE ASSUMINGLY GOING TO GET INTO A FOOT

PURSUIT WITH PEOPLE WHO HAVE JUST BEEN DEFACING CITY HALL, THEN

THOSE OFFICERS ARE GOING TO BE SEPARATED FROM THE REST OF THE

OFFICERS POTENTIALLY BAITED INTO AN AREA WHERE THERE ARE

NUMEROUS OTHER PEOPLE AROUND THE BLOCK WAITING FOR THEM.

SO I MADE THE DECISION AT THAT TIME FROM A SIGNIFICANT

DISTANCE AWAY, I ASKED OFFICER KIM TO DISCHARGE HIS

40 MILLIMETER PROJECTILE IMPACT WEAPON WHERE THESE PEOPLE WERE

DEFACING CITY HALL KNOWING THAT THEY WERE LIKELY OUT OF THE

EFFECTIVE RANGE OF THAT PROJECTILE IMPACT WEAPON.

Q.   OKAY.  THAT EFFECTIVE RANGE BEING 100 YARDS PER YOUR

UNDERSTANDING?

A.   MORE OR LESS.  AN ESTIMATION.

Q.   AND IS SPRAY PAINTING A PHYSICAL THREAT?

A.   NO.

Q.   IS SPRAY PAINTING SOMETHING THAT COULD BE LIKELY TO CAUSE

SERIOUS BODILY INJURY OR HARM TO SOMEONE?

A.   NO, IT IS NOT.

SER-0070

THE TIME IN MAY OF 2020 OR EARLIER?

A.   I BELIEVE SO.  I HAVE SEVERAL VERSIONS OF IT.  I BELIEVE THAT'S WHAT WAS TURNED OVER TO THE PLAINTIFF'S COUNSEL, YES.

Q.   THANK YOU.

YOUR HONOR, I WOULD ASK THAT THIS BE ADMITTED INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. SYMPSON:  OBJECTION.  I THINK GIVEN THE PREVIOUS TESTIMONY TODAY, THIS WOULD BE CUMULATIVE AND THIS SPECIFICALLY WILL HAVE MORE PREJUDICIAL VALUE THAN PROBATIVE AT THIS POINT.

THE COURT:  OVERRULED.  IT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 181 WAS RECEIVED IN EVIDENCE.)

MR. BASTIDA:  THANK YOU, YOUR HONOR.

IF WE CAN GO TO PAGE 2 OF THE DOCUMENT.

MAY I ASK THAT IT BE PUBLISHED, YOUR HONOR?

THE COURT:  YES.

BY MR. BASTIDA:

Q.   WITH RESPECT TO PROJECTILE IMPACT WEAPONS, DO YOU SEE THE BULLET POINT AT THE BOTTOM WHERE IT SAYS BE AWARE OF YOUR BACKSTOP?

A.   YES.

Q.   AND CAN YOU EXPLAIN BRIEFLY WHAT THAT MEANS?

A.   THESE ARE GENERAL FIREARM SAFETY PROTOCOLS TAUGHT AT EVERY FIREARMS COURSE.

THE BE AWARE OF YOUR BACKSTOP IS TO ALWAYS HAVE A MIND

SER-0071

TOWARDS WHAT IS BEHIND YOUR TARGET.

Q.   AND THIS WOULD BE -- THIS WOULD ALSO APPLY TO PROJECTILE IMPACT WEAPONS; CORRECT?

A.   CORRECT.

Q.   CAN YOU GO TO PAGE 26 OF THE DOCUMENT.

DO YOU SEE THAT IN FRONT OF YOU, SERGEANT?

A.   YES.

Q.   OKAY.  AND CAN YOU EXPLAIN WHAT THE SECOND TO LAST BULLET POINT MEANS, THE 2 PERCENT RESULTED IN PENETRATION OR DEATH?

A.   YEAH.  THESE ARE OLD STATISTICS THAT WERE PART OF THE PRESENTATION THAT WAS ORIGINALLY HANDED OVER TO ME.

THE 2 PERCENT RESULTED IN PENETRATION OR DEATH WAS BASED ON THE STATISTICS AT THAT TIME.  WHAT IT MEANS IS THAT AT SOME POINT IN THE STUDY THAT WAS DONE, THAT THEY IDENTIFIED 2 PERCENT OF THE ROUNDS THAT WERE FIRED IN REAL WORLD SCENARIOS CAUSED SOME LEVEL OF PENETRATION INTO THE SKIN OR DEATH.

Q.   OKAY.  AND WILL YOU GO TO THE LAST PAGE, PLEASE.  I JUST WANT TO CONFIRM, SERGEANT.  DOES THIS APPEAR TO BE AN ACCURATE PRESENTATION OF THE LAST SLIDE OF YOUR PRESENTATION AT THAT TIME?

A.   YES.

Q.   OKAY.

NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  MR. SYMPSON, QUESTIONS?

MR. SYMPSON:  JUST ONE.

SER-0072

THE COURT:  ABSOLUTELY.  YOU DIDN'T TRY THE FIRST TIME.

MR. SCHECHTER:  I UNDERSTAND, YOUR HONOR.

**DIRECT EXAMINATION (RESUMED)**

BY MR. SCHECHTER:

Q.   MR. CLARK, YOU INDICATED -- I THINK YOU'VE SAID YOU'VE GIVEN LECTURES BEFORE ON POST STANDARDS?

A.   I HAVE.

Q.   AND WERE THOSE WHILE YOU WERE WITH THE SHERIFF'S DEPARTMENT, SINCE YOU BECAME A POLICE CONSULTANT OR DURING YOUR ENTIRE CAREER?

A.   DURING MY ENTIRE CAREER BOTH AS AN OFFICER AND LECTURES AS INVITED.  I HAVE ONE COMING UP THIS MONTH AT DAVIS -- NOT DAVIS, IRVINE.  EXCUSE ME.

Q.   AND HAVE YOU EVER GIVEN LECTURES ON THE USE OF 40 MILLIMETER PROJECTILE IMPACT WEAPONS?

A.   I HAVE, AND I'VE TESTIFIED ACCORDINGLY.

Q.   AND HOW OFTEN HAVE YOU LECTURED ON THE USE OF 40 MILLIMETER PROJECTILE IMPACT WEAPONS IN TERMS OF THEIR USE? LET ME FIRST ASK GENERALLY.

A.   FOR RIOT SITUATIONS, WHICH HAS BEEN THE TOPIC THE LAST COUPLE OF YEARS, MY LECTURES HAVE ALWAYS INCLUDED IN LAW SCHOOLS THAT COMMENTARY, AND I'VE HAD ONE CASE IN FEDERAL COURT IN LOS ANGELES REGARDING A 40 MILLIMETER, AN INJURY FROM THE 40 MILLIMETER.

SER-0073

A.   WELL, I WAS GIVEN VIDEO, I WAS GIVEN DEPOSITION TESTIMONY. THERE WERE EIGHT DEPOSITIONS.  I WAS GIVEN POLICIES, REPORTS, AND THEN I HAD AUGMENTED THAT WITH POST LEARNING DOMAINS THAT I CONSIDERED IMPORTANT AND WROTE A REPORT.

Q.   YOU MENTIONED THE POST LEARNING DOMAINS.  CAN YOU EXPLAIN WHAT THOSE ARE?

A.   SO THE LEARNING DOMAINS ARE THE CURRICULUM THAT IS DEVOTED TO THE TOPIC.

AND THE MOST KEY HERE ARE THE LEARNING DOMAIN ON FORCE, WHICH IS NUMBER 20, USE OF FORCE.

AND THEN THE FURTHER CONTROL OF THE CROWD OR HANDLING A RIOT, WHICH IS LEARNING DOMAIN NUMBER 24.

THERE ARE OTHERS THAT -- WELL, FLAVOR THAT ARE INVOLVED, AND I HAVE LISTED THOSE OUT.

Q.   AND CAN YOU GIVE THE JURY A BRIEF DESCRIPTION OF WHAT IS CONTAINED IN LEARNING DOMAIN NUMBER 20 REGARDING USE OF FORCE?

A.   SO 20, IT DEVOTES TO THE PURPOSE OF FORCE, THE CALCULUS ON WHAT WOULD BE APPROPRIATE OR NECESSARY AND LAWFULLY PER THE TRAINING AUTHORIZED FOR WHATEVER CONDUCT THE OFFICER IS FACING, AND IF CIRCUMSTANCES THE OFFICER IS INVOLVED IN, AND BASICALLY BREAKS IT DOWN INTO FOUR SPECIFIC CATEGORIES:  COOPERATIVE, RESISTIVE, COMBATIVE, ASSAULTIVE, AND LIFE THREATENING, AND THE APPROPRIATE RESPONSE TO THOSE.

AND THEN IT DEFINES AND GIVES EXAMPLES.  AND THEN IT REQUIRES SCENARIO ROLE PLAY AS WELL AS THE CLASSROOM WORK AND

SER-0074

ALSO SIMULATION.

Q.   AND SIMILARLY, CAN YOU JUST GIVE A BRIEF DESCRIPTION OF WHAT YOU WILL FIND IN LEARNING DOMAIN NUMBER 24 REGARDING CROWD CONTROL?

A.   SO LEARNING DOMAIN 24 HAS TWO SPECIFIC CHAPTERS ON CROWD MANAGEMENT AND CONTROL AND DEMONSTRATIONS, AND THEN RIOT CONTROL AND HANDLING OF RIOT AND THE PROPER METHODS TO ABATE THOSE KINDS OF PROBLEMS, AND THE LINE BETWEEN THE TWO, DEMONSTRATIONS VERSUS -- OR PROTESTS VERSUS RIOTS, AND WHAT IS APPROPRIATE AND NECESSARY UNDER THOSE CIRCUMSTANCES.

Q.   AND IN EITHER OF THOSE TWO LEARNING DOMAINS OR IN OTHERS ARE THERE SECTIONS DISCUSSING THE USE OF PROJECTILE IMPACT WEAPONS?

A.   SO IN LEARNING DOMAIN 20 PROJECTILES ARE LISTED IN TERMS OF KINETIC ENERGY TRANSFER, OR USE OF KINETIC ENERGY TO OVERCOME RESISTANCE OR DEAL WITH A PROBLEM.

     AND IN LEARNING DOMAIN 24, IT IS THE REQUIREMENT TO HAVE THE POLICIES AND TRAINING AND THE SKILLS NECESSARY WHEN THOSE TYPES OF MUNITIONS ARE USED, ALONG WITH CHEMICAL AGENTS AND SO FORTH.

Q.   AND ARE THESE LEARNING DOMAINS MATERIAL THAT WOULD BE PROVIDED TO OFFICERS WHEN TAKING A POST BASIC COURSE?

A.   YES, AND THAT'S MY COMMENTARY HERE.  EVERY SINGLE OFFICER, INCLUDING THE LINE OFFICER TO THE CHIEF OF POLICE WOULD HAVE AS A FOUNDATION FOR THESE TYPES OF EVENTS.

SER-0075

THE COURT:  THAT'S A QUESTION ABOUT EVERY USE OF IT FOR THE ENTIRE TIME.  I'M NOT GOING TO ALLOW THAT.

BY MR. SCHECHTER:

Q.  MR. CLARK, BASED ON YOUR TRAINING AND EXPERIENCE AND CONTINUING EDUCATION WITH RESPECT TO THE 40 MILLIMETER PROJECTILE IMPACT WEAPON, WAS THAT A PROPER USE OF THAT WEAPON WHEN MR. JOHNSON WAS STRUCK ON THE EVENING OF MAY 30TH, 2020?

MR. JOHNSON:  OBJECTION.  INCOMPLETE HYPOTHETICAL. LACKS FOUNDATION.

THE COURT:  SUSTAINED.

BY MR. SCHECHTER:

Q.  MR. CLARK, GIVEN YOUR TRAINING AND EXPERIENCE AND CONTINUING EDUCATION, ON MAY 30TH, 2020 AT THE TIME WHEN MR. JOHNSON WAS STRUCK IN THE LEG, IN YOUR OPINION WAS THE SAN JOSE POLICE DEPARTMENT COMPLYING WITH POST STANDARDS REGARDING PROJECTILE IMPACT WEAPON?

MR. JOHNSON:  SAME OBJECTIONS.

THE COURT:  YOU NEED TO BREAK IT DOWN INTO EACH INDIVIDUAL USE AND LAY A FOUNDATION.

BY MR. SCHECHTER:

Q.  MR. CLARK, HAVE YOU HAD AN OPPORTUNITY TO REVIEW VIDEO OF THE TIME WHEN OFFICER ADGAR FIRED A 40 MILLIMETER PROJECTILE IMPACT WEAPON THAT STRUCK MR. JOHNSON?

A.  YES.

Q.  AND GIVEN YOUR REVIEW OF SUCH VIDEO, ALONG WITH YOUR

SER-0076

BACKGROUND, EXPERIENCE, EDUCATION, CONTINUING EDUCATION, IN YOUR OPINION WAS THAT A PROPER USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON BY OFFICER ADGAR DIRECTED TOWARDS MR. JOHNSON?

A.   NO.

Q.   IN YOUR OPINION, WHY NOT?

A.   WELL, PRIMARILY BECAUSE AT THAT TIME OR AT THE TIME MR. JOHNSON WAS NOT A CREDIBLE THREAT.

Q.   WHEN YOU SAY HE WAS NOT A CREDIBLE THREAT IN YOUR OPINION, WHAT DO YOU MEAN BY THAT?

A.   WELL, WHAT I VIEWED WAS THAT MR. JOHNSON WAS LEAVING, HE HAD NOTHING IN HIS HANDS, HE HAD THROWN NOTHING.  HE HAS -- HE WAS NOT BEING PROVACATIVE.  HE WAS LEAVING, AND HE WAS WOUNDED WITH AN IMPACT WEAPON.

Q.   ON THE VIDEOS THAT YOU OBSERVED IN CONNECTION WITH THIS CASE, AGAIN, FOCUSSING ON THE EVENING OF MAY 30TH, 2020, DID YOU SEE OFFICER -- OTHER OFFICERS USE A PROJECTILE, 40 MILLIMETER PROJECTILE IMPACT WEAPON?

A.   I OBSERVED IT.

Q.   AND I'M GOING TO -- I'M WITHDRAWING THAT.

THE COURT:  OKAY.

BY MR. SCHECHTER:

Q.   IN YOUR OPINION, MR. CLARK, GIVEN YOUR EXPERIENCE AND EDUCATION AND ONGOING EDUCATION, WHEN OFFICER ADGAR FIRED HIS PROJECTILE IMPACT WEAPON AND STRUCK MR. JOHNSON, WAS

SER-0077

Q.   OFFICER ADGAR IN COMPLIANCE WITH POST STANDARDS?

A.   HE WAS NOT.

Q.   IN YOUR OPINION, WHY NOT?

A.   BECAUSE MR. JOHNSON DID NOT FIT IN THE CATEGORY OF RESISTIVE OR ASSAULTIVE, COMBATIVE OR THREATENING.  HE WAS LEAVING THE AREA AND WAS DOING NOTHING OTHER THAN THAT AND WHEN THE WOUND WAS INFLICTED.

Q.   MR. CLARK, BASED ON YOUR EXPERIENCE, YOUR LAW ENFORCEMENT EXPERIENCE, YOUR POST TRAINING, YOUR ONGOING EDUCATION IN CROWD MANAGEMENT SITUATIONS, DO OFFICERS NEED TO BE AWARE OF THEIR AGENCY'S POLICIES AND PROCEDURES REGARDING CONDUCT?

A.   YES.

Q.   AND WOULD THAT CONDUCT INCLUDE THE USE OF FORCE?

A.   YES.

Q.   BASED ON YOUR EXPERIENCE AND YOUR POST TRAINING AND CONTINUING AND ONGOING EDUCATION WITH RESPECT TO CROWD MANAGEMENT SITUATIONS, DO LAW ENFORCEMENT OFFICERS ALSO NEED TO COMPLY WITH THEIR AGENCY'S POLICIES AND PROCEDURES REGARDING USE OF FORCE?

A.   YES.

          MR. SCHECHTER:  ONE MOMENT, YOUR HONOR.

          THE COURT:  YES.

     (DISCUSSION AMONGST PLAINTIFF'S COUNSEL OFF THE RECORD.)

          MR. SCHECHTER:  MR. DANG, IF YOU COULD PLEASE PUT UP THE VIDEO THAT HAS PREVIOUSLY BEEN ADMITTED INTO EVIDENCE AS

SER-0078

EXHIBIT 108A.

Q.   MR. CLARK, I'LL ASK YOU TO WATCH THE SCREEN THERE.

MR. DANG, IF YOU COULD PLAY THAT VIDEO, PLEASE.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SCHECHTER:

Q.   MR. CLARK, GIVEN YOUR LAW ENFORCEMENT TRAINING, EDUCATION, IN YOUR OPINION, WHAT YOU SAW ON THE VIDEO, WOULD THAT BE A PROPER USE OF THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

MR. JOHNSON:  OBJECTION.  CALLS FOR SPECULATION. LACKS FOUNDATION.

THE COURT:  SUSTAINED.  NO FOUNDATION.

BY MR. SCHECHTER:

Q.   LET ME ASK THIS QUESTION, MR. CLARK.  BASED ON YOUR EDUCATION, EXPERIENCE, AND TRAINING, WAS THAT A PROPER USE OF FORCE IN COMPLIANCE WITH POST STANDARDS IN YOUR OPINION?

THE COURT:  I DON'T KNOW WHAT THAT IS, AND WE HAVEN'T ESTABLISHED WHAT WEAPONS ARE BEING USED OR IF THE WITNESS IS EVEN AWARE AND CAN IDENTIFY WHAT THEY ARE.  THAT'S THE PROBLEM WITH THE FOUNDATION.

BY MR. SCHECHTER:

Q.   MR. CLARK, IN WATCHING THAT VIDEO, DID YOU SEE ANY USE OF ANY SORT OF WEAPONS DURING THE COURSE OF THAT?

A.   I DID.

Q.   WHAT DID YOU SEE?

A.   I SAW AN OFFICER FIRE A 40 MILLIMETER INTO THE GROUP

SER-0079

IMMEDIATELY IN THE CENTER OF THE SCREEN.  I SAW -- THERE IT IS RIGHT THERE TO THE LOWER LEFT (INDICATING).

AND IT APPEARS POINTED AT AN AREA WHERE THERE IS NO CREDIBLE THREAT ON THE RIGHT SIDE WHAT APPEARS TO BE FLASH BANGS ON CHEMICAL CANNISTERS OF GAS APPEARS ON THE RIGHT SIDE.

Q.   LET ME SIMPLY FOCUS YOUR ATTENTION ON THE OFFICER THAT YOU REFERENCE THERE ON THE LEFT SIDE HOLDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON.

GIVEN YOUR EXPERIENCE AND TRAINING AND ONGOING EDUCATION, WAS THAT A PROPER USE OF THAT WEAPON FOR PURPOSES OF CROWD CONTROL?

MR. JOHNSON:  OBJECTION.  LACKS FOUNDATION.

THE COURT:  OVERRULED.

THE WITNESS:  IT IS NOT A PROPER USE OF THE WEAPON.

BY MR. SCHECHTER:

Q.   IN YOUR OPINION, WHY NOT?

A.   BECAUSE THE FORESEEABLE CONSEQUENCES IS INJURY, SIGNIFICANT INJURY BECAUSE OF THE NATURE OF THE WEAPON INTO AN AREA THAT HAS, IN MY VIEW, NO CREDIBLE THREAT.

Q.   AND LET ME ASK, WHEN YOU SAY IN YOUR OPINION NO CREDIBLE THREAT, IN YOUR OPINION WHAT WOULD A CREDIBLE THREAT BE?

A.   WELL, IT WOULD BE -- IT COULD BE SOMETHING IN TERMS OF LIKE A -- BASED ON PREVIOUS EXPERIENCE, AN INDIVIDUAL READY TO THROW A ROCK OR TO THROW A WEAPON, OR TO HAVE A WEAPON READY TO USE IT SUCH AS A FIREARM.  THAT WOULD BE TYPICAL EXAMPLES.

SER-0080

BUT THERE IS -- I SAW NOTHING IN MY VIEW THAT THERE WAS ANYONE READY TO THROW ANYTHING OR DO ANYTHING THAT WAS GOING TO HARM ANYONE.

Q.    MR. CLARK, AND AGAIN, FOCUSSING ON THE OFFICER THAT WE SEE ON THE LEFT-HAND SIDE OF THE SCREEN, AND GIVEN YOUR EXPERIENCE AND TRAINING AND YOUR CONTINUING EDUCATION, WAS THE OFFICER SEEN THERE COMPLYING WITH POST STANDARDS?

A.    NO.

Q.    AGAIN, IN YOUR OPINION, WHY NOT?

A.    BECAUSE THE USE OF FORCE DEFINED STATEMENT IN THE TRAINING IS FORCE MUST BE NECESSARY AND APPROPRIATE IN ORDER TO BE -- IN ORDER TO BE JUSTIFIED.  APPROPRIATE AND NECESSARY.

THERE'S NOTHING IN THIS EVENT THAT I'M WATCHING OR HAS BEEN DEPICTED THAT SHOWS THAT IT IS APPROPRIATE OR NECESSARY TO FIRE A SIGNIFICANT WEAPON INTO A CROWD.

Q.    AND JUST SO WE'RE ALL CLEAR, AND AGAIN BASED ON YOUR EXPERIENCE AND EDUCATION AND TRAINING, WHEN YOU SAY NECESSARY, WHAT DID YOU MEAN BY THAT?  CAN YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY THAT TERM?

A.    SURE.  SO IF THERE IS AN ONGOING SET OF FACTS OR SERIES OF EVENTS THAT POSE AN IMMEDIATE RISK, THEN A USE OF FORCE TO ABATE THAT RISK WOULD BE APPROPRIATE AND NECESSARY.

NOW IT HAS TO BE THE LEVEL OR THE RESPONSE, NOT -- YOU CAN'T USE SUCH A HEAVY HANDED LEVEL OF FORCE TO HANDLE PEOPLE THAT ARE GATHERED AND ARE PROTESTING.

SER-0081

AND THEY ARE NOT CULPABLE INDIVIDUALLY UNTIL A DECLARATION OF UNLAWFUL ASSEMBLY.

THEY ARE THERE, AND IF THERE'S AN INDIVIDUAL THAT THEY'RE DEALING WITH, THAT'S ONE THING.

BUT TO INDISCRIMINATELY SHOOT INTO THE CROWD OR INFLICT RECKLESS USES OF FORCE OF THIS NATURE, YOU'RE UNFORESEEABLY GOING TO INJURE AND HURT PEOPLE.

Q.   THANK YOU, MR. CLARK.

NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ALL RIGHT.  MR. JOHNSON, ANY CROSS-EXAMINATION?

MR. JOHNSON:  YES.  THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

BY MR. JOHNSON:

Q.   MR. CLARK, WITH REGARD TO YOUR OPINION THAT THE SHOT THAT OFFICER ADGAR FIRED AS BEING IMPROPER, THAT OPINION IS BASED ON THE ASSUMPTION THAT OFFICER ADGAR TARGETED MR. JOHNSON, ISN'T IT?

A.   IT'S BASED ON THE ASSUMPTION THAT BECAUSE IT'S TARGET SPECIFIC, THAT ADGAR IS REQUIRED TO BE TRAINED AND PROFICIENT AND WHENEVER HE -- WHEN HE PULLS THE TRIGGER HE HAS HIS TARGET.

