No: 25-1392 and 25-5468

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

KYLE JOHNSON,

        Plaintiff-Appellee

v.

JAMES ADGAR,

        Defendant-Appellant

NO.  25-1392 and 25-5468
Consolidated

D.C. No: 5:21-cv-01849-BLF
Northern District of California,
San Jose Division

## Appellant's Reply Brief

On Appeal from the United States District Court
for the Northern District of California (San Jose)
No. 5:21-cv-01849-BLF
Hon. Beth Labson Freeman

SUSANA ALCALA WOOD, City Attorney (156366)
ARDELL JOHNSON, Assistant City Attorney (95340)
THOMAS GRAY, Senior Deputy City Attorney (191411)
BRIAN P. EGGLESTON, Senior Deputy City Attorney (289309)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Thomas.Gray@sanjoseca.gov;
Brian.Eggleston@sanjoseca.gov

Attorneys for James Adgar

# Table of Contents

Table of Authorities ..............................................................................................iii

Standard of Review ............................................................................................. 1

Argument ..............................................................................................................2

I.   Plaintiff fails to identify a coherent evidentiary basis for finding an indiscriminate shooting, while also relying on a theory that is legally insufficient to establish a Fourth Amendment seizure. ..................................2

   A. Plaintiff's speculation regarding an alternative theory the jury might have accepted lacks substantial evidence. ...........................................................3

   B. Plaintiff identifies only one fact as the purported basis for inferring an indiscriminate shooting, and it does not show what Plaintiff claims it shows. .................................................................................................................4

II.  Plaintiff's excessive force claim fails on the first prong of the qualified immunity analysis. .................................................................................8

   A. The reasonableness of Officer Adgar's actions as a matter of law is not insulated from appellate review, as Plaintiff claims.....................................8

   B. Plaintiff's Answering Brief does not dispute the foundational facts establishing the reasonableness of Officer Adgar's actions, rather Plaintiff relies on evidence that is irrelevant to the Fourth Amendment analysis.... 14

   C. *Puente* establishes the reasonableness of Officer Adgar's actions as a matter of law, and Plaintiff's attempt to distinguish *Puente* relies on incidental background facts that were not central to the *Puente* panel's analysis. ....... 17

   D. The reasonableness of Officer Adgar's actions is further established by the admissions of Plaintiff's own police practices expert. ...............................22

III. Even if Plaintiff's excessive force claim could survive the first prong of the qualified immunity analysis, the lack of any clearly established law governing the situation faced by Officer Adgar is fatal to Plaintiff's § 1983 claim. .......24

   A. *Puente*'s holdings as to what rights *Nelson* did and did not clearly establish are not "subsequent developments in the law" within the meaning of *Sanderlin*; they can properly be considered in the second prong of the qualified immunity analysis and are squarely on point.................................24

   B. Contrary to Plaintiff's assertion, on the second prong of qualified immunity Officer Adgar is allowed to rely on high-level generalities because it is not

his burden to show that the legality of his conduct was clearly established; it is Plaintiff's burden to show the illegality of his actions was clearly established, which does require defining the right at a particularized level. ...................................................................................................26

IV. Plaintiff's position on the existence of a "clearly delineated and plainly applicable" right relies on a fundamentally mistaken characterization of the law governing Bane Act claims.....................................................27

Conclusion ........................................................................................................30

Certificate of Compliance for Briefs...................................................... 31

# TABLE OF AUTHORITIES

**CASES**

*A.D. v. State of Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) ...1, 9, 10, 11, 12, 13

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .................................................................26

*Brower v. Cty. of Inyo*, 489 U.S. 593 (1989) ............................................................. 17

*Est. of Aguirre v. Cty. of Riverside*, 131 F.4th 702 (9th Cir. 2025) ........................12, 13

*Graham v. Connor, 490 U.S. 386 (1989)* ................................................................ 16

*Harper v. City of L.A.*, 533 F.3d 1010 (9th Cir. 2008) .................................................9

*Kisela v. Hughes*, 584 U.S. 100 (2018) .................................................................. 25

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)...........................3, 5, 21, 25, 29

*Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024) .......................17, 19, 20, 21, 25

*Reese v. Cty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ................................. 12, 25

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ................................... 9, 19

*Sandoval v. Cnty. of Sonoma*, 912 F.3d 509 (9th Cir. 2018) ......................................28

*Thompson v. Mahre*, 110 F.3d 716 (9th Cir. 1997) ..................................................... 1, 9

**STATUTES**

42 U.S.C. § 1983 ................................................................................... 27, 30

Cal. Civ. Code § 52.1(b) ............................................................................ 27, 30

**RULES**

Fed. R. Civ. P. 50 ...................................................................................10, 19

## STANDARD OF REVIEW

The Answering Brief appears to dispute the de novo standard of review applicable to questions of qualified immunity. Plaintiff argues the authority Appellants cite as support for the standard involved an appeal from a dismissal with prejudice rather than from a jury verdict. Answering Brief ("A.B.") at 21 (emphasis added). Plaintiff then mentions repeatedly that the district court already rejected various arguments—an observation pertinent only if the district court's decision were entitled to deference. *E.g.*, A.B. at 8, 24, 44, 46, 60.