Q.   I APPRECIATE YOUR ANSWER, BUT DOESN'T IT FOLLOW FROM WHAT YOU'VE JUST SAID, THAT IN ORDER FOR OFFICER ADGAR'S USE OF THE 40 MILLIMETER AT THAT TIME TO BE IMPROPER, HE WOULD HAVE TO HAVE BEEN TARGETING SOMEBODY WHO WAS PEACEFUL, WHO REPRESENTED

SER-0082

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 11, 2025

SER-0083

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

            PLAINTIFF,           CASE NO.  CV-21-01849 BLF

  VS.                    SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 13, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,  VOLUME 6
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 966 - 1195

         DEFENDANTS.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   MCMANIS FAULKNER
                  BY:  ABIMAEL BASTIDA
                    MATTHEW SCHECHTER
                 10TH FLOOR
                 50 WEST SAN FERNANDO STREET
                 SAN JOSE, CALIFORNIA 95113

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

SER-0084

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:                OFFICE OF THE CITY ATTORNEY
                                   BY:  ARDELL JOHNSON
                                        JAMES HUANG
                                        NICHOLAS SYMPSON
                                   16TH FLOOR
                                   200 EAST SANTA CLARA STREET
                                   SAN JOSE, CALIFORNIA 95113


ALSO PRESENT:                      MCMANIS FAULKNER
                                   BY:  GALENSTEIN DANG, PARALEGAL
                                   10TH FLOOR
                                   50 WEST SAN FERNANDO STREET
                                   SAN JOSE, CALIFORNIA 95113

SER-0085

A.   YES.

Q.   AND ON MAY 30TH, 2020, IT WAS -- THE OC ROUND WAS ALLOWED FOR CROWD CONTROL; ISN'T THAT RIGHT?

A.   YES.

Q.   BUT THE FOAM BATON ROUND WAS NOT ALLOWED FOR CROWD CONTROL; CORRECT?

A.   WE HAD SOME CONFLICTING DUTY MANUAL SECTIONS ON THAT DAY, SO WHAT I WILL SAY IS THAT IT WAS NOT INTENDED AT THE TIME.  I BELIEVE THE POLICY STATED IT WASN'T TO BE FIRED IN THE SAME MANNER AS OUR 37 MILLIMETERS.

HOWEVER, THERE WAS STILL ANOTHER DUTY MANUAL SECTION IN THE 2600'S, THE L 2600'S THAT STATED THAT A -- TWO CIRCUMSTANCES WHEN A FOAM BATON ROUND COULD BE USED, AND THAT WAS IF SOMEONE WAS ARMED WITH A WEAPON, OR IMPROVISED WEAPON IF ITS USE WOULD PREVENT THE INJURY TO ANY PERSON.

SO BOTH OF THOSE POLICIES EXISTED AT THE SAME TIME.  I BROUGHT THAT TO THE ATTENTION OF OUR CHIEFS, AND IT WAS BROUGHT TO THE ATTENTION OF THE VERY SEARCH AND DEVELOPMENT DEPARTMENT.

Q.   RIGHT.  BUT ON MAY 30TH, AS THE POLICY WAS WRITTEN, THE 40 MILLIMETER FOAM BATON ROUND WAS NOT TO BE USED IN CROWD CONTROL?  IT WAS TO BE USED SOLELY IN THOSE EXPLICIT TWO SCENARIOS GIVEN BY THE DUTY MANUAL; CORRECT?

A.   CORRECT.

Q.   OKAY.  AND IS THE FOAM BATON ROUND ALLOWED FOR -- EXCUSE ME, I THINK YOU JUST MENTIONED THE 37 MILLIMETER WAS ALLOWED

SER-0086

DWYER AS-ON DIRECT BY MR. JOHNSON

Q.   NO.  THAT'S FINE.

YOU WERE ALSO TESTIFYING ABOUT -- I THINK YOU GAVE A HYPOTHETICAL OF POLICE OFFICERS WERE TO RESPOND TO SOMEONE'S HOMES AFTER THEY HAD BEEN HIT WITH A WATER BOTTLE OR, AND I THINK YOU SAID THE PURPOSE OF THE USE OF A PROJECTILE IMPACT WEAPON LIKE THE 40 MILLIMETER IS TO PREVENT THAT PERSON TO INJURE ANOTHER INDIVIDUAL, EVEN IF IT IS WITH A WATER BOTTLE; IS THAT CORRECT?

A.   CAN YOU REPEAT THAT QUESTION, PLEASE.

Q.   THE PURPOSE OF USING THE PROJECTILE IMPACT WEAPON IS TO PREVENT THE INJURY?

A.   CORRECT.

Q.   ON MAY 30TH, 2020, BASED ON YOUR ROLE AS COMMANDER AND YOUR KNOWLEDGE AND EXPERIENCE, WOULD IT HAVE BEEN WITHIN POLICY FOR OFFICERS TO AIM THE 37 MILLIMETER PROJECTILE IMPACT WEAPONS, THE ONES THAT YOU TESTIFIED WERE TYPICALLY TRAINED TO BE SHOT INTO THE GROUND, WOULD THEY HAVE BEEN WITHIN POLICY FOR OFFICERS TO SHOOT DIRECTLY AT INDIVIDUALS?

A.   NO.

Q.   AND SIMILARLY, ON MAY 30TH, 2020, WOULD IT HAVE BEEN WITHIN POLICY FOR OFFICERS TO USE THE 40 MILLIMETER PROJECTILE IMPACT WEAPONS AT A SUSPECT WHO WAS NOT A THREAT OF VIOLENCE, WAS NOT IN THE PROCESS OF THROWING ANYTHING, BUT WHO ONLY FAILED TO OBEY A VERBAL ORDER TO DISPERSE, WOULD THAT HAVE BEEN WITHIN POLICY?

SER-0087

A.    NO.

Q.    OKAY.

NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  THANK YOU.  REDIRECT OR RECROSS FOR THIS WITNESS?

MR. JOHNSON:  NO.  THANK YOU, YOUR HONOR.

THE COURT:  AND MAY CAPTAIN DWYER BE EXCUSED?

MR. BASTIDA:  YES, SUBJECT TO RECALL, YOUR HONOR.

THE COURT:  ALL RIGHT.  CAPTAIN DWYER, THANK YOU FOR YOUR TESTIMONY.  YOU ARE EXCUSED NOW.  YOU ARE SUBJECT TO RECALL.

THE WITNESS:  THANK YOU, YOUR HONOR.

THE COURT:  MR. BASTIDA, YOUR NEXT WITNESS?

MR. BASTIDA:  YES.  SERGEANT PALMER UNDER FEDERAL RULE EVIDENCE 611(C)(2).

THE COURT:  LADIES AND GENTLEMEN, WHEN YOU HEAR MR. BASTIDA MAKE THAT REQUEST ABOUT THE WITNESS AND HE GIVES SOME RULE.  LET ME JUST TELL YOU, WHEN A LAWYER CALLS A WITNESS WHO MIGHT BE ASSOCIATED WITH THE OTHER SIDE, THEY'RE ALLOWED TO ASK THEM A DIFFERENT KIND OF QUESTION BECAUSE IT'S A WITNESS ADVERSE TO THEIR CASE.

SO I'M JUST APPROVING IT AND THEN WE DON'T HAVE OBJECTIONS TO THE QUESTIONS ON THAT BASIS.

SO I JUST -- I KNOW IT SOUNDS CONFUSING, AND YOU MAY WONDER WHAT WE'RE DOING, BUT IT'S JUST A NORMAL PART OF CASES.

AT THE BEGINNING THERE?

A.   HERE WE'RE FACING IT APPEARS SOUTHBOUND TOWARDS CITY HALL.

Q.   AND CORRECT ME IF I MISHEARD YOU.   YOU SAID ST. JAMES IS NORTH OF YOUR LOCATION?

A.   YES.

Q.   AND SO WOULD IT BE FAIR TO SAY THAT IF THE CROWD THAT IS COMING SOUTH TOWARDS CITY HALL, THEY'RE COMING TOWARDS THE BACK OF THE SKIRMISH LINE?

A.   CORRECT.

Q.   OKAY.   DO YOU RECALL EITHER INDEPENDENTLY OR HAVING WATCHED THIS VIDEO, THE ATMOSPHERE OF THE CROWD THERE AT CITY HALL PLAZA CHANGING WHILE THESE NEWER PEOPLE ARE SHOWING UP?

A.   I KNOW BASED OFF OF THIS VIDEO YOU COULD HEAR MORE AGITATED PEOPLE, PEOPLE USING CURSE WORDS AND FOUL LANGUAGE TOWARDS THE OFFICERS AS THEY'RE WALKING BY, AND I DO RECALL IT GETTING A LITTLE BIT MORE LOUD AS THE MORE PEOPLE GOT THERE.

Q.   CAN WE FAST FORWARD TO 22:16:52.   I'D LIKE TO PLAY UNTIL ABOUT 22:17:07.

     (VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   UP UNTIL THIS POINT YOU WOULD AGREE THAT THE CROWD WAS STILL PRIMARILY PEACEFUL AT THIS POINT?

A.   YES.

Q.   AND TO WHAT EXTENT DO YOU RECALL, OR DO YOU SEE IN THIS VIDEO ANY SORT OF CONCERN GROWING?

SER-0089

Q.   CAN WE PLEASE GO TO 22:18:40, AND I'D LIKE TO PLAY TO 22:19:24.

BEFORE WE PLAY THAT, DO YOU RECALL TO WHAT EXTENT, IF ANY, THE OFFICERS ON THE SKIRMISH LINE WERE ENGAGED IN ANY SORT OF CONVERSATIONS OR DIALOGUE WITH THE PROTESTORS?

A.   I DON'T REMEMBER OFF OF THE TOP OF MY HEAD, NO.

Q.   GO AHEAD AND PLAY.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   AT THIS POINT IN THE VIDEO, WE'RE AT APPROXIMATELY 10:19 P.M.; IS THAT CORRECT?

A.   CORRECT.

Q.   AND HOW WOULD YOU DESCRIBE THE INTERACTIONS BETWEEN OFFICERS AND MEMBERS OF THE PROTEST, AT LEAST AT THIS MOMENT 22:19?

A.   PEACEFUL, CORDIAL, FRIENDLY ALMOST.

Q.   CAN WE JUMP FORWARD TO 22:21:15.  AND I'D LIKE TO PLAY TO 22:22:15.

(VIDEO PLAYING OFF THE RECORD.)

BY MR. SYMPSON:

Q.   HOW WOULD YOU DESCRIBE THE INTERACTIONS BETWEEN THE PROTESTORS AND OFFICERS SHOWN IN THAT PORTION OF THE VIDEO?

A.   VERY CORDIAL.

Q.   AND THAT'S AGAIN, AT ABOUT 10:22 P.M.?

A.   CORRECT, PER THE TIME STAMP.

SER-0090

Q.   OKAY.  AT THIS POINT WE'VE SEEN VIDEOS STARTING AT AROUND ROUGHLY 9:45 P.M. AND NOW WE'RE UP TO 10:22 P.M.

BASED UPON YOUR RECOLLECTION OF WHAT YOU'VE SEEN SO FAR, DO YOU SEE OR RECALL ANY OFFICERS USING ANY LESS-LETHAL PROJECTILE IMPACT WEAPONS ON THE CROWD THUS FAR?

A.   NOT TO MY RECOLLECTION OR BASED ON WHAT I'VE SEEN THUS FAR, NO.

Q.   AND, IN FACT, AT LEAST WITHIN THESE PAST FEW MINUTES IT LOOKS LIKE IT'S A RELATIVELY CORDIAL ATMOSPHERE?

A.   THAT'S CORRECT.

Q.   AND DO YOU RECALL IF THE ATMOSPHERE STAYED THAT WAY AS YOU STAYED AT THE LOCATION?

A.   I DON'T BELIEVE IT DID.  I THINK IT -- JUST BASED ON MY RECOLLECTION, I KNOW WE DID HAVE TO GO PUSH A CROWD THROUGH CITY HALL, WHICH I DON'T THINK WOULD HAVE BEEN ASKED TO DO HAD IT BEEN REMAINING THAT WAY.

Q.   COULD WE FAST FORWARD TO 22:24:00, AND I'D LIKE TO PLAY IT TO 22:24:50.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  PLAY JUST A COUPLE MORE SECONDS.

(VIDEO PLAYING OFF THE RECORD.)

MR. SYMPSON:  THAT'S FINE.  THANK YOU.

Q.   AND YOU SAW WHAT WAS DEPICTED IN THIS LAST PORTION?

A.   YES.

Q.   AND THIS IS APPROXIMATELY 10:24 P.M., SO ABOUT I DON'T

SER-0091

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED:  JANUARY 13, 2025

SER-0092

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON, AN INDIVIDUAL,

      PLAINTIFF,           CASE NO.  CV-21-01849 BLF

   VS.                  SAN JOSE, CALIFORNIA

CITY OF SAN JOSE, A CALIFORNIA   JANUARY 14, 2025
CHARTER CITY; SAN JOSE POLICE
DEPARTMENT OFFICER JAMES ADGAR,   VOLUME 7
BADGE NO. 4552, AN INDIVIDUAL;
DOES 2 THROUGH 50,          PAGES 1196 - 1344

      DEFENDANTS.


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S

  FOR THE PLAINTIFF:   MCMANIS FAULKNER
                    BY:  ABIMAEL BASTIDA
                      MATTHEW SCHECHTER
                  10TH FLOOR
                  50 WEST SAN FERNANDO STREET
                  SAN JOSE, CALIFORNIA 95113


         (APPEARANCES CONTINUED ON THE NEXT PAGE.)


  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

SER-0093

A P P E A R A N C E S: (CONT'D)


FOR THE DEFENDANTS:          OFFICE OF THE CITY ATTORNEY
                             BY:  ARDELL JOHNSON
                                  JAMES HUANG
                                  NICHOLAS SYMPSON
                             16TH FLOOR
                             200 EAST SANTA CLARA STREET
                             SAN JOSE, CALIFORNIA 95113


ALSO PRESENT:                MCMANIS FAULKNER
                             BY:  GALENSTEIN DANG, PARALEGAL
                             10TH FLOOR
                             50 WEST SAN FERNANDO STREET
                             SAN JOSE, CALIFORNIA 95113

SER-0094

Q.   WHAT, IF ANYTHING, DO YOU RECALL WAS DISCUSSED AT THAT BRIEFING ON THE 30TH?

A.   SO I ATTENDED OVER THE COURSE OF THE WEEK MULTIPLE OF THESE, BUT SPECIFICALLY ON THE 30TH.  I KNOW THERE WAS CAPTAINS AND LIEUTENANTS.  I SPECIFICALLY REMEMBER ONE LIEUTENANT WHO WAS THERE EVERY DAY GOING OVER -- TO THE OFFICERS, THEY WENT OVER THE GENERAL OUTLINE OF HOW THEIR VIEW OF RESPONSE WOULD BE TO THE POSSIBILITY OF A PROTEST, AND LIKELIHOOD OF A PROTEST WITHIN DOWNTOWN.

Q.   OKAY.  AND ANY DISCUSSION OF WHAT HAD OCCURRED THE DAY BEFORE ON THE 29TH?

A.   BASED ON MY RECOLLECTION OF THAT BRIEFING IT WAS VERY MINOR, GOING OVER SOME OF THE KEY DETAILS OF MAJOR INCIDENTS THAT HAD HAPPENED, AND JUST THAT DUE TO THE COORDINATED RESPONSE ON THIS DAY, NOW THE SECOND DAY OF THE PROTEST, AND THE RESOURCES THAT WERE ALREADY AVAILABLE, THAT NOT -- IN THEIR MIND THEY WERE NOT GOING TO LET WHAT HAPPENED ON THE 29TH HAPPEN AGAIN ON THE 30TH.

Q.   AND ARE YOU SUGGESTING IT WAS MORE OF A BETTER COORDINATED RESPONSE ON THE 30TH THAN THE 29TH?

A.   YES.

Q.   OKAY.  DO YOU -- IF YOU RECALL, DO YOU RECALL ANY SORT OF DISCUSSION ABOUT THE USE OF FORCE POLICY ON THE 30TH DURING THAT BRIEFING?

A.   I REMEMBER BITS AND PIECES OF THAT BRIEFING.  I KNOW THE

SER-0095

A.   YES, IT CAN PRODUCE GREAT BODILY INJURY.

Q.   OKAY.  BUT I JUST WANT TO MAKE SURE WE'RE CLEAR.

MY QUESTION IS THE FACT THAT IT CAN PRODUCE GREAT BODILY INJURY, THAT IT IS PART OF THE ASSESSMENT TOWARDS THE OBJECTIVELY REASONABLENESS REQUIREMENT THAT YOU ARE TRYING TO EXERCISE IN USING THAT WEAPON; CORRECT?

A.   IT'S SOMETHING THAT WE CONSIDER WITH ANY WEAPON WE USE.

Q.   OKAY.

A.   SO YES.

Q.   OKAY.  AT THE TIME OF THE PROTESTS, YOU WERE FAMILIAR WITH THE DUTY MANUAL IN PLACE AT THAT TIME?

A.   YES.

Q.   AND SPECIFICALLY YOU WERE FAMILIAR WITH THE L2629, WHICH IS THE WRITTEN POLICY WITH RESPECT TO THE 40 MILLIMETER PROJECTILE WEAPONS; CORRECT?

A.   YES.

Q.   AND YOU UNDERSTOOD THAT THE DUTY MANUAL PROVIDED FOR TWO SPECIFIC INSTANCES WHERE THAT WEAPON -- WHEN THAT WEAPON CAN BE USED?

A.   YES.

Q.   AND THE FIRST ONE IS TO INCAPACITATE A SUSPECT ARMED WITH A WEAPON LIKELY TO CAUSE SERIOUS BODILY INJURY OR DEATH UNTIL THE SUSPECT CAN BE CONTROLLED AND SAFELY TAKEN INTO CUSTODY; CORRECT?

A.   THAT SOUNDS CORRECT, YES.

SER-0096

Q.   AND THE SECOND SCENARIO IS WHEN OBJECTIVELY REASONABLE WHERE IT IS LIKELY TO PREVENT ANY PERSON FROM BEING SERIOUSLY INJURED; IS THAT CORRECT?

A.   YES.

Q.   SO ON MAY 30TH, 2020, WAS IT -- IT WAS YOUR UNDERSTANDING THAT BASED ON THIS POLICY AS A POLICE OFFICER, YOU WERE NOT SUPPOSED TO SHOOT SOMEONE WITH YOUR 40 MILLIMETER LAUNCHER, PROJECTILE IMPACT WEAPON, UNLESS THAT PERSON IS ACTUALLY THREATENING YOU OR SOMEONE ELSE WITH GREAT BODILY INJURY; IS THAT RIGHT?

A.   YES.

Q.   AND ISN'T IT TRUE THAT IF THE ONLY FACT THAT YOU HAVE TO ASSESS WHAT LEVEL OF FORCE TO USE IS THAT PEOPLE ARE NOT DISPERSING PURSUANT TO A DISPERSAL ORDER, THAT THAT BY ITSELF IS NOT ENOUGH TO JUSTIFY SHOOTING ANY OF THOSE INDIVIDUALS WITH THE 40 MILLIMETER PROJECTILE IMPACT WEAPON?

A.   JUST TO BE CLEAR, JUST THE DISPERSAL ORDER AMONG -- WITH PEOPLE IN THE CROWD?

Q.   RIGHT.  THE FACT THAT PEOPLE ARE NOT OBEYING THE DISPERSAL ORDER.

A.   YEAH, THAT IS NOT A REASON I WOULD FIRE MY LESS-LETHAL PROJECTILE.

Q.   THAT WOULD BE AGAINST THE POLICY; CORRECT?

A.   THE WAY I INTERPRET THE POLICY, YES, THAT'S NOT A REASON FOR ME TO USE A 40 MILL.

SER-0097

THE COURT:  WELL, LET HIM LOOK AT IT.

MR. BASTIDA:  YEAH.  DO YOU WANT TO SCROLL THROUGH.

THE WITNESS:  YES.

MR. BASTIDA:  THANK YOU.

YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. SYMPSON:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 65 WAS RECEIVED IN EVIDENCE.)

MR. BASTIDA:  THANK YOU.  AND THAT IT MAY BE PUBLISHED?

THE COURT:  YES.

MR. BASTIDA:  IF YOU COULD GO TO THE SECOND PAGE OF THE DOCUMENT, PLEASE.

I'M JUST WAITING FOR IT TO BE PUBLISHED.

(PAUSE IN PROCEEDINGS.)

BY MR. BASTIDA:

Q.   DO YOU SEE THE DOCUMENT IN FRONT OF YOU, OFFICER?

A.   YES.

Q.   AND I'LL CALL YOUR ATTENTION TO THE SIXTH BULLET POINT ON THIS PAGE.

IT'S TRUE THAT YOU WERE TRAINED AT ALL TIMES WITH RESPECT TO THE 40 MILLIMETER TO BE SURE OF YOUR TARGET, BACKSTOP, AND BEYOND; CORRECT?

SER-0098

A.   YES.

Q.   AND THAT WAS THE CASE ON MAY 30TH, 2020?

A.   YES.

Q.   OKAY.  THANK YOU.

CAN WE GO TO PAGE 4, PLEASE.

YOU TESTIFIED EARLIER WITH RESPECT TO APPROVED -- OR I DON'T WANT TO PUT WORDS IN YOUR MOUTH.  I THINK YOU SAID THAT THERE ARE THREE CATEGORIES OF BODY PARTS, THE ONES YOU SHOULD NOT HIT, THE ONES THAT YOU CAN HIT IF THERE'S NO BETTER OPTION ESSENTIALLY, AND THEN THE PREFERRED AREAS.

IS THAT A FAIR SUMMARY OF YOUR TESTIMONY?

A.   YES.

Q.   OKAY.  IS THIS, WHAT WE ARE SEEING HERE ON THIS PAGE, ARE THESE THE BODY PARTS THAT YOU TESTIFIED TO EARLIER?

A.   YES.  THE RED WOULD BE WHERE I WAS INDICATING IS THE AREAS TO AVOID; THE YELLOW WOULD BE IF THERE'S NO OTHER BETTER OPTION; AND THE GREEN IS THE APPROVED ZONE.  THAT'S WHAT I RECEIVED WHEN I INITIALLY TOOK THE TRAINING.

Q.   THANK YOU.  AND THAT WAS YOUR UNDERSTANDING ON MAY 30TH, 2020, WITH RESPECT TO WHAT THE POLICY AND TRAINING IS WITH RESPECT TO THE BODY PARTS THAT SHOULD BE TARGETED WITH THE 40 MILLIMETER?

A.   I DON'T KNOW IF THIS IS THE EXACT IMAGE I WAS TRAINED ON JUST PRIOR TO, BUT IT'S A VERY CLOSE REPRESENTATION OF IT, YES.

Q.   THANK YOU.  YOU'RE TRAINED THAT PARTICULARLY WITH RESPECT

SER-0099

ADGAR CROSS BY MR. BASTIDA

TO THE HEAD, THAT IT IS PARTICULARLY DANGEROUS BECAUSE IT COULD VERY WELL LEAD TO DEATH IF SOMEONE IS HIT IN THE HEAD WITH THE 40 MILLIMETER; CORRECT?

A.   YES, THE HEAD IS A VERY DANGEROUS PLACE TO STRIKE WITH THE 40 MILLIMETER.

Q.   YOU CAN TAKE THAT DOWN.  THANK YOU.

DURING YOUR TRAINING WITH RESPECT TO THE PROJECTILE IMPACT WEAPONS, THE 40 MILLIMETER, ISN'T IT TRUE THAT YOU WERE TRAINED THAT YOU SHOULD NOT SHOOT INTO A CROWD WITH THIS TYPE OF WEAPON UNLESS YOU AS AN OFFICER CAN ACTUALLY AIM AT THE PERSON WHO IS POSING A THREAT?

A.   YES.

Q.   AND THE RECOMMENDED DISTANCE FOR THE 40 MILLIMETER IS 5 TO 75 FEET; CORRECT?

A.   IT'S --

Q.   BASED ON -- LET ME ADD TO THAT.

BASED ON YOUR TRAINING AND YOUR UNDERSTANDING WITH RESPECT TO THAT TOOL, THAT WEAPON, THE RECOMMENDED DISTANCE TO FIRE THAT WEAPON IS 5 TO 75 FEET; CORRECT?

A.   BASED ON WHAT I REMEMBER, THAT WOULD BE MORE WHERE I WOULD FEEL COMFORTABLE AND I BELIEVE THAT IS WITHIN OUR POLICY GUIDELINES ON THE USE OF THE LAUNCHER, YES.

Q.   OKAY.  WITH RESPECT TO THE USE OF THIS WEAPON, SPECIFICALLY WHEN IT INVOLVES CROWDS, YOU WERE TRAINED THAT SPECIFICALLY A 40 MILLIMETER CANNOT BE USED FOR CROWD CONTROL;

SER-0100

REPRESENTATION OF YOU AT THAT TIME?

A.   YES.

MR. BASTIDA:  YOUR HONOR, I WOULD ASK THAT THIS EXHIBIT BE ADMITTED INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. SYMPSON:  NO, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 88 WAS RECEIVED IN EVIDENCE.)

MR. BASTIDA:  AND I ASK THAT IT BE PUBLISHED.

THE COURT:  SURE.