To the extent Plaintiff disputes the de novo standard of review in this procedural posture, Plaintiff is incorrect. The de novo standard of review stated in Appellant's Opening Brief is correct. *See A.D. v. State of Cal. Highway Patrol*, 712 F.3d 446, 452–53 (9th Cir. 2013) ("We review the district court's denial of [an] assertion of qualified immunity as raised in a renewed motion for JMOL de novo."). As Plaintiff agrees, the "application of law to the facts to determine whether on those facts, qualified immunity is established, is reviewed de novo, because the determination of qualified immunity on facts not genuinely at issue is for the court." A.B. at 22 (quoting *Thompson v. Mahre*, 110 F.3d 716, 721 (9th Cir. 1997)).

# ARGUMENT

**I.** **Plaintiff fails to identify a coherent evidentiary basis for finding an indiscriminate shooting, while also relying on a theory that is legally insufficient to establish a Fourth Amendment seizure.**

Plaintiff acknowledges that "when an officer intentionally targets one person and accidentally strikes another, the non-targeted person is not seized," Answering Brief ("A.B.") at 49, and that Plaintiff had the burden of proving that Officer Adgar shot "indiscriminately" into the crowd. As in the trial court, "indiscriminately" here is used in a specific sense: it means Officer Adgar was not aiming at an individual target and instead his target was the crowd at large. *Accord* A.B. at 53 ("[W]hat was alleged … in the operative complaint [is] that Adgar, without a specific target, fired into the crowd.").

Plaintiff characterizes Appellant's discussion of the summary judgment hearing as a "red herring," *id.*, but the Answering Brief's discussion of the sufficiency of the evidence demonstrates its necessity to clarify the significance of proving an "indiscriminate" shooting in this very particular sense, *see* Opening Brief ("O.B.") at 32–34. Instead of focusing on evidence showing Officer Adgar lacked a specific target, Plaintiff argues the sufficiency of evidence to show Adgar's actions were indiscriminate in the sense of "careless." While evidence establishing Adgar shot "indiscriminately" in the sense of "carelessly" is sufficient to support Plaintiff's negligence claim, that claim is not at issue in this appeal. For purposes of

2

his unreasonable seizure claim, Plaintiff's burden was to prove that the object of Officer Adgar's use of force was the crowd at large rather than a particular individual; that is the only meaning of "indiscriminate" that matters under *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012). *See* O.B. at 34; *infra* at 4.

### A. Plaintiff's speculation regarding an alternative theory the jury might have accepted lacks substantial evidence.

The jury apparently credited Officer Adgar's testimony that he saw someone throwing something, attempted to track that individual through the crowd, and then discharged his PIW once he believed he had that person identified, 2-ER-264:6–11, as well as his testimony identifying the individual in Exhibits 552a and 553, since the jury found the individual's negligence was a substantial factor in causing Plaintiff's injury. 1-ER-56–57.[1] Plaintiff resists this conclusion, arguing that "the jury could rationally conclude the conduct of the individuals identified in these exhibits escalated tensions or contributed to the conditions that led to the use of PIW by officers [] without accepting that Adgar was in fact specifically aiming at either individual when he fired and struck Johnson." A.B. at 50. The jury could not have based its verdict on this newly fashioned theory of causation because it was

---

[1] Exhibit 552a (2-ER-111) is a frame from video Exhibit 527 (2-ER-88). Exhibit 553 (2-ER-114) is a frame from video Exhibit 107 (2-ER-68).

never presented to the jury and no evidence was introduced to support it, particularly with respect to the individual identified in Ex. 553.

The foam baton round that struck Plaintiff was fired at 22:33:15, SER-188 at 22:33:05–22:33:16, while the individual in Ex. 553 is shown throwing an object at 22:33:28, ER-68 at 22:33:25–30.[2] Having occurred after Plaintiff's injury, the specific conduct shown in the video cannot have contributed to Plaintiff's injury. Rather, the jury must have relied on conduct by that individual from *before* Plaintiff was struck. Since there was no video evidence linking the individual in Ex. 553 to any conduct preceding Plaintiff's injury, the *only* evidence the jury could have relied on to find causation was Officer Adgar's testimony. 2-ER-264:6–11. Plaintiff's attempt to reconstruct some alternate theory on which the jury could have found comparative fault therefore fails for lack of substantial evidence.

**B.**     **Plaintiff identifies only one fact as the purported basis for inferring an indiscriminate shooting, and it does not show what Plaintiff claims it shows.**

In *Nelson*, a seizure of the plaintiff occurred because, "[r]egardless of whether Nelson was the specific object of governmental force, he and his fellow students were the undifferentiated objects of shots intentionally fired by the officers

---

[2] This is not due to a time difference in the two BWC's timestamps. The same event can be seen on Officer Adgar's BWC at the same time. SER-188 at 22:33:25–30.

in the direction of that group." *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012). This fact was demonstrated in *Nelson* by objective evidence: "[the officers] were instructed by [Sergeant] Wilson to 'shoot at the crowd.'" *Id.* Such an avenue was not open to Plaintiff in this case, since video evidence showed Officer Adgar being specifically instructed to target individuals throwing bottles. O.B. at 7–8. Lacking any objective evidence that Officer Adgar's force was directed at the crowd-at-large, Plaintiff instead argued circumstantial evidence to show that Officer Adgar's subjective motives in firing the PIW were different from his objective, official assignment. O.B. at 36–37.