BY MR. BASTIDA:

Q.   OFFICER ADGAR, ARE YOU HOLDING THE 40 MILLIMETER PROJECTILE IMPACT WEAPON IN THIS PICTURE?

A.   YES.

Q.   AND IS THAT IT ON YOUR RIGHT HAND?

A.   YES.

Q.   THANK YOU.  WE CAN TAKE THAT DOWN.

YOU ALSO FIRED YOUR 40 MILLIMETER PROJECTILE IMPACT WEAPON ON MAY 30TH; CORRECT?

A.   YES.

Q.   AND PURSUANT TO POLICY AND TRAINING YOU WROTE A USE OF FORCE REPORT DETAILING THOSE EVENTS; CORRECT?

A.   YES.

Q.   OKAY.  AND AT THE TIME, LIKE I SUSPECT ANY TIME, YOU UNDERSTOOD THE IMPORTANCE OF BEING ACCURATE IN YOUR REPORT?

A.   YES.

Q.   BEING TRUTHFUL IN YOUR REPORT?

A.   YES.

Q.   OKAY.  AND YOU WROTE THE REPORT, I BELIEVE YOU SAID IT WAS EITHER AT THE END OF YOUR SHIFT ON THE 30TH, OR YOU CAME IN EARLIER THE NEXT DAY; RIGHT?

A.   CORRECT.

Q.   BUT THE POINT IS THAT THE EVENTS WERE FRESH IN YOUR MIND WHEN YOU WROTE THE REPORT?

A.   YES.

Q.   OKAY.  IN YOUR REPORT YOU IDENTIFY A -- TWO SUBJECTS WHO WERE WEARING BLACK CLOTHING AND WERE WEARING BACKPACKS.

     BUT THEN ISN'T IT TRUE THAT YOU LOST VISIBILITY OF THEM?

A.   I BELIEVE SO, YES.

Q.   OKAY.  AND THAT WAS AFTER THEY WENT BEHIND A WALL; IS THAT CORRECT?

A.   YES.

Q.   AND IN YOUR REPORT YOU ALSO REFERENCE A GREEN BEER BOTTLE.  DO YOU SPECIFICALLY RECALL SEEING THE COLOR GREEN THAT NIGHT?

A.   YES.

Q.   OKAY.  OKAY.  AND YOU WRITE IN YOUR REPORT, "FROM THE ELEVATED LEDGE I SAW A GREEN BEER BOTTLE THROWN FROM BEHIND THE WALL SOUTH OF OUR LOCATION WHERE I HAD SEEN THE SUBJECTS CLIMB UP EARLIER.  IMMEDIATELY AFTER THE GLASS BOTTLE WAS THROWN, I SAW THE SUSPECTS FLEEING FROM THE ELEVATED LEDGE ATTEMPTING TO

SER-0102

HIDE IN THE CROWD THAT WAS RUNNING EASTBOUND THROUGH

CITY HALL."

ISN'T IT TRUE THAT YOU DID NOT PERSONALLY SEE THE SUSPECTS THROW THAT BOTTLE?

A.   YES, THE WALL WAS BLOCKING ME.

Q.   BUT YOU SAW WHAT YOU BELIEVED TO BE THOSE SUSPECTS RUNNING AWAY; IS THAT CORRECT?

A.   YES.

Q.   YOU THEN WRITE IN YOUR REPORT, "I FIRED ONE 40 MILLIMETER FOAM BATON LESS-LETHAL PROJECTILE TOWARDS THE SUSPECT THAT HAD THE BEER BOTTLE IN HIS HAND EARLIER AS HE ATTEMPTED TO FLEE."

A.   YES.

Q.   BUT ISN'T IT TRUE THAT AT THE MOMENT THAT YOU FIRED YOUR 40 MILLIMETER, YOU DID NOT SEE THE SUSPECT WITH ANY BEER IN HIS HAND, ANY BEER BOTTLE IN HIS HAND?  THAT'S CORRECT?

A.   AT THE TIME WHEN I WAS WRITING THAT, YEAH.

Q.   OKAY.  AND YOU DIDN'T SEE THIS SUSPECT THROW THE BOTTLE?

A.   THE BOTTLE I MENTIONED BEFORE?  NO.

Q.   OKAY.  YOU ALSO DID NOT GIVE A WARNING BEFORE FIRING THIS SHOT?

A.   NO.

Q.   AND YOU GO ON TO SAY IN YOUR REPORT, "I SAW A MALE ADULT WEARING ALL BLACK CLOTHING THROW A GLASS BOTTLE TOWARDS OFFICERS FROM INSIDE THE CROWD.  I FIRED TWO 40 MILLIMETER FOAM BATON LESS-LETHAL PROJECTILES TOWARDS THE SUSPECT."

SER-0103

MR. SYMPSON:  NO OBJECTION, YOUR HONOR.

THE COURT:  IT WILL BE ADMITTED.

(PLAINTIFF'S EXHIBIT 440 WAS RECEIVED IN EVIDENCE.)

MR. SCHECHTER:  YOUR HONOR, MAY I PUBLISH TO THE JURY?

THE COURT:  WHY DON'T YOU USE THE ELMO.  WE'RE NOT GOING TO PASS IT AROUND.  IT'S SO OLD SCHOOL, YOU'VE FORGOTTEN HOW TO USE IT.

MR. SCHECHTER:  THERE WE GO.  THANK YOU.

Q.   MR. JOHNSON, THAT'S THE CIRCLE THERE, RIGHT THERE ON THE LEFT SIDE OF THE PHOTO?

A.   YES, THAT IS CORRECT.

Q.   AND THAT'S YOUR INITIALS UNDERNEATH?

A.   YES, THAT IS CORRECT.

Q.   THANK YOU.

THE CLERK:  YOU CAN JUST LEAVE IT UP.

MR. SCHECHTER:  AND, MR. DANG, IF WE CAN TAKE THIS DOWN AND NOW BRING UP EXHIBIT 112C AND GO INTO TIME STAMP 22:33:13.

MR. DANG:  PLAY?

MR. SCHECHTER:  WELL, ARE YOU AT 22:33:13?

Q.   MR. JOHNSON, LET ME ASK, LOOKING AT THAT STILL ON YOUR SCREEN, CAN YOU SEE YOURSELF ON THAT IMAGE?

A.   NO, NOT YET.

Q.   IF WE COULD MAYBE MOVE IT FORWARD FRAME BY FRAME.

SER-0104

(VIDEO PLAYING OFF THE RECORD.)

MR. SCHECHTER:  STOP THERE.

Q.   CAN YOU SEE YOURSELF AT THIS POINT?

A.   YES, I CAN.

Q.   AND CAN YOU IDENTIFY -- FIRST OF ALL, HOW CAN YOU IDENTIFY YOURSELF?

A.   AS I EXPLAINED IN MY EARLIER TESTIMONY LAST WEEK, I TALKED ABOUT COVERING MY HEAD AS I WAS WALKING AWAY FROM THE SKIRMISH LINE AS THEY DESCRIBED, THE POLICE OFFICERS, AND I CAN SEE MYSELF WITH MY HANDS OVER MY HEAD.

Q.   AND WHERE ARE -- WHERE DO YOU SEE YOURSELF, LOOKING AT THAT SCREENSHOT?

A.   IF YOU CAN SEE THE GENTLEMAN IN THE GREY SWEATER, TO HIS LEFT OR BEHIND HIM IS A PLANTER.  PERFECT.

AND THEN IF YOU WERE TO GO DIRECT -- DIAGONALLY TO THAT PLANTER, THERE'S A GENTLEMAN OVER HERE WHERE THE CURSOR IS AND THERE'S A GENTLEMAN OVER HERE WITH HIS HANDS OVER HIS HEAD, AND THAT'S ME (INDICATING).

Q.   YOU CAN TAKE THAT DOWN.  THANK YOU.

MR. JOHNSON, FOCUSSING ON THE MOMENTS JUST BEFORE YOU WERE STRUCK WITH THE 40 MILLIMETER PROJECTILE IMPACT WEAPON.

A.   OKAY.

Q.   AT THE TIME THAT YOU WERE STILL FACING THE OFFICERS?

A.   OKAY.

Q.   RIGHT IN THAT MOMENT, IN THE MOMENTS BEFORE YOU STARTED TO

SER-0105

TURN AROUND, SO FACING THE OFFICERS, AT THAT POINT IN TIME, DID YOU SEE ANYONE NEXT TO YOU MAKE ANY SORT OF THROWING MOTION?

A.   NO, I DID NOT.

Q.   AGAIN, IN THAT SAME POINT IN TIME, DID YOU SEE ANYONE IN YOUR IMMEDIATE VICINITY MAKE ANY SORT OF THROWING MOTION?

A.   NO, I DID NOT.

MR. SYMPSON:   OBJECTION.   OUTSIDE OF THE SCOPE OF REBUTTAL TESTIMONY.   CALLS FOR SPECULATION.

THE COURT:   WELL, IT DOESN'T CALL FOR SPECULATION. THE OBJECTION IS OVERRULED.

BY MR. SCHECHTER:

Q.   MR. JOHNSON, NOW AGAIN, AS YOU WERE STARTING TO TURN AROUND -- I BELIEVE YOU INDICATED YOU TURNED AROUND AT ONE POINT; IS THAT FAIR?

A.   YES, THAT'S CORRECT.

Q.   AS YOU TURNED AROUND, DID YOU SEE ANYBODY NEXT TO YOU MAKE A THROWING MOTION?

A.   NO, I DID NOT.

Q.   DID YOU SEE ANYONE IN YOUR VICINITY MAKE A THROWING MOTION?

A.   NO, I DID NOT.

Q.   ONCE YOUR BACK WAS TO THE OFFICERS AND YOU'RE NOW STARTING TO WALK AWAY, SO RIGHT BASICALLY AS YOU'RE ABOUT TO BE HIT, AGAIN, DID YOU SEE ANYONE NEXT TO YOU MAKE A THROWING MOTION?

A.   NO, I DID NOT.

SER-0106

MR. SYMPSON: OBJECTION. LACK OF FOUNDATION. CALLS FOR SPECULATION.

THE COURT: OVERRULED.

BY MR. SCHECHTER:

Q. WHAT WAS THE ANSWER TO THAT QUESTION, MR. JOHNSON?

A. NO, I DID NOT.

Q. DID YOU SEE ANYONE IN YOUR IMMEDIATE VICINITY MAKE ANY SORT OF THROWING MOTION, AGAIN ONCE YOUR BACK TOWARDS THE OFFICERS?

A. NO, I DID NOT.

Q. DURING THE TIME PERIOD THAT YOU WERE AT CITY HALL PLAZA, SO FROM THE MOMENT YOU ARRIVED UNTIL THE MOMENT THAT YOU WERE STRUCK, DID YOU YOURSELF OBSERVE ANYONE THROWING ANY GLASS BOTTLES?

A. NO, I DID NOT.

Q. DID YOU OBSERVE ANYONE THROWING ANY DEBRIS?

A. NO.

MR. SCHECHTER: NOTHING FURTHER, YOUR HONOR.

THE COURT: THANK YOU. MAY MR. JOHNSON STEP DOWN?

MR. SCHECHTER: YES, YOUR HONOR. THANK YOU.

THE COURT: LADIES AND GENTLEMEN, THE REASON THAT THE DEFENSE ISN'T ASKING ANY QUESTIONS IS BECAUSE THEY USED THEIR TIME ELSEWHERE.

MR. JOHNSON, YOU MAY STEP DOWN. THANK YOU.

THE WITNESS: YES, YOUR HONOR.

SER-0107

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  JANUARY 14, 2025

SER-0108



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KYLE JOHNSON,

         Plaintiff,

    v.

CITY OF SAN JOSE, et al.,

         Defendants.

Case No.  5:21-cv-01849-BLF

**JURY INSTRUCTIONS**

**IT IS SO ORDERED.**

Dated: January 15, 2025

BETH LABSON FREEMAN
United States District Judge

SER-0109

Instruction No. 1

Duty of Jury

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be sent to the jury room for you to consult during your deliberations. It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

1

SER-0110

Instruction No. 3

Burden of Proof

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

4

Instruction No. 32

Particular Rights—Fourth Amendment—Unreasonable

Seizure of Person—Generally

As previously explained, plaintiff, Kyle Johnson, has the burden of proving that the acts of defendants, James Adgar and the City of San Jose, deprived plaintiff of particular rights under the United States Constitution.  In this case, plaintiff alleges defendants deprived him of his rights under the Fourth Amendment to the Constitution when plaintiff was struck by a 40 mm projectile and incapacitated, even for a short period of time.

Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of his person.  In order to prove defendants deprived plaintiff of this Fourth Amendment right, plaintiff must prove the following additional elements by a preponderance of the evidence:

1.  James Adgar seized the plaintiff's person;

2.  in seizing plaintiff's person, James Adgar acted intentionally; and

3.  the seizure was unreasonable.

A defendant "seizes" the plaintiff's person when he restrains the plaintiff's liberty through coercion, physical force or a show of authority.  A person's liberty is restrained when, under all of the circumstances, a reasonable person would not have felt free to ignore the presence of law enforcement officers and to go about his business.

In determining whether a reasonable person in plaintiff's position would have felt free to leave, consider all of the circumstances, including:

1.  the number of officers present;

2.  whether weapons were displayed;

3.  whether the encounter occurred in a public or nonpublic setting;

4.  whether the officer's manner would imply that compliance would be compelled; and

5.  whether the officers advised the plaintiff that he was free to leave.

33

A person acts "intentionally" when the person acts with a conscious objective to engage in particular conduct. Therefore, plaintiff must prove that James Adgar intended to fire his 40 mm projectile indiscriminately into the crowd. It is not enough to prove that James Adgar negligently or accidentally engaged in that action. But while plaintiff must prove that defendant intended to act; plaintiff need not prove that defendant intended to violate plaintiff's Fourth Amendment rights.

34

SER-0113

Instruction No. 33

Particular Rights—Fourth Amendment—Unreasonable

Seizure of Person—Excessive Force

In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in defending himself or others. Therefore, to establish an unreasonable seizure in this case, plaintiff, Kyle Johnson, must prove by a preponderance of the evidence that the officer used excessive force.

Under the Fourth Amendment, a police officer may use only such force as is "objectively reasonable" under all of the circumstances. You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight. Although the facts known to the officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to your inquiry.

In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officer on the scene, including:

(1)   the nature of the crime or other circumstances known to the officer[s] at the time force was applied;

(2)   whether there was an immediate threat to the safety of the officer or to others;

(3)   the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;

(4)   the relationship between the need for the use of force and the amount of force used;

(5)   the extent of plaintiff's injury;

(6)   any effort made by the officer to temper or to limit the amount of force;

(7)   whether it was practical for the officer to give warning of the imminent use of force, and whether such warning was given; and

(8)   whether a reasonable officer would have or should have accurately perceived a mistaken fact.

35

SER-0114

JAMES McMANIS (40958)
ABIMAEL BASTIDA (303355)
EVAN MILLER (336473)
TIANQI SUN (341044)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244
Email:        abastida@mcmanislaw.com

Attorneys for Plaintiff,
KYLE JOHNSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Kyle Johnson, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of San Jose, a California charter city; San Jose Police Department Officer James Adgar, Badge No. 4552, an individual; Does 2 through 50,<br><br>Defendants. | Case No. 5:21-cv-01849-BLF<br><br>**PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 21, 2023<br>Time: 9:00 a.m.<br>Dept: Courtroom 3 - 5th Floor<br>Judge: Hon. Beth L. Freeman<br><br>Trial Date: February 26, 2024 |

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; CASE NO. 5:21-CV-01849-BLF

SER-0115

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................8

STATEMENT OF FACTS ...................................................................................9

    I.     CITY-WIDE PROTESTS TAKE OVER THE CITY ON
          MAY 29, 2020. .................................................................................9

    II.    THE CITY RESPONDS WITH INDISCRIMINATE, EXCESSIVE
         FORCE..............................................................................................9

         A.    SJPD Officers Were Not Trained To Use PIWs In Crowd
              Control Settings. ......................................................................10

         B.    SJPD Failed To Supervise Or Discipline Its Officers For
              Their Unconstitutional Conduct, Such as Excessive Force or
              Free Speech Retaliation ...........................................................11

    III.   THE NEXT DAY PLAINTIFF ATTENDS THE PROTESTS AND
         IS MET WITH THE SAME POLICE BRUTALITY HE WAS
         PROTESTING AGAINST.................................................................12

LEGAL STANDARD...........................................................................................13

ARGUMENT........................................................................................................14

    I.     TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON
         PLAINTIFF'S EXCESSIVE FORCE CLAIM AGAINST
         OFFICER ADGAR. .........................................................................14

         A.    The Evidence Shows Officer Adgar Fired A Projectile
              Without Warning That Struck Plaintiff From Behind. .........14

         B.    Officer Adgar Possessed The Requisite Intent To Restrain
              To Constitute A Fourth Amendment Seizure. ......................17

         C.    Qualified Immunity Does Not Apply Here Because Officer
              Adgar's Conduct Violated Plaintiff's Clearly Established
              Rights. ......................................................................................19

    II.    GENUINE DISPUTES OF MATERIAL FACT PRECLUDE
         SUMMARY JUDGMENT ON PLAINTIFF'S FIRST
         AMENDMENT RETALIATION CLAIM. .....................................20

    III.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE
         SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM
         AGAINST THE CITY. .....................................................................23

SER-0116

A.   The City Has Failed To Meet Its Burden To Demonstrate A Lack Of Genuine Disputes Of Material Fact. ......................................23

B.   The Evidence Demonstrates The SJPD's Custom And Practice Of Excessive Force Toward People Peacefully Protesting Police Violence. ....................................................24

C.   There Are Triable Issues For Plaintiff's Policy Of Inaction *Monell* Theories. ........................................................27

1.   Evidence Shows The SJPD Failed To Supervise Its Officers' Conduct And Use Of Projectile Impact Weapons. ...............................................27

2.   The SJPD Failed To Train Its Officers In The Use Of Projectile Impact Weapons In Crowd Control Circumstances. ..........................................30

D.   The SJPD's Department-Wide Protest Response And Subsequent Acts Support The Inference Of Ratification. .....................31

IV.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS. ...................................................32

CONCLUSION.....................................................................32

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0117

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Ambat v. City & Cnty. of San Francisco*
 757 F.3d 1017 (9th Cir. 2014) ............................................................................. 13

*Anderson v. Liberty Lobby, Inc.*
 477 U.S. 242 (1986) ............................................................................... 13, 14, 17

*Anti Police-Terror Project v. City of Oakland*
 477 F. Supp. 3d 1066 (N.D. Cal. 2020) ................................................................ 22

*Avina v. United States*
 681 F.3d 1127 (9th Cir. 2012) ............................................................................. 14

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*
 466 F. Supp. 3d 1206 (W.D. Wash. 2020) ........................................................... 22

*Block v. City of Los Angeles*
 253 F.3d 410 (9th Cir. 2001) ............................................................................... 14

*Breathe v. City of Detroit*
 484 F. Supp. 3d 511 (E.D. Mich. 2020) ............................................................... 22

*Brendlin v. California*
 551 U.S. 249 (2007) ........................................................................................... 18

*Brown v. Ransweiler*
 171 Cal.App.4th 516 (Cal. Ct. App. 2009) .......................................................... 32

*Brown v. State of La.*
 383 U.S. 131 (1966) ........................................................................................... 21

*Castro v. Cnty. of Los Angeles*
 833 F.3d 1060 (9th Cir. 2016) ............................................................................. 27

*Celotex Corp. v. Catrett*
 477 U.S. 317 (1986) ........................................................................................... 14

*City of Canton v. Harris*
 489 U.S. 378 (1989) ........................................................................................... 30

*City of Houston v. Hill*
 482 U.S. 451 (1987) ........................................................................................... 20

*City of St. Louis v. Praprotnik*
 485 U.S. 112 (1988) ................................................................................. 23, 27, 29

*Collins v. Jordan*
 110 F.3d 1363 (9th Cir. 1996) ............................................................................. 20

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0118

*Connick v. Thompson*
    563 U.S. 51 (2011) ................................................................................................. 30

*Davis v. City of Ellensburg*
    869 F.2d 1230 (9th Cir. 1989) ............................................................................. 27

*Don't Shoot Portland v. City of Portland*
    465 F. Supp. 3d 1150 (D. Or. 2020) .................................................................... 22

*Duran v. City of Douglas, Ariz.*
    904 F.2d 1372 (9th Cir. 1990) ............................................................................. 21

*Espinosa v. City & Cnty. of San Francisco*
    598 F.3d 528 (9th Cir. 2010) ............................................................................... 19

*Est. of Aguirre v. Cnty. of Riverside*
    29 F.4th 624 (9th Cir.) ......................................................................................... 19

*Est. of Mendez v. City of Ceres*
    390 F. Supp. 3d 1189 (E.D. Cal. 2019).............................................................. 24

*Estate of Casillas v. City of Fresno*
    342 F.Supp.3d 990 (E.D. Cal. 2018)................................................................... 32

*Ford v. City of Yakima*
    706 F.3d 1188 (9th Cir. 2013) ............................................................................. 19

*Henry v. Cnty. of Shasta*
    132 F.3d 512 (9th Cir. 1997) ............................................................................... 24

*Horton by Horton v. City of Santa Maria*
    915 F.3d 592 (9th Cir. 2019) ............................................................................... 23

*Huffman v. City of Boston*
    No. 21-cv-10986-ADB, 2022 WL 2308937 (D. Mass. June 27, 2022)................... 24

*Hunter v. Cnty. of Sacramento*
    652 F.3d 1225 (9th Cir. 2011) ............................................................................. 26

*Hutchinson v. United States*
    677 F.2d 1322 (9th Cir. 1982) ............................................................................. 14

*Hyland v. Wonder*
    117 F.3d 405 (9th Cir. 1997) ............................................................................... 25

*Index Newspapers LLC v. U.S. Marshals*
    977 F.3d 817 (9th Cir. 2020) ............................................................................... 20

*Jackson v. Barnes*
    749 F.3d 755 (9th Cir. 2014) ......................................................................... 27, 28

5

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0119

*Johnson v. City of San Jose*
  No. 21-CV-01849-BLF, 2022 WL 17583638 (N.D. Cal. Dec. 12, 2022)..........23, 24, 26, 28, 29, 30, 31

*Johnson v. Hawe*,
  388 F.3d 676 (9th Cir. 2004) ................................................................................................ 30

*Keyser v. Sacramento City Unified Sch. Dist.*
  265 F.3d 741 (9th Cir. 2001) ................................................................................................ 20

*Leslie v. Grupo ICA*
  198 F.3d 1152 (9th Cir. 1999) .............................................................................................. 13

*Martinez v. City of Santa Rosa*
  499 F. Supp. 3d 748 (N.D. Cal. 2020) ................................................................................. 31

*McRorie v. Shimoda*
  795 F.2d 780 (9th Cir. 1986) ................................................................................................ 24

*Menotti v. City of Seattle.*
  409 F.3d 1113 (9th Cir. 2005) ......................................................................................... 24, 26

*Monell v. Dep't of Soc. Servs. of City of New York*
  436 U.S. 658 (1978)............................................................................................................... 23

*NAACP of San Jose/Silicon Valley v. City of San Jose*
  No. 21-CV-01705-PJH, 2023 WL 4983161 (N.D. Cal. Aug. 3, 2023) ...... 19, 20, 22, 23, 24, 25

*Nelson v. City of Davis*
  685 F.3d 867 (9th Cir. 2012) ..................................................................................... 18, 19, 20

*Oviatt By & Through Waugh v. Pearce*
  954 F.2d 1470 (9th Cir. 1992) .............................................................................................. 27

*Reed v. Lieurance*
  863 F.3d 1196 (9th Cir. 2017) .............................................................................................. 30

*Reese v. Cty. Of Sacramento*
  888 F.3d 1030 (9th Cir. 2018) .............................................................................................. 32

*Samaha v. City of Minneapolis*
  525 F. Supp. 3d at 933 .......................................................................................................... 28

*Sanderlin v. City of San Jose*
  No. 20-CV-04824-BLF, 2023 WL 2562400 (N.D. Cal. Mar. 16, 2023)............................ 19, 20

*Saucier v. Katz*
  533 U.S. 194 (2001)............................................................................................................... 19

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0120

*Smith v. City of Hemet*
   394 F.3d 689 (9th Cir. 2005) ........................................................................................... 14

*Stephens v. Union Pac. R.R. Co.*
   935 F.3d 852 (9th Cir. 2019) ........................................................................................... 16

*Thomas v. Newton Int'l Enterprises*
   42 F.3d 1266 (9th Cir. 1994) ........................................................................................... 14

*Tirado v. City of Minneapolis*
   521 F.Supp.3d 833 (D. Minn. 2021).............................................................. 24, 28, 29

*Torres v. Madrid*
   141 S. Ct. 989 (2021)........................................................................................................ 18

*Zetwick v. Cnty. of Yolo*
   850 F.3d 436 (9th Cir. 2017) ........................................................................................... 15

Rules

Fed. R. Civ. P. 56............................................................................................................... 13, 14

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0121

**INTRODUCTION**

On May 25, 2020, Minneapolis police officer Derek Chauvin killed George Floyd, a Black man, by kneeling on his neck for over *nine minutes* while other officers held him down.  A bystander's video quickly spread across the country and ignited nationwide outrage against the disproportionate treatment of Black people by police.  Plaintiff Kyle Johnson ("Plaintiff" or "Mr. Johnson") joined hundreds of protesters in San Jose, California to speak out against this racist police violence.  He was inspired by his late grandmother's participation in the "Bloody Sunday" march from Selma in 1965.  He did not, however, expect he would face the parallels of history.