The primary theory pressed in support of this motive at trial was that Officer Adgar had a retaliatory animus against all the protestors due to the anti-police nature of the protest. O.B. at 36. But the trial court found the theory was not supported by substantial evidence, *id.*, and Plaintiff has not appealed that ruling, nor does he press such a theory in his Answering Brief.

Beyond arguing generally that the shooting was "indiscriminate" in the sense of "negligent," Plaintiff points to only a single piece of circumstantial evidence purporting to show that Officer Adgar's force was directed at the crowd-at-large rather than an individual who had thrown something: "Photos [showing] where Adgar allegedly saw someone making a throwing motion that led to him firing his

PIW and where Johnson was standing at that same moment in time (2-ER-111–112 and SER-217–218), and that the two positions are not in close proximity." A.B. at 21.

From this fact, and this alone, Plaintiff seeks an inference that, instead of following the orders he had just been given to target individuals throwing bottles, Officer Adgar instead simply took the opportunity to fire aimlessly toward the crowd-at-large. Neither logic nor evidence supports that conclusion.

Although the two exhibits cited by Plaintiff show Plaintiff and Officer Adgar's target "at that same moment in time," A.B. at 21, that moment in time is *not* the moment Officer Adgar fired his PIW. The exhibits (2-ER-111–112 and SER-217–218) are annotated versions of a frame from Officer Moraga's BWC footage at 22:33:14. 2-ER-111; SER-217. A comparison of Officer Moraga's BWC footage with Officer Adgar's shows that the timestamps on Officer Moraga's footage are roughly three seconds ahead of those on Officer Adgar's. *Compare* 2-ER-88 (first bottle thrown at 22:33:08 in Moraga's BWC) *with* SER-188 (first bottle thrown at 22:33:05 in Adgar's BWC). Officer Adgar fires his PIW at 22:33:15 according to his own BWC footage, SER-188 at 22:33:14–22:33:16, which would be 22:33:18 in Officer Moraga's BWC footage.

That means Officer Adgar fired his PIW roughly 4 seconds after the frame depicted in 2-ER-111–112 and SER-217–218, which is more than enough time for Officer Adgar's target to clear the distance between the two points in the exhibit. And the actual video from which the frame is taken shows that is exactly what he did. Immediately after throwing an object, Officer Adgar's target is seen running in Plaintiff's direction (right-to-left from the perspective of Officers Moraga and Adgar). 2-ER-88 at 22:33:13–22:33:19.

This is not only perfectly consistent with Officer Adgar's testimony, 2-ER-264:6–11; it is confirmed by the very video Plaintiff identifies as support for an indiscriminate shooting. In SER-176 at 00:09 to 00:10[3], right before the first bottle is thrown, Officer Adgar can be seen standing on the street as the upper-right-most officer in the video. At 00:10, when the first bottle is thrown, Officer Adgar begins moving toward the street, coming to attention. At 00:16[4], Officer Adgar begins to raise his weapon, and from 00:16 to 00:19, Officer Adgar can be seen tracking something from his right to his left.[5]

---

[3] Because the security footage of City Hall Plaza lacks time stamps, citations are relative to the beginning of the video.

[4] Measuring from the time of the first bottle being thrown, this would be roughly when Officer Adgar's target can be seen throwing something in Officer Moraga's BWC.

[5] The security camera then shifts such that Officer Adgar is no longer in frame.

This footage lines up perfectly with Adgar's testimony as to what happened:

> [I]nitially one was thrown, … usually when there was one, there was more. So at that point I began approaching the skirmish line and trying to observe the crowd. At that point I saw someone throw something or in the process of throwing it, which caused me to focus on that individual, try to aim at that individual, and track him through the crowd, and at that point once I believed I had that person identified, I pulled the trigger and used my 40 millimeter.

2-ER-264:1–11.

Given that there was more than enough time for Officer Adgar's target to move from his location in 2-ER-111–112 to Plaintiff's approximate location, and given that video footage shows Officer Adgar tracking him doing exactly that, any difference in location between Plaintiff and Officer Adgar's target several seconds before Plaintiff was struck simply isn't probative of whether Officer Adgar was shooting aimlessly into the crowd.

## II. Plaintiff's excessive force claim fails on the first prong of the qualified immunity analysis.

### A. The reasonableness of Officer Adgar's actions as a matter of law is not insulated from appellate review, as Plaintiff claims.

Understandably, Plaintiff seeks to avoid analysis of this case under the holdings in *Puente* since they underscore the reasonableness of Officer Adgar's actions as a matter of law. Plaintiff therefore attempts to establish a general principle of law that a jury's determination of excessive force is wholly insulated from appellate review. *See* A.B. at 29–30. This purported principle of law not only

8

contradicts Ninth Circuit and Supreme Court precedent; it entails untenable results in practice.