People came to speak out against police brutality.  The police responded with brutality. Beginning on May 29, 2020, the San Jose Police Department ("SJPD") incessantly barraged peaceful protesters near City Hall with "less-lethal" force on live television.  In recognizing the anti-police nature of the demonstrations, the SJPD adopted an unlawful practice of applying excessive force to the protesters, including the indiscriminate firing of projectile impact weapons (PIWs) into the crowds with little or no warning.  The City argues there is no evidence of this unwritten custom.  The officers' conduct, captured on video, as well as the victims of the more than 550 projectiles fired on May 29 prove otherwise.

Officers were banned from using non-chemical PIWs to disperse crowds. They were not trained on how to use these weapons in crowd control situations.  Indifferent to the historic number of PIW rounds that were discharged on the first day alone and the rampant misconduct of its officers, the City and the SJPD deliberately chose to not change course the next day.

On the night of May 30, 2020, Officer James Adgar ("Officer Adgar")—purportedly in response to a water bottle thrown from the other side of the plaza—intentionally fired his 40mm PIW and struck Plaintiff from behind as he tried to leave the area with his hands behind his head. This too was caught on video.  Yet, Officer Adgar argues Plaintiff lacks evidence.  He alternatively argues, using misstatements of law, it was a mistake as he tried to shoot someone else.  Not only is this disproven by forensic analysis of the video, but binding precedent also holds otherwise.  He also argues Plaintiff's mere presence at the protest was not First Amendment expressive activity.  The Supreme Court rejected this argument during the civil

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0122

rights era.  The remainder of Defendants' arguments, such as entitlement to qualified immunity, have already been roundly rejected by the summary judgment orders in the other lawsuits against the City related to these protests.

Defendants tried to silence Plaintiff at the George Floyd protest.  This motion for summary judgment is another attempt to do so.  Plaintiff's evidence genuinely disputes the material "facts" raised by defendants.  The federal and state law claims have triable issues that should be heard by a jury.  Defendants motion should be denied.

## STATEMENT OF FACTS

### I.       CITY-WIDE PROTESTS TAKE OVER THE CITY ON MAY 29, 2020.

On May 28, 2020, the Special Investigations Unit of the San Jose Police Department ("SJPD") learned that a protest over the killing of George Floyd was scheduled to occur the following day.  Declaration of Abimael Bastida in support of Plaintiff's Opposition to Summary Judgment ("Bastida Dec."), Ex. 1 (After Action Report "AAR") at p. 38; Ex. 2 (Tindall Depo) at 127:4-20; Ex. 3 (Dwyer Depo) at 56:1-58:25.

On May 29, 2020, the protest began at approximately 2:00 p.m. and initial reports by officers assigned to work foot patrol at City Hall indicate the protest was peaceful.  *Id.,* Ex. 1 (AAR) p. 38.  It was apparent to police, at least to the Incident Commander observing the crowd from within a parked vehicle near City Hall, that the protest messages of the attendees were directed at police.  *Id.,* Ex. 1 (AAR) at p. 39.

At approximately 4:50 p.m., an estimated 400 people blocked traffic lanes in front of City Hall.  *Id.,* Ex. 1 (AAR) p. 41.  Shortly thereafter, the encounter between police officers, fully equipped with riot gear, and protesters turned violent when SJPD officers began using less-lethal weapons, including batons, skirmish lines, and PIWs on the protesters.  This was captured live by news media outlets, including CBS KPIX Channel 5.  *Id.,* Ex. 4 (SJ405900-KPIX CBS SF Bay Area News Report).

### II.      THE CITY RESPONDS WITH INDISCRIMINATE, EXCESSIVE FORCE.

On live television and in real time, officers could be seen directly firing projectiles at demonstrators at close range, including some with their hands raised.  *Id*.  At one point, reporter

SER-0123

Len Ramirez was shot by an SJPD officer with a PIW, as the cameras rolled, to which he exclaimed, "I just got hit with something" seconds after SJPD police began firing into the crowd. *Id.* In the same video clip, Reverend Moore, head of the NAACP, is seen pushed, hit, and nearly shot by SJPD officers with PIWs. *Id.*

Rather than deescalate the protests, SJPD officers engaged in an unrestricted use of less lethal weapons with unfettered discretion. *Id.,* Ex. 3 (Dwyer Depo) at 114:16-19 (incident commander on May 30th authorized use of force, including PIWs). SJPD officers indiscriminately and unlawfully used physical force, batons, tear gas, and an estimated 550 PIW rounds—an amount that reportedly depleted their entire inventory— against protesters. *Id.,* Ex. 5 (OIR - SJ325814.) As a result, SJPD made "emergency purchases" to replenish its stock. *Id.,* Ex. 3 (Dwyer Depo) at 73:3-21 [explaining SJPD depleted inventory it had on PIW projectile munitions], 161:2-15, 168:6-18.)

## A. SJPD Officers Were Not Trained To Use PIWs In Crowd Control Settings.

It is undisputed that firing PIWs at an unauthorized target area on the body may rise to deadly force. *Id.* Ex. 6 (Byers Depo) at 50:16-52:2; Ex. 7 (Matchett Depo), at 55:10-15, 61:16-20 [assigned incident commander on May 29]; Ex. 8 (Cabellos Depo), at 17:15-19 (SJPD sergeant at time of protests), 29:9-12 [indicating 40mm PIW can cause death or great bodily injury].) For this reason, PIWs were limited to be used "as a defensive weapon" for many years. *Id.,* Ex. 9 (Less Lethal Training) at ADGAR000007. In 2018, SJPD policy changed to allow use of PIWs "when objectively reasonable" to incapacitate an armed suspect who is likely to cause serious bodily injury or death. *Id.,* Ex. 10 (Garcia Memo # 2018-024).

Officers were not, however, trained to use these weapons in a crowd control context. Before May 29, 2020, training on the use of the 40mm PIW was limited to shooting a single unobstructed stationary target. *Id.*, Ex. 11 (Tassio Depo) at 69:10-16 (designated as the City's Rule 30(b)(6) witness on training provided to officers regarding use of force, including with respect to crowd control); 78:16-19 (the purpose of the training was to "strike a target area with two rounds at varying distances"); 79:5-14 (the target was stationary). The training took place at the shooting range where officers lined up in lanes with a stationary target at a specified distance

SER-0124

in front of them and no obstructions or moving obstacles, i.e., nothing that would mimic a target moving within a crowd. *Id.,* at 80:3-20.

### B. SJPD Failed To Supervise Or Discipline Its Officers For Their Unconstitutional Conduct, Such as Excessive Force or Free Speech Retaliation.

On May 29, 2020, countless social media and news organizations provided live coverage of the protests throughout San Jose, specifically those occurring at or near City Hall. (Bastida Dec., Ex. 4 (SJ405900-KPIX CBS SF Bay Area); Ex. 12 (SJ405904-SKY 7 Live Footage); Ex. 13 (SJ405910-SKY7 Live Footage); Ex. 14 (SJ405915-SKY7 Live Footage); Ex. 15 (SJ405916-SKY7 Live Footage); Ex. 16 (SJ405939-37 mm Deployment ); Ex. 17 (SJ405943-Cameraman hit); Ex. 18 (SJ405983-Twitter bowiezamudio); Ex. 19 (SJ405991-Twitter nagrooven). Relatedly, SJPD has at least one staff member, the Public Information Officer, whose job it is to monitor mainstream media—both broadcast and print—to have a "situational awareness" about what is going on in the City. *Id.,* Ex. 3 (Dwyer Depo) at 57:10-58:5.  Many, if not most of SJPD members receive daily email blasts about newsworthy events related to law enforcement. *Id.,* 58:6-24.  Chief Garcia specifically received daily Google alerts regarding news reports about the protests that occurred daily within San Jose. *Id.,* Ex. 20.

News reporting captured SJPD officers firing PIWs in an attempt to disperse crowds. *Id.,* Ex. 8 (Cabellos Depo) at 97:20-98:1 [explaining SJPD officers are not allowed to use their PIWs at crowds in order to get them to disperse]; Ex. 4 (SJ405900-KPIX CBS SF Bay Area News Report).  Footage also shows no attempt by officers to take custody of any individuals. *Id.* Instead, officers are seen firing PIWs into the crowd while moving in formation to push the crowd back. *Id.*  Countless individuals were injured as a result of the officers' excessive use of force. *See, e.g., id.; see also* Declaration of Derrick Sanderlin in Support of Opposition to Summary Judgment, ¶ 5; Declaration of Breanna Contreras in Support of Opposition to Summary Judgment, ¶¶ 3-4; Declaration of Adira Sharkey in Support of Opposition to Summary Judgment, ¶ 5; Declaration of Pietro Di Donato in Support of Opposition to Summary Judgment, ¶¶ 4-5.

Live television captured SJPD officers, including Officer Jared Yuen, behaving

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0125

aggressively, taunting and instigating protesters with obscenities, and firing PIWs in a reckless manner.  Officer Yuen's conduct circulated on social media and the news on May 29, and May 30.  *Id.*, Ex. 4 (SJ405900); Ex. 18 (SJ405983); Ex. 19 (SJ405991); Ex. 21 (SJ405982).  The City's Rule 30(b)(6) witness designated to testify regarding investigations and disciplinary actions taken against officers as a result of their conduct during the protests testified no officer, including Officer Yuen, was disciplined or reprimanded for their conduct during the protests.  *Id.*, Ex. 22 (Zuniga Depo) at 7:1-22, 12:2-13, 13:17-21; 25:22-26:4.

There was no attempt by those in charge to supervise, much less discipline, officers for their conduct during the protests.  Instead, the City relied on the police officers to police themselves.  *Id.*, Ex. 3 (Dwyer Depo) at 176:5-21, 179:17-25 [officers expected to supervise themselves].

**III.  THE NEXT DAY PLAINTIFF ATTENDS THE PROTESTS AND IS MET WITH THE SAME POLICE BRUTALITY HE WAS PROTESTING AGAINST.**

Plaintiff, a Black American, watched George Floyd's murder on social media and television.  Plaintiff attended the protest on May 30, 2020, in San Jose, California, near City Hall to exercise his First Amendment right to protest George Floyd's murder and police brutality, in general.  *Id.*, Ex. 23 (Johnson Depo) at 74:19-75:15; Declaration of Kyle Johnson in Support of Opposition to Summary Judgement ("Johnson Dec."), ¶ 3.

Plaintiff arrived at City Hall at approximately 9:53 p.m. via Fourth Street and Santa Clara Street.  *Id.* at ¶ 8.  Upon arriving, Plaintiff walked toward the rotunda in the direction of Third Street and Santa Clara Street.  *Id.* at ¶ 9.  He remained at or near City Hall for over 20 minutes.  *Id.* at ¶¶ 10-13.

At around 10:24 p.m., SJPD officers began firing their PIWs into the crowd in response to plastic water bottles thrown by a few members of the crowd.  *Id.* at ¶ 14.  Plaintiff began retreating toward the City Hall rotunda seeking shelter and cover from the onslaught of projectile munitions and tear gas deployed by officers.  *Id.*  Fortunately, Plaintiff was not injured at this time.  *Id.*  Plaintiff returned to the same planter box he had stood by earlier and stayed there for several minutes.  *Id.* at ¶ 15.

At approximately 10:33 p.m., SJPD officers again fired their PIWs indiscriminately into

SER-0126

the crowd after a plastic water bottle was thrown at police officers near the intersection of 4th Street and Santa Clara. *Id*. at ¶ 16*; see also* Bastida Dec., Ex. 23 (Johnson Depo) at 103:5-12, 162:14-17. Plaintiff again ran toward the City Hall rotunda seeking cover with his hands behind his head. *Id*. at ¶ 16. As Plaintiff was retreating, he was struck in the back of the leg with a projectile with considerable impact. *Id*. at ¶ 17. This caused Plaintiff to jump in the air as he continued to retreat, now with a limp. *Id*. Officer Adgar can be seen in the same frame with his PIW in hand and in a shooting position. *Id.* at ¶ 16, Figures I and J*; see also* Bastida Dec., Ex. 24 (SJ045550 Adgar BWC) at 22:33:03 - 22:33:19.

After he was shot, Plaintiff sought cover, limped away from City Hall, and ultimately left the area injured. Johnson Dec.*,* ¶¶ 18-22. At no point during the entire time Plaintiff was at the protest did he throw any object at police officers or assault or threaten anyone. *Id.* at ¶ 23. He did not observe anyone within 75 yards of him throw an object at police officers. *Id*. at ¶ 4. Moreover, from the moment Plaintiff arrived at City Hall, at approximately 9:53 p.m., until after he was struck with a PIW munition, at approximately 10:34 p.m., there were no warnings or unlawful assembly dispersal orders given by any police officers. *Id*. at ¶ 23.

## LEGAL STANDARD

Summary judgment is only appropriate when a moving party establishes there is no genuine dispute as to any material fact and it is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56. As such, the moving party "bears the heavy burden of showing that there are no genuine issues of material fact[.]" *Ambat v. City & Cnty. of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).

In weighing the sufficiency of the evidence on this motion, the court must view the facts in the light most favorable to the nonmoving party and draw all ambiguities and reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); see *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) ("[I]f direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

SER-0127

facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.  Trial courts should act "with caution" and may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." *Id.*; see *Hutchinson v. United States*, 677 F.2d 1322, 1325 (9th Cir. 1982) ("summary judgment procedures should be used with care and restraint.").

A material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994).

## **ARGUMENT**

### I.  **TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIM AGAINST OFFICER ADGAR.**

Evidence presented in this case, i.e., video footage and Plaintiff's testimony supported by expert analysis, at minimum raises triable issues of fact regarding Plaintiff's Fourth Amendment claim, and thus precludes judgment as a matter of law.  "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (reversing the district court's grant of summary judgment because "such cases almost always turn on a jury's credibility determinations").

### A.  **The Evidence Shows Officer Adgar Fired A Projectile Without Warning That Struck Plaintiff From Behind.**

The evidence in the record is clear: Officer Adgar fired the shot that injured Plaintiff. This is demonstrated by the video evidence and analysis by Plaintiff's video forensics expert,

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0128

Jason Fries, police practices expert, Roger Clark, and Plaintiff's own review.  Declaration of Jason Fries in Support of Plaintiff's Opposition to Summary Judgment ("Fries Dec."), at ¶ 7, Attachments B and C; Declaration of Roger Clark in Support of Plaintiff's Opposition to Summary Judgment ("Clark Dec."), Exh. A at p. 6-7; Johnson Dec. at ¶ 17.

Mr. Fries' report definitively shows Plaintiff was shot with a projectile at San Jose City Hall by Officer Adgar.  Fries Dec., Attachment B at p. 17.  Mr. Fries evaluated the body-worn camera footage of every officer who fired a PIW during the relevant time period.  Fries Dec., Attachment B at p. 6-15; Bastida Dec., Ex. 25 (CSJ SROG RESP) at No. 20-21 (identifying all shooting officers).  He tracked the position and location of every shot, as well as Plaintiff's position during this time, and concluded "that Mr. Johnson was shot with a less than lethal shot by Officer Adgar at time 10:33.14."  Fries Dec., Attachment B at p. 17.  Mr. Fries also evaluated whether Officer Adgar was under threat at the time he fired his weapon: "The result of that analysis reveals that not only was Mr. Johnson moving away from Officer Adgar at the time of the shooting there was no person moving toward Officer Adgar in any manner that a reasonable person would perceive as threatening." *Id.*  This evidence undoubtedly disputes Officer Adgar's baseless claims that he did not shoot Plaintiff with a projectile.  Mr. Clark, who also reviewed the video footage, similarly concludes that "Officer Adgar lifted, aimed, and fired at Mr. Johnson at the precise moment that Mr. Johnson was struck."  Clark Dec., Exh. A at p. 6-7, 17.  Upon his review of the footage, Plaintiff states under the penalty of perjury that he was the individual shot in the video footage reviewed by the experts and confirms that at the time no one within a 75-yard radius of Plaintiff threw any object in the direction of Officer Adgar.  Johnson Dec. at ¶ 4.

Officer Adgar fails to present any rebuttal expert testimony or analysis on the issue of causation.  Instead, he relies on lawyer's arguments and Plaintiff's confusion at his deposition to claim there is no dispute of material fact.  This is unavailing.

*First*, the argument that Officer Adgar could not have shot Plaintiff because he only shot individuals who had thrown bottles is plainly contradicted by the video of Officer Adgar shooting Plaintiff, who testified that he had not thrown any bottles.  *See Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("[W]here evidence is genuinely disputed on a particular

SER-0129

issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment.") (internal quotation marks omitted). Fries Dec at ¶ 7, Attachment C. Officer Adgar presents no evidence beyond self-serving declarations and mistaken police reports to claim he shot someone other than Plaintiff. The description in Officer Adgar's police report that he shot a Hispanic male at the time Plaintiff was shot is itself a dispute of material fact given the evidence indicating Plaintiff, who is not Hispanic, was the one shot at that moment. *Compare* ECF 107-3 (Declaration of James Adgar) at ¶¶ 5-8 *with* Johnson Dec. ¶ 17.

**Second**, Officer Adgar's argument that there is no evidence showing Plaintiff being struck by a police projectile is obviously disputed by the 40mm-shaped bruise on Plaintiff's leg. Johnson Dec. at ¶ 24, Exh. A (JOHNSON_001975). Officer Adgar did not present any evidence showing someone other than SJPD officers were firing 40mm projectile rounds at City Hall on May 30, 2020. Moreover, the idea proffered by Officer Adgar that a projectile cannot be seen on video ignores the fact that the frame-rate of body-worn and security cameras is not sufficiently capable of picking up objects traveling hundreds of miles per hour through the air. Bastida Dec., Ex. 26 (Fries Depo), at 131:4-132:8. Mr. Fries' analysis concludes a projectile was fired, and Plaintiff was shot at 10:33. Fries Dec. at ¶ 7.

**Third**, Oficer Adgar's argument that Mr. Fries' opinion cannot create a dispute of material fact because it relies on assumptions is misplaced. The "assumptions" identified by Officer Adgar—"that Plaintiff was struck sometime around 10:33 p.m." and "Plaintiff maintained his exact path of travel following a brief sighting of him on camera"—are not assumptions, rather they are conclusions and observations supported by the evidence. ECF 107, p. 12. Officer Adgar's reliance on *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852 (9th Cir. 2019) in support of his "assumptions" argument is inapplicable here.

In *Stephens* the Court ruled a physician's assumption that plaintiff was frequently exposed to asbestos was unsupportable due to the lack of evidence showing he was in fact in frequent contact with asbestos. *Stephens,* at 856-587. Here, in contrast to the facts in *Stephens*, Mr. Fries bases his opinion on the video evidence, i.e., body worn camera footage from SJPD officers and security footage from City Hall, to conclude Plaintiff was shot at 10:33 p.m. Fries

SER-0130

Dec. at ¶ 7.

Officer Adgar introduces Plaintiff's deposition testimony, taken years after the incident, to claim Mr. Fries' "assumption" is not supported because Plaintiff said he was struck at 10:24 p.m.  This, however, is a misrepresentation of Plaintiff's testimony.  Plaintiff explicitly testified that he was struck "between the hour of 10:00 p.m. to about 11:30 [p.m.]."  Bastida Dec., Ex. 23 (Johnson Depo) at 102:11-21.  Officer Adgar attempts to harp on Plaintiff's confusion between two separate occasions where protesters allegedly threw bottles at police officers to cast doubt on Mr. Fries' expert analysis.  However, upon review of the video footage, Plaintiff has dispelled any confusion.  *See* Johnson Dec. at ¶¶ 6-17 (Plaintiff clearly identifies himself and the moment he is struck).  At most, this sort of confusion at a deposition is a question for the jury.  *See* Ninth Circuit Model Civil Jury Instructions No. 1.14 ("Sometimes a witness may say something that is not consistent with something else he or she said.  …  People often forget things or make mistakes in what they remember.  …  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.").

Officer Adgar argues Mr. Fries' observation and conclusion, that Plaintiff was in a "particular location" at 10:33 p.m., is also an "assumption."  ECF 107, p. 12.  Counsel, not an expert, ironically attempts to introduce his own "analysis" and "observations" to claim Mr. Fries' analysis lacks a basis.  *Id.*  The so-called "assumption" here is that Plaintiff, after being briefly obscured by another person on video, is still the same person when reappearing on the other side of the obstruction.  *Id.*  At best, this is a dispute of material fact.  Even so, Plaintiff has positively identified that he is, indeed, still the same person on the other side.  Johnson Dec. at ¶¶ 17-18.

Ultimately, Defendants ask this Court to adopt their version of the facts as true in an effort to mischaracterize genuine disputes of material fact as factual impossibilities warranting summary judgment.  This is improper.  Any inferences that may be drawn from the evidence *must* be made in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 256.

**B.     Officer Adgar Possessed The Requisite Intent To Restrain To Constitute A Fourth Amendment Seizure.**

Officer Adgar misconstrues the intent analysis under the Fourth Amendment to proffer two equally unavailing arguments: (1) he did not have the intent to seize Plaintiff because he

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0131

accidentally shot him, and (2) he lacked intent to seize because he intended to repel or disperse Plaintiff. *Id.*, p. 15-16.  These arguments rely on separate misconstructions of the law.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted).

The first argument—that Plaintiff's injuries were unintentional and incapable of amounting to a Fourth Amendment violation because Plaintiff was not individually targeted by Officer Adgar—relies on an inappropriate subjective construction of the law.  *See Torres v. Madrid*, 141 S. Ct. 989, 998 (2021) ("Moreover, the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context.") (emphasis in original). Officer Adgar repeats the argument of the officer defendants in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), for which the court held "[t]his argument misapprehends the distinction between intentional and unintentional conduct that the Supreme Court has repeatedly held as determinative of the Fourth Amendment analysis." *Id.* at 876.  "For an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." *Id.*  Thus, "[r]egardless of whether [Plaintiff] was the specific object of governmental force, he and his fellow [protesters] were the undifferentiated objects of shots intentionally fired by the officers in the direction of that group." *Id.* at 877.

The second argument—that Officer Adgar lacked intent to seize because he intended to repel Plaintiff—also misses the mark.  This precise argument was specifically addressed, and disposed of, by the *Nelson* court: "Whether the officers intended to encourage the [protesters] to disperse is of no importance when determining whether a seizure occurred.  The officers took aim and fired their weapons toward [Plaintiff] and his associates.  Regardless of their motives, their application of force was a knowing and willful act that terminated [Plaintiff's] freedom of movement.  It unquestionably constituted a seizure under the Fourth Amendment." *Id.* at 877-78.

SER-0132

Plaintiff notes that these exact arguments have already been rejected in the other matters arising out of the same protests. *See NAACP of San Jose/Silicon Valley v. City of San Jose*, No. 21-CV-01705-PJH, 2023 WL 4983161, at *4 (N.D. Cal. Aug. 3, 2023) ("Stated differently, defendants argue that any force used by officers was used with the "intent to disperse" rather than the 'intent to restrain.'  However, the Ninth Circuit in *Nelson v. City of Davis* has already addressed this very same argument, and has rejected the approach advocated by defendants."); *Id*. at *5 ("[D]efendants are not entitled to summary judgment based on the argument that Acosta was struck unintentionally."); *Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2023 WL 2562400, at *8 (N.D. Cal. Mar. 16, 2023) ("They need not prove that they were the intended targets of those shots under *Nelson.*").  Officer Adgar presents no basis for a different finding.