As Plaintiff acknowledges, "the determination of qualified immunity on facts not genuinely at issue is for the court." *Thompson v. Mahre*, 110 F.3d at 721. Although deference is due the jury's findings of fact, where the facts establish an officer's actions are reasonable as a matter of law, the jury's legal conclusion to the contrary is of no import. *See A. D.*, 712 F.3d at 458–59 ("[I]n a Fourth Amendment case we could choose not to accept the jury's conclusion that the officer's conduct was unreasonable."). Plaintiff's argument that a jury verdict fundamentally changes the nature of the qualified immunity inquiry also conflicts with the Supreme Court's guidance that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). Finally, consistent with the foregoing principles, this Court has in fact addressed the first prong of qualified immunity in appeals from jury verdicts finding a constitutional violation. *E.g. Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008).

The foregoing also accords with common sense. If a jury finds a constitutional violation following denial of an officer's Rule 50(a) motion, and the

next day a new precedent conclusively establishes that the Rule 50(a) motion should have been granted, it is clearly proper for the officer's renewed motion under Rule 50(b) to be granted. The jury's intervening finding would be immaterial because the question should never have gone to the jury in the first place. But under Plaintiff's theory, the officer would be without recourse in such a situation. According to Plaintiff, the jury's verdict would prevent the court from acknowledging the absence of a constitutional violation under the new precedent, while the new precedent could not be considered at the second prong of the qualified immunity analysis because it post-dated the officer's actions, A.B. at 33. This Court should not interpret its own precedents to require such an incongruous result.

The three cases relied on by Plaintiff do not establish the legal principle advanced by Plaintiff. They represent application of the normal legal standard for motions seeking judgment as a matter of law. *A.D. v. State of Cal. Highway Patrol*, the origin for the language Plaintiff cites, makes this clear:

> Since 1998, clear precedent has established that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective. Therefore, once a jury has found (with reasonable support in the evidence) such a due process violation on the

> part of the officer, he may not successfully assert qualified immunity in
> a post-verdict motion for judgment as a matter of law.

712 F.3d at 450.

In *A.D.* reviewed the evidence presented at trial and found that "[t]his evidence supports the reasonable inference that [the officer] acted with the purpose to harm unrelated to a legitimate law enforcement objective." *Id.* at 458. This finding established a constitutional violation as a matter of law and was therefore conclusive. The panel made clear, "we do not hold that a court *cannot* conduct an objective qualified immunity analysis after a jury verdict. Rather, post-verdict, a court must apply the qualified immunity framework to the facts that the jury found (including the defendant's subjective intent)." *Id.* at 459 (emphasis in original) (internal citations omitted).

The *A.D.* panel specifically distinguished the issue it faced from the issue of whether a particular set of facts constitutes excessive force under the governing standard, noting that "unlike in Fourth Amendment cases, Plaintiffs' due process claim is based on a subjective, rather than *objective*, standard of culpability. While in a Fourth Amendment case we could choose not to accept the jury's conclusion that the officer's conduct was unreasonable, here, we cannot disregard the jury's reasonable finding of fact that Markgraf acted with a subjective bad intent." *Id.* at 458–59. Accordingly, *A.D.* does not support Plaintiff's argument that an appellate

court is prohibited from reviewing whether the facts established by the trial evidence constitute excessive force under the governing standard.

In *Reese*, which did involve an excessive force claim, it was undisputed the officer had used deadly force against the plaintiff. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1039 (9th Cir. 2018). The disputed question was whether "it appear[ed] that Plaintiff posed an immediate threat of death or serious physical injury to [the officer]." *Id.* at 1036. The jury found Reese had not brandished a knife at the officer and concluded Reese did not appear to pose an immediate threat. Those factual findings were not challenged on appeal. *Id.* It was against this backdrop that the panel concluded "the jury's finding that Reese posed no immediate threat of death or serious physical injury to Rose addresses the first prong of the qualified immunity analysis." *Id.* at 1038. Like *A.D.*, *Reese* stands for nothing more than the unremarkable proposition that, where the facts found by the jury are sufficient to establish a constitutional violation, there is no further inquiry to be undertaken on the first prong of the qualified immunity analysis.

The last case cited in support of a purported bar on appellate review of the existence of a constitutional violation is *Est. of Aguirre v. Cty. of Riverside*, 131 F.4th 702 (9th Cir. 2025). In that case, a prior interlocutory appeal addressed the legal question of whether certain facts, if found by the jury, would establish a

constitutional violation. *Id.* at 705. The panel had "held that … killing a suspect who poses no immediate threat to an officer or others violates the suspect's Fourth Amendment rights." *Id.* Because factual disputes remained "as to 'the level of threat [plaintiff] posed immediately before his death,'" the case was remanded for a jury trial on that issue. *Id.* at 705-06. On further appeal following the jury's verdict, the panel reviewed the evidence presented at trial and concluded it supported a finding that the plaintiff had not presented an immediate threat. *Id.* at 707 ("The trial evidence demonstrated that Najera was not an immediate threat to Ponder justifying the use of deadly force."). Against this backdrop, the panel's conclusion—that the jury's factual determination conclusively resolved the question of whether a constitutional violation occurred—is unremarkable. It does not stand for the novel proposition that—of all the issues determined by a jury—the existence of a constitutional violation is uniquely insulated from appellate review altogether. Instead, as the panel in *A.D.* concluded, "in a Fourth Amendment case we could choose not to accept the jury's conclusion that the officer's conduct was unreasonable," so long as deference is accorded the jury's underlying findings of fact. 712 F.3d at 458–59.