## C.    Qualified Immunity Does Not Apply Here Because Officer Adgar's Conduct Violated Plaintiff's Clearly Established Rights.

In determining whether qualified immunity applies, courts must decide (1) whether the facts, "taken in the light most favorable to the party asserting the injury … show the officer's conduct violated a constitutional right" and (2) if so, whether that right was clearly established at the time of defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Only the "clearly established" inquiry is relevant here as, taken in the light most favorable to Plaintiff, the evidence shows Officer Adgar's use of force violated Plaintiff's Fourth Amendment rights. *See ante* Section Argument, I.A-B.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Here, Officer Adgar claims he "inadvertently" struck Plaintiff while firing at someone who committed "felony assault on police officers." ECF 107, p. 17.  He presents no evidence or expert analysis to support his claim.  As discussed, this approach has been rejected.  See *Nelson*, 685 F.3d at 876-878.  Nonetheless, granting qualified immunity on Officer Adgar's version of disputed facts would not be appropriate. *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 630 (9th Cir.); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).  It was clearly established that an officer could not shoot a projectile at an individual who was peacefully protesting the police. *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013),

19

SER-0133

abrogated on other grounds by *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ("Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech."); *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). Defendants should know this given other related lawsuits.  *See Sanderlin, supra,* 2023 WL 2562400, at *18 (N.D. Cal. Mar. 16, 2023) ("right to peacefully engage in anti-police protests … was clearly established."), *18 (clearly established that "an officer could not shoot a projectile at an individual who was peacefully protesting the police."); *NAACP of San Jose/Silicon Valley, supra,* 2023 WL 4983161, at *7 ("[I]t was clearly established by the Ninth Circuit in *Nelson* that an officer could not constitutionally shoot a projectile that risked causing serious harm in the direction of non-threatening individuals who had committed, at most, minor misdemeanors[.]").

## II.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM.

To prevail on a Section 1983 First Amendment claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) defendants' conduct would chill a person of ordinary firmness from continuing to participate in the protected activity, and (3) the protected activity was a "substantial or motivating factor" in the defendants' conduct.  *See, e.g.*, *Index Newspapers LLC v. U.S. Marshals*, 977 F.3d 817, 827 (9th Cir. 2020).

Defendants contest only the third prong.  "This element of a First Amendment retaliation claim may be met with either direct or circumstantial evidence, and we have said that it involves questions of fact that normally should be left for trial." *Index Newspapers LLC*, 977 F.3d at 827. In free speech retaliation cases, the Ninth Circuit has held that circumstantial evidence of a short "proximity in time between the protected action and the allegedly retaliatory [conduct]", when combined with evidence of the awareness of the speech, and a showing that "proffered explanations for the [conduct] were false and pretextual", creates a genuine issue of material fact on the question of retaliatory motive. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 744 (9th Cir. 2001).  Similarly, when in response to a plaintiff's expressive conduct, the

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0134

complete lack of a "legitimate, articulate reason" for a government actor's deprivation of a plaintiff's rights is indicia of an improper motive. *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377 (9th Cir. 1990) (denying summary judgment for officer).

There is a genuine dispute of material fact as to whether Plaintiff's expressive conduct was a substantial or motivating factor in Officer Adgar's decision to shoot him. In his deposition, Officer Adgar acknowledged the "anti-police" nature of the protest. Bastida Dec., Ex. 33 (Adgar Depo) at 181:12-17. It is undisputed that the retaliatory conduct, i.e., the officers' indiscriminate use of PIWs on peaceful protesters, occurred *during* the protest. *See ante* Statement of Facts ("SOF"). Defendants' argument that Plaintiff apparently "did not even engage in any speech or expressive activity outside his mere physical presence at a political demonstration," ECF 107, p. 18:18-19, is contradicted by Plaintiff's testimony that he specifically went to the demonstration "to peacefully protest against the murder of George Floyd, racial injustice, and systemic police brutality toward Black Americans." Johnson Dec. ¶ 3. Even so, Plaintiff's First Amendment "rights are not confined to verbal expression." *Brown v. State of La.,* 383 U.S. 131, 142 (1966).

Further, there is no logical explanation as to why Plaintiff was shot. There is no allegation that he committed a crime or posed a threat to officers' safety, and he was walking away from Officer Adgar with his hands behind his head when he was shot. Johnson Dec. at ¶¶ 3-4, 17-18. The claim that Officer Adgar was supposedly shooting at a nearby person who had thrown a bottle is belied by Plaintiff's testimony and the video evidence showing bottles being thrown from the opposite side of the plaza, at least 75 yards away. *Id*. ¶ 4; Bastida Dec., Ex. 23 (Johnson Depo), at 96:20-97:5, 103:5-12; Fries Dec., Attachment B at p. 7. Thus, there was no "legitimate, articulate reason" for Officer Adgar's decision to shoot Plaintiff. *Duran*, 904 F.2d at 1377.

Additionally, Plaintiff's police practices expert, Roger Clark, concludes "Officer Adgar demonstrated an unprofessional hostility toward the demonstrators and the protests that resulted in Mr. Johnson's injury." Clark Dec., Ex. A at p. 8. Official department policy and best practices direct usage of the 40mm to prevent injury, yet Officer Adgar admitted in his self-

SER-0135

authored report that he fired the 40mm at someone who had already thrown a bottle and was thus no longer a credible threat. Clark Dec., Ex. A at 8-9. SJPD policy required PIWs to only be used when sufficient numbers of officers are present to make an arrest, yet Officer Adgar fired despite not being in such a position. Clark Dec., Exh. A at p. 9.

This kind of indiscriminate shooting of peaceful protesters supports the inference that their expressive conduct motivated the officer's use of force. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1213–14 (W.D. Wash. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155–56 (D. Or. 2020); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1087–88 (N.D. Cal. 2020); *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 518 (E.D. Mich. 2020).

Courts have recognized "the unique factual circumstances presented by this case, where the parties alleged to have used excessive force are themselves the subject of the plaintiffs' viewpoint expression. Thus, there is an inherently oppositional nature between the viewpoint and the police[.]" *NAACP of San Jose/Silicon Valley, supra,* 2023 WL 4983161, at *17. The evidence demonstrates this was not a typical protest, involving protesters and counter-protesters, but, rather, the "counter-protesters" were the police themselves. This was evidenced by SJPD's response to the protests: Captain Dwyer, the City's designated Rule 30(b)(6) witness as to the Crowd control and PIW tactics used at the protests, testified that the goal of SJPD's response was to deploy its officers in front of City Hall "facing the crowd" to "deter[]" and to put on a "show of force". Bastida Dec. Ex. 3 (Dwyer Depo) at 21:20-23:21, 109:6-11. During the course of the first day of protests, SJPD's Special Operations unit alone expended approximately 550 rounds of PIW munitions, which include 40mm foam baton rounds. Bastida Dec. Ex. 3 (Dwyer Depo) at 163:1-13; Ex. 5 (OIR AAR SJ325752) at p. 59. At City Hall, at the same protest Plaintiff attended, Sergeant Byers, a sergeant during the George Floyd protests in charge of the officers on the mobile field force team, gave the order to "let'em have it!", precipitating a flurry of indiscriminate fire into the crowd of protestors. *Id.,* Ex. 41 (SJ045604) at 22:33:09 – 22:33:35; *Id*., Ex. 6 (Byers Depo) at 26:16-27:6, 83:12-84:3.

This Court previously held these facts, as allegations, "plausibly establish that the

SER-0136

protestors' protected First Amendment activity was a substantial or motivating factor in Defendants' conduct[.]" *Johnson v. City of San Jose*, No. 21-CV-01849-BLF, 2022 WL 17583638, at *6 (N.D. Cal. Dec. 12, 2022).  Now, supported by evidence, these facts establish a genuine material dispute that precludes summary judgment.

**III.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM AGAINST THE CITY.**

There are genuine disputes of material fact as to the City's liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), including: an unwritten custom or practice, a failure to train, a failure to supervise, and a decision or act by a final policymaker. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-603 (9th Cir. 2019).

It is important to note Judge Hamilton's recent denial of the City's motion for summary judgment as to *Monell* claims by other plaintiffs who were also shot with 40mm foam baton rounds by SJPD officers while peacefully protesting at the exact same demonstration in downtown San Jose on May 30, 2020.  *NAACP of San Jose/Silicon Valley, supra,* 2023 WL 4983161, at *17.  In that matter, the plaintiffs' opposition relied on much of the same *Monell* argument presented by Plaintiff in this matter, including numerous citations to this Court's recent motion to dismiss order.  *See, supra, Johnson*, 2022 WL 17583638.

**A.  The City Has Failed To Meet Its Burden To Demonstrate A Lack Of Genuine Disputes Of Material Fact.**

The City fails to meet its initial burden of establishing a lack of triable issues regarding Plaintiff's *Monell* claims.  Its perfunctory motion for summary judgment relies entirely on lawyer's arguments and proclamations of official municipal policy prohibiting excessive force and free speech retaliation.  *See ECF 107 at 19-24.  However, the Supreme Court has held that such "precatory admonition[s]" cannot insulate a city from *Monell* liability.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130-131 (1988).  Undoubtedly, if an official written policy prohibiting unconstitutional conduct by employees was a complete defense, then virtually all municipalities would be completely immune to *Monell* claims.

The City's assertions that Plaintiff's *Monell* theories are "difficult to discern" and that it is "unclear" whether some are being pursued, ECF 107 at 20:12-13, 24:15-16, demonstrate the

SER-0137

City's abject failure to directly respond to any of the *Monell* theories articulated in Plaintiff's complaint, *see* ECF 73, and the recent Rule 12 briefing and order.  *See Johnson v. City of San Jose*, 2022 WL 17583638, at *6-9.  Instead, the City misconstrues Plaintiff's complaint to argue that it cannot be liable for a single instance of conduct.  Judge Hamilton recently denied this exact line of reasoning by the City.  *NAACP of San Jose/Silicon Valley, supra,* 2023 WL 4983161, at *16 ("[T]he Supreme Court has held that it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.") (internal quotation marks omitted).

### B. The Evidence Demonstrates The SJPD's Custom And Practice Of Excessive Force Toward People Peacefully Protesting Police Violence.

A custom or practice can be established with evidence of similar instances of misconduct.  *See McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) (repeated violation by several officers on single day sufficient to establish policy and custom); *Menotti v. City of Seattle.*, 409 F.3d 1113 (9th Cir. 2005) (five similar incidents on a single day sufficient for triable issue as to City policy or custom); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (several similar incidents, involvement of multiple officials gave rise to genuine issues of material fact as to whether abuses were pursuant to county policy or custom); *Huffman v. City of Boston*, No. 21-cv-10986-ADB, 2022 WL 2308937, at *7 (D. Mass. June 27, 2022) (conduct on May 29 and 31, 2020 could establish municipal custom); *Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 842-843 (D. Minn. 2021) (ten incidents of misconduct during Floyd protests could establish municipal custom).  "The inquiry regarding adequacy of notice is highly specific to the facts of the case under consideration; the line between adequate and inadequate evidence of repeated constitutional violations does not involve a specific quantum or number of allegations." *Est. of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1209 (E.D. Cal. 2019).  In addition, "post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." *Henry,* 132 F.3d at 519.

Triable issues of fact exist as to the City's implementation during the George Floyd protests of an unwritten custom and practice of responding to non-violent demonstrators protesting police violence with excessive force, including the indiscriminate use of 40mm PIWs.

SER-0138

Beginning on May 29, 2020, through the time of Plaintiff's injuries on May 30, SJPD officers perpetuated a reign of terror against those peacefully demonstrating police violence in downtown San Jose. *See ante* SOF Sec., I-III.  Such was the moving force behind Plaintiff's injuries. *See* Johnson Decl., ¶¶ 3-4, 17-18.

Assistant Chief Knopf, who had authority delegated to him by Chief Garcia, authorized the continual use of force against the crowds of protestors.  Bastida Dec. Ex. 27 (Garcia Depo.) at 24:24-25:5.  Given this delegation of authority, his policy decisions constituted official acts of the city. *See Hyland v. Wonder*, 117 F.3d 405, 415 (9th Cir. 1997) (granting summary judgment to plaintiff on *Monell* claims where policymakers delegated authority to an individual whose exercise of that authority was attributable to the municipality).

Even though written policy required 40mm PIWs to only be used against assaultive individuals and banned them for crowd control purposes, the City allowed and encouraged their indiscriminate use by permitting large numbers of projectiles to be fired into crowds without justification.  For example, Sgt. Tassio—who was designated as the City's Rule 30(b)(6) witness on crowd control and use of force policies in effect during the protests—acknowledged in a May 23 email, two days before George Floyd's death, "As I understand this policy modification, we may no longer deploy 40mm foam baton rounds during crowd control incidents."  Bastida Dec., Ex 28 (SJ350614-SJ350615).  Six days later on May 29, Sgt. Tassio ordered officers to use force on non-violent people, and shouted at one point: **"Get fucking foam baton 40's too, I don't give a fuck about the policy right now."**  *Id.*, Ex. 29 (SJ020037 at 17:14:20–17:15:00).

A litany of evidence demonstrates countless peaceful protesters were shot with PIWs, including the 40mm, during the protests on May 29 and May 30. *See ante* SOF Sec. II.B; *Id.*, Ex. 30 (SJ406823-SJ406824 [peaceful protester shot with PIW on May 29 at close range, events witnessed were broadcast on KPIX]); *Id.*, Ex. 31 (SJ364378-SJ364378 [Captain Dwyer admitting to using 40mm foam baton rounds in lieu of OC-rounds]); *see NAACP of San Jose/Silicon Valley, supra,* 2023 WL 4983161, at *1-2 (nine peaceful protesters shot with PIWs at same protests).  By his own admission, Officer Adgar admitted to a fellow officer that he fired his 40mm PIW into the crowd without knowing what or whom he was firing at because it was too

SER-0139

dark to see.  Bastida Dec., Ex. 32 (SJ045550 Adgar BWC) at 22:24:13 to 22:25:24 ["I couldn't see - it was all dark, black clothing."]

Deputy Chief Tindall, who was incident commander on May 29 and 30, testified that he was not aware of any officers who violated department policy regarding crowd control and the use of PIWs during the protests.  Bastida Dec. Ex. 2 (Tindall Depo.), 97:1-14 [was at command post for 13 days straight], 196:6-18 [not aware of any policy violations], 109:7-25 [incident commander for both days].  Thus, in his view, the officers who injured peaceful protesters were doing as instructed.

A custom or practice may also be inferred from evidence of repeated constitutional violations for which errant municipal officers were not discharged or reprimanded.  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233-34 (9th Cir. 2011).  The Court previously held Plaintiff's allegations supported this theory, yet the City fails to address it in its motion.  *See Johnson*, 2022 WL 17583638 at *8.

Despite the widespread evidence of peaceful protesters being shot with PIWs, including the 40mm, no officers to date have been disciplined for their conduct during the protests. Bastida Dec., Ex. 2 (Zuniga Depo) at 11:12-25 , 12:1-13 , 13:17-21 , 31:13 – 32:5 [Yuen has not been disciplined for his actions during the protests].  Thus, the Court can infer the existence of a custom and practice from this evidence.  *See Menotti*, 409 F.3d at 1147.

The evidence also establishes triable issues as to the existence of a custom and practice of using force *with insufficient or no warning*.  Johnson Dec., ¶¶ 4, 24 (stating that there was no warning); Fries Dec., ¶ 12 (stating that there was no warning); Bastida Dec., Ex. 33 (Adgar Depo.) at 80:2-11 (confirms based on training that officers not required to give warning before PIW shot and sometimes warning is not feasible); *Id.*, Ex. 34 (Adgar Depo.) at 105:25-106:6; 106:15-25 (does not recall that any announcements at protests had PIW warnings.); *Id.*, Ex. 2 (Tindall Depo.) at 62:7-22 (warning before PIW not always feasible), 62:24-63:6 (scenario where not feasible to give warning is when someone charging at officer or incident whereby he could not deploy before warning); *Id.*, Ex. 35 (Preuss Depo.) at 171:23-172:8 (did not see bottle thrown nor hear warning before shooting);  *Id.*, Ex. 36 (Dywer Depo.) at 162:18-163:4 (no use of

SER-0140

force warnings over the loud speaker).  Rather, in lieu of verbal caution, SJPD officers relied on the projectile weapons themselves as an "implied warning."  *Id.* Put differently, the impact was the warning.  Notably, the officers' conduct directly contravened the official written policy.  *Compare Id.*, Ex. 37 (SJ300549-SJ300556 – PIW Training Slides), p. 8 (officers have duty to warn before using any force) *with* Johnson Dec. ¶¶ 4, 24 (Plaintiff shot without warning); SOF, Sec. II.B (declarations of individuals shot without warning; Clark Dec., Ex. A, p. 19; Fries Dec., ¶ 12; *see City of St. Louis*, 485 U.S. at 130-31 (a custom or practice may constitute a municipality's policy even though it is contrary to formally promulgated policies).

### C.   There Are Triable Issues For Plaintiff's Policy Of Inaction *Monell* Theories.

"Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury."  *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992).  The City is not entitled to judgment as a matter of law because there is evidence to support *Monell* liability as a result of a policy of inaction, i.e., deliberate indifference on behalf of the City.  The Ninth Circuit has explained:

> Under *Monell,* a local government body can be held liable under § 1983 for policies of inaction as well as policies of action.  A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's failure to implement procedural safeguards to prevent constitutional violations.  In inaction cases, the plaintiff must show, first, that the policy amounts to deliberate indifference to the plaintiff's constitutional right.  This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation.  Second, the plaintiff must show that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.

*Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (internal quotation marks and citations omitted).  The deliberate indifference standard is an objective inquiry.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc).

####   1.   Evidence Shows The SJPD Failed To Supervise Its Officers' Conduct And Use Of Projectile Impact Weapons.

The deliberate indifference standard extends to claims predicated on inadequate supervision.  *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).  A failure to supervise establishes deliberate indifference when municipal policymakers have actual or

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0141

constructive notice that employees are engaged in a pattern of constitutional wrongs and thereafter fail to take necessary protective or corrective measures. *Jackson*, 749 F.3d at 763.

Addressing Plaintiff's failure to supervise theory, the Court previously held Plaintiff's allegations that the "SJPD was aware of the officers' conduct during the protests … and did nothing to change course … creates a reasonable inference of a deliberate indifference by SJPD as to the rights of the protestors." *Johnson*, 2022 WL 17583638, at *9.

Evidence that instances of unconstitutional conduct, such as excessive force and free speech retaliation, were broadly reported by news outlets and by individuals on social media can demonstrate a city's awareness thereof when combined with evidence that the city monitored the channels of information or was otherwise specifically aware of the law enforcement response. *Samaha v. City of Minneapolis,* 525 F. Supp. 3d 933, 943 (D. Minn 2021); *Tirado, supra,* 521 F. Supp. 3d at 843-44.

The evidence supports triable issues as to the SJPD's awareness that its officers were indiscriminately shooting peaceful protesters with less-lethal force.  Footage of this conduct was broadcast on live television and shared in real-time across social media on May 29, 2020.  *See ante* SOF Sec. II.B (listing social media and news video coverage).

The SJPD regularly monitors the news and social media to stay apprised of national and local events.  *Id.,* Ex. 3 (Dwyer Depo.) at 56:1-5, 56:8-57:8 (SJPD watches news and receives periodicals to stay apprised of national events), 57:10-17 and 57:20-58:25 (SJPD has Public Info Officer who monitors media and command staff receive news publication email blasts), 60:19-20.  Indeed, the officials in charge of the SJPD's response tracked the news and social media throughout the protests.  *Id.*, Ex. 2 (Tindall Depo.) at 95:19-96:13 (Dwyer, Tindall, and Anaya were paying attention to the media accounts from May 29 and even briefed other officers about it the next day).  On May 29, Chief Garcia personally received seven separate email alerts of news articles detailing the SJPD's brutal response to the protesters.  *Id.*, Ex. 20 (Google Alerts, SJ363964, SJ362814, SJ362805, SJ362804, SJ362810, SJ362808, SJ362812, SJ363966).

Despite an opportunity to provide new or different instruction at the general briefing on May 30, SJPD officials failed to address the officers' indiscriminate shooting of peaceful protesters.  *Id.*, Ex. 2 (Tindall Depo.) at 94:6-14 (PIW and crowd control tactics not discussed at

SER-0142

May 30 general briefing).  In fact, officers were expected to monitor "themselves."  *Id.*, Ex. 3 (Dwyer Depo.) at 176:5-21.

Similarly, the fact that the "SJPD went so far as to replenish the stock of less lethal weapons midway through the protest, after a very large amount were used, yet failed to direct the officers to change their behavior … [also] creates a reasonable inference of a deliberate indifference by SJPD as to the rights of the protestors."  *Johnson*, 2022 WL 17583638, at *9.

On the night of May 29, 2020, officers were authorized to bring their 40mm PIWs to the protests despite department policy banning their use for crowd control.  Bastida Dec., Ex. 3 (Dwyer Depo.) at 78:6-82:23 (Knopf approved usage after Dwyer brought discrepancy to his attention).  That night, approximately 550 PIW rounds were fired at protesters at San Jose City Hall.  *See, ante* SOF Sec. II.  At the end of that day, department officials were aware of only seven total arrests.  Bastida Dec., Ex. 38 (SJ350709).  Given that the supply of projectiles had been depleted after only one day, the department was forced to make an emergency purchase.  *Id.*, Ex. 5 (OIR AAR SJ325752) at p. 21-22; *Id.,* Ex. 2 (Tindall Depo.) at 168:8-18 (purchase of additional munitions), 171:5-16 (request for more munitions); *Id.*, Ex. 3 (Dwyer Depo.) at 168:5-169:8 (necessary to order more munitions on second day because months' supply of PIW rounds depleted); *Id.,* Ex. 39 (SJ350693 – munitions critically low after protest).

At the general briefing on May 30, prior to that evening's protest, department officials failed to provide corrective guidance on the use of the 40mm or other PIWs, *Id.*, Ex. __ (Tindall Depo.) at 94:6-14; *Id.*, Ex. 3 (Dwyer Depo.) at 168:5 – 169:8, even though "[n]othing like this ha[d] ever happened where [SJPD] depleted that – that many munitions."  *Id.* at 169:16-170:17.  There was no oversight as to the amount of PIWs being fired by SJPD officers.  *Id.* at 168:5-169:8.  Plaintiff's police practices expert, Roger Clark, finds department officials absolutely should not have deployed the 40mm PIW on May 30, 2020 given the sheer number of projectiles fired on May 29.  Bastida Dec., Ex. 40 (Clark Depo) at 90:13-93:7, 176:6-177:10.

In failing to distinguish between Plaintiff's policy of inaction theories, the City does not address Plaintiff's inadequate supervision *Monell* theory.  The City merely appends "supervision" and "supervise" to its failure to train arguments.  *Id.*  For example, the City cites

SER-0143

*Connick* to claim a failure to supervise is, along with failure to train, the "most tenuous" *Monell* theory. *Id.* at 21:23-24. *Connick*, however, speaks exclusively as to failure to train claims, not inadequate supervision. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Indeed, all "evidence" referred to by the City, here, relates only to its arguments regarding training, not supervision. ECF 107, pp. 23-24. Nonetheless, triable issues exist as to the City's failure to supervise.

> 2.    The SJPD Failed To Train Its Officers In The Use Of Projectile Impact Weapons In Crowd Control Circumstances.

There are triable issues as to the City's liability under a failure to train theory. The City's failure to provide *any* training or guidance on using PIWs in crowd control circumstances, in combination with its decision to equip SJPD officers responding to the protests with these weapons, amounts to a deliberate indifference to the rights of those protestors whom the officers came into contact. See *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This is because "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Since Plaintiff was shot with a PIW within a crowd at the protests, the City's failure to train is "closely related to the ultimate injury." *Id.* at 391.

Officers received no training, in the academy or ongoing, on the use of non-chemical PIWs in crowd control circumstances. *See ante* SOF Section II.A. Roger Clark, a police practices expert, opines the SJPD's lack of an adequate policy and training on the use of PIWs at the protests contributed to their improper use by the officers, in contravention of established law enforcement tactics and best practices. Clark Dec., Exh. A, p. 17-20 (opinions 4, 7, 8); see *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017) ("[A] police practices expert may provide helpful testimony regarding whether there was a failure to train without veering into improper legal opinions."); *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (reversing a grant of summary judgment for a defendant on a failure-to-train claim in which the district court held the plaintiff provided no evidence of a policy or custom when the plaintiff had, in fact, submitted a declaration from a law enforcement expert who opined that the defendant police department's

30
PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0144

practices amounted to a failure to train).