**B.** **Plaintiff's Answering Brief does not dispute the foundational facts establishing the reasonableness of Officer Adgar's actions, rather Plaintiff relies on evidence that is irrelevant to the Fourth Amendment analysis.**

Plaintiff incorrectly asserts that Appellant's argument relies on an "improper rejection [of] the jury's findings of fact," A.B. at 27, and "requires one to accept as true Adgar's version of events and deem his testimony credible," *id.* at 58. Notably, however, the basic facts relied upon by Appellant to establish the reasonableness of his actions under *Puente* are either explicitly acknowledged in Plaintiff's Answering Brief or are implicitly conceded by the failure to address those facts at all.

Specifically, Plaintiff does not dispute that at the time Officer Adgar fired his PIW, he was under orders from his commanding officer to target any individuals that Adgar saw throwing bottles. *See* O.B. at 7–8. Nor does Plaintiff dispute that people in the crowd at City Hall Plaza did in fact throw bottles and that Officer Adgar saw them doing so; indeed, Plaintiff explicitly concedes that, when firing the shot that ultimately struck Plaintiff, Officer Adgar was responding to a volley of objects being thrown from the crowd. A.B. at 14 ("At approximately 10:33 p.m., people in the crowd threw a second volley of objects—again, primarily water bottles—at the officers…. As before, the officers, including Adgar, responded by firing their PIW into the crowd.").

Instead of disputing these fundamental facts, Plaintiff instead attempts to obfuscate the issue by presenting a series of facts irrelevant to the qualified immunity analysis; it is therefore unsurprising that Appellant has not challenged the sufficiency of the evidence to support those particular facts. Examples of such irrelevant facts can be found throughout Plaintiff's Answering Brief and include the following:

- The protests on May 30 were less violent than the ones on May 29.[6] A.B. at 15–16.

- A sergeant in the San Jose Police Department ordered a different officer—not Officer Adgar—to fire a 40mm PIW at an individual engaging in graffiti who did not appear to pose any threat.[7] *Id.* at 16.

- Up until 10:19 p.m., the crowd at City Hall Plaza was mostly peaceful.[8] *Id.* at 16.

- Officer Adgar fired his PIW intentionally.[9] *Id.* at 47.

- The foam baton round fired by Officer Adgar is the object that struck Plaintiff in the back of the leg.[10] *Id.* at 47.

---

[6] The fact that even more force could have been used on May 29 has no bearing on whether the level of force used on May 30 was justified.

[7] Not only does this fact have no bearing on the propriety of Officer Adgar's actions; it is clearly intended to evoke antipathy toward the City's police force as a whole, encouraging a decision based on prejudice rather than evidence.

[8] The use of force at issue occurred at 10:33 p.m. A.B. at 14–15.

[9] This was never in dispute.

[10] This appeal does not challenge the element of causation.

- Plaintiff did not observe anyone in his vicinity throwing anything.[11] *Id.* at 14.

- Plaintiff was not throwing anything or engaging in any behavior that could be deemed a threat.[12] *Id.* at 15.

- At the time Plaintiff was struck, he did not see anyone throwing anything besides water bottles.[13] *Id.* at 20.

- Plaintiff did not see any officers get injured.[14] *Id.* at 20.

- The individuals who came to Johnson's aid after he was struck were not members of the San Jose Police Department.[15] *Id.* at 15.

---

[11] The reasonableness of Officer Adgar's use of force is "judged from the perspective of a reasonable officer on the scene," *Graham v. Connor*, 490 U.S. 386, 396 (1989), not from the plaintiff's perspective. Office Adgar's BWC footage shows bottles being thrown from his perspective, SER-188 at 22:33:04–22:33:18; whether Plaintiff saw those bottles being thrown is immaterial.

[12] This speaks only to whether Plaintiff was an appropriate target of force. But Plaintiff has never contended that he was the target of Officer Adgar's use of force, was evidence to that effect ever introduced at trial.

[13] Officer Adgar was under orders to target individuals throwing bottles, O.B. at 7–8, and Plaintiff's own police practices expert testified that intermediate force would be an appropriate response to such behavior, O.B. at 18–19. Plaintiff's attempt to evade this testimony is addressed in § II.D.

[14] Appellant is aware of no authority suggesting the reasonableness of force used in response to a threat to public safety depends on the success of that threat.

[15] It was undisputed at trial that Officer Adgar did not see what happened to Plaintiff. This irrelevant fact is clearly intended to raise antipathy toward the San Jose Police Department in general, rather than actually establish any element of Plaintiff's excessive force claim.

- PIWs are not intended to be used for crowd dispersal purposes.[16] *Id.* at 39.

- Officer Adgar was trained not to deploy his PIW into a crowd unless he could actually aim at the person posing a threat.[17] *Id.* at 19.

Appellant's argument does not rely on any facts that were genuinely disputed at trial or that the jury could have discredited. Appellant rejected those facts on the basis of irrelevance, not on any basis that would require the jury's findings themselves to be set aside.