In addition, the SJPD failed to provide appropriate policies and training regarding the declaration of an unlawful assembly, including the means of maintaining such a declaration and the appropriate circumstances in which using force thereafter is appropriate. Clark Dec., Exh. A, p. 19-20 (opinions 7, 8, 9). This failure was an additional cause of Plaintiff's injuries given that Plaintiff was shot with a PIW without warning. Johnson Dec. at ¶¶ 4, 23.

The City argues an unlawful assembly announcement had been made prior to Plaintiff's injuries, yet the evidence shows Plaintiff arrived after the supposed time of this announcement. Johnson Dec., at ¶¶ 4, 8, 23; Fries Dec. at ¶ 12. Thus, the City's claim is itself evidence that officers failed to adequately maintain a dispersal order. Had proper measures been taken, Plaintiff would have become immediately aware of the circumstances upon his arrival at City Hall and had an opportunity to leave before being subject to force.

### D. The SJPD's Department-Wide Protest Response And Subsequent Acts Support The Inference Of Ratification.

The City argues a ratification theory is unavailable to plaintiff because no policymaker was aware of Adgar's use of force or approved of it. Not so. When a police department "is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates." *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020). This is particularly true when department heads make "comments that could be interpreted as suggesting that the officers who used force did not meaningfully deviate from the department's plan." *Id.* The Court previously held Plaintiff's allegations of "an organized, department-wide response" permits an inference of ratification by the SJPD. *Johnson, supra,* 2022 WL 17583638, at *9.

The City does not dispute that the SJPD was engaged in an organized, department-wide response. No officer, including Officer Adgar, was disciplined for their conduct. Bastida Dec., Ex. 22 (Zuniga Depo.) at 11:12-25, 13:17-21, 31:13-32:5. Indeed, Chief Garcia made comments after the protests on May 29 praising Officer Yuen, who was seen excessively using force all over the news and social media. *See ante* SOF.

SER-0145

## IV.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS.

Defendants' request for summary judgment as to Plaintiff's state law claims for battery, and violations of the Bane Act must be denied for the same reasons Defendants' request for summary judgement as to Plaintiff's Fourth Amendment claim must be denied.

Defendants contend that Plaintiff's Bane Act and battery claims may only survive if Plaintiff proves Officer Adgar had the specific subjective intent to use force against Plaintiff. ECF 107 at 24:20-28 (citing *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526 (Cal. Ct. App. 2009) and *Reese v. Cty. Of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).).  Thus, defendants argue, since Officer Adgar "inadvertently" struck Plaintiff during his "use of the 40mm to target assaultive suspects during an unlawful assembly" his conduct was reasonable.  ECF 107 p. 25. Defendants' analysis however misses the mark.

First, Defendants' argument requires the Court to accept as true Officer Adgar's version of events, notwithstanding the numerous contradictions to his claims, including his own admissions on the night in question and the vast amount of video evidence.  Second, and what Defendants fail to address, is that satisfying the "specific intent" requirement under the Bane Act is not an onerous task, where "mere reckless disregard" of the underlying right is sufficient. *Reese*, 888 F.3d at 1045 ("[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.").

Here a reasonable jury may conclude that Officer Adgar acted with reckless disregard for Plaintiff's constitutional rights based on the evidence presented.  The law is clear, "[s]tate law claims for battery, wrongful-death negligence, and interference with federal or state rights under the Bane act are coextensive with claims for excessive force under the Fourth Amendment." *Estate of Casillas v. City of Fresno*, 342 F.Supp.3d 990, 1002 (E.D. Cal. 2018).  This Court should deny Defendants request for summary judgment as to Plaintiff's state claims.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny Defendants' motion for summary judgment and allow Plaintiff his day in court.

SER-0146

Dated:  August 18, 2023                    McMANIS FAULKNER


                                           /s/ *Abimael Bastida*
                                           ABIMAEL BASTIDA

                                           Attorneys for Plaintiff
                                           KYLE JOHNSON

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; Case No. 5:21-cv-01849-BLF

SER-0147

JAMES McMANIS (40958)
ABIMAEL BASTIDA (303355)
CHERRIE TAN (324871)
EVAN MILLER (336473)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244
Email:        abastida@mcmanislaw.com

Attorneys for Plaintiff,
KYLE JOHNSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Kyle Johnson, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of San Jose, a California charter city; San Jose Police Department Officer James Adgar, Badge No. 4552, an individual; Does 2 through 50,<br><br>Defendants. | Case No. 5:21-cv-01849-BLF<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Second Amended Complaint for Damages; Demand for Jury Trial;
Case No. 5:21-cv-01849-BLF

SER-0148

**INTRODUCTION**

1.      On May 25, 2020, Minneapolis police officer Derek Chauvin killed George Floyd, a Black man, by kneeling on Mr. Floyd's neck for over nine (9) minutes (Haley Willis, et al., *New Footage Shows Delayed Medical Response to George Floyd*, N.Y. TIMES, Aug. 11, 2020 (updated Jan. 6, 2021), https://www.nytimes.com/2020/08/11/us/george-floyd-body-cam-full-video.html), while fellow officers held Mr. Floyd down and prevented others from rescuing him. Public outrage over this act of police brutality inspired millions of Americans nationwide to march against the disproportionate use of deadly force by law enforcement against Black people. Alongside many others, plaintiff, Kyle Johnson ("plaintiff" or "Mr. Johnson") participated in the George Floyd protests on Saturday, May 30, 2020, in San Jose, California.  In addition to the horrifying circumstances of Mr. Floyd's unjustifiable killing, the actions of Mr. Johnson's grandmother, who participated in the "Bloody Sunday" march from Selma in 1965, inspired him to make his voice heard.

2.      The San Jose Police Department ("SJPD") responded to the George Floyd civil rights demonstrations with excessive force.  Throughout the demonstrations, and including on May 30, 2020, the SJPD made liberal use of projectile impact weapons ("PIWs" or "less lethal firearms") against individuals who posed no threat but advocated a political viewpoint that is expressly disagreed with by some members of the SJPD.  This lawsuit is to redress injuries Mr. Johnson sustained from the SJPD's unreasonable and excessive use of less lethal firearms against nonviolent protesters on May 30, 2020.

**JURISDICTION AND VENUE**

3.      This action arises under 42 U.S.C. § 1983, the Constitution of the United States, the Constitution of the State of California, and California state law.  The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367(a).

4.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because the action arises therein, and a substantial part of the events giving rise to this action occurred therein.

///

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0149

**INTRADISTRICT ASSIGNMENT**

5.      Assignment of this action to the San Jose Division is proper under Civil Local Rules 3-2(c) and 3-2(e), because a substantial part of the events giving rise to the claims alleged herein occurred in the County of Santa Clara.

**PARTIES**

6.      Plaintiff Kyle Johnson ("Mr. Johnson" or "plaintiff") is, and at all times herein mentioned was, an individual residing in the County of Santa Clara, State of California.

7.      Defendant James Adgar ("Officer Adgar") is, and at all times herein mentioned was, an officer of the SJPD and an employee of the City of San Jose.  Officer Adgar is sued in his individual capacity.

8.      Defendant City of San Jose ("City") is, and at all times herein mentioned was, a public entity and charter city located in the County of Santa Clara, State of California.  At all relevant times, the City and its policymakers are and were responsible for the policies, procedures, practices, and customs of the City's various agents and agencies, including but not limited to, the SJPD.  At all relevant times, the City and its policymakers had the power and authority to adopt policies and prescribe rules and regulations affecting the operation of the SJPD and its tactics, methods, practices, customs, and usage.  At all relevant times, the City is and was responsible for assuring that the actions, omissions, policies, procedures, tactics, methods, practices, and customs of the SJPD, its employees and agents, and any law enforcement officers who provided the City with mutual aid, including Does 2 through 50, complied with the laws of the State of California and the laws of the United States.

9.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 2-50, inclusive, and therefore sues these defendants by such fictitious names.  They are sued in their individual capacities, and any reference in this complaint to "defendants" also refers to Does 2-50.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the acts, omissions, injuries, and damages herein alleged.

3

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0150

10.     SJPD officers whose names are unknown to plaintiff, and who are therefore sued as Does, are employed by the City.  At all times mentioned herein, defendants, including Does 2-50, inclusive, were employed by the City and acting within the course and scope of their employment, or in the alternative, were employed by another law enforcement agency while they were providing mutual aid to the SJPD.

11.     At all times herein mentioned, defendants, including those sued herein as Does 2 through 50, were the agents, servants, and employees of their co-defendants and in doing the things herein alleged were acting in the scope of their authority as such agents, servants and employees, under the direction and supervision and with the permission and consent of their co-defendants.  At all times herein mentioned, defendants, including those sued herein as Does 2 through 50, provided each other with armed backup and aided, incited, or conspired in the denial of plaintiff's constitutional rights, and plaintiff's rights under California Civil Code sections 51.7 and 52.1.

## GENERAL ALLEGATIONS

### *The Protests*

12.     Starting May 29, 2020, for five days, countless people gathered on the streets of San Jose peacefully to protest the killing of George Floyd, police brutality, and systemic racism.

13.     Along with many others, plaintiff, Kyle Johnson, demonstrated against police brutality and systematic racism.

14.     On information and belief, during the five days of protest, police officers used force to target demonstrators based upon the demonstrators' race and their belief that police should be held accountable for their actions.  In response to protests against police brutality, the police chose to engage in brutality.

15.     During the five-day protest, demonstrators exhibited peaceful behavior without antagonizing the police such as playing a guitar while marching, kneeling on the ground and praying, standing with their hands up, and trying to walk away.  Police officers, however, still shot impact munitions and chemical weapons at the peaceful demonstrators.

4

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0151

16. On May 29, 2020, at around 2:00 pm, demonstrators protested in downtown San Jose. On information and belief, the protest was peaceful. At about 4:00 pm, the police presence increased. Police arrived in riot gear from the East on Santa Clara Street and simultaneously, uniformed law enforcement arrived from the North on Sixth Street.

17. Before the increase in police presence, including officers in riot gear with less-lethal weapons drawn, there was no incident related to the peaceful protest that justified the police to define the demonstration as an unlawful assembly or to use force against the demonstrators. Even so, SJPD announced the protest an unlawful assembly through a loudspeaker that was inaudible and unclear.

18. At the time SJPD had only one Long Range Acoustic Device available to make announcements. On information and belief, due to the lack of preparation and the lack of necessary acoustic devices, demonstrators could not hear and were unaware of any dispersal orders or announcements made by SJPD. Similarly, due to a lack of training, SJPD officers failed to give clear or repeated warnings sufficient to put demonstrators on notice of any dispersal orders or announcements.

19. On information and belief, that same day, the City or its agencies, including, but not limited to the SJPD, also authorized or ordered the use of "kettling" (also known as containment or corralling), which is a police tactic where officers surround a large group of people in a space by enclosing them so there is no escape. SJPD officers formed police lines and drove vehicles towards the demonstrators. The demonstrators were herded in a set direction by a skirmish line and police vehicles that blocked the demonstrators from leaving the area. Kettling results in panic, elevates tensions, and chills speech.

20. That same day, law enforcement, including SJPD officers, used less-lethal force including tear gas, batons, rubber bullets, bean bags, and physical force against peaceful demonstrators.

21. SJPD officers also deployed thirty-one pepper ball projectiles, thirty-two tear gas canisters, and at least 400 foam batons or rubber bullets into crowds of peaceful demonstrators. As a result, most of the SJPD's less-lethal munitions and chemical agents were depleted after the

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0152

first day of peaceful protests, and the SJPD was forced to make emergency purchases of additional munitions.

22.     In the SJPD's After Action Report in September 2020, it was stated that there was lack of training and experience, insufficient staffing levels, and a need to update policies and procedures which impacted the SJPD's response to the George Floyd protest.  The After Action Report also found that, with respect to SJPD officers, academy training and the mandated annual training was insufficient.

23.     In the City's Independent After Action Regarding the Events of May 29 – June 7, 2020 Report in October 2021, the same Department-wide training deficiencies in the realm of crowd control and civil disorder were addressed.  This report also stated that the vast majority of officers and sergeants had not received the appropriate training; any training regarding civil disorder had been sparse for years and provided only to a relatively small segment of the SJPD organization.

### *The Incident*

24.     On May 30, 2020, between approximately 9:30 p.m. and 11:00 p.m., Mr. Johnson was exercising his First Amendment rights in front of City Hall, by participating in one of the hundreds of peaceful civil rights demonstrations that occurred across the United States in response to the killing of George Floyd by Minneapolis police officers on May 25, 2020.

25.     Mr. Johnson was one of many peaceful demonstrators at City Hall.

26.     No curfew was in place in the City on May 30, 2020.

27.     On information and belief, as of May 30, 2020, the use of 40mm projectile impact weapons that do not contain chemical agents for crowd control purposes were prohibited as a matter of City policy.  Further, the SJPD has no ongoing 40mm Launcher training for patrol officers.

28.     During the relevant time period, Mr. Johnson was located near the planters lining the sidewalk of East Santa Clara Street in front of the City Hall plaza.  Officer Adgar was in the vicinity on East Santa Clara Street, equipped with zip ties and a 40mm launcher.  The City Hall plaza is a public forum.

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0153

29. The SJPD and the law enforcement officers who provided mutual aid to the City responded to the George Floyd police brutality protests with excessive force directed against the civil rights demonstrators. Officers lining East Santa Clara Street opposite Mr. Johnson began to deploy weapons, including but not limited to, less lethal firearms, after another member of the crowd threw a plastic water bottle up in the air (which landed on the ground without harming any officer). In an attempt to flee from the officers' use of their weapons on the crowd, Mr. Johnson ran perpendicular from the officers and towards City Hall. Officer Adgar aimed and intentionally fired at least one 40mm foam baton projectile towards Mr. Johnson as Mr. Johnson was attempting to flee. Mr. Johnson heard a noise that sounded like compressed air and what he believed to be a projectile shooting out of a gun. Mr. Johnson then felt the officer-fired projectile hit the back of his leg, which left a large circular-shaped injury. Mr. Johnson was in the City Hall plaza when he was struck.

30. After he was hit, Mr. Johnson hobbled out of the line of fire towards the City Hall building until he felt safe enough to limp away from the area of the demonstrations.

31. As he was limping away, Mr. Johnson heard tear gas being deployed, and then an announcement that the gathering was unlawful. At no point before Mr. Johnson was hit did he hear any order to disperse, or any declaration that the assembly was allegedly unlawful. During the time when Mr. Johnson was present in the City Hall plaza, the SJPD did not declare an unlawful assembly until after Mr. Johnson was shot.

32. At all relevant times, Mr. Johnson exercised his First Amendment rights in a peaceful manner, did not pose a threat to the officers or anyone else, and did not engage in any illegal activity. No reasonable officer would interpret Mr. Johnson's speech or actions on May 30, 2020, to be threatening to anyone. Mr. Johnson was never charged with any crime in connection with his exercise of his First Amendment rights on May 30, 2020.

33. Upon information and belief, Officer Adgar held views contrary and hostile towards the demonstrators and the protests. He employed excessive force as a result of his discriminatory views towards the demonstrators and his disagreement with the protest. Officer Adgar's willingness to blatantly flout multiple department policies and basic logic, in employing

7

SER-0154

excessive force, supports the inference that his bias and animosity motivated his actions.

    a. Department policy directed officers to use projectile weapons when objectively reasonable to prevent bodily injury, yet Officer Adgar directly fired his projectile weapon at an already-fleeing crowd.  Officer Adgar states, in a report that he authored, that after identifying a suspect who had already thrown the bottle they were holding, he "fired one 40mm foam baton less lethal projectile towards the suspect that had the beer bottle in his hand earlier as he attempted to flee."  In another instance, Officer Adgar fired two 40mm projectile rounds at a woman, who other officers claimed had already thrown a bottle, that was already leaving the City Hall area.  Any injury that could have been caused by the bottle could not have been prevented by firing a projectile weapon at the suspect after the fact, Officer Adgar's use of his PIW was inappropriate in this circumstance.

    b. Plaintiff was shot from behind as he was leaving, he did not pose a threat, and Officer Adgar was not using his projectile weapon to prevent bodily injury.

    c. Department policy requires officers to only fire projectile weapons when they have identified a target.  Shortly after firing his weapon, Officer Adgar's body worn camera footage captures him telling other officers that he couldn't see where he was firing.

    d. Department policy directs officers to not use projectile weapons unless there are a sufficient number of officers present to immediately take control and custody of the suspect.  Upon information and belief, Officer Adgar used a projectile weapon despite not being in a position to arrest any of the people on whom he used the weapon.

34. Plaintiff is informed and believes, and thereon alleges, that Officer Adgar received no training from the SJPD in the use of Combined Tactical Systems (CTS) projectiles within the five years preceding the May 30, 2020, civil rights demonstration.  The CTS 40mm foam baton round is used by Special Operations and patrol personnel as an impact projectile.

8

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0155

35.     The impact of the projectile caused a large circular mark and severe bruising to form on Mr. Johnson's leg, resulting in the formation of a blood clot, which required multiple trips to the emergency room and a sustained course of follow-up treatment, including medication.  As a result of his injuries, Mr. Johnson's risk of blood clots increased, and he continues to suffer from blood clots.  He recently had to return to the hospital, and anticipates he will have to continue taking medication to counteract the blood clots for the rest of his life.

36.     Before he was hit, Mr. Johnson was an active, athletic person who taught physical education and coached sports.  As a result of the unlawful and unnecessary use of excessive force, Mr. Johnson's mobility was seriously impaired, and he was unable to walk or exercise normally for approximately three (3) months following the incident.  Mr. Johnson continues to experience pain and reduced mobility in connection with the blood clots.

37.     As a result of his injuries, Mr. Johnson experienced severe physical pain, and the mental and emotional distress that would normally flow from the experience of being shot in the course of protesting the use of deadly force by law enforcement against Black people, and learning the injuries were serious and would require a sustained course of treatment.  The intentional use of excessive force by the SJPD and other law enforcement officers involved was sufficient to deter Mr. Johnson and any ordinary person from exercising their First Amendment rights to protest deadly force by law enforcement and its disproportionate use against Black people.

***The City's Custom, Policy, Practice, and Failure to Supervise and Train Its Police Officers***

38.     Plaintiff's injuries were the result of crowd control customs, policies, or practices implemented by the City before, and during, the George Floyd protests that the City knew, or should have known, would likely result in the deprivation of First and Fourth Amendment Constitutional rights of members of the public, including plaintiff.  These customs, policies, and practices relate to crowd control tactics including, but not limited to, the use of projectile impact weapons and "kettling."

        a.   On October 30, 2018, Chief Garcia send out Memo # 2018-024 which, among other things, revised the use requirements for projectile impact weapons.  The

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0156

revision no longer required that PIW's be used "as a defensive weapon" but, rather, "when objectively reasonable" to incapacitate an armed suspect who is likely to cause serious bodily injury or death.

b. On May 22, 2020, a week before the protest, Chief Garcia sent Memo # 2020-019 to all SJPD personnel regarding a revision to the Duty Manual on the use of projectile impact weapons and crowd control.  He advised the policy now allowed 40mm projectile impact weapons in crowd control situations when they had previously been prohibited.

c. SJPD policy in effect at the time of the protests allowed for indirect fired (or "skip fired") munitions, which are intended to be fired so that the projectile impacts the ground first and then "skips" into the intended target.  In law enforcement, it is a best practice to prohibit the use of skip fire munitions to be used against people, including in crowd control or crowd management situations.

d. Furthermore, SJPD policy in effect at the time of the events complained of herein allowed for multi-target munitions (rounds launching multiple projectiles at the same time) to be fired into a crowd for crowd control.

e. Upon information and belief, the City or its agencies, including, but not limited to, the SJPD, authorized the use of "kettling" as a crowd control tactic.  Kettling, which derives from a German military term referring to an army surrounded by a much larger force, is a police tactic whereby officers confine a large group of people to a designated space by surrounding them on all sides so that there is no escape.  By doing so, the officers effectively control people's movements.

f. Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech.  SJPD officers accomplished this by forming a police line in front of City Hall along Santa Clara Street.

g. On May 28, 2020, Chief Garcia became aware of a planned protest scheduled to take place in front of City Hall.  At this time, SJPD had recently implemented a new strategy of zero tolerance for violence or property damage.

10

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0157

39. Plaintiff's injuries were the result of the City's customs, policies, or practices, including the failure to properly supervise or train police officers to avoid violations of Constitutional rights, under the First and Fourth Amendments, of members of the public in the performance of their duties including, but not limited to, the use of excessive force, constitutional limitations on the use of force, and racial, religious, and viewpoint bias and profiling.

40. Plaintiff is informed and believes, and thereon alleges, that as of May 30, 2020, crowd control training for SJPD officers had been minimal and infrequent. In particular, plaintiff is informed and believes, and thereon alleges, that training on the use of, and the constitutionality of using, less lethal firearms against peaceful demonstrators was minimal and infrequent.

41. Plaintiff is informed and believes, and thereon alleges, that the SJPD conducted no ongoing training for patrol officers regarding the 40mm launchers used against the George Floyd civil rights demonstrators. Because training in firearms, including less lethal firearms, is a perishable skill, the infrequency of the training is significant.

42. Plaintiff is informed and believes, and thereon alleges, that the SJPD did not provide regular trainings to officers and command staff on crowd control, in part because such mass trainings require time away from already depleted patrol staffing.

43. In spite of the lack of necessary training, the SJPD allowed untrained officers to be equipped with less-lethal firearms during the George Floyd civil rights demonstrations.

44. On information and belief, Defendants, including Does 2-50, did not have adequate training on legally permissible uses of less lethal firearms in a crowd control context for at least the last five years before the subject incident.

45. A 40mm course attendance report produced by the City in this action (SJ301668-SJ301672), which lists the name of all officers who have been trained in the use of 40mm munitions and the date of their course, does not include Officer James Adgar. This list also does not include Officer Jared Yuen. Both Officer Adgar and Officer Yuen were deployed with 40mm munitions during the protests.

SER-0158

46.     To the extent training was provided, it was constitutionally inadequate because it lacked specificity and even encouraged officers to improperly use force.

      a.   For example, a slide deck for a training on Projectile Impact Weapons given by SJPD Sergeant Christopher Sciba, a Sergeant with the SJPD Training Unit, states that such munitions may be used for "Riot/Crowd Control," but fails to provide any guidance about the circumstances under which use in that specific context would be constitutional or in compliance with SJPD policy.  The slides fail to provide such guidance despite acknowledging, "[i]njury should be expected," and depicting shots to the chest, spine, head, and neck as "lethal force" in a graphic on one of the slides.

      b.   Further, Sergeant Sciba included a slide with a cartoon that mocks shots to the groin. The cartoon depicts two cavemen who fell a giant mammoth with their tiny arrow by shooting it in the groin. This slide immediately follows the slide which covers where the shooter should aim and which body parts to avoid.

      c.   The final slide in the presentation tells trainees to "not hesitate," and to "[a]lways win."  Such words fail to discourage the escalation of force in any given police encounter.

47.     On information and belief, the failure to provide adequate training on crowd control and use of force, including, but not limited to, less lethal firearms resulted in the SJPD officers' inappropriate use of PIWs against individuals who posed no threat to anyone, causing injury to Mr. Johnson and others.  Such failure to train amounts to deliberate indifference to individuals who exercise their protected rights of assembly and free speech, who may come into contact with the untrained officers and command staff.  Violation of constitutional rights is a highly predictable consequence of the failure to equip SJPD officers with appropriate training to handle recurring crowd control situations.

48.     Including the foregoing, a litany of incidences prior to Plaintiff's arrival at City Hall on May 30, 2020, at 9:30 p.m. demonstrate that the City knew, or should have known, of its failure to train, supervise, monitor, or instruct police officers to avoid violations of the

SER-0159

Constitutional rights of members of the public under the First and Fourth Amendments.  The City took no steps to rectify its behavior despite numerous opportunities to do so.