**C.** *Puente* **establishes the reasonableness of Officer Adgar's actions as a matter of law, and Plaintiff's attempt to distinguish** *Puente* **relies on incidental background facts that were not central to the** *Puente* **panel's analysis.**

In light of Plaintiff's position that the existence of a constitutional violation is insulated from appellate review, he does not meaningfully address Appellant's argument that Officer Adgar's actions were objectively reasonable under *Puente v. City of Phx.*, 123 F.4th 1035 (9th Cir. 2024). Accordingly, after clarifying a few

---

[16] Officer Adgar was not acting under orders to use his PIW for crowd-dispersal purposes; he was acting under orders to target anyone whom he saw throwing bottles. *See* O.B. at 7-8.

[17] Any failure by Officer Adgar to take adequate steps to guard against accidentally hitting an innocent bystander supports his negligence claim but does nothing to support his excessive force claim. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) ("[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." (internal citations omitted)).

points in response to Plaintiff's arguments, Appellant rests on the arguments set forth in his Opening Brief.

Plaintiff argues that Appellant relies on the actions of individuals other than Johnson to justify his use of force. *See* A.B. at 42. That is true because Plaintiff has never contended Officer Adgar targeted him. Therefore, it is immaterial whether Plaintiff took any actions to make himself a proper target of such force. Because Officer Adgar was acting under orders to target individuals throwing bottles, *see* O.B. at 7–8, he naturally relies on the actions of the individuals throwing bottles to justify the level of force used.

Plaintiff also faults Appellant for not discussing *Sanderlin v. Dwyer*, 116 F.4th 905 (9th Cir. 2024), which Plaintiff characterizes as "the most on-point Ninth Circuit case." A.B. at 38. But *Sanderlin* did not involve the accidental shooting of an innocent bystander, as this case does. Instead, in *Sanderlin*, there was video evidence in which "[the officer] can be heard yelling to [the plaintiff], 'I'm going to hit you, dude. You better move!' [The plaintiff] fails to immediately comply, continuing to stand in the sidewalk holding his sign over his head. After only a few seconds, [the officer] fires a 40mm foam baton at Sanderlin, striking him in the groin area." 116 F.4th at 909. The officer in *Sanderlin* targeted that plaintiff. The

case has no bearing here because Plaintiff has never contended he was the target of Officer Adgar's use of force.

Finally, each of Plaintiff's attempt to distinguish *Puente* from his case fails. First, Plaintiff attempts to distinguish *Puente* procedurally because it was an appeal from a summary judgment motion, not from a jury verdict, and thus lacked "all of the deference to the jury's findings that go with [a verdict]." A.B. at 38. While appellate courts do afford deference to the jury's findings of fact, Plaintiff overstates its effect on the actual legal standard.

The Supreme Court has admonished that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves*, 530 U.S. at 150. Thus, under both standards, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* Accordingly, there is no reason to believe the *Puente* panel's analysis would have been different if it had arisen in the context of a Rule 50 motion.

Plaintiff also argues that *Puente* is different because "the [*Puente*] officers issued multiple warnings to the protestors not to throw objects and to remain peaceful." A.B. at 40. While the panel did mention this in its detailed factual background, 123 F.4th at 1045, the fact did not appear anywhere in the panel's

discussion of the plaintiffs' excessive force claims. This is unsurprising, as there is no authority to Appellant's knowledge holding that officers must say "obey the law" or "don't attack us" before they may properly respond with force when attacked. There is no reason to think the officers' admonitions to follow the law were material to the panel's analysis.

Plaintiff also argues "the officers in *Puente* did not indiscriminately fire into [the] crowd[,] even when the agitators mixed with peaceful protestors." A.B. at 41. However, the officers in *Puente* apparently engaged in exactly the kind of conduct that Plaintiff characterizes in this case as firing indiscriminately into a crowd. In *Puente*, "[a]fter taking her photos, [plaintiff] Travis turned and began to slowly walk away from the police line, at which point police fired a weapon toward her at close range…." *Puente*, 123 F.4th at 1059. There was no contention that Travis posed any threat of violence, but she was "between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers." *Id.*

Like Plaintiff, Travis was not doing anything that warranted the use of intermediate force against her as an individual. She simply had the misfortune of being in a crowd that included some people whose conduct did warrant the use of intermediate force. This is exactly the kind of conduct that Plaintiff attempts to

characterize in this case as "firing indiscriminately into a crowd." Nonetheless, the *Puente* panel found the force used against Travis reasonable as a matter of law, noting that Travis's position between the officers and the wrongdoers "does not diminish the [officers'] strong interests in addressing the lawlessness behind her." *Id*. *Puente* is simply not distinguishable on those grounds.

Finally, Plaintiff contends the officers in *Puente* used "chemical—not impact—weapons" against the plaintiffs in that case, A.B. at 41, while Officer Adgar used a "projectile <u>impact</u> weapon[]," A.B. at 39 (emphasis in original). This argument fails because the pepper balls used in *Puente* and *Nelson were* projectile impact weapons. The foam baton rounds discharged by Officer Adgar's 40mm PIW "can travel at speeds of 240-260 feet per second," A.B. at 14–15, while "[pepperball] rounds are fired at a velocity of 350 to 380 feet per second," *Nelson*, 685 F.3d at 873. "They break open on impact and release OC powder into the air, which has an effect similar to mace or pepper spray. Pepperballs therefore *combine* the *kinetic impact of a projectile* with the *sensory discomfort of pepper spray*." *Id*. (emphasis added). The distinction between pepperballs and foam batons makes no difference to the constitutional use of force analysis. Both are an intermediate level of force.