49.     On information and belief, beginning on May 29, 2020, the City was aware of the lack of training or supervision, as the result of extensive video footage and images circulated via news media reports and social media, where (1) SJPD officers were using their less lethal firearms and tactics to suppress the demonstrations against the police and not using their equipment out of a need to defend themselves or others against imminent harm, or even to prevent significant property damage; (2) SJPD officers were improperly using their PIW firearms in contravention of SJPD policy and best practices; and (3) SJPD officers were employing improper crowd control tactics.

a.  On May 29, local live news broadcasts, especially those beginning at 5:00 p.m. and 6:00 p.m., displayed real-time footage of unprovoked SJPD officers indiscriminately firing projectiles at peaceful protesters while making no attempt to arrest anyone.  Officer were shown directly firing projectiles at demonstrators at close range.  These included, but are not limited to, the broadcasts of ABC7 News (KGO-TV), CBS KPIX5 News (KPIX-TV), NBC Bay Area News (KNTV), and KTVU FOX 2 News (KTVU).

b.  As another example, during the 6:00 p.m. CBS KPIX5 News broadcast on May 29, reporter Len Ramirez appears to have been shot by an SJPD projectile after stating that he had "just been hit with something."  SJPD officers can then be seen indiscriminately firing at the crowd in close range and located on public property.  The news anchor notes that "they are firing directly at them" and that "you can clearly see police officers firing into the crowd, it appears to be some sort of a projectile…"  No warning or order to disperse is heard from the SJPD officers.  On information and belief, Len Ramirez was not arrested and is not alleged to have committed any crime.

c.  As an example of policymakers' awareness, San Jose Mayor Liccardo appeared on the 5:00 p.m. broadcast of KTVU Fox 2 while SJPD officers could be seen live

13

SER-0160

on-screen indiscriminately firing at protesters in close range without any attempt to arrest.  Mayor Liccardo was asked about his reaction to the live footage of less lethal firearms being used.  The reporters specifically told to him that these events were happening near City Hall.  Mayor Liccardo was specifically asked if he was aware of the situation on Santa Clara Street to which he responded that he had just been on the phone with Police Chief Edgardo Garcia who had informed him that less lethal firearms were being used on Santa Clara Street near City Hall.  Further, in an appearance on ABC7 News, Mayor Liccardo admitted that he was observing the protests in downtown, from his office in City Hall, and that they were peaceful and in control despite blocking some traffic on Santa Clara Street.

50.     Video taken on or about May 29, 2020, shows SJPD Officer Jared Yuen behaving aggressively, yelling obscenities at demonstrators, and firing his less lethal firearm in a reckless manner.  Yuen's conduct demonstrated a failure by the City adequately to train its officers and the City's response demonstrates their failure to supervise officers.  On information and belief, City policymakers were aware – or should have been aware – of Yuen's conduct before plaintiff was shot.

51.     Video of Yuen's conduct was circulated on social media on May 29 and 30, 2020. In response to officer Yuen's unreasonable behavior, then-Chief Edgardo Garcia described Yuen at a media briefing on May 31 as "a good kid" who "made a mistake[.]"  Garcia later apologized for his remarks.  Yuen allegedly was allowed to return to duty on May 30, 2020.  The failure of SJPD leadership to promptly and unequivocally condemn Yuen's behavior sent the wrong message to other SJPD officers – that the unreasonable use of less lethal firearms against non-threatening demonstrators would be tolerated and would not result in termination.  Chief Garcia's decision to allow Yuen to return to duty on May 30, 2020, was a ratification or an act of deliberate indifference to Yuen's constitutional violations that he knew or should have known about.

52.     On May 29, 2020, with the authorization of Sergeant Ronnie Lopez and Sergeant Lee Tassio, Officer Yuen deployed about 100 40mm projectiles.

14

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

53.     SJPD received 1,079 complaints regarding Officer Yuen's conduct at the week's protest.

54.     Officer Yuen among other officers did not have adequate training on the use of force or any training at all on the use less lethal firearms in at least the last five years.  They were present at the George Floyd protest, however, and committed acts of excessive force and violations in their use of less lethal firearms.

55.     Among other incidents occurring over the course of the George Floyd civil rights demonstrations in San Jose, it was reported that a "Good Samaritan," who had attempted to assist when an officer was knocked unconscious, was later shot in the abdomen with a projectile, allegedly by Officer Yuen and  a peaceful demonstrator was struck in the genitals with a projectile.

56.     On information and belief, on May 30, 2020, officers responded to a woman recording the police in her home and yelling at them for mistreating the protestors.  Officers shot and hit her while she was in her apartment.  They shot through her living room and bedroom window, and threw a tear gas canister into her apartment. Thirteen projectiles were found in her apartment.  Her neighbor's windows were also shot during the same event.

57.     Plaintiff is informed and believes, and thereon alleges, that the City of San Jose and its various agencies, including, but not limited to, the Office of the Independent Police Auditor, publish annual statistics regarding the number of SJPD officers that receive complaints of excessive force per year, as well as the total number of excessive use of force allegations by members of the public.  Plaintiff is further informed and believes, and thereon alleges, that a significant number of the complaints against SJPD officers or use of force allegations made by members of the public are similar constitutional violations by SJPD officers, including excessive use of force and constitutional violations regarding crowd control.  Nevertheless, the number of SJPD officers that receive complaints of excessive force and the number of use of force complaints over the years has not improved.  Thus, establishing an obvious need for additional or adequate training and a failure by the City to train SJPD officers on the proper use of force and crowd control.  Alternatively, the annual statists provided or made available to those within final

15

SER-0162

policymaking authority within the City and SJPD coupled with the failure to train, discipline, or otherwise address the complaints against its officers, constitutes a ratification or deliberate indifference by final policymakers within the City and SJPD to the repeated constitutional violations of SJPD officers.

58. By the end of May 29, 2020, the City should have been aware of the lack of training, supervision, and the detrimental impacts of its policies, because, despite making only 18 arrests, the City was forced to make an emergency purchase of additional munitions as its less lethal munitions and chemical agents had been depleted after only one day of protests. Such a high usage of munitions, in contrast to so few arrests, draws the inference that PIWs were not being properly used.

59. Plaintiff is informed and believes, and thereon alleges that the City and the SJPD were unable to document the true number of less lethal munitions fired during the course of the George Floyd civil rights demonstrations, among other reasons, because many officers simply documented using "multiple" rounds without providing an accurate or specific total. For example, for the demonstrations that occurred on May 30, 2020, the SJPD could only estimate that its Special Operations forces fired approximately 133 40mm foam baton rounds, and its patrol officers fired an unknown number of such rounds. In spite of the policy set forth in section L 2629 of the SJPD's Duty Manual that, "[t]he intentional discharge of a Projectile Impact Weapon at a suspect shall be documented as a use of force[,]" the SJPD's documentation was inadequate. The failure to carefully and appropriately document uses of less lethal firearms on nonviolent civil rights demonstrators evidences deliberate indifference to the lives and safety of individuals who exercise their First Amendment rights in the City.

60. On information and belief, some members and former members of the SJPD are openly hostile to the Black Lives Matter movement or others who advocate for the eradication of anti-Black racism in law enforcement. For example, based on a June 26, 2020 anonymous blog post available at https://blog.usejournal.com/racism-and-hate-behind-the-blue-wall-exposing-secret-law-enforcement-facebook-groups-6cf23a596a98, it was widely reported that SJPD Officer Mark Pimentel commented on Facebook, "black lives don't really matter." Similarly, it

16

SER-0163

was reported that SJPD Officer Phillip White was reinstated by an independent arbitrator after he was fired, having tweeted, "Threaten me or my family and I will use my God given and law appointed right and duty to kill you. #CopsLivesMatter" and "By the way if anyone feels they can't breathe or their lives matter, I'll be at the movies tonight, off duty, carrying my gun."  In relation to this same Facebook group, a retired SJPD officer, William Rockmiller, also posted publicly against Black Lives Matter and condemned those who supported the movement, stating "Fuck BLM."  The Facebook group was exposed as a platform for white supremacists and racism within SJPD.

61. In 2016, the San Jose Police Officers Association posted a video, available at https://www.youtube.com/watch?v=w5amQnliQqk, which ends with the words, "The San Jose Police Officers' Association believes All Lives Matter" and "Blue Lives Matter."  These slogans are commonly understood to have been created in response to the Black Lives Matter movement, in order to undermine it.  On information and belief, such sentiments influenced the SJPD's use of force decisions during the George Floyd demonstrations, which is a result of the failure of policymakers adequately to supervise officers in the years leading up to the protests.

62. After former-Chief Garcia's retirement was announced, the City named its finalists in the search to replace him – including Minneapolis police Chief Medaria Arradondo, who led the Minneapolis Police Department at the time George Floyd was killed.  Arradondo withdrew his name from consideration.  Salonga & Angst, *San Jose: Minneapolis chief drops out of SJPD chief search*, THE MERCURY NEWS, Jan. 25, 2021 (updated Jan. 26, 2021), https://www.mercurynews.com/2021/01/25/san-jose-quietly-announces-sjpc-chief-finalists-including-the-top-cop-in-minneapolis/.

63. On November 20, 2020, pursuant to California Government Code §§ 905, 910, et seq., plaintiff presented to the City a government claim for money damages against the City and individuals originally named as Does 1-50, for the conduct alleged herein.  On or about January 14, 2021, the City mailed a Notice of Rejection of Claim.

///

///

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0164

*SJPD's Custom or Practice Constitutional Violations Based on Race and Bias, and the City's Ratification of, or Deliberate Indifference to, Those Constitutional Violations*

64.     Defendants employed excessive force against plaintiff and other peaceful protesters at the George Floyd protests because the message of the demonstrations was focused on racist killings of Black people by police throughout the country.  As a result, defendants targeted people of color.

65.     A memorandum by then-Chief of Police, Edgardo Garcia dated September 4, 2020, included the *Police Department Preliminary After Action Report for the Public Protests, Civil Unrest, and Law Enforcement Response From May 29-June 7, 2020 1, 122* (available online at http://www2.sjpd.org/records/pc-13650_library/Misc/Police%20Department%20Preliminary%20After%20Action%20Report%20for%20the%20Public%20Protests,%20Civil%20Unrest%20and%20Law%20Enforcement%20Response%20from%20May%2029th%20-%20June%207th,%202020.pdf) provided statistics that confirm that of the 176 total arrests related to the demonstrations, more than 75% of the arrests were of people of color.

66.     The targeting of people of color during the George Floyd protests, however, is not a single isolated constitutional violation but rather it is one that comprises a widespread practice that is so permanent and well settled throughout the history of the SJPD that it constitutes a custom or practice within SJPD.

　　a.  In 1991, the American Civil Liberties Union, published a press release (available online at https://www.aclu.org/press-releases/police-and-community-react-san-jose-traffic-stop-data) reporting its finding that the SJPD stopped people of color on the road at significant high rates relative to the census population of the City.

　　b.  In 2017, the same issue persisted.  In a study by Michael R. Smith, Jeff Rojek, Robert Tillyer & Caleb Lloyd titled, *San Jose Police Department Traffic and Pedestrian Stop Study*, analyzing traffic and pedestrian stops from 2013-2016, people of color again were found to be significantly more likely, than White drivers or pedestrians, to be stopped or searched.

18

SER-0165

c. Shortly after the George Floyd protests, and in response to law enforcement's actions during the protests in San Jose, a Bay Area news organization referenced FBI statistical data from 2018, which revealed that despite a 3% makeup by Black people of the City's population, Black people were three times more likely to be arrested by SJPD compared to White people.  The news organization's article is available online at https://abc7news.com/police-arrests-bay-area-systematic-racism/6243588/.

d. In 2020, the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, published a report confirming that in 2020 SJPD still had discriminatory policing practices towards people of color.  With respect to the SJPD, the data showed that for every 1,000 white adults in the population, 1.1 received a citation as a result of a stop by SJPD.  However, for every 1,000 Latinx adults, 2.4 received a citation and for every 1,000 Black adults, 7.0 received a citation.  The report titled *Cited for Being in Plain Sight: How California Polices Being Black, Brown, and Unhoused in Public*, is available online at https://lccrsf.org/wp-content/uploads/LCCR_CA_Infraction_report_4WEB-1.pdf.

67.     The above examples show that throughout the years SJPD has a custom or practice of unconstitutional policing and discrimination towards people of color.  This also confirms that neither the SJPD, nor the City, has adequately trained, disciplined, or otherwise addressed SJPD's harmful practice of targeting people of color and that SJPD's discriminatory policing persists.  The Chief of Police, or other final policymakers within the City, ratified or otherwise acted with a deliberate indifference to the constitutional violations of SJPD officers.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Fourth Amendment – Excessive Force**

**(Against the City of San Jose, Officer Adgar and Does 2-50)**

68.     Plaintiff incorporates herein the preceding paragraphs of this Complaint to the extent relevant, as if fully set forth.

69.     In shooting Mr. Johnson with a less lethal firearm, although Mr. Johnson was

19

SER-0166

demonstrating peacefully and was never alleged to have committed any crime, defendants subjected Mr. Johnson to an unreasonable seizure and excessive force.  In doing the acts alleged herein, defendants deprived Mr. Johnson of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  It is obvious under the circumstances that the use of force of any kind on Mr. Johnson was unreasonable.

70.     In doing the acts alleged herein, defendants were acting under color of state law.

71.     In violating plaintiff's constitutional rights, defendants were acting in accordance with a custom, policy and practice of the City and the SJPD, which proximately caused the harm, damages, and constitutional violations alleged herein.  Defendants failed to ensure that only officers who had received adequate training were allowed to use less-lethal firearms during the George Floyd civil rights protests.  Defendants further failed to ensure that any training provided was adequate to apprise officers of the circumstances under which less lethal firearms constitutionally may be used for crowd control.  Such failure amounts to deliberate indifference to the rights of persons with whom the SJPD comes into contact.

72.     As a direct and proximate result of defendants' wrongful acts, Mr. Johnson suffered damages, including but not limited to, bodily injury, physical pain, emotional distress, and deprivation of constitutional rights, according to proof at the time of trial.

73.     Plaintiff is informed and believes, and thereon alleges, that defendants' acts alleged herein were done with malice, fraud, and oppression, and in reckless disregard of plaintiff's constitutional rights, justifying an award of punitive damages.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – First Amendment – Retaliatory Use of Force**

**(Against the City of San Jose, Officer Adgar and Does 2-50)**

74.     Plaintiff incorporates herein the preceding paragraphs of this Complaint to the extent relevant, as if fully set forth.

75.     Mr. Johnson was engaged in the constitutionally protected activity of peacefully protesting police brutality at the time he was shot.

76.     Defendants' wrongful acts alleged herein would chill an ordinary person from

20

SER-0167

continuing to engage in this protected activity.

77.     Mr. Johnson is informed and believes, and thereon alleges, that defendants subjected him to the above-described treatment in retaliation for, and as punishment for, his exercise of his protected rights of free speech and assembly, and to deter him from asserting his First Amendment rights in the future.  Officer Adgar had no reasonable basis to believe that Mr. Johnson had committed a crime, or that Mr. Johnson had done anything to warrant any force being used against him.  Officer Adgar intentionally shot a projectile towards Mr. Johnson without warning, as Mr. Johnson was trying to flee.  SJPD officers used projectiles, chemical agents, and flash bang devices against the demonstrators, including demonstrators who had not engaged in violent conduct and were not knowingly participating in an unlawful assembly after having been lawfully warned to disperse.  Mr. Johnson is informed and believes, and thereon alleges, that defendants' desire to retaliate against individuals protesting police brutality, and to deter such protests, was a substantial and motivating factor in their use of excessive force.

78.     In doing the acts alleged herein, defendants deprived Mr. Johnson of his rights under the First and Fourteenth Amendments to the United States Constitution.

79.     In doing the acts alleged herein, defendants were acting under color of state law.

80.     In violating plaintiff's constitutional rights, defendants were acting in accordance with a custom, policy and practice of the City and the SJPD, which proximately caused the harm, damages, and constitutional violations alleged herein.  Defendants failed to provide constitutionally adequate training on use of force, and specifically, use of less lethal firearms, in the context of crowd control and civil rights demonstrations.  Such failure amounts to deliberate indifference to the rights of persons with whom the SJPD comes into contact.

81.     As a direct and proximate result of defendants' wrongful acts, Mr. Johnson suffered damages, including but not limited to, bodily injury, physical pain, emotional distress, and deprivation of constitutional rights, according to proof at the time of trial.

82.     Plaintiff is informed and believes, and thereon alleges, that defendants' acts alleged herein were done with malice, fraud, and oppression, and in reckless disregard of plaintiff's constitutional rights, justifying an award of punitive damages.

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0168

**THIRD CLAIM FOR RELIEF**

**Bane Act – California Civil Code §§ 52.1, 52**

**(Against the City of San Jose, Officer Adgar, and Does 2-50)**

83.     Plaintiff incorporates herein the preceding paragraphs of this Complaint to the extent relevant, as if fully set forth.

84.     Defendants' conduct alleged herein interfered with, or constituted an attempt to interfere with, Mr. Johnson's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and article I, sections 2, 3, and 13 of the California Constitution, through violent acts, threats, intimidation, or coercion.

85.     Not only did defendants intend to use force against Mr. Johnson and the other demonstrators, defendants intended to use unreasonable and excessive force against Mr. Johnson and the other demonstrators.  Mr. Johnson is informed and believes, and thereon alleges, that defendants subjected him to excessive force in retaliation for, and as punishment for, his exercise of his protected rights of free speech and assembly on the subject of police brutality, and to deter him from asserting these rights in the future on the subject of police brutality.  Mr. Johnson reasonably believed that if he continued to exercise his rights under the First Amendment to the United States Constitution and sections 2 and 3 of the California Constitution, defendants would commit further violence upon him.

86.     As a direct and proximate result of defendants' wrongful acts, Mr. Johnson suffered damages, including but not limited to, bodily injury, physical pain, emotional distress, and deprivation of constitutional rights, according to proof at the time of trial, and is entitled to statutory damages under Cal. Civ. Code § 52.

87.     Plaintiff is informed and believes, and thereon alleges, that defendants' acts alleged herein were done with malice, fraud, and oppression, and in reckless disregard of plaintiff's constitutional rights, justifying an award of punitive damages.

///

///

///

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0169

## FOURTH CLAIM FOR RELIEF

### Battery

### (Against the City of San Jose, Officer Adgar, and Does 2-50)

88.     Plaintiff incorporates herein the preceding paragraphs of this Complaint to the extent relevant, as if fully set forth.

89.     In performing the acts alleged herein, defendants intentionally touched, or caused less lethal projectiles to touch, Mr. Johnson.

90.     Defendants used unreasonable and excessive force to seize Mr. Johnson.

91.     Mr. Johnson did not consent to defendants' use of force.

92.     As a direct and proximate result of defendants' wrongful acts, Mr. Johnson suffered damages, including but not limited to, bodily injury, physical pain, emotional distress, and deprivation of constitutional rights, according to proof at the time of trial.

93.     Plaintiff is informed and believes, and thereon alleges, that defendants' acts alleged herein were done with malice, fraud, and oppression, and in reckless disregard of plaintiff's constitutional rights, justifying an award of punitive damages.

## FIFTH CLAIM FOR RELIEF

### Negligence

### (Against the City of San Jose, Officer Adgar, and Does 2-50)

94.     Plaintiff incorporates herein the preceding paragraphs of this Complaint to the extent relevant, as if fully set forth.

95.     Defendants knew or should have known that shooting Mr. Johnson with a projectile from a less lethal firearm would injure him, and that such force was unreasonable and excessive under the circumstances.  In doing the acts alleged herein, defendants breached a duty to Mr. Johnson to refrain from using unreasonable and excessive force.

96.     Defendants knew or should have known that their failure adequately to train SJPD officers in crowd control and the use of less lethal firearms in that specific context would cause Mr. Johnson and other civil rights demonstrators injury.  In failing to provide appropriate training, defendants breached a duty to Mr. Johnson.

23

SER-0170

97.     As a direct and proximate result of defendants' breach of their duties, Mr. Johnson suffered damages, including but not limited to, bodily injury, physical pain, emotional distress, and deprivation of constitutional rights, according to proof at the time of trial.

98.     Plaintiff is informed and believes, and thereon alleges, that defendants' acts alleged herein were done with malice, fraud, and oppression, and in knowing and reckless disregard of plaintiff's constitutional rights, justifying an award of punitive damages.

WHEREFORE, plaintiff prays for relief as set forth below.

## **PRAYER FOR RELIEF**

Plaintiff has been damaged by the foregoing acts of defendants, and each of them, in an amount according to proof at trial.  Plaintiff seeks as relief, without limitation, the following:

1.     For general damages in an amount according to proof;

2.     For special damages, including but not limited to past and future medical expenses, in an amount according to proof;

3.     For civil penalties under California Civil Code §§ 51.7 and 52;

4.     For statutory damages under California Civil Code §§ 52.1 and 52;

5.     For punitive damages against the individual defendants, as allowed by law;

6.     For pre-judgment and post-judgment interest;

7.     For attorneys' fees;

8.     For costs of suit; and

9.     For such other and further relief as the Court may deem proper.

DATED:  July 14, 2022                    McMANIS FAULKNER

                                         /s/ *Abimael Bastida*
                                         ABIMAEL BASTIDA

                                         Attorneys for Plaintiff,
                                         KYLE JOHNSON

///

///

///

24

SER-0171

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury trial as provided by Amendment VII to the United States Constitution and Rule 38(a) of the Federal Rules of Civil Procedure.

DATED:  July 14, 2022                           McMANIS FAULKNER

                                                 /s/ *Abimael Bastida*
                                                ABIMAEL BASTIDA

                                                Attorneys for Plaintiff,
                                                KYLE JOHNSON

Second Amended Complaint for Damages; Demand for Jury Trial
Case No. 5:21-cv-01849-BLF

SER-0172

# TRIAL EXHIBIT 65

# Less Lethal 40m Launcher & Stunbag Projectile Impact Weapons Safety Update Training

SER-0173

# Less Lethal 40mm Launcher & Stunbag Projectile Impact Weapons Safety Update Training



**MICHAEL J. JOHNSON**
MEMORIAL RANGE

Dedicated September 17, 2015

# San Jose Police Department Range Unit

Updated
3/15/16

**ADGAR000001**

SER-0174

# OPERATIONAL LESS LETHAL LAUNCHER SAFETY

1. TREAT ALL LAUNCHERS AS IF THEY ARE LOADED. NEVER ASSUME ABOUT THE CONDITION AND ABILITY TO FUNCTION.

2. BE SURE THAT THE DESIGNATED LESS LETHAL LAUNCHER IS LOADED WITH LESS LETHAL MUNITIONS <u>ONLY</u>. (PRIOR TO LOADING, OFFICERS SHOULD VISUALLY & PHYSICALLY INSPECT HIS/HER LAUNCHER AND MUNITIONS WHENEVER THEY HAVE BEEN OUT OF THEIR DIRECT CONTROL OR ARE LEFT UNSECURED)

3. <u>LASER RULE:</u> NEVER ALLOW THE MUZZLE TO COVER ANYONE YOU DO NOT INTEND TO DEPLOY LESS LETHAL MUNITIONS AGAINST.

4. <u>MASTER GRIP:</u> THE FINGER IS KEPT OFF THE TRIGGER AND OUT OF THE TRIGGER GUARD UNTIL THE CONSCIOUS DECISION IS MADE TO DEPLOY LESS LETHAL MUNITIONS.

5. <u>COMMUNICATE:</u> IN ORDER TO AVOID "CONTAGIOUS FIRE" FROM OTHER OFFICERS, VERBALLY COMMUNICATE WHEN LESS LETHAL MUNITIONS ARE ABOUT TO BE DEPLOYED.