**D.    The reasonableness of Officer Adgar's actions is further established by the admissions of Plaintiff's own police practices expert.**

As noted in Appellant's Opening Brief, Plaintiff's police practices expert, Roger Clark, confirmed that an officer would be justified in responding with intermediate force to individuals throwing water bottles. O.B. at 18–19. That is what Officer Adgar was instructed to do and precisely what he did. Plaintiff attempts to avoid his own expert's testimony by arguing that (1) Clark was responding to an incomplete hypothetical, and (2) the question referred to the use of intermediate force without specifying what that intermediate force would entail. A.B. at 42–43; *id.* at 39–40 (arguing that not all intermediate force is the same). With respect to Plaintiff's first argument, that Clark was responding to an incomplete hypothetical, Clark had the opportunity to respond with "it depends" or some answer indicating additional facts would be necessary to determine the propriety of force. Instead, he responded with an unqualified agreement that intermediate force would be appropriate in response to an individual throwing water bottles.

With respect to Plaintiff's second argument, Appellant agrees that the term intermediate force can refer to various levels and types of force. But when Clark's response is considered in context, it is unmistakably clear that he understood "intermediate force" to be a shorthand for the level of force used by Officer Adgar

in this case. Clark testified on direct examination that the 40mm PIW is intended to be used on a specific person who poses a "credible threat." FER-4:9–20. He also testified that the reason Officer Adgar's use of the PIW against Plaintiff was improper is that "[Plaintiff] was not a credible threat." SER-76:21–77:14.On cross-examination, Clark confirmed that his use of the term "credible threat" meant "the impetus for an officer to use an intermediate level of force." 1-ER-337:13–16. Thus, in the context of Clark's overall testimony, it was clear that he was referring to Officer Adgar's use of the PIW when he opined that intermediate force would be an appropriate response to someone throwing bottles. *Accord* SER-80:14–81:3 (Roger Clark opining that Officer Adgar's use of the PIW was not appropriate because there was no "credible threat," such as "anyone ready to throw anything").

Roger Clark's opinion, however, on whether Officer Adgar's use of the PIW was appropriate was immaterial insofar as it assumed Plaintiff was the target of Officer Adgar's use of force, since no evidence was ever introduced to support that factual predicate. *See* 1-ER-336:15–0337:11; *see also* SER-77:23–78:7 (opining that Officer Adgar's use of the PIW was not consistent with POST standards because Plaintiff was not resistive, assaultive, combative, or threatening).

**III. Even if Plaintiff's excessive force claim could survive the first prong of the qualified immunity analysis, the lack of any clearly established law governing the situation faced by Officer Adgar is fatal to Plaintiff's § 1983 claim.**

    **A.** ***Puente*'s holdings as to what rights *Nelson* did and did not clearly establish are not "subsequent developments in the law" within the meaning of *Sanderlin*; they can properly be considered in the second prong of the qualified immunity analysis and are squarely on point.**

Plaintiff argues that, in light of *Sanderlin*, this Court should not consider

*Puente* under the second prong of the qualified immunity analysis. A.B. at 32-33.

This argument misunderstands the role that *Puente*'s analysis played in Appellant's

Opening Brief. In *Sanderlin*, the Court held that, "in assessing an officer's claim of

qualified immunity, decisions post-dating the incident may elucidate whether the

officer has committed a constitutional violation at all—if there is no violation, then

there is no liability. But if there is a violation, the officer cannot take advantage of

subsequent developments in the law to argue that the right was not clearly

established at the time he committed the violation." 116 F.4th at 916–17.

In discussing the first prong of the qualified immunity analysis in his opening

brief, Appellant did indeed rely on the substantive Fourth Amendment analysis in

*Puente*, which is explicitly authorized by *Sanderlin*. When turning to the second

prong of qualified immunity, however, Appellant relied *only* on the parts of *Puente*

that discussed the second prong of the qualified immunity analysis. Specifically,

Appellant relied on *Puente*'s discussion of what *Nelson* did and did not clearly establish as a matter of law. *See* O.B. at 28–31.

This reliance is appropriate under *Sanderlin* because the very focus of that analysis was determining the state of the law in August 22, 2017, the date when the incident in *Puente* took place. Because the *Puente* panel's "clearly established law" analysis was fundamentally backward looking, it does not—as Plaintiff claims— constitute a "subsequent development[] in the law" within the meaning of *Sanderlin*. Rather, it is authority that is directly on point for determining what factual scenarios are sufficiently similar to *Nelson* to fall within the clearly established law of that case.

To the extent any doubt remains as to the propriety of considering *Puente*'s "clearly established law" analysis here, it bears noting that the *Reese* panel did something exactly analogous. *See Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). In determining whether the law governing the situation in *Reese* was clearly established, the panel looked to an intervening Supreme Court decision in *Kisela v. Hughes*, 584 U.S. 100 (2018), relating to the second prong of the qualified immunity analysis. Noting that the Supreme Court found *Kisela* to be "far from an obvious case," the *Reese* panel concluded that if *Kisela* was far from obvious, then so was the case before it. *Reese*, 888 F.3d at 1040.