6. BE SURE OF YOUR TARGET, BACKSTOP AND BEYOND.

14

ADGAR000002

SER-0175

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address: cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| KYLE JOHNSON, | Case Number: 5:21-cv-01849-BLF |
|---|---|
| Plaintiff(s), | **TRIAL EXHIBIT 100a: City Hall West Plaza Video** |
| v. | |
| CITY OF SAN JOSE, et al. | |
| Defendant(s). | |

## <u>MANUAL FILING NOTIFICATION</u>

Regarding: **TRIAL EXHIBIT 100a: City Hall West Plaza Video.**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

SER-0176

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025                          NORA FRIMANN, City Attorney


By:  */s/ Nicholas Sympson*
     NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 100A          Case Number: 5:21-cv-01849-BLF
                                                                   2194178

SER-0177

# TRIAL EXHIBIT 100a

# City Hall West Plaza Video (.mp4)

SER-0178

## CERTIFICATE OF SERVICE

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**       5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 100a: City Hall West Plaza Video**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/ Brian Ward*_____
Brian Ward

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON, | Case Number:  5:21-cv-01849-BLF |
| Plaintiff(s), | **TRIAL EXHIBIT 106a: T. Takash 5/30 BWC [22.33.03-22.33.40]** |
| v. | |
| CITY OF SAN JOSE, et al. | |
| Defendant(s). | |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 106a: T. Takash 5/30 BWC [22.33.03-22.33.40].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 106A          Case Number: 5:21-cv-01849-BLF
2194181

SER-0180

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated: March 28, 2025

NORA FRIMANN, City Attorney

By: */s/ Nicholas Sympson*
NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 106A          Case Number: 5:21-cv-01849-BLF
2194181

SER-0181

# TRIAL EXHIBIT 106a

# T. Takash 5/30 BWC [22.33.03-22.33.40] (.mp4)

SER-0182

## CERTIFICATE OF SERVICE

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**    5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 106a: T. Takash 5/30 BWC [22.33.03-22.33.40]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/Brian Ward*_____
Brian Ward

SER-0183

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON, | Case Number:  5:21-cv-01849-BLF |
| Plaintiff(s), | **TRIAL EXHIBIT 108a: A. Brown 5/30 BWC [22.32.54-22.33.52]** |
| v. | |
| CITY OF SAN JOSE, et al. | |
| Defendant(s). | |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 108a: A. Brown 5/30 BWC [22.32.54-22.33.52].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 108A          Case Number: 5:21-cv-01849-BLF
2194184

SER-0184

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated:  March 28, 2025                    NORA FRIMANN, City Attorney


By:  /s/ Nicholas Sympson
     NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 108A          Case Number: 5:21-cv-01849-BLF
                                                                        2194184

SER-0185

# TRIAL EXHIBIT 108a

# A. Brown 5/30 BWC [22.32.54-22.33.52] (.mp4)

**Trial Exhibit 108a**

## CERTIFICATE OF SERVICE

**CASE NAME:**   *Johnson v. City of San Jose, et al.*
**CASE NO.:**    5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 108a: A. Brown 5/30 BWC [22.32.54-22.33.52]**

☒   by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28 2025**, at San Jose, California.

*/s/ Brian Ward*_____
Brian Ward

1

CERTIFICATE OF SERVICE                                    Case Number: 5:21-cv-01849-BLF
                                                                          2194184

SER-0187

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number:  (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON,<br><br>    Plaintiff(s),<br><br>  v.<br><br>CITY OF SAN JOSE, et al.<br><br>    Defendant(s). | Case Number:  5:21-cv-01849-BLF<br><br>**TRIAL EXHIBIT 112c: J. Adgar 5/30 BWC [22.32.59-22.33.38]** |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 112c: J. Adgar 5/30 BWC [22.32.59-22.33.38].**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 112C    Case Number: 5:21-cv-01849-BLF
                              2194188

SER-0188

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

Respectfully submitted,

Dated: March 28, 2025                    NORA FRIMANN, City Attorney

By:  */s/ Nicholas Sympson*
        NICHOLAS SYMPSON

Attorneys for Defendants CITY OF SAN JOSE
and JAMES ADGAR

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 112C          Case Number: 5:21-cv-01849-BLF
                                                                                              2194188

SER-0189

# TRIAL EXHIBIT 112c

## J. Adgar 5/30 BWC [22.32.59-22.33.38](.mp4)

SER-0190

**CERTIFICATE OF SERVICE**

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**        5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 112c: J. Adgar 5/30 BWC [22.32.59-22.33.38]**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| |  |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/ Brian Ward*_____
Brian Ward

1

SER-0191

NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
NICHOLAS SYMPSON, Sr. Deputy City Attorney (295535)
JAMES HUANG, Deputy City Attorney (309476)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address: cao.main@sanjoseca.gov

Attorneys for Defendants CITY OF SAN JOSE and
JAMES ADGAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KYLE JOHNSON, | Case Number: 5:21-cv-01849-BLF |
| Plaintiff(s), | **TRIAL EXHIBIT 120a: City Hall Rotunda Pantry Exit Video Excerpt** |
| v. | |
| CITY OF SAN JOSE, et al. | |
| Defendant(s). | |

**MANUAL FILING NOTIFICATION**

Regarding: **TRIAL EXHIBIT 120a: City Hall Rotunda Pantry Exit Video Excerpt.**

This filing is in physical form only and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served on you directly.

For information on retrieving this filing directly from the court, please see the court's main web site at http:// www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

☐ Voluminous Document (PDF file size larger than the e-filing systems allows)

☐ Unable to Scan Documents

☐ Physical Object (description):

☒ **Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media**

1

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 120A            Case Number: 5:21-cv-01849-BLF
                                                            Manual Filing Notification-Exhibit 120a

SER-0192

☐ Item Under Seal in Criminal Case

☐ Conformance with the Judicial Conference Privacy Policy (General Order 53).

☐ Other (description):

                       Respectfully submitted,

Dated:  March 28, 2025               NORA FRIMANN, City Attorney

                        By:  */s/ Nicholas Sympson*
                             NICHOLAS SYMPSON

                        Attorneys for Defendants CITY OF SAN JOSE and JAMES ADGAR

MANUAL FILING NOTIFICATION OF TRIAL EXHIBIT 120A        Case Number: 5:21-cv-01849-BLF
                                        Manual Filing Notification-Exhibit 120a

SER-0193

# TRIAL EXHIBIT 120a

# City Hall Rotunda Pantry Exit Video Excerpt (.mp4)

**Trial Exhibit 120a**

SER-0194

## CERTIFICATE OF SERVICE

**CASE NAME:**    *Johnson v. City of San Jose, et al.*
**CASE NO.:**        5:21-cv-01849-BLF

I, the undersigned declare as follows:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is 200 East Santa Clara Street, San Jose, California 95113-1905, and is located in the county where the service described below occurred.

On **March 28, 2025**, I caused to be served the within:

**TRIAL EXHIBIT 120a: City Hall Rotunda Pantry Exit Video Excerpt**

☒    by ELECTRONIC TRANSMISSION, with a copy of this declaration, to an electronic address listed below.

I further declare that the electronic transmission was sent on **March 28, 2025**, before 7:00 p.m., and that the City of San Jose, City Attorney's electronic address is CAO.Main@sanjoseca.gov.

The above-described transmission was reported as sent by a transmission report available for printing from the computer.

Addressed as follows:

| | |
|---|---|
| Abimael Bastida<br>Matthew Schechter<br>McMANIS FAULKNER<br>50 W. San Fernando Street, 10th Floor<br>San Jose, CA 95113<br>abastida@mcmanislaw.com<br>mschechter@mcmanislaw.com<br>lmoniz@mcmanislaw.com<br>gdang@mcmanislaw.com<br><br>**Attorneys for Plaintiff KYLE JOHNSON** | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 28, 2025**, at San Jose, California.

*/s/ Brian Ward*_____
Brian Ward

# TRIAL EXHIBIT 151a

SJPD 2020 Duty Manual-(SJ278383, SJ278677-78, SJ278690, SJ278694-5)

SER-0196

# SAN JOSE POLICE DEPARTMENT DUTY MANUAL



# Policies, Rules, Procedures

## Public Version
Security Procedures Redacted Pursuant to
California Government Code Section 6254(f)

DM2020 052220

**SJ278383**

SER-0197



## L 2600 - USE OF FORCE:
*Revised 01-01-20*

The San Jose Police Department recognizes and understands the complexity of those situations necessitating the use of force. Officers follow established authorizations to use force provided by state law (Penal Code Sections 835 and 835a). At times, officers are confronted with situations where control is required to affect arrests or protect the public safety. Attempts are made to achieve control through advice, warnings and persuasion. However, in situations where resistance, a threat to life or a threat of physical force against officers or others is encountered and verbal persuasion has not been effective, is not feasible or would appear to be ineffective, an officer may use objectively reasonable force. In the event deadly force is utilized, a thorough investigation is conducted. All use of force is appropriately investigated, documented and reviewed by supervisory/command staff.

Peace Officers' authority to use physical force is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Department finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law. The decision by an officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force.

## PROCEDURE

**L 2601    GENERAL PROVISIONS:**
*Revised 06-16-04*

Officers may use force to affect a detention, arrest, prevent an escape or overcome resistance, in self-defense or defense of others. The type and degree of force used will be objectively reasonable and based upon the facts and circumstances of the situation. In any event, the following specific procedures will be adhered to.

**L 2602    OBJECTIVELY REASONABLE FORCE (Definition):**
*Revised 06-16-04*

Objectively reasonable force is that level of force which is appropriate when analyzed from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who has actually used force. Objectively reasonable force is not judged with hindsight, and will take into account, where appropriate, the fact that officers must make rapid decisions regarding the amount of force to use in tense, uncertain and rapidly evolving situations. Important factors to be considered when deciding how much force can be used to apprehend or subdue a subject include, but are not limited to, the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others and whether the subject is actively resisting arrest or attempting to evade arrest by flight. This policy guideline applies to all uses of force, including deadly force.

*Public Version*
*Security Procedures Redacted Pursuant to California Government Code Section 6254(f)*
*Page 252*

DM2020 052220

**SJ278677**
SER-0198

**L 2602.1    DEADLY FORCE:**
*Added 01-01-20*

NECESSITY: Officers will use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

WHEN DEADLY FORCE IS JUSTIFIED: An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or to another person.

- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.


WARNINGS: When feasible, officers shall, prior to the use of deadly force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

DEFINITIONS: For purposes of this section, the following definitions shall apply:

- "Deadly force" means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

- A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

- "Totality of the circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.

**L 2602.5    TACTICAL CONDUCT**
*Added 08-15-16*

Department members are expected to use tactics that are consistent with San Jose Police Department and California P.O.S.T. Commission training standards.  Based on the totality of the circumstances, and allowing for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation, Department members shall consider the following relevant tactical considerations in any situation where an officer reasonably believes that the use of physical force is or may become necessary:

DM2020 052220

**SJ278678**
SER-0199

**L 2620    PROVIDING FIRST AID AFTER USE OF ERTB:**
*Revised 06-30-06*

Officers will obtain a medical clearance from Valley Medical Center (VMC) for an arrestee who has been immobilized by use of the ERTB. Another hospital emergency room may be used if, based on the available information, it appears to be necessary to provide immediate emergency medical treatment for the arrestee or if VMC is closed for admissions or the ERTB was used in a jurisdiction outside the City of San Jose.

In cases where another hospital emergency room is used or if the suspect is already at another hospital facility with an emergency room, the officer will obtain the necessary medical clearance paperwork for booking from that hospital.  There is no need to transport the suspect to VMC in this case. The prisoner will only be transferred to VMC upon approval of medical personnel at both facilities.

Jail personnel will be advised that the arrestee was immobilized by the use of the ERTB.

**L 2621    USE OF IMPACT WEAPONS:**
*Revised 01-01-20*

Impact weapons the Chief of Police authorizes for use in DM Section S 1124 (Minimum Uniform and Equipment Articles Required for All Officers) include the straight baton, expandable baton, side handle baton, Kendo sticks and Yawara stick. In addition to the authorized impact weapons, impact objects may be used as objectively reasonable based on the totality of the circumstances.

Officers may only intentionally target a suspect's head with an impact weapon as a deadly force option (i.e. when the force being responded to is likely to cause death or serious bodily injury) when the use meets the requirements of Duty Manual Section L 2602.1.

**L 2622    PROVIDING FIRST AID:**
*Revised 09-27-17*

When use of an impact weapon on any body part other than the head causes injury which would reasonably require medical attention, the officer using the impact weapon shall ensure the injured individual receives proper medical attention.

Officers shall obtain a medical clearance from Valley Medical Center (VMC) for an arrestee who has been struck in the head with an impact weapon (whether intentionally or unintentionally).  Another hospital emergency room may be used if, based on the available information, it appears to be necessary to provide immediate emergency medical treatment for the arrestee or if VMC is closed for admissions.

**L 2623    USE OF POLICE SERVICE DOGS:**
*Revised 07-24-15*

Properly used Police Service Dogs (Canines) constitute a resource useful in police service. Their uses include searches, tracking, apprehension of suspects, and protection of officers and members of the public from serious physical injury.

*Public Version*
*Security Procedures Redacted Pursuant to California Government Code Section 6254(f)*
*Page 265*

**SJ278690**

SER-0200

When documenting the Use of Force, Officers will specifically mention the chokehold in the Use of Force report and General Offense Crime Report (GO).

**L 2629**     **USE OF PROJECTILE IMPACT WEAPONS:**
*Revised 10-30-18*

Only officers who have completed an approved training course taught by a qualified Department member or a representative of the manufacturer supplying the ammunition are authorized to use this type of equipment. Because projectile impact weapons have the potential to cause serious injury or death, this type of weapon will only be used in the following circumstances:

• To be used when objectively reasonable to incapacitate a suspects armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody.

• To be used when objectively reasonable in situations where its use is likely to prevent any person from being seriously injured.

All patrol officers, who have completed an approved training course, shall be required to carry a projectile impact weapon (either a stun-bag shotgun or a 40mm Projectile Impact Weapon) while on-duty; officers not permanently assigned a 40mm Projectile Impact Weapon shall check out a projectile impact weapon (stun-bag shotgun or 40mm Projectile Impact Weapon) from Central Supply at the beginning of each assigned shift.

The intentional discharge of a Projectile Impact Weapon at a suspect shall be documented as a use of force. When an intentional discharge of a Projectile Impact Weapon is used for the purpose of breaking glass, and the discharge does not result in any person being struck by a projectile, the discharge shall be documented in a General Offense report.

**L 2629.5**     **LIMITED USE OF 37 MM PROJECTILE IMPACT WEAPON FOR CROWD CONTROL:**
*Added 02-03-17*

Only the 37mm Projectile Impact Weapon may be used for crowd control purposes as prescribed in this section.  Stun-bag shotguns and 40mm Projectile Impact Weapons may only be used in accordance with Section L 2629 and may not be used for crowd control purposes as a method for crowd dispersal as described in this section.

The 37mm utilizes a single black powder round that deploys five foam baton projectiles. For the purposes of this policy, this Projectile Impact Weapon is ███████████████

DM2020 052220

**SJ278694**
SER-0201

████████████████████████████████████████████████.  For the purposes of this policy, assaultive resistance is defined as acts of violence against persons, or intentional destruction of property resulting in major property damage.  An example of this type of conduct would include suspects throwing objects capable of causing bodily injury from within the crowd at officers or other persons.

The 37mm Projectile Impact Weapon shall be utilized in accordance with the following procedures:

1.  A lawful dispersal order shall have been given and the crowd has been given a reasonable amount of time to disperse and has failed to do so in violation of Penal Code Section 409 – Failure to Disperse.
2.  Only personnel assigned to the Special Operations Division shall utilize the 37mm Projectile Impact Weapon during crowd control situations.
3.  A Command Officer must authorize both the carrying and discharging of the 37mm Projectile Impact Weapon for crowd control purposes.
4.  When authorized, the 37mm round ████████████████████████████████████████████████████████████████████████.

When an intentional discharge of a 37mm Projectile Impact Weapon is used for the purpose of dispersing a crowd engaged in assaultive resistance, the discharge shall be documented as a use of force in accordance with Duty Manual Sections L 2643 – L 2645 regardless of whether or not a person is struck by a 37mm round.  Nothing in these guidelines is meant to restrict or prevent an officer from deploying a Projectile Impact Weapon in accordance with the Duty Manual Sections L 2629 – L 2631.

**L 2630    PROHIBITEDUSES OF PROJECTILE IMPACT WEAPONS**:
*Revised 08-18-05*

Projectile impact weapons will not be used in the following circumstances:

-    On restrained, unconscious or otherwise incapacitated persons
-    Except in emergency situations, projectile impact weapons will not be used until a sufficient number of officers are present to immediately take control and custody of the suspect

**L 2631    PROVIDING FIRSTAID AFTER USE OF PROJECTILE IMPACT WEAPONS**:
*Revised 06-30-06*

Officers will obtain a medical clearance from Valley Medical Center (VMC)for an arrestee who has been immobilized by use of a projectile impact weapon. Another hospital emergency room may be used if, based on the available information, it appears to be necessary to provide immediate emergency medical treatment for the arrestee or if VMC is closed for admissions.

DM2020 052220

**SJ278695**

SER-0202

# TRIAL EXHIBIT 155

# SJPD Duty Manual Revisions re Projectile Impact Weapons

SER-0203



*Memorandum*

TO: **ALL DEPARTMENT PERSONNEL**   FROM: Edgardo Garcia
                                            Chief of Police

SUBJECT: **PROJECTILE IMPACT WEAPONS**   DATE: May 22, 2020
         **SEE BELOW**

---

Memo# 2020-019

---

## SUBJECT

**DUTY MANUAL REVISION – L 2629 USE OF PROJECTILE IMPACT WEAPONS**

**DUTY MANUAL REVISION – L 2629.5 LIMITED USE OF 37 MM PROJECTILE IMPACT WEAPON FOR CROWD CONTROL**

## BACKGROUND

In the interest of providing officers with additional less-than-lethal force options, the Department is revising the following Duty manual sections related to the use of Projectile Impact Weapons (PIW) to include the authorized use of the 40mm OC less-than-lethal munitions. Field situations often arise where a normal 40mm foam baton round is ineffective on a dangerous suspect. These circumstances include but are not limited to incidents where the suspect is barricaded and/or behind cover. The 40mm OC round, which is similar to the foam baton round but carries a payload of OC powder, has the capability to be deployed at or in the general area of a suspect in order to gain compliance through blunt force and/or through the OC irritant exposure. Several Duty Manual sections are being revised to ensure that the use of the 40mm OC round complies with the PIW sections as well as with the Chemical Agent sections of the Duty Manual.

The availability of a 40mm PIW containing Chemical Agents requires revision of section L 2629.5 which previously prohibited the use of 40mm PIWs in crowd control situations.

## ANALYSIS

The Duty Manual has been revised to reflect changes to the below listed sections. Additions are shown in *italics and underlined*. Deletions are shown in "strike through" form.

**SJ404740**

SER-0204

**ALL DEPARTMENT PERSONNEL**
**SUBJECT: DUTY MANUAL REVISIONS – PROJECTILE IMPACT WEAPONS**
May 22, 2020
Page 2 of 3

**L   2629        USE OF PROJECTILE IMPACT WEAPONS:**
*Revised 05-22-20*

Only officers who have completed an approved training course taught by a qualified Department member or a representative of the manufacturer supplying the ammunition are authorized to use this type of equipment. Because projectile impact weapons have the potential to cause serious injury or death, this type of weapon will only be used in the following circumstances:

• To be used when objectively reasonable to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody.

• To be used when objectively reasonable in situations where its use is likely to prevent any person from being seriously injured.

***NOTE:*** *Less lethal projectiles containing chemical agents are available for use by authorized personnel.  The use of less lethal chemical agent projectiles shall comply with this Duty Manual section and with sections DM L 2609 – USE OF CHEMICAL AGENTS and DM L 2610 – PROVIDING FIRST AID.*

All patrol officers, who have completed an approved training course, shall be required to carry a projectile impact weapon (either a stun-bag shotgun or a 40mm Projectile Impact Weapon) while on-duty; officers not permanently assigned a 40mm Projectile Impact Weapon shall check out a projectile impact weapon (stun-bag shotgun or 40mm Projectile Impact Weapon) from Central Supply at the beginning of each assigned shift.

The intentional discharge of a Projectile Impact Weapon at a suspect shall be documented as a use of force. When an intentional discharge of a Projectile Impact Weapon is used for the purpose of breaking glass, and the discharge does not result in any person being struck by a projectile, the discharge shall be documented in a General Offense report.

**L 2629.5       LIMITED USE OF 37 MM PROJECTILE IMPACT WEAPON FOR CROWD CONTROL:**
*Revised 05-22-20*

Only the 37mm Projectile Impact Weapon *(i.e. SAGE Gun)* may be used for crowd control purposes ~~as~~ *in the method* prescribed in this section. Stun-bag shotguns ~~and 40mm Projectile Impact Weapons may only be used in accordance with Section L 2629 and~~ may not be used for crowd control purposes ~~as a method for crowd dispersal as described in this section.~~  *40mm Projectile Impact Weapons that do not contain chemical agents may not be used for crowd control purposes.  40mm Projectile Impact Weapons that do contain chemical agents may be used for crowd control purposes as described in section L 2609.*

**SJ404741**

SER-0205

ALL DEPARTMENT PERSONNEL
**SUBJECT: DUTY MANUAL REVISIONS – PROJECTILE IMPACT WEAPONS**
May 22, 2020
Page 3 of 3

The 37mm utilizes a single black powder round that deploys five foam baton projectiles. For the purposes of this policy, this Projectile Impact Weapon is not intended to target individual suspects, but to provide a visual and auditory deterrent (loud report and bright muzzle flash). The primary objective when deploying a 37mm Projectile Impact Weapon in this manner is to compel persons engaged in assaultive resistance to disperse peacefully, so that the use of physical force intentionally directed at persons can be avoided. For the purposes of this policy, assaultive resistance is defined as acts of violence against persons, or intentional destruction of property resulting in major property damage. An example of this type of conduct would include suspects throwing objects capable of causing bodily injury from within the crowd at officers or other persons.

The 37mm Projectile Impact Weapon shall be utilized in accordance with the following procedures:

1. A lawful dispersal order shall have been given and the crowd has been given a reasonable amount of time to disperse and has failed to do so in violation of Penal Code Section 409 – Failure to Disperse.
2. Only personnel assigned to the Special Operations Division shall utilize the 37mm Projectile Impact Weapon during crowd control situations.
3. A Command Officer must authorize both the carrying and discharging of the 37mm Projectile Impact Weapon for crowd control purposes.
4. When authorized, the 37mm round shall be fired into the ground in front of the crowd. The 37mm round should only be expelled when there is sufficient distance between the officer and the crowd to allow the energy of the round, once it strikes the ground, to sufficiently dissipate in order to prevent any substantial risk of injury to any person.

When an intentional discharge of a 37mm Projectile Impact Weapon is used for the purpose of dispersing a crowd engaged in assaultive resistance, the discharge shall be documented as a use of force in accordance with Duty Manual Sections L 2643 – L 2645 regardless of whether or not a person is struck by a 37mm round. Nothing in these guidelines is meant to restrict or prevent an officer from deploying a Projectile Impact Weapon in accordance with the Duty Manual Sections L 2629 – L 2631.

**ORDER**

Effective immediately, all sworn personnel will adhere to the above listed Duty Manual changes.

Edgardo Garcia
Chief of Police

EG:PC

# TRIAL EXHIBIT 181

# Sciba Less Lethal Devices Training

SER-0207

# Projectile Impact Weapons

## Sgt. Chris Sciba #3317

## San Jose Police Department

SJ300645

SER-0208

# Blunt Trauma Injuries

- 82% of impacts resulted in bruising/abrasion
- 7% resulted in no injury
- 6% resulted in laceration
- 3% resulted in fractures
- 2% resulted in penetration or death
- No impacts to chest stopped the heart

SJ300670

# Questions

- Be safe out there

- Always err on the side of caution

- Do not hesitate

- Always win



SJ300694

SER-0210

# TRIAL EXHIBIT 210

# Less Lethal Training

**Trial Exhibit 210**

SER-0211



SJ411117

SER-0212

## 40 MM MUNITIONS

CTS 40 MM FOAM BATON ROUND (4557)

SMOKELESS POWDER, SPIN STABALIZED

VELOCITY: 240-260 FT / SEC

MAX EFFECTIVE RANGE: 150 FT

MIN SAFE DISTANCE:  10 FT



SJ411120

SER-0213

# TRIAL EXHIBIT 211

# MFF Metro Academy Training

**Trial Exhibit 211**

SER-0214



Sgt. Lee Tassio #3872

3872@sanjoseca.gov

San Jose Police Department

Special Operations

METRO Unit

SJ411158

SER-0215

<div style="border: 2px solid black; padding: 20px; text-align: center;">

# DEPARTMENT POLICY
# L2629 – PROJECTILE IMPACT WEAPON

</div>

• To be used when objectively reasonable to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody.

• To be used when objectively reasonable in situations where its use is likely to prevent any person from being seriously injured.

SJ411194

SER-0216

# TRIAL EXHIBIT 440

527 Moraga BWC Screenshot [22.33.14] Marked by Johnson on 1/14/25

SER-0217



SER-0218

527 Moraga



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No.: 5:21-cv-01849-BLF
DEFENDANTS' EXHIBIT NO. 552-A
440
Date Admitted:_____
By: Tiffany Salinas-Harwell, Deputy Clerk