**B.** **Contrary to Plaintiff's assertion, on the second prong of qualified immunity Officer Adgar is allowed to rely on high-level generalities because it is not his burden to show that the legality of his conduct was clearly established; it is Plaintiff's burden to show the illegality of his actions was clearly established, which does require defining the right at a particularized level.**

Plaintiff argues that Appellant cannot rely on high-level generalities in his "clearly established law" analysis. A.B. at 35 ("It is unhelpful to this Court's analysis for Adgar to use generalized terms—'violent behavior,' 'threat to public,' 'protest turned violent'—that do not identify in a particularized fashion what he faced on May 30th that justified his use of force."). Plaintiff's only proposed reason for this is that plaintiffs cannot define rights at a high level of generality, so defendants should not be able to so either. *Id.* This argument fundamentally misunderstands the nature of qualified immunity and threatens to turn the entire doctrine on its head.

The reason Officer Adgar can rely on high-level generalities—in the absence of any clearly established exception—derives from the very nature of qualified immunity itself. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To effectuate this protection, the burden is on a plaintiff seeking monetary damages to show that

illegality of the official's conduct was clearly established at the time the official acted. The prohibition on defining rights at a high level of generality prevents would-be plaintiffs from conducting an end-run around the protections of qualified immunity.

On the other hand, an official who relies on a high-level generalization to establish the legality of his conduct is simply enjoying the "breathing room" that qualified immunity provides. Such an official need not show that the legality of his conduct was "clearly established" at the time; rather the burden remains on the plaintiff to show that the illegality of his actions was clearly established. In short, it is wholly consistent with the principle of qualified immunity for Appellant to rely on high-level generalities on the second prong of the qualified immunity analysis, and for Plaintiff to bear the burden of showing the inapplicability of those generalities to the situation he faced.

## IV. Plaintiff's position on the existence of a "clearly delineated and plainly applicable" right relies on a fundamentally mistaken characterization of the law governing Bane Act claims.

Citing only to a district court decision, Plaintiff argues that "[t]he clearly delineated and plainly applicable standard [under the Bane Act] is nowhere as exacting as the clearly established law requirement under § 1983," A.B. at 56, then asserts the standard is met because "'[a]t a broad level of generality, it is of course

indisputable that the right to be free from [excessive force] is well-established and clearly delineated,'" *id.* (quoting *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018)).

Simply providing the full quote from *Sandoval* is enough to rebut this argument in its entirety:

> We conclude that the plaintiffs' right was not clearly delineated and plainly applicable in this case. At a broad level of generality, it is of course indisputable that the right to be free from warrantless seizures of personal property is well-established and clearly delineated. But the California Court of Appeal has indicated that we must look to whether there is anything vague or novel about the application of the right under the circumstances of this case. Under the circumstances of this case, it was legally unclear whether the 30-day impounds were 'seizures' at all within the meaning of the Fourth Amendment until we issued our decision in *Brewster* in 2017. The plaintiffs' vehicles were impounded in 2011, well before this date, and at that point the County and City could not have had the requisite specific intent to violate the plaintiffs' Fourth Amendment rights.

912 F.3d at 520 (internal quotation marks, alterations, citations omitted).

As the original quote makes clear, Plaintiff's attempt to minimize the "clearly delineated and plainly applicable" requirement into oblivion contravenes the requirements of the statute. To the extent the right in *Nelson* could even be considered applicable in this case, it would clearly be a novel application of that right. For instance, in *Nelson*, not a single member of the group targeted by the officers was engaging in any violent behavior and the officers were using their PIWs

28

for the express purpose of crowd dispersal. *Nelson*, 685 F.3d at 874 ("[N]o one from Nelson's group threw bottles at the police.... Wilson ordered his team to 'disperse them,' at which point Barragan, Chang and Garcia shot pepperballs towards Nelson's group."). In contrast, by Plaintiff's own admission, this case involves a situation where Plaintiff was part of a crowd that included individuals engaging in violent behavior, and the officers were responding to those acts of violence when they deployed their PIWs. *See* A.B. at 14 ("[P]eople in the crowd threw a second volley of objects—again, primarily water bottles—at the officers.... As before, the officers, including Adgar, responded by firing their PIWs into the crowd."). And rather than acting under orders to disperse the crowd with his PIW, as in *Nelson*, Officer Adgar was acting under orders to target individuals engaging in violent behavior. O.B. at 7-8. These differences alone make the right claimed by Plaintiff a novel application of any right that might have been established by *Nelson*.

## Conclusion

The judgment in favor of Plaintiff on his § 1983 and Bane Act claims should be reversed and the award of attorney's fees should be vacated.

Respectfully submitted,

SUSANA ALCALA WOOD, City Attorney

Dated:  March 30, 2026                    By:  */s/ Brian Eggleston*
                                                  BRIAN EGGLESTON
                                                  Sr. Deputy City Attorney

Attorneys for Defendant-Appellant

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-1392 and 25-5468 Consolidated

I am the attorney or self-represented party.

This brief contains 6,884 words**,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature /s/ Brian Eggleston       Date: March 30, 2026